# EXHIBIT 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **TQ DELTA, LLC,** | |
| *Plaintiff*, | |
| v. | **CIV. A. NO. 2:21-CV-310-JRG** |
| | (Lead Case) |
| **COMMSCOPE HOLDING COMPANY, INC., COMMSCOPE INC., ARRIS INTERNATIONAL LIMITED, ARRIS GLOBAL LTD., ARRIS US HOLDINGS, INC., ARRIS SOLUTIONS, INC., ARRIS TECHNOLOGY, INC., and ARRIS ENTERPRISES, LLC,** | |
| *Defendants*. | |

| | |
|---|---|
| **TQ DELTA, LLC,** | |
| *Plaintiff*, | |
| v. | **CIV. A. NO. 2:21-CV-309-JRG** |
| | (Member Case) |
| **NOKIA CORP., NOKIA SOLUTIONS AND NETWORKS OY, and NOKIA OF AMERICA CORP.,** | |
| *Defendants*. | |

| |
|---|
| **NOKIA OF AMERICA CORP.,** |
| *Third-Party Plaintiff*, |
| v. |
| **BROADCOM CORP., BROADCOM INC., and AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LTD.,** |
| *Third-Party Defendants*. |

### DECLARATION OF RICHARD D. WESEL, PH.D.
### REGARDING CLAIM CONSTRUCTION

# TABLE OF CONTENTS

I.      Introduction ................................................................................................. 1

II.     Qualifications ............................................................................................... 2

III.    Scope of Opinions ........................................................................................ 4

IV.     Legal Standards Relied Upon ...................................................................... 4

V.      Background ................................................................................................... 5

        A.     Family 3 Patents ................................................................................. 5

        B.     Certain Family 9 Patents .................................................................... 6

VI.     Level of Ordinary Skill in the Art ............................................................... 9

VII.    Disputed Claim Terms ............................................................................... 10

        A.     Family 3 Patents ............................................................................... 10

               1.     "shared memory" / "sharing the memory" / "operable to be
                      shared" / "sharing" ................................................................. 10

               2.     "wherein the generated message indicates how the memory
                      has been allocated between the [first deinterleaving /
                      interleaving] function and the [second] deinterleaving
                      function" / "a message indicating how the shared memory
                      is to be used by the interleaver or the deinterleaver" ............... 13

        B.     Certain Family 9 Patents .................................................................. 15

               1.     "wherein the transceiver is operable to receive at least one
                      retransmitted packet using interleaving" ................................. 15

               2.     "wherein the instructions further cause the transceiver to
                      retransmit the packet using forward error correction
                      decoding and deinterleaving." ................................................. 15

               3.     "receive at least one message without using interleaving" ....... 16

               4.     "higher immunity to noise" ..................................................... 19

## I.     INTRODUCTION

1.      My name is Richard D. Wesel, Ph.D., and I have been retained as a technical expert by counsel for Defendants Nokia of America Corporation, Nokia Corporation, Nokia Solutions and Networks Oy (collectively, "Nokia") and CommScope Holding Company, Inc., CommScope Inc., ARRIS US Holdings, Inc., ARRIS Solutions, Inc., ARRIS Technology, Inc., and ARRIS Enterprises, LLC (collectively, "CommScope") (together, "Defendants") to address certain issues concerning U.S. Patent No. 7,844,882 (the "'882 Patent"), U.S. Patent No. 8,276,048 (the "'048 Patent"), U.S. Patent No. 8,495,473 (the "'5473 Patent"), U.S. Patent No. 9,547,608 (the "'608 Patent"), and U.S. Patent No. 10,409,510 (the "'510 Patent") (collectively, "Family 3 Patents"), as well as U.S. Patent No. 8,595,577 (the "'577 Patent"), U.S. Patent No. 9,904,348 (the "'348 Patent"), U.S. Patent No. 9,485,055 (the "'055 Patent"), U.S. Patent No. 10,044,473 (the "'4473 Patent"), U.S. Patent No. 10,833,809 (the "'809 Patent"), and U.S. Patent No. 8,468,411 (the "'411 Patent") (collectively, "Family 9 Patents"), which have been asserted by TQ Delta, LLC ("Plaintiff" or "TQ Delta"). Unless otherwise stated, the matters contained in this declaration are of my own personal knowledge and, if called as a witness, I could and would testify competently and truthfully with regard to the matters set forth herein.

2.      My opinions are based on my years of education, research and experience, as well as my investigation and study of relevant materials. A list of materials considered is included in **Exhibit A** to my declaration.

3.      I may rely on these materials, my knowledge and experience, and/or additional materials, documents, and information in forming any opinions in this Action, including but not limited to opinions to rebut arguments raised by Plaintiff. I reserve all rights that I may have to supplement this declaration if further information becomes available or if I am asked to consider

1

additional information. Furthermore, I reserve all rights that I may have to consider and comment on any additional expert statements or testimony of Plaintiff's experts in this matter.

4.      My analysis of materials relevant to this Action is ongoing, and I may continue to review new material as it becomes available. This declaration represents only those opinions I have formed to date. I reserve the right to revise, supplement, and/or amend my opinions stated herein based on new information and on my continuing analysis of the materials already provided. I also reserve the right to create exhibits to use in Court if called upon to testify.

5.      I am being compensated at my usual consulting rate of $600 per hour for my time spent working on issues in this case. My compensation does not depend upon the outcome of this matter or the opinions I express.

## II.      QUALIFICATIONS

6.      I have summarized in this section my educational background, work experience, and other relevant qualifications. A true and accurate copy of my curriculum vitae is attached as **Exhibit B** to this declaration.

7.      I have over 30 years of experience in communications and signal processing. I am a professor in the Electrical and Computer Engineering Department of UCLA as well as the Associate Dean for Academic and Student Affairs of the Henry Samueli School of Engineering and Applied Science. After receiving bachelors and master's degrees in Electrical Engineering from MIT in 1989, I worked at AT&T Bell Laboratories from 1989 to 1991 as a Member of Technical Staff performing research and development in telecommunications. I attended Stanford University from 1991 to 1996, receiving my Ph.D. in Electrical Engineering in 1996. Upon receiving my Ph.D. I joined the faculty of the UCLA Electrical Engineering Department, where I have been teaching and doing research on communications and signal processing for the last 24

years.

8.      I have extensive experience researching and teaching communications techniques including multi-carrier modulation, interleaving, and error control coding in general as well as Reed-Solomon coding in particular. My publications and patents are listed in my curriculum vitae . I have published over 200 conference and journal publications, and I am the inventor on nine patents. I have received the National Science Foundation (NSF) CAREER Award and an Okawa Foundation award for research in information theory and telecommunications. I am a Fellow of the Institute of Electrical and Electronics Engineers (IEEE). I previously served as an Associate Editor for Coding and Coded Modulation for the IEEE Transactions on Communications. I currently serve as an Associate Editor for Coding and Decoding for the IEEE Transactions on Information Theory.

9.      I authored an Asilomar conference paper in 1995 entitled "Fundamentals of Coding for Broadcast OFDM" that discusses techniques for designing coding and modulation for multicarrier transmission with interleaving. My 1996 Ph.D. dissertation included the design of trellis codes for multicarrier transmission with interleaving. In a 1999 Communications Letter, I presented related results on trellis codes for multicarrier transmission with interleaving. In a 2000 IEEE Transactions on Communications paper, I compared the performance of these new codes to Reed-Solomon codes used on multicarrier transmission with interleaving. I also authored several conference papers in the late 1990's related to coding for multicarrier transmission with interleaving including "Joint Interleaver and Trellis Code Design," "Periodic Symbol Puncturing of Trellis Codes," and "Trellis Codes for Compound Periodic Gaussian Channels."

10.     I authored the chapter entitled "Error Control" in the book Wireless Multimedia Communications: Networking Video, Voice, and Data in 1997, which discussed the concepts of

Reed-Solomon codes and interleaving. This book also discusses multicarrier modulation in Section 3.4 and Section 5.2.

11.     I am an inventor on U.S. Patent No. 6,125,150 entitled "Transmission System using Code Designed for Transmission with Periodic Interleaving," which discloses, among other things, error control techniques for multicarrier transmission with interleaving. I am also an inventor on U.S. Patent No. 6,158,041 filed in October 1998 entitled "System and method for I/Q Trellis Coded Modulation" which also describes, among other things, error correction coding techniques for multicarrier transmissions using interleaving.

12.     A complete list of cases in which I have testified at trial, hearing, or by deposition within the preceding five years is attached as **Exhibit C** to my declaration.

13.     Based on my education and experience, I believe I am qualified to render the opinions set forth here.

## III.     SCOPE OF OPINIONS

14.     I have been asked to provide opinions regarding the meaning of certain disputed claim terms as understood by one of ordinary skill at the time of the claimed inventions. My opinions are based on my understanding of the disputed claim terms and proposed construction and the evidence relied upon by the parties.

## IV.     LEGAL STANDARDS RELIED UPON

15.     Certain legal principles that relate to my opinions have been explained to me by counsel.

16.     I understand that ultimately the Court will determine how specific terms shall be construed. The intent of this declaration is to help inform the Court how a person of ordinary skill in the art would have understood the meaning of certain disputed claim terms at the time of the

claimed inventions in the context of the Asserted Patents' claims, specifications, and prosecution histories in a manner that will assist the Court in the process of construing the claims. I understand that patent claims are generally given the meaning that the terms would have to a person of ordinary skill in the art in question as of the earliest claimed priority date. It is my understanding that a patentee can act as its own lexicographer by defining a term, in the patent specification, to have specific meaning. It is my understanding that statements made to the patent office by the patentee or its legal representative during prosecution can serve to illuminate, or possibly narrow the proper scope of claim terms, and that such statements must be considered when construing the claim terms. This is sometimes referred to as disclaimer. I have taken into account these principles in my analysis.

17.    I understand that a claim is indefinite if, when read in light of the specification and its prosecution history, the claim fails to inform, with reasonable certainty, those skilled in the art about the scope of the claimed invention.

18.    I understand that a patent may include both independent and dependent claims. I understand that a claim in dependent form must contain reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form must be construed to incorporate by reference all the limitations of the claim on which it depends.

## V.    BACKGROUND

### A.    Family 3 Patents

19.    I have been asked to provide opinions regarding the meaning of certain claim terms in the '882 Patent, '048 Patent, '5473 Patent, '608 Patent, and the '510 Patent.

20.    Each of the Family 3 Patents is titled "Resource sharing in a telecommunications environment."

21.     I understand that TQ Delta has asserted the following claims and priority dates:

| Patent | Asserted Claims | Asserted Priority Date |
|--------|-----------------|------------------------|
| '882 Patent | 9, 13, 14, 15 | October 12, 2004 |
| '048 Patent | 1, 5, 6, 7 | October 12, 2004 |
| '5473 Patent | 10, 28, 36 | October 12, 2004 |
| '608 Patent | 2, 3, 4 | October 12, 2004 |
| '510 Patent | 21, 22, 23 | October 12, 2004 |

22.     I have been asked to assume the applicability of the priority dates for these patents as detailed above and have therefore analyzed the claim constructions and knowledge of one of ordinary skill for the patents as of those dates.

23.     In forming the opinions set forth in this declaration, I have reviewed the asserted Family 3 Patents, the relevant file histories, as well as the Provisional Application No. 60/618,269, the provisional application to which the Family 3 Patents claims priority.

24.     The Family 3 Patents, which share a common specification, are generally directed to sharing a common memory and allocating that common memory between an interleaver and a deinterleaver in digital subscriber line ("DSL") technology. *See* '882 Patent at Abstract. As an example, the '882 Patent admits that interleaving and Reed-Solomon coding were known in the prior art but that the memory requirements were burdensome. *Id.* at 1:49–55. Accordingly, the '882 Patent explains that "an exemplary aspect of this invention relates to sharing memory between one or more interleavers and/or deinterleavers in a transceiver." *Id.* at 1:56–58.

25.     With respect to the background of the invention, I reserve the right to respond to TQ Delta's expert's description should a more detailed description of memory allocation between an interleaver and deinterleaver become available.

**B.     Certain Family 9 Patents**

26.     I have been asked to provide opinions regarding the meaning of certain claim terms in the '577 Patent, '348 Patent, and the '809 Patent ("Certain Family 9 Patents").

6

27.     Each of the '577 and '348 Patents is titled "Packet retransmission." The '809 Patent is titled "Techniques for packet and message communication in a multicarrier transceiver environment."

28.     As to only the Certain Family 9 Patents, I understand that TQ Delta has asserted the following claims and priority dates:

| Patent | Asserted Claims | Asserted Priority Date |
|--------|-----------------|------------------------|
| '577 Patent | 16, 17, 18, 30, 31, 32, 37, 38, 39, 44, 53, 54, 55, 60 | April 12, 2006 |
| '348 Patent | 1, 2, 3, 4, 9, 10, 11, 12 | April 12, 2006 |
| '809 Patent | 1, 2, 3, 4, 6, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 20, 22, 23, 24, 25, 27 | April 12, 2006 |

29.     I have been asked to assume the applicability of the priority dates for these patents as detailed above and have therefore analyzed the claim constructions and knowledge of one of ordinary skill for the patents as of those dates.

30.     The Certain Family 9 Patents share a common specification. For the purposes of this Background section, I use the '348 as the representative patent of the Certain Family 9 Patents. I will now describe the '348 Patent below.

31.     Entitled "Packet Retransmission," the '348 Patent issued on July 28, 2015. *See* '348 Patent, Front Page. I understand that the U.S. Non-Provisional Patent application that was eventually granted as the '348 Patent was U.S. Non-Provisional Patent App. No. 14/075,194, entitled "Packet Retransmission" and filed November 08, 2013 with an earliest priority date of April 12, 2006. *Id*. More specifically, I understand the following:

•      U.S. Non-Provisional Patent App. No. 14/075,194 was a continuation of U.S. Non-Provisional Patent App. No. 12/760,728, entitled "Packet Retransmission," filed on April 15, 2010, and granted on November 26, 2013 as U.S. Patent No. 8,595,577. *Id*.

col. 1:05–18.

- U.S. Non-Provisional Patent App. No. 12/760,728 was a divisional of U.S. Non-Provisional Patent App. No. 12/295,828, entitled "Packet Retransmission and Memory Sharing," filed on October 02, 2008, and granted on December 18, 2012 as U.S. Patent No. 8,335,956. *Id*.

- U.S. Non-Provisional Patent App. No. 12/295,828 was a national stage entry of P.C.T. International Patent App. No. PCT/US2007/066522, entitled "Packet Retransmission and Memory Sharing," filed on December 04, 2007, and claiming priority to U.S. Provisional Patent App. Nos. 60/849,650 and 60/792,236, filed October 05, 2006 and April 12, 2006, respectively. *Id*.

32.    For purposes of this Declaration, I use April 12, 2006 as the priority date of the '348 Patent. The materials I have considered predate the Certain Family 9 Patents' priority date.

33.    The '348 Patent generally relates to pre-existing telecommunications technologies and noise mitigation techniques, including error correction coding (also referred to as forward error correction (FEC) coding), error detection coding, interleaving, and retransmission. The specification identifies the field of the invention as "retransmission of packets in a communication environment" and "memory sharing between transmission functions and other transceiver functions." *Id*. at 1:24–29.  It further explains that the transceiver operates using "well known componentry" for DSL systems.  *Id.* at 9:59–10:5.

34.    Retransmission is a well-known technique where the transmitter retains the transmitted information to await a feedback message from the receiver. If the message indicates unsuccessful reception (a negative acknowledgement or NACK), the transmitter will transmit the information again. If the message indicates successful reception (an acknowledgement or ACK),

retransmission will not be needed and the transmitted information no longer needs to be retained.

35.     Retransmission can be used in conjunction with the techniques of error detection coding, error correction coding, and interleaving/deinterleaving. With well-known error detection coding such as a Cyclic Redundancy Check (CRC) code, an error detection encoder at the transmitter converts a sequence of input data symbols into a longer sequence of codeword symbols, for example by appending CRC bits or symbols to the input sequence. Then, an error detection decoder at the receiver can detect the presence of errored symbols, for example when the received CRC is not consistent with the input sequence to which it is appended. At the receiver, the results of the error detection decoder can be used, for example, to decide whether to send an ACK or a NACK.

36.     With well-known error correction encoding such as Reed-Solomon encoding, an error correction encoder at the transmitter converts a sequence of input data symbols into a longer sequence of codeword symbols, for example by appending Reed-Solomon parity symbols to the input sequence. Then, an error correction decoder at the receiver can correct up to a certain number of errored symbols based on the special structure imposed by the error correction code. With the well-known technique of interleaving/deinterleaving, an interleaver at the transmitter rearranges the order of the symbols to spread out the symbols of each codeword across the sequence of transmitted symbols. A deinterleaver at the receiver returns the symbols to their original pre-interleaving order so that they can be properly understood by the error correction and/or error detection decoders. Interleaving/deinterleaving is beneficial in combating bursts of errors in the channel by distributing the errored symbols to multiple error correction codewords.

## VI.     LEVEL OF ORDINARY SKILL IN THE ART

37.     I have been asked to offer my opinion regarding the level of ordinary skill in the art

with respect to each of the Asserted Patents.

38.     In my opinion, with regard to the Family 3 Patents, a person of ordinary skill in the art ("POSITA") would have had at least a Bachelor's degree in electrical engineering, or a related field, and at least 6–7 years of experience in telecommunications or a related field; a master's degree in electrical or computer engineering, or the equivalent, and at least 4–5 years of experience in telecommunications or a related field; or a Ph.D. in electrical or computer engineering, or the equivalent, with at least 1–2 years of experience in telecommunications or a related field. As of the time of the invention of the various patents, I qualify as a person of ordinary skill in the art.

39.     With regard to the Certain Family 9 Patents, a POSITA would have had a bachelor's degree in electrical or computer engineering (or a similar field) and 3-5 years of experience in communications systems. A higher degree (such as a master's or doctoral degree) in electrical or computer engineering could substitute for work experience; for example, a person with a master's degree in electrical engineering with 1-2 years of experience in communications systems would also qualify as a POSITA. As of the time of the invention of the various patents, I qualify as a person of ordinary skill in the art.

## VII.     DISPUTED CLAIM TERMS

40.     I have been asked to provide opinions as to the terms and issues identified below and the claims associated with those terms.

### A.     Family 3 Patents

**1.     "shared memory" / "sharing the memory" / "operable to be shared" / "sharing"**

| Claim(s) | Plaintiff's Position | Defendants' Position |
|---|---|---|
| '882 Patent, Claims 9, 13<br><br>'048 Patent, Claims 1, 5 | "common memory used by at least two functions, where a portion of the memory can be used by either one of the functions" | Plain and ordinary meaning |

| '5473 Patent, Claims 10 | | |
|---|---|---|
| '510 Patent, Claims 21, 22 | | |
| '608 Patent, Claim 2 | | |

41.     I understand that the parties dispute the construction of "shared memory" / "sharing the memory" / "operable to be shared" / "sharing" (collectively, the "shared memory" limitation), which appears in the above-listed claims of the '882 Patent, the '048 Patent, the '5473 Patent, the '510 Patent, and the '608 Patent. I understand that the Plaintiff contends that this term be construed to mean "common memory used by at least two functions, where a portion of the memory can be used by either one of the functions." I understand that the Defendants contend that these terms should be afforded their plain and ordinary meaning. Having considered the parties' positions, I agree with Defendants' interpretation.

42.     It is my opinion that the shared memory limitation should not be narrowed to mean "common memory used by at least two functions, where a portion of the memory can be used by either one of the functions" as proposed by the Plaintiff. As an initial matter, persons of ordinary skill in the art at the time of the invention would have known, without the benefit of a construction, what a "shared memory" is. The construction as proposed by Plaintiff injects unnecessary confusion into a term that was well known in the art. Indeed, shared memory is a well-known concept known well before the priority date of the Family 3 Patents. For example, during prosecution of each of the Family 3 Patents, the Examiner considered and addressed U.S. Patent No. 6,707,822 to Fadavi-Ardekani, et al., which was filed on January 7, 2000 and issued as a U.S. Patent on March 16, 2004. As to the '882 Patent, the Examiner allowed the claims of the '882 Patent over Fadavi-Ardekani but explained that Fadavi-Ardekani "discloses sharing a memory

11

between the interleavers and deinterleavers." '882 File History, Notice of Allowance dated October 6, 2010. It thus makes little sense to define a term that was well known by persons of ordinary skill in the art.

43.     Additionally, Plaintiff's construction appears to narrow the term "shared memory" to exclude certain embodiments that a POSITA would have recognized to be a shared memory. With random access memories (RAMs), for example, the location where bytes or words of memory are written or read is provided to an address register, and functions are often allocated memory space by assigning to the function a range of addresses. In these circumstances, it might be that multiple functions share the RAM but input addresses into the register and are assigned so that the functions use the memory space without ever using the same portion of memory even though the functionality of the RAM makes it possible and easy for multiple functions to use the same portion of memory. In cases like this, it would be unclear whether, under Plaintiff's construction that requires that "a portion of the memory can be used by either one of the functions," such a memory would meet those requirements.

44.     As another example, in digital signal processing chips (DSPs), numerous functions access a single memory resource. Those numerous functions share the same memory regardless of whether memory locations are used to support multiple functions or not. A POSITA would have known that these functions share the common memory of the DSP even though the POSITA may not have immediately known whether the DSP was programmed so that multiple functions actually access the same location in the common memory. Here again, it is unclear whether "a portion of the memory can be used by either one of the functions," even though a POSITA would have recognized that the memory is shared.

45.     With both of these examples, multiple functions share a memory whether or not a

portion of memory is used by more than one function. Whether to use the same location of memory for multiple functions is a choice that a person of ordinary skill in the art makes about how to use a shared memory rather than a defining characteristic of a shared memory. The plaintiff's construction leads to unnecessary confusion as to whether a portion of the memory can be used by either one of the functions. For example, when two functions share the same RAM, but the application only requires a one-time allocation of memory to each of the two functions, the fact that the shared memory is only allocated once does not change the fact that it is shared. As Plaintiff's proposed construction merely causes confusion where none previously existed, shared memory should be construed as its plain and ordinary meaning.

> **2.** **"wherein the generated message indicates how the memory has been allocated between the [first deinterleaving / interleaving] function and the [second] deinterleaving function" / "a message indicating how the shared memory is to be used by the interleaver or the deinterleaver"**

| Claim(s) | Plaintiff's Position | Defendants' Position |
|---|---|---|
| '5473 Patent, Claims 10, 28 | Plain and ordinary meaning. | Plain and ordinary meaning, which is that the message indicates the amount of memory [that has been allocated to / is to be used by] the [first deinterleaving / interleaving] function and the amount of memory [that has been allocated to / is to be used by] the [second] deinterleaving function |

46.    I understand that the parties dispute the construction of "wherein the generated message indicates how the memory has been allocated between the [first deinterleaving / interleaving] function and the [second] deinterleaving function" and "a message indicating how the shared memory is to be used by the interleaver or the deinterleaver," which is in the above-listed claims of the '5473 Patent. I understand that the Plaintiff contends that this term should be afforded its plain and ordinary meaning, while Defendants contend that this term should be

13

afforded its plain and ordinary meaning as well, which is that the message indicates the amount of memory [that has been allocated to / is to be used by] the [first deinterleaving / interleaving] function and the amount of memory [that has been allocated to / is to be used by] the [second] deinterleaving function." Having considered the parties' positions, I agree with Defendants' interpretation and agree that their expression of the plain and ordinary meaning is correct.

47.      It is my opinion that the limitations "wherein the generated message indicates how the memory has been allocated between the [first deinterleaving / interleaving] function and the [second] deinterleaving function" and "a message indicating how the shared memory is to be used by the interleaver or the deinterleaver" should be afforded their plain and ordinary meaning. When read in light of the specification and file history, the plain and ordinary meaning of those terms is "the message indicates the amount of memory [that has been allocated to / is to be used by] the [first deinterleaving / interleaving] function and the amount of memory [that has been allocated to / is to be used by] the [second] deinterleaving function."

48.      In my opinion, a person of ordinary skill in the art reading the limitation in the context of the claims would have read the term "indicates/indicating how" to mean indicating an amount of memory. For example, reading claim 10, it generally recites a transceiver with a shared memory, sharing that memory between an interleaver and deinterleaver, and, in a message, indicating how the shared memory is to be used. A person of ordinary skill in the art would have read "indicating how the shared memory is to be used" to mean indicating the amounts of memory that are to be used by the interleaver and deinterleaver. Likewise, reading claim 28, it recites that a portion of the memory may be allocated to the interleaver and the deinterleaver, and a message that indicates how the memory has been allocated between the interleaver and deinterleaver. A POSITA would have read "indicates how the memory has been allocated" to mean indicates the

amount of memory that has been allocated. Therefore, a person of ordinary skill in the art, reading the language in the context of the claims, would have understood that the plain and ordinary meaning of indicating how the shared memory is to be used would be indicating an amount of memory to be used.

49.     Reading the specification, I do not believe there is any other logical conclusion. A person of ordinary skill in the art would read the specification and would find no examples of *how* memory is used beyond an indication of the amount of memory that is used. For example, the specification provides three examples of the contemplated invention. In the first example, the memory is referenced in relation to allocating "16 Kbytes of interleaver memory," allocating "4 Kbytes of interleaver memory" and sharing a "memory space containing at least (16–4)=20 Kbytes." '882 Patent at 6:24–67. In the second example, the memory is referenced in relation to "4 Kbytes of interleaver memory" and a "memory space containing at least 3*4=12 Kbytes." *Id.* at 7:10–28. In the third example, the memory is referenced in relation to "10 Kbytes of interleaver memory" resulting in "20K of shared memory." *Id.* at 7:29–49.

### B.    Certain Family 9 Patents

#### 1.    "wherein the transceiver is operable to receive at least one retransmitted packet using interleaving"

| Claim(s) | Plaintiff's Position | Defendants' Position |
|---|---|---|
| '577 Patent, Claims 17, 31 | No construction needed. | Indefinite |

#### 2.    "wherein the instructions further cause the transceiver to retransmit the packet using forward error correction decoding and deinterleaving."

| Claim(s) | Plaintiff's Position | Defendants' Position |
|---|---|---|
| '809 Patent, Claim 24 | No construction needed. | Indefinite |

### 3.     "receive at least one message without using interleaving"

| Claim(s) | Plaintiff's Position | Defendants' Position |
|---|---|---|
| '577 Patent, Claims 37, 53 | No construction needed. | Indefinite |

50.     I understand that the parties dispute the construction of the above-identified phrases in the above listed claims of the '577 and '809 Patents. I understand that the Plaintiff contends that each of the phrases requires no construction. Having considered the parties' positions, I agree with Defendants' interpretation that each of the phrases is indefinite. As I explain below, it is my opinion that a POSITA would not have understood what is meant by this term.

51.     As discussed above in the background, there are a variety of techniques that transceivers use to improve the reliability of data transmission, including error correction, error detection, retransmission, and interleaving/deinterleaving. For each of these techniques, there is a function or operation performed by the transmitter portion of the transceiver at one end of the connection and a corresponding but distinct function or operation performed by the receiver portion of the transceiver at the other end of the connection. The table below presents examples of the transmitter and receiver functions for examples of a variety of techniques.

| Technique | Transmitter operation | Receiver operation |
|---|---|---|
| Error correction Example: Reed-Solomon Coding | Encoder converts an input sequence of symbols into a longer sequence of coded symbols according to an error correction encoding rule. | Decoder finds the sequence of input symbols that is the best guess based on the (possibly corrupted) received sequence of coded symbols and the encoding rule. |
| Error Detection Example: Cyclic Redundancy Check Coding | Encoder converts a sequence of input symbols into a longer sequence of symbols according to an error detection encoding rule. | Decoder determines whether the (possibly corrupted) received sequence obeys the rule. If so, it validates the corresponding sequence of information data symbols. If not, it declares an |

16

| | | error. |
|---|---|---|
| Retransmission based on feedback | Retransmission at the transmitter retains the transmitted sequence to await feedback from the receiver. If the feedback indicates unsuccessful reception, transmit the sequence again. | Feedback from the receiver informs the transmitter whether or not the information data symbols have been received successfully. This is usually accomplished with error detection. |
| interleaving/deinterleaving | Interleaving rearranges the order of the symbols to spread out the symbols of each codeword. | Deinterleaving returns the symbols to their original pre-interleaving order so that they can be properly understood by the error correction and/or error detection decoders |

52.     With each of these techniques described above, it is well known that the operations performed at the transmitter portion of the transceiver at one end of the connection are distinct from the corresponding operations performed at the receiver portion of the transceiver at the other end of the connection. Encoding for error correction and/or error detection is performed only at the transmitter portion of the transceiver at the transmitting end of the connection and not at the receiver portion of the transceiver at the receiving end of the connection. Retaining and retransmitting is performed only at the transmitter and not in the receiver portion of the transceiver at the receiving end of the connection. Interleaving is performed only at the transmitter portion of the transceiver at the transmitting end of the connection and not in the receiver portion of the transceiver at the receiving end of the connection. Therefore, a person of ordinary skill in the art would find a claim element that instructs the receiver to receive a packet using interleaving, which is an operation performed only at the transmitter portion of the transceiver, to be meaningless and hence indefinite. Vice versa, a POSITA would likewise find a claim element that instructs the transmitter to transmit or retransmit a packet using forward error correction decoding and

deinterleaving, which are operations performed only at the receiver portion of the transceiver, to be meaningless and hence indefinite.

53.     The specifications of the '577 and '809 Patents support my opinion. Specifically, each of the '577 and '809 Patents recites:

> Moreover, while some of the exemplary embodiments described herein are directed toward **a transmitter portion of a transceiver performing interleaving and/or coding on transmitted information**, it should be appreciated that **a corresponding deinterleaving and/or decoding is performed by a receiving portion of a transceiver**. Thus, while perhaps not specifically illustrated in every example, this disclosure is intended to include this corresponding functionality in both the same transceiver and/or another transceiver.

'577 Patent, 9:38–46; '809 Patent, 9:66–10:07.

54.     The above-quoted text of the '577 and '809 Patents' specifications acknowledges that, with interleaving/deinterleaving, the interleaving function is performed at the transmitter portion of the transceiver at the transmitting end of the connection and the corresponding but distinct deinterleaving function is performed at the receiver portion of the transceiver at the receiving end of the connection. *See id*.

55.     Consequently, and in view of the remarks above, a POSITA would have had no reasonable way to ascertain a meaning of the disputed claim terms set forth in claims 17 and 31 of the '577 Patent and claim 24 of the '809 Patent. Specifically, claims 17 and 31 of the '577 Patent require that a receiver receive a packet using interleaving, which is an operation performed only at the transmitter portion of the transceiver. Likewise, claim 24 of the '809 Patent requires that a transmitter retransmit a packet using deinterleaving, which is an operation performed only at the receiver portion of the transceiver. For at least these reasons, it is my opinion that a POSITA would not know or understand what is meant by each of these phrases.

56.     For the same reasons explained above, it is my opinion that claims 37 and 53 of the '577 Patent are indefinite. Much as a POSITA would have been unable to ascertain the meaning

of receiving a packet using interleaving because interleaving is a function performed at the transmitter portion of the transmitter, the POSITA would likewise have been unable to ascertain the meaning of receiving a message without using interleaving, as the implication is that the function of interleaving could be used. Because the claim language is directed to the function of interleaving at a receiver portion, and because interleaving is a function used only at the transmitter portion of the transmitter, the claim language is unclear. As a result, I agree with Defendants' position that each of the claim terms is indefinite.

### 4.   **"higher immunity to noise"**

| Claim(s) | Plaintiff's Position | Defendants' Position |
|---|---|---|
| '348 Patent, Claims 2 and 9<br><br>'809 Patent, Claims 1, 9, 16, 23 | "higher SNR margin" | plain and ordinary meaning |

57.    I understand that the parties dispute the construction of the phrase "higher immunity to noise," which is in the above-referenced claims of the above-referenced patents. I also understand that the Plaintiff contends that the construction of this phrase is "higher SNR margin." Having considered the parties' positions, I agree with Defendants' interpretation. As I explain below, it is my opinion that a POSITA would have readily understood the term "higher immunity to noise" and would not have understood the term to be limited to only a "higher SNR margin."

58.    The disputed term I address in this section is directed to messages communicated as positive or negative acknowledgments of a received packet. *See, e.g.*, '809 Patent,14:60–16:67. A POSITA attempting to discern a definition of the disputed term would have looked to the specification.

59.    The '809 Patent's specification states explicitly, with regard to communication of

the positive and negative acknowledgement messages, that "it is important to make sure that these messages are as robust as possible and consume the least amount of data rate" because the channel used for their communication "**has a limited data rate and is not necessarily error-free**." *Id*. at 15:58–61 (emphasis added) (indicating that the positive and negative acknowledgments "can be transmitted over the same physical channel i.e., phone line, in the opposite direction as the received packets" and that "the channel has a limited data rate and is not necessarily error-free.").

60.     To that end, the '809 Patent's specification provides "several ways these requirements can be addressed." *Id*. at 15:65. These "several ways" include "repeating transmission of each message a number of times," sending at least one repeated message in one or more discrete multi-tone ("DMT") symbols, sending a single message for multiple packets "using multiple packet count values," increasing a margin of signal-to-noise ratio of the DMT sub-carriers used for modulating the messages above a 6 decibels ("dB"), or any combination thereof. *See id*. at 15:55–16:67.

61.     A POSITA reading the '809 Patent's specification, and in particular the above-cited portions, would have understood that each of the "ways" listed by the patent's inventive entity can be used alone or in combination with at least one of the other "ways." *See id*. at 15:65. Accordingly, a POSITA would have concluded that a message having a "higher immunity to noise" than another data unit can be achieved using one or more of "several ways" identified in the '809 Patent. In other words, the definition of this claim term is not limited to a single example disclosed in the specification.

62.     I note that the '809 Patent's specification states the following:

Alternatively, or in addition, the DMT sub-carriers that modulate these messages could operate with a much higher SNR margin e.g., 15 dB, as compared to the normal 6 dB margin of xDSL systems. This way, the messages would have a higher immunity to channel noise.

20

'809 Patent, 16:04–08.

63.     Even in view of the above-cited portion of the '809 Patent's specification, a POSITA would have known that each of the "several ways" listed by the patent's inventive entity, whether used alone or in combination with at least one of the other "ways," can result in "messages [that] would have a higher immunity to channel noise." *See id*. cols. 15:55–16:67. Reading the specification, it is clear to me that operating with a much higher SNR margin is merely one contemplated "way" of achieving a higher immunity to channel noise, and that there exists "several ways" of achieving the same goal.  *See, e.g.*, *id.* at 15:55–65.

64.     Consequently, it is my opinion that a POSITA would have concluded that the specification describes the term "higher immunity to noise" in an understandable manner that is not limited to "higher SNR margin," as proposed by the Plaintiff. Accordingly, and based on my analysis above, it is my opinion that Defendants' construction is correct.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of March, 2022.

*Richard D. Wesel*

Richard D. Wesel, Ph.D.