# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COTTMAN AVENUE PRP GROUP, <br> BALTIMORE GAS & ELECTRIC COMPANY, <br> CONSOLIDATED EDISON COMPANY <br> OF NEW YORK, INC., <br> JERSEY CENTRAL POWER & <br> LIGHT COMPANY, <br> LONG ISLAND LIGHTING COMPANY <br> d/b/a LIPA, <br> METROPOLITAN EDISON COMPANY, <br> ORANGE AND ROCKLAND UTILITIES, INC., <br> PECO ENERGY COMPANY, <br> POTOMAC ELECTRIC POWER COMPANY, <br> PPL ELECTRIC UTILITIES CORPORATION, <br> PUBLIC SERVICE ELECTRIC AND <br> GAS COMPANY, and <br> VIRGINIA ELECTRIC AND POWER <br> COMPANY, <br>              Plaintiffs, <br> <br> v. <br> <br> AMEC FOSTER WHEELER <br> ENVIRONMENTAL & <br> INFRASTRUCTURE INC., <br>              Defendant, <br> v. <br> HART CROWSER, INC. <br>              Third-Party Defendant. | Civil Action No.: 2:16-cv-06613-MSG |

## DEFENDANT AMEC FOSTER WHEELER ENVIRONMENT & INFRASTRUCTURE, INC.'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, Amec Foster Wheeler Environment & Infrastructure, Inc. (incorrectly named Amec Foster Wheeler Environmental & Infrastructure, Inc. and hereinafter "Amec"), by their undersigned counsel, files this Statement of Material Facts in Support of its Motion for Summary Judgment.

## The Project

1.      The Plaintiffs in this action are the Cottman Avenue PRP Group and the eleven utilities comprising it (collectively the "Plaintiffs" or the "PRPs"), who contributed hazardous substances to the Metal Bank Cottman Avenue National Priorities List Site in Philadelphia (the "Site"). Exhibit "A" (Complaint without exhibits1; ¶¶ 4-12).

2.      From approximately 1968 or 1969 until 1973, the Metal Bank of America, Inc. ("Metal Bank"), conducted transformer salvage operations at the Site, Specifically, Plaintiffs sold their used and discarded transformers and capacitors to Metal Bank, and oil containing PCBs and other contaminants were released into the environment during the salvage process. Exhibit "B" (Record of Decision); Exhibit "A" (Complaint, ¶19).

3.      "Between 1980 and 2006, the United States pursued judicial remedies against the owners and operators of the Site. The Utility PRPs were third-party defendants in the litigation." Exhibit "A" (Complaint, ¶ 25).

4.      In 1998, EPA issued an administrative order ("Administrative Order" or "AO") Requiring eight members of the PRPs to prepare a remedial design for the remedial action in accordance with the Record of Decision. Exhibit "A" (Complaint, ¶ 27).

5.      In August 1998, Amec entered into a contract with the PRPs to serve as the environmental engineering firm that would prepare the remedial design under the EPA order. Exhibit "C' - (the "1998 PSA"). Exhibit "A" Complaint, ¶ 40).

6.      One of the elements the EPA required in the remedial design was a sheet pile wall (the "Sheet Pile Wall" or "Wall") "to prevent erosion of fill materials into the river." Exhibit

---

[1] Amec will, upon request, submit any or all of the exhibits for review. They are omitted to due to their length, comprising of ____ pages. Exhibits to the Complaint that are relevant to this motion have been marked as separate exhibits to this motion.

2

"B" (Record of Decision p. 56). That aspect of the remedial action was provided to Amec by Third-Party Defendant Hart-Crowser pursuant to Subcontract; the design was actually prepared by Hart-Crowser's consultant, Ocean & Coastal Consultants. Exhibit "D" (Design Drawing C-26).

7. Amec performed all services due under the 1998 Agreement no later than April 2003. Exhibit "A" (Complaint, ¶¶ 54, 57).

8. In April 2003, Amec and the PRPs entered into a new professional services agreement in April 2003 (the "2003 PSA") in which Amec agreed to provide "assistance to the PRP Group and its legal counsel, as they may request such assistance from the Consultant, with respect to the *Union Corporation* litigation." Exhibit "E" (2003 Professional Services Agreement ("PSA"), § 1 (Definitions)).

9. The 2003 Agreement contains the following provisions relevant to this litigation:

> **2. Extent of Agreement**: This Agreement represents the entire agreement between PRP Group and Consultant and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both the PRP Group and Consultant.
>
> **4. Term.** The Term of this Agreement is from April 1, 2003, through the date provided for under Section 7 hereof.
>
> **7. Termination.** "This Agreement shall terminate at such time as the Services are completed. Unless the parties otherwise agree, time is of the essence in the performance of the Services."
>
> **12. Warranties**
>
> Consultant shall conduct its activities in a safe and professional manner in compliance with all applicable statutes, ordinances, orders, rules and regulations of the federal, state and local governments in whose

3

jurisdiction such activities are performed. Consultant shall conduct its activities in accordance with accepted professional standards for engineering and scientific practices adopted by environmental firms performing services of a similar nature in effect at the time Services are rendered. Consultant warrants said Services to be accurate and free from defects due to materials, workmanship and/or design in accordance with such professional standards.

### 15.1 Indemnification

Consultant shall defend, indemnify and hold harmless PRP Group from and against any and all claims, losses, damages, liability, costs or actions, including, without limitation, reasonable attorney fees and other costs and expenses ("damages") to the extent arising out of, resulting from or in connection with any unlawful, negligent or willful misconduct or omission by the Consultant, its agents, employees or subcontractors, in the performance of this Agreement, or resulting from or in connection with any direct or indirect exposure of an agent, employee or subcontractor of Consultant to toxic or otherwise hazardous substances or conditions while performing Services pursuant to this Agreement so long as such exposure or conditions are not caused by the unlawful conduct, the gross negligence or the willful misconduct or omission on the part of PRP Group. PRP Group shall defend, indemnify and hold harmless Consultant from and against any and all damages to the extent solely arising out of, resulting from or in connection with any unlawful, grossly negligent or willful misconduct or omission by the PRP Group under this Agreement.

### 20. Insurance

Consultant shall obtain and maintain, throughout the time during which it provides Services on behalf of the PRP Group, Worker's Compensation Insurance and Employer's Liability Insurance for the protection of Consultant's employees, as required by law. Consultant also shall provide and maintain in full force and effect during the tern of this Agreement Comprehensive General Liability Insurance and Automobile Liability Insurance with underwriters

4

> satisfactory to the PRP Group protecting Consultant and PRP Group, and naming the members of the PRP Group as additional insureds, against liability from damages because of injury, including death, suffered by persons, including employees of Consultant, and liability from damages to property, resulting from Consultant's performance of Services under this Agreement...
>
> The above insurances shall include a requirement that the insurer provide the PRP Group with thirty (30) days' written notice prior to the effective date of any cancellation or material change of the insurance.
>
> **24. Communications and Notices.** Notices of changes, deficiencies, delays, claims or disputes under this Agreement shall be in writing, and shall furnish full information to the extent available.

**(Exhibit "E," 2003 PSA)**

10. On March 16, 2006, Plaintiffs entered into a consent decree (the "Consent Decree") with the United States to resolve their potential liability as CERCLA arrangers. The Consent Decree obligated under the PRPs to design, construct operate and maintain the remedy for the Site. Exhibit "A" (Complaint, ¶71; Exhibit "F" (Utility Group Consent Decree).

11. Pursuant to change orders to the 2003 PSA, Amec prepared a revised Final Remedial Design (which changed aspects of the remedial construction unrelated to the design of the Sheet Pile Wall). The EPA approved the revised final remedial design by letter dated February 28, 2008. Exhibit "A" (Complaint, ¶77).

## Construction of the Project Begins in 2008

12. The role and responsibilities of the various parties involved in the construction of the remediation project are set forth in the "Contract Documents," which included written contracts between the parties and the PRPs, as well as documents incorporated by reference according to the terms of those contract documents. Exhibit "G" (Deposition of Wyn Davies ,

August 6, 2018, N.T 24:2-24:17, 28:12-28:16, 98:24-99:18)); Exhibit "H" (3/2013 Remedial Action Report/Engineer's Report ("Engineer's Report"), § 1-6); Exhibit "I" (Sevenson Contract ¶¶202, 202.1; Exhibit "J" (Tetra Tech Contract ¶¶202, 202.1).

13. During construction, Malcolm Pirnie served as Supervising Contractor and Resident Engineer of the Project, providing oversight "to assure compliance with the regulatory agreements, designs, plans, and specifications." Exhibit "H" (Engineers Report, §. 1-6.)

14. As called for by the Consent Decree, "[a]ll aspects of the Work…performed by Settling Third-Party Defendants pursuant to Sections VI (Performance of the Work by Settling Third-Party Defendants), VII (Remedy Review), VIII (Quality Assurance, Sampling, and Data Analysis), and XV (Emergency Response) of th[e] Consent Decree [were performed] under the direction and supervision of the Supervising Contractor." Exhibit "F" (Consent Decree, 10(a)).

15. Additionally, as Resident Engineer (or "Engineer") Malcolm Pirnie was authorized to act as the PRPs' representative at the Site, with authority to interpret the Contract Documents. Exhibit "J" (TetraTech Contract, 23, 23.1, 35.1); Exhibit "I" (Sevenson Contract, 23, 23.1, 35.1); Exhibit "K" (Project Specifications §§1028, 1046, 1300); Deposition of Wyn Davies , August 6, 2018, N.T 95:19-96:16, 98:24-99:18)).

16. Additionally, the supervising Contractor served as "registered professional engineer" that would certify "that the Remedial Action has been completed in full satisfaction of the requirements of this Consent Decree." Exhibit "F" (Consent Decree, §50); Exhibit H" (Engineer's Report, cover page, p. v.)

17. The PRPs first retained Tetra Tech, Inc, ("Tetra Tech") to serve as the contractor that would perform the remedial construction. Exhibit J (See generally, TetraTech Contract with PRP Group); Exhibit "F" (Consent Decree at ¶10.b).

6

18. Tetra Tech prepared the initial Remedial Action Work Plan ("Tetra Tech RAWP") setting forth the means and methods for construction of the approved remedial design, including a construction quality control plan and methodology for decontamination of equipment and the disposal of contaminated material.". Exhibit "A" (Complaint, ¶81); Exhibit "F" (Consent Decree, 11(b)(c).

19. Tetra Tech began remedial construction at the Site on June 30, 2008. Exhibit "A" (Complaint, ¶¶ 79-82) The PRPs terminated TetraTech's contract in 2009, and subsequently replaced Tetra Tech with Sevenson, Inc. ("Sevenson"). Exhibit "L" (Deposition of George Horvat dated July 23, 2018, [66:16-67:15]; Exhibit "I" (Sevenson Contract, ¶¶202, 202.1;

20. In 2008, the PRPs and Amec executed a Change Order to the 2003 PSA by which Amec agreed to provide "Engineering Support During Remedial Construction", as set forth in the letter proposal from Amec. Exhibit "M" (Amec's Change Order #7) Exhibit "N" (Amec Change Order # 8).

21. In early August 2009, Sevenson continued installation of the Sheet Pile that Tetra Tech had started, and in so doing installed the tie-rods supporting the Sheet Pile Wall in a manner that deviated from the design – specifically the tie-rods at the 45-degree corner of the Wall (Zone 2 corner) were spaced further apart than called for by the design drawings. Exhibit "O" (Malcolm Pirnie Daily Reports 8/1/09, 8/5/09).

22. Malcolm Pirnie requested Amec analyze this issue and on August 28, 2009, Amec provided to Malcolm Pirnie a draft analysis of the effect of the non-conforming tie-rod spacing on global stability of the Wall. Malcolm Pirnie approved the draft with minor changes. Exhibit "P" (Email from Davies to McKeever dated August 31, 2009 with draft Tie-Rod Memo" with attachments).

23. On September 8, 2009, Amec provided its final analysis to Malcolm Pirnie Exhibit "Q" (the "Final Tie-Rod Memo"); Malcolm Pirnie then sent that analysis to the EPA for its review. On September 15, 2009, the EPA sent their comments on the Tie-Rod Memo to Malcolm Pirnie, and requested that the analysis be supplemented, stating, in part:

> a. The [Tie-Rod] memo states that it is limited to global stability analyses of the wall…"It is necessary to perform calculations to determine the new load magnitudes caused by the increased tieback spacings and to analyze the tiebacks, waler and deadman to determine if these structural elements can support the new increased loads."
>
> b. The global stability calculations yielded a factor of safety of 1.208. …. It should be noted that industry accepted factors of safety for global stability of wall structures that may impact individual safety are 1.5 for permanent structures.

Exhibit "R" (Email from Sharon Fang to W. Davies dated September 15, 2009).

24. Malcolm Pirnie requested comments from Amec. Amec advised that it would perform additional calculations as required by the regulators, if Malcolm Pirnie requested, but Malcolm Pirnie did not. Exhibit "R" (Deposition of Kevin McKeever dated July 27, 2018, N.T. 282:17-283:16)

25. On September 21, 2009, a civil engineer employed by Malcolm Pirnie advised Joseph Vitale as to the calculations he believed should be performed to respond to the EPA; but there is no record. Exhibit "T" (Email from J. Vitale to M. Clark dated 9/21/2009).

26. There is no record that Malcolm Pirnie, or the PRPs, ever performed additional analyses or responded to the EPA's comments. The PRPs assert that they relied on Amec's August 28, 2009 Draft Memo in determining that the non-conforming spacing was acceptable. Exhibit "U" (Deposition of George Horvat dated October 5, 2018, N.T. 45:15-46:19, 10/5/2018); Exhibit "H" (Engineer's Report dated March 2013); Exhibit "V" (Deposition of Joseph Vitale

8

dated July 30, 2018, N.T. ; Exhibit "H" (Engineer's Report); Exhibit "G" (Deposition of Wyn Davies dated August 6, 2018, N.T. 192:6-192:16); Exhibit "S" (Deposition of Kevin McKeever dated July 27, 2018, N.T. 282:17-283:16)

### Construction Ends, and Amec Completes Its Services for the PRPs

27. Construction of the remediation was completed in 2010. (Superfund Preliminary Closeout Report at 1, ¶¶9-10, ECF No. 1-15.)

28. The PRPs did not receive any Certificate of Insurance pertaining to the insurance coverage provided by the PRPs after May 2009. Exhibit "W" (Letter from D. Jordanger, attaching Certificates of Insurance from 1998-2009 pertaining to Insurance Coverage provided by Amec).

29. The Final Inspection for the Construction occurred on April 28, 2010. Exhibit "X" (E-mail from W. Davies to J. Vitale, dated April 29, 2010).

30. In 2011, Amec provided one additional task for the PRPs, when Counsel for the PRPs authorized Amec to provide certain documents that had been requested by the Trustees for the Metal Bank Site. Exhibit "Y" (Plaintiffs' Response to Amec's Request for Admissions, No. 11).

31. After that, Amec did not agree to provide any additional services under the 2003 Agreement, or any other agreement. (Plaintiffs' Response to Amec's Request for Admissions, No. 11).

### Amec Did not Arrange for Disposal of Hazardous Substances at the Site

32. The waste containing the hazardous substance – namely PCBs – was disposed of at the Site in the 1960s and 1970s. [Engineer's Report, § 1-6]

9

33. Amec did not contribute any materials containing hazardous substances to the Site then, or at any time subsequent. Exhibit "F" (Consent Decree, §1.1)

34. Rather, Amec was a response action contractor for the Site. Exhibit "A" (Complaint, ¶ 159)

35. Amec did not dispose of hazardous waste at the Site while serving as a response action contactor for the PRPs. During remedial construction, management of the remediation-derived waste was performed exclusively by TetraTech, Sevenson, and/or Malcolm Pirnie in accordance with the approved RAWPs. Exhibit "H" (Engineer's Report, §§1-6, 2.5, 3.12. 3.56, Ex. D to Report (Waste Transport Manifests).

36. The PRPs admit that Amec did not own or possess any hazardous substances that were disposed of at the Site while Amec was providing services under the 1998 and 2003 PSAs. Exhibit "Y" (Plaintiffs' Responses to Request for Admission, Nos. 8, 9).

37. The only hazardous substance Amec (or its subcontractors) may have possessed while performing services for the PRPs, were samples taken from the Site for off-site environmental testing; but those substances were not then returned to the Metal Bank Site for disposal. (Plaintiffs' Responses to Request for Admission, Nos. 8, 9; Remedial Action Certification Report, §§1-6, 3.12)

### The PRPs' Obligations of Operation and Maintenance of the Site Begin; the PRPs Did Not Diligently Perform Them.

38. After completion of construction, the PRPs were obligated to operate and maintain (the "O&M obligations") the Site pursuant to the Consent Decree. (Complaint, 98)

39. As part of its O&M obligations, the PRPs were required to visually inspect the Wall and repair areas of corrosion. Exhibit "Z" (Second Five-Year Review at 12; Exhibit "B" (1996 Record of Decision, Operations & Maintenance, p. 56).

10

40. In October 2012, after a representative of the Army Corp of Engineers identified potential signs of movement of the Wall, the PRPs' Supervising Contractor hired RA Consultants ("RAC"), a purported sheet pile wall expert, to perform a visual inspection of the Wall. Exhibit "AA" (Letter from Walter J. Papp to Joseph Vitale dated May 17, 2013); Exhibit "BB" (Deposition of Joseph Vitale dated August 16, 2018, N.T. 39:13-41:12, 40:17-40:24, 96:16-18, 102:5-11).

41. On November 12, 2012, the PRPs and RAC performed the first water-side inspection of the Wall since May 2010 and discovered cracks in waler located at the 45-degree corner of the Wall located in Zone 2 (in area of the non-conforming tie-rod spacing). Additionally, they observed additional signs of movement in Zones 1 and 3 as well as areas of corrosion on the Wall. Exhibit "AA" (Letter from Walter J. Papp to Joseph Vitale dated May 17, 2013); Exhibit "BB" (Deposition of Joseph Vitale Deposition dated August 16, 2018, N.T. 96:16-18, 102:5-11, 27:13-20, 78:10-10].

42. In March 2013, the PRPs and their Supervising Contractor submitted the Remedial Action Certification/Engineer's Report asserting that the remedial construction had been performed "in accordance with the requirements of the consent decree." On September 20, 2013, EPA accepted the revised Engineer's report EPA certified the remedial action as complete. Exhibit "CC" (Letter from J. Webb, EPA, to G. Horvat, PECO Energy Company (Sep. 20, 2013).

43. In April 2014, the PRPs performed another inspection of the cracked waler; the PRPs discovered that it had failed. Exhibit "DD" (Letter from W. Papp to Joseph Vitale dated May 2, 2014); (Exhibit "BB") (Deposition of Joseph Vitale dated August 16, 2018, N.T. 96:16-18, 102:5-11, 27:13-20, 78:10-10).

11

44. The PRPs do not know when the waler cracked, because they did not visually inspect that area of the wall between May 2010 and October 2012. Similarly, the PRPs do not know when the cracked waler failed, because they did not visually inspect that area of the Wall between December 2012 and April 2014. Exhibit "EE" (Deposition of Joseph Vitale dated August 30, 2018, N.T. 219:14-220:19); Exhibit BB " (Deposition of Joseph Vitale dated August 16, 2018, N.T. 26:17-28:10, 39:13-41:12, 78:10-10. 90:22-91:3, 96:16-97:21, 102:5-11). Exhibit "EE" (Deposition of Joseph Vitale dated August 30, 2018, N.T. 219:14-220:19). Exhibit "GG" (Deposition of Walter Papp dated July 25, 2018, N.T. 101:4-101:9, 327:3-327:7)

45. On May 29, 2014, the PRPs first advised Amec that there were problems with the Wall. The PRPs assert "[a]t the time of this letter, neither EPA nor the Group had identified the reason why the wall was failing" (Complaint, 103); Exhibit "FF" (Letter to P. McQuiston, P.E. of Amec (May 29, 2014).

46. However, during the summer of 2014, RAC performed a geotechnical analysis of Amec's design documents and concluded that flaws in Amec's design caused the failure. Exhibit "A" (Complaint, ¶¶103, 105).

47. That analysis relied on documents possessed by the PRPs, and that were available to it in 2012. Exhibit "GG" (Deposition of Walter Papp dated July 25, 2018, N.T. 183:24-339:8); Exhibit "EE" (Deposition of Joseph Vitale dated August 30, 2018, N.T. 356:11-356:15).

48. In October 2014, the PRPs submitted to EPA a sheet pile wall repair work plan that identified the problems with the wall and proposed repair work consistent with RAC's, and attaching the 2014 RAC Analysis asserting Amec's design to be the cause of the failure. Exhibit "HH" October 2014 Sheet Pile Wall Repair Work Plan dated October 2014).

12

49. Submission of the repair plan created the EPA's "expectation" that the PRPs would perform the repair. Exhibit "EE" (Deposition of Joseph Vitale dated July 30, 2018, N.T. 75:10-75:23)

50. Beginning in August 2014, the PRPs prepared to bring suit against Amec for alleged negligence based on the results of the Analysis. Exhibit "II" (8/29/14 Papp Email noting go after negligence of Amec for not considering mean high – low scenario.").

51. The PRPs did not seek Amec's opinion on the Repair Plan or RAC's 2014 Analysis prior to submitting the plan to the EPA in October 2014. Exhibit "JJ" (Letter from D. Jordanger to P. McQuiston dated December 12, 2014).

52. On December 12, 2014, the PRPs sent a letter to Amec that, for the first time, advised Amec that it was "responsible for the damage to the sheet pile wall through the defective design of the wall".

53. The PRPs demanded that Amec "acknowledge its responsibility for the failing sheet pile wall and agree to indemnify the Group (i) by reimbursing the Group for costs incurred and (ii) either performing or paying for repair of the wall." Exhibit "JJ" (Letter from D. Jordanger to P. McQuiston dated December 12, 2014).

54. On June 2, 2015, counsel for the PRPs wrote to counsel for Amec requesting that Amec inform the PRPs before the end of June 2015 if it wished "to limit its exposure by performing the repair work itself." And noting that "the PRP Group will hold Amec responsible for all costs that have been and will be incurred to assess the damage and repair the wall." Exhibit "KK" (Letter from D. Jordanger to B. Knight dated June 2, 2015)

55. In May of 2016, Creamer International, Inc. performed the repair work by placing 5,059.6 tons of R6 stone on the river side of the wall in front of Zones 1, 2, and 3. Exh0ibit "A" (Complaint, ¶123).

## There Has Been No Determination that the Repair was Necessary or That There was Design Defect

56. The EPA did not make any formal determinations regarding the cause of, or need for, the repair. Exhibit "EE" (Deposition of Joseph Vitale dated July 30, 2018, N.T. 77:5-78:10).

57. On December 7, 2016, EPA's remedial project manager issued a letter to the PRPs' consultant Ramboll Environ stating: "Post-construction inspections by EPA in 2012 revealed structural defects of the sheet-pile wall, including, among other things, damage to components of the wall that were most likely caused by movement of the wall toward the adjacent Delaware River." Exhibit "LL" (Letter from W. Geiger to N. Steenhaut dated December 7, 2016).

58. With respect to the repair construction, the EPA's 2nd-Five Year Review for Site states only: "Subsequent evaluations determined that one of the wall's walers had failed and warranted repair; this repair occurred between May and July 2016. Exhibit "Z" (Second EPA Five-Year Review, at 12).

59. The PRPs did not investigate the possibility that the failure of the waler was caused by defects in construction workmanship, materials, or maintenance. [Papp 343: 17-20, 278: 6-14, 279-17, 280:1-20, 297: 19-24. 299:1-24.]

60. The 2014 RAC analysis relied on incorrect data and assumptions, including but not limited to:

14

      a. In January 2016, RAC provided the EPA a revised analysis, and contained a note that admitted its original model (for analysis of the wall) for Zone 3 was inaccurate. Exhibit "BB" (Deposition of Joseph Vitale dated August 16, 2018, N.T. 170:21-171:6; 205:8- 208:22; Deposition of Walter Papp, N.T. 333:1-20).

      b. Additionally, RAC determined that the 2014 analysis overstated the load upon the waler because it relied on incorrect bathymetric data, so the "report and those calculations had used a waterside elevation that was lower" than actual conditions. Exhibit "GG" (Deposition of Walter Papp dated July 25, 2018, N.T. 200:14-24).

### The Structural Defects in the Waler Did Not Cause a Release of Hazardous Substances

61.    Although a waler cracked, the Wall did not "breach" that resulted in releases of hazardous substances. Exhibit "BB" (Deposition of Joseph Vitale dated August 16, 2018, N.T. 152:17-153:21, 155:8-157:2, 162:14-163:10, 245:12-246:8); Exhibit "GG" (Deposition of Walter Papp dated July 25, 2018, N.T. 300:15-303:7)

62.    Between 2012-2016, the PRPs advised the EPA that the Wall met its design objective of preventing off-site migration of contaminated soil particles into the aquatic environment. (See, for example, 2015 LTM Annual Report); Exhibit " "Exhibit "BB" (Deposition of Joseph Vitale dated August 16, 2018, N.T. Ex. 21, p.3); Exhibit "MM" (Letter to Counsel for NOAA dated February 14, 2013).

63.    The PRPs admit "that the whole reason for the repair was for the threat of releases as opposed to having a release." Exhibit "EE" (Deposition of Joseph Vitale August 30, 2018, N.T. 133:21-133:23, 8/30/2018).

**The PRPs Initiate This Litigation**

64. On December 29, 2016, Plaintiffs initiated this action against Amec, relying on the 2014 RAC analysis to support its allegations regarding their being a defect in Amec's design. Exhibit "A" (*See generally*, Complaint, ¶¶ 105-108) Exhibit "BB" (Deposition of Joseph Vitale dated August 16, 2018, N.T. 209:10-209:14, 8/16/2018)).

65. The PRPs state that they do not seek to recover any costs from Amec that were incurred before EPA certified the remedy to be complete, and "[t]he earliest costs claimed by the Group in this action were incurred in April 2014." [Plaintiffs Opposition to Amec's Motion for Summary Judgment, ECF Document 60-1, p. 22, 24]

66. In October 2018, the PRPs submitted its experts' reports identifying defects in Amec's services not raised by the 2014 RAC analysis, focused primarily on Amec's 2009 Tie-Rod Memo. [Exhibits "NN" Initial and Rebuttal Experts Reports of Simpson Gumpertz & Heger, p. 39; Exhibit "OO" Initial and Expert Reports Mueser Rutledge Consulting Engineers, p. 9.).

67. No party currently asserts that the 2014 RAC analysis is accurate. Id. Exhibit "PP" (Expert Report of Peirce Engineering, pp. 15-16).

                                      Respectfully submitted,

                                      By:    /s/ Richard Davies
                                                    Richard J. Davies (#46380)
                                                    Cory P. Taylor (#201791)
                                                    MILBER MAKRIS PLOUSADIS &
                                                    SEIDEN, LLP
                                                    1000 Westlakes Drive, Suite 200
                                                    Berwyn, PA 19312
                                                    (610) 677-2400
                                                    *Attorneys for Defendant,*
                                                    *Amec Foster Wheeler Environmental &*
                                                    *Infrastructure, Inc.*

Dated: June 10, 2019