```
1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
2                         MARSHALL DIVISION

3    TQ DELTA, LLC.,                (   CAUSE NO. 2:21-CV-310-JRG
                                    )   (Lead Case)
4            Plaintiff,             (
                                    )
5    vs.                            (
                                    )
6    COMMSCOPE HOLDING COMPANY,     (
     INC., et al.,                  )
7                                   (
             Defendants.            )
8    ─────────────────────────────────────────────────────────
     TQ DELTA, LLC.,                (   CAUSE NO. 2:21-CV-309-JRG
9                                   )   (Member Case)
             Plaintiff,             (
10                                  )
     vs.                            (
11                                  )
     NOKIA OF AMERICA CORPORATION,  (
12   et al.,                        )   MARSHALL, TEXAS
                                    (   JUNE 1, 2022
13           Defendants.            )   9:00 A.M.

14

15

16                         MARKMAN HEARING

17            BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE

18

19

20

21

22                   SHAWN McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
23                    MARSHALL, TEXAS  75670
                          (903) 923-8546
24            shawn_mcroberts@txed.uscourts.gov

25
```

<u>A P P E A R A N C E S</u>

```
FOR THE PLAINTIFF:     DAVIS FIRM, P.C.
                       213 N. FREDONIA ST., SUITE 230
                       LONGVIEW, TEXAS  75601
                       (903) 230-9090
                       BY: MR. RUDOLPH FINK
                           MR. CHRISTIAN HURT
                           MR. WILLIAM DAVIS

                       McANDREWS HELD & MALLOY, LTD
                       500 W. MADISON ST., 34TH FLOOR
                       CHICAGO, ILLINOIS  60661
                       (312) 775-8000
                       BY:  MR. PETER McANDREWS

FOR THE DEFENDANT:     GOODWIN PROCTOR, LLP - BOSTON
(CommScope)            100 NORTHERN AVENUE
                       BOSTON, MASSACHUSETTS  02210
                       (617) 570-1209
                       BY:  MR. DOUGLAS KLINE

                       GOODWIN PROCTER, LLP -
                       MENLO PARK
                       135 COMMONWEATH DRIVE
                       MENLO PARK, CALIFORNIA  94025
                       (650) 752-3100
                       BY:  MR. ANDREW ONG

                       FINDLAY CRAFT, PC
                       102 N. COLLEGE AVE., SUITE 900
                       TYLER, TEXAS  75702
                       (903) 534-1100
                       BY:  MR. ERIC FINDLAY

FOR THE DEFENDANT:     ALSTON & BIRD, LLP-NC
(Nokia)                101 SOUTH TRYON STREET
                       SUITE 4000
                       CHARLOTTE, NC  28280
                       (704) 444-1025
                       BY:  MR. MATTHEW STEVENS
                            MS. KARLEE WROBLEWSKI
                            MR. NICHOLAS MARAIS
                            MR. KIRK BRADLEY
```

```
 1              FOR THE DEFENDANT:      ALSTON & BIRD, LLP - ATLANTA
                (Nokia)                 ONE ATLANTIC CENTER
 2                                      1201 WEST PEACHTREE STREET NW
                                        #4900
 3                                      ATLANTA, GEORGIA  30309-3424
                                        (404) 881-7000
 4                                      BY:  MR. JOHN HAYNES
                                             MS. KATHRERINE DONALD
 5
                                        ALSTON & BIRD, LLP - DALLAS
 6                                      2200 ROSS AVE., SUITE 2300
                                        DALLAS, TEXAS  75201
 7                                      (214) 922-3453
                                        BY:  MR. ADAM AHNHUT
 8
                OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
 9                                      100 E. HOUSTON STREET
                                        MARSHALL, TEXAS  75670
10                                      (903) 923-8546

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Be seated, please.

2      All right.  This is the time set for claim construction

3  in a series of consolidated cases.  The cases before the Court

4  today include the lead case styled TQ Delta versus CommScope

5  Holding Company, Inc., et al., Case No. 2:21-CV-310.

6  Consolidated with it as a member case is Case No. 2:21-CV-309,

7  styled TQ Delta versus Nokia Corp, et al.  And consolidated

8  with it as a second member case is Case No. 2:21-CV-309,

9  styled Nokia of America Corp versus Broadcom Corp, et al.

10      And at this time, the Court will ask for announcements on

11  the record from the parties before we proceed to take up the

12  disputed claim terms.

13      What says the Plaintiff TQ Delta?

14          MR. DAVIS:  Good morning, Your Honor.  Bo Davis on

15  behalf of Plaintiff TQ Delta.  With me at counsel table is

16  Mr. Rudolph Fink, Mr. Christian Hurt, Mr. Pete McAndrews, and

17  from TQ Delta we have representative, Ms. Alba Divine.  And we

18  are ready to proceed, Your Honor.

19          THE COURT:  All right.  Thank you, Mr. Davis.

20      What's the announcement from the CommScope Defendants?

21          MR. FINDLAY:  Good morning, Your Honor.  Eric

22  Findlay, Doug Kline, and Andrew Ong on behalf of the CommScope

23  Defendants.  We are ready to proceed, Your Honor.

24          THE COURT:  All right.  What's the announcement from

25  the Nokia parties?

1          MR. AHNHUT:  Good morning, Your Honor.  Adam Ahnhut

2   on behalf of the Nokia Defendants.  And with me is Scott

3   Stevens, John Haynes, Karlee Wroblewski, Nic Marais, Katie

4   Donald, and Mr. Kirk Bradley, and a summer associate as well

5   from our offices, Gina Campanelli.  And we are ready to

6   proceed.

7          THE COURT:  All right.  Thank you, Mr. Ahnhut.

8      What's the announcement from Broadcom?  Do we have

9   Broadcom represented here today, or what's that status?

10          MR. DAVIS:  I don't see Broadcom in the courtroom,

11   Your Honor.  I don't believe they're here.

12          MR. STEVENS:  That's My understanding as well.

13          THE COURT:  Okay.  Has anyone failed to announce on

14   the record that's represented here today?  Okay.  I'll assume

15   not.

16      And we'll proceed, counsel, with disputed claim terms

17   before the Court.

18      As you-all are already very much aware, there is a huge

19   amount of material here.  The Court has allocated three hours

20   for claim construction, and we'll cover as much of it by way

21   of oral argument as we can.  Any disputed terms not reached

22   for oral argument today the Court will take up and decide on

23   the briefing and the papers.  I have advised you by email as

24   to the order of the disputed terms and we'll follow that order

25   through the process this morning.

```
 1          With that, let's begin with the disputed term

 2     'transceiver'.

 3          Let me hear from the Plaintiff first, followed by the

 4     Defendants.

 5               MR. FINK:  Thank you, Your Honor.  Rudy Fink for

 6     TQ Delta for the term 'transceiver'.

 7          The dispute in this term is fairly narrow, Your Honor.

 8     The parties agree the first part of the construction, the

 9     difference here is this highlighted portion which is, 'wherein

10     the transmitter portion and the receiver portion share at

11     least some common circuitry'.

12          Plaintiff's construction is the same construction that

13     the Court in Delaware adopted.  This exact same dispute was

14     before Judge Andrews in Delaware.  He resolved it in

15     TQ Delta's favor.  This term is substantially through most of

16     the patents.  I think it's in about 18 of the 22 patents that

17     are involved in this litigation.  We believe that the Delaware

18     Court's construction was correct--transceiver is a portmanteau

19     of a transmitter and a receiver, in the same way like a

20     motorcycle is a portmanteau of the terms motor and bicycle.

21          It -- basically, a portmanteau here means something that

22     fundamentally is both things; it's not a distinct and separate

23     entity from both a transmitter or a receiver.  And so we

24     believe that this construction that incorporates this common

25     sharing of circuitry captures this distinction where both
```

1    things are combined into one at least and a nod to that as a

2    part.

3         This construction is supported both by the -- extensively

4    by the record here, a transceiver -- this is from the IEEE

5    dictionary, I believe, or it's -- basically says it's a

6    transmitter/receiver that uses many of same components for

7    both-transmission and reception.  This is another dictionary

8    that says that it's -- basically it employs common

9    circuits--here down at the bottom--or components or

10   transmitting.  Again, this is going back to that thing where

11   it is both a transmitter and receiver; it shares those

12   elements.

13        Defendants' own extrinsic evidence supports TQ Delta's

14   construction.  As part of the Court's 4-2 rule, Defendants

15   were asked to provide or given the option of providing

16   dictionary definitions that they contended supported their

17   respective claim construction position.  Here, as you can see,

18   Defendants' evidence is that the -- over on the right, that

19   the transmitter receiver uses many of the same components for

20   both transmission and reception; again, that shared circuitry

21   that the Delaware court's construction captured.

22        Similarly, their other definition is a radio

23   transmitter/receiver that's combined into one unit, that it

24   shares that.

25        They also provided a citation here to the patent, and

1    that patent also then discusses shared memory, shared

2    components that are also part of that construction.  This is

3    further reflected in the figures of the patents, just as a

4    general matter, that here it shows from figure 1 of the '5473

5    and several other patents, shared components all within a

6    transceiver as an element.

7         Similarly, as another figure shown in most of the other

8    patents, the transceiver also contains a number of various

9    different shared components.

10        Respectfully, Defendants' construction reads out the

11   shared nature.  In sense, it would convert the motorcycle,

12   which is fundamentally a device that has both -- you know,

13   that is a motorcycle that's combined in that way to something

14   that just happens to have a motor and happens to be a bicycle.

15   And we do not believe that this is appropriate; that the

16   transceiver construction captures this sort of fundamental

17   intertwining of the nature of a transceiver rather than going

18   back to the historic separate transmitter and separate

19   receiver.

20        And also we believe that it adds a tangibility that's

21   important and helpful to the jury; that it provides a

22   physicality of circuitry and a physicality of this connection

23   rather than just an abstract device of some kind that's

24   capable of.  So, for instance, say your finger is capable of

25   transmitting and receiving information, but here this is

1  providing circuitry that captures that definition that's, we

2  believe, well-understood.

3      And if there's nothing further, Your Honor, given the

4  number of terms, we'll move on.

5      THE COURT:  No, I think that's fine, Mr. Fink.

6      I think at this point it would be helpful for the

7  Defendants to give me their version, so let me hear from the

8  Defendants.

9      MR. FINK:  Thank you, Your Honor.

10      MS. WROBLEWSKI:  Good morning, Your Honor.  Karlee

11  Wroblewski on behalf of Defendants.

12      THE COURT:  Tell me why Judge Andrews got it wrong?

13  Did he just rely too much on dictionaries, or what was the

14  problem?

15      MS. WROBLEWSKI:  So, yes, at the end of the day,

16  Judge Andrews relied on extrinsic evidence to define what we

17  believe has a clear plain and ordinary meaning based on the

18  intrinsic record.

19      THE COURT:  I mean, if something is a well-known

20  term in the art, that usually means dictionary input is

21  relevant.  It's only when it's not well-known and understood

22  that dictionaries don't give you much guidance.  Why would the

23  sources that he relied on be erroneous here?

24      MS. WROBLEWSKI:  So we believe that transceivers

25  sometimes do include common circuitry and that does not depart

from the dictionary definitions, but what we have here if we turn to the intrinsic record of the specification is a definition of transceivers where transceivers are generically being referred to as modems.  And specifically here in columns 2, 1 through 5, we see that a modem, this generic term 'modem' includes a transmitter section for transmitting data and a receiving section for receiving data.  And ultimately, while these definitions include transceivers, that would, in fact, include common circuitry, as we saw in the dictionary definitions.  It's not necessarily the case that that is a requirement of what a transceiver is.

And, indeed, TQ Delta's expert agrees that this isn't always required.  In the -- Doctor Cooklev's declaration, he indicated that typically a transceiver would include a transmitter portion and a receiver portion with common circuitry.  But the fact that the term 'typically' here is used indicates that it's not always required.  And while 'transceiver', as it's used in the patent, may involve the use of common circuitry, it does not always.

THE COURT:  Your proposed construction doesn't address the common circuitry issue at all.  In light of your argument that you're not saying it never does, you're just saying it may not always, why did you not propose something like what you have together with 'which may, but does not always involve some common circuitry'?  I mean, was there a

1    reason you left that concept out completely in your proposal,

2    given that that's really what we're focused on and given that

3    you're telling me some of the time it does involve common

4    circuitry?

5            MS. WROBLEWSKI:  I believe that would be fine.  We

6    did not include that because that's not what we understand as

7    being the plain and ordinary meaning of the term.  The term

8    'transceiver'--'trans' involving transmitting, 'ceive'

9    involving receiving--so we did not include that in our

10   proposed definition, but if we, you know, had a definition

11   that indicated that sometimes common circuitry is involved and

12   sometimes it isn't, I think that would be fine.

13           THE COURT:  All right.  What else do you have for

14   me?  Don't feel compelled to go through every one of your

15   slides.

16           MS. WROBLEWSKI:  Yeah.  I only have one more, so

17   hopefully it will be brief.

18       Just this slide indicates that parties have agreed in the

19   past that the plain and ordinary meaning of 'transceiver'

20   does -- is, in fact, consistent with the proposal that we've

21   included here.  So on the left side we see that the parties

22   agreed in this lower paragraph that a device that transmits

23   and receives data -- or 'transceiver' is a device that

24   transmits and receives data.  And over here on the right in

25   *Calypso Wireless versus T-Mobile*, we again see that a first

1    transceiver was simply defined as a combination transmitter

2    and receiver, and is otherwise silent to whether or not a

3    common circuitry is, in fact, required.

4            THE COURT:  All right.  Thank you, counsel.

5        Let's move to the next disputed terms 'configurable to',

6    'operable', and 'operable to'.

7        Let me hear from Plaintiff first.

8        And I'll note that it appears that the Delaware court has

9    given some guidance here, although not directly on point and

10   perhaps in not exactly the same context as we have here.

11       Go ahead, Mr. Davis.

12           MR. DAVIS:  Thank you, Your Honor.  Bo Davis for the

13   Plaintiff.

14       And yes, we have 'configurable to'/'operable to'.  We

15   proposed that it means 'able to be configured'; Defendants

16   have said 'not mere capability'.  I'm showing here on this

17   slide, Your Honor, just the I guess prevalence of this term

18   throughout the claims.  Its shows up in almost all of the

19   families in either the 'configurable to' or 'operable to' form

20   of the claim.  And really the issue here is whether these

21   claims are directed to capabilities or whether they are

22   directed to capabilities of a device or whether they're

23   directed to actual operation.

24       And we proposed yes, they are directed to capable.

25   Defendants have said 'not mere capability', but what they've

1    also said in their brief is that the terms at issue here

2    require actual operation.  And I think that's really the part

3    of their understanding of what 'not mere capability' is that

4    gives us the most concern.

5        Words ending in 'able' typically mean 'able to be'.  They

6    are directed to capabilities.  If the term means 'in operation

7    to', then what that means is -- according to the Defendants is

8    that 'not mere capability', but that it's actually being used

9    in a way that addresses the functionality.

10       And where this issue plays out throughout the course of

11    the case is that the devices that are sold, the transceivers

12    that are sold, whether they are on the customer side or the

13    operator side, have functionality in them that comply with

14    standards, the standards that are at issue in the case.  And

15    if they've got that functionality, and the Defendants are

16    correct that these terms are directed to the operation of

17    them, then the issue becomes, well, is that functionality --

18    has it actually been turned on or not when it's sold.  And so

19    that obviously creates issues for infringement, it creates

20    issues for damages, and so, you know, it's a significant term.

21       The Delaware court has addressed this concept of whether

22    the claims are directed to capabilities or not in a number of

23    different opinions, and what you'll see is that there are some

24    earlier opinions where the court was trying to address really

25    what does it mean for something to be capable of, and

1    addressing it the way that some courts have addressed it in

2    terms of a negative limitation that precludes a certain amount

3    of modification.

4        So, in other words, if you have a device that is capable

5    of doing something without being modified, without rewriting

6    the code, rebuilding the hardware, then that is capable, but

7    if the native functionality is present in the device when it's

8    sold, regardless of whether it's -- you know, when it's turned

9    on, whether it's turned on out of the box or turned on by the

10   end user, then that fits within the meaning of capability.

11       And in one of the earlier decisions, this is from 2018,

12   where the Court was construing the term 'plurality of bonded

13   transceiver', so it wasn't even addressing the term

14   'configurable to' or 'operable to', he recognized that even in

15   this case, Judge Andrews recognized that a plurality of bonded

16   transceivers is directed to something that encompasses

17   configurability.  And as part of his construction, he said the

18   transceiver is configurable to do something, and then he

19   provided a negative limitation that doesn't require 'in

20   operation', but what it requires is -- or what it excludes is,

21   you know, rebuilding, recoding, redesigning any of the

22   components in a plurality of bonded transceivers.  And we

23   agree with this concept of configurability that the claims are

24   directed to that.

25       In family 6 in the context of summary judgment, the court

1    actually did construe the words 'configurable to' and also

2    'configured', past tense, to say that the claims require

3    hardware and software for performing the functionality, which

4    addresses capability, which includes capability to a certain

5    extent.  We're not talking about any capability in the sense

6    that anything is possible, but if there -- if it's capable to

7    do this without rebuilding, rewriting, recompiling the code or

8    redesigning any of the hardware or software, then that's

9    capability.

10        So he essentially provided a plain meaning construction

11   that excludes certain fundamental changes to the device, but

12   he included functionality that's in the device natively when

13   it's sold, regardless of whether or not it's in operation as

14   sold.

15           THE COURT:  What's your view as to the relation

16   between 'operable', 'operable to', and 'capable'?  Are you

17   equating the two?

18           MR. DAVIS:  Yes, Your Honor, we are.  We're treating

19   them all the same.  We've treated them the same.  Defendants

20   have treated them the same.  That's why these terms are

21   grouped together.  There's been no argument from either side

22   that the terms should be configured differently.  I believe

23   that both terms are equally directed to and casting the net

24   around capabilities of a device as opposed to something that,

25   you know, must be in operation as it's sold.

1        THE COURT:  I understand the dispute between whether

2   it infringes sitting in the box or it has to be taken out,

3   plugged in, turned on, so forth and so on, I understand that.

4        MR. DAVIS:  Yes, Your Honor.

5        THE COURT:  But to say something is operable seems

6   to me to be something different than saying it's merely

7   capable of.  You know, there are a lot of things that may be

8   capable of other unintended uses, but they're operable for

9   their intended use.  I can use a rifle as a club, but it's

10  intended to shoot a projectile.

11       I have some discomfort with the absolute equality that

12  you're proposing between 'operable' and 'capable'.

13       MR. DAVIS:  I understand, Your Honor.  And we are

14  not intending to make a distinction along the lines of the

15  example you just provided.  The issue that we're concerned

16  with is primarily the Defendants' I guess interpretation of

17  'not mere capability', which is their negative limitation, to

18  mean that the term requires that it be in operation to.  And

19  so, you know, as opposed to being operable to, able to operate

20  in an infringing manner, that we believe is covered by the

21  capability of the device, but we're not in a situation where

22  we're saying that a rifle is operable as a club.  That's not

23  the situation.  I mean, these devices are built for, designed

24  for a specific purpose, a specific type of operation, and the

25  issue -- the reason we have a claim dispute here is because

1    the Defendants essentially mean by 'not mere capability' that

2    it must actually be operating.  That's really the distinction.

3              THE COURT:  I think we're talking about two

4    different things.  My worry is that in addressing what you're

5    concerned about we open the door to what I'm concerned about,

6    and I'm trying to get some input as to how to draw the line

7    here.

8              MR. DAVIS:  Well, and, you know, one of the -- I

9    guess one of the concepts that I think addresses the issue

10   that Your Honor's concerned about is, is it operable to be

11   used in the way it was designed to be used or intended to be

12   used.  So this intent aspect, I believe -- you know, that's

13   not our concern.  We believe that, you know, the devices are

14   intended to be used a certain way.

15        So, you know, to the extent that that gives the Court

16   concern, we are not proposing something that would encompass

17   mere capability in the sense that you have a device, it's

18   designed for a specific purpose, but you're using it for

19   another purpose.

20        And again, Your Honor, in family 10, the Delaware court

21   tried to address this issue, and I think what you're

22   articulating is consistent with what -- the concern of the

23   Delaware court and why the Delaware court at least articulated

24   the issue in this way.  He said that 'operable to' requires

25   something more than 'capable of', but he didn't require that

 1    it meant 'in operation to' in his construction.

 2        And in this -- the court went on to actually grant

 3    summary judgment of non-infringement, but it was in a specific

 4    circumstance where the device wasn't configured or capable of

 5    operating without modification.  So, in other words, you would

 6    have had to modify the device through a command line

 7    interface, a password-protected feature, something like that.

 8        So there are these -- there is a situation where the

 9    court did say narrower than 'capable of' but, you know, again,

10    there's a bit of a -- I guess a disconnect or a diversion

11    between some of what the Court has said in Delaware and

12    statements like this, Your Honor.

13        Again, and I do want to point this out, we recognize that

14    at least in the family 9 context the Delaware court did

15    construe 'operable' to mean 'in operation to' in the context

16    of granting summary judgment of no infringement on that

17    patent.  However, we respectfully disagree.  We just don't

18    believe that 'operable to' means 'in operation to' in the

19    sense that out of the box the functionality must be turned on,

20    so-to-speak.

21            THE COURT:  What else, Mr. Davis?

22            MR. DAVIS:  Well, Your Honor, in the *Huawei* case I

23    believe you addressed a very similar issue.  The term here was

24    'adapted' and 'configured', past tense, as opposed to

25    'operable to' or 'configurable to'.  But even here, Your

1   Honor, what you -- what the Court held was that this language

2   isn't mere capability of performing the functions in the

3   abstract, which I believe is like your golf club rifle

4   example.  In the abstract, sure, you can take a rifle and use

5   it as a golf club, but that's not what it was designed to do.

6   So we don't believe that this case holds that the claims must

7   be construed to mean 'in operation to'.

8        And we have other cases from this Court, like the *e-Watch*

9   case where the Court recognized that the claim at issue there,

10  which included the language 'operable to' was -- when it used

11  the word 'operable to', it was directed to capabilities.  And

12  here the Court says, "For example, claim 1 of the '168 Patent

13  recites, 'an image collection device being operable to provide

14  visual image data,'" and goes on to list various other

15  iterations of this 'operable to'.  And the Court said, that

16  language, 'operable to', is addressed to capabilities.

17       In the *Iron Oaks* case from the Federal Circuit, the same

18  word, term, 'operable to' was at issue, operable to do

19  something, perform a function, and the Federal Circuit agreed

20  that -- agreed with the board in that case that a second

21  mobile unit that is capable of creating patched operating code

22  in some circumstances still satisfies the claim that it simply

23  must have the capability of performing the function.

24       And finally, Your Honor, there is a whole slew of cases

25  such as the *Finjan* case where it's not a claim construction

```
 1    issue, it's a summary judgment infringement issue, but it does

 2    stand for the general proposition that apparatus claims are

 3    directed -- when they're directed to capabilities don't

 4    require actual operation.  And we believe that's the problem

 5    with their construction.  We believe that's what they're

 6    advocating for--that these claims require actual operation,

 7    and we respectfully request that the Court reject that

 8    limitation.

 9         That's all I have, Your Honor.

10         THE COURT:  All right.  Thank you, counsel.

11         Let me hear from the opposing parties.  Go ahead,

12    Mr. Stevens.

13         MR. STEVENS:  Thank you, Your Honor.  Scott Stephens

14    for Defendants.

15         So the dispute that you just heard is actually not a

16    dispute in this case.  We're not going to say -- to Your

17    Honor's analogy, we're not going to say that the gizmo has to

18    be taken out of the box, plugged into a wall, and actually in

19    operation.  We've discussed through the meet and confer

20    process that that is not what we're saying in this case.  What

21    we're saying in this case is to be configured to or operable

22    to or in operation to requires the device as shipped be able

23    to meet those claim languages; that you can't rewrite the

24    source code, change the hardware.

25         I think Mr. Davis said, if I heard him correctly, that
```

1   his construction does not incorporate rebuilding, rewriting

2   code, redesigning the product, using a command line interface

3   to modify the product, or given access to password-protected

4   features.  If that's all true and that's what we're going to

5   hear consistently through the case, I'm not sure there's much

6   of a dispute on this term.

7        What we are worried about is that there are certain parts

8   of the standard that are optional; that are not actually

9   implemented in the chip sets that we purchase or in the

10  products that we deliver to the customer.  Now, hypothetically

11  could that decision have been different?  Could the people

12  that wrote the source code have written the source code

13  differently and implemented it on the same chips and on the

14  same transceivers?  That's hypothetically possible, but the

15  claim requires more than hypothetical possibility.  That's

16  what we're talking about with our limitation of 'not mere

17  capability'.

18       All we're saying is that we have to look at the products

19  as shipped, not a product that could be capable of, be

20  redesigned, or have different source code put on it.  And the

21  concern from their construction is 'able to be configured'.

22  'Able to configured' to us sounds much, much broader.  If I

23  have a computer and it's got a memory and a processor, it's

24  able to be configured in a plethora of ways.  You could buy

25  software from another party and put on it, you could send it

1    back to the manufacturer to have something changed about it,

2    it's all able to configured that way, but --

3            THE COURT:  Well, I mean, quite honestly, isn't

4    'configurable' just 'able to be configured' with the word

5    being cut in half and the front half being put on the back?  I

6    mean, just -- it's the same part of the language.

7            MR. STEVENS:  It very well could be the same

8    construct, but what we believe is that that's an attempt to

9    say, No, you could ship it back and put different software on

10   it and do something different.

11           THE COURT:  Let me ask you this.

12           MR. STEVENS:  Yes, sir.

13           THE COURT:  If the Court were to construe

14   'configurable' to 'be able to be configured', as the Plaintiff

15   requests, but make it clear that that doesn't mean it's the

16   same as being capable of anything through redesign or

17   reconfiguration or alteration, which comports with what I

18   heard Mr. Davis argue, I think at that point we're back full

19   circle to where you started in that we may not have that much

20   of a disagreement here.

21           MR. STEVENS:  I think that's correct, Your Honor.

22   If the construction is clear that it does not include

23   rebuilding, rewriting the code, redesigning, command line

24   interface modifications, or password protected features, then

25   I don't believe there's a dispute.

1          THE COURT:  Well, as I hear both of you, it sounds

2     like you're both saying the same thing, but you don't trust

3     each other to stay to that position and you're worried about

4     what they're going to do after this is over.

5          MR. STEVENS:  I think in fairness, Your Honor, I'm

6     sure that's not the first time that's been your view, and

7     that's probably very true.  I mean, we did have this

8     discussion, both of us, in good faith during the meet and

9     confer process and weren't able to resolve it, so it's not

10    entirely clear to me that there's not an issue bubbling here

11    that is beyond my purview, but as Your Honor just phrased it,

12    we would have no problem with that construction.

13         THE COURT:  All right.  Mr. Davis, do you have

14    anything else to add?  It's clear to me this may be one of the

15    more pressing terms here.  In light of this colloquy with

16    Mr. Stevens, do you want to revise your earlier statement or

17    confirm it or what would you like to add, if anything?

18         MR. DAVIS:  I believe that I agree with Your Honor's

19    articulation of it.  I do want to clarify for the record and

20    make it abundantly clear that, you know, the list of things

21    that Mr. Stevens read off is not entirely accurate with the

22    way that we -- the way that I articulated it.

23         And with respect to the list of things, you know, he said

24    not rewriting code, not redesigning chips, but then he also

25    included password protected and command line interface.  When

1    I mentioned password protected and command line interface, I

2    was talking about in the context of the Delaware court having

3    granted summary judgment, so as a factual matter the court

4    held in those cases that I don't believe that something that

5    is inoperable is -- satisfies the definition of 'capability'.

6        So I just wanted to make sure that we're not on record

7    having agreed to password protected or command line interface.

8    There are Federal Circuit cases that address those issues as

9    to the ultimate infringement question, which I think is

10   ultimately where this goes, and a lot -- Your Honor is

11   absolutely correct.  The concern here is that I think both

12   sides are afraid that the other side is going to, you know, do

13   something that addresses the ultimate infringement question.

14       So I just would want to clarify that to the extent the

15   Court is going to articulate, not as part of the construction

16   but as part of the analysis and the opinion or something that

17   it expects the parties to adhere to, that, you know, we're

18   talking about, you know, redesigning, rebuilding something

19   that is not functionality that's, you know, inherent in the

20   machine as it's designed.

21           THE COURT:  I understand.  And I think, in very

22   large part, both sides are in the same posture.  It's clear to

23   me you're just worried about what wiggle room the Court might

24   leave that the other can take advantage of the down the road.

25   And quite honestly, counsel, as Mr. Stevens pointed out, this

1    is not the first time I've seen that scenario.

2              MR. DAVIS:  I understand.

3              THE COURT:  But it's part of my job to make sure

4    that there's not any inappropriate wiggling in any room that's

5    left, and I can certainly do that.

6              MR. DAVIS:  Thank you, Your Honor.  Appreciate it.

7              THE COURT:  Okay.  I think I've heard all I need to

8    on this term, unless there's somebody else that needs to weigh

9    in.

10        If not, let's turn to the next group of disputed

11   terms--'each bit in the diagnostic message is mapped to at

12   least one DMT symbol', and then we've got 'DMT symbols that

13   are mapped to one bit of the diagnostic message'.  The third

14   iteration of this from claim 40 appears to have been dropped,

15   it looks like to me, and we're just talking about these first

16   two iterations.

17        Why don't you go ahead and give me Plaintiff's posture on

18   this, please.

19             MR. DAVIS:  Yes, Your Honor.

20        The issue here is indefiniteness.  The Defendants have

21   alleged that this term is indefinite, and we obviously

22   disagree.  We have proposed a construction that is consistent

23   with the Delaware construction for a slightly different term.

24   The term at issue was not 'DMT symbol'; it was 'DMT signal'.

25   But we have essentially adapted it to these claims, so --

 1           THE COURT:  Let me ask you this, counsel.

 2           MR. DAVIS:  Yes, Your Honor.

 3           THE COURT:  If--and this is a hypothetical--but if

 4  the Court were not persuaded by the Defendants' indefiniteness

 5  argument, would a construction of plain and ordinary meaning

 6  be adequate here?  It doesn't look like to me the Defendants

 7  have come forward with any alternative construction beyond

 8  positing their arguments on indefiniteness.  That it need to

 9  be construed as you've attempted to...

10           MR. DAVIS:  I don't believe so, Your Honor.  My

11  understanding is that I believe plain and ordinary meaning

12  would be sufficient.  So I -- you know, I believe that's --

13           THE COURT:  Okay.

14           MR. DAVIS:  We would agree with that.

15           THE COURT:  Well, tell my why their indefiniteness

16  argument fails here.

17           MR. DAVIS:  Yes, Your Honor.

18       They've articulated an indefiniteness argument that

19  doesn't rise to the level of indefiniteness where, you know,

20  the term is incapable of being understood by a person of skill

21  in the art.  Essentially what -- I think it would be helpful

22  to just give a brief explanation.

23       What the '686 Patent is dealing with is a situation where

24  there's interference or noise in the transmission line, and it

25  wants to figure out what's going on, so it goes into a

1    diagnostic mode so that information can be exchanged to try to

2    fix the problem.  And because there's noise, we need a more

3    robust way of communicating the message, and the diagnostic

4    mode is basically slowing the bandwidth down to where we're

5    using the entire DMT symbol in the transmission to communicate

6    a single bit of information.

7         And the specification of the '686 Patent talks in a

8    number of places about this issue about needing a diagnostic

9    mode or establishing a diagnostic link mode to be able to

10   communicate the message in a simple and robust manner.  And so

11   that's what we're talking about and that's what this claim

12   term, 'each bit being mapped to one or more DMT symbols' is

13   talking about.  It's talking about we're going to communicate

14   less data in a slower fashion, but it's more robust so that

15   it's more likely to get through.

16        And the Defendants have essentially said, We don't

17   understand what this means, we don't understand the concept of

18   mapping.  And they agree that they do understand the concept

19   to the extent that you're mapping one bit to one symbol, so

20   they -- I think or I gather from their briefs that at least

21   that part of the claim is understandable by them.  But what

22   they don't understand and what they think is indefinite is

23   where you're mapping one bit to more than one symbol.

24        Now, the claim itself says 'one or more'.  They

25   understand at least the 'one' part of it.  And I believe their

1    indefiniteness argument is focused on the 'or more' part.  But

2    as for disclosure in the specification for this concept of

3    'each bit being mapped to at least one DMT symbol', we have

4    express disclosure in column 1 -- sorry, column 3, lines 44 to

5    53.  "In the diagnostic link mode, the RT modem sends

6    diagnostic and test information in the form of a collection of

7    information bits to the CO modem that are, for example,

8    modulated using one bit per DMT symbol modulation as is used

9    in the C-RATES1 message in the ITU and ANSI ADSL standards."

10        So the standards talk about C-RATES1, they talk about

11   mapping one bit, they address this concept of 'only one bit of

12   information is transmitted in each symbol'.  So it seems that

13   quite a few people of skill in the art understand this

14   concept; they understand what it means to map a bit to a

15   symbol.

16        The -- in the paragraph immediately following, there is

17   also disclosure for the one bit per DMT symbol modulation

18   message encoding scheme where a bit with a value of 0 is

19   mapped to the REVERB1 signal and a bit with a value of 1 is

20   mapped to a SEGUE1 symbol.  And it talks about, Since both

21   signals are wideband and known in advance, the receiver can

22   easily detect them using a simple matched filter.  So it's

23   saying, look, we're going to use a REVERB signal and a SEGUE

24   symbol to map 1s and 0s, wideband, easy to understand.

25        And I think this addresses their concern or their

1   indefiniteness challenge that we don't understand how you map

2   one bit to, you know, the same bit in a message to multiple

3   symbols.  We think it's very simple and straight forward.

4   You're just repeating the same symbol.  You're repeating the

5   same bit.  And that's exactly what's disclosed in the standard

6   with respect to REVERB1.  REVERB1 is a type of signal.  Each

7   symbol of REVERB1 is identical, and the duration of C-REVERB1

8   is 512 repeating symbols.  That sounds like mapping a single

9   bit to more than one symbol to me.  And it's disclosed in the

10  standard that's incorporated into the spec.

11      This is just an example of a signal, what a signal would

12  look like, the wave form of a DMT symbol that's been

13  modulated, and it's just repeating.  So how do you map one bit

14  to more than one symbol?  It's repeated, exactly as discussed

15  in the REVERB signal portion of the standard.

16      So Defendants' argument is, Well, this is a -- 'mapped'

17  is a jargon term.  We don't understand it.  It could mean that

18  the same bit is represented by one symbol, two symbols, or

19  every symbol that results from a given DMT signal.  That's

20  fine.  That's not indefiniteness.  That's -- it could.  That's

21  disclosed in the spec.  It's disclosed with respect to the

22  REVERB1 signal for 512 symbols.

23      And essentially they say a person of skill in the art

24  would understand that you have to define a mapping function

25  with specificity in order to understand -- for both sides of

1    the transmission to be understood.  That's fine.  Agreed.

2    That doesn't make the term indefinite simply because both

3    sides have to have been -- have to have a mapping function

4    ahead of time so that they understand what's being

5    communicated.  That doesn't render the term indefinite.

6         And then they say, Well, the REVERB and SEGUE signals are

7    intended -- are instead only relevant to the state of the

8    communication protocol.  That may be true in the standard, but

9    the standard is incorporated by reference and it's

10   incorporated into the spec as a way to communicate a

11   diagnostic message.  So the patentee, the inventor is saying,

12   Hey, we could use something like this REVERB signal defined in

13   the standard to communicate the diagnostic message.  So the

14   fact that the standard may use REVERB and SEGUE for a

15   different purpose doesn't mean that the inventor can't

16   incorporate that into his invention.

17        And finally, this is, again, from the declaration of

18   Doctor McNair, and in here he's admitting that while 'one' is

19   clear, he's admitting that at least that part of the claim is

20   clear, mapping one bit of a message to one symbol, he says,

21   "The term 'at least one' allows for the scenario that a given

22   bit is mapped to more than one DMT signal.  As described

23   below, the different possible interpretations tied to each

24   version of the claim further adds to the indefiniteness of the

25   term."

1          As I just explained with respect to REVERB, the REVERB

2     signal, that's disclosed in the specification, the person of

3     skill in the art would understand what is meant by that.

4          And, finally, their indefiniteness argument boils down to

5     a number of questions which I don't believe satisfies the

6     standard for indefiniteness.  Just because there are questions

7     that can be articulated doesn't mean that the term is

8     indefinite, but I believe the answers to all -- there are

9     answers to all of these questions that are apparent from the

10    intrinsic record.  The first question is whether there is some

11    error coding used to map a bit into several redundant symbols.

12    Maybe so.  That doesn't mean the term is indefinite.  Error

13    coding is something that's understood in the art.

14    Essentially, in its most basic form, error coding is repeating

15    the same bit over and over again.  You're creating redundancy

16    in the message to ensure the reliability of the transmission.

17         The second question whether the same bit is sent multiple

18    times, once in each symbol, yes, that is the way to do it.

19    That is a way to do it.

20         Whether the claim language contemplates something else

21    entirely.  The claim is broader than that, certainly.  It

22    could encompass any error coding scheme where you're mapping

23    each bit to at least one symbol.

24         With all that said, Your Honor, I don't have anything

25    further.  We just don't believe this term is indefinite.

 1          THE COURT:  All right.  Thank you, counsel.

 2      Let me hear responsive argument.

 3          MS. WROBLEWSKI:  Karlee Wroblewski on behalf of

 4  Defendants.

 5          THE COURT:  Go ahead, counsel.

 6      Let me ask you, before you proceed with your actual

 7  argument, if your position is that the potential need for a

 8  mapping function makes the claim terms unclear, and I gather

 9  at least one reading of your briefing would support that, why

10  isn't that really an enablement or a lack of written

11  description issue more than an indefiniteness problem?

12          MS. WROBLEWSKI:  Yes, Your Honor.

13      So I think ultimately, as counsel has pointed out, there

14  is a bit of discussion within the specification as to what is

15  required by the claim language, but there is additional

16  discussion that was not raised by counsel that would indicate

17  that multiple possibilities are -- could satisfy this claim

18  language, and that's where the indefiniteness issue comes

19  from.

20      So if I may sort of point out the claim language and

21  indicate where in the specification that additional disclosure

22  is, that is the crux of why this is, in fact, indefinite.

23          THE COURT:  At some point I want you to answer my

24  question, though, as to why this is truly an indefiniteness

25  issue and not really a lack of fully enabling it or possessing

1    the full scope or written description problem.

2              MS. WROBLEWSKI:  Yes, Your Honor.

3         So, ultimately, I believe that the issue and why this is

4    indefinite is because looking at the claim language, it does

5    not allow one of skill in the art to understand the bounds of

6    the claim, and that's sort of the crux of the indefiniteness

7    issue.  We're not of the position that there is not

8    description within the specification where one could pull

9    multiple meanings as to what this language might mean, but,

10   rather, that it's not clear which of those possible

11   interpretations might be correct, and so that's why we're

12   setting forth an indefiniteness position as opposed to a

13   written description or lack of enablement.

14             THE COURT:  I mean, it's clear that the old standard

15   that used to be applied here of insolubly ambiguous is no

16   longer the test.

17             MS. WROBLEWSKI:  Right.

18             THE COURT:  But that doesn't necessarily mean that

19   we revert to the opposite end of the spectrum where any

20   uncertainty automatically equates to indefiniteness.

21             MS. WROBLEWSKI:  Yes, Your Honor.

22             THE COURT:  You do have a clear and convincing

23   burden or standard here, so let me hear the rest of your

24   argument.

25             MS. WROBLEWSKI:  Yes, Your Honor.

1        So, specifically, as you referred to the standard, we

2   believe that a person of ordinary skill in the art would not

3   have reasonable certainty as to what is intended by this

4   language.  And turning to the specification, this is the same

5   specification that TQ Delta's counsel just had up.  And what

6   TQ Delta's counsel pointed out was this disclosure as to 'one

7   bit per DMT symbol modulation', and again here 'one bit per

8   DMT symbol modification'.

9        And if I return to Plaintiff's proposed construction,

10  they are reading this requirement into the language so that it

11  represents only a single bit of the diagnostic message.  But

12  what this doesn't consider is this additional requirement in

13  the middle of the specification, column 3, lines 50 and at

14  line 53, where it indicates that "other exemplary modulation

15  techniques include, for example, higher order QAM modulation

16  which involves more than one bit per carrier."

17       So this requirement that there can only be a single bit

18  should not, in fact, be part of the claim, and this

19  conflicting disclosure within the specification is the basis

20  for why we believe there's not reasonable certainty as to what

21  this claim limitation actually means.

22            THE COURT:  All right.  What else?

23            MS. WROBLEWSKI:  Returning to our position of

24  indefiniteness, I just want to point out that Plaintiff has

25  proposed the same definition with respect to these two very

1  different limitations, so the first limitation being, "Each

2  bit in the diagnostic message is mapped to at least one DMT

3  symbol and DMT symbols that are mapped to one bit of the

4  diagnostic message."

5      And it's clear that based on these differing language --

6  based on this differing language, it can't be the case that

7  one construction solves all of the ambiguity that exists

8  within the claim, and this differing language, in fact, raises

9  different questions as to what is required by each of these

10  limitations.

11          THE COURT:  Well, if that's the case, and I don't

12  necessarily disagree with you that it is, why did Defendants

13  opt to stop with your indefiniteness argument and not go

14  forward and say, And, alternatively, if the Court finds that

15  this is not indefinite, what the Plaintiff has proposed here

16  doesn't fit there and what he's proposed there doesn't fit

17  here.  You didn't give me any of that.  You didn't go beyond

18  just simply saying it's indefiniteness, end of story, and now

19  you're arguing somewhat what you failed to brief, and I'm

20  curious as to why.

21          MS. WROBLEWSKI:  Respectfully, I do believe that we

22  -- I do believe that our brief included at least the basis for

23  these arguments.  But, you know, to your point, if the Court

24  is not inclined to go with an indefiniteness position, simply

25  adopting, you know, the plain and ordinary meaning of these

1    terms I think would be acceptable.  Ultimately, these terms

2    cannot be satisfied by the same construction that has been set

3    forth by TQ Delta, and --

4          THE COURT:  Tell me in -- to carry this discussion a

5    little further, then, tell me what your view is of what the

6    plain and ordinary meaning should be of this claim language.

7          MS. WROBLEWSKI:  Truly, Your Honor, because of the

8    lack of specificity of these terms, I think that what we would

9    be left with is just the language of the claim as is and that

10   no additional construction would be necessary and would be a

11   factual issue we would have to deal with down the road.

12         THE COURT:  Well, let me just be real candid with

13   you, counsel.  I don't want to leave the door open to a

14   late-breaking, end-of-the-process, most inconvenient possible

15   raising of an *02 Micro* issue.  So if you've got what the plain

16   and ordinary meaning ought to be, tell me it is now, or tell

17   me the claim language suffices without any further

18   construction.  Don't be silent here and then down the road as

19   we're picking the jury say, Oh, for the first time it's just

20   dawned on me you have to construe what the plain and ordinary

21   meaning is.  So that's what I'm trying to foreclose here, to

22   be candid with you.

23         MS. WROBLEWSKI:  Understood, Your Honor.

24         And to the extent the Court is not inclined to agree with

25   our indefiniteness, we would submit that the plain language of

1    the claim here would be the plain and ordinary meaning.

2              THE COURT:  All right.  Anything further?

3              MS. WROBLEWSKI:  No, Your Honor.

4              THE COURT:  Okay.  Thank you, counsel.

5        All right.  Let's move on to this fourth category, 'array

6    representing frequency domain received idle channel noise

7    information'.

8        Let me hear from the Plaintiff on this.

9              MR. DAVIS:  Thank you, Your Honor.  Bo Davis again

10   for the Plaintiff.

11             THE COURT:  This is one of those cases where we have

12   a prior construction from Delaware, is it not?

13             MR. DAVIS:  It is, Your Honor.  We have a Delaware

14   construction.  We have proposed the Delaware construction, and

15   essentially the Defendants have proposed the Delaware

16   construction up to a point.  The language that I --

17             THE COURT:  On the 'received channel' seems to be

18   where it deviates.

19             MR. DAVIS:  Yes, Your Honor.  They have omitted that

20   language from their construction.

21       And the Delaware court addressed this thoroughly and

22   recognized that we're not talking about a complete absence of

23   any transmission signal.  Transmission signals, as the

24   specification says, are a source of the noise that we're

25   trying to address.  And so when we're talking about -- I mean,

1    what we're talking about here is we have a particular channel.

2    We want to measure the amount of noise on that channel, so

3    we're going to stop transmission on that channel, measure the

4    noise, get the information we have about it so that we can

5    then adjust the parameters we need to adjust to make the

6    transmission on that channel more reliable.

7        So we do think it's important for that reason to have the

8    language 'on the received channel' present in the claim to

9    distinguish the Defendants' construction, which is in the

10   absence of a transmission signal.

11       So I don't know that there's really a whole lot more to

12   say about it than that, and for brevity, I'm happy to rest on

13   that argument, unless Your Honor has a question, but I believe

14   that's the issue.

15           THE COURT:  All right.  I don't have any questions

16   of Plaintiff at this juncture.

17       Let me hear from Defendants.

18           MS. WROBLEWSKI:  Karlee Wroblewski again.

19       So, respectfully, I believe there are two disputes with

20   respect to this term, the first being the requirement of

21   'array', and then, as counsel pointed out, the difference

22   between Plaintiff's construction and Defendants' construction

23   as to whether or not 'on the received channel' is required.

24       With respect to 'array', we think that this is a

25   well-understood term within the art, and that adding the

 1    additional construction of 'ordered set of values' would just

 2    serve to add additional confusion to the jury and require

 3    additional description as to what is intended by that term.

 4    In addition, we don't feel that that fully captures what

 5    'array' can require.

 6            THE COURT:  So you think there is some divergence

 7    between the plain and ordinary meaning, the well-established

 8    meaning of 'array' and 'ordered set of values'?

 9            MS. WROBLEWSKI:  Yes, Your Honor.

10        So -- and then turning to the dispute that TQ Delta

11    raised is with respect to 'on the received channel'.   I'd

12    first like to point out that 'on the received channel' is not

13    anywhere within the specification.  It doesn't point out that

14    in order to measure idle channel noise information it must be

15    that channel that is, in fact, silent.

16        What we do see within the specification is two things:

17    One, the language as proposed by Plaintiff and Defendants'

18    construction requires 'the absence of a transmission signal'.

19    And from the specification we can see that a transmission

20    signal is one signal that goes across the entire subscriber

21    loop.  So we see that in the '686 Patent at column 1, lines 34

22    through 43, and again within column 2, line 1 through 11.

23            THE COURT:  Isn't there some difference between an

24    absolute absence of a transmission signal and the channel

25    simply being idle?  I mean, those are not the same thing, are

1    they?

2         MS. WROBLEWSKI:  They are not.  And what we are

3    measuring with respect to idle channel noise information is

4    the noise information that would exist within a given channel,

5    but that does not require that that channel be the only thing

6    that is idle.  So the specification further tells us that --

7         THE COURT:  But not requiring that that's not the

8    only thing that's idle is not the same thing as saying there's

9    no transmission signal at all, is it?

10        MS. WROBLEWSKI:  Well, the specification points to

11   examples of noise that can exist on a line, and so we see here

12   that what the specification considers is not noise that is

13   present on adjacent channels, but as we see on line 45, the

14   noise that is present on an adjacent phone line.  And so the

15   differentiation here is that we, based on this disclosure

16   within the specification, understand that the claims are not

17   so specific as to indicate that there must only be an absence

18   of noise on the channel, but rather, that the entire line must

19   be silent.

20       If we look at -- this is from TQ Delta's technology

21   tutorial.  We see the noise that can be introduced from

22   adjacent lines here on this telephone pole, and then we have

23   four different lines going to four different houses

24   communicating different types of data.  And these different

25   lines are, in fact, impacting the line at issue that -- for

1    which we want to evaluate what noise is, in fact, present on a

2    given channel.

3         So it is our position, based on this image, that it's not

4    necessary that to measure the idle channel noise information

5    of a channel that it must only be the case that other channels

6    are idle, but rather, that the entire line must be idle.

7              THE COURT:  Let me return to your first point.

8         What differences are there, in your view, between the

9    well-established understanding of an array and an ordered set

10   of values?  I'm not at all sure that I think there's a lot of

11   difference or space here, but you seem to think it's worth

12   making a point in argument over.  So tell me what is it that

13   'ordered set of values' doesn't convey that is part and parcel

14   of the well-known meaning of 'array'.

15             MS. WROBLEWSKI:  So there's a few examples.  One is

16   that an array doesn't necessarily require an ordered set;

17   rather, an array could include, for example, the array of

18   colors in a rainbow.  So it's not necessary that we have a

19   table that allows us to pick and choose what satisfies that

20   term and sort of an ordered pair of values.

21             THE COURT:  Every rainbow I've ever seen looks the

22   same way.  Are you telling me there's a difference between the

23   way they're ordered?

24             MS. WROBLEWSKI:  Not necessarily.  So it could be

25   the case that the array of rainbows tells you them in a

```
 1    particular order, but -- sorry, the array of the colors in a
 2    rainbow is in a particular order; but it could also be the
 3    case that those colors are presented in a different order, but
 4    that wouldn't necessarily mean that they are not still
 5    representative of the colors of that rainbow.
 6              THE COURT:  All right.  Anything that you want to
 7    cover that you haven't already, counsel?
 8              MS. WROBLEWSKI:  No, I think that covers it, Your
 9    Honor.
10              THE COURT:  Okay.  Thank you.
11         All right.  Let's move on to 'plurality of bonded
12    transceivers'.
13         Let me hear from the Plaintiff, please.
14              MR. HURT:  Thank you, Your Honor.  Christian Hurt
15    for the Plaintiff.
16         This is a term that was also construed in the Delaware
17    case, and the main dispute between the parties --
18              THE COURT:  Are we back to the 'configurable'
19    argument again?
20              MR. HURT:  That's right, Your Honor.  And it's a
21    little bit different because 'configurable' is not in the
22    claim language.  The claim language is 'bonded transceiver',
23    and there is a dispute over what it means to be bonded.  And
24    the Delaware court resolved that by including language that
25    the transceivers are on the same side of a physical link.
```

1    That's what it means to be bonded.  But what the Defendants

2    want on top of that is that the transceivers have to actually

3    be running in bonded mode.  They need to be running in that

4    particular mode of operation.  And that's what the Delaware

5    court rejected, and that's the main issue that's being

6    relitigated in this case.

7         And so the main issue in the actual construction is the

8    Defendants have the word 'coordinated to', which the Delaware

9    court referenced, and it's in the briefing as 'active bonding

10   that's actually doing the bonding', and our construction,

11   which is the Delaware construction, is 'configurable to'.

12        So that's the primary issue.  That's the issue that's

13   briefed between the parties.

14        And so -- and the Delaware court resolved this, and, as I

15   mentioned, for giving meaning to the word 'bonded' found that

16   the transceivers are on the same side of two or more physical

17   links.  And that's what it means for these transceivers to be

18   bonded.  That's the actual structure.

19        But what the Defendants are including here, which they

20   included in Delaware, is not only do they need to be -- the

21   transceivers need to be set up that way; they actually need to

22   be running in bonded mode.  And the district court in Delaware

23   rejected that.  And that's where the 'configurable to

24   transmit' comes in instead of 'coordinated to transmit' comes

25   in, and that was in the Delaware case.

1    And this is one of the --

2         THE COURT:  Tell me how 'coordinated' equates with

3    actual operation.  I mean, doesn't 'coordinated to' re-raise

4    the issue of 'configured to' as opposed to actual operation?

5         MR. HURT:  Well, Your Honor, I would think if in

6    the -- I would think Your Honor is correct in the absence of

7    the record that's in Delaware and how this dispute played out.

8    The Defendants proposed 'coordinated to' and in their briefing

9    took the position that that meant actual active bonding,

10   actual operation.  And so that's the issue.

11   I think if we were just talking about 'coordinated

12   to' without that context, it would be closer to what Your

13   Honor asked, but the reason we're talking about it as 'active

14   operation' and 'active bonding' is because that's how the

15   Defendants have framed the issue in Delaware.  And that's the

16   language that provides the hook for that.

17        THE COURT:  All right.

18        MR. HURT:  And so the district court rejected that

19   argument.  This case in Delaware actually went to a verdict,

20   so a lot of these Delaware cases are at different stages.  The

21   jury actually rendered a verdict on this -- on these claims

22   under that construction.

23   And so the Defendants, to show that it requires active

24   operation, point to two with parts of the specification in

25   which the Delaware court looked at, but if you look at those

1    parts, it's talking about an exemplary system, it's not

2    something that's definitional, and it says "to, for example,

3    generate a high data rate."  So it doesn't say it's actually

4    doing it right now; it's -- in this example system it's set up

5    to do it, which is what the Delaware court's configurable

6    construction already captures.

7         The second part of the specification similarly doesn't

8    help the Defendants' re-definition because it mentions the

9    exemplary system being bonded together to form a single

10   stream.  But again, the district court's -- Delaware court's

11   construction captures this because they're on the same side of

12   the physical link, and this is actually the part of the

13   specification that the Delaware court relied on to have two

14   transceivers on the same side of the physical link, which is

15   in TQ Delta's construction.  So this is already captured in

16   what it means to be bonded.

17        But what the Defendants are doing now, which is what they

18   did in Delaware, is have an additional requirement that those

19   transceivers are up and running in bonded mode, that they are

20   actually in this operation, and the district court rejected

21   that in Delaware.  It ultimately went to a jury verdict.

22   There is no reason to depart from that construction.  Nothing

23   in the intrinsic record would support that view.

24             THE COURT:  All right.

25             MR. HURT:  Unless Your Honor has any questions.

1        THE COURT:  No.  Thank you, Mr. Hurt.

2        MR. HURT:  Thank you, Your Honor.

3        THE COURT:  Let me hear from Defendants, please.

4        MR. ONG:  Good morning, Your Honor.  Andrew Ong on

5   behalf of Defendants.

6        These two terms, the plurality of bonded transceivers and

7   the next term are only relevant to CommScope because these are

8   the only -- they are only asserted against CommScope.

9        So I think the key thing here to note is that what

10  Plaintiff admitted during argument is that the 'configurable

11  to' language is nowhere in the claim language.  It's not

12  anywhere in the patent specification for the '881 Patent.

13  It's not used in any of the claims as issued.

14        And so if you look at the plain language of the claim,

15  you are requiring a plurality of bonded transceivers.  What

16  Plaintiff is asking the Court to do is essentially rewrite it

17  to be -- to say what they wish it said, which is something

18  along the lines of a plurality of transceivers that are

19  capable of being bonded, or if the Court is inclined to use

20  the 'configurable to' language, that's something that they're

21  proposing that's just not in the language of the claims.

22  And --

23        THE COURT:  So for that reason, the Delaware court

24  got it wrong.

25        MR. ONG:  We do think that the Delaware court got it

 1    wrong, Your Honor, and we do think that the Delaware court's

 2    construction is contrary to the intrinsic evidence and

 3    Defendant -- excuse me -- plaintiff pointed out the portions

 4    that we cited to in our brief, and they're on the screen.  So

 5    the exemplary systems and methods of this invention combine

 6    multiple physical PHY's.  And this is in the summary of the

 7    invention at lines -- column 4, line 29, it says, "The

 8    exemplary system illustrated in figure 2 PHY's 160 and 170 are

 9    bonded together."  So the applicants recognized in drafting

10    the specification, in drafting the claim language, that

11    bonding -- that having actual bonding is what's required for

12    the claimed invention.

13         The last point that TQ Delta made in its brief is that

14    the construction that we're proposing here is contrary to

15    Federal Circuit law about what a device actually is as opposed

16    to what the device actually does.  And we disagree with that,

17    Your Honor, for a couple of reasons.  One is, again, the plain

18    language says it's bonded, so that's telling us what the

19    structure is.  And this is no different than a situation where

20    you have a system and you have a couple of computers and it

21    says the computers are connected to each other.  Right?  This

22    is what's -- that's what's required to satisfy the claim

23    language.

24         And to the extent that Defendants -- excuse me.  To the

25    extent that Plaintiff believes that this is imposing a --

1    improperly imposing a use requirement, we cited the *Typhoon*

2    *Touch versus Dell* case.  And basically if the specification

3    supports it and you have a structure that is defined by

4    functional language, it is not -- it is proper to include a

5    use or operation requirement in the claim construction.  And

6    we submit that that is the case here because the plain

7    language requires that the transceivers are actually bonded to

8    satisfy the limitation.

9            THE COURT:  Do you agree, counsel, that whether

10   we're going to argue about 'configurable' or 'corresponding'

11   or 'bonded' or any of this claim language, that at the end of

12   the day that really comes back to whether or not actual

13   transmission and reception is required?

14           MR. ONG:  That's --

15           THE COURT:  That's really the nut of the problem

16   here, isn't it?

17           MR. ONG:  That is correct, Your Honor.

18           THE COURT:  Okay.

19           MR. ONG:  And I have nothing further on this.

20           THE COURT:  Is there anything that you've given me

21   that was not presented to the court in Delaware, or is this

22   basically the same argument that was presented there?

23           MR. ONG:  I believe that's correct.

24           THE COURT:  Okay.  Thank you.

25           MR. ONG:  Thank you, Your Honor.

1          THE COURT:  All right.  Let's move on to item 6,

2     which is 'reduce a difference in latency between the bonded

3     transceivers'.

4          And let me hear from the Plaintiff.

5          MR. HURT:  Christian Hurt for the Plaintiff, Your

6     Honor.

7          This term is in the same claim as the one that we just

8     discussed, and this issue was also raised in Delaware by the

9     -- and resolved there.  And there are two issues that the

10    parties are briefing.  The first is indefiniteness.  The

11    district court in Delaware addressed that, found the claims

12    were not proven indefinite.

13         And the second is this alternate construction which

14    replaces the word 'reduced' --

15         THE COURT:  With 'minimize'.

16         MR. HURT:  -- with 'minimize'.

17         THE COURT:  Right.

18         MR. HURT:  And the Delaware court addressed that and

19    concluded these are two different things.  Pretty clear

20    'reduced' and 'minimize' aren't the same, no lexicography or

21    disavowal.

22         And we really have the same record here, and I'll go

23    through it briefly, Your Honor, but this term is about using

24    transmission parameters to reduce a difference in latency

25    between more than one transceiver.  So if Your Honor recalls

```
 1    from the tutorials, the bonded system is where you're trying

 2    to use two or more phone lines to blast a bunch of data to

 3    someone's house, and when it gets back to the house it all has

 4    to be recombined.  And so if there's differences in some of

 5    the timing of when that data shows up, it may not come in

 6    order or there may be issues trying to restructure it.  And

 7    this term is about, Well, how about I fiddle with some of

 8    these parameters to make it so when the data comes in I can

 9    process in the way that's a little more synchronized and

10    optimizes the system.  And that's what this term just says on

11    its face is you utilize a transmission parameter value to

12    reduce that difference in latency.

13         And the district court judge on the definiteness issue in

14    Delaware mentioned -- has held this is clear as to what this

15    means, there is nothing ambiguous about this.  And Defendants

16    here don't point to anything in the text itself that's

17    ambiguous.  What their argument is, Well, the patent doesn't

18    tell you how to reduce the latency, and that's not correct.

19    And as Your Honor mentioned earlier with the family 1 patents,

20    that's really a written description/enablement issue, not a

21    claim scope issue.

22         And then the other argument is, Well, there are many

23    times of latencies.  One is configuration latency, but also

24    another one is wire latency, which is the two wires could be

25    of such different lengths that when the actual information
```

1    travels on them, one's a lot slower than the other because

2    it's a lot longer.  But the signals on these wires travel at

3    somewhere around 30 to 50 percent of the speed of light, and

4    so there's never really an instance where Defendants have

5    pointed to where that wire latency really has such a big

6    impact on the system compared to configuration latency which,

7    in the patent, is in an order of milliseconds.  So we're

8    talking about the predominant latency driver is the

9    configuration latency.  The wire latency you have to have a

10   difference in wires that are hundreds or thousands of miles

11   for that to even approach the configuration latency.

12             THE COURT:  When you say 'wire latency', are you

13   talking about what Defendants argued in their briefing as

14   overall system latency, or is that something different.

15             MR. HURT:  It's part of it.  The overall system

16   latency is -- has a couple of components.  One is wire latency

17   and one is configuration latency, and the total system latency

18   is basically those start to add up.

19        But what the claim's talking about is you change the

20   configuration latency parameters to reduce this difference in

21   latency.  And the Defendants say, Well, it may not reduce the

22   difference in latency because the wire latency may be way out

23   of whack.  But there's really no evidence to support that.

24        And even if in that situation where you utilize the

25   transmission parameters and it didn't reduce the latency,

1   that's just a non-infringement issue; that's not a claim scope

2   issue.  The claim scope issue is you use those parameters and

3   it reduces the latency.

4       And that's what the district court judge in Delaware

5   held.  The claims are clear to what their face -- on their

6   face as to what's claimed, there isn't really a definiteness

7   issue, and there's no reason to change -- reduce the

8   difference -- to minimize the difference.

9       And in terms of the argument, well, the patents -- and

10  again, Your Honor, this is a claim that went to verdict in

11  Delaware, so a definiteness -- the judge found there was no

12  indefiniteness on summary judgment, the patent proceeded to

13  trial, and there's currently a verdict.

14      So the specification tells you that the latency of the

15  claims they're talking about is configuration latency, and

16  that's what those transmission parameters drive.  And I don't

17  think there's really a dispute about that.  The Defendants'

18  alternate construction is to minimize the difference in

19  configuration latency.

20      But to this definiteness argument that the specification

21  doesn't tell you the how is just incorrect.  So the

22  specification tells you how to measure latency, how to

23  calculate it with some equations, how to balance the two

24  receivers to have the same latencies, and that even tells you,

25  you know, if you can't get them -- if you can't exactly have

1   them line up, you can still use some buffering to get -- to

2   make sure that you're able to piece the stream together.

3        So this is actually from figure 9 where you can see the

4   three streams coming in on the right side of the screen.  The

5   middle one is a little bit faster so you may want to hold it

6   and wait for the top one to come in before you piece the

7   stream back together.

8        And the Defendants' argument is, Well, this is talking

9   about an embodiment that's not claimed--I disagree with

10  that--but there is also a second embodiment in the patent that

11  shows the same thing.

12       And so this goes to the Defendants' argument that

13  'reduce' means 'minimize'.  Their argument is you've got to

14  set the two latencies equal to each other, and the patent

15  discloses, sure, that's an example equation, but it says,

16  Look, if they're not exactly equal, which in the real world is

17  basically usually the case, you can use some type of buffering

18  to compensate for the difference in latency.  And that's in

19  figure 9 and figure 15 of the patents.

20       And Your Honor, all of this was before the Delaware judge

21  who ruled in the way that TQ Delta is asking Your Honor to

22  rule in this case.

23            THE COURT:  All right.

24            MR. HURT:  So unless Your Honor has any questions.

25            THE COURT:  I think I understand your position.

1          Let me hear from the Defendants, please.

2              MR. ONG:  Andrew Ong for CommScope.

3          And just to get it out front, we -- this stuff was before

4     judge Andrews, but we do believe he got it wrong based on the

5     intrinsic record.

6          We do believe that the 'reduce the difference of latency

7     between the bonded transceivers' term is indefinite.  There is

8     no disclosure in the patent specification that would allow a

9     person of ordinary skill to understand what it means to reduce

10    the configuration latency -- or reduce a difference in latency

11    between two transceivers.

12         The key issue here is that in the specification there is

13    no discussion that allows a person of ordinary skill to

14    understand sort of what is the latency of the system before

15    these transmission parameter values are used as compared to

16    when you have the claim language where the -- at least one

17    transmission parameter value is then being used to reduce a

18    difference in latency between the transceivers.

19         So essentially if you don't know what the latency is

20    before the values are used, there's no way to know whether the

21    utilization of those transmission parameter values actually

22    reduces a latency -- a difference in latency between the

23    bonded transceivers.

24         And actually the -- with respect to the configuration

25    latency, the portion of the specification that the Plaintiff

1    was highlighting actually adds to or demonstrates the problem

2    here.  The only discussion of the configuration latency

3    reducing is to set the transmission parameter values so that

4    the configuration latency across two bonded lines are -- is

5    the same, and that way your difference in latency is always

6    going to be zero.

7        In that context--right?--you know that the difference in

8    latency has been set to zero, but there's no discussion in the

9    patent specification about what the difference in latency was

10   without using those transmission parameter values.  If the

11   transmission -- if the difference in latency at that point is

12   zero, then going from zero to zero, there is no reduction in

13   the latency after using the transmission parameter values.

14       So the portion of the specification that I was just

15   talking about there was the '881 Patent at column 6, lines 56

16   to 65.

17       TQ Delta points to the patent's discussion of using

18   buffers, but as we explained in our briefing, and as TQ Delta

19   concedes in its reply brief, the use of buffers is a different

20   -- is a completely different embodiment than what was -- what

21   is claimed this claim 17, 18 of the '881 Patent.  And you'll

22   see in the reply brief at page 5, they -- in the parenthetical

23   they say, "regardless of the embodiment, understanding that

24   it's not directed to what's being claimed."

25       And also using buffers as described in the patent does

1    not reduce a difference in latency.  There's no -- there's

2    nothing done on the latency -- done to latency on the lines

3    based on the use of buffers.  One line is simply held up while

4    waiting for data on the other line to arrive, and so the

5    latency on the lines is not affected at all.

6        So given that, we still believe that a person of ordinary

7    skill in the art would not be able to understand what a

8    reduction in the difference in latency is between two bonded

9    transceivers.

10            THE COURT:  If you look at the specification of the

11   '881 Patent here, particularly the description at column 6,

12   lines 10 through 15, doesn't that really provide a context for

13   understanding latency in this patent?  Are you telling me that

14   the specification just leaves you uninformed as to the concept

15   of latency and a reduction that would follow?

16            MR. ONG:  So column 6, lines 10 to 16, that's just

17   describing what configuration latency is and what transmission

18   parameter values can be used to affect configuration latency.

19            THE COURT:  Isn't part of your indefiniteness

20   argument that a person of ordinary skill couldn't read this

21   and know what to do?  Doesn't this impart a pretty clear

22   understanding of 'configuration latency'?

23            MR. ONG:  Well, it's not the -- our indefiniteness

24   argument is not based on the understanding of 'configuration

25   latency'; it's determining the difference between -- or

1    whether there is a reduction in the difference in

2    'configuration latency', and that's the issue, because --

3              THE COURT:  I mean, you have to understand the

4    concept of 'configuration latency' before you get to an

5    ability to understand the reduction issue.  Right?  I mean,

6    we're not talking about just what does it mean to reduce

7    something, are we?

8              MR. ONG:  Right.  So I think -- having an

9    understanding of what 'configuration latency' is is not

10   sufficient to arrive at understanding what it means to reduce

11   a difference in configuration latency, because there's

12   no -- again, back to -- there's no --

13             THE COURT:  I'm not saying that understanding

14   'configuration latency' in and of itself answers the entirety

15   of the issue; I'm just saying it's part of how you get there.

16   And doesn't the specification give you that in this column 6,

17   lines 10 through 15, understanding that there's more to

18   meeting the claim language than merely understanding

19   'configuration latency'?

20             MR. ONG:  I think I can agree with Your Honor that

21   column 6, lines 10 to 16, does give a person of ordinary skill

22   an understanding of what 'configuration latency' is.

23             THE COURT:  Okay.  That was really the point I was

24   trying to make.  And I concede that's not the entirety of the

25   inquiry.

1          MR. ONG:  Okay.  I apologize, Your Honor.

2      I think that's all I have, unless you have any further

3   questions on that term.

4          THE COURT:  Let's talk a minute about your

5   alternative here.  Tell me why 'minimize' is appropriate over

6   'reduce'.

7          MR. ONG:  Sure.  Sorry.

8      With respect to 'minimize', I think that goes back to the

9   sole disclosure in the patent relating to what they say is

10  reducing the difference in latency for the configuration

11  latency, and that goes to setting the transmission parameter

12  values so that the configuration latency is the same on both

13  lines.

14     And because you're basically setting it to zero, that's

15  why we believe that 'minimize' is a proper term, because

16  otherwise, your -- it kind of goes back to the issue of you

17  still don't know whether there is a reduction as opposed to if

18  you use the term 'minimize', then you are able to then -- then

19  this disclosure kind of explains what that is.

20         THE COURT:  Are you telling me that setting it to

21  zero is the only way you can do it; therefore, it's always got

22  to be set to zero; therefore, it's always got to be absolutely

23  minimized?  Is that the argument?

24         MR. ONG:  As disclosed in the patent, yes.

25         THE COURT:  Okay.  All right.  What else?

1        MR. ONG:  Nothing further on that term, Your Honor.

2   Thank you.

3        THE COURT:  Okay.  Thank you.

4      All right.  Let me ask you this, counsel.  Item 7 here,

5   hasn't this really already been covered?  Do we need to argue

6   this separately before we go on to 'shared memory'; the 'each

7   bonded transceiver utilizing/selecting at least one

8   transmission parameter to reduce a difference in latency

9   between the bonded transceivers'?  I mean, didn't we just

10  cover that, in essence.

11       MR. HURT:  Yes.  Christian Hurt for the Plaintiff.

12     Yes, Your Honor, those two terms were briefed together,

13  argued together.  There's no separate argument, at least from

14  Plaintiff's view, between the two -- what is item 6 in the 4-3

15  chart and item 7 in the 4-3 chart.

16       THE COURT:  Do you agree with that, Mr. Ong?

17       MR. ONG:  We do, Your Honor.

18       THE COURT:  Okay.  Then let's move on, in light of

19  that, to 'shared memory'/'sharing the memory'/'a memory

20  wherein the memory is operable to be shared.'

21     Let's start with Plaintiff.

22       MR. McANDREWS:  Good morning, Your Honor.  Peter

23  McAndrews for Plaintiff.

24       THE COURT:  Go ahead, counsel.

25       MR. McANDREWS:  So the dispute with 'shared memory'

1    is TQ Delta wants to stick with the construction that was

2    provided in Delaware.  Defendants want to go with plain and

3    ordinary.  And the reason for that is because there's two

4    types of what they would potentially call shared memory that

5    are inconsistent with the usage of the term in the patent

6    specification and in the claims.

7         So the claims speak to allocating memory.  I'm sorry.

8    The claims speak to 'allocating shared memory between an

9    interleaver function and a deinterleaver function'.  The

10   construction that Judge Andrews provided was 'common memory

11   used by at least two functions where a portion of the memory

12   can be used by either one of the functions'.

13        And what this construction does is it eliminates two

14   other types of memory that the Defendants we believe would

15   like to call shared memory.  One of them is -- and it's best

16   to look at figure 1 of the patent just for a baseline here.

17   So in figure 1, it shows a shared memory element 120 that sits

18   between the transmitter portion that has interleavers in it

19   and the receiver portion that has deinterleavers in it.  This

20   is a single transceiver, so it transmits information outward

21   and it receives information inward; it interleaves for data

22   leaving the device; it deinterleaves for data entering the

23   device.

24        So one of the types of memory that they'd like to call

25   shared memory is something called interprocess memory where

1    what it would require is the deinterleaver and interleaver of

2    the same device are using this memory block to pass

3    information to each other.  And, of course, that doesn't make

4    any sense.  This transceiver is communicating with a device on

5    the other end of the line, so it doesn't make any sense for

6    the interleaver to be communicating through the shared memory

7    with a deinterleaver.  So that's one thing that Judge Andrews'

8    construction eliminates.

9        The other thing that Judge Andrews' construction

10   eliminates is merely having a common pool of memory where some

11   portion of it is used for the interleaver and another portion

12   is used for the deinterleaver, but those can never cross over;

13   you can never -- you have a hard line -- yes, it's a common

14   pool of memory, but there's a hard line where a particular

15   portion of that memory will only ever be used for one

16   function, like the interleaver, and the other portion will

17   only ever be used for the deinterleaver.

18       The reason why we know that that's inconsistent with the

19   specification, Your Honor, and it's actually best illustrated

20   by the examples provided in column 6, 7, and 8 of the patent,

21   and so it's describing a common pool of memory of the amount

22   of 20 kilobytes, and then it gives examples of different types

23   of allocations.  In one allocation, one latency path, so the

24   interleaver, for example, is using 16 kilobytes of memory of

25   the 20; the other latency path, the deinterleaver, for

1     example, is using four kilobytes, and so we've got a 16/4

2     split within the 20 kilobytes of memory.  That's example 1.

3          Example 3 describes where, instead, you have one latency

4     path is 10 kilobytes and the other latency path is 10

5     kilobytes, you still have a total of 20, but now six of the

6     kilobytes of memory that were once used for the interleaver

7     are now being used for the deinterleaver.  And so the concept

8     is you have this flexible memory that allows some portion of

9     it to be used for one function at one time and a different

10    function at another time.

11         There's actually -- while it's not describing this, one

12    way to think of how prior art would have worked is in column

13    8, around line 15, it's describing three latency paths, so

14    perhaps two interleavers and a deinterleaver, and it's saying

15    each of them could be a maximum of 16 big, 16 in size.

16         In the prior art when you had -- even if you had a common

17    pool of memory, those would -- there would be a hard line

18    dividing them, so you would need 48 kilobytes of memory.

19    You've got 16, 16, and 16.  But what this is saying is that's

20    the maximum I can use for any particular latency path, but

21    then it gives a third -- I'm sorry.  It gives an additional

22    restriction and says, Well, I only have a 20 of total shared

23    memory, so now we've got to figure out how to divide that up.

24    So we can use 20, but we can't use the full maximum on any

25    particular latency path.

1          So these examples are illustrating the idea of common

2    memory, but common memory where some portion of it is -- can

3    be used for interleaving at one time and deinterleaving at

4    another time.

5          THE COURT:  Does 'can be used for interleaving at

6    one time and can be used for deinterleaving at another time'

7    necessarily equate to 'at some time must be used'?  I mean,

8    does the ability to use this flexible memory, it's -- does it

9    mean that over time it will necessarily have to be used in

10   both functions?

11         MR. McANDREWS:  Your Honor, it does not mean that.

12   It would mean that you have hardware set up, so, first of all,

13   that the memory hardware is accessible by both the interleaver

14   and deinterleaver functions, so that would be one thing that

15   is a requirement for it to be capable of or that it can do

16   this.  The other thing is the way the source code is written

17   is the source code could take that common block of memory and

18   decide ahead of time, I'm going to divide it so no function

19   can ever step over the other guy's line.  You know, the

20   example would be I divide a 20 kilobyte memory into ahead of

21   time so it is always 10 for one function, 10 for another

22   function.  That would be a situation where 'can' doesn't work.

23   The source code itself set up that memory so that you can't

24   step over the line into the other space.

25         But if the source code allows flexibility in assigning

1    portions of the memory to the interleaver and the

2    deinterleaver, and we intend to show that through our

3    infringement proofs, that would be a capability -- that would

4    be the capability of allocating one portion to the interleaver

5    at one time and allocating that same portion to the

6    deinterleaver at another time.  It doesn't --

7              THE COURT:  I understand that.  But I guess what I'm

8    trying to get you to address for me is your understanding of

9    the Delaware construction of memory can be used doesn't

10   involve or include the concept that over time it eventually

11   must be.  It doesn't have to be; it just can be.

12             MR. McANDREWS:  That's correct, Your Honor.

13             THE COURT:  Okay.

14             MR. McANDREWS:  So if the device would infringe as

15   sold as opposed to you'd have to observe it during the course

16   of its actual use by a particular customer.

17             THE COURT:  Okay.  That's what I wanted you to touch

18   on.

19        What else here?

20             MR. McANDREWS:  I think that's it for Plaintiff for

21   now, Your Honor.

22             THE COURT:  And you're not proposing anything

23   different for these claim terms that were not previously

24   construed in Delaware; you're just effectively saying it's all

25   subsumed by the one construction?

1        MR. McANDREWS:  That's correct, Your Honor.  I mean,

2   possibly, you know, adjusting obviously for the context, but

3   'shared memory', 'sharing memory', 'configured to be shared',

4   'operable to be shared', they all are the same concept of a

5   portion of the memory can be used for the interleaver at one

6   time and the deinterleaver at another time.

7        THE COURT:  All right.  Thank you, counsel.

8        Let me hear from Defendants, please.

9        MR. MARAIS:  Thank you, Your Honor.  Nic Marais on

10  behalf of Defendants.

11        THE COURT:  Please proceed.

12        MR. MARAIS:  Thank you.

13        As an initial matter, I just want to point out --

14        And if I can please switch to the elmo.

15        So what TQ Delta seems to be arguing in this case is the

16  notion that a shared memory here, or at least their

17  construction of a shared memory encapsulates all shared

18  memories.  The one thing I just want to point out is that is

19  not how the Delaware court construed this term.

20        If we look down here, we can see that the Delaware court

21  indicated that the Plaintiff points to two different types of

22  shared memory, and those are the types that Mr. McAndrews

23  pointed to earlier, that are unlike the shared memory

24  described in the patents.  And what it ultimately concluded

25  is, based on those two different types it said over here, What

1    we're going to do is we're going to adopt this language--the

2    common memory can be used by either one of those functions.

3        So while we are -- Your Honor's point that 'can be'

4    doesn't necessarily require, that does make us a lot more

5    comfortable with their position that they are not necessarily

6    requiring that a portion of the memory -- or at least that

7    there's ever a second allocation that actually shows a single

8    portion of the memory or a single block of memory being

9    allocated to two different portions, we still believe what

10   TQ Delta is trying to get at is they are reading out two

11   embodiments of a shared memory, and -- at least a shared

12   memory that a person of ordinary skill would understand a

13   shared memory to be.

14       Now, where we think the Delaware court erred, Your

15   Honor --

16       Do you mind, can we please switch back here?

17       Is we think the Delaware court erred by importing a

18   limitation of the claims that is not in every single claim,

19   and that really just describes a particular use case of a

20   shared memory.  And they are importing that limitation into

21   every single time you see the term 'shared memory'.

22       So what I have up here on the slide, Your Honor, is a

23   claim 9 of '882 Patent.  And we can see it says 'shared

24   memory' a number of times.  And then we have the '608 Patent,

25   claim 2, which is part of the same family, and here we see at

1    the top it says 'a memory is operable to be shared'.  So

2    again, that's just the same term as 'shared memory', and the

3    parties agree that that's -- those terms are being construed

4    consistently.

5        But what that term ultimately does -- or what this claim

6    ultimately does is it goes on to explain how that sharing

7    actually happens.  And it says here, "The sharing comprises

8    using a first portion of the memory for the interleaver

9    function and simultaneously using a second portion of the

10   memory different than that for the first portion for the

11   deinterleaver function."  And then, importantly, it goes on

12   and says, "and the first and second portions of the memory are

13   configurable such that one or more bytes of the memory can be

14   used by the interleaver function at one particular time, and

15   the same one or more bytes of the memory can be used by the

16   deinterleaver function at a second time."

17       And so it's our view is that everything that's underlined

18   in red there, Your Honor, aligns with a second clause of

19   TQ Delta's construction, which is where a portion of the

20   memory can be used by either one of those functions.  And

21   every time you see 'shared memory' in claims like the '882

22   Patent--it's also in a number of other patents--it does --

23   that does not include this limitation.  What we understand TQ

24   Delta to be trying to do is import this entire limitation into

25   that.

1          THE COURT:  And is that to avoid some prior art?

2     What's the rationale behind it?  Usually that's what's behind

3     it when the plaintiff tries to import a limitation, as opposed

4     to defendant who's trying to avoid infringement.

5          MR. MARAIS:  That's exactly right, Your Honor.

6        And if we can switch back to the elmo.

7        So sideways is a little tricky here.  If you look here --

8     so starting from 'second' at the bottom of the page here, it

9     says, "Second, and Plaintiff notes that yet another type of

10    shared memory, known as ping-pang memory both involves

11    transmission in a single direction and uses a shared memory

12    exclusively for an interleaver or for a deinterleaver at any

13    one time."

14       Now, this ping-pang memory is a term that comes directly

15    out of one of our prior art references, Your Honor, and often

16    it's actually referred to as ping-pong memory, so we know it

17    comes out of that reference because it's one of the few

18    references that would refer to as ping pang instead.  And what

19    the court ultimately did in the claim construction is it

20    effectively read out this prior art reference by narrowing the

21    claim language.

22          THE COURT:  Okay.  What else?

23          MR. MARAIS:  So the only other thing I would add,

24    Your Honor, is that ultimately the --

25        Well, let me switch back.

1          Ultimately we agree that a shared memory is, you know, a

2    memory that would be used by two or more functions, but

3    ultimately it just has to have the ability to allocate that

4    memory amongst those different functions.  It doesn't have to

5    do it.  It doesn't ever have to have a second allocation of

6    that memory.  It doesn't ever have to -- even if it does have

7    a second allocation of that memory, a single particular block

8    of that memory does not necessarily have to service as two

9    functions.  You can have an allocation, as Mr. Hurt was

10   talking about, or -- I apologize -- as Mr. McAndrews talks

11   about the example where you have 16 bites and four bytes,

12   there could be an allocation that re-allocates to 12 bytes and

13   two bytes.  A portion or a single block of that memory would

14   never have overlapped between those functions, but it wouldn't

15   changing the fact that it's still a shared memory.

16        I have nothing further, Your Honor.

17             THE COURT:  Okay.  Thank you.

18        All right.  Let's go on to the next area of dispute

19   including 'wherein the generated message indicates how the

20   memory has been allocated between the first deinterleaving

21   function and the second deinterleaving function', as well as

22   'a message indicating how the shared memory is to be used by

23   the interleaver or the deinterleaver'.

24        I'll hear from Plaintiff, Mr. Davis.

25             MR. DAVIS:  Thank you, Your Honor.

1          Just to set the stage for this term, this is a situation

2     where we are proposing plain and ordinary meaning.  The

3     Defendants have adopted a construction from Delaware, but the

4     way that this construction was situated or developed is with

5     respect to a different term.  And so we're essentially taking

6     the court's construction of the amount of memory portion of

7     this -- portion of this -- of the Defendants' construction was

8     in Delaware, but it came as a result of a different claim that

9     actually used the words 'amount of memory' in the claim.

10         And so we're proposing plain meaning because we think the

11    claim language is clear.  It says, "Wherein the generated

12    message indicates how the memory has been allocated."  We

13    think that's clear.  We don't think we need a construction.

14    This claim language does not include the words 'amount of

15    memory'.

16         And so -- and as you'll see on the next slide here,

17    'amount of memory' was actually a term that was construed in

18    Delaware in a claim that uses the language 'amount to memory'.

19    So we have a different claim that doesn't use the 'amount of

20    memory'; it just says 'message indicates how the memory'.

21         So in Delaware, claim 5 of the '890 Patent, which is not

22    asserted in this case, actually uses the word 'amount of

23    memory'.  And so there was a big dispute and a lot of briefing

24    about what does 'amount of memory' mean, and ultimately in

25    Delaware for that term 'amount of memory', we had proposed 'a

1    number of units of memory', defendants proposed 'number of

2    bytes of memory', and the Court said plain meaning.  So for

3    'amount of memory', the Court said plain meaning, and

4    expressly rejected this notion that the amount of memory for

5    that claim was limited to a number of bytes.  The term is

6    broader than 'bytes', and a jury will not have trouble

7    deciding what is or is not an amount of memory.

8        The claim here, as you can see, doesn't use the

9    word 'amount of memory'.  The term here 'wherein the generated

10   message indicates how' the memory has been allocated but

11   doesn't limit it to an amount.

12       And so, you know, I imagine you'll hear from Defendants

13   that the -- you know, the construction that they have proposed

14   is a construction that the Delaware court adopted, but it's a

15   lot more complicated than that, because 'amount of memory' was

16   the term at issue.  The court went plain meaning.  And then

17   for the term at issue here 'wherein the generated message

18   indicates how', those issues kind of bled over and we ended up

19   proposing a construction in Delaware that did use the

20   word 'the amount', and the court adopted our construction.

21   But because of -- it wasn't -- in our view, the reason for

22   that is not because plain meaning wouldn't have sufficed; it's

23   because the initial issue started with what does it mean for

24   an amount to be -- what does an amount of memory mean.

25       And so we're in a situation here where 'amount of memory'

1    was construed in Delaware to mean plain meaning.  Defendants

2    have proposed 'amount of memory' in a claim term that says the

3    message simply indicates how the memory has been allocated.

4         So we don't think it's the exact same issue, we don't

5    think that the words 'amount of memory' are necessary to

6    explain claim language as simple and straight forward as the

7    claim language we have here.  And so for those reasons we have

8    proposed plain and ordinary meaning for this term, and we just

9    don't believe that these terms need to be construed at all.

10   We think they're plain on their face, and the Defendants'

11   proposed construction for 'amount of memory' is simply -- it's

12   too limiting, for one, and it's not necessary for these terms.

13        And that's all I have, Your Honor.

14             THE COURT:  All right.  Let me ask a question.

15             MR. DAVIS:  Yes, Your Honor.

16             THE COURT:  It seems that in what's been put

17   forward, the Defendants agree not to assert that the meaning

18   of this claim language is limited to indicating a number of

19   bytes of memory.  That's not -- if that's true, that's not

20   enough to address your concerns?

21             MR. DAVIS:  I believe it partially addresses our

22   concerns.  The issue, though, is still they're importing this

23   notion that there must be an amount, an amount of memory.  And

24   so while they're saying they're not going to argue that that

25   means a number of bytes, they're still going to argue

```
 1    something about an amount, some proxy for that.  And that's

 2    our concern is that whatever they're going to argue about the

 3    amount that the message doesn't expressly -- they don't

 4    infringe because the message in their systems doesn't specify

 5    an amount of memory, that that will still be problematic in

 6    this case with the claims we have asserted here because the

 7    claim is not limited to an amount.  It says the message merely

 8    has to indicate how the memory has been allocated, and it's

 9    not limited to indicating how the memory has been allocated by

10    way of an amount.

11              THE COURT:  Well, how do you -- as a practical

12    matter, how do you allocate memory without discussing the

13    amount of memory that is allocated?  I mean, if the total is

14    12 and you say six on one side, six on the other, you've said

15    how to do it, but you've also indicated some quantity or

16    amount.  Or if it's four on one side and eight on the other or

17    two on one side and 10 on the other.  If you're going to fully

18    enumerate the how, how do you do that and avoid the amount

19    issue?

20              MR. DAVIS:  Well, there will always be an amount

21    involved.

22              THE COURT:  Agreed.

23              MR. DAVIS:  So I agree with you there.  The question

24    is, does the message have to indicate the amount?  Does it

25    have to state the amount, or can it be -- can the amount be
```

1    indicated in some other fashion; can it be indicated

2    through -- I mean, in the way the systems work, whatever

3    mechanism they're using to indicate how to allocate memory, it

4    may not be expressed in an amount.

5            THE COURT:  Well, I guess my question is, when you

6    look at the language 'wherein the generated message indicates

7    how the memory has been allocated', how do you do that and

8    avoid covering, to some extent, the amount, given that there

9    is an amount that will be employed?  I mean, are you talking

10   about some kind of fractional differentiation, half here, half

11   there; third here, two thirds there; but you haven't

12   identified a precise number of bytes, even though the amount

13   of memory is going to be a known quantity?

14           MR. DAVIS:  Correct.

15           THE COURT:  I'm just not sure how you meet the claim

16   language and avoid the concept of an amount.

17           MR. DAVIS:  Well, I think that Your Honor just

18   provided one example.  It could be expressed as a fraction, it

19   could be expressed as a percentage, it could be expressed as

20   some indication relative to speed, the speed of the

21   transmissions.  We want to make sure that we're operating

22   within certain parameters, and in order to do so we have to

23   allocate certain memory, certain amounts of memory.

24       So yes, the -- and I do believe that, you know, the

25   Defendants' construction, even the word 'indicates' provides

1     some breadth there to give us some flexibility.

2         And, you know, this is what the Delaware court went with.

3     And I don't believe that their construction actually limits it

4     to a specific number of bytes or a specific amount.  In other

5     words, it does provide flexibility to convey memory allocation

6     in other ways, such as fractions or percentages or operating

7     within certain parameters.

8         But at the end of the day, we're dealing with different

9     claim language that merely requires that the message indicate

10    how the memory has been allocated.  It doesn't say 'indicate

11    the amount of memory that has been allocated'.  And so we're

12    importing a limitation that's just not in the claims.

13        And as far as I understand Defendants' argument, they're

14    primarily just relying on Delaware saying, This is what they

15    did in Delaware, this is analogous to a different claim where

16    the Defendants -- analogous to an issue where Plaintiffs

17    proposed this.  So we're in a situation where they haven't

18    really articulated any reason for why 'amount of memory' needs

19    to be in the claim, and the claim language itself is broader;

20    it simply says indicate how.

21            THE COURT:  Let me ask you another question.  Claim

22    9, as construed by the Delaware court, does adopt this concept

23    of the amount of memory, and my understanding of that process

24    in Delaware was that it was driven by the presence of the

25    word 'allocated' in the claim language.  Claim 10 here doesn't

```
 1    use the word 'allocated', or any variation thereof.  The
 2    Defendants take the position here that, nonetheless, the plain
 3    and ordinary meaning of the language in claim 10 also
 4    encapsulates the concept of amount of memory.  You've told me
 5    it ought to be plain and ordinary meaning in both cases.
 6        It looks like to me there may be a difference here on
 7    claim 10 between what Plaintiff views as the plain and
 8    ordinary meaning and what Defendant views as the plain and
 9    ordinary meaning.
10        Comment for me on the propriety or impropriety of
11    incorporating the concept of 'amount of memory' in the plain
12    and ordinary meaning of the disputed language in claim 10,
13    understanding that claim 10 doesn't have the
14    operative 'allocate' or 'allocated', as claim 9 does.
15              MR. DAVIS:  Absolutely, Your Honor.  And I
16    believe --
17              THE COURT:  I hope that was a clear question.
18              MR. DAVIS:  I think I understand.  I think I
19    understand your question.  And if I could briefly summarize it
20    just to make sure, I think you're saying, you know, claim 9
21    uses the word 'allocated'; claim 10 doesn't; and is there a
22    difference with respect to whether or not the 'amount of
23    memory' should be in the construction of either or both of
24    these terms.
25              We have treated them the same.  We've grouped them
```

1   together.  I believe Defendants, at least in their briefing

2   did the same.  I don't know if they'll agree with it today or

3   whether they'll offer up a different construction for claim

4   10, but we don't believe that the issue of the amount of

5   memory in the message has to be -- is really driven by the

6   fact that claim 9 uses 'allocated' and claim 10 does not.  I

7   just don't -- I don't think that that really speaks to the

8   issue of should the construction -- should there be a

9   construction that requires the message to indicate the 'amount

10  of memory'.

11          THE COURT:  It seemed to me--and I may be wrong--it

12  seemed to me that the process in Delaware was, at least to

13  some extent, driven by that difference, and that the concept

14  of 'allocating' in claim 9 is, at least to some extent, the

15  support found by the Delaware court for the use of the 'amount

16  of memory' language in its construction.  And if that analysis

17  after the fact on my part is correct, then the absence of the

18  word 'allocated' in claim 10 would seem to indicate maybe a

19  different result.  But I want you, and I'm going to ask

20  Defendants, to give me their view on that issue.

21          MR. DAVIS:  Yes, Your Honor.  I think that is true.

22  And to some extent, I mean, the Delaware -- the way the

23  Delaware construction process unfolded for this term, again, I

24  think it was largely driven by the fact that in claim 1 of the

25  '890 Patent there was a term 'amount of memory', and by the

1    time we got to the 'wherein' clause here for -- in Delaware

2    that's also at issue here, the Plaintiff had proposed a

3    construction that did indicate an amount.  And that may have

4    been driven by this allocation feature.

5        I don't believe that for us it necessarily drives the

6    dispute here, because we're simply saying -- we don't

7    necessarily think the Delaware construction was incorrect; we

8    just don't believe that a phrase like 'wherein the generated

9    message indicates how the memory has been allocated' really

10   needs a construction, and the fact that Defendants want to

11   propose an 'amount of memory' is just not necessary.  So I

12   guess that's a long way of answering --

13       THE COURT:  The last thing I want to do is say,

14   You're both right, it's plain and ordinary meaning, nothing

15   else is needed, and then down the road Defendants say, Well,

16   that plain and ordinary meaning must include the concept of an

17   amount of memory, and you say it must not, and then we're back

18   to the proverbial *02 Micro* conundrum I'm trying to avoid.

19       MR. DAVIS:  And I understand.  I understand, Your

20   Honor.  And, I mean, the claim language itself -- under -- you

21   know, built into the concept of indicating how memory is

22   allocated necessarily results in an amount.  The question is

23   does the message itself have to specifically indicate the

24   amount in some unit versus some other way.

25       And I guess that's where, again, we don't -- we don't

1    necessarily disagree with the Delaware court's construction or

2    this -- the fact that the message does indicate the amount.

3    It's really a situation where the claim says how the message

4    must indicate how the memory has been allocated.  We've got

5    additional language in here that it -- that's just not

6    necessary, and appears to be limiting the claims.

7        And even with Defendants' admission or concession in

8    their response brief that they're not going to argue that it

9    requires the number of bytes, we still think that there's some

10   other issue there with respect to how they're reading that

11   term.  And they haven't expressed it -- they haven't

12   articulated what that is; they just say we want a construction

13   that indicates the amount.  And so we really just don't know

14   what they mean by that.

15           THE COURT:  It sounds like there's a lack of trust

16   here, counsel.

17           MR. DAVIS:  Your Honor, I admit there may be.

18           THE COURT:  All right.  Anything further, Mr. Davis?

19           MR. DAVIS:  No, Your Honor.

20           THE COURT:  Let me hear from Defendants.

21           MR. MARAIS:  Thank you, Your Honor.  Nic Marais on

22   behalf of Defendants.

23           THE COURT:  Please proceed.

24           MR. MARAIS:  I'll address your question first, Your

25   Honor, and that is, is there a difference between these two

 1    terms--the wherein the generated message indicates how the

 2    memory has been allocated between the interleaving function

 3    and the deinterleaving function a message indicating how the

 4    shared memory is to be used by the interleaver or the

 5    deinterleaver.

 6         And I absolutely agree with you, Your Honor, that the

 7    hook for the Delaware court was the term 'allocated'.   The --

 8    where we would push back on that is that ultimately what we're

 9    looking at here are -- is the language 'how the memory has

10    been allocated' and comparing that to 'how the shared memory

11    is to be used'.

12         And if you look to the specification, which is where the

13    Delaware court looked to understand how the memory has been

14    allocated, every time an allocation is talked about in the

15    specification, or every time the specification talks about how

16    the memory has been allocated, in the same way every time the

17    specification talks about how the shared memory is to be used

18    it talks about an amount.   And so when you're reading this

19    claim language in the context of the specification and

20    applying some level of lexicography here, the specification

21    tells us that the only way this is actually being considered

22    is when it's talking about an amount of memory that's being

23    allocated.

24              THE COURT:   Well, if 'allocated' is the hook, as you

25    say, for the court in Delaware arriving at the construction

1    that implements the concept of 'amount of memory', why is that

2    missing hook in claim 10 still going to give you a plain and

3    ordinary meaning that continues to carry forward the concept

4    of 'amount of memory'?  Because that's what you're telling me

5    the plain and ordinary meaning of the claim 10 language is,

6    but to use your own language, it's missing the hook.

7              MR. MARAIS:  So what I would say to that, Your

8    Honor, is I don't agree that it's missing the hook; I agree

9    that it's missing the allocation hook that the Delaware court

10   relied on.  The hook here for that language is the term used

11   'used'.  And so here we have 'how the memory is to be used',

12   'how the memory has been allocated'.  The specification treats

13   those terms -- or treats as uses consistently.  And so the

14   hook for that language would just be 'used'.

15        And if we go to some of the language in the

16   specification, I won't walk through every single example here,

17   but every time it talks about how the memory has been

18   allocated or how the memory is being used, it's talking about

19   an allocation of an amount of memory.  So for the first

20   example, it talks about 16 kilobytes of memory for the

21   interleaver.  The second example, 16 kilobytes of interleaver

22   memory at the transmitter or deinterleaver memory at the

23   receiver.  There is not other language in the specification

24   that would -- you would look to and say, Okay, well, that

25   could maybe mean how memory is being used versus how memory is

1      being allocated.

2          So, respectfully, I would just say that those -- while

3      the Delaware court relied on that hook, the same hook exists

4      in claim 10 and it's just the term 'used'.

5          And another point I would point out is that what this

6      claim language requires is a message, and it's that message

7      that's indicating how the memory has been allocated and the

8      message that indicates how the memory is to be used.  And as

9      Your Honor pointed out, when you're looking at or considering

10     what that message is actually doing, we have two the

11     transceivers, the remote transceiver and the office

12     transceiver, VTUR and VTUO, and they are communicating during

13     initialization.  That's what the patent specification's

14     contemplating here.  And in that initialization procedure,

15     there is a message that's communicated.  And if we look to

16     figure 2 of the patent, that message may indicate 'allocating

17     the shared interleaver and deinterleaver memory'.

18         Now, it would make sense to consider when you're looking

19     at what the message is actually allocate -- or what the

20     message is actually indicating, that it would be an amount of

21     memory so that these transceivers know how to set up and

22     configure their settings.

23             THE COURT:  All right.

24             MR. MARAIS:  The final point I'll make, Your Honor,

25     is just one thing that Mr. Davis said that I disagree with is

1    where he said he disagrees that the claim language is the

2    same, and what he did was he pointed to the claim at issue in

3    the Delaware court and he points to a limitation that we're

4    not asking this Court to construe.  He pointed to a limitation

5    that said the 'amount of memory' and -- but that's

6    just -- it's not at issue here.  What we're looking at here is

7    a term that TQ Delta proposed to the Delaware court and that

8    the Delaware court adopted in its entirety.  And so for that

9    reason we believe that TQ Delta is actually estopped for

10   arguing for a term, at least as to this first term, the 'how

11   the memory has been allocated' term, we believe that they are

12   estopped from arguing for a different construction because

13   it's a position they affirmatively put forth and that the

14   Delaware court relied on and ultimately adopted.

15              THE COURT:  And that estops them in this Court, or

16   does it estop them from taking a different position at a later

17   time in the Delaware court?

18              MR. MARAIS:  Your Honor, we believe that it estops

19   them from taking a different position just generally.  So --

20              THE COURT:  Anywhere.

21              MR. MARAIS:  Anywhere; yes, Your Honor.  That's

22   right.

23              THE COURT:  All right.  Well, do you have anything

24   else for me?

25              MR. MARAIS:  Nothing further, Your Honor.  Thank

1    you.

2              THE COURT:  Okay.  Thank you.

3         Let's turn to the next disputed term or claim language

4    'specifying a maximum number of bytes of memory that are

5    available to be allocated to an interleaver/deinterleaver'.

6         Let me hear from the Plaintiff.

7              MR. DAVIS:  Thank you, Your Honor.  Bo Davis on

8    behalf of the Plaintiff.

9              THE COURT:  Can I get your take on one issue that

10   came to mind before I hear your argument, and that is, do you

11   agree, Mr. Davis--and I'll ask the Defendants the same thing

12   when it's their term--but do you agree that it's the message

13   that specifies; not something else?

14             MR. DAVIS:  For this term, Your Honor?

15             THE COURT:  For this term.

16             MR. DAVIS:  Yes, Your Honor.

17             THE COURT:  Okay.  Now go ahead and tell me why

18   plain and ordinary meaning without any construction is

19   appropriate here.

20             MR. DAVIS:  Well, I guess as an initial matter, Your

21   Honor, I just want to point out that, you know, we believe

22   this term was actually agreed to, and we were a little

23   surprised in the response brief when we received Defendants'

24   argument about it.

25        The 'specifying a maximum number of bytes of memory that

1    are available to be allocated', the term itself already has

2    the language that the Defendants are proposing for

3    construction.  Their construction is where the message must

4    specify a maximum number of bytes.  Well, the only difference

5    between their construction and the claim language is they've

6    inserted the word 'must' ahead of 'specifying'.  I don't know

7    what they mean by that or what their -- why they think there's

8    a claim scope dispute.  I -- frankly, it's just confusing.  I

9    don't really understand their position.

10        And again, it wasn't really briefed because up until the

11   -- you know, up until our opening brief, this was the state of

12   play with respect to this term.  It was plain and ordinary

13   meaning.  And so I'm just -- I don't know exactly what they

14   mean, so I'm a little bit at a loss as to how to respond to

15   what their construction actually adds or what the claim scope

16   dispute is here.  But --

17                THE COURT:  Let's do this, then.

18                MR. DAVIS:  Yes, Your Honor.

19                THE COURT:  Let he hear from Mr. Stevens, and then

20   after he's given me that explanation and along with other

21   argument I'll let you have a shot at it.

22                MR. DAVIS:  Thank you, Your Honor.

23                MR. STEVENS:  So the answer to your question is yes.

24                THE COURT:  Okay.

25                MR. STEVENS:  The message must specify.

```
1              THE COURT:  Or it is the message that specifies?

2              MR. STEVENS:  Yes, sir.

3              THE COURT:  Okay.

4              MR. STEVENS:  So I think the dispute here, Your

5    Honor -- you brought up not wanting an 02 Micro fight later on

6    in this case, and that's why we're raising this now, to put

7    everyone on notice that we think there is a lurking fight here

8    about this particular construction and what it means and what

9    it doesn't mean.

10       It's absolutely right that our construction is simply the

11   words of the claim.  You know, we think that must happen.  If

12   all parties agree that the message must specify a maximum

13   number of bytes of memory, if we're all on the same page that

14   the message must say something like max bytes equals 20, no

15   fight at all.  But I urge, Your Honor, that that's not going

16   to be the case here in a couple of months; that there's going

17   to be a different construction brought to you when we get a

18   little bit further in the case.

19       Now, if they're willing --

20             THE COURT:  What's your crystal ball tell you that

21   that future construction from the Plaintiffs is going to be?

22             MR. STEVENS:  They're going to point to something

23   that specifies a minimum number of bytes.  So, for example, if

24   the claim language were, I specify to Judge Gilstrap the

25   maximum speed he's allowed to drive home today, I say Judge
```

1    Gilstrap can drive home no faster than 50 miles per hour, the

2    analogy would be someone could come to you and say, No, no,

3    no, no, no, you have 15 minutes to get home; that's the

4    maximum amount of time; you need to drive at a speed -- you

5    know, that's the minimum speed that you can get home.  That's

6    what we're going to see later in this case--that they're not

7    going to point to something that is a max number of bytes;

8    they're going to point to something that is a minimum number

9    of bytes.  That's going to be the fight that we're going to

10   have here in a few months, and fear we're going to be right

11   back in front of you with an *02 Micro* fight.

12       Now, if counsel for the Plaintiff is willing to get up

13   here and say, That's -- Mr. Stevens is crazy, he's wrong, you

14   know, we're not going to point to anything that says max bytes

15   equals a number, then maybe there isn't a fight, but if

16   there's going to be a different interpretation in this case or

17   a different argument that this claim is somehow satisfied by

18   an entirely different parameter, I think we should hear that

19   today.  I think we should hear today what Plaintiff's position

20   is going to be with respect to what it actually takes to

21   satisfy this limitation.

22       We think it's very simple.  Right?  There has to be a

23   message.  The message must specify a maximum number of bytes

24   of memory.  If we all agree that that parameter must be

25   specified in the message, then maybe we don't have a fight.

1    But if there's going to be some other interpretation or some

2    other definition offered, I do think that, as the Defendants,

3    we believe we should be entitled to hear that today.

4            THE COURT:  All right.  Well, let's go around the

5    merry-go-round one more time.

6       Having heard that, Mr. Davis, let me hear your response.

7    I'm not sure how you specify a maximum number by specifying a

8    minimum number, but go ahead and tell me what your reaction

9    is.

10           MR. DAVIS:  I'm not either, Your Honor.  And what I

11   heard Mr. Stevens say is he wants to basically decide an

12   infringement issue without any record of it, and he's -- he is

13   assuming that we are going to be pointing -- what I heard him

14   say is they're going to point to something that says

15   'minimum'.  You know, I'm not sure what he's referring to, but

16   the claim says 'maximum'.  So it seems to me, like, if we're

17   at the summary judgment stage and we're pointing to something

18   that says 'minimum' and doesn't have anything to do with

19   'maximum', then, you know --

20           THE COURT:  You may be in a bad position.

21           MR. DAVIS:  We may be in a bad position.  That's

22   correct, Your Honor.

23      And I just -- you know, I could take a stab at telling

24   you our infringement theory on their product at this point,

25   but I don't think that's the purpose of claim construction--to

1    pre-try or pre-judge or have Mr. Stevens try to pin us down on

2    a very specific the message must say 'max bytes equals X'

3    construction when that's not a construction they've proposed.

4        And the word says 'maximum'.  And the example he said is

5    they're going to point to something that says 'minimum'.  I

6    don't -- that's not right, Your Honor.  And so the claim

7    language itself addresses Mr. Stevens' concern where the claim

8    says 'blue' and we're pointing to something that's white.  I

9    mean, if it's as binary and completely orthogonal as

10   Mr. Stevens suggested, then, you know, that's -- I think

11   that's a summary judgment issue and not a claim construction

12   issue where they're proposing the exact same word that's in

13   the claim.

14       And it's just -- it's really not appropriate to engage

15   in -- to let the ultimate infringement question be litigated

16   at the claim construction stage without a record of any of

17   that.

18       That's our position, Your Honor.  So we believe plain and

19   ordinary is appropriate here.

20            THE COURT:  Well, there's no dispute that both sides

21   say plain and ordinary is appropriate.  There seems to be some

22   concern as to what plain and ordinary would be here.  But I

23   agree, at this point in the process I don't know how either

24   the parties or the Court say 'max number of bytes equals X'

25   must be a part of what is shown.  Whatever is going to be

1    shown is going to be shown, and if it specifies a maximum

2    number of bytes of memory, then it's going to meet this

3    limitation; and if it doesn't, it doesn't.

4        And, quite honestly, by the time we get to summary

5    judgment, both sides are going to know what the other side's

6    position is a lot better than they may speculate about it

7    today.  And if at that point the Plaintiff's position has

8    something to do with something other than the maximum number

9    of bytes, whether it's by saying you have this much time to

10   get home, you can drive any speed you want to, rather than you

11   can't go above 50 miles per hour, that's the kind of thing I

12   would expect to take up and rule on at summary judgment.

13       So I'm going to decline the polite invitation from both

14   sides to go beyond plain and ordinary meaning at this point.

15   But I'll say this, especially in light of this discussion,

16   I'll also decline any opportunity or invitation from either

17   side to open an *02 Micro* discussion post-summary judgment

18   where one side or the other would have and should have and

19   could have raised this issue then.

20       So it looks like to me I may well be revisiting this at

21   summary judgment, but I'm happy to wait until summary

22   judgment; just don't fail to raise it at all at summary

23   judgment and then try to tell me in the middle of jury

24   selection we've got an *02 Micro* problem.

25       But with that, I don't think there's any other benefit to

1    arguing this other than letting me apply plain and ordinary

2    meaning, and we'll take it from there.

3         MR. DAVIS:  Thank you, Your Honor.

4         THE COURT:  Okay.  Let me jump ahead for one thing,

5    counsel, so I don't overlook it, because it's quite clear

6    we're not going to get through every one of these disputed

7    claim terms for argument.

8         Item 24 on our list looks like to me that there is really

9    no alternative construction proposed by Defendants, and,

10   consequently, I'm reading this as being effectively agreed to

11   be plain and ordinary meaning.  Am I missing something here?

12   Is there a dispute on PTMTC, packet transfer mode transmission

13   convergence code words?

14        MR. HURT:  Christian Hurt for the Plaintiff.

15        I assume Your Honor's referring to the numbering in the

16   Plaintiff's 4-3 chart?

17        THE COURT:  Yes.

18        MR. HURT:  Yes, Your Honor.

19        Plaintiff's understanding is there is no dispute.  There

20   was initially a definiteness issue on this, and then

21   Defendants dropped the definiteness defense, and there was

22   never any counterproposal, and that's why that term was not

23   briefed and is not in the 4-5 chart either.

24        So your understanding -- Your Honor's understanding is

25   consistent with Plaintiff's.

1          THE COURT:  That's how I came to ask this question.

2    But Mr. Stevens, I'd like to hear from the Defendant on this.

3          MR. STEVENS:  That's correct.  We have withdrawn our

4    § 112 defense on that and agree with plain and ordinary

5    meaning.

6          THE COURT:  Good.  Then that answers that without

7    waiting till we get there, if we get there.

8        Let's go back to 'phase characteristics', 'each carrier

9    signal has a phase characteristic associated with the bit

10   stream'.

11       Let me hear from the parties on this.

12       We'll start with the Plaintiff.  Go ahead, Mr. McAndrews.

13         MR. McANDREWS:  Thank you, Your Honor.

14       So 'phase characteristic', this term -- this is something

15   that would definitely cause an *02 Micro* problem later in the

16   case.  The way this developed in Delaware is many years after

17   the Court did claim construction, this term was raised.  I

18   think it came up in part in a motion in limine in the pretrial

19   order and in part on a request for reconsideration of a denial

20   of a motion for summary judgment.  The Defendant asked for a

21   construction of this for the very first time.

22         THE COURT:  This didn't get addressed at claim

23   construction.

24         MR. McANDREWS:  It did not get addressed at claim

25   construction; it did get addressed about two to three months

1    ago, Your Honor.  We had a live claim construction hearing

2    where Judge Andrews took live witness testimony from Dr. Vijay

3    Madisetti and Doctor Zimmerman, who the Defendants are relying

4    on in this case as well.  And it's quite clear that what the

5    Defendants want to do with plain and ordinary meaning is later

6    on in the case they want to say, Well, because the way a phase

7    characteristic is expressed by the source code in binary form,

8    or something about it is not naturally -- would not naturally

9    be considered a phase characteristic, so we'll take advantage

10   of the fact that the jury is looking for something like an

11   angle expressed in a number of degrees, juries don't

12   understand radians, but potentially they'd be looking for

13   something expressed in degrees or radians, and that's not the

14   way computers talk to itself.  Computers talk to themselves

15   using digital bits, and those digital bits have a context and

16   they mean something.

17        And so let me just jump forward to -- well, here's an

18   illustration, Your Honor.  I mean, this is what a phase

19   characteristic is, if you were to illustrate it in the time

20   domain.  It's simply a shifting of a sine wave in time.  And

21   you can think of a cycle of the sine waive as being divided up

22   into 360 degrees, and then you can scroll forward and that

23   represents a phase, and that phase can be represented in code

24   in a number of ways.  So I'm just showing a simple diagram

25   here where we've gone forward 45 degrees in time, and that

 1    represents the digital bits 00; or I've gone back 45 degrees

 2    in time, which is the same as going forward 315 degrees in

 3    time, and that gives you the value 01.

 4        It can also be illustrated in the frequency domain, and

 5    I'm showing here on the screen -- actually an illustration

 6    that comes out of a prior art DSL standard, the ANSI T1.413

 7    standard, figure 22 of that.  And what this shows is -- this

 8    tiny little diagram here actually shows multiple ways to

 9    represent a phase characteristic.  So one way to represent it

10    is you have an XY cartesian plane here, and so if you

11    take -- and actually we've -- there's something called

12    constellation points--think of the stars in the sky, but these

13    are divided up in a grid--and each constellation point

14    represents a phase and amplitude of a wave, and each

15    individual constellation point represents a certain number of

16    data bits.

17        So on the left-hand side we have the ANSI T1.413

18    standard, and what's showing is we have four constellation

19    points that are labeled in decimal values here.  We have 0 in

20    the upper right-hand quadrant, and then counterclockwise we

21    have 2, 3, 1.  What I've done is I've made an illustration

22    over on the right-hand side, because computers don't speak in

23    decimal values typically, they speak in binary, and so what

24    each of those decimal values is represented in binary, a 0 is

25    00, a 2 is 10, 3 is 11, 1 is 10.  So those constellation

1    points have been relabeled with how a computer would think

2    about those constellation points.

3         The XY coordinates -- and this is one way, and Doctor

4    Zimmerman agrees that this is one way to express a phase in

5    amplitude characteristic is either XY, or it's also referred

6    to as an INQ, but INQ bring in the idea of imaginary numbers,

7    so most people think of these as XY coordinates.  The idea is

8    that if you have -- looking at the right-hand side, if you

9    have an X with a 1 value--and I've got a little slash

10   there--and a Y of 1, so it's plus 1 plus 1 brings you to the

11   00.  If I want to get over to the 10, that would be minus 1

12   plus 1.

13        And then you can see that each of these has an angle

14   associated with it.  Right?  But the way of expressing this

15   phase characteristic can be any one of the things you see on

16   the screen here.  So on the next slide I've kind of summarized

17   that.

18        So the way that you can express a characteristic is by

19   the group of bits that represent -- that -- by the group of

20   bits that are grouped onto a particular carrier.  And I'll

21   have a next slide to show what I mean by that.  Because bits

22   in a bit stream don't have a phase characteristic associated

23   with them; it's when the bit scream is broken up into the

24   constellation point, so there's -- for example, if you want --

25   if you decide you want to have two bits per carrier, you have

1     a two-bit constellation point.  Once it's broken up into that

2     group, it's now for a carrier, you know you have a particular

3     phase characteristic.  So you can represent a phase

4     characteristic with the grouping of bits or you can represent

5     it in any one of these other ways.

6         So one is the decimal values that we saw on the prior

7     page, one is an XY pair, so plus one plus 1 or minus 1 plus 1.

8     You can also represent it in, for example, 45 degrees or in

9     radiance pi over 4.  But the computer is not going use things

10    like 45 degrees and pi over 4; they're going to use one of

11    these other digital representations of the value.

12        So this is really a dispute over the way a computer

13    expresses a value as opposed to over what a phase

14    characteristic is.  I think the parties agree that a phase

15    characteristic is this -- if it's illustrated in the time

16    domain, it's this offset in time by which you determine the

17    information that you're sending and receiving.  I don't think

18    there's any dispute over what a phase characteristic is; the

19    dispute is over how a computer will represent that phase

20    characteristic.

21        And so the concern with plain and ordinary meaning is it

22    leaves open a dispute that was resolved in Delaware.  And in

23    Delaware, the dispute was resolved by construction that was

24    'one or more values that represent the angular aspect of a...'

25    and this is where we deviated from the Delaware construction.

1    The Delaware construction, the way it differs from ours is

2    rather than 'carrier signal', it's 'constellation point'.  And

3    the reason why we've made that change here, Your Honor, is we

4    think that it's a little bit confusing because the

5    constellation point itself--and Doctor Zimmerman agreed with

6    this--the constellation point itself can represent the angular

7    aspect.

8        So we didn't want it to be circular.  What we're talking

9    about is a phase characteristic of a particular carrier

10   signal, because each one of them is going to have a

11   constellation point; each one of them will have its own phase

12   characteristic.  And so we inserted the term 'carrier

13   signal' rather than 'constellation point' because we thought

14   it was a bit circular and potentially confusing.

15            THE COURT:  You made the comment this was disposed

16   of or dealt with in Delaware.  I mean, this is out of claim 14

17   of the '008 Patent.  The decision in Delaware arose with

18   regard to the '660 Patent.  That is really unrelated to the

19   '008, but is related to the family 10 patents.  Is that

20   correct?  There wasn't an actual construction of this portion

21   of the language from claim 14 of the '008 in Delaware, was

22   there?

23            MR. McANDREWS:  I'm sorry, Your Honor.  There must

24   be some confusion in the record because that's not true,

25   that's not accurate, Your Honor.

1          THE COURT:  Well, that's why I'm asking questions.

2          MR. McANDREWS:  Yes.  I'm sorry, Your Honor.  And

3     perhaps it's something in the way we -- perhaps we have a

4     typo, but the decision that Judge Andrews recently issued in

5     Delaware was certainly with respect to the '008 Patent and two

6     other patents in the same family that used the same term.

7          THE COURT:  Okay.

8          MR. McANDREWS:  I believe it's the '627 and '048

9     Patent are the other two patents in the same family, family 4.

10    It was certainly directed to the family 4 patents, Your Honor.

11         THE COURT:  Well, I may be mistaken, but that's why

12    I wanted to get some clarity on that.

13         Also it's clear that what we're talking about here comes

14    from two different sections of claim 14.  It's your view that

15    the one construction that you put forward adequately addresses

16    both of the sections of claim language that come from claim

17    14?  There's not a difference necessary between construing

18    'phase characteristics', which looks like it's on column 12,

19    line 8 or 9, of the '008, and 'each carrier signal as a phase

20    characteristic associated with the bit stream', which is in

21    column 11, it looks like lines 44, 43.  I'm not sure of the

22    counting here.  But obviously we've got different language

23    from the same claim that is before the Court here, and I've

24    got one proposed construction from the Plaintiff.

25         Is there some distinction between these two sections of

1    claim language that would indicate something other than that

2    one proposed construction's appropriate, in the Plaintiff's

3    view?

4              MR. McANDREWS:  No, Your Honor.  So 'phase

5    characteristic' or 'phase characteristics', just the plural of

6    that, we're proposing the same construction.  I think the

7    additional term here that is referenced I guess only in the

8    preamble, which is 'each carrier signal has a phase

9    characteristic associated with the bit stream' --

10             THE COURT:  Right.

11             MR. McANDREWS:  That would -- other than the word

12   'phase characteristic', the rest of that term would take on

13   its plain and ordinary meaning.  I was prepared to explain

14   what that meant.  I'm not certain that there's any -- it's all

15   subsumed in the word 'phase characteristic' and how a phase

16   characteristic is expressed; it's not this issue of

17   association, although I was prepared to just briefly describe

18   that, if Your Honor is interested.  And I think that the

19   discussion of how the phase characteristic is associated with

20   the bit stream will provide clarity to a term that's coming

21   two down from now, 'same bit value'.  So if Your Honor would

22   indulge me, I'll just mention that.

23             THE COURT:  That's fine.

24             MR. McANDREWS:  This is an illustration essentially

25   of a bit stream, and then this is a showing -- this is showing

1       the association of those bits, first of all, with the carrier

2       signal.  And then, as I mentioned before, once the grouping of

3       bits becomes associated with a carrier signal, that begins to

4       represent the phase.  So the phase -- once the grouping of

5       bits occurs, you can represent the phase using the value of

6       the group of bits.  You can represent it in any other manner.

7           So this illustration here shows the bit stream.  It shows

8       you take -- you snip off two bits of that bit stream, and you

9       decide that using something called a bit allocation table.

10      The bit allocation table can decide how many bits you want to

11      put on a carrier.  Here we're showing an equal number of bits

12      on every carrier, although the whole idea of DMT is that you

13      -- depending on your signal, the noise ratio available on each

14      carrier, you load a different number of bits.  But to simplify

15      the discussion here, I'm showing a bit allocation table that

16      puts two bits on every carrier.  Each one of those two-bit

17      groupings is now a constellation point.  It has a phase

18      characteristic associated with it.

19          I'll stop here on this point.  I'm going to come back to

20      a similar discussion, though, for 'same bit value', but just

21      let's keep this in mind for a couple of moments from now.

22          But unless Your Honor has any further questions about

23      'phase characteristic', I'll rest on that.

24              THE COURT:  Well, I assume you'd agree with me that

25      'phase' is a well-established term of art; that there's not

1    something new or novel about the word 'phase' here.

2         MR. McANDREWS:  Nothing, Your Honor.  And we're not

3    attempting to import anything novel about the way a phase is

4    represented in a device either.

5         THE COURT:  Okay.  Tell me why you're proposing

6    'carrier signal' instead of 'constellation point' in what

7    you've proffered here.

8         MR. McANDREWS:  Yes, Your Honor.

9         So if I can go back to this screen here, and this is

10   something that was -- well, it was disputed in Delaware, but

11   the way this was characterized is the top four columns here --

12   I'm sorry -- the top four rows here would be characterized as

13   a constellation point.  The bottom two rows would not be

14   considered a constellation point because they leave out any

15   concept of amplitude, and a constellation point has both a

16   phase and an amplitude.  Constellation point, if we look back

17   here, there is an angle of rotation off of the X axis, that's

18   an angle, but the amplitude is the distance from the origin.

19   You know, there's Pythagorean theorem, or something, by which

20   you get that distance.  But that becomes the amplitude.

21        So when we -- so when we express a phase characteristic

22   using what is also considered a constellation point, the

23   construction that the Delaware court arrived at, 'one or more

24   values that represent the angular aspect of a constellation

25   point' becomes a little confusing because maybe you're looking

1    for something different than the constellation point when, in

2    fact, the constellation point itself represents the phase

3    characteristic.

4        I'm not sure it's a problem, Your Honor; it was a little

5    bit confusing to us, and we wanted in the idea that this is

6    per carrier; you know, each carrier has its own unique phase

7    characteristic; you know, not unique in the sense that it's

8    necessarily different from one to the other, but it is it's --

9    it's its own phase characteristic.

10       So we wanted -- first of all, we wanted to issue of

11   'carrier signal' in there, and we were concerned that there

12   would be some circularity to referring back to the

13   constellation point.

14       It's not critical.  We think that ultimately, you know,

15   our expert is capable of explaining how a constellation point

16   itself represents the angular aspect of the constellation

17   point.  I'm not sure that there's going to be -- well, I'm

18   certain there's going to be debate over that, but we -- I

19   guess what I'm saying is we wouldn't have too much trouble

20   with sticking with the Delaware construction, but we do think

21   that there is a little bit of confusion when you are talking

22   about the constellation itself representing its angular

23   aspect.

24               THE COURT:  All right.  What else?

25               MR. McANDREWS:  That's it on the term 'phase

1    characteristic', Your Honor.

2              THE COURT:  Okay.  Let me hear from the Defendants.

3              MS. DONALD:  This is Katherine Donald on behalf of

4    the Defendants, Your Honor.

5              THE COURT:  Go ahead, Ms. Donald.

6              MS. DONALD:  I think I can streamline this dispute.

7    The Defendants' construction does not provide more clarity

8    because it only represents encoding bits to a constellation

9    map, which the plain language of the claim does not

10   contemplate.  And as shown here in the specification, this

11   invention is not related to only QAM modulation and, as a

12   result of TQ Delta's construction, it only injects more

13   ambiguity into the claim language than it solves.

14        For instance, as Mr. McAndrews just alluded, they're now

15   going to have to have each party put forth an expert just to

16   clarify what an angular aspect can mean in the context of

17   other modulation schemes.

18        In addition, it's going to confuse the jury by requiring

19   each party to put forth an expert to explain that the jury has

20   to look for something other than searching for an angle.

21        And finally, Your Honor, as TQ Delta's expert has

22   alluded, Doctor Madisetti, there are various ways in which a

23   phase characteristic can be expressed.  And because of this,

24   we ask that you give the well-known term of the art's plain

25   ordinary meaning.

1      THE COURT:  What's your problem with the

2   construction that emanated from Delaware?

3      MS. DONALD:  Your Honor, the parties in Delaware

4   were arguing about limiting the claim language to QAM

5   modulation, and the plain language of the claim is not limited

6   to QAM modulation.  If you're going to have one or more values

7   that represent the angular aspect of a constellation point,

8   that's going to be specifically to QAM modulation and not to

9   what a phase characteristic is understood to someone in the

10  art.

11     THE COURT:  What assurances can you give me that if

12  I adopt a plain and ordinary meaning, we won't have a problem

13  down the road with *02 Micro* here?

14     MS. DONALD:  Well, Your Honor, as Mr. McAndrews

15  alluded, part of their construction is based on potential

16  future infringement positions, and so I think at this point if

17  you take the plain language of what a phase characteristic is,

18  which a person of ordinary skill in the art often knows is a

19  position of a point in time, I don't think there is going to

20  be a further *02 Micro* dispute until we reach that issue.

21     THE COURT:  Okay.  What else do you have for me on

22  this?

23     MS. DONALD:  Nothing, Your Honor.

24     THE COURT:  Okay.

25     MS. DONALD:  Thank you.

1        MR. FINDLAY:  Your Honor?

2        THE COURT:  Yes.

3        MR. FINDLAY:  Eric Findlay.

4    Very briefly, may a counsel that is not required be

5    permitted to quietly leave the courtroom to use the

6    facilities?  I know we're trying to rush, but I've gotten a

7    look from somebody that I think he had too much coffee in the

8    morning and might need to take a quick break, if it's all

9    right with the Court.

10        THE COURT:  Well, without getting more explicit on

11   the record, Mr. Findlay, why don't we take a five-minute

12   recess, we'll come back, and then we'll pick up where we left

13   off.

14    Court stands in recess.

15                    (Brief recess.)

16        THE COURT:  Be seated, please.

17    Before we move on, let's go back to the preceding claim

18   terminology, particularly 'phase characteristic/

19   characteristics'.

20    The only thing that I've seen emanating from Judge

21   Andrews on this is effectively a one-page order adopting this

22   construction.  I don't see any real analysis there.  I

23   understand the Delaware court's practice sometimes is to issue

24   a separate opinion from a separate construction order.  I

25   don't know if there is a separate opinion that puts forward

1    his actual analysis as to how he reached this construction.

2    If there is, it would be beneficial for me to have an

3    opportunity to look at that.  And it appears, from what I can

4    tell on the docket there, that the transcript from the

5    argument that related to this one-page order is sealed on the

6    docket there, so I don't have access to that either.

7        If there's something the parties can provide me here by

8    way of the underlying analysis, either from a copy of the

9    transcript that both sides could agree to ask the Delaware

10   court to unseal that you could share with me, or a separate

11   order setting forth his analysis rather than just the one-page

12   entry that adopts this construction, that would be helpful.

13   And to the extent both sides can meet and confer and come up

14   with a way to give me something else than what I have, I'd

15   appreciate it.

16       Mr. McAndrews, you're on your feet.

17           MR. McANDREWS:  Yes, Your Honor.  May I address that

18   just momentarily?

19           THE COURT:  Certainly.

20           MR. McANDREWS:  And I have the next term as well.

21       Your Honor, Judge Andrews did provide a detailed

22   analysis, but he did it orally on the record, and then the

23   very brief order came out after that.  But he addressed his

24   analysis immediately following the conclusion of the live

25   testimony.

1    THE COURT:  Would it be possible for both sides to

2    jointly ask the Court to unseal that portion of it for the

3    purpose of sharing it with me?

4    MR. McANDREWS:  Yes, Your Honor.

5    At a minimum, we'll make sure that we can share it with

6    you, or we'll do our best to redact anything that somebody

7    thought might have been confidential about that hearing.

8    THE COURT:  Defendants have any problem with that?

9    MR. STEVENS:  No.  I would only point out, Your

10   Honor, that Nokia is not involved with that.  So it would be

11   nice if it's unsealed for you, we'd like to get a copy of it

12   as well.

13   THE COURT:  Well, I'll leave those discussions to

14   everybody who's represented here in the room.  My basic point

15   is I haven't had the benefit of Judge Andrews' analysis on

16   this and I'd like it.  If it comes from the transcript, fine;

17   if it comes from some separate opinion as opposed to his

18   actual issued order, fine; but based on Mr. McAndrews'

19   statement, I assume just the section of the transcript where

20   he announced into the record the reasons behind the adoption

21   of this construction would be beneficial to me.  And I'd like

22   to get it as quickly as possible.  I don't want that to become

23   an impediment to me getting an opinion out in this case.

24   So I'll leave the rest of the process up to you-all, but

25   if you-all will work together and try and get me that, fine.

1     If you have some problem with that, I'm happy to talk to Judge

2     Andrews and see if he'll deal directly with me on it, but it

3     would probably be more appropriate for you-all to raise that

4     with the court there and communicate to the court there that

5     this Court has expressed a specific desire to see and have the

6     benefit of his analysis.

7          Okay?

8               MR. McANDREWS:  Yes, Your Honor.

9               THE COURT:  Okay.  All right.  Let's go on to

10    'substantially scramble, the phase characteristics of the

11    plurality of carrier signals'.

12         Since you're at the podium, Mr. McAndrews, why don't you

13    give me Plaintiff's view on this.

14              MR. McANDREWS:  Yes, Your Honor.

15         So this is a rehash of the dispute in Delaware, although

16    I think in Delaware the Defendants took the position that the

17    term was indefinite.  They -- you know, because occasionally a

18    term like 'substantially a matter of degree' can be viewed as

19    potentially indefinite if the specification doesn't tell you

20    how to measure what is 'substantially'.

21         In this case the patent specification does, in fact, do

22    that.  There are a number of places in the patent

23    specification where it describes what it means to

24    substantially scramble a signal, and that is that it is

25    substantially scrambled when there is a reduced

1    peak-to-average power racial, PAR, which is one of the issues

2    addressed by the family 4 patents is reducing the PAR of the

3    transmission signal.

4         I don't think we need a long, detailed explanation of the

5    technology behind that, but we see here in the patent

6    specification, both in the abstract and a couple of times

7    during the course of the description, that the term

8    'substantially scramble' is equated with 'reducing peak

9    average power ratio'.

10        Now, the Defendants have a concern with this term because

11   they say that it's merely claiming a result, and that's

12   actually not -- it's not true as an initial matter.  I'll

13   separately address whether it's appropriate to describe what

14   could be characterized as a result in a claim construction or

15   even in a claim.  But this actually includes the term 'adjust

16   the phase characteristics of the carrier signals by varying

17   amounts', so that's something that is actually describing

18   functionality; and then it's 'to produce a transmission signal

19   with a reduced peak-to-average power ratio'.

20        'To produce a transmission signal with a reduced

21   peak-to-average power ratio' is describing -- is further

22   enhancing and describing and limiting the 'adjust the phase

23   characteristics of the carrier signals by varying amounts'.

24   It is not merely claiming a result in the absence of the

25   functionality to support that in the claim, and that's why we

 1     believe that the claim construction is appropriate in this

 2     instance.

 3          If we were to leave this simply as plain and ordinary

 4     meaning, I'm very concerned that later on we're going to have

 5     an *02 Micro* problem; possibly not on infringement, I'm

 6     speculating here, but more likely on prior art where they're

 7     going to point to something that doesn't substantially

 8     scramble a signal and say, Well, there's some aspect of

 9     scrambling and we're going to characterize that as

10     substantial.

11          So we believe that the district court in Delaware looked

12     at this term, considered whether it was definite, and

13     considered the totality of the construction and determined

14     that 'adjusting the phase characteristics by varying amounts'

15     was appropriate and to describe further what that

16     accomplishes.

17          So this is not necessarily something that comes from the

18     plain and ordinary meaning of the term; it comes from the

19     patent specification defining what is meant by 'substantially

20     scramble'.

21          And unless you have any questions, I'll turn it over.

22              THE COURT:  The Defendants seem to say in what I've

23     read there that the Delaware court improperly imported

24     functional language from the specification.

25          Is there anything in response to that that you need to

1    tell me that you haven't already said?

2              MR. McANDREWS:  No, Your Honor.

3              THE COURT:  Okay.  All right.  Then let me hear from

4    the Defendants.

5              MS. DONALD:  This is Katherine Donald again on

6    behalf of the Defendants.

7         Your Honor, the dispute here is different because in the

8    Delaware litigation both the parties were arguing about what

9    the actual intended result was, whereas here we're arguing

10   that it's improper to import the intended result into the

11   claim language when the claim language clearly does not

12   contemplate 'producing a transmission signal with a reduced

13   peak-to-average power ratio'.  And this is the best evidenced

14   by the claim language itself, which is highlighted in pink on

15   the left and also by the part of the specification which the

16   -- TQ Delta does not cite to.

17        The phase scrambler combines the phase shift computed for

18   each carrier signal with the phase characteristic of that

19   carrier signal, and that is what it means to substantially

20   scramble the phase characteristics.  And because the claim

21   language is not -- and because reducing the PAR value is not

22   inherent in the claim language, TQ Delta has to import that

23   intended result into the meaning.

24        And, Your Honor, on the next slide, what is illustrated

25   as figure 2 of the patent specification, and here this is just

1    one embodiment, but my point is simple.  At step 115, you have

2    the computing the phase shift.  At step 120, you have

3    combining the phase shift with the phase characteristic.  This

4    is exactly what the claim language says and what the

5    specification contemplates.  And at this point where the red

6    arrow is indicating is that you have substantially scrambled

7    the phase characteristics.

8         And as this diagram goes on, at step 130 you're going to

9    combine the carrier signals to produce a linear transmission

10   signal, and at this point you'll be able to see whether or not

11   the PAR is reduced.  And, in theory, the PAR could actually

12   increase.

13        And so, Your Honor, another part of evidence in the

14   intrinsic record that supports our argument is the related

15   patent, U.S. Patent No. 7,292,627.  It is a parent patent to

16   the '008 Patent.  And on the left-hand side I've taken claims

17   1 and 2, and on the left-hand side I've highlighted almost

18   identical language to our asserted patents on the right-hand

19   side.  However, in the parent patent, the patent had a

20   dependent claim which reduces the peak-to-average power ratio

21   as a result of substantially scrambling.

22        And so our argument is simple, Your Honor.  They're

23   importing an intended result which may or may not happen,

24   and it's improper to do that.

25             THE COURT:  All right.

1          MS. DONALD:  Is there anything further, Your Honor?

2          THE COURT:  No.  I think I understand your argument.

3          MS. DONALD:  Okay.  Thank you.

4          THE COURT:  Thank you.

5     All right.  Let's go to 'same bit value', and we'll also

6     take up the 'multiple carrier signals corresponding to the

7     scrambled carrier signals that are used by the first

8     multicarrier transceiver to modulate the same bit value'.

9     And this will probably consume the rest of the allocated

10    time that the Court set aside for oral argument this morning.

11    Go ahead, Mr. McAndrews.

12         MR. McANDREWS:  Thank you, Your Honor.

13         THE COURT:  Defendants are telling me this is

14    indefinite.  Why is that not right?

15         MR. McANDREWS:  Right.  So, Your Honor, so 'same bit

16    value' is being interpreted, and that's really the word that

17    drives both of these -- that's the phrase that drives both of

18    these terms.  So there's nothing different about the remainder

19    of that other term other than its plain meaning that we're

20    advocating.

21    But -- so 'same bit value', it was interpreted in

22    Delaware to mean 'value of the same bit'.  The analysis there

23    was, as it is here, the Defendants really haven't presented

24    any new argument.  They argue that there are two ways to

25    interpret that.  One of them is that two bits and one each

1    assigned to a different carrier would just happen to have the

2    same value.  And what they say about that and they admit about

3    that, the absurdity of that is that if you have -- if you're

4    sending one bit values and if you have more than two carriers,

5    well, because you only have two choices of a bit value,

6    carrier one, for example, has a 1 on it; carrier two has a 0,

7    carrier three happens to carry a 1 again, now they're saying

8    that the claim is automatically met when, in fact, there's

9    nothing interesting about that.  There's no reason to claim

10   that.  There would be nothing -- there is no -- nothing novel

11   about that if we have -- if where he merely happen to have the

12   same value that goes on multiple carriers.

13       Instead, what the patent specification is describing is

14   where -- it's this situation here, Your Honor.  So this is a

15   modified -- slightly modified version of the figure I showed

16   earlier where we had a first group of bits assigned to carrier

17   one, a second group of bits going to carrier two, the third

18   group of bits went to carrier three, and the fourth group of

19   bits went to carrier four.  But even in that instance -- so

20   let's -- and I apologize.  I'm going to scroll back here a

21   little bit and describe essentially what Defendants' position

22   is.  There we go.

23       So their position would be that even though the second

24   grouping of bits in blue, 01, are not the same bits as the

25   orange group of bits, 01, they just happen to be the same,

1    and, therefore, we have values on two different carriers that

2    happen to be the same, when, in fact, what the patent

3    specification describes--and their expert witness Doctor

4    Zimmerman admits this--that it's all over the patent

5    specification in terms -- the intrinsic record.  It's in the

6    provisional application, and they agree that it's described in

7    the patent specification that there's this concept of taking

8    the same bits and putting their value on two different

9    carriers.  So it's showing here that the first grouping of

10   bits actually gets copied onto carrier one and carrier three.

11   That's the concept that the patent specification is

12   describing.  And I don't think there's any dispute that the

13   patent specification is describing that embodiment.

14       The dispute is over their belief that 'same bit value'

15   means the first thing or the second thing.  But in view of the

16   patent specification, in view of what the inventor was

17   describing as what was different about this than just standard

18   old modulation where you might by happenstance have values

19   that are the same on multiple carriers, he's describing where

20   multiple carrier signals are actually used to modulate the

21   same bit value.  And we believe that that is best interpreted

22   as 'value of the same bits' as opposed to just happening to be

23   the value.

24       And Defendants point out that the patent specification

25   when -- the patent specification and the provisional

 1   application use 'same bit', they say it doesn't use 'same bit

 2   value', and that's their concern about the specification using

 3   a different word than the claim, but the claim is actually

 4   more accurate, because you don't modulate a bit position.

 5   You're not telling the other side, Hey, this bit came from the

 6   third position.  You have to modulate the value.  The value

 7   has to be -- is what is modulated.  And so by saying 'same bit

 8   value' doesn't mean this is just any value; it still has to be

 9   from the same bit.  So it's the same bit, but it's a value

10   that gets modulated.  The bit itself, you know, some empty

11   place that could hold anything you want it to hold, is not

12   what gets modulated.

13           THE COURT:  Didn't you argue in Delaware that 'same

14   bit value' referred to 'bit position' rather than 'value'?

15   Are you arguing something different here than you argued

16   there?

17           MR. McANDREWS:  You know, we're not, Your Honor, and

18   this is kind of -- this is a false dichotomy that was set up

19   in the response brief.  'Bit position' -- the reason why 'bit

20   position' was being addressed in Delaware is it was talking

21   about the value that resides in a particular position.  So if

22   -- looking at the screen here, bit position 1 has a 0 in it.

23   Bit position two has a 1 in it.  Bit position three has a 1 in

24   it.  Bit position four has a 0 in it.  The idea is that it's

25   those same -- it's the value that comes from that bit position

1    that is modulated on to multiple carriers.  The bit position

2    itself isn't what goes on there.  So there's a little bit of

3    confusion here.

4        We have been consistent I believe, Your Honor, in

5    arguing -- so, first of all, they're not two different things.

6    To say 'bit position' versus 'value of the same bit', they're

7    not the same thing.  We intended them to mean the same thing

8    in the sense that it's the value that comes from a particular

9    bit position that goes on to multiple carriers.  So it's the

10   value of the same bit that goes onto multiple carriers.  So we

11   didn't intend them to mean different things.

12       Defendants' responsive brief, for some reason they set up

13   this false dichotomy, and I think they actually said that we

14   argued something other than 'value of the same bit' in

15   Delaware.  I mean, that was what we proposed and that's what

16   Judge Andrews adopted was 'value of the same bit'.

17       It just -- and understandably, there can be some

18   confusion here, but the way to explain it best by an expert

19   would be to say you take the bit from position one and copy

20   that on to two carriers.  It's not by happenstance that bit

21   position one and bit position four are 0s and they wind up on

22   different carriers.  That's not what the claim is talking

23   about.  The claim is talking about taking the value from the

24   same bit position and copying it onto multiple carriers.

25            THE COURT:  Okay.

1          MR. McANDREWS:  So we think that the specification

2     makes it clear what the inventor intended as his invention.

3     'Same bit value' is best clarified for purposes of resolving

4     this dispute as 'value of the same bit'.

5          THE COURT:  Thank you.

6       Let me hear from Defendants on this.

7          MR. HAYNES:  Thank you, Your Honor.  John Haynes for

8     Defendants.

9          THE COURT:  Go ahead, Mr. Haynes.

10          MR. HAYNES:  We just heard recognition that this

11     claim is confusing, and that is the problem.  Now, they may

12     have wished they had drafted a claim that said 'mapping the

13     same bit to multiple carriers', but that's not what they wrote

14     down in the claim.  In this claim they said 'same bit value',

15     and there's only two possibilities for that value--1 or 0.

16     'Same bit value' means you're taking a 1 or a 0 and you're

17     mapping it to multiple carriers.  That's one possible

18     interpretation.

19       Now, we don't disagree that what he just described is

20     also a possible interpretation, and the problem we have is the

21     spec doesn't tell you which is correct.  You don't know with

22     reasonable certainty whether 'same bit value' is talking about

23     a value of a 1 or a 0 or whether it's talking about a specific

24     bit in that chain.

25       So there are two possible interpretations here and

1    they're both reasonable, and the spec actually supports both

2    and I'll show you where that is.  And when you're in that

3    situation, it's not your job to try to rewrite the claim to

4    make it what the inventors may have intended from their

5    invention.  The question is what does the claim say, and can a

6    person of ordinary skill in the art reading the specification

7    determine which of these two things is correct.

8         So let's talk about the first interpretation, and this is

9    the question of 'same bit value'.  If you look at those words,

10   the value in this system is a 1 or a 0.  Nobody disputes that.

11   And one of the problems that the patent explains is that when

12   you have a system where you're mapping all your points to a 1

13   or a 0, you end up with this situation where you have too many

14   1s and too many 0s, and that causes this peak-to-average power

15   ratio problem.

16        And so one way you can cause it under the first

17   interpretation is if you end up with bunch of bit streams get

18   mapped to carriers, and it happens that you've got 1s straight

19   down the line.  Now you're modulating a whole bunch of 1s and

20   that's going to cause a peak-to-average power ratio problem,

21   and that's what the spec identifies as one possible

22   problem--you don't have enough variance in your mappings.  And

23   when you don't have enough variance in your mappings, you

24   know, different values.  Right?  You're not mapping to .1, .2,

25   .3, .4, .5, and then you run into this problem.  And so their

1    solution to that problem is this phase scrambler.

2         So that's one reasonable interpretation--that the 'value

3    of the same bit' means exactly what those words say, or the

4    'same bit value' means exactly what that says, which is a 1 or

5    a 0, so you're mapping a 1 or a 0 to multiple carriers.

6    That's one of the problems they identify.

7         The second interpretation is the one that Plaintiff's

8    counsel just explained, which is you have the situation where

9    you have the input bit stream and you essentially map the same

10   bit to multiple carriers, and because you're mapping the same

11   bit, that bit also has a value of a 1 or a 0, but in this

12   instance you're actually taking that bit and putting it on

13   multiple carriers.  That also causes a PAR problem.  Right?

14   And you need scrambling to fix that.

15        And that's the construction they say you should write

16   into the claim, is that 'same bit value' means 'value of the

17   same bit', which I took from the discussion today they're

18   basically saying means 'same bit'.  The problem is the claim

19   doesn't say 'same bit'; it says 'same bit value', and it's

20   those words that create this ambiguity.

21        And when you have that ambiguity, two reasonable

22   constructions of the same term in light of the specification,

23   that means the claim is indefinite.  He wants you to resolve

24   that ambiguity based on the intent of the inventor, but the

25   spec supports both.  And if you look in the briefing, when it

1    talks about a bit value, it always talks about one of two

2    things.  It either talks about a 0 bit value or a 1 bit value.

3    And we looked at that language a second ago.  Right?  In the

4    places where it talks about bit values, it says 0 value for a

5    data bit corresponding to 90 degrees or a 1 value for a data

6    bit corresponding to minus 90 degrees.

7        Now, in terms of Plaintiff's proposed construction of

8    'value of the same bit', it doesn't solve the ambiguity.  If

9    you have a construction that says 'value of the same bit', I

10   don't know, am I talking about the fact that it happens to be

11   a 1--that's the value of the bit--or am I talking about the

12   fact that it is the same bit, which means the same bit

13   position and the value of the bit in that position?  And

14   there's nothing in the claims or the spec that allows me to

15   look at that term 'same bit value' and choose between them,

16   and that's a problem.  It is confusing.

17       You heard Plaintiff's counsel say multiple times, "This

18   is confusing."  A person of ordinary skill in the art reading

19   this patent is going to be confused.  It is not going to --

20   they will not know with reasonable certainty which of these

21   meanings was intended, and that means it has to be indefinite.

22           THE COURT:  All right.  Anything further from the

23   Plaintiff on this?

24           MR. McANDREWS:  No, Your Honor.

25       I did want to point out, and I should have said this --

1          THE COURT:  Go to the podium, please.

2          MR. McANDREWS:  I'm sorry.

3      I should have pointed this out when I first came up.

4      There was some typographical errors that occurred in our

5  construction.  What happened is when the Plaintiff's proposed

6  a construction for this particular term, we accidentally

7  pulled a construction for a 'demodulate' term from the

8  Delaware district court decision on the family 4 patents.  We

9  pulled it from -- and I believe it's the '048 Patent addresses

10  essentially descrambling a signal rather than scrambling a

11  signal, and so it talked about receiving the same bit value.

12      And I think what we ought to do, and if you could pull

13  this up, this right here shows the mistake that was made.

14  This is actually the way that our construction needs to be

15  modified.  It accidentally addressed 'demodulating' and the

16  'received bit stream' rather than the way it should have been,

17  which is -- well, I guess I didn't repeat -- what remains

18  after this redline is what the proposed construction should

19  have been.

20      I believe the Defendants recognized this as an error, and

21  so I don't think there's a point of contention over this.

22  Their witness actually -- their expert witness actually

23  commented that it looked like we made a mistake and we

24  intended to say 'modulate'.  And it would have been on the

25  transmitter side.

1       So I just wanted to point this out that we didn't intend

2   to give a 'received' definition for what's going on at the

3   transmitter, which is 'modulating', not 'demodulating'.

4           THE COURT:  Okay.  I appreciate that.  It would have

5   been nice to have that earlier, but better late than never.

6           MR. McANDREWS:  Sorry about that, Your Honor.  We

7   noticed it last night.

8           THE COURT:  Mr. Haynes, I'll give you the last word

9   on this.

10          MR. HAYNES:  If we could bring the last slide up,

11  the one you had just now.  Yeah.

12      The change to their construction that -- they did give us

13  notice of this last night, Your Honor, and we weren't sure

14  whether they were going to propose it or not.  The change in

15  the construction actually makes the ambiguity worse because

16  now we're talking about the value of a bit and they've deleted

17  that the bit is of the received bit stream.  That creates even

18  more ambiguity of whether I'm talking about just a value of 1

19  or a 0, because now I'm removing myself even further from the

20  notion of same bit.

21      And again, this change and the fact that they focused on

22  'demodulating', when you look at the Delaware court's argument

23  and the discussion in Delaware, they were very focused on this

24  'demodulation' term.  And if you look at Judge Andrews'

25  reasoning, he explains that -- and adopted this construction

1    because he viewed this as, I'm demodulating the same thing

2    that I modulated on the other side, and that was his reasoning

3    why it needs to be a 'value of the same bit'.

4         That resolution, however, doesn't really address the

5    problem we're talking about, which is when you're talking

6    about 'modulating', are you modulating a 1 because it is the

7    same bit, or are you modulating a 1 because that is the value

8    of the bit that has to be on two different carriers.  So Judge

9    Andrews' reasoning doesn't actually address the problem.

10        We agree that if you put a 1 on the left, you're going to

11   demodulate a 1 on the right, and the transmitter -- if you

12   transmit a 1, you're going to try to demodulate a 1 on the

13   receiver.  But that doesn't resolve the issue.  The issue is,

14   is the 1 I'm putting there a 1 because it's the same bit --

15             THE COURT:  I know.  We're back to your same

16   argument.

17             MR. HAYNES:  Thank you, Your Honor.

18             THE COURT:  I understand.  Thank you.

19        Counsel, that consumes all the time the Court's allocated

20   on oral argument on these claim construction issues this

21   morning, or I guess it's this afternoon now.  The remainder of

22   what's in dispute that's been submitted the Court will take up

23   and address on the papers.

24        These matters are under submission.  I'll attempt to get

25   you some written guidance by way of a claim construction

1    opinion as soon as practical.  I would like for you-all to act

2    promptly and see if you can get me that additional analysis

3    from Delaware that I asked for.

4         Those are all the matters that I have set this morning.

5    Is there anything that either side needs to raise with the

6    Court?  As I mentioned to you in chambers, I will get you a

7    written order on the clarification as to the Court's order on

8    narrowing, and I addressed that with you off the record in

9    chambers, but I'll get you a written order on that shortly.

10        If there's not anything further, as I say, these are

11   under submission, the Court stands in recess, and you're

12   excused.

13                        (End of hearing.)

14

15

16

17

18

19

20

21

22

23

24

25

1              I HEREBY CERTIFY THAT THE FOREGOING IS A

2              CORRECT TRANSCRIPT FROM THE RECORD OF

3              PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4              I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5              FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6              COURT AND THE JUDICIAL CONFERENCE OF THE

7              UNITED STATES.

8

9              S/Shawn McRoberts          06/14/2022

10             _____DATE_____
              SHAWN McROBERTS, RMR, CRR

11             FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25