■■■■■■■■■■■■■■■■■■■■■■■

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| TQ Delta, LLC,<br>    *Plaintiff*,<br><br>v.<br><br>CommScope Holding Company, Inc., *et al.*,<br>    *Defendants*. | Civil Action No.: 2:21-CV-00310-JRG<br>(Lead Case)<br><br>■■■■■■■■■■■■ |
| TQ Delta, LLC,<br>    *Plaintiff*,<br><br>v.<br><br>Nokia Corp., *et al.*,<br>    *Defendants*. | Civil Action No.: 2:21-CV-00309-JRG<br>(Member Case) |

## TQ DELTA, LLC'S
## RESPONSE TO DEFENDANTS' OPPOSED
## SECOND MOTION FOR ENTRY OF ORDER FOCUSING PATENT CLAIMS

■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

TABLE OF AUTHORITIES ................................................................................................................. ii

I. INTRODUCTION ........................................................................................................................ 1

II. ARGUMENT ................................................................................................................................ 3

    A. TQD Has Complied with The Focusing Order but Defendants Are Attempting to Avoid Their Mutual Obligation ............................................................................................ 5

    B. Defendants Misstate the Case's Complexity .......................................................................... 6

    C. Defendants' Per-Standard Approach Ignores the Realities of the Case ................................. 7

        1. The Asserted Patent Families Do Not Neatly Map to Standards ..................................... 7

        2. Defendants Do Not Agree the Patents Are Standard Essential ......................................... 7

    D. Defendants Per-Standard Approach Would Damage TQD's Case ........................................ 8

    E. Defendants Do Not Explain How the Case Would Be Simplified ......................................... 8

    F. Defendants Do Not Accurately Describe the State of the Case ............................................. 9

        1. CommScope's Discovery ................................................................................................ 10

        2. Nokia's Discovery ........................................................................................................... 11

        3. Third-Party Discovery .................................................................................................... 11

    G. Defendants' Approach Is Not Equitable ............................................................................... 12

III. CONCLUSION .......................................................................................................................... 12

# TABLE OF AUTHORITIES

**Statutes**

35 U.S.C. § 271 .................................................................................................................10

**I.    INTRODUCTION**

The Court should deny Defendants' Second Opposed Motion for Entry of Order Focusing Patent Claims (Dkt. No. 243) ("Motion") that seeks to modify the Court's Focusing Order (Dkt. No. 128).  It is, functionally, a motion to dismiss almost all of TQD's case (or effectively grant summary judgment in Defendants' favor), forcing TQD to drop most of its currently asserted claims and patents.  There is nothing "fair" about it.

Defendants do not propose to give anything up for eliminating most of TQD's case.  They do not offer any kind of stipulation, concession, or agreement to alleviate the prejudice to TQD.  In other words, Defendants will contest TQD's case based on the limiting they are asking the Court to enforce.  For example, they offer no agreements not to contest the one-patent-per-standard approach they ask the Court to impose, such as on damages (by agreeing that TQD's damages will not be limited by asserting only one patent) or infringement (by agreeing a representative patent covers all accused products and all aspects of a standard covered by TQD's other patents).

Defendants do not offer any good cause for this substantial prejudicial change.  Instead, Defendants paint a misleading picture (e.g., discovery is complete, expert discovery will add nothing) with an imagined view of the case they know is impossible—that TQD will adopt a damages model (a per-standard model) that Defendants concede TQD will not adopt (TQD will put forward a per-patent family per-standard model, as it did in the Delaware cases).  They then attempt to use this "strawman" argument, in a conclusory way, to ask the Court to dismiss two-thirds of TQD's remaining case to make it "simpler."  Their Motion should be denied.

Defendants' aggressive "heads I win tails you lose" fairness is clear in their alternative request <u>to ignore the Court's Focusing Order</u> and avoid narrowing their case at all. The Focusing Order, which Defendants proposed, required each Defendant to elect no more than 40 total references by May 18 and then elect 20 total references by their opening expert reports.  (Dkt.

No. 128, p. 3). Now, Defendants ask to disregard their final narrowing (and keep their 40 total references), despite the fact that TQD halved the number of asserted claims against each Defendants (from 32 to 16) and dropped several patents. The only cause Defendants offer to ignore the Court's Order is the unsupported assertion that, based only on the number of patents, "the Defendants cannot reasonably limit their prior art to just 20 references total." (Mot., p. 9). This is a conclusion, not supported good cause. Defendants' position is also contrary to their own elections of prior art, where, generally speaking, <u>the art they have asserted is on a per-family basis not a per-patent basis</u>. Defendants are also silent on the fact that they are already bypassing the Court's Focusing Order on prior art by asserting different combinations in 11 IPR proceedings.[1] While Defendants claim to care about the amount of work, these IPR proceedings, which will have institution decisions before trial but will not complete until 9 months after trial, have generated a considerable amount of work (over a thousand pages of briefing and declarations) and add another layer of complication on the focusing assessment.

Defendants limited cause does not stand up to scrutiny. Defendants' assertion "TQ Delta has all the information it needs to [narrow]; it just wants to delay its decision" is, at best, misleading. (Mot., p. 2). First, TQD does not have a reason to delay. The vast bulk of the work that will occur between now and trial will be performed by TQD, since it bears the burden to prove infringement. Second, as Defendants are aware, significant discovery is still both being obtained, in depositions and through production, and assessed. Most of the documents Defendants have produced in the entire case were produced since July, and Defendants' source code was first made

---

[1] Nokia has filed additional IPRs, apparently at the behest of CommScope, on patents that are not asserted against Nokia in this case. These are patents tied to TQD's trial victories in Delaware against CommScope. Nokia, which claims to want to avoid unnecessary work, <u>filed three IPR's amounting to over 400 pages of briefing and expert declarations on patents that are not asserted against it in this case</u>, while not filing IPRs on patents that were asserted against it.

2

available in late July (around the time of their Motion). Despite the Court's orders on the timing of production (the April substantial-completion deadline and the January P. R. 3-4(a) technical-document deadline), TQD did not have this information for its earlier narrowing and does not have much of it still. Defendants have also chosen to delay providing material details of their litigation positions (e.g., on infringement, validity, damages, and licenses) until expert discovery. And, as the Court is aware, TQD has moved to compel Defendants on several different fronts to produce technical and damages-related discovery. TQD will be receiving significant discovery through, at least, the end of fact discovery and must then take time to process that discovery.

TQD appreciates that the Court's Focusing Order expects narrowing to continue through the pretrial process, including up to the pretrial conference. (Dkt. No. 128, n.3). TQD will continue to work to narrow its case for trial, including based on the forthcoming information from discovery, Defendants' experts' positions, the results of institution decisions on Defendants' 11 IPRs, and the dispositive and *Daubert* briefing Defendants are sure to file. While TQD will work to streamline the case for trial, TQD notes the case is already quite narrow—down 80% in size from the 128 claims when it was filed—with only 16 claims asserted (24 total across both cases) for 7 families of closely-related patents (e.g., they share essentially identical specifications). Generally, all asserted patents are directed to VDSL2 products, "add on" standards used with VDSL2 (e.g., G.inp and G.Bond), and G.Fast. Narrowing claims is a complex process and it has not been easy for TQD to reach this point, striking a delicate balance across all of the aspects of the case. In short, TQD is continuing to work to narrow this case even further, but it can only work with the information it has available, and Defendants have delayed providing that information.

## II.  ARGUMENT

Defendants ask the Court to alter structure of the Focusing Order that TQD has twice complied with and has relied upon in developing its case. Defendants proposed the Order's

3

original structure, fully knowing the number of patents, patent claims, accused products, and standards that were asserted, and the Court granted Defendants' their requested relief. Now, Defendants seek to materially alter the Order to their benefit and to TQD's prejudice, eliminating over two-thirds of TQD's remaining case. Defendants, essentially, propose that TQD be subject to additional narrowing and that they not have to narrow at all. The Court's Order states that the movant "must demonstrate good cause <u>warranting the modification</u>." (Dkt. No. 128, p. 3 (emphasis added)). Given the dispositive and one-sided nature of Defendants' request, Defendants would need a quite strong showing of good cause.

But, instead of showing good cause, Defendants assert conclusory statements about their convenience and make statements about the case that are not based in reality. First, Defendants argue that the number of patents is not what they claim to have hoped, but they do not address the fact that they proposed the original limits that the Court agreed with knowing the structure of the case.[2] They also do not explain why TQD's case should be bound by what they now claim their original hopes were. Defendants complain they expected TQD to drop more patents, but they point to no past statement in any brief making their alleged expectations clear. Second, Defendants base their entire Motion on a hypothetical world where, if TQD were to adopt the damages model Defendants prefer, then narrowing might not prejudice TQD. But Defendants know their hypothetical world will not come to pass and that "TQ Delta asserts that its damages model in this case … will be a rate per patent family (as it has argued for in the Delaware litigations)." (Mot.,

---

[2] Evidence suggests that, contrary to their claims, the case has played out as Defendants expected. For example, though Defendants filed 13 IPRs, they chose not to file IPRs on all of TQD's asserted patents. Looking back, Defendants were, generally, able to predict, apparently using their superior access to information on infringement, the patents that TQD would later drop. For example, TQD has dropped two of the original five patents asserted from Family 9, but unlike the three remaining patents, Defendants never filed IPRs against these two dropped patents.

p. 6). Defendants also focus on the number of patents, ignoring that the parties have grouped the patents into related families, treat those families like individual patents, and that TQD has tightly narrowed its claims.

### A. TQD Has Complied with The Focusing Order but Defendants Are Attempting to Avoid Their Mutual Obligation

Defendants spend much of their Motion implying TQD has done something wrong. TQD has not. TQD followed the Court's Focusing Order without complaint despite Defendants' failure to produce information TQD would have used in its narrowing. TQD has twice followed that Order and planned its case accordingly, dropping most of its case down to 16 claims asserted against each defendant. This has materially narrowed TQD's case by 4/5ths (to 24 total claims across both cases from 128 originally). Dropping these claims, especially given the state of discovery, was not easy, and TQD has struck a delicate balancing across the issues of the case.

But now that it is time for Defendants to make the same kind of choices that TQD already has, Defendants are attempting to avoid the Focusing Order that they proposed. And their choices are fundamentally easier than TQD's: 1) they are not giving up claims, only reducing the number of prior art references that they might use as a defense to those claims; and 2) Defendants have known all of the details of the patents since filing to determine their prior art—they are not dependent on discovery from TQD. And, at this stage, the Focusing Order only requires Defendants to reduce to 20 total references, which is more than one reference per claim. (Dkt. No. 128). Defendants can even reuse these references across all of their patents, and the Order provides up to six different references can be used per patent. (*Id.*) As TQD explains below, all of the patents fit into one of seven closely related families—that share an essentially common specification—giving Defendants about three unique references for each family. Defendants can comply with the Focusing Order; they just would prefer not to.

5

To be clear, though they are attempting to change the Focusing Order, Defendants are not proposing that TQD may "redo" any of its earlier narrowing. Though the Motion is silent on the point, Defendants' proposed order makes clear that "[t]he identified claims must be from among the previously identified claims in TQ Delta's First Final Election of Asserted Claims." (Dkt. No. 243-7). In other words, even though TQD relied on the terms of the earlier order, twice, and Defendants are fundamentally changing its structure, Defendants provide no ability for TQD to reassess its earlier decisions. Defendants are, again, being "fair" by awarding themselves the best of both worlds at TQD's expense.

### B. Defendants Misstate the Case's Complexity

Defendants, at least seven times, describe the issue as 14 patents against Nokia and 12 patents against CommScope, sometimes in a combination of bold and italics. This is misleading, and it is not how either the Defendants or TQD understand the case. As Defendants allude to (but do not explain in their Motion), TQD is asserting claims from 7 patent families. The patents in each family are closely related and share, essentially identical, specifications. As the Court is aware both TQD and Defendants grouped the patents into these families during *Markman* proceedings, treating all the patents in a family, essentially, as the same. (*See* Dkt. Nos. 124, 135, 140). In other words, the case is not, as Defendants imply, 12 to 14 completely different patents.

Instead of the patent counts Defendants argue, the parties understand that the claims within families are more akin to claims from a single patent. For example, though Defendants do not tell the Court, they have, with a handful of exceptions, asserted the same art across all of the patents in a family. *See* Ex. A (Nokia's Election of Prior Art), B (CommScope's Election of Prior Art). Using Nokia as an example, TQD is asserting 4 patents (and 4 claims) from Family 3, and Nokia has elected identical prior art across all 4 patents. (*See* Ex. A).

### C. Defendants' Per-Standard Approach Ignores the Realities of the Case

Defendants argue that TQD must be limited to one patent per standard solely on the basis of a damages model that they acknowledge TQD will not adopt. (*See* Mot., p. 6 (acknowledging TQD will not adopt the damages model Defendants base their Motion on)). This cannot be good cause, and their proposal, which Defendants describe as "clear and fair" does not track the case's reality. (Mot., pp. 2-3). But, even if it did, Defendants do not agree that they would not contest TQD's damages model if the Court adopted their one-patent-per-standard approach. Nor do they agree that the one patent they are restricting TQ Delta to is representative of all the patents, across all of the families, asserted against that one standard.

#### 1. The Asserted Patent Families Do Not Neatly Map to Standards

Defendants propose to tie TQD's infringement (and damages case) to one patent per standard, but the asserted patent families, as Defendants are aware, do not map, one to one, to standards. Defendants' attempt to reduce the case on those terms is an attempt to eliminate their exposure for infringement and damages. Instead of mapping separate standards, most of the patent families are directed to VDSL2. And some of the families apply to multiple standards, *e.g.*, G.Fast and G.Inp (Family 9); G.Fast, G.Inp, and VDSL2 (Family 10); VDSL2 and G.Vector (Family 6); and bonding functionality for ADSL2/2+ and VDSL2 in the G.bond standards (Family 2). Defendants are therefore proposing the Court adopt a structure that they know does not reflect either the infringement or damages realities of the case.

#### 2. Defendants Do Not Agree the Patents Are Standard Essential

Worse, Defendants themselves do not believe that standards apply to this case. While their Motion is silent on the issue, Defendants have taken the position that none of the patents at issue are essential to any standard. Therefore, Defendants are trying to talk out of both sides of their

mouth, claiming the case should be limited by standards while simultaneously planning to argue that standards do not apply to any of TQD's patents.

### D. Defendants Per-Standard Approach Would Damage TQD's Case

Defendants' argument that one-patent per standard is "fair" and will "avoid[] any real prejudice to TQD" is inaccurate and self-interested. (Mot., p. 2). Defendants are aware that every claim they can force TQD to drop before trial is a claim that will not be asserted against them for liability in this case. As discussed above, they are also aware that the damages model they want TQD to adopt is not a damages model TQD will adopt.

Forcing TQD to a one-patent-per-standard theory of infringement will damage TQD's case. First, Defendants' proposal would force TQD to weigh all of the standards equally, which is not reflected in the infringement or damages cases. As explained above, most of the patent families are directed to infringement in VDSL2. By limiting TQD to just one patent for VDSL2, TQD would be limited in the aspects of VDSL2 that it may assert are infringing and, consequently, its damages. Second, as explained above, TQD's patents read across multiple standards. By limiting a patent to just one standard, TQD would be, effectively, forced to drop other standards from this case for reasons unrelated to the merits of TQD's claims or the need to streamline issues for trial. Third, several of TQD's infringement theories are not fully tied to any standard and involve proof through testing the operation of accused products. Defendants' proposal ignores those patents and does not provide TQD with a way to pursue their infringement.

### E. Defendants Do Not Explain How the Case Would Be Simplified

While forcing TQD to one patent per standard has clear benefits to Defendants for reducing their infringement and, consequently, their damages liability in this case, Defendants do not explain how the case would be meaningfully simplified by this change. Generally, the parties will still need to explain the same standards and products at trial. There might be some marginal

8

efficiency gain because the claims of closely-related patents could not be asserted, but that would represent a minimal amount of savings.

Other than the damages benefits Defendants seek, their position on why further narrowing is necessary is unclear. After all, Defendants take the position that they would not have filed their motion if TQD would have agreed to only assert seven patents—one patent from each family. (Mot., p. 6). But Defendants do not explain what the meaningful difference in trial complexity between asserting one patent per family and asserting the handful of other closely related patents as well would be. In other words, if Defendants would raise no objection to proceeding forward on seven patents, what is their basis for objecting to what amounts to eight more claims tied to the same specifications?

## F. Defendants Do Not Accurately Describe the State of the Case

Defendants' statements that TQD "has all of the information" it needs, much less the time to fully consider that discovery, and that "there is no basis for … delay" are incorrect. (Mot., p. 2). As the Court is aware, both the fact discovery and opening expert report deadlines were recently extended, by, respectively, four days and two weeks. (Dkt. No. 249). TQD sought these extensions because, to the extent Defendants are providing information rather than withholding it, Defendants are packing both document and deposition discovery into the final weeks of discovery. In many instances, Defendants (and third-party Broadcom) are requesting to present witnesses after the Court's current August 19, 2022 fact-discovery deadline. TQD is in the position of having to consider a case's worth of discovery in the last month, much of it in the last two weeks.

As a general matter, both Defendants have obstructed TQD's ability to gain a clear picture of both unit sales and total dollar volumes involved in the case. Both Defendants seem to have taken the position that they can only infringe by sales in the United States. This position is improper and ignores that they may also infringe by importing, using, making and inducing

9

infringement. *See* 35 U.S.C. § 271.  They have also withheld sales information on pre-2015 sales and worldwide sales, regardless of whether the products were developed, at least in part, in the United States.  Defendants also appear to have withheld information on products imported into the U.S. and then shipped elsewhere.  This has complicated TQD's ability to assess damages both overall and for specific accused products.

TQD provides the following general picture of the state of discovery.  As noted above, the Court's Orders, which provided a January P. R. 3-4(a) technical-document production deadline and an April substantial-completion production deadline were largely not followed.

### 1. CommScope's Discovery

TQD has had to move to compel both technical and business document discovery from CommScope. (Dkt. Nos. 234, 239).  Generally, CommScope has produced almost no internal business documents and very few internal technical documents.[3]  (*See* Dkt. No. 239).  As TQD explained in its motion, given the significant number of products, their complexity, and the unit and dollar volumes involved, it is quite unlikely that CommScope has, essentially, no documents related to its accused products.  *See id.*  Most of the few technical documents CommScope has produced, to the extent they are not duplicates, are high level documents, such as data sheets and testing documents for unrelated features, not substantive engineering materials.  *See id.*

CommScope withheld all of its depositions until the last two weeks of fact discovery and there are substantial technical depositions that will occur this week (the week of August 15th).  The depositions that have occurred have confirmed that material business and technical documents exist, have not been produced by CommScope, and are readily available within CommScope. (*See*

---

[3] Though page numbers are a rough metric, CommScope has only produced around 40k pages of documents, compared to over 800k for Nokia and over 500k for TQD.  Around 13k pages of CommScope's production is its prior art production.

*e.g.*, Ex. C (August 11th emails to CommScope requesting material in TQD's motion and confirmed in Wauters, Baker, and Hagarty depositions to be produced).[4] Many of CommScope's interrogatory answers include blanks that provide no information on accused products, preventing TQD from being able to know relevant technical details regarding the accused products. That includes information relating to CommScope's highest-selling product in the U.S.

### 2. Nokia's Discovery

TQD has had to move to compel Nokia to provide two withheld technical-witness depositions, including one of an expert. (*See* Dkt. Nos. 199, 255). TQD has also had to move to compel Nokia to produce withheld pre-2015 sales information, discovery on related worldwide sales, and internal reports related to the accused products. (Dkt. No. 198). Technical and business-document discovery that TQD expected has also not been produced by Nokia, and TQD will likely have to move to compel this material before the close of fact discovery. A number of Nokia's interrogatory answers also do not provide the requested information on accused products, preventing TQD from being able to know relevant technical details regarding the accused products. That includes information related to firmware versions on Nokia's products.

### 3. Third-Party Discovery

TQD has sought discovery from third-parties Broadcom, AT&T, and Frontier. Broadcom is a supplier of chips to some of the Defendants' accused products, and AT&T and Frontier are customers of Defendants. As the Court is aware, Broadcom was previously joined to this suit and its chips are, for a number of products, involved in Defendants' infringement. While Broadcom has made source code available, accessing that source code has been difficult and Broadcom has delayed and, in some cases, fought providing printed copies of the code following inspection. This

---

[4] CommScope has yet to reply to any of these emails requesting production of material.

has delayed TQD's ability to obtain necessary discovery from Broadcom. Broadcom has also delayed providing its corporate deposition, and, currently, Broadcom is resisting providing any witness for deposition before the fact-discovery deadline of August 19th. In short, discovery from Broadcom is still ongoing. Discovery from AT&T and Frontier is ongoing as well, as they have, heavily, resisted basic discovery, preventing TQD from knowing the details of how accused products are used and the details of Defendants' interactions with these customers.

### G. Defendants' Approach Is Not Equitable

Defendants do not propose any significant stipulations to support such a narrowing. They are not offering to give up anything to allow TQD to achieve the narrowing they request. For example, they do not propose to be bound by representative products of TQD's choosing, for their products overall, for individual standards, or for patent families. They also do not propose to be bound by representative patents for standards or for patent families. While they discuss damages for TQD, they do not stipulate that they will be bound to such a damages theory or that they will not challenge the amount of damages if TQD were to reduce its asserted patents as they propose.

### III. CONCLUSION

Defendants ask the Court to materially modify its Focusing Order, which TQD has followed and relied upon, in a one-sided and prejudicial way at a critical moment in the case. Defendants fail to show the significant good cause for such a modification. Defendants provide no specific showing and only make conclusory statements about an unrealistic version of the case. For example, Defendants base their Motion on a damages model they understand TQD will not adopt and they repeat patent counts that do not accurately reflect the case's complexity while ignoring describing the patent families that do. Defendants also assert that discovery is complete, while knowing it is not and that they have pushed most of their substantive positions into expert

discovery. This is not being straightforward, and it is not good cause to support the exceptional dispositive relief—of dismissing two-thirds of TQD's remaining case—that Defendants request.

TQD acknowledges that this is a complicated case. But these cases have already narrowed substantially, as the Court ordered, and TQD is working and will continue to work to attempt to narrow further by trial, including based on the forthcoming information from discovery, Defendants' experts' positions, the results of institution decisions on Defendants' 11 IPRs, and the dispositive and *Daubert* briefing Defendants are sure to file. TQD believes that narrowing issues, to the extent any remain, will be able to be addressed adequately at the pretrial conference.

██████████████████████████████

Dated: August 15, 2022

/s/ William E. Davis, III

William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com

Christian J. Hurt
Texas State Bar No. 24059987
churt@davisfirm.com

Rudolph "Rudy" Fink IV
Texas State Bar No. 24082997
rfink@davisfirm.com

Edward Chin
Texas State Bar No. 50511688
echin@davisfirm.com

Ty Wilson
Texas State Bar No. 24106583
twilson@davisfirm.com

**THE DAVIS FIRM PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661

Peter J. McAndrews
(*Pro hac vice*)
pmcandrews@mcandrews-ip.com

Rajendra A. Chiplunkar
(*Pro hac vice*)
rchiplunkar@mcandrews-ip.com

Ashley Ratycz
(*Pro hac vice*)
aratycz@mcandrews-ip.com

**MCANDREWS, HELD & MALLOY, LTD.**
500 West Madison St., 34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000

Facsimile: (312) 775-8100

**Counsel for TQ Delta, LLC**

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document and all attachments thereto are being filed electronically in compliance with Local Rule CV-5(a). As such, this document is being served this August 15, 2022 on all counsel of record, each of whom is deemed to have consented to electronic service. L.R. CV-5(a)(3)(A).

/s/ William E. Davis, III
William E. Davis, III

15