```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
 2                         MARSHALL DIVISION

 3   TQ DELTA, LLC,                  (   CAUSE NO. 2:21-CV-310-JRG
                                     )   (LEAD CASE)
 4            Plaintiff,             (
                                     )   CAUSE NO. 2:21-CV-309-JRG
 5   vs.                            (   (MEMBER CASE)
                                     )
 6   COMMSCOPE HOLDING COMPANY,      (
     INC.,                           )
 7   et al.,                         (   MARSHALL, TEXAS
                                     )   SEPTEMBER 1, 2022
 8            Defendants.            (   1:00 P.M.
     _____

 9

10

11   _____

12                        MOTION HEARING

13           BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE

14   _____

15

16

17

18

19

20

21

22                   SHAWN McROBERTS, RMR, CRR
23                    100 E. HOUSTON STREET
                     MARSHALL, TEXAS  75670
24                      (903) 923-8546
                  shawn_mcroberts@txed.uscourts.gov
25
```

<u>A P P E A R A N C E S</u>

```
FOR THE PLAINTIFF:     THE DAVIS FIRM, PC - LONGVIEW
                       213 NORTH FREDONIA, SUITE 230
                       LONGVIEW, TEXAS  75601
                       (903) 230-9090
                       BY: MR. BO DAVIS
                           MR. RUDOLPH WILSON
                           MR. TY WILSON

FOR THE DEFENDANT:     FINDLAY CRAFT, PC
(COMMSCOPE)            102 N. COLLEGE AVENUE
                       SUITE 900
                       TYLER, TEXAS  75702
                       (903) 534-1100
                       BY:  ERIC FINDLAY

FOR THE DEFENDANT:     ALSTON & BIRD, LLP-NC
(NOKIA)                101 SOUTH TRYON STREET
                       SUITE 4000
                       CHARLOTTE, NC 28280
                       (704) 444-1025
                       BY:  MR. MATTHEW STEVENS
                            KARLEE WROBLEWSKI

                       THE DACUS FIRM, PC
                       821 ESE LOOP 323, SUITE 430
                       TYLER, TEXAS  75701
                       (903) 705-1117
                       BY: MR. DERON DACUS
                           MS. SAVANNAH CARNES

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
                       MARSHALL, TEXAS  75670
                       (903) 923-8546
```

1          THE COURT:  Be seated, please.

2      All right, counsel.  You're here, as the Court is well

3  aware, on pending disputed motions in the TQ Delta versus

4  CommScope, et al., matter, Civil Action 2:21-CV-310, as well

5  as the TQ Delta versus is Nokia matter, 2:21-CV-309.

6      Let's start by getting announcements on the record.

7      Let me ask for announcements from Plaintiff TQ Delta.

8          MR. DAVIS:  Good afternoon, Your Honor.  Bo Davis,

9  Rudy Fink, and Ty Wilson on behalf of the Plaintiff.  We are

10  ready to proceed.

11          THE COURT:  What's the announcements for the

12  CommScope.

13          MR. FINDLAY:  Good afternoon, Your Honor.  Eric

14  Findlay on behalf of CommScope.  We are ready to proceed.

15          THE COURT:  And for the Nokia Defendants.

16          MR. DACUS:  Good afternoon, Your Honor.  Deron Dacus

17  and Savannah Carnes with my office, and here on behalf of

18  Nokia is Scott Stevens and Karlee Wroblewski.  And we are

19  ready to proceed, Your Honor.

20          THE COURT:  Thank you.

21      I'll note for the record, per the Court's prior

22  directive, counsel for the parties have been here since 9:00

23  this morning meeting and conferring on what appears to be

24  seven different disputed discovery motions.  Those include

25  TQ Delta's motion to compel directed toward Nokia, Document

1    198; TQ Delta's motion to compel directed toward CommScope,

2    Document 234; TQ Delta's motion to compel deposition directed

3    toward Nokia, that's Document No. 199; Nokia's motion to

4    compel toward TQ Delta, Document 201; TQ Delta's second motion

5    to compel directed toward CommScope, Document 239; TQ Delta's

6    second motion to compel directed toward Nokia, Document 263;

7    and TQ Delta's motion to compel expert deposition directed

8    toward Nokia, Document 255.

9        Those are the matters set.  I'm aware there are some

10    other matters that are not set for today that are churning out

11    there in the to be decided area, including a request from the

12    Plaintiff to extend fact discovery as to AT&T, and CommScope

13    and Nokia's second motion to narrow the claims.  But let's

14    consider that we have this seven disputed motions to compel

15    set for today.

16        As I noted, the parties have been here since this morning

17    at 9:00 meeting and conferring on these various disputes.  I'm

18    led to believe there's been a substantial amount of progress

19    made between the parties between 9:00 a.m. and it's now five

20    minutes after 3:00 p.m. in resolving these matters.  I'm open

21    to suggestions from counsel as to how you would best like to

22    memorialize your agreements and clarify what, if any, areas of

23    dispute remain for the Court to give you guidance on.

24        Most of these appear to have been initiated by TQ Delta.

25    Mr. Davis, do you want to give me an idea of what you

1    understand the agreements that have been worked out so far

2    entail?

3            MR. DAVIS:  Yes, Your Honor.  I think that I can

4    report on the record that TQ Delta and CommScope have resolved

5    the disputed issues in the motions between those two parties,

6    and if the Court would like a recitation of the agreements as

7    to the categories of documents and the agreements the parties

8    have reached, I believe Mr. Fink can provide that if that's

9    the way the Court would like to proceed.

10           THE COURT:  Well, let me stop you there and for

11   clarity, as I understand it, you're telling me that TQ Delta's

12   motion to compel directed to CommScope, Document 234, and

13   TQ Delta's second motion to compel directed toward CommScope,

14   Document 239, have been resolved completely.  Is that right?

15           MR. DAVIS:  That's correct, Your Honor.

16           THE COURT:  Can counsel for CommScope confirm that

17   for me?

18           MR. FINDLAY:  Yes, Your Honor, we can.

19           THE COURT:  All right.  I don't have any doubts that

20   you'll both live up to what you've agreed to.  I'm happy to

21   either allow you to withdraw the motions or deny them as moot

22   in light of your agreement.  If either of you have any desire

23   to enunciate specifically on the record what the agreements

24   cover, I'm happy to let you do that; but as I say, if you both

25   tell me that you resolved everything related to these motions,

1   I'll consider that the end of it.  I would not suggest at a

2   future date you come back and raise something that's in one of

3   these motions in a future motion to compel or you'll probably

4   get some real straight questions from me about why that's

5   happening.

6       Do either of you want to set forth the particular as to

7   your agreements here?

8           MR. DAVIS:  Your Honor, I am comfortable not doing

9   that.  It's a rather lengthy list that the parties spent

10  multiple hours working on, and I believe based upon the candor

11  and cooperativeness with which we engaged in those discussions

12  that we're all on the same page, and so I don't think there's

13  any need to do that, and I --

14          THE COURT:  How do you feel about that, Mr. Findlay?

15          MR. FINDLAY:  I would concur, Your Honor.  I think

16  based upon Mr. Davis' candor and good faith negotiations back

17  and forth, I feel comfortable.

18          THE COURT:  Well, with regard to Document 234 and

19  Document 239, I'm going to deny those as moot in light of the

20  parties' announced resolution of all issues emanating from

21  those motions to compel, having been resolved by agreements of

22  the parties.  So we'll check those two off our list.

23      What's next, Mr. Davis?

24          MR. DAVIS:  Your Honor, I know there are two

25  discreet issues for Nokia for which we are at an impasse,

1    unless counsel for Nokia corrects me, and those would be

2    Docket 255, the motion for expert deposition related to a

3    Mr. Spruyt, and the --

4              THE COURT:  What's the other matter?

5              MR. DAVIS:  The other matter is, Your Honor, I

6    believe it's related to 263, Docket 263, the second motion to

7    compel on Nokia and that relates to an issue about firmware.

8    Those two issues are at an impasse.  I believe that for all of

9    the other issues, including some of the issues in 263, we

10   either have agreement or we are very close to an agreement,

11   and I think we would request a few more minutes to iron out

12   the language of a stipulation, and we're working on with

13   respect to worldwide sales.  That's one issue that I believe

14   if we resolved that, then that resolves everything except for

15   the two issues that I mentioned, Docket 255 and then a

16   discreet issue within Docket 239 which relates to firmware.

17             THE COURT:  263 you mean?

18             MR. DAVIS:  Yes, Your Honor.  Excuse me.

19             THE COURT:  Mr. Dacus, what do you have to say on

20   behalf of Nokia in response to those representations?

21             MR. DACUS:  To the best of our knowledge, Your

22   Honor, that's exactly correct.

23             THE COURT:  All right, counsel.  I would like to get

24   us down to these two remaining discreet issues that I can hear

25   brief argument on and then give you a ruling and some

1   guidance.  It's now about 10 minutes after 3:00.  Can you give

2   me a good faith estimate of how long you need to work out this

3   remaining language that would get us to that point?

4             MR. DAVIS:  Your Honor, I would say 20 minutes.  I

5   think we're going to bottom out on it within the next 20

6   minutes.

7             THE COURT:  I'm not sure 'bottom out' is an

8   optimistic term, but I'm happy to give you an additional 20

9   minutes if you think we can get down to these two remaining

10  issues.

11            MR. DAVIS:  Okay.

12            THE COURT:  Given that, I'll recess from now till

13  3:30, and in 20 minutes at 2:30, more or less, I'll be back on

14  the bench and get a report at that point.

15            MR. DAVIS:  Thank you, Your Honor.

16            THE COURT:  All right.  Court stands in recess.

17                       (Brief recess.)

18            THE COURT:  Be seated, please.

19       Where are we, counsel?

20            MR. DAVIS:  Your Honor, Bo Davis for the Plaintiff.

21       And I believe that the remaining issue on the stipulation

22  I mentioned before the recess has been resolved, and the

23  parties have reached a stipulation that the final language of

24  which is not complete, but we are confident that we'll be able

25  to cross the Ts and dot the Is, and I think we've got

1    resolution on that issue.

2              THE COURT:  Okay.  So you're telling me that there's

3    a discreet issue left unresolved between Plaintiff and Nokia

4    in the 255 matter, and the 263 matter you're also telling me

5    that all other disputes represented in what's set for hearing

6    to between those parties has been resolved.

7              MR. DAVIS:  I believe that's correct, Your Honor.

8              THE COURT:  Does that sound right to you, Mr. Dacus?

9              MR. DACUS:  It does, Your Honor.

10             THE COURT:  All right.  Are we ready to turn to

11   these two remaining issues, then?

12             MR. DAVIS:  We are, Your Honor.

13             THE COURT:  All right.  Both of these motions appear

14   to have been brought by TQ Delta, so since you're at the

15   podium, Mr. Davis, why don't you identify these two issues for

16   me and give me a very brief statement on your position.

17             MR. DAVIS:  Yes, Your Honor.

18         And I do have some slides on this, but I'm happy to give

19   you the preview.  And I understand Your Honor is -- has a

20   limited amount of time today.

21         The first issue relates to a firmware release that we are

22   requesting from Nokia.

23             THE COURT:  And this is in the 255 or the 263?

24             MR. DAVIS:  This would be the 263 motion, Your

25   Honor.

1          THE COURT:  Okay.

2          MR. DAVIS:  And then the other one relates to the

3   255 motion, which relates to a purported expert disclosure for

4   a Mr. Paul Spruyt.

5          THE COURT:  Okay.  What's TQ Delta's position with

6   regard to this firmware release issue?  Tell me what it is and

7   tell me what you think should happen.

8          MR. DAVIS:  Yes, Your Honor.

9      We've requested that Nokia produce an executable copy of

10  firmware released 4.401, and this is firmware for one of the

11  accused products.  And we have requested that they produce the

12  firmware because we need it to run some testing, some

13  diagnostic information, diagnostic tests on some of the

14  accused products, and the firmware was released after we

15  acquired the products or it's later than the products that we

16  have.  This is a firmware release that Nokia provides to its

17  customers, and we would like to get a copy of it, install it,

18  and run tests on it.

19     My understanding of Nokia's position is that we have the

20  source code for this firmware, which is accurate, and that --

21  but that's sufficient and they don't need to produce the

22  actual executable.  And while we agree that the source code

23  is responsive and is, you know, something we're reviewing and

24  using, we are also as part of our expert reports providing

25  testing for certain products and certain features, and so we

 1    can't run the source code that is on the source code computer,

 2    obviously; we have to have the executable.

 3        So we've requested essentially an exemplar of one of the

 4    accused products, which is pretty common and typical in cases.

 5    If there's an accused product and you need it and you can't

 6    get it publicly, then you ask the defendant for it, and that's

 7    what we've done.  And my understanding is they just -- they

 8    don't want to give it to us because they think that the source

 9    code, the native source code that's uncompiled, can't be run

10    on a computer, we, you know, have to follow the protective

11    order provisions and look at it at the review computer and all

12    that, is sufficient.

13            THE COURT:  So let me understand this.  Are you

14    asking them for them to produce the firmware or are you asking

15    for them to deliver you an accused product you don't have, or

16    both?

17            MR. DAVIS:  Just the firmware, Your Honor.  We have

18    the product.  We're asking for the firmware to load on the

19    product we have.

20            THE COURT:  And is the firmware any different from

21    the firmware that Nokia gives to its existing customers who

22    have purchased or acquired these products?

23            MR. DAVIS:  No, Your Honor.  My understanding, it's

24    the exact same firmware release, and we took a deposition to

25    figure out, you know, which firmware release had the

1    functionality we were interested in and this was the version

2    that was identified.  And so we requested this version of the

3    firmware from the Defendants.  We have not requested an

4    exemplar of the actual physical product; we just have asked

5    for the software release that we can load on the product that

6    we have.

7              THE COURT:  All right.  Why don't we move forward

8    and let me hear your position with regard to Mr. Spruyt, and

9    then I'll hear from both issues on both issues from Nokia.

10             MR. DAVIS:  Your Honor, would it be okay if Mr. Fink

11   addresses that issue?

12             THE COURT:  That will be perfectly fine.

13             MR. DAVIS:  Thank you, Your Honor.

14             MR. FINK:  Hello, Your Honor.  Rudy Fink for the

15   plaintiff TQ Delta.

16        So this issue is related to the deposition of Mr. Paul

17   Spruyt who Nokia has designated as an expert.  Our motion

18   addressed two points.  One was his deposition.  We had noticed

19   his deposition under 30(b)(1) and then that Monday are told he

20   is now an expert.  We had asked for a compliant declaration,

21   which we'll talk about, and then additional time to take his

22   deposition.  Nokia has said that they will now provide us with

23   his deposition, so the remaining part of this motion is the

24   sufficiency of the declaration that Nokia provided.

25        The issue that we have --

1      THE COURT:  Let me stop you, Mr. Fink.

2      MR. FINK:  Sure.

3      THE COURT:  Did you take the deposition of

4  Mr. Spruyt or did you not --

5      MR. FINK:  No, Your Honor.  Sorry.

6      THE COURT:  You didn't take his deposition.

7      MR. FINK:  No, Your Honor.  His deposition has not

8  yet been taken.

9      THE COURT:  Okay.

10      MR. FINK:  And we have -- our understanding is that

11  Nokia will provide him for a deposition in the remaining part

12  of the case.

13      THE COURT:  All right.  So the precise issue you

14  need guidance on is what?

15      MR. FINK:  So if I may approach, Your Honor?

16      THE COURT:  You may.

17      MR. FINK:  Your Honor, I've handed you a copy of

18  what was Exhibit A to our motion, which is Docket No. 255, and

19  this is a copy of the Rule 26(a)(2)(C) declaration -- sorry --

20  disclosure that Nokia provided for Mr. Paul Spruyt to

21  designate him as an expert.

22      At a high level, our problem with this disclosure is that

23  it does not meet the requirements of Rule 26(a)(2)(C).  This

24  is the -- what we call the non-restained expert exception.

25  Nokia bears the burden of showing the fact that its witness

1    qualifies for this exception, and our issue with this is that

2    -- I guess is two-fold.

3        The overall point is that to the extent that Nokia is

4    bringing Mr. Spruyt as an expert to trial, we believe, given

5    the wide subject matter that he's designated to testify on

6    here, as you can see--you know, ZyXEL technology, the prior

7    art, there's also, you know, the operation of Nokia's

8    firmware, the state of the prior art--that essentially he's

9    covering more waterfront from this disclosure than Nokia's

10   other experts.

11       May I have the elmo, please?

12       THE COURT:  Why is this individual not being

13   designated under 26(a)(2)(B) as a retained expert?

14       MR. FINK:  He is an employee of Nokia, and so my

15   understanding is that benefit to Nokia of this is just simply

16   that it avoids providing a full written report.  Our problem

17   with that is that, given the extensive technical subject

18   matter that he's testifying on, and as you can see here, one

19   of the things he's -- I guess it's the top part, is the

20   meaning of technical terms is one skilled in the art in the

21   prior art and everything.  This is exactly the kind of

22   material that Nokia has other experts on.

23       Your Honor, I've put on the screen here the designation

24   of experts that Nokia has provided for prior art.  As you can

25   see, there's five different experts that they have here.  The

1    same material that Mr. Spruyt is covering is being covered by

2    Nokia's other experts, so from our perspective there's not

3    additional material here that Nokia doesn't already have an

4    expert to cover, but they're bringing in Mr. Spruyt.

5         And so, again, this comes back to our question if he's

6    just testifying on some factual matter, then he's not an

7    expert; but if he is an expert, given the breadth and depth of

8    his subject matter, we need a report to understand what his

9    testimony is going to be.

10        THE COURT:  Well, as I understand Rule 26(a)(2)(B)

11   and (C), it's not about whether the witness is an employee of

12   the party or a consultant or a retained outside expert; it's

13   about the extent and degree of their expected expert

14   testimony, and typically the 26(a)(2)(C) disclosure is

15   implemented where you have principally a fact witness who may

16   give incidental expert testimony and a disclosure, which is

17   more limited than a full report, is appropriate.  If the scope

18   of the witness' expert testimony is preponderate, then I have

19   some question about whether 26(a)(2)(C) is appropriate as

20   opposed to 26(a)(2)(B).

21        MR. FINK:  Your Honor, I would completely agree with

22   that, and, you know, I would also say that my understanding is

23   that Rule 26(a)(2)(C) is directed to -- mainly to the sort of

24   testifying positions of the people.  To the extent they had a

25   limited report, it was formed in the past; not contemporaneous

1    for a case that's in the present.

2          THE COURT:  Well, either fortunately or

3    unfortunately for the parties before me today, I just went

4    through a major dispute between two other parties in another

5    case precisely on this issue, so it's certainly, I'll say,

6    fresh in my mind.

7       It's your view, I assume, Mr. Fink, that this Mr. Spruyt

8    is not simply a fact witness who may give limited expert

9    testimony, but is, in effect, an expert witness who the

10   majority of his testimony will be opinion-based analysis

11   rather than his personal knowledge.

12         MR. FINK:  Your Honor, I would say yes, but with a

13   caveat that from his disclosure basically they've painted a

14   picture that covers sort of any possible issue that would be

15   in the entire case.  From his disclosure we don't know what

16   his opinions are because they just provide areas of testimony,

17   and those areas of testimony are essentially so broad that we

18   can't know.  So like, for example, all of the prior art or all

19   of the ZyXEL technologies or all of Nokia's products, that

20   doesn't get us down to a level low enough to know, Okay, he's

21   going to opine on this particular area about this particular

22   product.

23      But to step back to answer Your Honor's questions, our

24   view is he should absolutely produce a report, given the

25   breadth of his testimony, yes.

1        THE COURT:  And I gather this designation under

2   26(a)(2)(C) was made just before your previously scheduled

3   deposition and that's why it didn't go forward.

4        MR. FINK:  Yes, Your Honor.

5        We basically said -- we asked -- we initially tried to

6   ask for a more, in our view, compliant declaration to

7   understand what his testimony would be about, and then based

8   on the conditions that came back from Nokia we asked to move

9   his deposition to a point in time where we would prepare for

10  what was now a very substantive expert deposition.

11       THE COURT:  All right.  Do you have anything else

12  for me on this, Mr. Fink?

13       MR. FINK:  No, Your Honor, other than I would just

14  say -- I don't know if it will come up, but the cases that the

15  Defendants raised in their brief I do not think are

16  particularly helpful.  So one of the issues that we raised

17  here is that our understanding is that for a lot of cases when

18  a non-restained expert is designated under Rule 26(a)(2)(C),

19  that potentially privilege is waived for the communications

20  between the now designated expert and the entity based on the

21  idea that if this witness is, in fact, testifying about what

22  was known in the past, there is no problem with seeing what

23  the expert presently considered; but if the expert is sort of

24  now testifying as a mouthpiece then we need to know.

25       The cases that the Defendants have cited are all -- they

1    are all instances in which the court found that privilege was

2    waived.  And again, one of our arguments in our brief here is

3    that all of this is simplified if they just provide a report

4    that we then don't need to get into those kind of privilege

5    issues or anything else with the witness.

6              THE COURT:  All right.  Thank you.

7         Let me hear from Nokia on these two discreet issues.

8    Let's start with the firmware issue, and we'll follow the same

9    order, and then I'll hear about Mr. Spruyt's deposition.

10             MR. STEVENS:  Yes, sir.  Scott Stevens for Nokia,

11   Your Honor.

12             THE COURT:  Yes, Mr. Stevens.  Good to see you.  Go

13   ahead.

14             MR. STEVENS:  Good to see you again, Your Honor.

15        On the firmware issue, as Mr. Davis alluded, we have

16   provided the complete build of source code on the source code

17   computer pursuant to Your Honor's protective order.  We

18   thought that that resolved this whole issue.  About a week

19   before the close of discovery, this whole new thing comes up

20   that they want to be able to take that code, my understanding

21   to ship it outside the United States, test it in some lab in a

22   foreign country that they're not going to be present for, and

23   to run some tests.  Again, we have produced every line of

24   source code of this version.  There is no dispute that that

25   has been on the source code computer, and there's nothing that

1    they can't see since they have the source code.  If they want

2    to see what parameters are set by default, that's on the

3    source code computer.

4              THE COURT:  Tell me this.

5              MR. STEVENS:  Yes, Your Honor.

6              THE COURT:  What is your position with regard to

7    this firmware?  Is it a resource that Nokia has generated and

8    furnished to its other customers or its customers that have

9    purchased these accused products?

10             MR. STEVENS:  So it is firmware that is generated

11   and sent to current customers of Nokia who have purchased

12   certain products.  I don't know what product that they've

13   purchased.  Mr. Davis alluded to this release maybe being

14   recent.  This is a March 2016 release, so this is now six

15   years in the past this release came out.  I don't know what

16   piece of equipment they purchased before that time or since

17   that time, so I have no sense as to whether this firmware

18   would ever be distributed to a customer who had this precise

19   piece of equipment that they apparently have over in Europe.

20   So I can't tell Your Honor that anyone that had that piece of

21   equipment would ever get this firmware.

22        However, if you have an ongoing relationship with Nokia

23   and you've purchased products for which this firmware is

24   intended to be run, then yes, you could have a copy of this

25   firmware.  However, you can't have a copy of the source code.

1    Right?  Our customers don't get our source code, which is

2    better because you can see under the hood how everything's

3    working.  And like I said, that's been provided for months on

4    the source code computer.

5            THE COURT:  But you don't know as you stand here

6    whether the products that the Plaintiffs are wanting this

7    firmware run upon is a product for which this firmware would

8    otherwise have been released by Nokia to any other customer

9    because you don't know exactly which product it is.

10           MR. STEVENS:  That is correct, Your Honor.

11           THE COURT:  Well, as they said in that classic movie

12   Cool Hand Luke, it appears what we have here is a failure to

13   communicate.  Is there some reason why, A, you haven't asked;

14   and B, you haven't told each other what the product is to

15   determine if it is a product for which Nokia's subsequently

16   produced firmware would have otherwise been released in the

17   ordinary course of business?

18       Let me just say this.  You're going to do that and then

19   Nokia's going to take the description and the identity of the

20   product or products that TQ Delta is interested in and has

21   possession of, and if those products -- if that product or

22   those products are products for which Nokia otherwise would

23   have furnished this firmware to had TQ Delta been an ordinary

24   customer in the course of business, then you're going to

25   furnish that firmware to TQ Delta.  If this is not a product

1    or products for which Nokia would have furnished this firmware

2    to an ordinary -- another customer in the ordinary course of

3    business, you're not going to have to produce it.  But, I

4    mean, if the firmware fits with the product, you need to

5    produce the firmware.  If the firmware doesn't fit with the

6    product, you're not to produce the firmware and they'll have

7    to rely on the source code.

8         But it's bizarre to me you-all haven't communicated about

9    this particular issue.  But you're going to do that, and if

10   it's a match between the product and the firmware, then

11   Nokia's got to produce it.  If it's not a match, then you're

12   not going to have to produce it.

13        And when I say a match, I don't mean model number X21.3

14   and it's firmware for X21.2.A.  I mean, if it is a realistic

15   match, produce it; if it's not and it's clearly not a match,

16   don't produce it.  But there's no benefit to the Plaintiff to

17   get firmware for a product that Nokia would not have otherwise

18   produced and released it to another customer in the course of

19   business.  But if, in fact, that does align here between the

20   product and the firmware, then there's no reason Nokia

21   shouldn't furnish it to TQ Delta.

22             MR. STEVENS:  May I ask one question, Your Honor?

23             THE COURT:  Yes.

24             MR. STEVENS:  We don't know where this is going to

25   go.  We'd like it to stay in the United States, or at least

1    have a log of where this goes, sort of like there's a log in

2    the source code computer of who sees it and who doesn't see

3    it.

4              THE COURT:  Well, do you require that other

5    customers of Nokia in the regular course of business who have

6    products for which this firmware is generated and you deliver

7    this firmware to them, do you have any limitations on how they

8    can use it or whether they have to use it within the United

9    States or some other type of monitoring, or you just send them

10   the firmware and they implement it?

11             MR. STEVENS:  No, we do.  This is under an NDA to

12   all of our customers, and so it could be geographically

13   limited to North America.  It could be, you know,

14   geographically -- different versions of it could be

15   geographically limited to different places.  But no, a Nokia

16   customer can't say, Hey, I let me take this from my U.S.

17   products and then take that firmware and ship it to somewhere

18   else in the world.  My understanding is that's not how that

19   happens.

20             THE COURT:  Well, let's start with the first

21   premise.  If the product and the firmware align and match,

22   then you're going to produce it.  And if you produce it, it's

23   going to be subject to the handling and use as prescribed by

24   the protective order in this case.  It's not just something

25   free and unencumbered that TQ Delta can do anything they want

1    to with it.  If understanding that there are still issues

2    between the parties as to Nokia wanting some further

3    limitation beyond the application of the protective order,

4    then you-all need to try to be reasonable with each other, and

5    if you can't be you need to come back to me and I'll resolve

6    that.  I'm not going to speculate about what might or might

7    not happen out there.

8         I'll say this, Mr. Stevens.  If the product and the

9    firmware match and align such that you would have produced it

10   to anybody else who had bought that product and you produce it

11   here, I'm not going to probably insist that TQ Delta comply

12   with a set of rules and limitations and monitoring that

13   wouldn't be implemented by other customers in the ordinary

14   course of their usage.

15        MR. STEVENS:  Understood.

16        THE COURT:  By the same token, Mr. Davis, I'm not

17   probably going to allow TQ Delta a freer hand to use this

18   firmware than any other customer of Nokia would have had they

19   received that firmware in the ordinary course of business for

20   application with the product that you have.

21        So to the largest extent possible, if--and this is the

22   premise--if the product and the firmware align and match such

23   that Nokia would have released it to any other customer who

24   has this product, then Nokia's going to release it here, and

25   its use and its implementation and the limitations on that use

1    and implementation, to the greatest extent possible, are, A

2    going to be subject to the protective order in this case; and

3    B, are to replicate the same limitations and monitoring, if

4    any, that any other normal customer of Nokia would have to

5    undergo.  Is that clear?

6              MR. DAVIS:  Your Honor, may I ask a question?

7              THE COURT:  You certainly may.  First of all, tell

8    me if you understand what I just said.

9              MR. DAVIS:  I do understand, Your Honor, but I would

10   like to make a couple of clarifications.

11      I guess number one on the geographic limitations that

12   Mr. Stevens just requested, I believe Mr. Stevens is aware

13   that the testing lab that we are using to test these products

14   is in the UK, so I don't know if he's trying to preclude that

15   or not, but I'm going to send it to the UK.

16             THE COURT:  First of all, we don't know if there's a

17   match here.

18             MR. DAVIS:  That is correct, Your Honor.

19             THE COURT:  And none of this comes up unless there

20   is.  I don't intend TQ Delta to receive the firmware, and then

21   based on some imposed limitation on its use by Nokia, not

22   being able to use it.  Now, if Nokia requires every other

23   customer who gets it to implement it only within the borders

24   of the United States, then they can certainly raise that with

25   me as to why in this case you would be using it outside of the

1    borders of the United States.  But if they don't require every

2    other user to do that, I don't see any basis for them to

3    require you to do it.

4           MR. DAVIS:  Okay.  Thank you, Your Honor.

5        My only other question is with respect to the premise, as

6    Your Honor styled it, that the matching -- I mean, the reason

7    we are requesting this firmware update is because our product

8    predates the release of the firmware, and --

9           THE COURT:  I assume most firmware is generated

10   after products are released to update those products, so that

11   chronology is not unusual at all.

12          MR. DAVIS:  I don't know.  I just -- when Your Honor

13   raised the matching issue, it just -- it brought -- this is

14   the first time I had heard that that was the issue -- that

15   that was potentially the issue is that, you know --

16          THE COURT:  Up until now they've been telling you

17   you got the software, you can figure it out -- or the source

18   code, you can figure it out from the source code.

19          MR. DAVIS:  Correct, Your Honor.  And we can figure

20   -- we can see how the firmware release works, but we need to

21   run a test to show that it actually works in operation.  So I

22   guess the only question there is that, you know, if we are in

23   a situation where I guess Nokia is taking the position that

24   this doesn't match or we wouldn't have provided it to this

25   customer, that would be new information for us, and then in

1    that case we would either purchase a newer product or, you

2    know, request that they give us a product to run it on,

3    whatever one product they think matches.  But our basis is

4    that the product we have, the product that we're running the

5    tests on has the same chips.  And so I just wanted to at least

6    raise that issue and make sure that there wasn't --

7              THE COURT:  Well, it sounds like to me, Mr. Davis,

8    you're trying to anticipate a refusal to give you the firmware

9    based on a position that Nokia may or may not take that your

10   product and their firmware don't align and match such that you

11   would have gotten it had you been another Nokia customer who

12   had purchased this product.  If that's the case, then either

13   you-all are going to have a disagreement that that factual

14   analysis by Nokia is unfair and flawed and it really is a

15   product that should be entitled to this firmware; or, as you

16   say, you're going to go buy a product that does get the

17   firmware; or if that can't be done, you may attempt to have

18   Nokia produce a product to you.  All of those are things that

19   may or may not happen that depend upon the first question

20   being answered, and that is what is your product and what is

21   their firmware and is their firmware ordinarily in the course

22   of business released to other customers who have your product.

23   And it may well be that there's no question about that.

24             MR. DAVIS:  Okay.

25             THE COURT:  So I can't sit here today and anticipate

```
 1    all these potential former moves on the chess board, if this
 2    then that and if this then that, but -- and, for whatever
 3    reason, I'm now satisfied that the issue can come down to what
 4    is your product and is your firmware the firmware that's
 5    ordinarily provided to other customers who have that product.
 6    And if it is, Mr. Stevens, you're going to produce it.  And if
 7    it's not, Mr. Davis, then you're either going to go get a
 8    product that does get the firmware or you're going to find
 9    some other solution, and if a solution can't be resolved then
10    I trust you'll be back on my doorstep.
11              MR. DAVIS:  Yes, Your Honor.
12              THE COURT:  Okay?
13              MR. DAVIS:  Understood.  Yes, Your Honor.
14              THE COURT:  All right.  Let me hear from Nokia on
15    this Paul Spruyt, or whatever his pronunciation is, issue.
16              MR. STEVENS:  I believe it is Spruyt, Your Honor.
17              THE COURT:  Good.
18              MR. STEVENS:  And what you said a few minutes ago is
19    exactly our understanding.  Mr. Spruyt is a fact witness.  He
20    has percipient knowledge of everything that we expect him to
21    talk about, and we did this as sort of a just-in-case
22    mechanism.  I believe Your Honor -- I don't have your exact
23    words in my mind, but you said a fact witness who someone
24    might argue, you know, put their toe onto the line of expert
25    testimony.  And that's where we are with Mr. Spruyt.
```

1    He is a named author on a small number of pieces of prior

2    art.  He's not here to talk about the prior art at large.

3    He's a named author on three articles.  He will talk about

4    those three articles.  He has percipient knowledge of two

5    product prior art, pieces of prior art that are kept in his

6    office, and he's going to speak to his own knowledge about

7    that.  And he is a product manager in the DSL product line and

8    he will speak to his knowledge of those products.  That's all

9    we intend to do here.

10          THE COURT:  Well, the question is if he is a witness

11   that the great preponderance of his testimony is going to be

12   fact witness testimony that doesn't lapse into opinion or

13   expert testimony and comes from his own personal knowledge

14   related to his employment with Nokia, but that there is a

15   concern that in some discreet small areas he may go into what

16   would be argued to be opinion testimony, then 26(a)(2)(C) is

17   probably appropriate.  But you can't give the disclosure in

18   26(a)(2)(C) with such vague and broad terms that the other

19   side doesn't know what those discreet areas where he may give

20   opinions are going to be.

21          This entire rule is about fair notice, so if he is the

22   kind of witness that fits within 26(a)(2)(C), so be it, but

23   that doesn't mean you can give a disclosure under that section

24   of the rule that doesn't give in this case the Plaintiff fair

25   notice of what he may know about and what he may, more

1    importantly, give or be called upon to give expert testimony

2    about at trial.

3         Now, I haven't seen the disclosure.  I haven't looked at

4    it.  If -- you know, if it's not precise and targeted enough

5    so these folks on the other side know what to expect of this

6    witness, then it needs to be.

7         Now, if he is not a predominantly fact witness, then --

8    and if the majority of his testimony is going to be on opinion

9    matters, whether he's an employee or not, he needs to give a

10   full report under 26(a)(2)(B).

11        MR. STEVENS:  Our intent, Your Honor, is not to ask

12   him for his opinion on anything.  In our mind he's not going

13   to deliver anything but fact testimony.  So I understand the

14   dividing --

15        THE COURT:  This is the same dichotomy that came up

16   in this other case.

17        MR. STEVENS:  I'm aware of the case, Your Honor.  I

18   appreciate it.  And that's why we did this, because we didn't

19   want that to arise halfway through a jury trial.  I'm happy to

20   put on the elmo the few paragraphs --

21        THE COURT:  Well, Let me stop you there --

22        MR. STEVENS:  Yes, sir.

23        THE COURT:  -- Mr. Stevens.

24        Let me just ask Mr. Fink, does TQ Delta take issue with

25   the precision and specificity of the disclosure regarding

1  Mr. Spruyt, assuming for purposes of argument it's appropriate

2  and he's an appropriate witness to comply with 26(a)(2)(C)?

3        MR. FINK:  Yes, Your Honor.

4        THE COURT:  Okay.  Well, do you have any

5  information, Mr. Fink, that would rebut the argument by

6  Mr. Stevens that he's principally a fact witness who may give

7  a small amount of testimony that could be argued to be

8  opinion-type testimony?  Do you have anything to show me that

9  he's really an expert witness clothed in his Nokia employment

10  whose testimony is going to be substantially that of any other

11  full-blown expert witness?  I need to know.

12        MR. FINK:  Your Honor, I would point Your Honor to

13  -- so to be clear, I would point Your Honor to the disclosure

14  that I handed up earlier, which is this Document 255-2.  And

15  for our reading, the scope of that disclosure is substantially

16  equivalent to what I -- if I were to outline what any other

17  expert would testify on, it's equivalent to that.

18     So, for example, on page 3 of that, there is a summary of

19  facts and opinions, and bullet point A there, which is the

20  first one says, "Mr. Spruyt is expected to testify regarding

21  ZyXEL technology"--that's all the technology in the

22  case--"it's development and his understanding as one skilled

23  in the art," which in a sense to me that's the same subject

24  matter testimony that any infringement expert or invalidity --

25        THE COURT:  But that's not the kind of targeted area

1  of inquiry that a fact witness who might cross the line

2  temporarily into expert testimony would give.  So your earlier

3  statement that if he's appropriate under 26(a)(2)(C), is the

4  disclosure adequate to put you on fair notice, I gather what

5  you're really telling me is no, it's not because the

6  disclosure is so broad and unlimited we don't know where he

7  might come down.

8       MR. FINK:  Yes, Your Honor.  I mean, at the core of

9  it, from that disclosure I don't know what he's going to say.

10  And from looking at all of it, it essentially covers the same

11  waterfront as the infringement or invalidity experts.

12       For instance, there's another point that's -- I think

13  where basically he's going to testify about what the firmware

14  does or doesn't do and the functionality of the firmware.  To

15  me that would otherwise be a source code expert or a very

16  technical infringement expert.

17       Again, I understand what they're saying is he's going to

18  testify only on factual issues, but the disclosure that

19  they've given us is the disclosure of a full-bore expert, not

20  a, you know, he's going to testify on this one specific

21  product in his office and just about this limited part of that

22  one product in his office.  So there's, at least from our

23  perspective, a substantial mismatch between the declaration

24  that we're getting and what they're telling us his testimony

25  is going to be.

1          THE COURT:  Okay.  What do you say to that,

2    Mr. Stevens?  I've got this disclosure in front of me now, and

3    at least as to what Mr. Fink called out, those are pretty darn

4    broad disclosures.

5          MR. STEVENS:  So again, before this moment, you

6    know, we had understood that the -- we had offered to make

7    this more specific if they wanted it.  We understood the

8    objection to be -- to him being designated under this rule at

9    large.  But let me move away from that.

10         If you look at B, C, and D, you will see those are the

11   three articles that we call out by article name where he is a

12   named author on each of those three articles, and we intend to

13   ask him questions about each of those three articles.

14         In paragraph E, we announce the piece of prior art that

15   we expect him to say, I have personal knowledge that this was

16   sold and offered to customers back in the time.

17         And F, he's going to talk about our products.  He's not

18   going to talk about the patents or other technology, but he

19   does know how the products work.  And so if he's asked a

20   question -- if there's a fact dispute at the end of the day

21   when we're before the jury, you know, we might pull him up

22   here and ask him to talk about how the products work.  We're

23   not going to have him compare it to the claims of the patent

24   or make any sort of suggestion about infringement or

25   non-infringement, but what we don't want to do is ask him a

1    technical question, perhaps one that might use the same word

2    that happens to appear in a patent, and draw an objection at a

3    trial that he shouldn't be able to do that.  In our mind that

4    would be purely factual testimony, and that's what we're sort

5    overtrying to protect her.

6        So if you look at, again, B, C, and D, call out the three

7    articles--he's not going to talk about other articles; E calls

8    out the piece of prior art that he has firsthand knowledge of

9    that he will testify about; and F is about the actual

10   functionality of the products.

11       He's not a full-blown expert, he's not going to do an

12   invalidity analysis, he's not going to compare prior art to

13   claims or accused products to claims; he's not going to do any

14   of that.  He's going to talk about what he knows personally

15   about three pieces of paper, three documents, one prior art,

16   and then the accused products in this case.  And if

17   specificity's the issue, we've been happy to address that, but

18   I think here in B through F we've done our best to say this is

19   what he's going to talk about.

20            THE COURT:  Well, B through F are B through F, but

21   that doesn't resolve A and it doesn't resolve G and it doesn't

22   resolve anything but B through F.  And it may or may not

23   resolve B through F.  I see the articles.  I see the prior art

24   reference.

25            Let me say this.  We can do this one of two ways.  He can

1    generate a report as any other expert would under 26(a)(2)(B)

2    and then be deposed and he can be limited to his expert

3    report, and that report can be challenged under the *Daubert*

4    practice or motion to strike practice if there's a basis to

5    challenge it; or you can disclose these articles that are in

6    subpart B of category 2 on page 3, they're in subpart C, and

7    they're in subpart D, you can disclose the Alcatel A1000 ASAM,

8    and then he can be deposed on those and then he's not going to

9    testify beyond what he said in his deposition, so that the

10   Plaintiff has a discreet area to confine and know what he's

11   going to testify about.

12       As far as what he knows personally about how Nokia's DSL

13   products function or how they were developed, those, to me,

14   sound like areas that would fall squarely within his personal

15   knowledge and not elicit expert testimony anyway.

16       So, I mean, if you're telling me this witness is going to

17   talk about these three articles and this one piece of prior

18   art, then you need to disclose that and depose him on that and

19   that's going to cabin the entirety of any testimony of his

20   that's not within his own personal knowledge.  If that's not a

21   satisfactory resolution, then he can file a report just as any

22   other expert would under 26(a)(2)(B) and it can be challenged

23   under *Daubert*, and we all know what the rules are there.  But

24   if he's going to take this shortcut, you're going to have to

25   be precise.  It can't be ZyXEL technology, which is as wide as

1    the side of a barn.

2        So I'll permit the disclosure under 26(a)(2)(C) for this

3    witness, but limit the disclosure to the three articles

4    identified on page 3 of the current disclosure under the

5    category summary of facts and opinions as set forth in

6    subparts B, C, D, and the prior art in subpart E, and that

7    will be the totality of what he can offer any opinion

8    testimony on.  And he will give those opinions when he's

9    deposed so that there's no surprise pulled out in the middle

10   of the trial on the Plaintiff.  And if that's not satisfactory

11   to Nokia, then you can back up and he can do a full report

12   under 26(a)(2)(B).  But we're not going to have something in

13   between where both parties don't know where his expert

14   testimony starts and stops before he gets on the witness

15   stand.  I'm not going to permit that as an ambush of Plaintiff

16   anymore than I would permit Plaintiff to do that to Nokia.

17           MR. STEVENS:  Everything you just said sounds

18   perfectly reasonable to me and was the intent of this

19   document, just with one clarification.  In addition to that,

20   he's allowed to talk about the accused products to the extent

21   he has firsthand knowledge of them.

22           THE COURT:  This is only as to testimony that would

23   be opinion testimony called upon by an expert and governed by

24   Rule 702 and following.

25           MR. STEVENS:  Yes, sir.

```
 1            THE COURT:  I don't remember all the numbers.  There

 2   are three I think rules on expert testimony.

 3            MR. STEVENS:  Understood, Your Honor.  And we're

 4   comfortable with that.

 5            THE COURT:  All right.  Do you have any questions

 6   about that, Mr. Fink?

 7            MR. FINK:  No, Your Honor.

 8            THE COURT:  Okay.  I don't want to find out that his

 9   deposition's been taken and all of the sudden he starts giving

10   opinions about other than what we just talked about and

11   itemized from this disclosure.

12            MR. STEVENS:  Understood loud and clear, Your Honor.

13            THE COURT:  Okay.  All right.  That will be the

14   Court's ruling on these two other discreet, as they've been

15   called, areas of dispute.

16        Are there any other matters related to any of the seven

17   motions to compel set for today that haven't been either

18   resolved by the parties or now resolved by the Court?

19   Anything that's been left out?

20            MR. DAVIS:  Nothing from Plaintiff, Your Honor.

21            MR. STEVENS:  Nothing from Nokia, Your Honor.

22            THE COURT:  Okay.  Now, let's transition for a

23   minute.  How do we get this case back on track?  These -- you

24   know, this to me is like a wreck on the freeway where we've

25   got all these motions to compel that collided with each other
```

1    and in the meantime nothing's moved forward.

2        Where are we in this case?  Do we need a new docket

3    control order?  Is it appropriate to consider the close of

4    fact discovery or when the pretrial hearing will be held or

5    any of the other dates that are out there, in light of the

6    fact that because of these disputes I am of strong suspicion

7    that the case has not made the progress that it would

8    otherwise have made by this point in time.  Is this a problem

9    or am I worrying about something that I shouldn't be worrying

10   about?

11       MR. DAVIS:  Well, Your Honor, candidly, I do think

12   it -- the parties would benefit from some additional time, and

13   we had discussed amongst ourselves the possibility of moving

14   back the pretrial hearing by a couple of weeks to give us

15   some --

16       THE COURT:  And I'm not proposing to rule on

17   anything; I just want to raise potential issues, because it

18   seems to me both sides may need a little help with the

19   communication process and I want to make sure you're talking

20   to each other about what I think you need to be talking about.

21       MR. DAVIS:  Yes, Your Honor.

22       THE COURT:  Well, you need to meet and confer about

23   the overall structure and schedule of the docket control

24   order, the deadlines in the case in light of the resolution of

25   these discovery disputes, and if you're in good shape to make

1    up this time and catch back up with the deadlines that are in

2    the current docket control order, fine with me; but if there,

3    in light of this, is a need to retool some of the future

4    deadlines and dates, now's the time for you-all to be talking

5    about it.

6            MR. DAVIS:  Yes, Your Honor.

7            THE COURT:  You know, I'm not unfamiliar with

8    motions to compel.  I can't remember the last time I had to

9    set seven motions to compel on the same day to get them

10   resolved.  So that being the case, I just am concerned that

11   this may be an indicator of other problems we haven't talked

12   about today.  And if there are those issues, you're all good

13   lawyers, I know you, I respect your abilities, but you need to

14   sit down and talk to each other about this.  And if you need

15   to work something out and come back to me with a proposal

16   about restructuring of the docket control order, let's do it

17   now and let's not wait until I get hit with all these motions

18   to take depositions outside of the close of discovery and

19   this, that, and the other.

20           MR. DAVIS:  Understood; yes, sir.

21           THE COURT:  So make sure you-all discuss that issue.

22   And if you need to come with to me with something, I'll look

23   for it; if I don't hear from you, I'll assume you discussed it

24   and you both agree that you can continue to function and get

25   the case back on track within the time frame that the current

 1    docket control order provides for.

 2              MR. DAVIS:  I understand, Your Honor.

 3              THE COURT:  All right.  Is there anything else I

 4    need to take up with the parties today before we recess and I

 5    send you on your way, Mr. Dacus.

 6              MR. DACUS:  Nothing, Your Honor, from us.

 7              MR. DAVIS:  No, Your Honor; nothing from Plaintiff.

 8              THE COURT:  All right.  I do appreciate your

 9    efficiency in resolving the majority of these by agreement.  I

10    only wish you'd done it before I had to set these for hearing

11    and get you up here in person.

12         But I'll attempt to enter a short written order

13    memorializing these two areas that I've ruled on so you'll

14    have that in the record, although I don't think between our

15    discussion and the transcript you have any doubts about where

16    the Court has drawn the lines here.  Other than that, I can't

17    think of anything further.

18              MR. DAVIS:  I understand, Your Honor.  Thank you.

19              THE COURT:  All right, counsel.  That will complete

20    today's hearing.  You are excused.

21         And the Court stands in recess.

22                        (End of hearing.)

23

24

25

```
 1                          I HEREBY CERTIFY THAT THE FOREGOING IS A

 2                    CORRECT TRANSCRIPT FROM THE RECORD OF

 3                    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

 4                    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

 5                    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

 6                    COURT AND THE JUDICIAL CONFERENCE OF THE

 7                    UNITED STATES.

 8

 9                    S/Shawn McRoberts              09/08/2022

10                    _____DATE_____
                      SHAWN McROBERTS, RMR, CRR
11                    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```