**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| TQ DELTA, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>COMMSCOPE HOLDING COMPANY, INC., COMMSCOPE, INC., ARRIS US HOLDINGS, INC., ARRIS SOLUTIONS, INC., ARRIS TECHNOLOGY, INC., and ARRIS ENTERPRISES, LLC,<br><br>*Defendants*. | Civil Action No.: 2:21-cv-00310-JRG |

**<u>COMMSCOPE'S MOTION TO EXCLUDE EXPERT TESTIMONY OF
JONATHAN PUTNAM, PH.D. THAT IS INCONSISTENT WITH LEGAL PRECEDENT</u>**

# TABLE OF CONTENTS

**Page**

I.      Introduction ............................................................................................................ 1

II.     Dr. Putnam's Damages Theory Is Premised on Valuing the Entirety of DSL
        Technology. ........................................................................................................... 2

III.    Applicable Law: Federal Circuit Precedent Precludes Presenting Unreliable
        Expert Damages Opinions to the Jury ................................................................... 4

IV.     This Court Should Exclude Dr. Putnam's Opinions Premised on an Express
        Rejection of Federal Circuit Precedent. ................................................................ 5

        A.      In Contrast to Federal Circuit Precedent, Dr. Putnam's Methodology Fails
                to Limit Damages  to the Incremental Value of the Asserted Patents. ................. 5

        B.      In Contrast to Federal Circuit Precedent, Dr. Putnam Improperly Rejects
                the SSPPU Rule. ....................................................................................... 8

        C.      In Further Criticism of Federal Circuit Precedent, Dr. Putnam Improperly
                Relies on the Nash Bargaining Theory. .............................................. 10

        D.      In Contrast to Federal Circuit Precedent, Dr. Putnam Uses an Incorrect
                Date for the Hypothetical Negotiation. ............................................... 11

V.      TQ Delta's Own License Agreements Demonstrate That Dr. Putnam's Flawed
        Methodology Produces Unreliable Damages Numbers. ...................................... 11

VI.     Conclusion ........................................................................................................... 14

███████████████████████████████

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006).............................................................................11

*Bayer HealthCare LLC v. Baxalta Inc.*,
No. 16-CV-1122-RGA, 2019 WL 330149 (D. Del. Jan. 25, 2019).....................2, 10

*Chrimar Sys. v. Adtran*,
No. 6:15-cv-00618-JRG, 2016 U.S. Dist. LEXIS 204469 (E.D. Tex. Nov. 3,
2016) ........................................................................................................................5

*CSIRO v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)...................................................................... *passim*

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993)................................................................................................4

*Ericsson, Inc. v. D–Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014).................................................................... *passim*

*Kaist IP US LLC v. Samsung Elecs., Co.*,
No. 2:16-cv-01314-JRG-RSP, Dkt. 349 (E.D. Tex. Apr. 17, 2018)........................9

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)................................................................................................4

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012).........................................................................1, 8, 11, 14

*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
No. 3:15-CV-720-JAG, 2018 WL 678245 (E.D. Va. Feb. 2, 2018)........................6

*Thomas v. PFG Transco, Inc.*,
501 F. Supp. 3d 437 (E.D. Tex. 2020)....................................................................4

*Ultravision Techs., LLC v. Govision LLC*,
2021 U.S. Dist. LEXIS 101060 (E.D. Tex. 2021) ..................................................9

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)......................................................................4, 5, 8

**Other Authorities**

Fed. R. Evid. 702 .........................................................................................................4

████████████████████████

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| Ex. A | Corrected Expert Report of Jonathan D. Putnam, dated September 3, 2022 ("Putnam Op. Rpt.") |
| Ex. B | Supplemental Expert Report of Jonathan D. Putnam, dated November 16, 2022 ("Putnam Supp. Rpt.") |
| Ex. C | Second Supplemental Expert Report of Jonathan D. Putnam, dated December 1, 2022 ("Putnam Second Supp. Rpt.") |
| Ex. D | Excerpts from the deposition transcript of Jonathan D. Putnam dated December 6, 2022 ("Putnam 12/6/22 Dep.") |
| Ex. E | Confidential Patent License Agreement between TQ Delta and ████ ████████████████████████ and produced at TQD_TX00491589-641 ████████████") |
| Ex. F | Excerpts from the deposition transcript of Jonathan D. Putnam dated February 7, 2019 ("Putnam 2/7/19 Dep.") |
| Ex. G | Excerpts from Plaintiff TQD's Objections and Responses to CommScope's First Set of Interrogatories (Nos. 1□35) dated May 12, 2022 ("TQD's Interrog. Resps.") |
| Ex. H | Patent License Agreement between TQ Delta and ███████████ ████████████████ and produced at TQD_TX-00044425–446 |
| Ex. I | Patent License Agreement between TQ Delta and ████████████ ████████████████ and produced at TQD_TX-00044309–330 █████████████ |
| Ex. J | Settlement and Patent License Agreement between ████████████ ████████████████████████████ and produced at TQD_TX-00044447–505 ████████████ |

███████████████████████████████████

## I.      Introduction

TQ Delta's damages expert, Dr. Putnam, proposes to offer at trial certain damages opinions that fly in the face of several well-established legal principles concerning patent damages.  Those opinions should be excluded.

The law is clear that, in the context of standard-essential patents, "the patented feature must be apportioned from all of the unpatented features reflected in the standard," and "the patentee's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology."  *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1232 (Fed. Cir. 2014).  But Dr. Putnam does the opposite.  Instead of valuing an invention's incremental advance, he values the DSL standard itself.  Moreover, he applies a single royalty rate to entire patent families, regardless of how many patents within those families are actually at issue for valuation.

Dr. Putnam also rejects and has refused to apply the law that "it is generally ***required*** that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit' [SSPPU]."  *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (emphasis added).  In support of his personal view, Dr. Putnam cites his own unpublished manuscript describing "fundamental economic reasons" why the SSPPU rule should not apply.  But it is not Dr. Putnam's place to criticize the law or apply the law as he would prefer it.  This Court will identify the law, and will do so as it always has—consistent with precedent.  Dr. Putnam's role is limited to applying the law *as it exists* to the facts of the case in an effort to assist the jury.  But applying incorrect law, and using that foundation to reach overinflated damages figures, does the opposite.

Dr. Putnam's refusal to follow the law does not end there.  He also applies the discredited

███████████████████████

Nash Bargaining Solution (under which there is a 50/50 split of incremental profits earned), which courts have held to be, as a general rule, "a 'rule of thumb' [that is] inadmissible under *Daubert*." *Bayer HealthCare LLC v. Baxalta Inc.*, No. 16-CV-1122-RGA, 2019 WL 330149, at *6 (D. Del. Jan. 25, 2019).  Contrary to that precedent, Dr. Putnam trumpets his personal view that the Nash theory has many virtues and involved "work meriting the Nobel Prize."  Ex. A (Putnam Op. Rpt.) ¶ 348 n.443.  He then uses that very analysis in arguing that damages should flow from an equal division of the gains from DSL technology between implementers and innovators.

For these and other reasons, described more fully below, CommScope respectfully requests that the Court exclude Dr. Putnam's flawed opinions that are contrary to precedent.  Those include paragraphs 20–24, 28, 139–166, 281–282, 287, 288–291, 291–400, 442–448, Appendix I ¶ 4, II, Exhibits 3, 5, 9, 10, 11 13, 14, 19, 21, 22, and Figures 3.1–6 of Dr. Putnam's 9/3/22 Corrected Opening Report (Ex. A[1]); paragraphs 4, 7, 8, 9, 10, 12, and Exhibits 5, 21, 22 of Dr. Putnam's 11/16/22 Supp. Report (Ex. B); and paragraphs 11, 13, and Exhibit 1 of Dr. Putnam's 12/1/22 Second Supp. Report (Ex. C).

## II.   Dr. Putnam's Damages Theory Is Premised on Valuing the Entirety of DSL Technology.

TQ Delta originally accused CommScope of infringing 13 patents.  *See* Dkt. No. 1. Currently, TQ Delta asserts nine patents across seven patent families.  Each family contains other patents that are not at issue in this case and either have never been asserted against CommScope or were asserted but have since been withdrawn.

Dr. Putnam begins his damages analysis by attempting to value "DSL technology" as a

---

[1] All Exhibits are attached to the Declaration of Andrew Ong filed herewith.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

whole.  Ex. A (Putnam Op. Rpt.) ¶¶ 292–93.[2]  He does this by comparing the cost of DSL technology to telecommunications carriers (*not* to CommScope, an infrastructure equipment provider) to the cost of what he claims to be the next best alternative technology, fiber-to-the-premises ("FTTP") technology.  *Id.* ¶¶ 293–313, 327–32.  To determine the avoided costs to the carriers, Dr. Putnam performs a regression analysis using 22 cost estimates.  *Id.* ¶¶ 328, 333.  Dr. Putnam concludes that the "cost savings" to the carriers through using DSL technology rather than FTTP is approximately $544 per premise wired with DSL capability.  *Id.*, Ex. 3.  Then, to determine the royalty rate for DSL, Dr. Putnam performs the following steps:

- Dr. Putnam assumes that each premise wired with DSL will, on average, consume a total of four standard-compliant DSL units.  *Id.*, Ex. 3.

- Dr. Putnam takes the $544 in cost savings and divides by four (units) to obtain $136 in cost savings per unit of DSL equipment.  *Id.*  Dr. Putnam then divides the $136 by two (based on his assumption that DSL patent holders and implementers have equal bargaining power) to get approximately $68.  *Id.*

- Dr. Putnam next performs an analysis using a sampling method, coined a "knockout analysis," to calculate that there are 205 expected essential patent families per DSL standard.  *Id.* ¶¶ 370–75.

- Dr. Putnam then divides the $68 in allegedly avoided costs by 205 allegedly essential patent families to arrive at his damages rate of $0.33 per unit per standard for each of the patent families at issue.  *Id.*, Ex. 3, Ex. 5, Sch. A.1.

---

[2] Dr. Putnam admits that the methodology that he used in this case is the same as the methodology that he used in *TQ Delta, LLC v. 2Wire, Inc.*, C.A. No. 13-cv-1835-RGA (D. Del.) ("*2Wire*").  Ex. A, ¶17.  Dr. Putnam further confirmed during his deposition in this case that the testimony he provided in *2Wire* remains accurate and applicable to his methodology.  Ex. D at  128:25-129:19.

███████████████████████████████

### III.     Applicable Law: Federal Circuit Precedent Precludes Presenting Unreliable Expert Damages Opinions to the Jury

Under Federal Rule of Evidence 702, expert testimony is admissible if it will assist the trier of fact in determining the facts at issue or understanding the subject matter at hand (*i.e.*, it is reliable and relevant to the issues at hand).  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).  *Daubert* assigns to the Court an essential gatekeeping function to ensure that a proposed expert's testimony is sufficiently reliable to be considered by the jury.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The burden is on the party offering an expert witness to demonstrate that the proposed expert's testimony meets the *Daubert* criteria.  *Daubert*, 509 U.S. at 590–91; *see also Thomas v. PFG Transco, Inc.*, 501 F. Supp. 3d 437, 441 (E.D. Tex. 2020).

In the damages context, the Federal Circuit has warned that "given the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages award."  *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).  "While questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound."  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014).

For a reasonable-royalty analysis, the Court is "require[d] to carefully tie proof of damages to the claimed invention's footprint in the marketplace."  *VirnetX*, 767 F.3d at 1327 (internal quotes omitted).  In other words, the damages ultimately awarded for patent infringement "must reflect the value attributable to the infringing features of the product, and no more."  *Ericsson*, 773 F.3d at 1226.  This principle is known as "apportionment" and is "the governing rule" "where multi-component products are involved."  *Id.*  Consequently, to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other

4

████████████████████████████████████████

features.  *VirnetX*, 767 F.3d at 1329.

## IV.    This Court Should Exclude Dr. Putnam's Opinions Premised on an Express Rejection of Federal Circuit Precedent.

Dr. Putnam fails to apply any of the accepted methodologies for calculating royalties in the SEP context, and his chosen methodology violates several well-established rules for determining damages.  This Court should exclude each of those opinions.

### A.    In Contrast to Federal Circuit Precedent, Dr. Putnam's Methodology Fails to Limit Damages  to the Incremental Value of the Asserted Patents.

Federal Circuit precedent makes clear that a royalty rate for SEPs must be apportioned to the value of the patented invention.

> When dealing with SEPs, there are two special apportionment issues that arise. First, the patented feature must be apportioned from all of the unpatented features reflected in the standard.  Second, the patentee's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology.  These steps are necessary to ensure that the royalty award is based on the incremental value that the patented invention adds to the product, not any value added by the standardization of that technology.

*Ericsson*, 773 F.3d at 1232.  Similarly, as this Court has explained in the context of SEPs, "(1) the patented feature must be apportioned from all of the unpatented features reflected in the standard; and (2) the royalty must be premised on the value of the patented feature, not any value added by the standard adoption of the patented technology."  *Chrimar Sys. v. Adtran*, No. 6:15-cv-00618-JRG, 2016 U.S. Dist. LEXIS 204469, at *12 (E.D. Tex. Nov. 3, 2016) (citing *Ericsson*, 773 F.3d at 1232, and *CSIRO*, 809 F.3d at 1305).

Dr. Putnam acknowledges the applicable law.  *See* Ex. A (Putnam Op. Rpt.) ¶ 155 n.198. Nevertheless, Dr. Putnam refuses to apply the very law he cites and instead spends pages of his report explaining why he disagrees with it.  *See id.* ¶¶ 139–156.  He even purports to provide an *economic analysis* about why the law is wrong, providing his personal view that one should value the standard itself because "standardization is a winner-take-all process, in which—again unlike

market competition—there can be only one winner. . . . .   Standardization thus magnifies the difference between winning and losing, relative to market competition." *Id.* ¶ 142.  But it is not Dr. Putnam's place to say what the law should be; rather, it is this Court's province to inform the jury of the law.  An expert may not usurp this Court's role by rejecting the law and attempting to explain why he believes the law is wrong.  And certainly he should not be able to present such opinions to the jury.  Thus, they should be excluded.

In applying Dr. Putnam's incorrect view of the law, TQ Delta and Dr. Putnam establish royalty rates for the patent families at issue based solely on the families' supposed inclusion in the DSL standards—not based on the value of the individual inventions.  *See id.* ¶¶ 326–327, 383. Dr. Putnam proffers a royalty rate of $0.33 for a license to each patent family (as an entire family) rather than the value of the individual inventions (as individual patents).   At his deposition, Dr. Putnam acknowledged that his methodology does not allocate the value among the individual asserted patents and instead focuses on entire patent families.  Ex. D (Putnam 12/6/22 Dep.) at 21:12–22:2, 59:5–18.  Although Dr. Putnam admitted that, "if you're relying on a portfolio license to determine the value of individual patents, then you need to make adjustments for all the relevant differences between the portfolio license and the hypothetical license between the parties," *id.* at 25:21–26:3, he did not follow his own advice.  For example, Family 1 contains 14 patents.  *See* Ex. E████████████ at TQD_TX00491609–10.  TQ Delta asserts ***only one*** of those 14 patents against CommScope (the '686 patent).  Dr. Putnam nonetheless seeks a reasonable royalty of $0.33 for just the '686 patent, despite opining that the royalty covers all the technology of all the Family 1 patents.  *See Limelight Networks, Inc. v. XO Commc'ns, LLC*, No. 3:15-CV-720-JAG, 2018 WL 678245, at *7 (E.D. Va. Feb. 2, 2018) (court rejecting analysis failing to consider that "different patents can have vastly different values," finding it to be a "methodological flaw [that] lack[ed]

reliability"); *Microsoft*, 2013 WL 2111217, at *20 (noting "a patent that is extremely important and central to the standard would reasonably command a higher royalty rate than a less important patent").

The Federal Circuit has expressly and routinely rejected the approach that Dr. Putnam advocates and applies.  A reasonable royalty in the standards context must be tied to the patented feature at issue, and "must be apportioned from all of the unpatented features reflected in the standard." *Ericsson*, 773 F.3d at 1232.  Moreover, "reasonable royalties for SEPs generally—and not only those subject to a RAND commitment—must *not* include any value flowing to the patent from the standard's adoption." *CSIRO*, 809 F.3d at 1305 (emphasis added); *see also Ericsson*, 773 F.3d at 1232 ("the patentee's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology").  Dr. Putnam's methodology violates this rule by valuing the TQ Delta patents simply based on their inclusion in the DSL standards, regardless of whether the specific technology covered by those patents is actually used, or how frequently it is used.  And his methodology additionally violates this rule by seeking a full royalty for entire patent families, regardless of the number of patents actually being considered (and valued) within those families.

The decision in *Apple Inc. v. Wi-LAN, Inc.* is also instructive.  No. 14CV2235 DMS (BLM), 2019 WL 4248899 (S.D. Cal. Jan. 3, 2019), *aff'd*, 25 F.4th 960 (Fed. Cir. 2022).  In that case, the district court rejected an approach similar to Dr. Putnam's, where the expert's starting point was to value all of voice over LTE ("VoLTE") capability rather than the actual patented technology. *Id.* at *4.  The court noted that VoLTE technology was made up of multiple components, including LTE networks, the internet, and different components that different people and companies invented, and the plaintiff's damages theory thus "overstated the footprint of the invention." *Id.*

The court thus agreed that the expert's opinions lacked sufficient factual basis and "should not have been presented to the jury." *Id*. at *16.

Like the expert's approach in *Apple*, here Dr. Putnam's approach similarly "overstate[s] the footprint of the invention" and should not be presented to the jury.  DSL technology, as set forth in the standards, encompasses a wide variety of technologies, the vast majority of which have nothing to do with any of TQ Delta's patents.  Indeed, many DSL standards, such as VDSL2, are hundreds of pages long, and TQ Delta does not and cannot claim that it contributed to or invented each aspect or component of that technology.  Under the pertinent law, a royalty should be limited to "the incremental value that the patented invention adds to the product, not any value added by the standardization of that technology." *Ericsson*, 773 F.3d at 1232; *see also CSIRO*, 809 F.3d at 1301 (warning courts of the "great financial incentive parties have to exploit the inherent imprecision in patent valuation").  Dr. Putnam's contrary approach should be excluded.

### B.    In Contrast to Federal Circuit Precedent, Dr. Putnam Improperly Rejects the SSPPU Rule.

The Federal Circuit has made clear that, under the law, "it is generally ***required*** that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit'":

> Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.  Thus, it is generally required that royalties be based not on the entire product, but instead on the "smallest salable patent-practicing unit." *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009) (explaining that "counsel would have wisely abandoned a royalty base claim encompassing a product with significant non-infringing components.  The logical and readily available alternative was the smallest salable infringing unit with close relation to the claimed invention—namely the processor itself.").

*LaserDynamics*, 694 F.3d at 67; *see also, e.g.*, *VirnetX*, 767 F.3d at 1327–28 ("Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with

no relation to the patented feature . . . , the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology.  To hold otherwise would permit the entire market value exception to swallow the rule of apportionment.").

But continuing his criticism of the applicable law, Dr. Putnam expressly rejects the well-settled SSPPU rule.  *See* Ex. A (Putnam Op. Rpt.) ¶¶ 157–66.  In his report, Dr. Putnam argues—and apparently plans to tell the jury—that, "[a]part from its short and cramped legal history, the SSPPU has no general business or economic justification." *Id*. ¶ 159.  The primary basis for his criticism (and his refusal to apply it) is *his own unpublished* manuscript where he advocates that "there are fundamental economic reasons why economic agents do not rely on the supposed 'smallest saleable unit' by which to measure the economic contribution of an invention." *Id*. ¶ 158 & n.203.  In rejecting the SSPPU rule (both in premise and in application), Dr. Putnam proffers opinions that are nothing more than a naked attempt to charge the jury as to what *Dr. Putnam believes* the law *should be*—a job that is squarely within the province of the Court.  *Ultravision Techs., LLC v. Govision LLC*, 2021 U.S. Dist. LEXIS 101060, *5 (E.D. Tex. 2021); *see also Kaist IP US LLC v. Samsung Elecs., Co.*, No. 2:16-cv-01314-JRG-RSP, Dkt. 349 (E.D. Tex. Apr. 17, 2018).

Instead of following the law regarding the use of SSPPU, Dr. Putnam employs what may fairly be called the *largest* patent-practicing unit imaginable in this context: "DSL technology" as a whole.  This is unprecedented and unsupportable, it inflates TQ Delta's damages exponentially, and it should never be allowed in front of the jury.  Because Dr. Putnam outright rejects, openly criticizes, and certainly does not apply the SSPPU rule, his methodology is unsound and should be excluded.

C.      **In Further Criticism of Federal Circuit Precedent, Dr. Putnam Improperly Relies on the Nash Bargaining Theory.**

"In the patent context, the Nash theorem provides that where two parties are bargaining, under a certain set of premises, the Nash Bargaining Solution is a 50/50 split of the incremental profits earned by the infringer from the use of the asserted patents." *Bayer HealthCare*, 2019 WL 330149, at *6 (citing *VirnetX*, 767 F.3d at 1325, 1333–34).  As a general rule, "use of the Nash Bargaining Solution is a 'rule of thumb' [that is] **inadmissible under *Daubert***." *Id.* (citing cases) (emphasis added).

Undeterred by the law, Dr. Putnam trumpets the virtues of the Nash Bargaining Solution, emphasizing that the "work merit[ed] the Nobel Prize," and stating that "[i]t is simply an abuse of language to characterize the nature, history, impact and vitality of Nash's solution on par with a discredited 'rule of thumb.'"  Ex. A (Putnam Op. Rpt.) ¶ 348 n.443.  But recognizing that the law is contrary to his view, Dr. Putnam hedges by saying that he "cite[s] the Nash theorem as one (among several) justifications for an equal division of the gains from DSL technology (not 'profit') between all implementers and all innovators, each of whom has a claim on a 'fair' division of those gains and whose interests are supposed to be 'balanced' against each other." *Id.* ¶ 348 n.447.

Dr. Putnam's use of a 50/50 split as the relative bargaining strength of TQ Delta and CommScope does not follow any acceptable framework or methodology for patent damages.  Moreover, Dr. Putnam fails to tie his "50/50 sharing" opinion to the facts of this case.  In fact, at his *2Wire* deposition, Dr. Putnam admitted that he ignored the relevant agreements in formulating his assumption that DSL innovators and implementers would share the value of DSL equally in a hypothetical negotiation.  *See* Ex. F (Putnam 2/7/19 Dep.) at 52:8–56:4.  Likewise, in this case, Dr. Putnam again fails to identify or consider any such evidence.  Ex. D (Putnam 12/6/22 Dep.) at 143:22–150:10; Ex. A (Putnam Op. Rpt.) ¶ 348.  Therefore, Dr. Putnam's reliance on a 50/50

███████████████████████████████████████████

sharing theory in his damages analysis should be excluded.

**D.     In Contrast to Federal Circuit Precedent, Dr. Putnam Uses an Incorrect Date for the Hypothetical Negotiation.**

The '881 patent issued on November 18, 2008, and is the earliest issued patent among the Asserted Patents.  Accordingly, the hypothetical negotiation (for at least that patent) should occur at or around November 18, 2008—just before the alleged infringement began.[3]  *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1363–64 (Fed. Cir. 2006) ("[T]he hypothetical negotiation relates to the date of first infringement.").  Dr. Putnam opines that the date of the hypothetical negotiation here *does not matter*.  Ex. A (Putnam Op. Rpt.) ¶ 169.  During his deposition, Dr. Putnam stated that *if* a date required, then the relevant date is 2004—*four years before* the earliest Asserted Patent even issued.  Ex. D (Putnam 12/6/22 Dep.) at 109:6–14, 115:22–118:20.[4]  That is the wrong date as a matter of law, and thus any opinion regarding the results of a hypothetical negotiation is *per se* incorrect and should be excluded.  *See, e.g.*, *LaserDynamics*, 694 F.3d at 75–76 (rejecting reliance on wrong hypothetical negotiation date and noting that the date was essential to determine the "value of the patented technology to the parties in the marketplace" as of that date).

**V.     TQ Delta's Own License Agreements Demonstrate That Dr. Putnam's Flawed Methodology Produces Unreliable Damages Numbers.**

Dr. Putnam opines that TQ Delta's license agreements with ███████████████████ are comparable to the hypothetical license for CommScope.  Ex. A (Putnam Op. Rpt.) ¶¶ 194–95,

---

[3] TQ Delta agrees that the earliest date of alleged infringement for any CommScope entity is the date of issuance of the '881 patent in November 2008.  Ex. G (TQD's Interrog. Resps.) at 86–89.

[4] During his deposition, Dr. Putnam tries to fix his error by testifying that the hypothetical negotiation could be in 2008, but then turns around and argues that the relevant date for his analysis is nonetheless 2004.  Ex. D (Putnam 12/6/22 Dep.) at 115:22–117:21 ("So you can negotiate in 2008, but you need to adopt the terms that you would have set in 2004 for F/RAND").

███████████████████████████████████████████████

197–98, 200–02.  Even assuming these are comparable,[5] their royalty rates for VDSL2 patents are

██████████████████ royalty rate for the five VDSL2 patents asserted against CommScope[6]

according to Dr. Putnam's flawed methodology.  This further demonstrates the errors in Dr.

Putnam's methodology, providing additional justification for excluding it as unreliable.

█████████████████████████████████████████████████

████████████████████████████ the parties entered into ██████████████████

patent license agreement.  *See* Ex. H ██████████  The ████████ includes not only the

five asserted patents from the five VDSL families, but █████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████ Ex. A (Putnam Op. Rpt.) § 1.9.  In relevant part, the rate in the

████████████ on a per-unit or per-port basis for VDSL2 is ██████████████████████

*See id.* ¶ 182.

██████████████    ████████████████████████████████████

████████████ entered into a license agreement in which ████████ DSL products were licensed to

████████████████████████████████.  *See* Ex. I ███████████████   ████████████

█████████████████████████████████████████████████

Ex. A (Putnam Op. Rpt.) ¶ 184.

█████████████████████████████████████████████████

████████████████████████████████ to resolve litigation in the District Court of Delaware

---

[5] CommScope does not agree that these licenses are comparable.

[6] '686 Patent; '881 Patent; '008 Patent; '835 Patent; '354 Patent.



and the United Kingdom.  *See* Ex. J ███████████   The ██████████ includes ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████ .  *Id.*  In relevant part, the rate in the ███████████ on a per-unit

basis for VDSL2 is ███████████████████ .  *See* Ex. A (Putnam Op. Rpt.) ¶ 182.

In addition to the ███████████████████ , according to the November 23,

2022 license between TQ Delta and Nokia, there are ████████ in just the five VDSL2 families

asserted in this Litigation (Families 1, 3, 4, 6 and 10).  *See* Ex. E ███████████████ at

TQD_TX00491609–15.  That implies a royalty rate of ████████ for each TQ Delta VDSL SEP.

Dr. Putnam proposes to testify that the rate is much higher than that at ████ per unit for just

VDSL.  Ex. A (Putnam Op. Rpt.), Ex 5, Sch. A.2; Ex. D (Putnam 12/6/22 Dep.) at 87:19 (██

███████████ .  Viewed another way, Dr. Putnam is essentially saying that the six VDSL2

patents asserted in this case against CommScope are worth almost ███████████████████

███████████████████████████

Dr. Putnam tries to defend these discrepancies by arguing that they reflect an "upwards

adjustment" to the rates implied by the other licenses to account for an assumption of infringement

and validity.  Ex. D (Putnam 12/6/22 Dep.) at 118:3–9.  That is not a valid explanation for making

an "upwards adjustment" to licenses that Dr. Putnam opines are comparable.  As a preliminary

matter, ███████████████████████████████████████████████████

████ is more than just an adjustment to account for infringement and validity—it is nonsensical.

More fundamentally, the principal methodological problem is Dr. Putnam's assumption that

royalty rates in comparable licenses should be adjusted upwards in the first place.  That is contrary

to the law, which strongly favors the use of comparable licenses to determine royalty rates

"because the parties are constrained by the market's actual valuation of the patent." *CSIRO*, 809 F.3d at 1303.  *See, e.g.*, *LaserDynamics*, 694 F.3d at 80–82 (rejecting opinion for 6% running royalty rate where the actual license did not exceed $1 million as a lump sum); *Microsoft*, 2013 WL 2111217, at *84–85 (finding royalty rate equivalent to an established royalty rate appropriate, with no reason to increase rate).

## VI.    Conclusion

For the reasons stated above, CommScope respectfully requests that the Court exclude the damages opinions of Dr. Putnam that rely on the flawed methodologies described herein, including those that are inconsistent with Federal Circuit precedent.  The exclusion should encompass paragraphs 20–24, 28, 139–166, 281–282, 287, 288–291, 291–400, 442–448, Appendix I ¶ 4, II, Exhibits 3, 5, 9, 10, 11 13, 14, 19, 21, 22, and Figures 3.1–6 of Dr. Putnam's 9/3/22 Corrected Opening Report (Ex. A); paragraphs 4, 7, 8, 9, 10, 12, and Exhibits 5, 21, 22 of Dr. Putnam's 11/16/22 Supp. Report (Ex. B); and paragraphs 11, 13, and Exhibit 1 of Dr. Putnam's 12/1/22 Second Supp. Report (Ex. C).

Dated this 14th day of December, 2022

Respectfully submitted,

By: */s/ Eric H. Findlay*_____
Eric H. Findlay
State Bar No. 00789886
Brian Craft
State Bar No. 04972020
FINDLAY CRAFT, P.C.
7270 Crosswater Avenue, Suite B
Tyler, TX 75703
903-534-1100 (t)
903-534-1137 (f)
efindlay@findlaycraft.com
bcraft@findlaycraft.com

Douglas J. Kline
Lana S. Shiferman
GOODWIN PROCTER LLP

100 Northern Avenue
Boston, MA  02210
P:  (617) 570-1000
F:  (617) 523-1231
dkline@goodwinlaw.com

Brett Schuman
Rachel M. Walsh
GOODWIN PROCTER LLP
Three Embarcadero Center, 28th Floor
San Francisco, CA 94111
P:  (415) 733-6000
F:  (415) 677-9041
bschuman@goodwinlaw.com
rwalsh@goodwinlaw.com

Andrew Ong
GOODWIN PROCTER LLP
601 Marshall St.
Redwood City, CA 94063
P: (650) 752-3100
F: (650) 853-1038
aong@goodwinlaw.com

Ross R. Barton (NC Bar No. 37179)
M. Scott Stevens (NC Bar No. 37828)
Kirk T. Bradley (NC Bar No. 26490)
Stephen R. Lareau (NC Bar No. 42992)
Karlee N. Wroblewski (NC Bar No. 55043)
Nicholas C. Marais (NC Bar No. 53533)
Erin Beaton (NC Bar No. 59594)
Mary I. Riolo (NC Bar No. 59644)
ALSTON & BIRD LLP
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Email:*ross.barton@alston.com*
*scott.stevens@alston.com*
*kirk.bradley@alston.com*
*stephen.lareau@alston.com*
*karlee.wroblewski@alston.com*
*nic.marais@alston.com*
*erin.beaton@alston.com*
*mary.riolo@alston.com*
Telephone: 704-444-1000
Facsimile: 704-444-1111

Katherine G. Rubschlager
(Cal. Bar No. 328100)
ALSTON & BIRD LLP
1950 University Avenue, Suite 430
East Palo Alto, CA 94303
Email: katherine.rubschlager@alston.com
Telephone: 650-838-2004
Facsimile: 650-838-2001

***Counsel for Defendants***
***CommScope Holding Company, Inc.,***
***CommScope Inc., ARRIS US Holdings, Inc.,***
***ARRIS Solutions, Inc., ARRIS Technology,***
***Inc., and ARRIS Enterprises, LLC***

## CERTIFICATE OF CONFERENCE

In accordance with all the requirements of Local Rule CV-7(h), The Parties met and conferred regarding this Motion via teleconference on December 13, 2022.  The discussions have conclusively ended in an impasse, leaving an open issue for the Court to resolve. Therefore, this motion is opposed.

*/s/ Brian Craft*
Brian Craft



### CERTIFICATE OF SERVICE

Pursuant to Local Rule CV-5(c), the undersigned hereby certifies that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on December 14, 2022.

*/s/ Eric H. Findlay*
Eric H. Findlay