# EXHIBIT D

1                    DR. JONATHAN PUTNAM

2              UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
3                    MARSHALL DIVISION

4

5    TQ DELTA, LLC,

6          PLAINTIFF,

7    VS.              CIVIL ACTION NUMBER 2:21-CV-310

8    COMMSCOPE HOLDING COMPANY,
     INC.; COMMSCOPE INC.; ARRIS
9    INTERNATIONAL LIMITED; ARRIS
     GLOBAL LTD.; ARRIS US
10   HOLDINGS, INC.; ARRIS
     SOLUTIONS, INC.; ARRIS
11   TECHNOLOGY, INC.; AND ARRIS
     ENTERPRISES, LLC,
12
           DEFENDANTS.
13

14
     DEPONENT:   DR. JONATHAN PUTNAM
15

16
     TAKEN:       DECEMBER 6, 2022
17

18
     REPORTER:    DANNIELLE COPELAND
19                REGISTERED DIPLOMATE REPORTER
                  CERTIFIED REALTIME REPORTER
20                CALIFORNIA CSR 14444
                  TENNESSEE LICENSE 807
21                WASHINGTON CSR 22000824

22

23      STENOGRAPHICALLY REPORTED REMOTELY VIA ZOOM
                    VIDEOCONFERENCE
24

25   JOB NUMBER 220199

1          DR. JONATHAN PUTNAM

2               I N D E X

3

EXAMINATION:                           PAGE
4

5    BY MS. SHIFERMAN                        6
     BY MR. CHIN                           267
6


7

CERTIFICATE                              280
8


9

            E X H I B I T S
10


11   EXHIBIT 1    DR. PUTNAM'S EXPERT REPORT      41
     EXHIBIT 2    DR. PUTNAM'S CORRECTED EXPERT   41
12                REPORT
     EXHIBIT 3    DR. PUTNAM'S FIRST              183
13                SUPPLEMENTAL REPORT
     EXHIBIT 4    DR. PUTNAM'S SECOND             184
14                SUPPLEMENTAL REPORT
     EXHIBIT 5    ███████████████████████████     211
15   EXHIBIT 6    SPREADSHEET                     225
     EXHIBIT 7    COMMSCOPE'S FIRST SET OF        234
16                OBJECTIONS AND RESPONSES TO
                  PLAINTIFF'S FIRST SET OF
17                INTERROGATORIES NUMBERS 1
                  TO 18
18

19

20

21

22

23

24

25

1                    DR. JONATHAN PUTNAM

2           THE VIDEOTAPED DEPOSITION OF

3    DR. JONATHAN PUTNAM, TAKEN PURSUANT TO NOTICE

4    HERETOFORE FILED, VIA ZOOM VIDEOCONFERENCE, ON

5    DECEMBER 6, 2022, AT APPROXIMATELY 9:32 A.M.,

6    UPON ORAL EXAMINATION, AND TO BE USED IN

7    ACCORDANCE WITH THE FEDERAL RULES OF CIVIL

8    PROCEDURE.

9

10                    ***   ***   ***

11                      APPEARANCES

12               VIA ZOOM VIDEOCONFERENCE

13

14
     FOR THE PLAINTIFF:
15   EDWARD CHIN, ESQ.
     DAVIS FIRM P.C.
16   111 West Tyler Street
     LONGVIEW, TEXAS 75601
17

18   FOR THE DEFENDANTS:
     LANA SHIFERMAN, ESQ.
19   GOODWIN PROCTER LLP
     100 NORTHERN AVENUE
20   BOSTON, MASSACHUSETTS 02210

21
     ALSO PRESENT:
22   AWO BOS, COMPETITION DYNAMICS
     DAVID KLEIN, APPLIED ECONOMICS
23   EMILY WILKINSON, WINSTON
     DANIELLE WILLIAMS, WINSTON
24   DAVID WOODFORD, VIDEOGRAPHER

25

1               DR. JONATHAN PUTNAM

2               THE VIDEOGRAPHER:  Good morning,

3    Counselors.  My name is David Woodford, legal

4    video specialist in association with TSG

5    Reporting, Inc. Because this is a remote

6    deposition, I will not be in the same room with

7    the witness; instead, I will record this

8    videotaped deposition remotely.  The court

9    reporter, Dannielle Copeland, will also not be

10   in the same room and will swear the witness

11   remotely.

12               Do all parties stipulate to the

13   validity of this video recording and remote

14   swearing and that it will be admissible in the

15   courtroom as if it had been taken following

16   Rule 30 of the Federal Rules of Civil Procedure

17   and the state's rules where this case is

18   pending?

19               MS. SHIFERMAN:  Yes.

20               MR. CHIN:  Yes, for TQ Delta.

21               THE VIDEOGRAPHER:  Thank you.

22               This is Media Unit Number 1 of the

23   video-recorded deposition of Jonathan Putnam.

24   This is in the matter of TQ Delta, LLC, versus

25   CommScope Holding Company, Inc., et al.  It's

Page 5

```
 1                    DR. JONATHAN PUTNAM

 2   being heard before the United States District

 3   Court for the Eastern District of Texas,

 4   Marshall Division.  The Civil Action Number is

 5   2:21-CV-310.

 6               This deposition is taking place

 7   remotely on December 6th, 2022, beginning at

 8   9:32 a.m.

 9               Again, my name is David Woodford,

10   legal video specialist; and the court reporter

11   is Dannielle Copeland, both here on behalf of

12   TSG Reporting, Inc.

13               Will counsel present please

14   introduce yourselves and your affiliations, and

15   the witness will be sworn.

16               MS. SHIFERMAN:  Lana Shiferman with

17   Goodwin Procter on behalf of the CommScope

18   entities.  With me are Danielle Williams and

19   Emily Wilkinson from Winston, and David Klein

20   from Applied Economics.

21               MR. CHIN:  Edward Chin of the Davis

22   Firm representing TQ Delta and the witness, and

23   with me is Awo Bos.  She's with the witness's

24   firm, Competition Dynamics.

25
```

1                DR. JONATHAN PUTNAM

2                DR. JONATHAN PUTNAM, CALLED AS A

3   WITNESS HEREIN, HAVING BEEN FIRST DULY AFFIRMED

4   ON OATH, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

5

6                     EXAMINATION

7

8   BY MS. SHIFERMAN:

9        Q.    Good morning, Dr. Putnam.

10       A.    Good morning, Ms. Shiferman.

11       Q.    Can you please state your full name

12   for the record?

13       A.    Jonathan Douglas Putnam.

14       Q.    And please state your address for

15   the record.

16       A.    Home or business?

17       Q.    Your home address.

18       A.    ███████████████████████

    ██████████████████

20       Q.    Who are you employed by?

21       A.    Competition Dynamics, Incorporated.

22       Q.    Has your position at Competition

23   Dynamics changed since January 2019?

24       A.    No.

25       Q.    Do you have any documents with you

```
 1                    DR. JONATHAN PUTNAM
 2        Q.     Does -- so you said an ITC
 3   investigation doesn't require an allocation of
 4   value among the individual portfolio members.
 5        Does a district court case require an
 6   allocation of the value among the individual
 7   portfolio members?
 8        A.     Well, it depends on the
 9   methodology.  Not in my case, of course, and
10   not based on the methodology that I developed,
11   it doesn't.
12        Q.     So you're looking at this from your
13   own methodology and not any case law
14   requirement?
15        A.     Well, I don't -- in other words,
16   if -- if your question -- I mean, formally
17   speaking, if you're asking me what the case law
18   requires, that's a legal question; and I'll
19   decline to answer it.
20        If you're saying as an economist do I
21   understand that sometimes one should look at
22   the value of the other members of the portfolio
23   that aren't asserted in a case, and the answer
24   is:  Sometimes that's logically necessary, but
25   it's not legally required, as far as I
```

```
 1                    DR. JONATHAN PUTNAM

 2   understand.

 3       Q.    All right.  Well, you just said you

 4   didn't -- it wasn't required in an ITC case,

 5   and I just want to understand why you say it

 6   wasn't inquire -- required in an ITC case.

 7       Is it that ITC case, or ITC cases

 8   generally?

 9       A.    Well, as I said, I'm not trying to

10   make any pronouncement about the law at all.

11       So it's not -- the point is not that the

12   ITC doesn't require allocation of portfolios.

13       The point is to answer a question that the

14   ITC may consider relevant, such as was an offer

15   F/RAND, one may need -- and in my case did not

16   need -- to determine the value of other

17   portfolio members.  In the same way, in

18   district court, to compute damages, one may

19   need but one may not necessarily compute the

20   value of other portfolio members.

21       So there's no general legal rule, as far

22   as I know, and -- and that's because the answer

23   depends on what's the question being asked and

24   how is the expert going about trying to answer

25   it.
```

1                    DR. JONATHAN PUTNAM

2   percent, and the others or worth nothing; or it

3   could be that two of the patents in the

4   portfolio are each worth 10 percent, and both

5   are worth 10 percent together, and the others

6   are worth nothing; so there's, you know, a

7   variety of fact patterns that -- or it could be

8   that one patent is worth 8 percent, and the

9   other is worth 2 percent, and the others are

10  worth nothing.

11       There's all kinds of possible fact

12  patterns that could arise.

13       Q.    But if you're negotiating a license

14  to a subset of patents in that portfolio, do

15  you need to know the value of what those

16  patents are, whether -- be it high or low?

17       Do you need to value those -- that subset

18  of patents that are going to be the subject of

19  the license?

20       A.    Well, as I've said -- and again,

21  without trying to pronounce on the law, if

22  you're relying on a portfolio license to

23  determine the value of individual patents, then

24  you need to make adjustments for all the

25  relevant differences between the portfolio

1                    DR. JONATHAN PUTNAM

2    license and the hypothetical license between

3    the parties.

4         That would include whether the license

5    products are the same.  It would include

6    whether things have changed in the interval

7    between the negotiation dates of the two

8    agreements.  It would include the fact that

9    licenses, in general, are negotiated absent the

10   assumption of a validity and infringement;

11   whereas, in our negotiation, that's not true.

12        So all these things are adjustments that

13   should be made based on the facts.

14        Q.    Now, earlier you said that there

15   were sometimes -- sometimes the fact that some

16   patents in a portfolio are invalidated matters;

17   sometimes it doesn't.

18        Give me some examples of when it matters

19   that some patents in a portfolio are

20   invalidated.

21        A.    Well, I mean, let's just take a

22   hypothetical example.

23        There's two patents in a portfolio.

24   Everybody agrees that each one of them commands

25   a 5 percent royalty rate independently of the

```
 1                    DR. JONATHAN PUTNAM

 2    different times, and so the 33 cents didn't

 3    apply before the second patent issued, which

 4    was the correction.

 5         Q.     Putting aside the timing issue, did

 6    dropping one of the asserted patents from

 7    Family 10 impact your calculation of the rate

 8    for Family 10?

 9         A.     No, because of the analysis of --

10                MR. CHIN:  Form.

11                THE WITNESS:  I'm sorry.

12                MR. CHIN:  Yeah.

13                Objection, form.

14                THE WITNESS:  The analysis is

15    conducted at a -- for the reasons we discussed

16    previously at the level of the individual

17    family.  The royalties are collected on a

18    family basis.

19    BY MS. SHIFERMAN:

20         Q.     Does it matter in your analysis

21    whether all of the patents in Family 10 are

22    valid?

23         A.     No.  What matters is that one of

24    them is valid and infringed because that one

25    provides the exclusive power or scope of the
```

1                    DR. JONATHAN PUTNAM

2        Q.     That's higher than the max rate

3   that you discussed, right?

4        A.     Yeah.  I think that has to do with

5   whether you're doubling G.bond? or not.

6        Q.     Okay.  Well, when we calculated

7   ██████████████████████████████████████████████

8   right?

9        So ██████████████████████████████████████

   ████████████████████████████████████████████████

   █████████████████████████████████████

   ██████████████████████████████████████████

13       A.     Oh, the different -- I'm sorry.

14  Right.  Okay.

15       So I think the source of confusion is that

16  there are five families, four of which are

17  essential to VDSL2, and one of which is

18  practiced by VDSL2 but is not essential.

19       So if you look at -- ████████████████████████

   █████████████████████████████████████████████████

   ████████████████████████████████████████

22       Q.     So under that assumption, your max

23  rate's ███████████████████

24       A.     Well, that's -- one is for SEPs,

25  and one is for the patents asserted in this

1                    DR. JONATHAN PUTNAM

2              MR. CHIN:  Objection, form.

3              THE WITNESS:  I'm not sure what

4    that means.

5    BY MS. SHIFERMAN:

6         Q.    Did you compare the value that a

7    VD- --  VDSL brings, as opposed to, for

8    example, G.bond?

9              MR. CHIN:  Objection, form.

10             THE WITNESS:  I don't -- I'm not

11   aware of any way of computing that reliably, A,

12   at all; B, in a nondiscriminatory fashion; or

13   C, as of 2004, which is the -- for my purposes,

14   the date when one should value DSL technology.

15             So I don't -- maybe somebody thinks

16   that there is a, quote/unquote, "relative value

17   of the standard"; but I have no idea what that

18   means, particularly because the standards are

19   also practiced together.  You can't just

20   practice G.bond? in isolation.

21             So I think you would have to be

22   talking about some kind of incremental value of

23   one standard over another, and I know of no way

24   to measure that reliably; and I don't know of

25   anybody else has either.

1                    DR. JONATHAN PUTNAM

2    negotiation occurs.

3         Now, in your report, you say the time

4    doesn't matter; is that right?

5         A.    Okay.  So that actual --

6               MR. CHIN:  Objection, form.

7               THE WITNESS:  Sorry.

8               That's actually an important

9    objection.

10               I did not say that the hypothetical

11    occurred -- negotiation occurs in 2004.  So

12    let's just be clear about that.

13               I said that was the relevant

14    vantage point for valuing the technology.

15    BY MS. SHIFERMAN:

16         Q.    Okay.  So --

17         A.    With that proviso --

18         Q.    Sorry.  Go ahead.

19         A.    Yeah.  Well, with that proviso, I

20    think you should probably -- you should

21    probably re-ask your question.

22         Q.    How does the -- how does the fact

23    that 2004 is the relevant vantage point for

24    valuing the technology compare to your opinion

25    that for purposes of the hypothetical

1                    DR. JONATHAN PUTNAM

2    negotiation date in this case, it, you know,

3    doesn't matter when that date is?

4            MR. CHIN:  Objection to form.

5            THE WITNESS:  Well, I mean, I think

6    it compares in the sense that you're trying to

7    determine from the point of view of the --

8    well, I'll just back up.

9            TQ Delta has a portfolio of

10   patents, and one of the questions that's at

11   issue is has TQ Delta upheld its RAND

12   commitment in offering to license that

13   portfolio.

14           That portfolio comprises patents

15   that are alleged to be essential to ADSL, VDSL,

16   and subsequent standards.  So for that reason

17   you would look at the world from the point of

18   view of the first of those standards, which is

19   approximately 2004, and you would develop a

20   portfolio licensing program based on that,

21   based on the way the world looked at that date.

22           That licensing program must be

23   nondiscriminatory; so if any particular

24   licensee doesn't need a license until 2008,

25   that doesn't affect the analysis because you

```
 1                    DR. JONATHAN PUTNAM

 2    can't discriminate with respect to that

 3    licensee.  If you could, then you might take

 4    advantage of the fact that the licensee's

 5    alternatives appear to be worse in 2008 than

 6    they are in 2004, and you would use that to

 7    charge a higher rate, because the technology

 8    you're licensing is even more valuable than you

 9    thought it would be in 2004; but of course,

10    that would be discriminatory, if you did that.

11               So you can negotiate in 2008, but

12    you need to adopt the terms that you would have

13    set in 2004 for F/RAND purposes.

14               Now, for -- for damages purposes,

15    you also look at the perspective from 2004 and

16    you ask:  What's the value of the technology,

17    not just how was it offered.  And the value of

18    the technology in 2004 is higher than the rate

19    card that TQ Delta set for it or would have set

20    for it or Aware would have set for it if they

21    would have been setting a rate card in 2004.

22    BY MS. SHIFERMAN:

23         Q.    And why is that?

24         A.    Why is?

25         Q.    Why is it higher?
```

1                    DR. JONATHAN PUTNAM

2       A.      -- is the technology more valuable?

3       Q.      You said the rate would be higher.

4  I want -- I want to understand why?

5       A.      Well, for several reasons.

6       One of them is:  Again, in litigation,

7  you've removed the uncertainty surrounding the

8  infringement and validity and essentiality of

9  the patents; so that's a critical difference.

10       And then as a factual matter, it turns out

11  the technology is more valuable than the rate

12  that TQ Delta assigned to it when it developed

13  its rate card, which, of course, was long after

14  2004.  But what that tells you is that if

15  TQ Delta or Aware had adopted that rate card in

16  2004 for licensing end-product manufacturers

17  like and CommScope, that offer would have been

18  reasonable because the rates they requested

19  were much less than the value of the technology

20  they were licensing.

21       Q.      As part of the hypothetical

22  negotiation, though, you need to assume, based

23  on the Book of Wisdom, the layer of knowledge

24  that's required related to the value of DSL

25  technology; isn't that true?

1                    DR. JONATHAN PUTNAM

2    I've done the same thing.  The numbers are

3    different because the Courts ordered the cases

4    to be litigated differently.

5    BY MS. SHIFERMAN:

6         Q.    And you confirm that in Paragraph

7    17 of your report.  You say, "The methods I've

8    developed in Delaware, however, apply to

9    TQ Delta's entire patent portfolio; and thus, I

10   apply them here," correct?

11        A.    Well, yeah.  And again, by "entire

12   patent portfolio," what I mean by that is

13   including different members of the same

14   families, which are valued in the same fashion.

15   It doesn't mean that there is value that I've

16   assigned to nonasserted patents or families

17   that somehow has been imported into this case.

18   That's not true at all.

19        Q.    But the methods that you developed

20   in 2Wire are the same methods you're using in

21   this case?

22        A.    That is true.

23             MR. CHIN:  Objection, form.

24   BY MS. SHIFERMAN:

25        Q.    You provided testimony in the 2Wire

```
 1                 DR. JONATHAN PUTNAM

 2    case explaining -- or answering questions

 3    regarding your methodology.

 4         That testimony remains accurate?

 5         A.      Well, I mean, I would put it this

 6    way:  I'm not aware of anything that I would

 7    say differently.

 8         That being said, one can always improve

 9    the way one expresses oneself; and there are

10    many facts that have changed since that time.

11         In addition -- so those are two -- two of

12    the most important are there are additional

13    licenses that have been negotiated by TQ Delta,

14    and we've been able to compute the cost of

15    hold-out.

16         So -- but I -- as I sit here, I can't

17    think of anything that I would say differently;

18    although, if you pointed me to a particular

19    remark, I might change my mind.

20         Q.     Okay.

21                MS. SHIFERMAN:  It is just --

22    almost 1:00.  Is now a good time -- I'm going

23    to take a break now, but do you want to break

24    for lunch; or do you want to -- we can talk

25    about that off the record?
```

1                    DR. JONATHAN PUTNAM

2    saves the customer money, and that creates

3    value for the customer, which is reflected in

4    the customer's willingness to pay.  That's what

5    a demand curve comes from, is the customer's

6    willingness to pay for the product that is

7    being purchased.

8          In the same way that when I -- when Apple

9    sells me an iPhone, it is taking into account

10   the value that it creates to me when choosing

11   the price of the iPhone or any other product.

12         That's the demand side; and then the

13   supply side is Apple's doing that in

14   competition with Samsung; and CommScope's doing

15   that in competition with Nokia.  They're both

16   providing products that save their customers

17   costs, and so the price that results is the

18   customer's willingness to pay and the

19   supplier's competition for the customer's

20   business.  That's what supply and demand is.

21         Q.    And at -- all right.

22         So then you -- you have $136 in cost

23   savings per unit of DSL, and you split that

24   50/50 between the innovator and the

25   implementer; is that right?

1              DR. JONATHAN PUTNAM

2       A.    No.  I split that 50/50 between

3  innovators as a class and implementers as a

4  class because both innovators and implementers

5  come together to create standards, and they do

6  that because they both gain for that.

7       So then the question is:  How are the --

8  now -- now that we've calculated how much the

9  gains are, how should they be divided between

10  all implementers and all innovators.  So it is

11  very important to say that it is not an

12  innovator -- innovator and an implementer that

13  are dividing the gains 50/50.  It is all

14  innovators and all implementers that are

15  dividing the gains because the standardization

16  is supposed to be fair to both groups, which in

17  this case means that they gain equally or --

18  and I've given alternative calculations in

19  which they don't gain equally.

20       But in general, and as I've explained in

21  my report, fairness is an important

22  consideration; and when people are told to be

23  fair, particularly in groups, they divide

24  things equally.

25       Q.    All right.  Let me just restate my

```
 1                    DR. JONATHAN PUTNAM
 2    question, make sure I have this right.
 3         You took the $136 in cost savings per unit
 4    of DSL equipment, and you split that in half by
 5    the class of innovators and the class of
 6    implementers; is that correct?
 7         A.    Yes.
 8         Q.    And that's the same Step 3 that you
 9    utilized in the 2Wire case?
10         A.    Yes.
11         Q.    What's the basis for your 50/50
12    split up to the -- between the class of
13    innovators and the class of implementers?
14         A.    Well, there's several bases,
15    beginning in paragraph 348.
16         So economists have observed, both in
17    theory and in fact, that when people bargain
18    over things, they evaluate the gain from the
19    bargain relevant to their outside alternatives;
20    and if they have equal outside alternatives,
21    which means they have equal bargaining power,
22    then they tend to split the surplus 50/50.
23         That's the implication of self-interested
24    people trying to maximize their own share in
25    competition with somebody else trying to
```

1                    DR. JONATHAN PUTNAM

2    maximize their share.  That's the implication

3    of the NASH there.

4         Second, both parties -- meaning

5    implementers as a class and innovators as a

6    class -- so parties is the wrong word; they're

7    not parties -- both classes gain from

8    standardization.

9         Implementers gain because they can sell

10   more products; innovators gain because they can

11   license their technology.  In many cases those

12   people are the same people, and so the

13   standard-setting system endows both groups with

14   the right to a fair outcome, whatever that

15   means.

16        Third, because both groups are members

17   of -- some people are members of both groups,

18   they are induced to be fair to themselves

19   because if they argue for a high rate as a

20   licensor, then they're going to pay high rates

21   as a licensee; and so the system is

22   self-regulating in the sense that a -- a

23   rational licensor would only choose -- would

24   choose a rate that maximizes its total gains,

25   which includes the rates that it pays as a

```
 1                  DR. JONATHAN PUTNAM

 2   licensee.  So that tempers a licensor's demands

 3   and also makes a licensee want to pay more

 4   because the licensee may also be a patent

 5   owner.

 6          And finally, when you tell people in

 7   bargaining situations to be fair, then they

 8   often divide surplus equally; so in that case,

 9   they are thinking about the welfare of the

10   other person, not just their own.

11          So the interesting thing about this is

12   that whether you assume people are

13   self-interested and competing for shares or

14   whether you assume that they are other

15   interested and are truly sharing, you get the

16   same empirical implication, which is that

17   people divide the surplus 50/50.

18          So that's the basis of making that 50/50

19   assumption that I made, recognizing that there

20   is, in fact, no bargaining going on within a

21   standard development organization; and because

22   there's no -- there's no bargaining going on,

23   there's no market or, you know, alternatives.

24   A lot of the horse training is being done at

25   the level of technology, not at the level of
```

```
 1                    DR. JONATHAN PUTNAM

 2   prices.  So you've got to make an assumption

 3   about how to distribute the gain between

 4   innovators and implementers, and the -- by far,

 5   the most obvious and clearest focal point is a

 6   50/50 division, based both on common sense and

 7   on formal economics.

 8        Q.     One of the reasons you gave was

 9   that if people are trying to be fair, they tend

10   to split things 50/50.

11        What's your basis for that?

12        A.     Well, I would say on page -- or in

13   paragraph 349D, economists study this exact

14   phenomenon.  They give people things to divide

15   between the two of them, and they have to come

16   to some kind of bargain; and then they observe

17   what they do.

18        So for example, you give people -- you

19   give people a cake, and you say, you know, I

20   want you to bargain over how you're going to

21   divide this cake.  The only constraint is that

22   nobody gets any cake until you've come to an

23   agreement.

24        And so one offer under those circumstances

25   would be to say, okay, I want 95 percent of the
```

1                    DR. JONATHAN PUTNAM

2    cake, and you get 5 percent.  And if you don't

3    agree with me, then neither one of us gets any

4    cake.  And the person who's getting 5 percent

5    says, fine, I don't want any cake; you're not

6    being fair.

7         And, you know, there are people -- there

8    are bargains that result in 95 percent/5

9    percent divisions, but by far the most common

10   division of the cake under those circumstances

11   is that each person gets half.  So this is what

12   people do in the real world.

13        And that's also true, I should say, in

14   other experiments, what -- what's called the

15   cake-cutting algorithm.

16        So imagine that the rule, instead, is one

17   person gets to divide the cake however they

18   want, but the other person gets to choose the

19   piece.  They get to go first.  So when you set

20   up the rule that way, the person who is cutting

21   the cake won't choose an unequal division of

22   the cake because the other person who is

23   maximizing his own interests will choose the

24   larger piece; and so the person who cut the

25   cake will get the smaller piece.

```
 1                  DR. JONATHAN PUTNAM

 2        So what is -- what is the result when the

 3   cake cutter cuts -- she cuts the cake exactly

 4   in half because that maximizes the share of the

 5   cake that she will get when her counterparty

 6   gets to choose first.

 7        So you can explain equal division by

 8   selflessness, and you can explain equal

 9   division by selfishness.  It turns out you

10   still get equal division.

11        Q.     Now, did I understand that part of

12   your reason was the implementer class is

13   sometimes an implementer and other times -- or

14   strike that.

15        Do I understand that the innovator class

16   is sometimes an innovator and sometimes an

17   implementer; and therefore, that impacts the

18   positions they might take in a split?

19        A.     Well, that's true in standard

20   development organizations in general.

21        So for example, Siemens and Nokia in the

22   cellular context both sold handsets in the

23   early days; Siemens, you know, much longer ago,

24   and then Nokia exited maybe ten years ago.

25   They were both implementers and innovators.
```

1
                    REPORTER'S CERTIFICATE
2

3       I, DANNIELLE COPELAND, RDR, CRR, DO HEREBY CERTIFY

4    THAT THE FOREGOING DEPOSITION OF DR. JONATHAN PUTNAM

5    WAS TAKEN BEFORE ME AT THE TIME AND PLACE AND FOR THE

6    PURPOSE IN THE CAPTION STATED; THAT THE WITNESS WAS

7    FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH,

8    AND NOTHING BUT THE TRUTH; THAT THE DEPOSITION WAS

9    TAKEN BEFORE ME STENOGRAPHICALLY AND AFTERWARDS

10   TRANSCRIBED UNDER MY DIRECTION; THAT THE FOREGOING IS A

11   FULL, TRUE, AND CORRECT TRANSCRIPT OF THE SAID

12   DEPOSITION SO GIVEN; THAT THERE WAS NO REQUEST THAT THE

13   WITNESS READ AND SIGN THE TRANSCRIPT; THAT THE

14   APPEARANCES WERE AS STATED IN THE CAPTION.

15       I FURTHER CERTIFY THAT I AM NEITHER OF COUNSEL NOR

16   OF KIN TO ANY OF THE PARTIES TO THIS ACTION, AND AM IN

17   NO WAY INTERESTED IN THE OUTCOME OF SAID ACTION.

18       WITNESS MY SIGNATURE ON DECEMBER 9, 2022.  MY

19   COMMISSION EXPIRES SEPTEMBER 28, 2023.

20
                          _Dannielle Copeland_
21                   _____
                     DANNIELLE COPELAND, RDR, CRR
22                   CALIFORNIA CSR 14444
                     TENNESSEE LICENSE 807
23                   WASHINGTON CSR 22000824

24

25