# EXHIBIT 5

████████████

RICHARD D. WESEL, PhD - 12/1/2022

## Page 1

```
        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
                  MARSHALL DIVISION
TQ DELTA, LLC,              §
                            §
   Plaintiff,               §  JURY TRIAL DEMANDED
                            §
 VS                         §
_____        §  _____
COMMSCOPE HOLDING           §
COMPANY, INC ,              §
COMMSCOPE INC , ARRIS       §  Civil Action
INTERNATIONAL LIMITED,      §  2:21-cv-310-JRG
ARRIS GLOBAL LTD ,          §     (Lead Case)
ARRIS US HOLDINGS,          §
INC , ARRIS SOLUTIONS,      §
INC , ARRIS TECHNOLOGY,     §
INC , and ARRIS             §
ENTERPRISES, LLC,           §
_____        §  _____
NOKIA CORP , NOKIA          §
SOLUTIONS AND NETWORKS      §  Civil Action
OY, and NOKIA OF            §  2:21-cv-309-JRG
AMERICA CORP                §     (Member Case)
                            §
   Defendants               §


           ORAL AND VIDEOTAPED DEPOSITION OF
                RICHARD D  WESEL, PhD
                  DECEMBER 1, 2022

                 REPORTED REMOTELY
```

## Page 2

1  Oral and videotaped deposition of Richard D.
2  Wesel, PhD, produced as a witness at the instance of
3  the Plaintiff and duly sworn, was taken in the above
4  styled and numbered cause on Thursday,
5  December 1, 2022, from 11:08 a m. to 3:29 p m.,
6  before Rene N. White, CSR, CRR, RPR in and for the
7  State of Texas, reported by computerized stenotype
8  machine, remotely via Zoom videoconference platform,
9  pursuant to the Federal Rules of Civil Procedure and
10 any provisions stated on the record herein.

## Page 3

1        A P P E A R A N C E S
2     (All appearing remotely via videoconference )
3  FOR THE PLAINTIFF:
4    CHRISTIAN HURT, ESQ
     THE DAVIS FIRM, PC
5    213 N Fredonia Street, Suite 230
     Longview, Texas  75601
6    903 230 9090
     churt@bdavisfirm com
7
   FOR THE COMMSCOPE DEFENDANTS:
8
     ANDREW ONG, ESQ
9    GOODWIN PROCTER LLP
     601 Marshall Street
10   Redwood City, California  94063
     650 752 3100
11   aong@goodwinlaw com
12
     REX MANN, ESQ
13   MARISA C  THOMPSON, ESQ
     WINSTON & STRAWN LLP
14   2121 N  Pearl Street, Suite 900
     Dallas, Texas  75201
15   214 453 6412
     rmann@winston com
16
17 ALSO PRESENT:
    MR  TREY SOLIS - VIDEOGRAPHER AND EXHIBIT TECH

## Page 4

```
                    I N D E X

                                      PAGE
APPEARANCES                             3
 RICHARD D  WESEL, PHD
EXAMINATION
  BY MR  HURT                           5

ERRATA PAGE                            94
ACKNOWLEDGMENT OF DEPONENT             95
REPORTER'S CERTIFICATION               96


                  E X H I B I T S

NO         DESCRIPTION                 PAGE
Exhibit 1  Opening Expert Report of
           Dr  Richard Wesel On the
           Invalidity of the Asserted
           Claims of the Family 3
           Patents; 740 pages           7
Exhibit 2  US Patent Number 7,269,208
           B2; COMMSCOPE002299 to
           COMMSCOPE002312             40
Exhibit 3  US Patent Number 6,707,822
           B1; COMMSCOPE002515 to
           COMMSCOPE002523             46
```

RICHARD D. WESEL, PhD - 12/1/2022

Page 5

1  THE VIDEOGRAPHER: Today's date is
2  December 1st, 2022. The time is approximately
3  11:08 a m. We're on the record.
4  RICHARD D. WESEL, PhD,
5  having been duly sworn, testified as follows:
6  EXAMINATION
7  BY MR. HURT:
8  Q. Good morning, Dr. Wesel.
9  A. Good morning.
10  Q. You're -- you've been retained by
11  CommScope as an expert in this -- this case; is that
12  right?
13  A. That's correct.
14  Q. And you were also retained by Nokia; is
15  that -- is that right?
16  A. Yes, that's correct.
17  Q. But for -- for the purposes of today, the
18  only opinions that are left in this case for -- for
19  you are the ones relating to invalidity of the
20  Family 3 patents on the -- for -- for CommScope; is
21  that correct?
22  A. Yes, that's correct.
23  Q. Okay. When were you first retained by --
24  by CommScope, if you remember?
25  A. Oh, I don't remember. Do you want me to

Page 6

1  try to estimate or something like that?
2  Q. Well, let me ask -- ask you this. I
3  mean, was -- was it with -- was it sometime this
4  year in 2022, or -- or was it last year?
5  A. Yeah, it's been within the last one or
6  two years, you know. I don't remember the exact
7  month, yeah.
8  Q. Okay. And what -- do you remember about
9  when you were retained by Nokia?
10  A. I remember that -- what I remember is
11  that both -- it was a strange coincidence that both
12  parties contacted me, like, within 24 hours of each
13  other.
14  Q. Okay.
15  A. So it was about the same time.
16  Q. Okay. And for your work in this case, do
17  you bill CommScope and Nokia separately?
18  A. Yes.
19  Q. How -- how does that work for -- let me
20  ask it this way.
21  Do you divide it up any way for the --
22  the invalidity reports? So, for example, your
23  Family 3 report covers some patents that were for
24  CommScope and some patents that were for Nokia.
25  How -- how would you divide up the --

Page 7

1  your bills between -- between -- you know, for those
2  two sets of patents?
3  A. Well, for work -- I guess, in general,
4  for work that was only for Nokia, I billed Nokia.
5  For work that was only for CommScope, I billed
6  CommScope. And for work that was common for both
7  parties, I split the expenses between the two
8  companies.
9  Q. Okay. And you submitted some
10  declarations in connection with some inter partes
11  review petitions that Nokia filed, is that right,
12  for Family 3?
13  A. Yes, that's correct.
14  Q. Okay. And I assume based on your
15  practice, you just told me, that -- that you would
16  have just billed Nokia only for that work; is that
17  right?
18  A. That's correct.
19  MR. HURT: Okay. We can pull it up
20  just so we have it marked, Trey, the Exhibit 1 I
21  sent you, the Family 3 Wesel opening expert report.
22  And that will be Exhibit 1.
23  (Exhibit 1 marked.)
24  BY MR. HURT:
25  Q. And I'll ask you some questions,

Page 8

1  Dr. Wesel. And you'll have your report open with
2  you on the -- your own PDF copy and then also one
3  that's -- that's marked for the record. Okay?
4  A. Okay.
5  Q. About how much time did you spend on --
6  on this report?
7  A. I don't recall. It was -- I mean, it was
8  a significant amount of time.
9  Q. Okay. Would you say more than -- I
10  assume more than a hundred hours?
11  A. I'm not sure whether it was more than 100
12  hours or not. I think that's the right order of
13  magnitude.
14  Q. Okay. About when did you start working
15  on your invalidity report for the Family 3 patents?
16  A. Soon after I was contacted.
17  Q. And for the Family 3 patents, your
18  opinion that -- is that those claims are invalid in
19  the view of a few obviousness combinations, one
20  being Mazzoni with VDSL1, Mazzoni with LB-031, and
21  Fadavi-Ardekani in combination with VDSL1; is that
22  right?
23  MR. ONG: Objection, form.
24  THE WITNESS: Pardon?
25  MR. ONG: Sorry. I said "objection,

Page 29

1  there was a summary judgment, yes, I -- I -- I was
2  careful in my analysis. But as I say in my report,
3  there are a variety of things.
4       Even the opposing expert, Dr. Cooklev, in
5  one of his earlier reports, agreed that, you know,
6  the interleaver and deinterleaver use -- you know,
7  that a portion of the memory is used for both
8  interleaving and deinterleaving.
9  BY MR. HURT:
10     Q. You mentioned that Dr. Cooklev in one of
11 his reports agreed that a portion of memory is used
12 for interleaving and deinterleaving --
13     A. That's in --
14        (Simultaneous crosstalk.)
15        THE COURT REPORTER: Excuse me. I'm
16 sorry. I did not catch what you said, Dr. Wesel.
17     A. I -- I shouldn't have spoken before
18 Christian completed his question.
19        I was just directing to paragraph 1400 of
20 my report.
21 BY MR. HURT:
22     Q. Okay. I see that. Thank you.
23        And I -- I know you've been deposed
24 before, Dr. Wesel, and I don't need to go over all
25 the ground rules with it. And it may have been a

Page 30

1  little while, and it's also probably unique to Zoom.
2  But given some -- and given some of the technical
3  subject matter, I'll try to be real careful not to
4  speak over you and we'll just have to be -- be sure
5  so the court reporter gets everything not to speak
6  over each other. All right?
7       A. Understood.
8          THE WITNESS: I apologize, Rene.
9          THE COURT REPORTER: That's okay.
10 BY MR. HURT:
11     Q. Did you consider any other references
12 besides Mazzoni and Fadavi-Ardekani for disclosing
13 the ability to -- to have shared memory between an
14 interleaver and deinterleaver?
15        MR. ONG: Objection, form.
16     A. I think, as I said before, I considered
17 the two combination -- or that each of the
18 combinations together and go through each element.
19 So what I've shown is that the -- in each of the
20 combinations, each combination teaches a shared
21 memory.
22 BY MR. HURT:
23     Q. Okay. Well, let me ask you -- ask you
24 this question again. I wasn't trying to ask
25 something to trip you up. But other than the three

Page 31

1  combinations, Mazzoni combined with LB-031, Mazzoni
2  combined with VDSL1, and Fadavi-Ardekani combined
3  with VDSL1, did you consider any other references
4  for disclosing shared memory between the interleaver
5  and deinterleaver?
6       A. Oh, well, there is a -- in my -- in the
7  background section of my report, yes, for that
8  specific question, like, are there other references
9  that describe a shared memory between an interleaver
10 and a deinterleaver.
11        I have a section on VIII(D) called Shared
12 Memory where I go over a variety of earlier
13 references that use shared memory sometimes for
14 interleaving and deinterleaving.
15     Q. Okay. Are you relying on those
16 references for your -- let me ask it this -- so it's
17 clear.
18        Are -- are you relying on those
19 references -- the background references in
20 Section VIII(D) as part of your invalidity opinion
21 that the claims are -- of the Family 3 patents are
22 rendered obvious?
23     A. Well, that's -- let me try to give a
24 careful answer. So that section is in my invalidity
25 report. It is definitely part of my invalidity

Page 32

1  opinion. That's different from saying that those
2  references are official grounds for my opinion.
3       But they speak to the point that it's not
4  correct to say that shared memory was hugely
5  innovative at the time of the invention or that it
6  had never been used for -- to have a shared memory
7  in a communication system before, things like that.
8       So I think it's extremely relevant to my
9  opinion, but those specific references weren't, you
10 know, the official grounds. Does that make sense?
11     Q. I think I understand your -- your answer.
12 And maybe I'll make -- make sure I understand it.
13 So in terms of the official grounds, you're not
14 opining that Mazzoni combined with these background
15 references combined with VDSL1 is an -- is an
16 obviousness combination. Your obviousness
17 combinations are Mazzoni with VDSL1, Mazzoni with
18 LB-031, Fadavi-Ardekani with VDSL1. But these
19 references are for the general point that -- that --
20 that shared memory was being used in -- in -- prior
21 to the Family 3 patents.
22        Is that -- is that a fair recitation?
23        MR. ONG: Objection, form.
24     A. Yes.
25 BY MR. HURT:

RICHARD D. WESEL, PhD - 12/1/2022

Page 33

1    Q.   And to -- let me make sure I understand
2  your opinions a little bit on -- on shared memory
3  since that has -- has come up.  My -- my
4  understanding from reading your -- your report,
5  Dr. Wesel, is that your opinion is that Mazzoni and
6  Fadavi-Ardekani each disclose shared memory as the
7  Court has construed that term.  Is -- is that right?
8    A.   Yes, that's correct.
9    Q.   Does LB-031 disclose a shared memory as
10  the Court's construed that term?
11    A.   I'm not -- I don't believe that I show
12  that LB-031 explicitly discloses a shared memory.
13    Q.   Okay.  And is your answer the same for
14  VDSL1?
15    A.   Yes.
16    Q.   Okay.  And then my understanding is
17  that -- let me ask this first.
18         There's also an element of the claim that
19  relates to an initialization -- well, let me -- I'm
20  probably paraphrasing it wrong.  I probably want to
21  be precise.
22         But there's an element of the claims that
23  relates to a message that -- that -- that specifies
24  or indicates an amount of memory.
25         Are you familiar with those limitations?

Page 34

1         MR. ONG:  Objection, form.
2    A.   Yes.
3  BY MR. HURT:
4    Q.   And my understanding is that for those --
5  that message limitations, your opinion is that
6  LB-031 and VDSL1 each disclose the message elements.
7  Is that right?
8    A.   That's -- that is correct.
9    Q.   Okay.  Does -- does Mazzoni disclose the
10  claimed message elements?
11    A.   Well, for -- if we take a look at my
12  report in paragraph 557, for example, which is on
13  PDF page 263.
14    Q.   Okay.
15    A.   I discuss how a person of ordinary skill
16  in the art would have understood that to implement
17  the embodiments disclosed in Mazzoni, transmitting
18  and receiving initialization messages would have
19  been necessary.
20    Q.   And so this is on PDF page 263, paragraph
21  557?
22    A.   That's correct.
23         MR. HURT:  Mr. Solis, if you don't
24  mind going to that page so we have it on the screen.
25  BY MR. HURT:

Page 35

1    Q.   Why would transmitting and receiving
2  initialization messages setting parameters have been
3  necessary for Mazzoni?
4    A.   Well, I believe I discussed that
5  in the -- in the technology background section when
6  I discussed configuration messages like, just to
7  summarize -- let me go back to that -- let's see.
8         Basically, these communication devices at
9  the time, that was the common practice for them to
10  exchange initialization messages, as I discussed in
11  the technology background section and in other
12  places in my report, which we can go to if I can
13  look for them.  But that's the -- that's the basic
14  answer.
15    Q.   Okay.  Let me ask you this.  You
16  mentioned it was common practice to have these types
17  of messages -- I believe you called them
18  initialization messages.  But would Mazzoni require
19  the use of initialization messages?
20    A.   Yes.
21         MR. ONG:  Objection, form.
22    A.   Oh.
23         MR. ONG:  Sorry.  Objection, form.
24    A.   Yes, I believe it would.
25  BY MR. HURT:

Page 36

1    Q.   Okay.
2    A.   So as I discuss in the technology
3  background section and elsewhere in the report, the
4  two transceivers have to use the same communication
5  parameters for all the -- you know, not only for
6  interleaver, but certainly for interleaver, but also
7  Reed-Solomon coding and many other things that are a
8  variety of choices.
9         Both transceivers have to use the same
10  choices or they won't work well together.  And those
11  choices are made in the context of the specific
12  channel that they're operating over.  And so the
13  initialization process learns the channel and then
14  exchanges messages about the configuration
15  appropriate to the specific channel.
16    Q.   And can you -- you -- let me ask -- ask
17  this.
18         Is the support for -- for Mazzoni
19  requiring initialization messages where you've cited
20  here column -- in paragraph 557 in column 5:21
21  through 24?
22    A.   I think that's part of the support.  But
23  I'm -- it's really an inherency situation, you know.
24  It's inherent to this communication device that it's
25  going to exchange those configuration messages.

HANNA & HANNA, INC.
713.840.8484

Page 37

1  This is the -- the Column 5:21 to 24 is talking
2  about how I'm going to modify the parameters.  The
3  fact that it can modify those parameters means that
4  it is going to choose different parameters, but it
5  has to choose the same I, M -- I prime and M prime,
6  as the other transceiver, and so it can't just
7  change its parameters without doing exactly what the
8  other transceiver is doing.
9        Q.  And -- and in your --
10       A.  As I say --
11       Q.  Oh, go ahead.  Sorry.  Continue,
12  Dr. Wesel.  I didn't mean to cut you off.  So you
13  said as I said?
14       A.  So going to the end of paragraph 557, a
15  POSA would have understood that initialization
16  protocols to agree on the parameters M and I used by
17  both the operator and user transceivers would have
18  preceded the delivery of the M and I parameters to
19  the MCD.  That's what I was just describing.
20            And such a protocol requires both
21  transceivers to understand the other -- the
22  limitations of the other transceiver.  So that's a
23  second issue.
24            These parameters have to be appropriate
25  to the channel, and the two transceivers are going

Page 38

1  to learn the channel together through, like -- like,
2  a channel analysis phase, and then they are going to
3  make sure that they agree on parameters not only
4  that are appropriate to the channel, but also that
5  don't exceed the limitations of either transceiver.
6            For example, I can't use a value of M
7  larger than the value of M the other transceiver can
8  support.  And so that's why these configuration
9  messages are just inherently required in this type
10  of system.
11       Q.  Would -- would you agree with me,
12  Dr. Wesel, that the Mazzoni reference does not
13  expressly disclose the initialization messages?
14       A.  It -- it doesn't talk explicitly about
15  the initialization process, but it does, for
16  example, in paragraph 643 of my report, it talks
17  about the memory allocation can be reconfigured in
18  accordance with the bit rate actually processed by
19  the send/receive modem.
20            So -- well, let me give Trey a chance to
21  bring that up.
22            THE WITNESS:  That's on -- on PDF
23  page 301.
24       A.  So it says there -- if we -- if you go
25  down, like, into the -- like, the fifth -- the

Page 39

1  fourth and fifth line.  "Whose memory allocation can
2  be reconfigured in accordance with the bit rate
3  actually processed by the send/receive modem."  It's
4  actually referring -- I know it's not explicitly
5  saying there's an initialization message, but how do
6  these -- how would it know the bit rate actually
7  processed by the send/receive modem, which any
8  POSITA knows depends on the actual channel
9  characteristics which aren't learned until the two
10  devices are hooked up and talking to each other.
11            So it -- there's a lot of context here
12  that -- that supports, you know, the fact that these
13  devices are going to exchange configuration messages
14  to figure out what that actual bit rate is going to
15  be and then reconfigure their memory allocation,
16  their interleaver, deinterleaver parameters
17  according to what they've decided to do.
18  BY MR. HURT:
19       Q.  I think I understand.
20            Are you aware that the Mazzoni
21  references -- discusses a technician?
22       A.  How about if we go ahead and pull up the
23  Mazzoni reference?
24       Q.  Sure.
25            MR. HURT:  So, Trey, this document

Page 40

1  is -- let me give you the number here.  It is
2  COMMSCOPE002299.  And it is US Patent
3  Number 7,269,208 to Mazzoni, et al.  That will be
4  Exhibit 2.  And if you could send that around in the
5  chat so Dr. Wesel can open it natively.
6       A.  Do you mind if I just pull up my own copy
7  to save us a little time?
8  BY MR. HURT:
9       Q.  I don't.  I mean, this is the Bates
10  number that's cited in your report.
11       A.  Yeah.
12       Q.  So it should -- it should be the exact
13  same document.
14            (Exhibit 2 marked.)
15  BY MR. HURT:
16       Q.  Let me know when you have it up.
17       A.  I do have it up.  Yes.
18            Do you mind -- we don't have to go off
19  the record, but I'd just like to refill my water
20  glass.  I could be back in 30 seconds.
21            Is that okay or not okay?
22       Q.  Sure.  Please do that.  We can stay on
23  the record.
24            EXHIBIT TECH:  Christian, are we
25  going to a specific page?