**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| TQ DELTA, LLC, | Civil Action No.: 2:21-cv-00310-JRG |
| *Plaintiff,* | ██████████████ |
| v. | |
| COMMSCOPE HOLDING COMPANY, INC., COMMSCOPE, INC., ARRIS US HOLDINGS, INC., ARRIS SOLUTIONS, INC., ARRIS TECHNOLOGY, INC., and ARRIS ENTERPRISES, LLC, | |
| *Defendants.* | |

**COMMSCOPE'S OPPOSITION TO TQ DELTA'S MOTION
FOR LEAVE TO SERVE THE FIRST SUPPLEMENTAL
EXPERT REPORT OF JONATHAN D. PUTNAM (DKT. 349)**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 3

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT ................................................................................................................... 7

    I.     Dr. Putnam's Supplemental Report Offers New, Not Supplemental, Opinions. ........................................................................................................... 7

    II.    Good Cause Does Not Exist for Dr. Putnam's Untimely Report. ......................... 9

        A.    TQ Delta Has No Reasonable Explanation for Its Untimely Disclosure. .............................................................................................. 9

        B.    Dr. Putnam's New Opinions Are Not Important. .................................... 11

        C.    Allowing the Supplement Would Severely Prejudice CommScope........ 13

        D.    A Continuance Is Not Appropriate to Cure the Prejudice. ..................... 15

CONCLUSION .............................................................................................................. 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CEATS, Inc. v. Ticketnetwork, Inc.*,
No. 2:15-CV-01470, 2018 WL 453732 (E.D. Tex. Jan. 2018)..............................................7, 9

*In re Complaint of C.F. Bean L.L.C.*,
841 F.3d 365 (5th Cir. 2016) .................................................................................................14

*Daedalus Blue LLC v. SZ DJI Tech. Co.*,
No. W-20-CV-00073, 2022 WL 831619 (W.D. Tex. Feb. 24, 2022)....................................15

*Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*,
No. 2:16-CV-00134-JRG, 2017 WL 2869365 (E.D. Tex. May 18, 2017) .............................12

*Grant v. CRST Expedited, Inc.*,
No. 1:18-CV-433, 2021 WL 1151560 (E.D. Tex. Jan. 28, 2021)...........................................11

*Hamburger v. State Farm Mut. Auto. Ins. Co.*,
361 F.3d 875 (5th Cir. 2004) .................................................................................................15

*Kumar v. Frisco Indep. Sch. Dist.*,
476 F. Supp. 3d 439 (E.D. Tex. 2020)............................................................................ *passim*

*Metro Ford Truck Sales, Inc. v. Ford Motor Co.*,
145 F.3d 320 (5th Cir. 1998) ...................................................................................................8

*Newberry v. Disc. Waste, Inc.*,
No. 4:19-CV-00147, 2020 WL 363775 (E.D. Tex. Jan. 22, 2020)................................8, 9, 15

*Ortiz v. Minnesota Life Ins. Co.*,
No. 4:20-CV-00923, 2022 WL 4376406 (E.D. Tex. Mar. 11, 2022) .......................................8

*Reliance Ins. Co. v. La. Land & Exploration Co.*,
110 F.3d 253 (5th Cir. 1997) .................................................................................................15

*Tyco Healthcare Grp. LP v. Applied Med. Resources Corp.*,
No. 9:06-cv-151, 2009 WL 5842062 (E.D. Tex. Mar. 30, 2009) ...........................................14

**Rules and Statutes**

35 U.S.C. § 286...................................................................................................................4, 11, 13

Fed. R. Civ. P. 26(e) ...................................................................................................................7

Fed. R. Civ. P. 37(c)(1)..............................................................................................................12

███████████████████████

## INTRODUCTION

Defendants CommScope Holding Company, Inc., CommScope Inc., ARRIS US Holdings, Inc., ARRIS Solutions, Inc., ARRIS Technology, Inc., and ARRIS Enterprises, LLC (collectively, "CommScope") hereby oppose TQ Delta's motion for leave to serve Dr. Jonathan Putnam's First Supplemental Expert Report (the "First Supplemental Report") relating to pre-August 2015 damages calculations ("pre-2015 sales"), and preclude Dr. Putnam from testifying at trial on the new opinions disclosed therein.[1]   TQ Delta's motion is not a good faith request to merely "update" or "supplement" Dr. Putnam's report to address pre-2015 sales.   Rather, it is an attempt to have this Court belatedly bless TQ Delta's untimely introduction of a new damages theory to increase the size of the damages number that TQ Delta hopes to put in front of the jury at trial.

It is undisputed that TQ Delta had the sales data discussed in the First Supplemental Report since April 2022—more than *four months before* the August deadline for Dr. Putnam's original report.   *See* Dkt. 249 at 3 (First Amended Docket Control Order).   On August 29, 2022, TQ Delta served Dr. Putnam's original report without including its damages theory and calculations based on pre-2015 sales.   Then, on November 16, without notice to CommScope and without leave of this Court, TQ Delta just served the First Supplemental Report offering the new damages theory along with associated calculations amounting to $22.2 million in additional damages—an almost 35% increase over the damages asserted in Dr. Putnam's original report.   Thus, not only was this new report late, but it also relied entirely on data TQ Delta and Dr. Putnam have had since long before the deadline for serving opening reports.   Contrary to TQ Delta's attempt to justify its delay,

---

[1] CommScope's opposition is limited to the portions of the First Supplemental Report and exhibits that address pre-2015 sales.  *See, e.g.*, Dkt. 349-1 (First Supplemental Report), ¶¶ 1-2, 4, 6-8, 10, 12, Corrected Supplemental Exhibit 5 (both versions), and Corrected Supplemental Exhibits 21, 21.1, and 21.2 (both versions).   CommScope does not oppose TQ Delta's motion as to the remaining portions of the First Supplemental Report to the extent they address only post-2015 sales.

the First Supplemental Report (as to pre-2015 sales) was not necessary to correct inaccuracies or add information that was *unavailable* to Dr. Putnam before the deadline for service of his opening report.  It is simply a delayed attempt by TQ Delta to assert a new damages theory based on information it had all along.

TQ Delta has not shown good cause to permit the new and untimely opinions in Dr. Putnam's First Supplemental Report.  *First*, TQ Delta has no valid excuse for its almost three-month delay in disclosing Dr. Putnam's new opinions.  Nothing that CommScope did *after* the deadline for opening reports justifies TQ Delta's failure to use the information in its possession long *before* the deadline.  *Second*, Dr. Putnam's new opinions on pre-2015 sales are not important because they are based on a theory of recovery that (i) TQ Delta never disclosed during discovery and (ii) is unavailable as a matter of law, *see* Dkt. 340 (CommScope's Motion for Partial Summary Judgment), and thus can hardly be considered important.  *Third*, TQ Delta's decision not to disclose Dr. Putnam's pre-2015 sales theory and calculations sooner has materially prejudiced CommScope by limiting CommScope's ability to investigate relevant facts and meaningfully test the merits of Dr. Putnam's new opinions.  *Fourth*, this prejudice cannot be cured by a continuance.

If that were not enough, TQ Delta also delayed another three weeks after providing the First Supplemental Report to raise the instant motion with CommScope, and then TQ Delta waited until December 14—the deadline to file motions to strike expert testimony—to file this motion for leave.[2]  *See* Dkt. 299 (Third Amended Docket Control Order) at 3.  Despite its own delay in raising and filing the required motion for leave, TQ Delta bizarrely argues that *CommScope* should have acted sooner and objected to or moved to strike a report that TQ Delta admits was not formally

---

[2] In contrast to TQ Delta's four-week delay in filing the instant motion for leave, Dr. Putnam prepared and TQ Delta served a Second Supplemental Report on December 1, 2022, and TQ Delta, after meeting and conferring with CommScope, filed a motion for leave on December 2, 2022, just one day after the Second Supplemental Report was served.  Dkt. 321.

████████████████████████████

served or even addressed by TQ Delta.[3]  TQ Delta's motion should be denied.

## FACTUAL BACKGROUND

On April 22, 2022, CommScope produced a number of documents to TQ Delta, including four spreadsheets containing pre-2015 financial data for CommScope's DSL products.  *See* Ong Decl., Ex. B (COMMSCOPE16810, COMMSCOPE16813, COMMSCOPE16814, and COMMSCOPE16816), Ex. C (4/22/22 service email).  On their face, these searchable spreadsheets, produced natively, clearly and obviously list sales of Customer Premises Equipment for 2010–2015, broken down by product, financial quarter and year.  *See* Ong Decl., Ex. B.  And as shown below in the very spreadsheet on which TQ Delta ultimately relied, the tab entitled "US Sales" clearly states that it "Represents US Sales" and includes pre-2015 years such as "2010."



*See, e.g.*, *id.* at 19 (COMMSCOPE16814) (excerpted screenshot from native, annotated, and redacted).

---

[3] CommScope provided TQ Delta with timely notice of its objection to the First Supplemental Report in response to TQ Delta's email notifying CommScope that it intended to file the instant motion for leave to formally serve the report and seeking a meet and confer.  *See* Declaration of Andy Ong in Support of CommScope's Opposition to Motion for Leave ("Ong Decl."), Ex. A.

On July 26, 2022, TQ Delta moved to compel pre-2015 sales data, arguing that the information was relevant to a reasonable royalty analysis and the hypothetical negotiation. Dkt. 234 at 4 (arguing that "this financial data is, at least, relevant to the hypothetical negotiation (as the cases cited explain)").  Nowhere in the motion or during the meet-and-confer process did TQ Delta disclose its true reason for seeking the information—that it planned to seek damages for pre-2015 sales, outside of the § 286 statutory damages period.  To the contrary, TQ Delta stated that "§ 286 limits 'recovery' not discovery."  Dkt. 234 at 3.  In CommScope's response, filed on August 9, 2022—i.e., well before the August 29, 2022 due date for Dr. Putnam's opening report—CommScope told TQ Delta and the Court that it already had produced all pre-2015 sales information in its possession.  *See* Dkt. 253 at 2.  TQ Delta acknowledged that CommScope had previously produced pre-2015 sales data.  *See* Dkt. 234 at 3, n.3.

On August 11, 2022, TQ Delta deposed Daniel Hagarty, CommScope's Vice President of Finance.  TQ Delta marked and questioned Mr. Hagarty regarding nine financial spreadsheets produced by CommScope.  *See* Ong Decl., Ex. D (Hagarty Dep.) at 4 (identifying Exhibits 4–12). TQ Delta, however, chose—for whatever reason—not to ask Mr. Hagarty about the four spreadsheets that CommScope produced (COMMSCOPE16810, COMMSCOPE16813, COMMSCOPE16814, and COMMSCOPE16816), including the one that TQ Delta now relies on in the First Supplemental Report (as to pre-2015 sales).  *See id*.  In fact, TQ Delta chose not to ask *any* CommScope witness or counsel about these spreadsheets during fact discovery (to seek, for example, clarifications about their contents).

On August 29, 2022, Dr. Putnam served his opening damages report.  This report did not include any damages calculations for any pre-2015 sales, but rather, just ~~the~~ a brief placeholder:

386. I understand from counsel for TQ Delta that, CommScope could be liable for inducing infringement of accused products that it sold prior to August 2015, but provided technical and other support for after August 2015. *I further understand that data on these pre-2015 sales are the subject of a motion to compel that is pending with the Court.*

387. I reserve the right to supplement my opinion *should CommScope produce pre-2015 sales data.*

Dkt. 349-2 (Putnam Op. Rpt.) ¶¶ 386–87 (emphasis added).   Nowhere in his original report, including the above placeholder, does Dr. Putnam: (i) fully set forth the basis for a pre-2015 sales damages theory; (ii) cite to any other expert report or contention where such a theory was detailed (there is none); (iii) identify the already produced pre-2015 sales or any questions that he had regarding the already produced data;[4] or (iv) provide an *estimate* of damages based on the financial spreadsheets available, as he had done under similar circumstances elsewhere. *See id.*[5]

To be clear, by this time, both TQ Delta and Dr. Putnam *already had* CommScope's financial data for pre-2015 DSL products.  Indeed, in his original report, Dr. Putnam admits that he "was given access to search and review all documents produced by any party or third parties in this matter." Dkt. 349-2 ¶ 18 n.7.  Dr. Putnam also confirmed this at his deposition, *see* Dkt. 349-5 (Putnam Dep.) at 46:9–49:22, and even specifically testified that at the time of his original report, he had COMMSCOPE016814, the very spreadsheet he relies on for the first time in the First Supplemental Report. *Id.* at 191:8–25.  He also admitted in his deposition that, despite having the spreadsheet, he did not provide an estimate of damages for pre-2015 sales although he did provide such an estimate in the then-pending Nokia case. *Id.* at 276:3–13.

On November 14, 2022, at the request of TQ Delta, CommScope served supplemental

---

[4] To the contrary, Dr. Putnam inexplicably implied that the pre-2015 data was not yet produced. Dkt. 349-2 (Putnam Opening) at 195 ("should CommScope produce the pre-2015 sales data").

[5] The cursory reference to "accused products that [CommScope] sold prior to August 2015, but provided technical and other support for after August 2015" is the first time TQ Delta mentioned its new theory of induced infringement for pre-2015 sales. *See, e.g.*, Section II.B, *infra*.

interrogatory responses.[6]  *See* Dkt. 349-4.  CommScope did so as a courtesy in response to TQ Delta's September 2022 request for an amended interrogatory response that specifically lists the four spreadsheets that ***had already been produced by CommScope***[7] and ***identified by TQ Delta***. Dkt. 349-8.  The supplemental interrogatory response did not describe or explain the spreadsheets, instead stating simply that "[a]dditionally, pursuant to Federal Rule of Civil Procedure 33(d), CommScope identifies the following additional documents providing financial information for DSL products sold in the United States prior to 2015: COMMSCOPE016810; COMMSCOPE016813; COMMSCOPE016814; COMMSCOPE016816."  Dkt. 349-4 at 58.

On November 16, 2022, months after the deadline for opening reports and just two days before the deadline for *rebuttal* reports, Dr. Putnam served his First Supplemental Report, explaining that, "[a]fter [he] submitted the Corrected Putnam Report, CommScope identified (per TQ Delta's request) certain documents 'as providing financial information for DSL products sold in the United States prior to 2015.'"  Dkt. 349-1 ¶ 7.  As Dr. Putnam acknowledged, however, he had reviewed the COMMSCOPE016814 spreadsheet at the time of his original report.  He just claimed that he "couldn't interpret the numbers on [it]" before receiving the interrogatory response because that response provided "the interpretation of the document."  Dkt. 349-5 (Putnam Dep.) at 187:12–188:3, 189:13–192:9.  Then, using only the spreadsheet that CommScope had produced back in April 2022, Dr. Putnam offered a novel theory of damages based on products sold more than six years before suit, newly opining that additional damages of $22.2 million—a 35% increase—were warranted based on CommScope's pre-2015 sales.  Dkt. 349-1 ¶ 4.

---

[6] CommScope supplemented its response to Interrogatory No. 7 at TQ Delta's request and as a compromise to resolve a discovery dispute, but at all times maintained its position that any pre-2015 financial data, which predates the relevant 6-year statute of limitation, was not relevant and discovery on pre-2015 data was not proportional to the needs of this case.

[7] CommScope did not produce any additional pre-2015 sales data after the close of fact discovery.

Dr. Putnam did more than just provide these new calculations in his First Supplemental Report.  He also included, for the first time, an explanation (including new citations) of a theory of induced infringement for pre-2015 sales.  That theory was never disclosed by TQ Delta during discovery or in any expert report—until it appeared in Dr. Putnam's belated First Supplemental Report.  *Compare* Dkt. 349-1 ¶¶ 6–8, *with* Dkt. 349-2 (Putnam Op. Rpt.) ¶¶ 386–87.

## LEGAL STANDARD

Supplementing an expert report after a court-ordered deadline requires good cause. *See Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 467 (E.D. Tex. 2020) (citations omitted).  When evaluating whether good cause exists for untimely expert opinions, courts typically consider four factors: (1) the untimely party's explanation for its failure to disclose; (2) the importance of the testimony; (3) the potential prejudice to the objecting party in allowing the testimony; and (4) the availability of a continuance.  *See id.* at 467–68 (citations omitted).

## ARGUMENT

## I.    Dr. Putnam's Supplemental Report Offers New, Not Supplemental, Opinions.

The sections of Dr. Putnam's First Supplemental Report relating to pre-2015 damages calculations are not a proper supplementation under Rule 26(e).  Supplemental reports are "only permissible as a means of correcting inaccuracies or filling the interstices of an incomplete report based on information *that was not available at the time of the initial disclosure*."  *Kumar*, 476 F. Supp. 3d at 469 (emphasis added).  In other words, permissible supplemental reports "add[] to a previously-served report without going beyond the opinions expressed in the report and without using information available prior to the deadline for service of the supplemented report."  *CEATS, Inc. v. Ticketnetwork, Inc.*, No. 2:15-CV-01470, 2018 WL 453732, at *3 (E.D. Tex. Jan. 2018). They are "not intended to provide an extension of the deadline by which a party must deliver the

lion's share of its expert information." *Kumar*, 476 F. Supp. 3d at 469 (citation omitted); *see also Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998) ("The purpose of supplementary disclosures is just that—to supplement. Such disclosures are not intended to provide an extension of the expert designation and report production deadline.").

Dr. Putnam's First Supplemental Report, however, does not supplement or correct any prior opinions or calculations relating to pre-2015 damages; nor does it rely on data that was previously unavailable to him. Instead, it contains entirely new opinions based on information, such as sales data, that was produced to TQ Delta long before the deadline for service of Dr. Putnam's opening report and that Dr. Putnam admitted was available to and actually reviewed by him before he served his opening report. Dkt. 349-5 (Putnam Dep.) at 187:12–188:3; *see also Newberry v. Disc. Waste, Inc.*, No. 4:19-CV-00147, 2020 WL 363775, at *2 (E.D. Tex. Jan. 22, 2020) (report disclosing "entirely new opinions and conclusions based on facts that were available to the [p]laintiffs' expert from the start of the case" was not a supplemental report); *Ortiz v. Minnesota Life Ins. Co.*, No. 4:20-CV-00923, 2022 WL 4376406, at *3 (E.D. Tex. Mar. 11, 2022) (report that was not "based on any new information or any information that was not available at the time of the [original] [r]eport" was not a supplemental report).[8]

Moreover, Dr. Putnam's supplementation is not limited to just calculations. Rather, Dr. Putnam improperly replaces his one-sentence placeholder with a fulsome explanation—with

---

[8] The placeholder in Dr. Putnam's original report regarding the pre-2015 sales data does not transform his new opinions into supplemental ones. In his original report, Dr. Putnam states: "I reserve the right to supplement my opinion *should CommScope produce pre-2015 sales data*" (Dkt. 349-2 ¶ 387). Dr. Putnam admits he already had the pre-2015 sales data. His (or TQ Delta's) choice not to calculate damages based on the data or even make any estimations of calculations based on the data he had access to should not be excused due to the mere presence of a placeholder. *Kumar*, 476 F. Supp. 3d at 469 (citations omitted). If anything, such language indicates that Dr. Putnam knew that such opinions, based on the information then available to him, should have been included in his original report.

citations to evidence and expert reports—of TQ Delta's new theory of induced infringement for pre-2015 sales. *Compare* Dkt. 349-1 (First Supp. Rpt.) ¶¶ 6–8, *with* Dkt. 349-2 (Putnam Op. Rpt.) ¶¶ 386–87.  He could have included that theory of induced infringement in his original report, but he did not.  Indeed, TQ Delta never provided such a theory in this case; it does not exist in any interrogatory response, infringement contention, or expert report (other than the untimely First Supplemental Report).[9]

Accordingly, TQ Delta has failed to show good cause for its untimely disclosure of its new damages theory and associated calculations.

## II.     Good Cause Does Not Exist for Dr. Putnam's Untimely Report.

### A.     TQ Delta Has No Reasonable Explanation for Its Untimely Disclosure.

TQ Delta has no reasonable (or non-pretextual) explanation for its delay in serving Dr. Putnam's First Supplemental Report because the documents relied on were available to both TQ Delta and Dr. Putnam months before his original report.  *See CEATS, Inc.*, 2018 WL 453732, at *4 ("Most significantly, however, [plaintiff] has no good explanation for its delay in proffering this new information, which was available well before the deadline for its initial expert reports."); *see also Newberry*, 2020 WL 363775, at *3 (finding no reasonable explanation where plaintiff could not identify any information that was unavailable before the disclosure deadline).

The only explanation offered by TQ Delta and Dr. Putnam is that, despite possessing the underlying sales data, Dr. Putnam was unable to understand or interpret the spreadsheets absent the purported explanation provided by CommScope's November supplemental interrogatory response.  Dkt. 349 (Mot. for Leave) at 6; Dkt. 349-5 (Putnam Dep.) at 187:12–188:3; 189:13–192:9.   According to Dr. Putnam, "my understanding is that the rog responses rendered

---

[9] *See infra*, Section II.B, discussing TQ Delta's failure to properly and timely disclose its novel theory of induced infringement for pre-2015 sales.

interpretable what was previously uninterpretable in the way of financial spreadsheets that had been produced." Dkt. 349-5 at 187:18–24; *see also id.* at 190:13–17.[10]

This explanation simply lacks credibility.  It is the data, not the interrogatory response, that Dr. Putnam relied on for the new calculations in his supplemental report.  And what that data represented was clear on the face of the searchable spreadsheets, with a worksheet titled "US Sales," a description that the sheet "Represented US Sales," and column headers for product, year, and quarter.  *See, e.g.*, Ong Decl., Ex. B at 19 (COMMSCOPE16814) (excerpted from native and annotated at p. 3, *supra*).  It should have been apparent to a seasoned testifying expert like Dr. Putnam that information listed on a sheet that "Represented US Sales," with column headers 2010, 2011, 2012, 2013, and 2014, did in fact represent US sales from those particular years.  CommScope's supplemental interrogatory response—stating that "CommScope identifies the following additional documents providing financial information for DSL products sold in the United States prior to 2015:  COMMSCOPE016810;  COMMSCOPE016813;  COMMSCOPE016814; COMMSCOPE016816"—sheds no additional light on how to interpret the spreadsheets that Mr. Putnam already had when preparing his original report.  Dkt. 349-4 at 58.  Certainly, this brief statement cannot reasonably be said to "render interpretable what was previously uninterpretable" and is nothing more than a pretextual and after-the-fact explanation.[11]

But even if TQ Delta or Dr. Putnam had questions about the spreadsheets, they could and

---

[10] When asked what about the data he did not understand from the spreadsheets, Dr. Putnam testified, "Truthfully, I don't remember the details.  ***All I was told*** was we couldn't calculate it until we got the interrogatory responses, and then we could."  Dkt. 349-5 (Putnam Dep.) at 190:7–17 (emphasis added).  At best, this further calls into question Dr. Putnam's diligence in preparing his original report.  At worst, it evidences intentional delay and obfuscation.

[11] Such a statement could not have meaningfully improved Dr. Putnam's understanding of the spreadsheets. If Dr. Putnam could not understand the pre-2015 sales data prior to the ~~integratory~~ interrogatory response, his opinions now should be considered unreliable and excluded on those grounds.

should have asked about them during fact discovery, and they had every opportunity to do so. Moreover, Dr. Putnam could have disclosed the new damages theory and included estimated calculations in his report based on his best understanding of the data he possessed, and later corrected or updated those calculations based on new data (which never occurred, since he and TQ Delta had the data since April 2022).  But he did neither.  As this Court has explained, "a party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures."  *Grant v. CRST Expedited, Inc.*, No. 1:18-CV-433, 2021 WL 1151560, at *5 (E.D. Tex. Jan. 28, 2021).  Tellingly, Dr. Putnam *did* follow this procedure in his report served on Nokia the same day, Dkt. 349-5 (Putnam Dep.) at 276:3–13, and he also followed this procedure in serving multiple corrected or supplemental reports to account for updated information.  His refusal to do so with regard to pre-2015 damages for CommScope thus should not now be excused.

This factor weighs strongly against granting leave.  *See Kumar*, 476 F. Supp. 3d at 469 ("[The expert] was instead taking a second crack at his report utilizing information available at the time of his initial disclosure as *Diaz* forbids. This factor weighs against permitting Defendants' untimely filing.") (citations omitted).

### B.     Dr. Putnam's New Opinions Are Not Important.

Dr. Putnam's new opinions on pre-2015 damages calculations are not important or "essential" to TQ Delta's case.  To the contrary, these new opinions are based on a theory of recovery that is unavailable to TQ Delta as a matter of law.  As explained in CommScope's co-pending motion for partial summary judgment, § 286 of the Patent Act provides: "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."

████████████████████████████████

Dkt. 340 at 4–6.  Yet, in direct contravention of the well-established six-year limitations period, Dr. Putnam's First Supplemental Report adds $22.2 million in damages that is based on sales that occurred *before* the six-year bar date of August 13, 2015.  *Id.*  And even if such a theory were permissible, it would still fail as a matter of proof because TQ Delta has failed to present evidence of any post-2015 use of products sold pre-2015 or any affirmative actions of inducement by CommScope to support such a theory.  *Id.* at 7–11.  The First Supplemental Report, then, is in furtherance of a legally unavailable damages theory and cannot be considered important.

Dr. Putnam's new opinions should also be excluded on entirely separate grounds: they are based on theories of damages and inducement that TQ Delta never disclosed during discovery. The cursory reference in Dr. Putnam's original report to "accused products that [CommScope] sold prior to August 2015, but provided technical and other support for after August 2015" is the first time TQ Delta mentioned its new theory of induced infringement for pre-2015 sales (and is itself an insufficient disclosure).  Contrary to TQ Delta's motion (*see* Dkt. 349 at 10 n.1), nothing in TQ Delta's complaint, infringement contentions, or interrogatory responses set forth a theory that allows it to capture damages for products sold more than six years prior to suit, or even alleges inducement based on software updates provided for products sold before 2015.  *See* Dkt. 1; Ong Decl., Ex. E at 28–37, 48–53, 57–62 (Second Supp. Responses to Interrogatory Nos. 7 (damages), 13 (willful infringement), and 15 (indirect infringement)); Ong Decl., Ex. F (Inf. Contentions) at 3–4 (referencing complaint).[12]  Dr. Putnam's opinions should be excluded

---

[12] TQ Delta's generic allegations of "induced infringement" do not support its new theory. TQ Delta alleged merely that CommScope induced infringement by supplying accused products to customers and encouraging or instructing such customers to use the accused products. Ong Decl., Ex. E (Second Suppl. Resp. to Interrogatory No. 15) at 59–60; *see also* Dkt. 1 (Compl.) at e.g., 14, 17, 20.  These are acts that occur at or near the time of sale.  Nowhere did TQ Delta ever disclose a theory of inducement based on technical and other support (such as firmware upgrades) occurring up to five years later based on use of the accused products post-2015.

and cannot be important.  *See, e.g.*, Fed. R. Civ. P. 37(c)(1); *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, No. 2:16-CV-00134-JRG, 2017 WL 2869365, at *2 (E.D. Tex. May 18, 2017) (striking expert opinions that were not disclosed in an interrogatory response prior to the close of fact discovery).

Moreover, TQ Delta had ample opportunity to explain this theory when moving to compel pre-2015 sales information, but it did not.  In fact, TQ Delta did the exact opposite, expressly representing to the Court that this information was only relevant to a hypothetical negotiation in a reasonable royalty analysis, not that it was seeking information to calculate pre-2015 damages under an inducement theory.  *See* Dkt. 234 at 3 (TQ Delta arguing that "§ 286 limits 'recovery' not discovery"); *see also id.* (TQ Delta quoting, "Although [plaintiff] cannot recover damages for infringement for the period 1970 to 1978, [defendant]'s profits in this period are in fact relevant to the computation of a reasonable royalty that RCA would be entitled to recover for the period after 1978").  TQ Delta should not be allowed to hide the ball during discovery, fail to timely meet its expert disclosure obligations, and then seek leave to offer new opinions months later.

This factor also weighs against granting leave.

## C.   Allowing the Supplement Would Severely Prejudice CommScope.

Courts within the Fifth Circuit routinely disallow litigants from making untimely disclosures because they "recognize that making untimely, substantive changes to expert reports presents real prejudice to the other side."  *Kumar*, 476 F. Supp. 3d at 470 (collecting cases).

TQ Delta's untimely disclosure of its pre-2015 damages theory and calculations has significantly prejudiced CommScope in multiple ways.  Most importantly, because this theory was not disclosed during fact discovery, CommScope was not afforded the opportunity to develop facts that would further rebut TQ Delta's belated damages theory generally.  For example, had CommScope had notice that TQ Delta was seeking damages for pre-2015 sales based on

alleged, expected use, CommScope would have further investigated to what extent such accused products were used in an allegedly infringing manner (or at all), the nature of the software updates, the extent to which they were downloaded and installed, or whether they changed customer behavior.  Moreover, because the First Supplemental Report was served near the end of the expert discovery period and a mere two days before CommScope's rebuttal reports were due, CommScope was denied a meaningful opportunity to examine and rebut Dr. Putnam's new opinions.[13]  *See Kumar*, 476 F. Supp. 3d at 470 (concluding that untimely supplemental report prejudiced the opposing party because that party "lacked the appropriate time to properly consider the new report and prepare an adequate rebuttal"); *see also In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 373 (5th Cir. 2016) (finding prejudice where party submitted its second expert report near the end of the discovery period, leaving other party little opportunity to examine and rebut expert's new opinions); *Tyco Healthcare Grp. LP v. Applied Med. Resources Corp.*, No. 9:06-cv-151, 2009 WL 5842062, at *3 (E.D. Tex. Mar. 30, 2009) (striking expert theory where ability to analyze and respond to theory was "severely curtailed" by late disclosure).

TQ Delta exacerbated the prejudice to CommScope by delaying its motion for leave.[14]  By waiting to seek leave until the deadline to file dispositive motions and motions to strike expert

---

[13] TQ Delta selectively cites and misrepresents Dr. Becker's testimony as stating he had no reason to issue a rebuttal at all.  Dkt. 349 at 2, 5.  To the contrary, Dr. Becker's testimony was limited to the methodology that Dr. Putnam used for his calculation.  Dr. Becker clearly testified that he had not been asked to consider, and had not actually considered, whether there were other issues regarding the First Supplemental Report to which he would respond.  Dkt. 349-6 (Becker Dep.) at 94:2–14 ("if allowed to and asked to, that -- you know, whether there's any other issues regarding that, I -- I'd have to just go back and look. I hadn't really thought about that").

[14] TQ Delta's attempts to blame CommScope for its own delay are no more than a distraction.  CommScope stated its objections to Dr. Putnam's supplemental report as soon as TQ Delta stated its intention to seek leave.  *See* Ong Decl., Ex. A.  Absent leave of the Court, there was no report for CommScope to object to or seek to strike.  It is unambiguously the duty of the party seeking to serve the untimely supplement to seek leave of court.  *See Kumar*, 476 F. Supp. 3d at 468 (supplemental expert report after court-ordered deadline for expert reports required leave).

testimony (including *Daubert* motions), TQ Delta further limited meaningful avenues for CommScope to challenge the reliability of Dr. Putnam's opinions.

This factor also weighs against granting leave.

### D.   A Continuance Is Not Appropriate to Cure the Prejudice.

The prejudice to CommScope would not be cured by granting a continuance. *See Reliance Ins. Co. v. La. Land & Exploration Co.*, 110 F.3d 253, 258 (5th Cir. 1997) ("District judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case.").  To be sure, "[j]ust because a court can conceptually grant a continuance in any case does not mean that a court must choose to continue rather than strike in every case." *Daedalus Blue LLC v. SZ DJI Tech. Co.*, No. W-20-CV-00073, 2022 WL 831619, at *6–7 (W.D. Tex. Feb. 24, 2022).  And, here, besides disrupting the pretrial process and creating havoc on the parties' trial preparations, a continuance will also impose additional expense and delay on CommScope.  *See Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004) ("Because of a trial court's need to control its docket, a party's violation of the court's scheduling order should not routinely justify a continuance.").  Accordingly, as a continuance is not warranted, this factor also weighs in favor of excluding the pre-2015 damages calculations in Dr. Putnam's First Supplemental Report.  *See Newberry*, 2020 WL 363775, at *4 (finding that a continuance would not be appropriate where trial was three months away and concluding this factor weighed in favor of excluding plaintiffs' untimely filing).

### CONCLUSION

TQ Delta's motion for leave should be denied.  If, however, TQ Delta's motion is granted, Dr. Becker should be granted leave to provide a rebuttal report within seven days of the Order.

//

███████████████████████

Dated this 6th day of January, 2023

Respectfully submitted,

By: */s/ Eric H. Findlay*
Eric H. Findlay
State Bar No. 00789886
Brian Craft
State Bar No. 04972020
FINDLAY CRAFT, P.C.
7270 Crosswater Avenue, Ste. B
Tyler, TX 75703
903-534-1100 (t)
903-534-1137 (f)
efindlay@findlaycraft.com
bcraft@findlaycraft.com

Douglas J. Kline
Lana Shiferman
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
P:  (617) 570-1000
F:  (617) 523-1231
dkline@goodwinlaw.com
lshiferman@goodwinlaw.com

Brett Schuman
Rachel M. Walsh
GOODWIN PROCTER LLP
Three Embarcadero Center, 28th Floor
San Francisco, CA 94111
P:  (415) 733-6000
F:  (415) 677-9041
bschuman@goodwinlaw.com
rwalsh@goodwinlaw.com

Andrew Ong
GOODWIN PROCTER LLP
601 Marshall St.
Redwood City, CA 94063
P: (650) 752-3100
F: (650) 853-1038
aong@goodwinlaw.com

Ross R. Barton (NC Bar No. 37179)
M. Scott Stevens (NC Bar No. 37828)
Kirk T. Bradley (NC Bar No. 26490)

Stephen R. Lareau (NC Bar No. 42992)
Karlee N. Wroblewski (NC Bar No. 55043)
Nicholas C. Marais (NC Bar No. 53533)
Erin Beaton (NC Bar No. 59594)
Mary I. Riolo (NC Bar No. 59644)
ALSTON & BIRD LLP
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Email: *ross.barton@alston.com*
*scott.stevens@alston.com*
*kirk.bradley@alston.com*
*stephen.lareau@alston.com*
*karlee.wroblewski@alston.com*
*nic.marais@alston.com*
*erin.beaton@alston.com*
*mary.riolo@alston.com*
Telephone: 704-444-1000
Facsimile: 704-444-1111

Katherine G. Rubschlager (Cal. Bar No. 328100)
ALSTON & BIRD LLP
1950 University Avenue, Suite 430
East Palo Alto, CA 94303
Email: katherine.rubschlager @alston.com
Telephone: 650-838-2004
Facsimile: 650-838-2001

***Counsel for Defendants CommScope Holding Company, Inc., CommScope Inc., ARRIS US Holdings, Inc., ARRIS Solutions, Inc., ARRIS Technology, Inc., and ARRIS Enterprises, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  Therefore, this document was served on all counsel on January 6, 2023.

*/s/ Eric H. Findlay*
Eric H. Findlay