**EXHIBIT 2**

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4   TQ DELTA LLC,                )
                                  )
 5              Plaintiff,        )
                                  )  C.A. No. 13-1835-RGA
 6   v.                           )
                                  )
 7   2WIRE, INC.,                 )
                                  )
 8              Defendant.        )

 9
                                  J. Caleb Boggs Courthouse
10                                844 North King Street
                                  Wilmington, Delaware
11
                                  Monday, May 20, 2019
12                                9:00 a.m.
                                  Trial Volume I
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16              FARNAN LLP
                BY:  MICHAEL J. FARNAN, ESQUIRE
17
                      -and-
18
                MCANDREWS HELD & MALLOY, LTD
19              BY:  PETER J. MCANDREWS, ESQUIRE
                BY:  PAUL W. MCANDREWS, ESQUIRE
20              BY:  THOMAS WIMBISCUS, ESQUIRE
                BY:  JAMES MURPHY, ESQUIRE
21
                      -and-
22
                ROBINS KAPLAN LLP
23              BY:  DAVID A. PRANGE, ESQUIRE

24                              For the Plaintiff

25
```

2

```
 1   APPEARANCES CONTINUED:

 2              MORGAN LEWIS
                BY:  JODY C. BARILLARE, ESQUIRE
 3
                      -and-
 4
                GOODWIN PROCTER, LLP
 5              BY:  BRETT SCHUMAN, ESQUIRE
                BY:  RACHEL WALSH, ESQUIRE
 6              BY:  DOUGLAS KLINE, ESQUIRE
                BY:  CINDY CHANG, ESQUIRE
 7
                                For the Defendant
 8

 9              *** PROCEEDINGS ***

10

11              THE COURT:  All right.  Good morning, everyone.

12   Please be seated.

13              So basically is there anything you want to

14   discuss this morning?

15              MR. MURPHY:  Yes, there is, Your Honor.

16              THE COURT:  Good morning.

17              MR. MURPHY:  Good morning, Your Honor.  Jim

18   Murphy for TQ Delta.  We have one issue with the objection

19   to the slide presentation of 2Wire.

20              THE COURT:  Okay.

21              MR. MURPHY:  The parties have -- the issue has

22   been teed up.  The parties have met and conferred.

23              THE COURT:  Yeah, I believe you.

24              MR. MURPHY:  Yeah.  The issue has to do with one

25   slide, Judge.  They --
```

3

```
 1              THE COURT:  Can I see it?

 2              MR. MURPHY:  Yes.  May I approach, Judge?

 3              THE COURT:  Okay.

 4              MR. MURPHY:  It's Slide 8, Judge, from the

 5   2Wire's presentation, and we believe it's misleading, highly

 6   prejudicial, and just incorrect.  And the reason, Judge, is

 7   that they're asking to essentially taint this jury right out

 8   of the starting gate by arguing -- presenting to them an

 9   issue that is irrelevant to the two issues that are

10   irrelevant to this case.  The one is whether or not 2Wire

11   knew about our patents --

12              THE COURT:  Right.

13              MR. MURPHY:  -- not just that they're relevant.

14              THE COURT:  I understand your position.

15              MR. MURPHY:  Yeah.

16              THE COURT:  What's the response?

17              MS. CHANG:  Your Honor, this is Cindy Chang for

18   defendant, 2Wire.

19              THE COURT:  Okay.

20              MS. CHANG:  And it is our position that the

21   statements regarding no evidence assist to our presenting

22   context regarding 2Wire's products and the development of

23   its products outside of TQ Delta's involvement.

24              THE COURT:  So I agree with plaintiff.  These

25   are essentially arguments that are irrelevant to the only
```

4

```
 1   claims that are in here which are direct infringement;

 2   right?

 3              MS. CHANG:  So --

 4              THE COURT:  So the state of mind of 2Wire is not

 5   at issue, and whether or not they knew about the patents is

 6   irrelevant.  It's possible that whether or not they copied

 7   them could be relevant if there's -- you know, that's hard

 8   to tell for me in terms of -- until I hear what sort of

 9   thing is going on in the world of invalidity.  So I'm going

10   to sustain the plaintiff's objections to this which, you

11   know, besides for the fact that they're irrelevant, I think

12   they're also pretty argumentative.  So that takes care of

13   that.

14              What else do we have?

15              MR. MURPHY:  Thank you.  Just one other issue

16   you may want to take up.  2Wire has objected to the

17   introduction of evidence of a Curriculum Vitae of our first

18   witness, the inventor Mr. Marcos Tzannes.

19              THE COURT:  Right.  We don't do Curriculum

20   Vitaes in jury trials, so I sustain their objection.

21              MR. MURPHY:  Yeah.  Thank you, Your Honor.

22              THE COURT:  Okay.  Is there anything from the

23   defendant?

24              MR. SCHUMAN:  No, Your Honor.

25              THE COURT:  Okay.  So --
```

105

1  deinterleave the downstream data.

2         They'll also ask you to ignore the portion of

3  the message that I just showed you clearly say

4  max_delay_octet, not min, max.

5         Instead they're going to point you to a

6  different part of the standard that's about 160 pages

7  earlier in the standard that says the amount of memory

8  actually used as the interleaver and deinterleaver memory

9  might not be all the memory that is used by a particular

10 transceiver implementation.  A particular transceiver

11 implementation might use some of the memory for peripheral

12 functions.  So we got a block of memory that a particular

13 implementation might decide to use some pieces of that for

14 something peripheral.

15        But Dr. Cooklev will expose 2Wire's

16 misdirection.  He'll explain that the memory used for the

17 storage of the peripheral information is not interleaver and

18 deinterleaver memory.  It's not the interleaver and

19 deinterleaver memory itself.  It's not used to store RS

20 coded data bytes.  Remember, that fundamental function of an

21 interleaver and deinterleaver is storing RS coded data

22 bytes.

23        So what are some of these peripheral functions

24 that they will want you to learn about?  So the peripheral

25 functions might be a pointer system for keeping track of

106

1  where your RS coded data bytes are stored.  That peripheral

2  information doesn't have to be stored in the same memory

3  block, but when it is, it takes up a little bit of space.

4  In any event, that's what they're talking about when they

5  say that the minimum amount of memory is what's specified in

6  the message.  It's a minimum amount of memory, but it's not

7  the minimum amount of interleaver and deinterleaver memory.

8  The minimum amount of interleaver and deinterleaver memory

9  is the memory that's used to store Reed Solomon coded in the

10 device.  Thus, 2Wire's argument about a maximum actually

11 being a minimum is wrong.

12        Now, I want to turn for a moment to the issue of

13 validity.  So 2Wire says that even if it infringes, no

14 problem because the patents never should have been issued.

15 They want you to believe that the experts at the Patent

16 Office made a mistake each and every time they allowed the

17 three separate patents-in-suit.  What you will find is the

18 following, even after 2Wire provides its evidence.  Never

19 before the inventions of the patents-in-suit did anyone

20 make, use or sell a device or even describe or propose a

21 device having the invention set forth in the three patents.

22 Never before the inventions of these patents did anyone make

23 or describe a device that used a memory sharing message

24 during initialization to coordinate a memory sharing between

25 an interleaver and deinterleaver.

107

1         Yet, after the inventions were made by the

2  inventors, the inventions were widely adopted, including by

3  all 2Wire devices that practiced the DSL standard.  2Wire

4  argues that these inventions were obvious to someone, to an

5  ordinary person of skill in the art.  What we'll find is

6  this is classic hindsight.

7         Instead of acknowledging that these

8  inventions were a great idea that they wished they had

9  thought of themselves, their story is that anyone could have

10 thought that.  But they didn't.  Only the inventors did.

11        After Mr. Tzannes patent provided a

12 roadmap for 2Wire; however, it's pretty easy for them to

13 find bits and pieces in the prior art and then try to

14 reassemble to look like the patented inventions.  But in the

15 real world, we'll find that the prior art went exactly the

16 opposite direction and away from the patented inventions.

17        2Wire relies on an earlier patent to

18 an inventor named Mazzoni.  They also rely on a proposal

19 made to the DSL Standard Committee to inclusion of a DSL

20 standard.  The number of that proposal that you'll hear is

21 LB-031.

22        I will ask you to note the dates of

23 the Mazzoni reference and the LB-031 reference.  And what

24 you will find is the following:

25        Mazzoni was published in January 2002.

108

1  It had a form of shared memory, but the relative amounts of

2  Mazzoni's shared memory were set, or they were frozen upon

3  installation.  They were literally placed in by a technician

4  and frozen.  There was no message sent between the CO and CPE

5  to coordinate memory sharing.  Mazzoni's frozen memory could

6  not be reconfigured or reallocated by any messages.  So

7  Mazzoni failed to provide the claimed invention.

8         The next item of prior art is the

9  LB-031 reference.  You'll find that this proposal was made

10 in June of 2004, two-and-a-half years after Mazzoni.  In

11 those two-and-a-half years, though, apparently no one other

12 than Mazzoni thought that using frozen memory was a good

13 idea for any DSL products or any DSL standards.  And when

14 the LB-031 proposal was made in 2004, it went the opposite

15 direction.  It proposed using messages that were entirely

16 incompatible with the use of Mazzoni.

17        Not only did LB-031 not disclose the

18 use of shared memory, the messages it uses actually prevent

19 the use of shared memory.  Only separate, dedicated memories

20 could be used for the interleaver and deinterleaver of

21 LB-031.  Evidently, the authors of LB-031 understood the

22 drawbacks of Mazzoni's frozen memory technique and decided

23 to use dedicated memory.

24        Worst yet, the evidence will show that

25 if one tried to use LB-031 with Mazzoni to try to

109

1  reconfigure Mazzoni memory, it would break Mazzoni.  The
2  messages of LB-031, because they're incompatible with shared
3  memory, would actually cause Mazzoni to try to use far more
4  memory than it has available.  This would cause Mazzoni's
5  modem to fail when it tried to transmit data.
6              So in sum, 2Wire will ask you to
7  invalidate the important inventions of Mr. Tzannes and Mr.
8  Lund in view of discarded, incompatible, and broken pieces
9  of prior art.  On behalf of TQ delta, Ms. Divine and Mr.
10  Tzannes, I want to thank you for your time and attention.
11              THE COURT:  All right.  Thank you,
12  Mr. McAndrews.
13              So members of the jury -- Mr. Schuman, how long
14  do you expect your opening to be?
15              MR. SCHUMAN:  Approximately 30 minutes, Your
16  Honor.
17              THE COURT:  Okay.  So members of the jury, let's
18  just stand up for a minute, try to make sure we're alert.
19              And Mr. Schuman, you're ready to proceed?
20              MR. SCHUMAN:  Yes, Your Honor.
21              THE COURT:  Or it's fine just to sit there to
22  make sure you're ready to give -- all right.
23              Mr. Schuman, you may proceed when you're ready.
24              MR. SCHUMAN:  Just trying to switch over the
25  control.

110

1              THE COURT:  So is this a problem that we're
2  likely to solve in the next few minutes or --
3              THE TECHNICIAN:  Yes, I'll just do this real
4  quick, Your Honor.
5              THE COURT:  All right.  Success.  Thanks.
6              MR. SCHUMAN:  I think we're ready now, Your
7  Honor.
8              THE COURT:  All right.  Thank you, everybody.
9  Go ahead, Mr. Schuman.
10              MR. SCHUMAN:  Ladies and gentlemen, my name is
11  Brett Schuman, and together with my colleagues Doug Kline,
12  Rachel Walsh, Jodi Barillare, we represent 2Wire in this
13  case.  And with us in the front row is Mr. Jim Shead.  He's
14  legal counsel at 2Wire.
15              Now, we're very proud to represent 2Wire in this
16  case because, notwithstanding what you just heard from
17  Mr. McAndrews, 2Wire's done nothing wrong here.  2Wire does
18  not infringe TQ Delta's patents.  I don't expect you to take
19  my word for that.  As the Court said, opening statements are
20  not the evidence.
21              But once you've seen the evidence, once you've
22  heard from the witnesses that are going to testify here this
23  week, and you've seen the documents, we think that evidence
24  will show you that 2Wire doesn't infringe any of the TQ
25  Delta patents.  In fact, once you've seen that evidence, I'm

111

1  confident that you will see that the TQ Delta patents are
2  not even valid.
3              Now, as you've already heard a few times, this
4  case involves DSL.  And as you've also heard, DSL basically
5  uses a portion of your copper telephone line to deliver
6  broadband data service, for example, Internet service to
7  your business or to your home.
8              I have a simple graphic, similar to
9  Mr. McAndrews.  DSL uses primarily three pieces of equipment
10  to provide its service.  First, on the left, the central
11  office.  Mr. McAndrews had a DSLAM in the central office.
12  You can think of the central office such as Verizon, or
13  Windstream.  A DSL service provider has a central office.
14              Then you have the old-fashioned copper telephone
15  line connecting the central office to this piece of
16  equipment in your home or your business.  DSL modem,
17  sometimes it's called a DSL gateway.  It's the same piece of
18  equipment.
19              My client, 2Wire, was founded in 1998 just to
20  make that third piece of equipment, the DSL modem.  2Wire
21  was a real pioneer in the DSL industry.  In fact, its early
22  DSL gateways won awards at big consumer electronic shows as
23  early as 2000.
24              22Wire delivered the first DSL modem in the
25  spring of 2000.  Mr. McAndrews showed you one of these.

112

1  This is what they look like.  You might have one in your
2  home.  It's a black box.  This is one of the 2Wire modems
3  accused of infringement in this case.
4              Now, this is Mr. Ben Miller.  Ben Miller was an
5  early 2Wire employee.  He began at 2Wire in 1999 only about
6  six months after the company was formed.
7              He's been there almost 20 years.  He's a DSL
8  engineer.  He'll testify at this trial a little bit later
9  this week, and he'll tell you a little bit more about
10  2Wire's DSL modems and 2Wire itself.  Mr. Miller also has
11  degrees from Carnegie Mellon and Stanford engineering
12  degrees.
13              Now, let's talk just for a little bit about
14  shared memory.  You heard Mr. McAndrews use the term shared
15  memory.  This case is, indeed, about how to divide up the
16  shared memory that's in the 2Wire accused modems.
17              A DSL modem is in some ways just like a computer
18  or your phone.  It performs functions.  And to perform those
19  functions, it needs to have a memory.  Two of the functions
20  that a DSL modem needs to perform, as you've heard, are
21  called interleaving and deinterleaving.
22              Mr. McAndrews described those in some detail.
23  But the way I like to think of them, the interleaver sort of
24  scrambles up the data.  Then it goes across the wire and the
25  deinterleaver unscrambles that data.  It's simplistic, but

113

1  that's one way to think about interleaving and
2  deinterleaving.  You need memory to store the data while
3  you're scrambling it, and then you need memory on the other
4  end to store the data while you're unscrambling it.
5          And as Mr. McAndrews said, the data flows in
6  both directions.  You can upload things from your home
7  through your modem, photos, videos.  You can also download.
8  So, therefore, the modem has both interleaver memory and
9  deinterleaver memory in it.
10         You can implement that in two ways.  You can
11  have these separate memories, one for the interleaver, one
12  for the deinterleaver, or you can have this shared memory.
13  It's capable of doing both.
14         Now, even though TQ Delta's patents talk about
15  shared memory for the interleaver and the deinterleaver
16  functions, the evidence will clearly show that TQ Delta did
17  not invent shared memory for interleaver and deinterleaver
18  functions.  Shared memory for those functions was out there
19  in the prior art, a term you've heard used in the video and
20  already here today.  It was out there in the industry before
21  TQ Delta's patents were filed.
22         Instead, TQ Delta's patents are much narrower
23  than shared memory.  They all deal with a very specific way
24  to divide up that shared memory so that a portion of it is
25  used for the interleaver and a portion of it is used for the

114

1  deinterleaver.
2          All three of TQ Delta's patents, and you heard
3  Mr. McAndrews say, they're very similar.  They all have the
4  same specification using another term from the patent video.
5  All three of TQ Delta's patents talk about dividing up that
6  shared memory in response to a very specific message.
7  You're going to hear the language a lot during this trial.
8  It's a mouthful.
9          The message has to specify a maximum number of
10  bytes of memory available to be allocated either to the
11  interleaver or the deinterleaver function.
12         A simple way to think about it, the way I think
13  about dividing up shared memory in response to a specific
14  message is a pizza.  Let's say I'm coming home late from
15  work one night, and I call my wife, and I ask her to please
16  save me two slices of pizza.  With any luck, she allocates
17  two slices of pizza for me.  It's simplistic, but that's one
18  way to think about dividing up shared memory in response to
19  a specific message.  I ask for two slices, I get two slices.
20         Now, let me cut right to the chase about what
21  you're going to hear during this trial.  First, you're going
22  to hear evidence establishing that 2Wire's modems do not use
23  the specific approach for dividing up shared memory
24  described in all three of TQ Delta's patents.
25         As you heard in the patent video, the most

115

1  important part of a patent are the patent claims.  The
2  claims are what describe the extent of TQ Delta's property
3  rights.  And the TQ Delta patents that we're going to be
4  talking about this week, as I've already said once, all
5  require a very specific message, a message specifying the
6  maximum number of bytes of memory available to be allocated
7  to either the interleaver or the deinterleaver.
8          These are all three of the TQ Delta patent
9  claims side by side.  And this is the element of those
10  claims that I'm focusing on at the moment.  It says
11  transmitting or receiving.  And we'll focus on the receiving
12  part.
13         Receiving a message during initialization
14  specifying a maximum number of bytes of memory that are
15  available to be allocated, in the case of the '048, to the
16  interleaver.  In the case of the other two patents, the
17  claim talks about specifying the maximum number of bytes of
18  memory that are available to be allocated to the
19  deinterleaver.
20         To prove patent infringement in this case, TQ
21  Delta must prove that each of my client's accused DSL modems
22  receive a message during initialization specifying a maximum
23  number of bytes of memory available to be allocated.  Not
24  just any message, but a message that specifies that.  The
25  evidence in this case will show that these products do not

116

1  receive that specific message.  TQ Delta also must prove
2  that each of the other elements of each of these claims are
3  met by the 2Wire modems in order to prove infringement.  And
4  I won't go into the details now, but the evidence that
5  you're going to hear this week during this trial will show
6  that they also don't perform many of the other steps of each
7  of these claims.
8          Determining an amount of memory for the
9  interleaver or deinterleaver, and allocating a first number
10  of bytes.  And I won't read all the language there, but you
11  will hear evidence during this trial that 2Wire's products
12  do not meet more than just one of the requirements of each
13  of these patents.
14         The next thing the evidence will show is that
15  all of the 2Wire DSL modems accused of patent infringement,
16  they all use DSL chips from a company called Broadcom
17  Corporation.  Inside this black box is a little chip.
18  That's where the DSL functionality happens.
19         And those chips are all supplied to my client,
20  2Wire, by Broadcom.  Broadcom is sending someone to this
21  trial to explain to you just how those chips work, and that
22  evidence will show that the chips don't do what TQ Delta's
23  patents require.
24         Third, the fourth bullet on the slide, as you
25  heard from Mr. McAndrews and as you saw in the patent video,

117

1    a party accused of patent infringement can challenge the
2    validity of the patents.  The evidence will show that the TQ
3    Delta patents are invalid.  If dividing up a shared memory
4    based on receiving a message sounds sort of obvious, that's
5    because it is.  As you heard in the patent video, you can't
6    get a patent on something that is obvious.
7                   As I mentioned, shared memory was out there in
8    the prior art before TQ Delta, before these patents were
9    filed, as was messaging schemes for dividing up a shared
10   memory.  All those things were out there rendering these
11   patents obvious.
12                  Now, you heard Mr. McAndrews talk a little bit
13   about standards.  I would like to just talk briefly about
14   the standards process and what a standard is.
15                  Standards are how different companies get
16   together and make sure that their equipment can communicate
17   with each other.  WiFi is an example of a standard.  If you
18   have an Apple phone, a Samsung phone, if you have any phone,
19   you probably have WiFi and that phone is able to communicate
20   with the equipment made by other companies because all of
21   that equipment is communicating using the WiFi standard.
22   DSL is just another example of a standard.
23                  My client, 2Wire's DSL modems can communicate
24   with other companies' equipment that that central office
25   that DSLAM that Mr. McAndrews referred to because they're

118

1    all communicating using the deinterleaver standard.  And in
2    this case, we're talking about one of the DSL standards, the
3    VDSL standard.  Now as Mr. McAndrews said, the VDSL standard
4    requires that all compliant equipment send or receive this
5    O-PMS message.  You heard Mr. McAndrews use that term O-PMS.
6    You're going to become very familiar with the O-PMS message
7    during the course of this trial.
8                   But importantly, how the equipment uses the
9    information in that O-PMS message is not set by the
10   standard.  Everyone is free to do it differently.  In the
11   words of the standard itself, the actual amount of memory
12   used is implementation specific.  You're going to hear
13   evidence regarding what that means as we progress through
14   the trial.
15                  With that brief bit of background on the O-PMS
16   message, I would like to summarize for you what the evidence
17   will show on this question of infringement.  Before I do, as
18   you heard in the video, the plaintiff, TQ Delta, bears the
19   burden of proving my client's products infringe these
20   patents.  It is not our job to prove to you that they don't
21   infringe, however, I want to give you a road map here during
22   the opening statement of the reasons why we think the
23   evidence show that the those products don't infringe.
24                  This is Dr. Krista Jacobsen.  To look into this
25   question of patent infringement, 2Wire retained one of the

119

1    leading DSL experts in the field, Dr. Jacobsen.
2    Dr. Jacobsen got her Ph.D. studying under the father of DSL,
3    Dr. John Cioffi.  I wouldn't expect anyone here to have
4    heard of Dr. Cioffi, but he is known as the father of DSL,
5    sort of like the Thomas Edison of DSL.
6                   Now, Dr. Jacobsen studied under him, got her
7    Ph.D. under him and actually went to work with him designing
8    the first VDSL2 modems.  Also, Dr. Jacobsen has published
9    not one, but two books regarding DSL technology.  This is
10   one of them, it's entitled Fundamentals of DSL Technology.
11   And this book came out in 2006 long before this case began.
12   And the second book, Implementation and Applications of DSL
13   Technology, this one is from 2008.
14                  Now, what you will hear from Dr. Jacobsen a
15   little bit later on during this trial is the following:
16   Dr. Jacobsen will explain the O-PMS message and she will
17   explain that the O-PMS message does not specify a maximum
18   number of bytes of memory available to be allocated
19   anywhere.
20                  There is a lot of information in the O-PMS
21   message.  This is the same table that was in one of
22   Mr. McAndrews's slides.  There are sixteen fields of
23   information conveyed in the O-PMS message.  And the evidence
24   will show, ladies and gentlemen, that none of these sixteen
25   fields specify a maximum number of bytes of memory available

120

1    to be allocated anywhere.
2                   In this case, TQ Delta identifies these four
3    fields, the maximum delay objection at the time field.  But
4    the evidence will show and Dr. Jacobsen will explain that
5    the max_delay_octet field do not specify a maximum number of
6    bytes of memory available to be allocated for either the
7    interleaver or the deinterleaver.  Delay is not the same
8    thing as memory.
9                   Now, Dr. Jacobsen will explain delay a lot
10   better than I possibly can, but basically the delay is the
11   amount of time it takes for the data to get into and through
12   the interleaver, that is the scrambling to the time it takes
13   for it to come out the other end of the deinterleaver, the
14   unscrambling.  That's delay.
15                  As Dr. Jacobsen will explain these
16   max_delay_octet fields convey to the modem on the other end
17   the minimum amount of memory that the device needs to handle
18   that amount of delay.  It's a little tough the first time,
19   it was for me, at least, so I'll say it again, the maximum
20   delay translates into the minimum amount of memory required
21   to handle that delay.
22                  You can think of it like an apartment building.
23   If you're going to build an apartment building that has a
24   maximum of a hundred units, you're going to want to have a
25   minimum of a hundred parking spots, one for each unit.  That

121

1   doesn't mean that you have to have a maximum of a hundred
2   parking spots, you can, and hopefully build more, but a
3   minimum.  So the maximum number of units could convey the
4   minimum number of parking spots.  And that's similar to this
5   O-PMS message.  The maximum amount of delay conveys the
6   minimum amount of memory you need to handle that delay.
7   Dr. Jacobsen will explain that in greater detail.  We can
8   also go back to my pizza analogy.  When you call home and
9   ask to be saved two slices of pizza, I'm not saying I
10  wouldn't enjoy three or maybe four slices of pizza.  Again,
11  I'm conveying the minimum, but conveying the minimum does
12  not necessarily mean the maximum.
13          In short, TQ Delta is going to try to persuade
14  you during this trial that delay really means memory, and
15  that this word max here really, that max really means
16  minimum.
17          Now, as I mentioned, the accused 2Wire products
18  all include a chip from Broadcom.  Those chips use something
19  called source code.  Source code is just a fancy term for
20  the written instructions that tell the chip how to operate.
21  And as you know from Mr. McAndrews, TQ Delta hired an
22  expert, Dr. Almeroth to come testify here as to how he
23  thinks that source code operates.
24          So we decided to ask someone from Broadcom to
25  come here and explain to you how those chips really operate.

122

1   His name is Dr. Gong-San Yu coming from California.  He is
2   an employee of Broadcom.  He's the designer of some of the
3   Broadcom cell chips that are in these products, and he's the
4   head of the division responsible for all the CPE chips that
5   Broadcom sells.
6           Dr. Yu will testify that Broadcom's DSL modems
7   do not receive a message specifying a maximum number of
8   bytes of memory available to be allocated for either the
9   interleaver or the deinterleaver.  He will further explain
10  how those chips actually work.  The evidence you will hear
11  will show that the 2Wire products do not infringe any of the
12  three TQ Delta patent claims at issue here.
13          Last but certainly not least, I would like to
14  talk briefly about invalidity.  As you heard in the patent
15  video, invalidity is a proper defense to an assertion of
16  patent infringement.  Basically, the patent should not have
17  been issued in the first place.  You, the jury, are an
18  important part of the checks and balances built into our
19  system.  As you saw in the patent video, my client 2Wire did
20  not get to participate in the process that lead to the
21  issuance of these patents.  You also heard in the video
22  about the term prior art.  Prior art is another term that we
23  patent litigators use, basically it means patents and other
24  printed publications that were known, that were out there in
25  the industry before the time these patents were filed.

123

1           Here the evidence will show that this prior art
2   that we're going to show you invalidates TQ Delta's patents.
3   As I mentioned earlier, the evidence will clearly show that
4   TQ Delta did not invent this concept of shared memory.  One
5   of the pieces of prior art that you will see during this
6   trial is the Mazzoni prior art patent.  Mr. McAndrews talked
7   about it a little bit during his opening statement.  Mazzoni
8   is the name of the inventor, one of the two inventors on the
9   patent.  And this patent discloses using a shared memory for
10  interleaver and deinterleaver functions in a DSL system.
11  Dr. Jacobsen will explain it in more detail.  And she will
12  explain her opinion that this patent teaches the shared
13  memory that's in TQ Delta's patent claims.
14          Now, by challenging the validity of TQ Delta's
15  patents here during this trial, we're not criticizing any of
16  the patent examiners who issued these patents.  In fact, as
17  you heard in the patent video, the patent examiners in this
18  case did not even hear about the Mazzoni reference.  There
19  is no evidence that the patent examiners knew that this
20  reference existed, this piece of prior art when any of these
21  patents were issued.
22          The patent examiners also did not know about
23  LB-031.  You heard Mr. McAndrews refer to this piece of
24  prior art as well.  Dr. Jacobsen will explain to you LB-031.
25  LB-031 was a proposal submitted by another company to the

124

1   same group that developed the VDSL2 standard that produces
2   this O-PMS message that TQ Delta points to in its patent
3   infringement case.
4           And just like the max delay fields from that
5   O-PMS message that you're going to hear a lot about during
6   this trial, LB-031 communicates a message specifying the
7   maximum amount of delay in octet that the other end needs to
8   be able to handle.
9           This is how the prior art looks in chronological
10  order.  Here you have the prior art patent, the Mazzoni,
11  July 18th, 2000.  I think Mr. McAndrews said 2001, there is
12  a number of different dates on the patent.  All those dates
13  are before the date of TQ Delta's patents.
14          This is LB-031, the contribution to the
15  standards body that was producing the VDSL2 standard, this
16  piece of prior art dated June 14th, 2004.  And then after
17  these two dates the patent applications that lead to TQ
18  Delta's patents were filed in October of 2004.  Dr. Jacobsen
19  will testify and will explain to you her expert opinion that
20  LB-031 either alone or together with Mazzoni invalidate the
21  three TQ Delta patent claims that are at issue in this
22  trial.
23          Dr. Jacobsen will also testify regarding another
24  problem with two of TQ Delta's patents.  I think
25  Mr. McAndrews referred to as in his opening statement as a

506

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF DELAWARE

 3

 4   TQ DELTA LLC,               )
                                 )
 5              Plaintiff,       )
                                 ) C.A. No. 13-1835-RGA
 6   v.                          )
                                 )
 7   2WIRE, INC.,                )
                                 )
 8              Defendant.       )

 9
                           J. Caleb Boggs Courthouse
10                         844 North King Street
                           Wilmington, Delaware
11
                           Wednesday, May 22, 2019
12                         8:30 a.m.
                           Trial Volume III
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16        FARNAN LLP
          BY:  MICHAEL J. FARNAN, ESQUIRE
17
                  -and-
18
          MCANDREWS HELD & MALLOY, LTD
19        BY:  PETER J. MCANDREWS, ESQUIRE
          BY:  PAUL W. MCANDREWS, ESQUIRE
20        BY:  JAMES MURPHY, ESQUIRE
          BY:  THOMAS WIMBISCUS, ESQUIRE
21
                  -and-
22
          ROBINS KAPLAN LLP
23        BY:  DAVID A. PRANGE, ESQUIRE
          BY:  BENJAMIN C. LINDEN, ESQUIRE
24
                       For the Plaintiff
25
```

507

```
 1   APPEARANCES CONTINUED:

 2        MORGAN LEWIS
          BY:  JODY C. BARILLARE, ESQUIRE
 3
                  -and-
 4
          GOODWIN PROCTER, LLP
 5        BY:  BRETT SCHUMAN, ESQUIRE
          BY:  RACHEL WALSH, ESQUIRE
 6        BY:  DOUGLAS KLINE, ESQUIRE
          BY:  ANDREW ONG, ESQUIRE
 7        BY:  CINDY CHANG, ESQUIRE

 8                     For the Defendant

 9        *** PROCEEDINGS ***
10        DEPUTY CLERK:  All rise.
11        THE COURT:  All right.  Good morning, everyone.
12   Please be seated.
13        All right.  So one administrative matter.  I
14   believe the courtroom deputy has passed out the time that's
15   been allotted or that each side has used.  But if it's the
16   case that some of the depositions that were played
17   yesterday, that the time is supposed to be shared, we
18   haven't been given that information.  So if there needs to
19   be a different allocation of that, you need to get us that
20   information.
21        So in terms of any issues that I can help you
22   with or at least resolve this morning?
23        MR. MCANDREWS:  Yes, Your Honor.  We have a few
24   issues about slides.
25        THE COURT:  Okay.
```

508

```
 1        MR. MCANDREWS:  Ms. Targowska is going to handle
 2   the first one here.
 3        THE COURT:  Good morning, Ms. Targowska.  Come
 4   forward.
 5        MS. TARGOWSKA:  Permission to approach, Your
 6   Honor?
 7        THE COURT:  Sure.
 8        MS. TARGOWSKA:  The issue is with the
 9   demonstratives for Dr. Jacobsen's direct examination.  TQ
10   Delta is objecting to slides 34 through 58 as an undisclosed
11   expert opinion, and also as prejudicial under 403.
12        The reason is that every slide within that range
13   states that the LB031 reference discloses the element of the
14   claim.
15        THE COURT:  All right.  So I tend to agree with
16   you.  You don't have to say anything more that Dr. Yu -- oh,
17   wait.  This is Ms. Jacobsen.  Sorry.  Oh, sorry.  I
18   misunderstood what we were doing here.
19        What is the problem here?
20        MR. TARGOWSKA:  Dr. Jacobsen in her slides
21   asserts that every medical element of the claim is disclosed
22   by a single reference.  Anticipation has never been raised
23   in this case, Your Honor, and there is a difference between
24   saying that a person of ordinary skill would understand
25   something from a disclosure and saying that there's a
```

509

```
 1   combination of a reference with the knowledge of a person of
 2   ordinary skill in the art.
 3        THE COURT:  Okay.  So I think I understand what
 4   you're saying which is you can't say it anticipates, call
 5   that obviousness, and let the jury go from there.  Is that
 6   what you're saying?
 7        MS. TARGOWSKA:  Exactly, Your Honor.  It's --
 8        THE COURT:  Okay.  I've got that point.
 9        What is the response here, Mr. Ong?
10        MR. ONG:  Good morning, Your Honor.  So
11   Dr. Jacobsen is not going to testify as to an anticipation
12   opinion.
13        THE COURT:  But she can't testify that it
14   anticipates and say I'm calling it obvious, can she?
15        MR. ONG:  No, she's not going to testify to that
16   effect.
17        THE COURT:  So I guess what would make this
18   easier is -- is it Ms. Targowski?
19        MS. TARGOWSKA:  Targowska.
20        THE COURT:  Okay.  Sorry.  Ms. Targowska says
21   that these slides go along with Dr. Jacobsen saying every
22   single element is disclosed in one single prior art
23   reference.  Which element is not disclosed?
24        MR. ONG:  Which element is not disclosed?
25        THE COURT:  Right.  Right.  In other words, just
```

562

1   code that Dr. Almeroth focused on for allocation and draw
2   any conclusions about that?
3   A.      Well, Dr. Almeroth didn't identify any code that
4   actually allocates the memory.
5   Q.      Thank you.
6           So if we move -- remembering what your grid was,
7   if we move to the deinterleaver function of the 6091 chip,
8   we should have, if I did that correctly.  So how about this,
9   Dr. Walker, can you help us understand the deinterleaver
10  function for the BCM6091 chip?
11  A.      Sure.  The BCM6091 chip deinterleaver allocates
12  memory in a simpler fashion than the interleaver that we
13  just looked at.
14  Q.      How does it do that?
15  A.      What the source code tells us is that there is a
16  total amount of memory for the -- available for the
17  interleaver and the deinterleaver.  And then what the source
18  code says is that you subtract off the amount used by the
19  interleaver, you subtract off a little bit more of what it
20  calls a guard ban and it elevates everything else to the
21  deinterleaver.  Pretty straightforward.
22  Q.      Does max_delay_octet factor into that?
23  A.      Not at all.
24  Q.      And with respect to allocation, what did you conclude
25  with regard to the allocation functionality for the BCM6091

563

1   chip deinterleaver?
2   A.      So none of the source code that Dr. Almeroth has
3   identified allocates memory.
4   Q.      And next, the other chip that we've heard quite a bit
5   about is referred to as BCM63X68 chip.  Focusing first on
6   the interleaver functionality, could you explain to us how
7   that works, Dr. Walker?  And I have slide 8 if that's
8   helpful to you.
9   A.      So the BCM63X68 interleaver uses a more complicated
10  function.  It basically first calculates a required amount
11  of memory and then in the next step which is the bottom step
12  here where it says interleaver memory equals the max of two
13  quantities.  Max means, and those two quantities are what
14  amounts to the max delay message and this other computation
15  which is what it calls required interleaver memory.
16          So the way this works is that the amount of
17  memory that this code can allocate is at least the amount
18  specified in the -- by the max_delay_octet, or maybe more.
19  So in that way, the max_delay_octet specifies a minimum
20  amount of memory which is the polar opposite of a maximum
21  amount of memory.  So again, the source code does not use
22  the max_delay parameter to determine a maximum amount of
23  memory.
24  Q.      How about allocation for the interleaving function on
25  the BCM63X68?

564

1   A.      None of the source code identified by Dr. Almeroth
2   actually allocates the memory.
3   Q.      And then finally, and I don't -- we have source code
4   on the next one.  Tell me about -- tell us about your
5   analysis for the BCM63X68, deinterleaver, how is the
6   determination made there?
7   A.      Well, the determination --
8           MR. PRANGE:  Your Honor, request a side-bar.
9           THE COURT:  All right.
10          (Side-bar discussion:)
11          THE COURT:  Go ahead.
12          MR. PRANGE:  Your Honor, you may recall there
13  was a discussion of the slides.  We had an objection to the
14  slide that is presently on the screen.  This is the original
15  slide that looks like this.  We're concerned that the
16  question that's just been asked by Mr. Clark here --
17          MR. KLINE:  Mr. Kline.
18          MR. PRANGE:  Excuse me, Mr. Kline, that the
19  device going into the analysis --
20          THE COURT:  The one I changed yesterday?
21          MR. PRANGE:  Correct, Your Honor.
22          MR. KLINE:  He's not going to talk about code.
23          MR. PRANGE:  I didn't think he could talk about
24  anything.  The objection we had was it was simply a summary
25  point in his rebuttal report that simply said it wasn't

565

1   there but didn't go into detail about his analysis.
2           THE COURT:  I think that's what Mr. Kline said
3   he's going to do.
4           MR. KLINE:  I'm not going to talk about that.  I
5   can simple ask him whether the source code uses the
6   max_delay_octet parameters to -- does it use the max_delay
7   parameter to ensure the deinterleaver memory does not exceed
8   a maximum number of bytes, I can ask him that question.
9           THE COURT:  Okay.
10          MR. PRANGE:  All right.
11          (End of side-bar.)
12  BY MR. KLINE:
13  Q.      Thank you, Dr. Walker.  I just have one question.  So
14  the source code for the BCM6368 deinterleaver function, does
15  it use the max_delay_octet parameter to ensure that the
16  interleaver memory does not exceed a maximum number of
17  bytes?
18  A.      No, it does not.
19  Q.      Thank you.
20          And how about allocation with respect to the
21  63X68 deinterleaver, what did you look at there and what did
22  you conclude?
23  A.      That none of the source code Dr. Almeroth has
24  identified allocates memory.
25          MR. KLINE:  Very good.  Pass the witness, Your

610

1   functions.

2          So the easiest way to understand shared memory

3   is to contrast it with the only other way that you can do

4   this which would be with dedicated memory.  So on the left

5   here, I've got a figure that shows a dedicated memory

6   approach.  And there you have a block of memory that is

7   always and forever devoted to the interleaver.

8          And you have a separate block of memory that is

9   always and forever associated with the deinterleaver and

10  available to the deinterleaver.  If you have a shared memory

11  approach, instead what you do, if I can make my pointer

12  work, is there's a single block of memory.  And this

13  boundary here between the interleaver and deinterleaver can

14  move according to the Court's construction.

15         And I would -- I will emphasize that the Court's

16  construction doesn't actually require the shared memory to

17  be shared between an interleaver and a deinterleaver.  I'm

18  showing that in my diagrams simply because that's what the

19  patent claims require.  But the Court's construction is

20  actually more general than that, just to functions.

21  Q.     Was shared memory, as the Court has defined it, known

22  prior to the date of TQ Delta's patents?

23  A.     Absolutely, yes.

24  Q.     Can you explain?

25  A.     For example, one reference, and I will talk to you

611

1   more about this reference, is called the Mazzoni patent.

2   This was a patent that was actually considering the use of

3   shared memory in a VDSL system for interleaving and

4   deinterleaving.

5          This patent, and we'll talk more about it, I've

6   pulled out Figure 6 from this patent, and I've annotated

7   with some colors here and a bubble.  But the top part in

8   blue is the portion -- is the interleaver, and then the part

9   in pink is the deinterleaver.  And there's a shared memory

10  block labeled MM where part of it has been allocated to this

11  interleaver and part has been allocated to the

12  deinterleaver.

13         So that's one reference, and we'll talk more

14  about this a bit more.  And another couple of references are

15  the Berkmann patent and the Kang patent.  The Berkmann

16  patent describes a data memory for temporary storage of the

17  data to be interleaved and deinterleaved.

18         And the Kang patent describes a double buffering

19  procedure that allows the channel interleaver memory to be

20  used also as deinterleaver memory.  So those are a few

21  references that I found that show shared memory well before

22  the patents' priority date.

23  Q.     Let's switch gears, again, Dr. Jacobsen, back to your

24  non-infringement opinions.  Let's dig a little more into

25  your non-infringement opinion.  Did you prepare a slide

612

1   summarizing the bases for your disagreements with

2   Dr. Cooklev regarding whether these 2Wire products infringe

3   the TQ Delta patents?

4   A.     Yes, I did.  And what I did was first understand what

5   Dr. Cooklev needed to show in order to prove that the

6   accused products infringe.  And he had to prove that each of

7   the elements of the claims are performed by or practiced by

8   the accused products.

9          So I started with the standard, and then I

10  concluded that, among other things, the accused products do

11  not receive -- and the wording here is foreign, so I will

12  emphasize it here.  The claims require a message during

13  initialization specifying a maximum number of bytes of

14  memory that are available to be allocated to an interleaver

15  or deinterleaver.

16         And you've heard about the O-PMS message, and I

17  will talk more about it, but it does not have that.  And so

18  on that basis, the accused products do not receive that

19  message that's required by all of the claims.

20         I also looked at Dr. Cooklev's testing results,

21  and I don't disagree with his results, but I disagree with

22  how he has interpreted his result responsibility.  His

23  results merely show compliance with certain aspects of the

24  standard.  They don't show that there's infringement.

25  Again, the standard itself doesn't require infringement.

613

1   Q.     Let's dig a little more into the second bullet on the

2   slide, your opinion regarding the O-PMS message.

3   A.     Right.  I have prepared a slide here.  Again, the

4   accused products do not have and do not receive a message

5   during initialization specifying a maximum number of bytes

6   of memory that are available to be allocated to an

7   interleaver or a deinterleaver.

8          And just to be clear, I've merged the two kinds

9   of messages from the two claims.  One, I think it's the

10  '048, says the interleaver.  And then the other two say

11  deinterleaver, but I've merged them in my quotation here.

12         We just don't have that.  So the '048, the '882,

13  and the '381, they all require this message specifying a

14  maximum number of bytes of memory are available to be

15  allocated to a interleaver or deinterleaver.  We don't have

16  that.

17  Q.     Can you describe your opinion regarding what the

18  O-PMS message does and doesn't have for the members of the

19  jury, please?

20  A.     Yes.  Well, it doesn't specify a maximum amount of

21  memory.  What O-PMS describes -- first of all, it has a

22  bunch of fields.  I have my -- oh, there you go.

23         Okay.  So we have a bunch of fields here in this

24  O-PMS message.  You can see there's 16 fields.  None of

25  these fields specify a maximum amount of memory available to

614

1    be allocated to an interleaver or a deinterleaver at the
2    customer's premises equipment side.
3        So I'll back up here.  So we don't have a
4    maximum amount of memory specified.  It specifies in the max
5    delay octet values a maximum delay.  And as we talked about,
6    delay is not the same as memory.
7        So what the delay specifies is a minimum amount
8    of memory that needs to be allocated.  So delay and memory
9    are not the same, as I said.  We all -- all of us who are
10   developing the VDSL2 standard understood that there's a
11   difference between delay and memory.  We could have said
12   memory.  We said delay, and we did it purposely.  And we did
13   it so that people could implement the standard however they
14   felt was best.
15       If they wanted to use more memory, knock
16   yourself out.  If they wanted to use less memory, as long as
17   they met the minimum requirement, people could do that.  So
18   delay and memory are not the same.
19       And then specifying a minimum amount of memory
20   is not the same as specifying a maximum amount of memory.
21   So the O-PMS message does not meet the message limitation of
22   the claims.  And I also -- yeah, here's our description of
23   O-PMS, is the max_delay_octets.
24       Just by its name, it says maximum delay.  It
25   doesn't say maximum memory.

615

1    Q.    Can I pause you there for a second, Dr. Jacobsen.
2    Dr. Cooklev yesterday said because it's specified in bytes
3    that means that it's memory and not delay.  Do you have an
4    opinion on that subject?
5    A.    Yes.  And I disagree.  I disagree.
6    Q.    Explain that to the members of the jury, please.
7    A.    Well, as we talked about, just because something has
8    units -- just because something doesn't have units that you
9    might think about, for example, seconds for delay doesn't
10   mean that it somehow transforms into something else.
11       Delay can be measured in octet.  It can be
12   measured in time.  One of the reasons to specify it in
13   octets is because if we wanted to specify it in time, we
14   would need to know the bit rate.  Because the rate -- the
15   delay is going to depend on how quickly those bits are
16   coming into the interleaver and going over the line and
17   leaving the deinterleaver, and so we -- so if we wanted to
18   know time, we would also need to know the bit rate.  So to
19   remove the bit rate from the analysis we can refer to delay
20   only in terms of octets or bytes.
21   Q.    Let's turn to slide 25, please.  Dr. Jacobsen, you
22   highlighted on your slide -- you've highlighted a sentence
23   here.  Why did you highlight that sentence?
24   A.    Well, Mr. McAndrews highlighted the sentence in his
25   opening statement and I wanted to explain to you what that

616

1    sentence actually means.  So again, the sentence says that
2    the O-PMS message specifies the portion of shared interleave
3    memory that the VTU-R can use to deinterleave the downstream
4    data streams.
5        So first of all, as Dr. Cooklev I believe agrees
6    with me, the VSDL standard does not require the shared
7    memory.  It doesn't require the use of shared memory.  Why
8    would it say something about shared memory here?
9        The way that the initialization scheme works
10   typically in DSL standard is that one transceiver will send
11   a message to the transceiver on the other side of the line,
12   it will then reply with some other kind of message, so it's
13   a what we call half duplex kind of an operation.
14       The O-PMS message is the first message with
15   certain kinds of information.  And it always comes from the
16   central office side first.
17       The central office side gets to tell the
18   subscriber modem these are the values of I and D that I want
19   you to use when you are communicating with me.  So when
20   you're transmitting, set up your interleaver so that you use
21   this value of I and this value of D.  Those values are sent
22   in the O-PMS message.  They're actually in this LP0 and LP1
23   fields depending on how many latency paths we have.  We can
24   have up to two.  Are however many we have, for each of them
25   we will have a value of I and a value of D, and the central

617

1    office site dictates it to the CPE, the customer premises
2    equipment.
3        So the subscriber side modem receives that
4    information, and then it says okay, I need to support this I
5    and this D.  It's going to do whatever it's going to do to
6    figure out how much memory it needs and to actually allocate
7    that memory.  But it's going to do whatever it's going to do
8    and the central office transceiver has no idea how it's
9    doing this.
10       Once it's figured that out, in the case that it
11   is actually using a shared memory, it knows what it has left
12   over that would be available, that would be the portion of
13   the downstream -- sorry, of the shared memory that it could
14   use then for its own interleaving.
15       So my opinion is that this sentence here is not
16   tied at all to these max_octet values.  It is referring
17   instead to the transmission of the I and D values for use in
18   the upstream direction which again, was done well before any
19   of this.  The central office side always tells the customer
20   premises side which values of I and D to use in the upstream
21   direction.  That's been done since the beginning of DSL.  So
22   that's a very old feature.
23       And I think this note was just intended to tell
24   the reader that if shared memory is being used, that once
25   the O-PMS message has been received and the values of I and

803

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF DELAWARE

 3

 4   TQ DELTA LLC,                  )
                                    )
 5              Plaintiff,          )
                                    ) C.A. No. 13-1835-RGA
 6   v.                             )
                                    )
 7   2WIRE, INC.,                   )
                                    )
 8              Defendant.          )

 9
                               J. Caleb Boggs Courthouse
10                             844 North King Street
                               Wilmington, Delaware
11
                               Thursday, May 23, 2019
12                             8:30 a.m.
                               Trial Volume IV
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16            FARNAN LLP
              BY:  MICHAEL J. FARNAN, ESQUIRE
17
                    -and-
18
              MCANDREWS HELD & MALLOY, LTD
19            BY:  PETER J. MCANDREWS, ESQUIRE
              BY:  PAUL W. MCANDREWS, ESQUIRE
20            BY:  JAMES MURPHY, ESQUIRE
              BY:  THOMAS WIMBISCUS, ESQUIRE
21
                    -and-
22
              ROBINS KAPLAN LLP
23            BY:  DAVID A. PRANGE, ESQUIRE
              BY:  BENJAMIN C. LINDEN, ESQUIRE
24
                          For the Plaintiff
25
```

804

```
 1   APPEARANCES CONTINUED:

 2            MORGAN LEWIS
              BY:  JODY C. BARILLARE, ESQUIRE
 3

 4                    -and-

 5            GOODWIN PROCTER, LLP
              BY:  BRETT SCHUMAN, ESQUIRE
              BY:  RACHEL WALSH, ESQUIRE
 6            BY:  DOUGLAS KLINE, ESQUIRE
              BY:  ANDREW ONG, ESQUIRE
 7            BY:  CINDY CHANG, ESQUIRE

 8                        For the Defendant

 9            *** PROCEEDINGS ***
10
11            THE CLERK:  All rise.
12            THE COURT:  All right.  Good morning, everyone.
13   Please be seated.  So I understand there's something I can
14   do for you.
15            MR. PRANGE:  Good morning, Your Honor.  David
16   Prange on behalf of TQ Delta.  I have just a brief
17   housekeeping issue potentially, and it relates to probably a
18   belabored subject on the exhibits relating to the Broadcom
19   source code and other Broadcom material.
20            THE COURT:  Okay.
21            MR. PRANGE:  I'd simply ask -- and I'd like to
22   just -- so the record is clear, I'd like to make a motion to
23   move those into the record.
24            THE COURT:  Okay.
25            MR. PRANGE:  And then also I have a proposal in
```

805

```
 1   terms of how to handle them afterwards which is simply that
 2   we treat them as physical exhibits so that they go under
 3   seal, and we'd take custody after the trial and after
 4   they're used by the jury.
 5            THE COURT:  Okay.
 6            MR. PRANGE:  Okay.
 7            THE COURT:  Well, so I'm saying yes, this is all
 8   things.  So why don't we start with make your motion as to
 9   what exhibits we're talking about.
10            MR. PRANGE:  Certainly, Your Honor.  TQ Delta
11   moves to admit JTX 0086, specifically Page BCRM_code_000037.
12            THE COURT:  Are you going to do this 29 more
13   times?
14            MR. PRANGE:  Well, I have a sheet here.
15            THE COURT:  Okay.
16            MR. PRANGE:  It depends if you want me to do the
17   reduced version or the long version.
18            THE COURT:  So I'd like the short version, if
19   you have a sheet, which presumably 2Wire has, too.
20            MR. PRANGE:  I can just do -- the other option
21   is I could just say the exhibits, and I can provide a sheet
22   up to the Court.
23            THE COURT:  Well, maybe that would be a better
24   way to do it.  So, and I see Mr. Ong doing something that I
25   don't usually see.
```

806

```
 1            MR. ONG:  We're just taking a picture of it.
 2            THE COURT:  No, that's fine.  All right.
 3            So why don't you just say the exhibit numbers,
 4   Mr. Prange.
 5            MR. PRANGE:  TQ Delta moves for admission of
 6   Exhibits JTX 0086, JTX 0087, JTX 0088.
 7            THE COURT:  You know, if you don't say the
 8   zeros, they're going to be presumed.
 9            MR. PRANGE:  Excellent.  We further move to
10   admit PTX 252, PTX 263, PTX 264, PTX 265, PTX 269, and PTX
11   372.
12            THE COURT:  Okay.  Mr. Ong, are you in a
13   position to comment on that, or Ms. Walsh?
14            MR. ONG:  No objection, Your Honor.  I think one
15   thing we would like to do just to be able to make sure that
16   we maybe didn't add any pages to those exhibits, that we
17   have the opportunity to do that.
18            THE COURT:  Right.  That's what Mr. Prange said,
19   and I think that you should confer and provide a written
20   list of whatever the pages are which maybe the pages that
21   are already on Mr. Prange's list.
22            Okay.  So, but in any event, they'll be admitted
23   without objection.  And so that was part one of your
24   three-part request.
25            Hello, Ms. Haynes.
```

807

1    MS. HAYNES:  Hello.

2    THE COURT:  Why don't you hold on a minute.  Why

3    don't I go to part two here.

4    MR. PRANGE:  I may only have two parts.

5    THE COURT:  So what's the second part?

6    MR. PRANGE:  The second part is timely that we

7    make a motion to seal the exhibits just as well as JTX 0076

8    and JTX 0077.

9    THE COURT:  Okay.  All right.

10   I take it there's no objection from 2Wire?

11   MR. ONG:  No, Your Honor.

12   THE COURT:  Okay.  So I'll grant that.  And then

13   I thought the third part was that when we were done, the

14   custody of these would be relinquished to someone else

15   which -- right?

16   MR. PRANGE:  Correct, Your Honor.

17   THE COURT:  Okay.  So hold that thought.  So

18   Ms. Haynes, what would you like to say?

19   MS. HAYNES:  Good morning, Your Honor.  The only

20   issue -- I think certainly we, obviously, do not oppose that

21   they be sealed.  If I understood Your Honor's ruling

22   correctly last Friday, I think they were also supposed to

23   redact any portion of the source code upon which they were

24   not relying.

25   THE COURT:  I don't remember my ruling of last

808

1    Friday in terms of what they're giving the jury right now

2    about various specific pages.  And since I'm sealing them,

3    I'm not going to make them redact lines.  That may have been

4    what I said last Friday, but I don't -- well, what do the

5    parties say?

6    MR. PRANGE:  Your Honor, I'd actually like to

7    look back and look at what was in the transcript.  My

8    recollection is that there was a suggestion that you do so,

9    but there was no actual requirement to do so --

10   THE COURT:  Right.  Well --

11   MR. PRANGE:  -- because they're sealed.

12   THE COURT:  All right.  Do you have an opinion

13   on that?

14   MR. ONG:  We do not, Your Honor.

15   THE COURT:  Okay.  And I take it, Ms. Haynes,

16   since we're likely going to be giving closing arguments in a

17   few minutes and sending stuff back to the jury not too long

18   thereafter, that's what you're talking about, what goes back

19   to the jury; right?

20   MS. HAYNES:  That's what I understood Your

21   Honor's ruling on Friday.  We just learned about the motion

22   this morning.

23   THE COURT:  Right.  Well, maybe it was a ruling,

24   maybe it was a suggestion.  I have no independent memory of

25   it.  And this would have been done in the teleconference?

809

1    MS. HAYNES:  Yes.

2    THE COURT:  Mr. Prange, who has these exhibits

3    right now?  Does plaintiff?

4    MR. PRANGE:  Yes, Your Honor.  Okay.

5    THE COURT:  Well, so how much of an

6    administrative task is this assuming that I said, yeah,

7    redact the things because I think there is a pretty good

8    outline at least for some of these as to exactly what it was

9    that the experts were referring to?

10   MR. PRANGE:  I think it's going to take some

11   time in order to go through the record and determine what

12   was referenced and compare that actually to the source code.

13   THE COURT:  Is there a transcript of the

14   teleconference in the record?

15   MR. PRANGE:  I don't know, Your Honor.

16   MS. HAYNES:  I do have a copy.  I have it with

17   me.  I would need to go back and reference it.

18   THE COURT:  Well, actually maybe we can resolve

19   this.  Ms. Haynes, why don't you go and get the transcript.

20   Mr. McAndrews, sorry to interrupt you because

21   I'm sure you have other things on your mind right now.  Are

22   you planning on using any of the source code in your closing

23   argument?

24   MR. MCANDREWS:  Nothing by specific reference to

25   line numbers.

810

1    THE COURT:  Actually what I meant is are you

2    going to show any source code to the jury?

3    MR. MCANDREWS:  No, Your Honor.

4    THE COURT:  Okay.  Thank you.

5    MS. HAYNES:  Your Honor, I have the transcript

6    and this --

7    THE COURT:  And if it's not too marked up --

8    MS. HAYNES:  It's not.

9    THE COURT:  -- it would be easier for me to

10   read.  It's all on one page?

11   MS. HAYNES:  Correct.

12   THE COURT:  Can you just show it to Mr. Prange

13   what you're --

14   MR. PRANGE:  Okay.  Thank you, Your Honor.

15   THE COURT:  All right.  Having looked at it,

16   Mr. Prank, is it still your opinion it's a suggestion rather

17   than an order?

18   MR. PRANGE:  Yes.

19   MS. HAYNES:  Your Honor, page 23 beginning at

20   line 25 and continuing on to 24.

21   THE COURT:  Page 23.  Okay.  So I can see how

22   the paragraph, what I said could be interpreted as a

23   suggestion, because I said I would like to encourage the

24   parties.  You know, so I think it's probably something --

25   you know, it's stated in the suggestion, I think I meant it

**811**

1  more as an order, but I think it's perfectly reasonable
2  thing to interpret it as a suggestion, but I would like to
3  follow that as if it were an order rather than a suggestion.
4  All right?
5          So whether or not the source code goes back with
6  the rest of the evidence, whether we're sending it back to
7  the jury, I don't know, but if we could check -- try to get
8  it redacted, the 30 pages, it won't effect closing arguments
9  because Mr. McAndrews is not showing them any of this and
10  I'm assuming since 2Wire barely -- I don't recall them
11  showing any source code at any time, so I'm kind of doubtful
12  that Mr. Schuman is planning on showing source code now.  I
13  think there is time to do it.  Okay.
14          MR. PRANGE:  Your Honor, so I understand based
15  on what you have now just ordered, what's the scope of what
16  actually needs to be redacted?
17          THE COURT:  Well, basically on a particular page
18  there were times when -- you know, I remember there was a
19  demonstrative exhibit that was used with Dr. Almeroth where
20  it had lines of code which I thought was basically some kind
21  of, for lack of a better word, thing to help guide what you
22  were going to talk about.  And I'm not saying you have to go
23  back and, you know, identify a particular place in the three
24  days of trial transcript where a particular line was
25  mentioned, when you had a demonstrative and you had line 252

**812**

1  to 260, that's good enough to like leave those in even if --
2  you know, because we got to be a little practical here.
3          But I don't think it will actually be that
4  difficult for someone to figure out which parts were used
5  and which parts weren't used, but I would not hold anyone in
6  contempt if they were off by a line here or there.
7          MR. PRANGE:  Thank you.
8          THE COURT:  Okay.  All right?
9          MR. PRANGE:  So in terms of the process, is it
10  -- I think what we'll do is we'll work -- are the redacted
11  versions going to go back to the jury or nonredacted
12  versions?
13          THE COURT:  The redacted versions.
14          MR. PRANGE:  I think we'll highlight at least in
15  the first instance what it is and we'll share with the
16  others and then we can have a discussion about it, I think.
17          THE COURT:  Okay.
18          MR. PRANGE:  Thank you, Your Honor.
19          MS. HAYNES:  Thank you, Your Honor.
20          THE COURT:  Thank you, everyone.  Ms. Haynes, do
21  you want your page back?
22          MS. HAYNES:  Sure.
23          THE COURT:  So if there is something else, I
24  will come back and see you in ten minutes assuming the jury
25  is all here on time.  Okay?  Actually, Mr. Farnan, do you

**813**

1  have the jury instructions and voir dire or have you already
2  --
3          MR. FARNAN:  We have it.  I think it's outside
4  with the runner.
5          THE COURT:  In any event, if you could give it
6  to the clerk.
7          MR. FARNAN:  Your Honor, you want the claim
8  construction order in the back of the jury instructions?
9          THE COURT:  Yes.  Thanks.  We'll be in recess
10  for ten minutes.
11          (A brief recess was taken.)
12          THE COURT:  All right.  I did not expect to see
13  you standing there.
14          MR. PRANGE:  Neither did I, Your Honor.  I had
15  another thought with this issue of redaction.  One of the
16  issues that what was shown to the jury was not redacted and
17  that may cause confusion to the jury.  And the other issue
18  that I have now with it as I thought through this is that it
19  potentially creates an implication that something was wrong
20  in the first instance when we showed it, it may reflect
21  poorly in the minds of the jury to my client.  I don't
22  believe that they should be redacted.  I'm just throwing
23  this out, they're already going to be under seal, so that
24  should be enough in order to protect the information.
25          THE COURT:  Let me think about that for a

**814**

1  minute.
2          All right.  So Ms. Banzhoff, you're here, I
3  guess Ms. Haynes isn't.  Do you have something you would
4  like to say about this.
5          MS. BANZHOFF:  I think Your Honor was clear last
6  Friday, I don't think that the order should be reversed
7  because it wasn't followed earlier.  It doesn't make sense
8  to Broadcom.
9          THE COURT:  So I appreciate what you say, but
10  you know, that's the difficulty of giving orders that are
11  stated in less than order-like language.  And I thought it
12  would have been a good idea, but it was not carried through
13  and maybe this is not the right time to carry it through.
14  So I'm going to reverse my earlier ruling and just let you
15  put in the pages the way they were shown to the jury because
16  I do think there is more -- beside the administrative
17  difficulties, there is some inference, but it's a good
18  lesson for the future.
19          So all right.  So you don't need to do that,
20  Mr. Prange.  Are we ready to go?
21          MR. PRANGE:  Thank you, Your Honor.  I'll sit
22  down.
23          THE COURT:  I assume Mr. Schuman is here.
24          MS. WALSH:  He's on his way, Your Honor.
25          THE COURT:  Okay.  You're ready to go if he

815

1  doesn't show?
2       MS. WALSH:  Yes.
3       THE COURT:  Okay.  When you say he's on his way,
4  is there an ETA?
5       MS. WALSH:  Maybe ten minutes.
6       THE COURT:  Okay.  I don't like that.  You're
7  here, Ms. Walsh.  Do you know why he's not here?
8       MS. WALSH:  Just working on closing.
9       THE COURT:  Okay.  All right.
10      MS. BANZHOFF:  Your Honor, may I be heard one
11 more time?  I think the issue with Mr. Prange may be
12 resolved by an in limine instruction.
13      THE COURT:  You know, I thought about that,
14 Ms. Banzhoff, but I think it's a balancing at this point.
15 And I think it's better not to have more limiting
16 instructions.  I've already got one in here on something
17 else.
18          So not an unreasonable suggestion, but
19 I'm not going to do it.
20      MS. BANZHOFF:  Thank you, Your Honor.
21      THE COURT:  All right.  Well, Ms. Walsh, is
22 Mr. Schuman like staying a long ways away from here?
23      MS. WALSH:  No.
24      THE COURT:  Okay.  All right.  Well, I don't
25 think I can really go forward without him, so I'm sorry,

816

1  Mr. McAndrews.  I don't understand this, but we'll be in
2  recess until he shows up.
3       THE CLERK:  All rise.
4       (Recess was taken.)
5       THE CLERK:  All rise.
6       THE COURT:  All right.  We're all here.
7  Mr. Schuman.
8       MR. SCHUMAN:  Apologies.
9       THE COURT:  All right.  Well, we'll talk about
10 it later.
11          Okay.  So we're ready to go.  The jury is ready
12 to go.  They've been ready to go for at least 12 minutes.
13 Everybody else has been ready to go, so now let's go.
14          Can we get the jury, please?  And so,
15 Mr. McAndrews, just to be clear here, so you have
16 45 minutes.  You can save five of those for rebuttal.
17      MR. MCANDREWS:  And I'd like to do that, Your
18 Honor.
19      THE COURT:  Okay.
20      MR. MCANDREWS:  Will I get a signal?
21      THE COURT:  Well, generally we expect your team
22 to signal you.
23      MR. MCANDREWS:  Okay.
24      THE COURT:  But, okay.
25      MR. MCANDREWS:  Got that.  Thank you, Your

817

1  Honor.
2       THE COURT:  Yes.  Let's get the jury.
3       (Jury entering the courtroom at 9:13 a.m.)
4       THE COURT:  Good morning, members of the jury.
5  Sorry for the delay.  Can everyone be seated, and can we
6  hand out the jury instructions and the verdict form?
7          So members of the jury, the great bulk of the
8  jury instructions, I'm going to give you and so I have cause
9  to be handing out the written jury instructions.  As I give
10 these, you can read, or you can listen, or you can do
11 whatever you want.  You will have the written instructions
12 with you.  But the main thing is to try to absorb as much as
13 you can.
14          So first off, you will see that in the written
15 instructions, at pages 2 to 13, there are a bunch of
16 instructions which are pretty much what I told you at the
17 beginning of the trial.  They're there.  They're something
18 that if you have a question about something within those
19 topics, they provide the answers, but I'm not going to read
20 them to you again.  They're there for you to refer to.  And
21 should the attorneys want to rely on them in their closing
22 arguments, they're perfectly free to do that.
23          So I'm going to start on page 14, which is one
24 thing I didn't tell you in advance because it involved
25 things that happened at trial.  Over this week of testimony,

818

1  you have heard that one witness or another was not allowed
2  to discuss matters of another witness and that certain
3  witnesses had limited access to Broadcom's source code.  You
4  are not to draw any inferences, either positive or negative,
5  from those statements.
6          So I'm now going to summarize the issues that
7  you must decide and from which I will provide instructions
8  to guide your deliberations.  You must decide the following
9  main issues:
10          Whether TQ Delta has proven by a preponderance
11 of the evidence that 2Wire infringed claim 5 of the '381
12 patent, claim 13 of the '882 patent, and claim 1 of the '048
13 patent.
14          And I may summarize the three claims at issue as
15 the claims at issue as we go on.
16          So the second issue is whether 2Wire has proven
17 by clear and convincing evidence that the claims at issue
18 are invalid.
19          And the third issue is whether 2Wire has proven
20 by clear and convincing evidence that the certificates of
21 correction connecting claim 5 of the '381 patent and claim
22 13 of the '882 patent are invalid.
23          Before you decide whether 2Wire has infringed
24 any of the asserted claims of the asserted patents or
25 whether any of the asserted claims are invalid, you will

819

1    have to understand the claims.  The patent claims are

2    numbered sentences at the end of the patents.  The patent

3    claims involved here are the three that I just mentioned,

4    claim 5 of the '381 patent, claim 13 of the '882 patent and

5    claim 1 of the '048 patent.

6          The claims are intended to define in words the

7    boundaries of the inventor's rights.  Only the claims of the

8    patent can be infringed.  Neither the written description

9    nor the drawings of the patent can be infringed.  You must

10   use the same claim meanings on both your decision on

11   infringement and your decision on invalidity.

12         It is my job as a judge to provide to you the

13   meaning of any claim language that must be interpreted.  You

14   must accept the meanings that I give you and use them when

15   you decide whether any claim has been infringed and whether

16   any claim is invalid.  The three terms that I have

17   construed, and their meanings, are provided to you in a

18   separate order, the last page of these instructions.  And

19   you will recall the parties have often put them up on the

20   screen consistent with what's in that order.

21         So in terms of infringement, patent law gives

22   the owner of a valid patent the right to exclude others from

23   making, offering to sell, or selling the claimed invention

24   within the United States during the term of the patent.  Any

25   person or business entity that is engaged in any of those

820

1    acts without the patent owner's permission infringes the

2    patent.  Here, TQ Delta alleges that 2Wire's products, which

3    have model numbers 5031NV, 5168NV, 5168N, 5268AC, i3812V,

4    and 3801HGV, which if I refer to them again I will just call

5    them the accused products, infringe the three claims at

6    issue.

7          A party can infringe a patent without knowing of

8    the patent or without knowing that what the party is doing

9    is patent infringement.

10         To determine infringement, you must compare each

11   of the accused products with each of the asserted claims

12   using my instructions as to the meaning of the terms used in

13   these three claims.

14         A patent claim is infringed only if 2Wire

15   products include each and every element recited in that

16   patent claim.  If 2Wire's product does not contain one or

17   more elements recited in a claim, that 2Wire product does

18   not infringe that claim.

19         Each accused product should be compared to the

20   invention described in each of the three claims at issue.

21   The same element of the accused product may satisfy more

22   than one element of a patent claim.  What the asserted

23   claims recite is the capability to perform a function.  An

24   accused device may be found to infringe if it is reasonably

25   capable of satisfying the claim limitations, even though it

821

1    may also be capable of non-infringing modes of operation.

2    Actually showing the performance of the function is

3    unnecessary.

4          So in this case, the only items of or

5    only the following items are prior art:  ITU-T, SG/15/Q4

6    Contribution LB-031 entitled VDSL2 - Constraining the

7    Interleaver Complexity which I'm sure the parties will refer

8    to as LB-031.  And U.S. patent number 7,269,208 which will

9    probably be referred to as Mazzoni.

10         Regardless of whether a particular

11   prior art reference was considered by the patent examiners

12   during the prosecution of the applications, which matured

13   into the asserted patent claims, 2Wire must prove that it is

14   highly probable to each challenged claim is invalid.  This

15   burden of proof on 2Wire never changes regardless of whether

16   the patent examiner considered the reference.

17         In this case, the date of the

18   invention for the asserted claims in the patents is

19   October 12th, 2004.

20         The question of invalidity of a patent

21   claim is determined from the perspective of a person of

22   ordinary skill in the art in the field of the claimed

23   invention as of the time of the invention.  Thus, prior art

24   must be evaluated from the perspective of one of ordinary

25   skill in the field of the invention as of October 12, 2004.

822

1          2Wire contends that the three asserted

2    claims are invalid because each claimed invention is

3    obvious.

4          A claimed invention is invalid as

5    obvious if it would have been obvious to a person of

6    ordinary skill in the art of the claimed invention as of

7    October 12th, 2004.  Obviousness may be shown by considering

8    one or more than one item of prior art.

9          In deciding obviousness, you must

10   avoid using hindsight.  That is, you should not consider

11   what is known today or what was learned from the teachings

12   of the patent.  You should not use the patent as a roadmap

13   for selecting and combining items of prior art.  You must

14   put yourself in the place of a person of ordinary skill in

15   the art as of October 12th, 2004.

16         The following factors must be

17   evaluated to determine whether 2Wire has established that

18   the claimed invention is obvious.

19         1.  The scope and content of the prior

20   art relied upon by 2Wire.

21         2.  The differences, if any, between

22   each claimed invention of the asserted patents that 2Wire

23   contends is obvious and the prior art.

24         And three the level of ordinary skill

25   in the art as of October 12th, 2004.

823

1   Each of these factors must be
2   evaluated, although they may be analyzed in any order.  And
3   you must perform a separate analysis for each of the claims.
4   2Wire must prove by clear and
5   convincing evidence that each claimed invention of the three
6   asserted claims would have been obvious as of October 12th,
7   2004.
8   So 2Wire asserts the following
9   combinations of prior art render the asserted claims invalid
10  as obvious LB-031 in combination with the knowledge of a
11  person of ordinary skill in the art and LB-031 in
12  combination with Mazzoni.
13  You should analyze whether there are
14  any relevant differences between the prior art and the
15  claimed invention from the view of a person of ordinary
16  skill in the art as of October 12th, 2004.  Your analysis
17  must determine the impact, if any, of such differences on
18  the obviousness or non-obviousness of the claimed invention
19  as a whole and not merely some portion of it.
20  In analyzing the relevance of the
21  differences between the claimed invention and the prior art,
22  you do not need to look for precise teaching of the prior
23  art directed to the subject matter of the claimed invention.
24  You may consider the inferences in creative steps that a
25  person of ordinary skill in the art would have employed in

824

1   reviewing the prior art at the time of the invention.  For
2   example, if the claimed invention combined elements known in
3   the prior art and the combination yielded results that were
4   predictable to a person of ordinary skill in the art at the
5   time of the invention, then this evidence would make it more
6   likely than that the claim was obvious.  On the other hand,
7   if the combination of known elements yielded unexpected or
8   unpredictable results, or if the prior art teaches away from
9   combining the known elements, then this evidence would make
10  it more likely that the claim that successfully combined
11  those elements was not obvious.
12  Importantly, a claim is not proven
13  obvious merely by demonstrating that each of the elements
14  was independently known in the prior art.  Most, if not all,
15  inventions rely on building blocks long-known, and claimed
16  discoveries almost of necessity will likely be combinations
17  of what is already known.  Therefore, you should consider
18  whether a reason existed at the time of the invention that
19  would have prompted a person of ordinary skill in the art in
20  the relevant field to combine the teachings in a way the
21  claimed invention does.  The reason could come from the
22  prior art, the background knowledge of one of ordinary skill
23  in the art, the nature of any problem or need to be
24  addressed, market demand, or common sense.  If you find that
25  a reason existed at the time of the invention to combine the

825

1   elements of the prior art to arrive at the claimed
2   invention, and there would have been a reasonable
3   expectation of success for doing so, this evidence would
4   make it more likely that the claimed invention was obvious.
5   Similarly, you may consider the possibility that a reference
6   teaches away from the claimed invention.  A reference
7   teaches away from the invention when it would have
8   discouraged a person of ordinary skill in the art as of
9   October 12, 2004 from practicing the claimed invention, or
10  when such a person would be led in a different direction
11  than practicing the claimed invention.
12  To determine the obviousness of each
13  invention of the three asserted claims, you must determine
14  the level of ordinary skill in the field of the invention as
15  of October 12th, 2004.  The person of ordinary skill is
16  presumed to know all the prior art in this case.  The person
17  of ordinary skill is also a person of ordinary creativity
18  that can use common sense to solve problems.
19  When determining the level of ordinary
20  skill in the art, you should consider all the evidence
21  submitted by the parties, including evidence of:
22  1. The level of education and
23  experience of persons actively working field as of
24  October 12, 2004, including the inventors:
25  2. The types of problems encountered

826

1   in the art as of October 12, 2004; and
2   3. The sophistication of the
3   technology in the art as of October 12, 2004, including the
4   rapidity with which inventions were made in the art as of
5   October 12, 2004.
6   TQ Delta alleges that claim 5 of the
7   '381 patent and Claim 13 of the '882 patent issued from the
8   Patent Office containing errors.  Requesting a certificate
9   of correction is one way to correct certain kinds of errors
10  in patents.  Once properly corrected by a certificate of
11  correction, a patent has the same effect and operation in
12  law as if it were originally issued in the corrected form.
13  TQ Delta requested and obtained certificates of
14  correction for claim 5 of the '381 patent and claim 13 of
15  the '882 patent.  2Wire challenges the validity of those
16  certificates of correction and has the burden of proving
17  invalidity by clear and convincing evidence.
18  When the patent applicant is the one
19  who made the error, it can use a certificate of correction
20  only to correct errors of a clerical or typographical
21  nature.  An error is clerical or typographical if one of
22  skill in the art can tell just from looking at the patent
23  and the prosecution history that there was an error and how
24  the error should be corrected.  If an error was not clerical
25  or typographical in nature, the certificate of correction

827

1   correcting that error is invalid.

2          So the only other instructions I have

3   to do relate to deliberation, and I will give them to you

4   after the arguments of the attorneys.  So at this point,

5   let's turn to the arguments of the attorneys.

6          Basically for your reference, each

7   side is limited to 45 minutes.  And the way it works is

8   plaintiff goes first.  They can keep a small amount of time

9   as a reserve.  Then the defendant goes.  When the defendant

10  is finished, that reserve the plaintiff can use, but that

11  comes out of the 45 minutes.

12         Okay?  Mr. McAndrews.

13  MR. MCANDREWS:  Thank you, Your Honor.  Good

14  morning, ladies and gentlemen of the jury.  My name is Peter

15  McAndrews again, and TQ Delta and I want to thank you for

16  your very important jury service.  We know it's been a

17  disruption to your lives.  For sure it has been.  But your

18  sacrifice is incredibly important.  You're the backbone of

19  the U.S. judicial system.  So again, thank you.

20         Now, we've done some heavy lifting this week.  I

21  feel like all of you can probably pass a graduate level

22  course on DSL.  But that's not why you're here.  You're not

23  here for your technical expertise.  You're here for your

24  collective wisdom, for your common sense, for your impartial

25  view of the evidence and testimony.  And to judge the

828

1   credibility and motivation of the witnesses you have heard.

2          That's why the United States has a jury system.

3   It's the best in the world.  That's why we have trial by

4   jury.

5          Some of the words you have heard, DSL, bits and

6   bytes, DSLAMs and CPE, interleavers and deinterleavers,

7   Reed-Solomon codewords, O-PMS message, you heard a lot of

8   those, but I think the evidence, the testimony, the

9   presentation has distilled this back not to how interleavers

10  and deinterleavers necessarily work, not whether you're

11  talking about the CPE or the CO, hopefully now you have got

12  the directions in mind, although it is easy for lawyers to

13  mess it up from time to time.

14         It comes down to two primary issues.  The two

15  primary issues are whether the accused products include

16  shared memory, and I think that that's a fairly

17  straightforward question that's answered in TQ Delta's

18  favor, and whether or not the message specifies memory

19  rather than delay, and specifies a maximum rather than a

20  minimum.  Those are really the key things that I think the

21  jury needs to resolve and hopefully you have the tools to

22  resolve those.

23         Now, I want to remind you when you review the

24  evidence as you just heard that there is two main issues

25  here.  There is infringement and there is invalidity.  On

829

1   infringement, TQ Delta bore the burden.  But our burden of

2   proving infringement is just by a preponderance.  On a

3   scale, just a feather, just enough to move it in our favor.

4   If you believe that it's slightly more likely than not that

5   we have proven infringement, then you should find in favor

6   of TQ Delta on the issue of infringement.

7          On the invalidity side and invalidity will apply

8   both to invalidity in view of the prior art, whether the

9   claims are obvious, it also applies to whether 2Wire has

10  proven that the certificate of correction was issued

11  improperly.  2Wire bears a very heavy burden there.  It's a

12  clear and convincing burden, so they would have to tip the

13  scales much further down on their side to prove invalidity,

14  and we don't believe they have done that.

15         What I'm going to do, I'm not going to take you

16  through all the evidence, I'm not going to argue the entire

17  case to you here.  What I'm going to do is remind you some

18  of the things that you heard and bring back some of what you

19  have seen over the last few days and you can hopefully

20  understand and put yourself back to where you heard

21  Dr. Cooklev testify, Dr. Almeroth testify, the inventor,

22  Mark Tzannes testify.  If you could put yourself back there

23  when you listen to those words, what you felt based on your

24  common sense whether you were hearing the truth.

25         So Mark Tzannes, he's an innovator.  He devoted

830

1   his life's work, thirty years to the DSL industry.  He's got

2   more than a hundred patents.  And he contributed to the

3   development of these very important standards.

4          2Wire on the other hand, you didn't hear that

5   they were contributors.  Instead, they're implementers.  So

6   they took the benefits that Mr. Tzannes provided by working

7   very hard on the standards and they benefitted from that.

8   They benefitted from that, but they don't want to pay for

9   it, they don't want to acknowledge that they're using it.

10  They don't want to do what's right.  They should have taken

11  a license when they were approached six years ago, but they

12  didn't want to do that.

13         Something else.  They're trying to diminish the

14  value of the invention based on combinations, bits and

15  pieces of the prior art.  But we haven't heard yet anywhere,

16  and I think it was acknowledged yesterday in the testimony,

17  that never before is the complete invention of the claims,

18  was it placed in a patent, was it placed in a proposal or

19  placed in a device.  By the way, there was some testimony

20  during I think it was what's called recross of Dr. Cooklev

21  where there was a patent put up and the attorney for 2Wire

22  highlighted the word device.  That doesn't make it a device.

23  A device is something that's actually been built.

24         Of course patents can describe devices, they

25  would describe what they hope would be built, but that's not

831

1 an actual device.  We heard no testimony that this invention
2 was ever placed into a device before the invention by
3 Mr. Tzannes.
4         Now, one of the benefits of the invention, you
5 heard a little bit about this.  So it provides flexible
6 impulse noise protection.  So as there are changing
7 conditions on the network, there are changing needs for data
8 rates, it makes a flexible solution by exchanging memory
9 securing message.  You can be devote more memory to the
10 upstream path, and you can devote more memory to the
11 downstream path.  It does that by sharing the same memory.
12 You heard the complexity of sharing memories and how prior
13 art can be broken if the memory, if the messaging isn't done
14 the right way.
15         And ultimately what that does for implementers
16 is it saves them on cost.  And that's a very important
17 component when the implementers go to purchase chips and
18 when you reduce the cost of memory, it reduces the size of a
19 chip, reduces power consumption, reduces all sorts of things
20 that lower their costs.
21         And prior art, it didn't have shared memory, it
22 had dedicated memory.  You heard the testimony that to meet
23 the requirements of the standard, provide adequate service,
24 you would need approximately 130,000 bytes of this very fast
25 computer memory with dedicated memory.  Well, when you can

832

1 share memory, you can provide all the flexible but with half
2 the memory, about 65,000 bytes of memory.
3         One running theme here is the DSL standard.
4 2Wire undoubtedly admits that they practice the standard.
5 They put a witness on the stand that I think he attempted to
6 suggest that maybe they don't know very well, the equipment
7 is a little bit of a black box to them, but at the end of
8 the day, they tell the public, they tell their customers,
9 AT&T, they confirm in a very formal document that their
10 products comply with the standards.
11         One of those formal documents that we saw was
12 referenced as the Uber Matrix, kind of an odd term.  It has
13 nothing to do with how you guys may have gotten over here.
14 Sorry I jumped ahead.
15         Uber Matrix is a formal document where they tell
16 their largest customer that they comply.  The customer says
17 the device must be compliant with the VDSL2 and they confirm
18 that compliance.  And they confirm it for each software
19 release, each release of the product.  We saw evidence about
20 that.  And I don't think there is any dispute that they're
21 practicing the standard.
22         Remember, though, and we heard testimony about
23 this, that the claims, the totality of the claims that we
24 demonstrated were being used by the accused products, they
25 also require shared memory.  And you heard testimony that

833

1 the shared memory is actually not required by the standard,
2 and that's true.  It is recommended by the standard, the
3 standard allows for it, and, therefore, the standard
4 provides a memory sharing scheme that will allow you to
5 share your memory if you want.
6         Of course, the evidence also showed that the
7 2Wire products are actually sharing the memory.  They took
8 the benefit, they didn't have to, they could have made
9 products that didn't comply -- I'm sorry, they could have
10 made products that did not use shared memory, but they did,
11 they wanted the benefit provided, the cost savings to reduce
12 the amount of memory.
13         Now, TQ Delta carried its burden.  TQ Delta
14 carried its burden by showing you a number of things.  I'm
15 going to step you through them.  This is our burden on
16 infringement.  We believe that we tip the scales far more in
17 our favor than just the feather that was required.
18         So on the issue of shared memory, we looked at
19 the standard that recommends it.  We looked at some Broadcom
20 documents, some testing information, and some source code
21 analysis.  I'm going to take you through some of those, just
22 remind you what you may have heard over the last couple of
23 days, or hopefully what you did hear.
24         The standard, it says, this is referencing the
25 O-PMS message by the way, but it specifies a portion of the

834

1 shared interleaver memory.  So the message is in particular
2 referencing shared memory.  We agree this is not a
3 requirement of the standard, but it's a recommendation and
4 it's telling you the messages are there to allow you to do
5 that.
6         Dr. Cooklev also explained that the standard
7 recommends using shared memory.
8         Broadcom data sheets that we saw, they explain
9 that there is a triangular FIFO based, that's a fancy word
10 for shared memory.  Dr. Cooklev confirmed that that's, in
11 fact, shared memory.
12         Dr. Cooklev also explained how his testing
13 showed that given the different configurations he tested
14 that in some configurations, certain memory was used for the
15 interleaver and in another configuration certain portions of
16 the same memory were used for the deinterleaver.  We also
17 heard from Dr. Almeroth, and he showed how the source code
18 proves that the assignment of the memory in interleaver
19 memory and deinterleaver memory come from the same block of
20 memory.
21         On the other hand, we didn't have any evidence,
22 no opinions from any of the experts that showed up here for
23 2Wire.  Dr. Jacobsen had no opinion about whether the
24 accused products include shared memory.  She agreed, I don't
25 have an opinion.

835

1      Dr. Yu hadn't even looked at the claims so he
2 certainly didn't have any opinion on whether the accused
3 products used shared memory.  He didn't deny that they did.
4      And Dr. Walker didn't provide any testimony at
5 all, but I asked Dr. Jacobsen who had relied on Dr. Walker
6 for certain things and she agreed he had no opinion on
7 whether there was shared memory.  In fact, all the way back
8 at the start of the case when 2Wire's counsel spoke to you
9 in the opening statement, he agreed, he said this case is
10 indeed about how to divide up the shared memory that's in
11 the accused product.  So I really think that that issue is
12 put to rest.
13      Now, maximum is not a minimum.  Your common
14 sense tells you that's likely true.  But the technology is a
15 bit complex, so we took you through the evidence and showed
16 you why the amount of memory being specified in the message
17 was actually a maximum and couldn't be a minimum.  If it was
18 a minimum, the systems would be broken.  Dr. Cooklev
19 explained to you that the memory being specified as (I minus
20 1)(D minus 1) over 2, that was the maximum amount of
21 interleaver memory that could be used because the
22 interleaver and deinterleaver have to be mirror images, they
23 have to tell each other so they can coordinate that to
24 decode the data that can be interleaved on the way out and
25 deinterleaved on the way in, that's the only way it could

836

1 work.  It's specifying memory and specifying a maximum
2 amount.  Dr. Cooklev said if I got 30 and you got 40, that's
3 not going to work, if I say 30 and you treat that as a
4 minimum and you select 40, it's broken.  You select that
5 as -- if you read that and understand it as a minimum, it's
6 going to work.  So it's got to be a maximum not a minimum.
7      We also had this testimony about peripheral
8 memory.  I think 2Wire and some of their witnesses were
9 suggesting that this additional memory, this implementation
10 specific memory, they point to this portion of the standard
11 that talks about this is the minimum amount of memory
12 because of an implementation detail here.  But that part of
13 the standard doesn't say interleaver and deinterleaver
14 memory.  It says the total memory.
15      So what is the total memory?  The total memory
16 is the interleaver and deinterleaver memory.  Remember, it's
17 the memory that you need to store the Reed-Solomon coded
18 data bytes that you're spreading out.  And the additional
19 memory is peripheral memory.
20      And we have a number of sources that confirm
21 that it's peripheral memory.  We have a number of sources
22 that refuse to say and explain to you why they believe that
23 was interleaver memory.
24      So we've got a little chart here.  We've got
25 Dr. Jacobsen's book that explains that additional peripheral

837

1 memory is pointers and not the interleaver deinterleaver
2 memory itself.  I'll show you that.
3      Dr. Jacobsen called the additional memory
4 headroom.  Kind of a vague term, but she certainly didn't
5 say that it was interleaver deinterleaver memory.
6      Dr. Yu, he used a word very similar to
7 Dr. Jacobsen.  He said overhead.  Well, overhead, nobody
8 told you that that's interleaver and deinterleaver memory.
9 It's not.  Again, it's these pointers, these additional
10 things that help maybe control what's going on in the
11 interleaver deinterleaver memory, but it's not interleaver
12 deinterleaver memory.
13      And they're talking about implementation details
14 where they want to say it's a minimum.  Yeah, you need some
15 of this other stuff.  It doesn't even have to be stored, as
16 we heard from Dr. Jacobsen, in the same memory, but there's
17 a little bit more.
18      But the amount of memory, (I minus 1) (D minus
19 1), which is actually doing the interleaving and
20 deinterleaving, that's what's specified in the message.
21 That's what the maximum number of -- that can't be any more
22 than specified in the message.
23      And Dr. Walker referenced this 3MK plus 8, but I
24 think as you heard from Dr. Cooklev that's simply this
25 overhead.  That's in additional memory, pointers and things.

838

1      So here's the book.  The pointers are the A, and
2 the L, and the U.  And I apologize, I'm stepping through
3 this a little quickly, but I think you heard this.  The A,
4 and the L, and the U over there, that's effectively a memory
5 pointer.  And what it says is typically that's much smaller
6 than the interleaver or deinterleaver memory itself.
7      And this came out of the book that Dr. Jacobsen
8 edited.  She agreed that the book she edited distinguishes
9 the interleaver deinterleaver memory itself from the memory.
10 She agreed with that characterization of what the chapter in
11 her book said.
12      Dr. Yu explained -- he explained a couple things
13 here, but what he explained down here at the bottom when he
14 was talking about the memory is here's his term overhead.
15 So he talked about the (I minus one) (D minus one) over two.
16 Then he said that was a minimum.  But the only reason he
17 said it was a minimum is because there was some additional
18 overhead that was required.  Again, that's not the
19 interleaver deinterleaver memory.
20      So now max_delay_octets, we heard some
21 suggestion that that's delay.  It's not memory.  It's not
22 memory specified in bytes.  It's some sort of maybe time
23 delay or has nothing to do with memory perhaps.  And we saw
24 why that's not true.
25      First of all, the O-PMS message itself says that

839

1   the section of the standard says that it's specifying a
2   portion of shared interleaver memory, the field of the
3   message.  And we pointed to field eight for some of these
4   things.  That's the downstream deinterleaver.  And it
5   says -- it specifies the maximum value of delay octet, but
6   it's specified in bytes, and that's bytes of memory.
7           And that's exactly what this is referencing.
8   This is referencing, in more general terms, field eight.  So
9   some of the fields of the message.
10          Dr. Cooklev, he also explained that
11  max_delay_octet specifies a maximum amount of memory.  I
12  don't think they broke him down on that.  I think he stuck
13  to that.  You didn't hear anything convincing from anyone on
14  2Wire's side.
15          And Dr. Almeroth also showed you -- he concluded
16  and he reviewed the code.  He understands how the code is
17  processing the message and how it's interpreting.  And he
18  testified that the message says delay, and that means memory
19  specified in bytes.
20          Again, Dr. Yu, he testified that the O-PMS
21  message, it's memory.  Right.  It's memory.  He's not
22  telling you that that's some sort of delay untied to memory.
23  Dr. Yu says the O-PMS message max delay, that's a term
24  that's in the O-PMS message, and he's telling you that it's
25  memory.

840

1           So Dr. Almeroth's source code analysis, and I
2   think it was the only rigorous analysis of the source code.
3   And remember, Dr. Walker, he called it the gold standard.
4   He said the source code is the gold standard.  He said
5   that's really where you have to go to find out how these
6   products really work.
7           But nobody did a rigorous analysis.  You didn't
8   hear that out of Dr. Walker.  He didn't show you new
9   detailed lines of code.  He didn't step you down through the
10  functions.  And you certainly didn't hear that of Dr. Yu.
11          Dr. Yu didn't have any source code to show you.
12  He didn't explain any files.  He didn't show you that.
13          And the analysis of Dr. Almeroth was rigorous.
14  He started with the claim language.
15          Dr. Yu didn't start with any claim language.  He
16  didn't even -- he had never seen the patent.  He barely knew
17  how to read a patent.  He didn't know what a patent was.
18  Even his own patents, he's never read.
19          So Dr. Almeroth, starting with the claim
20  language, he looked at all -- how that mapped to the
21  standard to understand the functionality.  He started at the
22  top.  He worked his way down through every file and
23  function.  He gave you specific line numbers.  He showed
24  those to you.  He explained to you how each one of those
25  supported elements of the claim.

841

1           The analysis was very rigorous.  He showed you
2   exactly what he did.  He gave you the function names, the
3   file names.  He showed how one called the next as you
4   cascade down into the depths of the code.
5           You know, he started with 500,000 pages of code.
6   He worked his way through all of that.  He worked it down
7   until he found you the specific lines and functions and
8   showed you how it worked, and then he mapped that all to the
9   various claim elements.  He reached conclusions based on
10  that code and showed you how each element of every asserted
11  claim was met by his code analysis.
12          Now, Dr. Yu came in to help one of their larger
13  customers, 2Wire.  Broadcom flew him in to provide
14  testimony.  I think you heard a number of times from his --
15  2Wire's counsel that Dr. Yu is really going to provide an
16  answer.  We were really going to really hear why our
17  testimony was wrong.
18          But I don't think he did that.  In fact, I think
19  Dr. Yu largely confirmed, based on the testimony I showed
20  you, that TQ Delta is correct, that it's specifying memory.
21  It's specifying maximum amounts of memory.  I don't think
22  what we gained from Dr. Yu yesterday was at all a rebuttal,
23  certainly not a convincing rebuttal of anything that we put
24  on.
25          Now, validity.  We have Mazzoni and LB-031.

842

1   Start with Mazzoni.  The Mazzoni memory is frozen.
2   Dr. Jacobsen agreed with that.  It's very limiting if the
3   memory is frozen.
4           She agreed that it didn't disclose any sort of
5   messaging, doesn't even disclose any initialization at all.
6   It's done at installation.  Someone shows up, plugs it in,
7   configures it for you, and they're gone, and it's frozen.
8           Now, LB-031.  LB-031, she agrees, it doesn't
9   disclose shared memory.  I think they had a couple slides
10  that suggest that maybe it did, but ultimately she admitted
11  that this doesn't disclose shared memory.  In fact, it
12  doesn't have any explicit discussion of any memory
13  configuration.
14          And our witness, Dr. Cooklev -- and granted we
15  were a little rushed there at the send, but he explained to
16  you why LB-031 simply can't be used with memory sharing.  He
17  explained that you exchange a maximum on each side of these
18  two, but these two sides are not coordinated.  They each
19  exchange their maximum, and that's the end of the
20  conversation.  There is no further conversation between the
21  two devices.  There's nothing further disclosed in LB-031
22  about how you might coordinate memory.
23          And so what happens is you wind up with
24  unused -- if this guy says, I've got 40,000 bytes, and this
25  guy says, I've got 30,000 bytes on this path, there's no way

843

1   for this memory to end up down here because the conversation
2   is over at that point.
3           There's simply no way to share memory using
4   LB-031.  And in fact, we showed you with a specific
5   reference.  Well, so Dr. Cooklev he explained it, and again
6   it was a little bit rushed, but hopefully you gained from
7   that the reasons why it's broken, the reason why it won't
8   share memory.
9           And then on to the other issue.  So we actually
10  showed you -- one of the combinations they tried to put
11  together was LB-031 with Mazzoni.  We showed why LB-031
12  actually couldn't be used at all with Mazzoni.  And the
13  reason for that is, because as Dr. Cooklev explained,
14  Mazzoni only has, based on its various -- you know, its 12
15  service profiles, it only has 27,000 bytes of memory.  But
16  if you use Mazzoni's messaging protocol, it wants to tell
17  each other a total of 36,000 bytes of memory.
18          So that's going to break it.  There's not going
19  to be enough to work on either direction, and it's broken.
20          So what was the reason?  So the reason that
21  Dr. Jacobsen said that, no, that could be fixed.  One
22  skilled in the art would know how to fix that.  And her only
23  solution for that was to add more memory.  But remember,
24  she's saying that you would be motivated to combine them.
25          And what reason did she give?  She said that you

844

1   would be motivated to combine because both references --
2   both references are concerned with limiting the amount of
3   memory.  So if you put them together, you have to increase
4   that amount of memory again and make them work together.
5   You've defeated the whole reason you put them together in
6   the first place.
7           And now you don't even need shared memory.  You
8   have 36,000 bytes of memory.  Now, you can do what LB-031
9   did.  You never have to cross over into the other side.  You
10  can divide those memories back up and never use one for the
11  other side.  It completely eliminates the benefit of the
12  invention, and it eliminates the need for the invention.  So
13  there's no motivation to combine LB-031 in any way where
14  you're going to arrive at the invention.
15          Now, so back to the burden of proof.  We don't
16  think that there is anything that they've shown, anything
17  that 2Wire has shown that establishes their burden.  In
18  fact, we think they're way up here.  They've got LB-031 that
19  is totally incompatible with shared memory.  And when you
20  put them together, you've got a broken device.
21          Now, the certificate of correction, let me go
22  through that real quick.  You heard testimony that it was a
23  cut and paste error.  We believe that that's actually the
24  case, and I'll show you in a second why we absolutely
25  believe that it was a simple cut and paste that then got

845

1   corrected.
2           And the patent -- and remember, the issue was
3   there was a transposition of transmission and reception.
4   Simply, a transmission of -- transposition of transmission
5   and reception.  Transmitters transmit.  Receivers receive.
6   A deinterleaver is part of the receiver that receives the
7   deinterleave.  Transmitter, part of the interleaver that
8   interleaves to transmit.
9           And that's where the mistakes were made.  That's
10  how it was fixed.
11          We had an additional error in the claim, shred.
12  That was fixed.  Certainly patent attorneys can make
13  mistakes undoubtedly.
14          Now, here's why we know it's a cut and paste
15  error.  Shred.  So shred is not the sort of thing that you
16  would type out multiple times and make that same mistake
17  over, and over, and over again.  If your entire patent was
18  about shared memory, you're not going to make that mistake
19  that many times.  So obviously -- and this was shown to you
20  yesterday by 2Wire's attorneys.  They showed you, and I
21  think they were trying to make the point that we made the
22  mistake a lot.  2Wire's attorney made the mistake a lot.
23          In fact, what they proved was it was absolutely
24  a cut and paste error.  Look how many times shred showed up.
25  It got propagated across multiple patents.

846

1           So what the attorney was doing -- we got the
2   same disclosure -- he's claiming different aspects of the
3   same invention.  Some transmitters, some receivers looking
4   at different aspects of the message being sent.  And he cut
5   and pasted across and then went back.  And he did his best,
6   he tried to change the words that were the right words to
7   change, but he obviously missed a couple of them.  And some
8   of them, transmit was receive, receive was transmit.
9           And the Patent Office recognized that.  They
10  issued a certificate of correction, made the corrections.
11  And we don't think there's any way 2Wire has established by
12  clear and convincing evidence that this isn't something that
13  was readily recognized as a clerical error.
14          Now, lastly, I want to explain to you how
15  important our patent system is.  So the patent system, why
16  is it in the United States?  Well, it's there because in the
17  very first article of the Constitution, Section 8, Clause 8,
18  the founders of the country realized that we needed a strong
19  patent system.
20          And why did they need that?  Why did we need
21  that?  Because in Europe, the system was broken.  In Europe
22  what they did is they granted patents based on the friend
23  and family plan.  The Monarch would give the buggy patent to
24  his brother-in-law.  He would give the metallurgy patent to
25  his nephew.

847

1   And what did that do?  It meant that progress
2   was stagnate.  If you don't have any incentive, if you just
3   get it out of privilege and right, you're born into it,
4   there's no incentive to make a better buggy, a faster buggy.
5   There's no incentive to make better wheels.  There's no
6   incentive to make steel cheaper.
7   And that's why in the United States, we have the
8   greatest innovation engine in the world because we have a
9   strong patent system.  So it's very important to incentivize
10  our inventors.
11  And that's what happened here.  Marcos Tzannes,
12  he could have decided on a different career.  He could have
13  worked for a company that implemented technology and just
14  let other people invent for him.  But, no, he was
15  incentivized because he had ability to collect patents on
16  his inventions, and that gave him the right to exclude
17  others.  And by excluding others, yes, that gives you a
18  right to collect some money.  That's what your incentive is.
19  That's why in the United States, we invent
20  vastly more than any other country in the world because we
21  have a strong patent system.  So it's very important to
22  incentivize our inventors.  It's a critical part of the
23  reason why we have the best economy in the world.
24  Now, I'm going to take you through the verdict
25  form here really quick.  This is like a little multiple

848

1   choice test you're going to get when you go back and
2   deliberate.  I just want to explain to you that you're going
3   to have sections on infringement, validity, and certificate
4   of correction.  And the way that these verdict forms are
5   going to be filled out is they're just one question, but
6   read the question, pay attention.
7   So this one, for example, is -- so it's going to
8   explain to you that TQ Delta has the -- so the question is:
9   Has TQ Delta proven by a preponderance of the evidence --
10  the burden will be there to remind you -- that 2Wire -- has
11  2Wire infringed corrected claim 5 of the '381 patent by
12  making, selling, or offering to sell its product model
13  numbers?  And then the product model numbers are grouped
14  according to chip set.
15  And we provided testimony why the 5031NV and the
16  other models listed here that use the same chip.  Well, they
17  use two chips, but those two chips are related by the code
18  base as Dr. Almeroth explained.
19  So these products are all lumped together, and
20  they rise and fall together.  So if you find that there's
21  infringement of one of them, and you feel like we have shown
22  adequately that they're the same product, essentially as far
23  as DSL functionality goes, then you would answer this, you
24  would answer this one yes.  And this same question appears
25  for each of our accused, I'm sorry, each of the asserted

849

1   claims.  It's going to step you through the accused
2   products.
3   So, for example, here is the claim 13 of the
4   '882, and here is claim 13 of the '883 applied to the other
5   grouping of products, i3812V and 3801HGV which uses the
6   Broadcom chipset.
7   Similar questions again for the '048 patent.
8   And there is a little key here, so you can confuse who
9   you're finding for.  It says checking yes finding for TQ
10  Delta, checking no indicates a finding for 2Wire on the
11  issue of infringement.
12  And then we have got obviousness, so 2Wire says
13  the patents are invalid for obviousness.  Remember, it's
14  clear and convincing burden standard.  If you feel they have
15  not met that burden and we believe they have not, then the
16  answer will be no, and no.
17  So this is LB-031 along with what's called the
18  knowledge of ordinary skill in the art.  The question is
19  would someone had taken that reference and added shared
20  memory to it, and we have shown you why it's not going to
21  work together, so the answer would be no.
22  And this is -- and again, you're going to step
23  through for each of the asserted patents and each of the
24  asserted claims.  And then we get to the certificates -- I'm
25  sorry, whether the certificates of correction are valid.

850

1   And again, it's 2Wire's burden to prove by clear and
2   convincing evidence that it was not clearly evident that it
3   was -- you know, the double negatives here are a little
4   tough.
5   Essentially what 2Wire has to prove, what you
6   have to conclude by clear and convincing evidence is that
7   they weren't cut and paste errors, that they clearly were
8   not cut and paste errors, I guess that's the way to say it.
9   They would have had to show that they clearly are not cut
10  and paste errors in order for you to find for them.  And we
11  believe that you should find no, that they have not
12  established that.  So on the certificates of correction, on
13  each corrected claim we have asked you to find in favor of
14  TQ Delta.
15  And that concludes my opening presentation.  I
16  want to thank you again for your service.  We ask you when
17  you go back to deliberate to give due consideration to the
18  evidence we put on, and find in favor of TQ Delta.
19  Thank you very much.
20  THE COURT:  All right.  Thank you,
21  Mr. McAndrews.
22  Members of the jury, we're just going to take a
23  short break here.  So I'm going to ask that you be taken
24  out.
25  (Jury leaving the courtroom at 9:59 a.m.)

851

1    THE COURT:  All right.  So you all be seated.

2    Mr. Schuman, is there anything you care to

3    explain about why you were here at twelve minutes after

4    9:00?

5    MR. SCHUMAN:  Only to apologize, Your Honor.  As

6    Ms. Walsh said, we didn't finish the closing arguments.  I

7    apologize.

8    THE COURT:  Did you just lose track of time?

9    MR. SCHUMAN:  Basically.

10   THE COURT:  How long do you think your closing

11   argument is going to be?

12   MR. SCHUMAN:  As I said yesterday, I was aiming

13   for thirty minutes, and the Court gave us forty-five.  I'll

14   certainly try to keep it under forty-five minutes.

15   THE COURT:  So would it be -- so by my count,

16   you did get here twelve minutes late.  I'm trying to figure

17   out what the appropriate response is, because I never seen

18   something like this before.  It's probably too broad of a

19   statement.  But at least as a judge, I haven't seen

20   something like this.  Is there any reason why I shouldn't

21   deduct the twelve minutes from your forty-five?

22   MR. SCHUMAN:  I'll get the closing done in

23   thirty-three minutes if that's what Your Honor chooses.

24   THE COURT:  All right.  I think that would be

25   appropriate.

852

1    Okay.  Are you ready to go?

2    MR. SCHUMAN:  Can I have two minutes just to see

3    whether there is any adjustments to the slides following

4    Mr. McAndrews's closing?

5    THE COURT:  Yes.  So why don't we take a

6    five-minute break, or if you need more, tell me, but we're

7    obviously moving along here.

8    MR. SCHUMAN:  Thank you, Your Honor.

9    (A brief recess was taken.)

10   THE COURT:  All right.  Are you ready to

11   proceed, Mr. Schuman?

12   MR. SCHUMAN:  Yes, Your Honor.

13   THE COURT:  Okay.  Let's get the jury.

14   (Jury entering the courtroom at 10:11 a.m.)

15   THE COURT:  All right.  Members of the jury,

16   welcome back.  Everyone, you may be seated.

17   Mr. Schuman, you may proceed.

18   MR. SCHUMAN:  Thank you, Your Honor.

19   Thank you, ladies and gentlemen, members of the

20   jury.  As you know by now, Mr. McAndrews and I disagree

21   about quite a bit, but we both agree that your service is

22   very important to the patent system and I, too, thank you

23   for your service, your attention this week.

24   As I said in my opening statement, I hope to

25   give you the tools that you need to make the right decision

853

1    in this case.  This is not an easy case.  But I hope that we

2    have given you those tools through the witnesses we brought

3    to you and the evidence we presented.

4    As you know, this is a case involving patents

5    that relate to a DSL standard.  As Mr. McAndrews

6    acknowledged, the patents are not required by that standard,

7    but they relate to it, and Broadcom DSL chips.

8    So we brought you Dr. Yu from California to tell

9    you how the chips actually work.  He explained it to you.

10   And it is true, he has not read the patents.  Unlike

11   Dr. Almeroth and Dr. Cooklev, he has not read the patents.

12   He just came to tell you how the chips actually work.

13   And even though it's TQ Delta's burden of proof,

14   Dr. Yu's testimony proves that the chips do not infringe TQ

15   Delta's patents.

16   TQ Delta did not even cross-examine him

17   regarding how the chips work.  This is the lead of the team

18   who designed one of the chips and who managed the other

19   chips for ten years.  TQ Delta did not cross-examine him

20   regarding the operation of the chips.

21   We also brought you Dr. Jacobsen to explain how

22   the DSL standard works, and more specifically about these

23   max_delay_octet messages.  As she testified, the standard

24   does not tell the CPE side, the modem side, how much memory

25   to use.  It doesn't tell it the maximum amount of memory to

854

1    use.  It doesn't care.  As long as the modem on the CPE side

2    has the minimum required, it does not care how much more you

3    use.  Indeed as Dr. Jacobsen testified, it does not even

4    report back to the central office how much memory I'm using.

5    Dr. Jacobsen also testified as to her opinion

6    that the patents are invalid.  LB-031, she said, expressly

7    discloses everything in Mr. Tzannes' patents, except it does

8    not expressly disclose shared memory.  But she testified

9    there is only two kinds of memory, shared memory and

10   dedicated memory.

11   You had two choices and as she said, people of

12   ordinary skill in the art at the time knew those were the

13   two choices.  It would have been obvious to use either

14   shared memory or dedicated memory to implement LB-031.

15   I would like to go through the evidence in just

16   a little bit more detail.  This was Ben Miller.  He was the

17   early engineer from 2Wire.  You heard from him.  He talked

18   about 2Wire's award winning DSL modems.  He began before Mr.

19   Tzannes' patents were filed.  And what he said was look,

20   2Wire used to design its own chips, but we sold that

21   division in 2009.  Since then, everything that's relevant to

22   this case, Broadcom.  We buy the chips from Broadcom.

23   These are the claims, you have seen these

24   claims.  I'm going to go through this relatively quickly.

25   This is the receiving of the message.  This is that message

855

1  that you heard so much about.  TQ Delta pins its whole case
2  on the max_delay_octet messages.  Mr. McAndrews said in his
3  opening statement, max_delay_octet, specifying the bytes, in
4  bytes the maximum amount of deinterleaver memory.
5  Mr. Tzannes said, that's what Michael Lund and I invented.
6  And Dr. Cooklev also focused on the max_delay_octet fields
7  of this O-PMS message as the allegedly infringing message.
8          Mr. McAndrews in his opening statement didn't
9  talk so much about the max_delay_octet fields, he talked
10  about (I minus 1) (D minus 1) over 2, different formula.
11  Dr. Jacobsen explained that none of the 2Wire modems receive
12  a message specifying a maximum number of bytes of memory
13  available for either the interleaver or the deinterleaver.
14  She explained what the max_delay_octet message does.  I will
15  not repeat her testimony, but what she said was it can
16  convey information about a minimum amount of memory.
17  Maximum delay conveys information about the
18  minimum amount of memory that you need to have, not maximum
19  memory.
20          TQ Delta has to bowl a strike here.  They have
21  to knock over each one of these pins in order to prove
22  infringement.  If you find that even one of these elements
23  is not met in the accused products, then your verdict should
24  be for 2Wire.  But it's not just the first element that's
25  not met.  We heard evidence about the determining step, the

856

1  next step in each of these claims.  This is what Dr. Yu
2  referred to as the theoretical method.  This is the
3  formulas.  Dr. Cooklev was cross-examined about these
4  formulas.  Remember, he did some tests and in those test, he
5  didn't measure memory for his test, he calculated it.  And
6  he calculated it using a formula, (I minus 1) times (D minus
7  1) over 2.  That was the formula that he used and he got
8  that from the standard.  When he was cross-examined by
9  Mr. Kline, you might remember, he was asked about the
10  formula 3 times MK plus 8 plus (I minus 1) times (D minus 1)
11  over 2.  And what he said is well, Broadcom may be doing it
12  in a proprietary way, and he didn't really provide much
13  testimony about the formula itself.
14          Dr. Yu came yesterday and testified that the
15  formulas that, the Broadcom products use to determine
16  interleaver and deinterleaver memory are not (I minus 1)
17  times (D minus 1) over 2.  There is different formulas for
18  the interleaver side and the deinterleaver side of both of
19  these two chips.  None of those formulas are (I minus 1)
20  times (D minus 1) over 2.
21          And Dr. Yu clearly testified for both chips, for
22  both the interleaver side and the deinterleaver side that
23  the amount of memory in the Broadcom chip is not constrained
24  by these max_delay_octet fields.
25          I went through each of the sides of the two

857

1  chips with him and in all cases, he said they're not
2  constrained by max delay.  We allocate more memory than
3  max_delay_octet.
4          So for that reason, TQ Delta cannot prove that
5  this second step, determining the theoretical memory is met.
6  And the allocating step is important.  This is where the
7  memory is allocated in the physical memory.  Dr. Yu
8  explained that the actual memory allocated in the Broadcom
9  chips again for both chips for both the interleaver and the
10  deinterleaver side exceeds max_delay_octet.  It can exceed
11  max_delay_octet.
12          It's a long formula, he said.  It's essentially
13  physical memory allocated for the hardware.  So they are
14  bigger, not smaller.  They are exact.  This is for the
15  BCM6091 chip.  For that chip the amount they allocate is
16  exactly in the formula, but it's different for the other
17  chip, the BCM61X68.  I asked Dr. Yu, does the chip actually
18  allocate the number that you referred to as the theoretical
19  memory or does it allocate more in the physical memory.
20  More because of how you need overhead on top of theoretical
21  minimum memory.
22          Dr. Almeroth, smart guy, no doubt in the
23  credibility of his testimony, he looked at the code, he did
24  these function traces, but Dr. Yu has explained how they
25  actually work.  Not the theoretical what you can determine

858

1  from looking at the code on a source code computer, this is
2  how they actually work.  What they actually allocate in the
3  physical memory.  And that's a requirement of the claims and
4  a requirement of each of the third element of these claims
5  is that they allocate no more than the maximum amount
6  specified in that message.
7          Now, Mr. McAndrews said and TQ Delta has
8  suggested through the course of this trial that that's just
9  extra memory.  I think Mr. McAndrews referred to as
10  peripheral memory.  I think TQ Delta's position is that
11  doesn't count, you shouldn't focus on the three times MK,
12  that's just extra.
13          But Dr. Cooklev explained that this Z memory, Z
14  bytes, is it needed to interleave the Reed-Solomon coded
15  bytes?  Yes.  And Dr. Yu explained, does the chip allocate
16  the number that you referred to as the theoretical memory or
17  does it allocate more in the physical memory.
18          More, because of how you need the overhead on
19  top of the theoretical minimum.  When you say overhead, is
20  that overhead required to actually do the interleaver on the
21  interleaving side?
22          Yes.  This is part of the interleaver, and the
23  same thing on the deinterleaver side.  And you can't just
24  brush it aside and say, well, that's overhead.
25          This is Dr. Yu's testimony again for

859

1  both sides, the interleaver and the deinterleaver of both of
2  the two Broadcom chips that are at issue in this case.
3         So, again, TQ Delta has to bowl a strike.  They
4  have to prove to you that every single one of these elements
5  are met.
6         And while we don't bear the burden of
7  proof, we would submit that Dr. Yu's testimony, combined
8  with all the other evidence you've heard, establishes that
9  TQ Delta cannot meet that third element.
10        The pizza.  We've heard a lot about
11 the pizza.  It's my fault.  I mentioned in the opening, I
12 said simple example.  Maybe a little too simplistic.  I
13 acknowledge that.
14        I said if I call my wife and ask for
15 two slices of pizza, that's the minimum.  Hopefully she
16 saves me two slices.
17        But if I'm having dinner with Dr. Yu,
18 and I say, Dr. Yu, can you save me two slices of pizza?  Dr.
19 Yu is going to allocate four because that's what he said
20 every one of those Broadcom chips do.  They allocate more
21 than the theoretical minimum.
22        And most importantly, for purposes of
23 the claims in this case, they allocate more than the amount
24 specified in the max_delay_octet fields.  That was his
25 testimony for both chips.

860

1         Dr. Cooklev had this slide that
2  summarized his test.  I won't belabor this point.
3  Dr. Cooklev, the data was fine, but he misinterpreted the
4  data by using this equation.  He didn't actually measure the
5  memory in any of the chips.  He measured the R-PMS message.
6         And from that, he used that formula to
7  calculate what the data in that R-PMS message meant.  But
8  again, cross examination and Dr. Yu's testimony established
9  that that's just not the right formula for any of the
10 products that he tested.  His infringement tests do not
11 prove infringement.
12        I want to move on to the invalidity
13 side of the case.  This is the chronology I put up during my
14 opening statement.  Mazzoni was in 2000.  There's some
15 different dates for Mazzoni, but all those dates are before
16 October 2004 which you heard in the Judge's instructions is
17 the relevant date for Mr. Tzannes' patents.
18        And then LB-031.  You heard
19 Mr. McAndrews say that I acknowledged in my opening
20 statement that the products have shared memory.  I did.
21 They do have shared memory.
22        It's also undisputed in this case that
23 Mazzoni discloses shared memory.  Both the experts agree.
24        Dr. Cooklev, you agree that the
25 Mazzoni reference we have looked at discloses shared memory

861

1  as that term has been construed by the Court for this case:
2  correct?
3         I think, yes.
4         Dr. Jacobsen agreed.  It's not
5  something that you need to trouble yourselves with.  The
6  experts agree shared memory is in the prior art.  That prior
7  art Mazzoni was before October 2004, that important date.
8         And Dr. Jacobsen also testified that
9  shared memory was being discussed at the standards body.
10 Leuven, Belgium, June 14th to 18th, 2004.  We heard a little
11 bit about this Leuven, Belgium meeting.  This is the meeting
12 where Dr. Cory Modlin -- we heard his name.  He's the author
13 of the LB-031 contribution piece of prior art.
14        That's where he contributed that, at
15 the Leuven, Belgium, June 14th to 18th, 2004 meeting.  Mr.
16 Tzannes was there.  He acknowledged it.  About four months
17 later, he filed his patent application, October 2004.
18        LB-031, as Dr. Jacobsen testified, has
19 very similar language to the O-PMS description in the
20 standard itself.  That's because it was part of the process
21 of forming the standard.  This language, the actual amount
22 of required memory is implementation specific.  Almost
23 verbatim, that same language is in LB-031 and in the
24 standard, the VDSL2 standard.
25        Now, TQ Delta disputes that LB-031 is

862

1  prior art that invalidates the patents.  Dr. Cooklev
2  admitted that LB-031 has a messaging scheme, has a messaging
3  scheme that at least discloses exchanging a maximum number
4  of bytes available in each direction: correct?  That's what
5  is being exchanged.  Fine.  That's the max_delay_octet
6  message in VDSL2.
7         I mentioned this already, but
8  Dr. Jacobsen, in considering whether LB-031 discloses to a
9  person of ordinary skill in the art as of October 2004,
10 discloses -- renders obvious all of the elements of TQ Delta
11 claims on this one element that's not expressly disclosed.
12 She said, Well, look, there's only two kinds.  When a person
13 of ordinary skill in the art picks up and reads LB-031, you
14 can do it in either dedicated memory or shared memory.  And
15 importantly, LB-031 does not identify, either.
16        It is true, it does not identify
17 shared memory.  It is equally true, it does not identify
18 dedicated memory.  It's agnostic.
19        Dr. Jacobsen also testified regarding how a
20 person of ordinary skill in the art would have been
21 motivated to combine LB-031 with Mazzoni which is already
22 out there.  And her testimony was about the flexibility.
23        Mazzoni was restrictive.  It had shared memory
24 for interleaver and deinterleaver, but that was fixed.
25 Couldn't adjust which portions were for interleaver or which

863

1  portions were for deinterleaver.  But a person of ordinary
2  skill in the art, she testified would have recognized that
3  you could improve Mazzoni using the messaging scheme of
4  LB-031.
5       I'm going to move on to the certificates of
6  correction.  So there's a lot of typos.  Alleged typos.
7  There's a lot of mistakes across a lot of patent claims.
8       Dr. Jacobsen offered the opinion, Look, when I
9  consider the specification talking about how broad this
10 patent is, how many different ways you can implement the
11 technology in this patent, when I consider the file
12 histories, the filings of the Patent Office to get these
13 patents, and how these patents got made, she offered the
14 opinion that it's not obvious to a person of ordinary skill
15 that these words in the claims as they originally issued
16 were just typos.
17      Dr. Cooklev who's a professor at Purdue,
18 engineering professor testified extensively yesterday that
19 it must just be cut and paste errors.  He's just
20 speculating.  TQ Delta did not bring -- you did not hear
21 from Mr. Vick.  You heard his name yesterday, the attorney
22 who actually wrote these claims.  Instead, Dr. Cooklev
23 speculated this could be cut and paste.
24      I want to conclude by taking you through the
25 verdict form.  There we go.

864

1       It starts on Page 2.  Some of these questions
2  about infringement, if you agree with us that TQ Delta has
3  not proved infringement, you check no in each of these
4  boxes.
5       Claim 5 of the '381 patent is question number
6  one.
7       '882 patent, question number two.
8       Claim 13 of the '882 patent, question number
9  three.
10      And I should clarify there's a lot of numbers on
11 the verdict form.  You've heard product numbers during the
12 course of the case, and you've heard the Broadcom chip
13 numbers.  So these questions are grouped together according
14 to which products go with which Broadcom chip numbers.  So
15 for example, in Section 2, claim 13 of the '882 patent,
16 these are the products that correspond to the BCM6368 and
17 63168 chip sets.
18      Question four, infringement of the '048 patent
19 by the 63168.  If you agree with 2Wire, check no in that
20 box.
21      Claim one of the '048 patent as to the BCM6091
22 chip and the products associated with that, if you agree
23 with us, check no in that box.
24      Before I do the obviousness section, I want to
25 just -- I want to just talk a little bit about why an

865

1  inventor is not entitled to a patent on something that is
2  obvious.  Again, one of the things that Mr. McAndrews and I
3  agree about is the importance of the U.S. patent system.
4  But innovation is actually stifled if patents are issued on
5  obvious things.
6       The way the bargain works is if you come up with
7  something that is not obvious that advances the state of the
8  art, then you get that deed.  You get that piece of
9  property, that intellectual property that gives you that
10 right to exclude people from your property.  But if you
11 don't come up with something that's nonobvious, I know it's
12 a tongue twister, but if you don't come up with something
13 that's nonobvious, you haven't advanced the state of the
14 art, you're not entitled to that patent.  So we agree the
15 patent system is important.  We agree that inventors of new
16 and nonobvious inventions are entitled to that intellectual
17 property, that right to exclude.  But not if what you have
18 invented doesn't advance the state of the art.  You don't
19 get to exclude others for roughly twenty years.
20      So if you agree that the evidence we have
21 presented proves that each of the TQ Delta patents is
22 obvious, then you check the yes box.
23      And there is two choices on the verdict form.
24 You heard about LB-031, the contribution in Leuven, as
25 interpreted by somebody of ordinary skill in the art.  And

866

1  then there is a second question for LB-031 together with the
2  Mazzoni patent, the one that the experts agree discloses the
3  shared memory of the patent claims in this case.
4       So for claim 5 of the '381 patent if you agree
5  with 2Wire, check yes, that claim is invalid.
6       Question 6B is the combination of LB-031 and
7  Mazzoni.  If you agree with us, you check yes for 2Wire.
8       Claim 13 of the '882 patent, this is similar, if
9  you agree the evidence shows that LB-031 renders obvious
10 that claim, you check yes.  If you agree that LB-031 in
11 combination with Mazzoni renders obvious that claim, you
12 check yes.
13      Same two questions for the '048 patent, if you
14 agree with 2Wire on either LB-031 as understood by a person
15 of ordinary skill in the art or LB-031 together with
16 Mazzoni, check yes.
17      The validity of certificates of correction,
18 basically whether it's an obvious typo and a person of
19 ordinary skill in the art would have recognized it as an
20 obvious typo that could have obviously been corrected, 2Wire
21 has presented evidence that it is not obvious testimony,
22 Dr. Jacobsen's testimony, if you agree with us, check yes
23 for each of the two certificates of correction.
24      I want to end by thanking you again for your
25 time this week.  It's a very important case to my client,

**867**

1    2Wire.  And we appreciate your time.

2            Thank you.

3            THE COURT:  All right.  Thank you, Mr. Schuman.

4            Mr. McAndrews.  Do you need any time,

5    Mr. McAndrews, to set things up or are you ready to go?

6            MR. MCANDREWS:  No, I believe we're ready to go.

7    Thank you.

8            THE COURT:  All right.

9            MR. MCANDREWS:  So I get to have a brief moment

10   here to respond to some of that.

11           So in no particular order I want to start with

12   this discussion about a meeting in Belgium that was raised

13   at the end of the day yesterday.  I want to put it up on the

14   board here because Mr. Schuman didn't tell you the whole

15   story.  He didn't explain to you what Mr. Tzannes said after

16   Mr. Tzannes had a chance to say what was going on in the

17   document in Belgium.  If we could pull that up, please.

18           So what you didn't hear from Mr. Schuman was the

19   final answer that was given by Mr. Tzannes which was the

20   most important thing to understand about what went on in

21   Belgium.  I want to explain to you as an initial matter,

22   that's not prior art.  What went on in Belgium, not prior

23   art.  You're not going to find it on the verdict form.  What

24   you're going to find on your verdict form is the two

25   combinations that they presented evidence on in the case,

**868**

1    that's LB-031 in view of the knowledge of ordinary skill in

2    the art and LB-031 and Mazzoni, that was their position.

3    This Belgium thing is not prior art.

4            In any event, I'll tell you why it's not, even

5    if it was prior art, it's not relevant.  Because what

6    Mr. Tzannes said here, and in this document that was shown

7    to Mr. Tzannes, they said aren't there two paths and aren't

8    they sharing memory?  And the answer is yes, that's true,

9    there is two paths and they're sharing memory.  Do you know

10   what that is?  It's two paths in the same direction.  Do you

11   see that?  In the same direction, you have a fast path and a

12   slow path in the same direction.  It's like the figure here,

13   latency path one on the top, we didn't talk at all about the

14   second latency path because it would have added a layer of

15   complexity that's not relevant to the case.  You have a fast

16   path and a slow path.  What that means, if you share memory,

17   if you share memory it shares memory between two

18   interleavers.  It shares memory between two interleavers.

19   But in any event, there are two interleavers going in the

20   same direction, that's not sharing memory between an

21   interleaver and a deinterleaver where there is going to be

22   some coordination required to do that.  It's on the same end

23   of the line.  You don't have to send a message to anybody.

24   It's just like I'm going to share my left pocket with the

25   right pocket, I don't need to tell anybody how I'm going to

**869**

1    do that.  That's all this means.  This is not relevant to

2    the invention.

3            And certainly what you're not going to find in

4    the document because this is how it would work, you're not

5    going to find any discussion of messaging.  There is no

6    memory sharing message at all because there doesn't have to

7    be.  That was a little bit of misdirection I think on their

8    part.

9            I want to talk about LB-031.  They want to make

10   it sound like -- we don't need the slide for this.  They

11   want to make it sound like you got LB-031 and you got two

12   choices, it's a limited number of choices, it might be

13   shared memory, it might be dedicated memory.

14           Well, a skilled engineer is not going to pick,

15   if they got two choices, the skilled engineer is not going

16   to pick the version of that that doesn't work.  A hundred

17   percent of the time they're going to pick the only version

18   of that that works and that's dedicated memory.  They didn't

19   provide any rebuttal, you didn't hear any testimony from

20   anyone on their side of this case explaining how you would

21   make LB-031.  You didn't see anybody stepping through

22   messages the way we did.  They didn't provide any testimony

23   at all but through our testimony that you can't do it.  You

24   have no way to swap memory from the interleaver to the

25   deinterleaver.  From the upstream to the downstream.  There

**870**

1    is no way to do it.  So they're not equal choices.  In fact,

2    there is no choice, there is a single choice with LB-031 and

3    that is you got to use dedicated memory all the time.

4            Now, he mentioned that we didn't cross-examine

5    Dr. Yu who was supposed to provide this earth shattering

6    testimony that never arrived.  We did.  We did cross-examine

7    him.  We kept it short.  We didn't want to belabor it.  And

8    he testified that he wasn't even aware of the patent.  He

9    had never reviewed the claims, so he didn't know what

10   functionality he was trying to compare.

11           The other reason we didn't cross-examine him is

12   because you don't cross-examine somebody and try to

13   discredit them when they support your side of the case.

14   That's what Dr. Yu did.  Why would we try to change his

15   testimony when he confirmed that max_delay_octet and I minus

16   1 D minus 1 over 2 are exactly how much memory is used for

17   the interleaver and the deinterleaver.

18           Yeah, he called it theoretical.  That's a fancy

19   word they wanted to confuse you with.  It's not theoretical.

20   That is exactly how much memory that the product uses for

21   its interleaver and the deinterleaver.  And the remainder of

22   his testimony was that the other memory is being used as

23   overhead.  That's pointers, that's things that are not the

24   interleaver and the deinterleaver number.  That's not the

25   memory that is storing Reed-Solomon coded data.  It's not

871

1  that memory.  You don't even need to store it in the same
2  memory.  We heard testimony that sure it can be stored in
3  the same block of total memory, but it doesn't have to be
4  there.  It can be somewhere else and the reason it can be
5  somewhere else is because it's not the interleaver and
6  deinterleaver memory itself.
7          So I just want to kind of wrap this up here.  I
8  don't think there is any doubt that Mr. Tzannes did advance
9  the state of the art.  2Wire has used hindsight, pieced
10  together some incompatible elements of the prior art and say
11  there it is, you know, someone already did that.  Well, they
12  didn't do that.  What they're doing is using the patent,
13  picking out pieces like they're walking down a shopping
14  aisles and saying this looks like a patent, this looks like
15  a patent, let's put them together in a shopping cart.  They
16  never thought if they went together.  They don't go
17  together.  I'm trying to think of an analogy of two items of
18  food that you would eat at home, but that's not what this
19  is, you pull one off the shelf and pull one off the shelf
20  and try them in a dish and it tastes horrible, it doesn't
21  work.  And that's what they did.  And they used hindsight to
22  do this.
23          THE COURT:  Mr. McAndrews, your time is up.
24          MR. MCANDREWS:  Yes, Your Honor.
25          So they try to trivialize.  They talk about

872

1  pizza and parking lots.  That's not this.  This is complex
2  technology.  They put on superficial witnesses.
3          That's not the evidence that you should rely on.
4  The evidence you should rely on is the specific detailed
5  evidence that we put on showing you lines of source code.
6          They didn't do that.  It's just nothing on their
7  side of the case that tips the scales in their favor, so I'd
8  ask you to return a verdict in favor of TQ Delta.
9          Thank you very much.
10          THE COURT:  Thank you, Mr. McAndrews.  So
11  members of the jury, let me finish up by explaining some
12  things about your deliberations in the jury room and your
13  possible verdicts.
14          Once you start deliberating -- excuse me.
15          Mr. Dorsney, if you don't mind, would you
16  actually mind staying.  I want to talk to you about
17  something when we're done here.
18          So let me finish by explaining some things about
19  your deliberations in the jury room and your possible
20  verdicts.
21          Once you start deliberating, do not talk to the
22  jury officer, or to me, or to anyone else except each other
23  about the case.  If you have any questions or messages, you
24  must write them down on a piece of paper, sign them, and
25  then give them to the jury officer.  The officer will give

873

1  them to me, and I will respond as soon as I can which will
2  probably be slower than you would expect because I will have
3  to talk to the lawyers about what you've asked.  So it may
4  take me some time to get back to you.  Any questions or
5  messages normally should be sent to me through your
6  foreperson who by custom of this Court is Juror Number 1.
7  You.
8          So one more thing about messages.  Do not ever
9  write down or tell anyone how you stand on your votes.  For
10  example, do not write down or tell anyone that you're spit
11  four to 4, six to two, or whatever your vote happens to be.
12  That should stay secret until you're finished.
13          Your verdict must represent the considered
14  judgment of each juror.  In order for you as a jury to
15  return a verdict, it is necessary that each juror agree to
16  the verdict.  Your verdict must be unanimous.
17          It is your duty as jurors to consult with one
18  another and to deliberate with a view towards reaching an
19  agreement if you can do so consistent with your individual
20  judgment.  Each of you must decide the case for yourself,
21  but do so only after an impartial consideration of the
22  evidence with your fellow jurors.  In the course of your
23  deliberations, do not hesitate to reexamine your own views
24  and change your opinion if convinced that it is erroneous.
25  But do not surrender your honest conviction as to the weight

874

1  or effect of the evidence solely because of the opinion of
2  your fellow jurors, or for the purpose of returning a
3  verdict.  Remember at all times that you are not partisans.
4  You are judges of the facts.  Your sole interest is to seek
5  the truth from the evidence in the case.
6          A form of verdict has been prepared for you.
7  You need to answer the questions on the verdict form
8  regarding infringement and invalidity.  You will take this
9  form to the jury room, and when you've reached unanimous
10  agreement as to your verdict, you will have your foreperson
11  fill in, date, and sign the form.  You will then return to
12  the courtroom, and your foreperson will give your verdict.
13          Now that all of the evidence is in and the
14  arguments are completed, you are free to talk about the case
15  in the jury room.  In fact, it is your duty to talk to with
16  each other about the evidence and make every reasonable
17  effort you can to reach unanimous agreement.  Talk with each
18  other.  Listen carefully and respectfully to each other's
19  views, and keep an open mind as you listen to what your
20  fellow jurors have to say.  Try your best to work out your
21  differences.  Do not hesitate to change your mind if you're
22  convinced other jurors are right and that your original
23  position was wrong.
24          But do not ever change your mind just because
25  other jurors see things differently or just to get a case

875

1  over with.  In the end, your vote must be exactly that, your
2  own vote.  It is important for you to reach unanimous
3  agreement, but only if you can do so honestly and in good
4  conscience.
5        No one will be allowed to hear your discussions
6  in the jury room, and no record will be made of what you
7  say.  So you should all feel free to speak your minds.
8        Listen carefully to what the other jurors have
9  to say, and then decide for yourself.
10        During your deliberations, you must not
11  communicate with or provide any information to anyone by any
12  means about the case.  You may not use any electronic device
13  or media such as telephones, smart phones, computer
14  Internet, websites such as Facebook, Instagram, Snapchat,
15  MySpace, LinkedIn, YouTube or Twitter to communicate with
16  anyone any information about this case or to conduct any
17  research about this case until I accept your verdict.  In
18  other words, you cannot talk to anyone on the phone,
19  correspond with anyone, or electronically communicate with
20  anyone about this case.  You can only discuss the case in
21  the jury room with your fellow jurors during deliberations.
22        Now, let me finish up by repeating something
23  that I said to you earlier.  Nothing that I've said or done
24  during this trial was meant to influence your decision in
25  any way.  You must decide the case yourself based on the

876

1  evidence presented.
2        And then the last page is the Claim Construction
3  Order which has the three terms that I've construed that you
4  have to follow.
5        All right.  Are there any objections to the jury
6  instructions as read?
7        MR. MCANDREWS:  No Your Honor.
8        MR. SCHUMAN:  No Your Honor.
9        THE COURT:  All right.  Do we have a court
10  security officer here?
11        (Discussion held off the record:)
12        THE COURT:  So someone is on their way.  All
13  right.
14        So members of the jury, you just have to wait
15  for a minute because I have to swear the court security
16  officer to help hold you in some safe and good place
17  until -- well, while you're deliberating.  Usually they're
18  here, so I'm kind of surprised that no one is here right
19  now.
20        It's an amazing thing.  We have 30 court
21  security officers in the building, and many of them are
22  experienced at doing this, so I'm -- all right.
23        Sir, can you come forward?
24        DEPUTY CLERK:  Do you solemnly swear that you
25  will keep this jury in some quiet and convenient place, that

877

1  you will not suffer anyone to speak to them nor speak to
2  them yourself touching the issue before them unless it be to
3  ask them if they have agreed upon their verdict, so help you
4  God?
5        THE MARSHAL:  I do.
6        DEPUTY CLERK:  Thank you.
7        THE COURT:  All right.  Can you take the jury to
8  the jury room?
9        THE MARSHAL:  Yes, Your Honor.
10        (Jury leaving the courtroom at 10:56 a.m.)
11        THE COURT:  All right.  So you all can be
12  seated.  What I'd like to do is for the plaintiff or whoever
13  has the exhibits or maybe the parties to get them to the
14  Deputy Clerk.  I'd like to see Mr. Dorsney, Mr. McAndrews,
15  and Mr. Farnan in chambers for a minute, which you can come
16  in through this way.
17        I'd appreciate it Mr. Schuman and Mr. Barillare
18  if you, at a minimum, would hang around because I would also
19  like to talk to you about something else.  And I would
20  suggest -- well, I would require that someone make sure that
21  there is a phone number that the clerk can reach you if
22  there's a verdict or a question.
23        If we do have a question, I authorize the clerk
24  to tell you what it is, but that's not for you to delay
25  getting back here.  And I would request that at least for

878

1  the next 15 minutes or so that people hang around here just
2  in case something happens.
3        Okay?  So Mr. McAndrews.  Mr. Dorsney.
4        DEPUTY CLERK:  All rise.
5        (Recess was taken.)
6        COURT CLERK:  All rise.
7        THE COURT:  All right.  Please be seated.
8        So we have a note from the jury sent at what I
9  assume was 12:04, mine says 2:04.  And it says, and I quote,
10  "Please provide the document that was used multiple times
11  outlining all of the claims."
12        I'm not a hundred percent sure which document
13  the jury is talking about.  I'm just curious because do you
14  all actually know?
15        MR. MCANDREWS:  Your Honor, we've spoken, and we
16  don't think we know, but we've been talking about what we
17  think it might be.  It's not any document that we know that
18  really exists in a clean form yet, but we're talking on
19  agreeing on something that just sets the claims side by side
20  plain vanilla.
21        THE COURT:  Yeah.  Okay.
22        So Mr. Schuman, do you have anything to add?
23        MR. SCHUMAN:  I think what they're asking for is
24  a document that's not in evidence, and they may be referring
25  to various demonstratives where I think both Mr. McAndrews

879

1   and I at different times, openings, closings, and with
2   witnesses have displayed.
3           THE COURT:  I mean, it's a thing that has six
4   different products, and somehow it has the chip numbers?  I
5   mean, I'm not saying this is a hundred percent for sure, but
6   aren't they trying to get information that at the last
7   minute we tried to put into the verdict form?
8           MR. SCHUMAN:  My interpretation, Your Honor, of
9   the note is a little bit different.  I think I interpret --
10  and Mr. McAndrews and I were speaking about it briefly -- as
11  if they're asking about the patent claims.
12          THE COURT:  Oh, you mean like the elements?
13          MR. SCHUMAN:  Yeah.  Yes.
14          THE COURT:  Yeah.
15          MR. SCHUMAN:  And I think both Mr. McAndrews and
16  I, whether it's checkmarks, or X's, or highlighting have had
17  various versions of that, but I don't know -- I know that
18  those versions are not in evidence, and I don't know that
19  there's a clean version without somebody's highlighting or
20  checkmarks.
21          THE COURT:  Well, I would be pretty confident
22  that the -- if you're right about what they're asking for,
23  that it's not in evidence.
24          And Mr. McAndrews, this probably is unimportant
25  really, but what do you think they're asking for?  I mean,

880

1   recognizing that you don't have to be a hundred percent
2   certain, but what's the thing what do you think most likely
3   they're asking for?
4           MR. MCANDREWS:  Well, when I came into the
5   courtroom, Mr. Schuman had a document on his phone, and it's
6   just the claims listed, the three of them side by side.  I
7   looked at it.  We kind of agreed that that might be what
8   they're looking for.
9           THE COURT:  Okay.
10          MR. MCANDREWS:  As long as it's cleaned up,
11  there's no checkmarks, and there's no indication of who's
12  providing it.
13          THE COURT:  Well, I take it -- because one thing
14  that one could do is just say, Sorry, it's not in evidence.
15  Good luck.  But I think that if there were a way to provide
16  them what we think they're asking for in a fashion that has
17  no prejudice towards either side, that might actually be
18  helpful to their deliberations.
19          So is that what you want to do is basically
20  find -- you know, print out -- I mean, if Mr. Schuman has it
21  on his phone, we can always print it here.  Is that what you
22  want to do is, assume what it is most likely that they're
23  asking for, send them back the thing in vanilla, and wait
24  around to see if they were actually asking about something
25  else, figuring that at worst, sending them what we think

881

1   they're asking for, has no harmful effect?
2           MR. MCANDREWS:  We're certainly okay with that,
3   Your Honor.
4           MR. SCHUMAN:  We would be as well.
5           THE COURT:  Okay.  I was trying to summarize
6   what I thought you all were talking about.  But I'm
7   perfectly happy to do that if there's agreement on both
8   sides.
9           And if you want to spend some more time looking
10  at Mr. Schuman's phone or otherwise provide -- I mean, I
11  thought in the demonstratives -- I guess the problem with
12  the demonstratives is they all had headings and things, and
13  presumably you've already taken down all of your computer
14  capability.
15          All right.  Well, why don't we -- I told them it
16  would take a while to get back to something.  Why don't you
17  see if you can come up with such a document.  And if so, I
18  will essentially paperclip it to this and just send it back.
19          That's agreeable?
20          MR. SCHUMAN:  Yes, Your Honor.
21          MR. MCANDREWS:  Yes, Your Honor.
22          THE COURT:  Well, I guess when you've got such a
23  document or if you want to email it to the Deputy Clerk,
24  have her print it out and attach it.  We can do that, too.
25  But I guess until you give me such a document, there's not

882

1   much to be done; right?
2           MR. SCHUMAN:  Right.
3           MR. MCANDREWS:  Right.
4           MR. SCHUMAN:  Thank you, Your Honor.
5           THE CLERK:  All rise.
6           (Recess was taken.)
7           THE CLERK:  All rise.
8           THE COURT:  All right.  You can be seated.  Even
9   though I'm out here, we're not really going to do anything
10  until somebody shows up for the plaintiff.  But it seems to
11  be -- well, in any event.  We don't need to have this on the
12  record.
13          (Plaintiff's counsel entered the courtroom.)
14          THE COURT:  Are you ready?
15          MR. FARNAN:  Can we wait two more minutes?
16  Mr. Prange is right behind us.  Sorry.
17          THE COURT:  Okay.
18          (Mr. Prange entered the courtroom.)
19          MR. FARNAN:  All right, Your Honor.
20          THE COURT:  Okay.  All right.  Let's get the
21  jury.
22          (Jury entering the courtroom at 3:46 p.m. )
23          THE COURT:  Members of the jury, welcome back.
24  Mr. Foreperson, has the jury unanimously agreed upon the
25  verdicts?

883

1    THE JUROR:  Yes.

2    THE COURT:  All right.  I'm going to ask the

3  Deputy Clerk to go over and get the verdict form from the

4  foreperson.

5    All right.  Could we -- oh, I'm sorry.  Everyone

6  can be seated.

7    So I'm going to ask the Deputy Clerk to publish

8  the verdict which essentially means to read it out loud.

9  It's possible that you could be asked when she's done

10 whether you individually agree with the verdict as read, so

11 please listen carefully so that you hear what she's reading.

12   All right.  Go ahead, please.

13   DEPUTY CLERK:  The verdict reads:  Has TQ Delta

14 proven by a preponderance of the evidence that 2Wire

15 infringed corrected claim 5 of the '381 patent by making,

16 selling, and/or offering to sell the product model numbers

17 5031NV, 5168NV, 5168N and 5268AC?

18   Answer:  Yes.

19   Has TQ Delta proven by a preponderance of the

20 evidence that 2Wire infringed corrected claim 13 of the '882

21 patent by making, selling, and/or offering to sell its

22 product model numbers 5031NV, 5168NV, 5168N, and 5268AC?

23   Answer:  Yes.

24   Has TQ Delta proven by a preponderance of the

25 evidence that 2Wire infringed corrected claim 13 of the '882

884

1  patent by making, selling, and/or offering to sell its

2  product model numbers i3812V and 3801HGV?

3    Answer:  Yes.

4    Has TQ Delta proven by a preponderance of the

5  evidence that 2Wire infringed claim 1 of the '048 patent by

6  making, selling, and/or offering to sell its product model

7  numbers 5031NV, 5168NV, 5168N, and 5268AC?

8    Answer:  Yes.

9    Has TQ Delta proven by a preponderance of the

10 evidence that 2Wire infringed claim 1 of the '048 patent by

11 making, selling, and/or offering to sell the product model

12 numbers i3812V and 3801HGV?

13   Answer:  Yes.

14   Has 2Wire proven by clear and convincing

15 evidence that claim 5 of the '381 patent is invalid as

16 obvious in view of the disclosure of LB-031 as understood by

17 a person of ordinary skill in the art?

18   Answer:  No.

19   The disclosure of LB-031 in combination with the

20 disclosure of Mazzoni?

21   Answer:  No.

22   Has 2Wire proven by clear and convincing

23 evidence that claim 13 of the '882 patent is invalid as

24 obvious in view of the disclosure of LB-031 as understood by

25 a person of ordinary skill in the art?

885

1    Answer:  No.

2    The disclosure of LB-031 in combination with the

3  disclosure of Mazzoni?

4    Answer:  No.

5    Has 2Wire proven by clear and convincing

6  evidence that claim 1 of the '048 patent is invalid as

7  obvious in view of the disclosure of LB-031 as understood by

8  a person of ordinary skill in the art?

9    Answer:  No.

10   The disclosure of LB-031 in combination with the

11 disclosure of Mazzoni?

12   Answer:  No.

13   Has 2Wire proven by clear and convincing

14 evidence that the error in claim 5 of the '381 patent was

15 not clearly evident to a person of ordinary skill in the art

16 or that the correction of that error would not have been

17 clearly evident to a person of ordinary skill in the art?

18   Answer:  No.

19   Has 2Wire proven by clear and convincing

20 evidence that the error in claim 13 of the '882 patent was

21 not clearly evident to a person of ordinary skill in the art

22 or that the correction of that error would not have been

23 clearly evident to a person of ordinary skill in the art?

24   Answer:  No.

25   THE COURT:  All right.  Thank you.

886

1    Are there any requests from the parties?

2    MR. SCHUMAN:  No, Your Honor.

3    MR. MCANDREWS:  No, Your Honor.

4    THE COURT:  All right.  So members of the jury,

5  that concludes your service in this case.  And so in a

6  moment, I'm going to excuse you, and you'll be taken out.

7    I know it's late in the day.  I plan to come

8  back within a minute to thank you personally, but if you're

9  in a hurry to get somewhere else, don't hang around for me.

10 But I will be back there if you are still there.

11   All right.  So if you want to take the jury out,

12 please.

13   (Jury leaving the courtroom at 3:52 p.m.)

14   THE COURT:  All right.  So I will enter a trial

15 verdict that reflects the verdict that's just been read.

16   And is there anything further today?

17   MR. MCANDREWS:  No, Your Honor.

18   MR. SCHUMAN:  No, Your Honor.

19   THE COURT:  All right.  Well, thank you very

20 much for your time and attendance this week, and your

21 professionalism in presenting your cases in the time that we

22 had.  And I will be seeing you all down the road.

23   THE CLERK:  All rise.

24   (Court was recessed at 3:53 p.m.)

25