# THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| TQ Delta, LLC,<br>　　*Plaintiff*,<br><br>v.<br><br>CommScope Holding Company, Inc., *et al.*,<br>　　*Defendants*. | Civil Action No.: 2:21-CV-00310-JRG<br><br>JURY TRIAL DEMANDED |

# TQ DELTA, LLC'S
# RESPONSE TO COMMSCOPE'S MOTION FOR PARTIAL SUMMARY
# JUDGMENT TO LIMIT DAMAGES BASED ON 35 U.S.C. § 286 (DKT. 340)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

I. INTRODUCTION ................................................................................................................ 1

II. RESPONSE TO THE STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT ................................................................................................................................ 2

III. RESPONSE TO STATEMENTS OF UNDISPUTED MATERIAL FACTS ..................... 2

IV. APPLICABLE LAW ............................................................................................................ 2

V. ARGUMENT ........................................................................................................................ 3

    A. There Is Sufficient Evidence Of Acts Of Direct Infringement By Defendant's Customers ................................................................................................................... 3

        1. Defendant's Customers Have Used The Products ...................................... 3

        2. Defendant's Customers' Use Was An Act Of Direct Infringement Under Section 271(a) ............................................................................................... 6

    B. There Is Sufficient Evidence Of Defendant's Indirect Infringement ....................... 12

VI. CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*
    501 F.3d 1307 (Fed. Cir. 2007) ............................................................................................. 7

*Allergan Sales, LLC v. Sandoz, Inc.*
    211 F. Supp. 3d 907 (E.D. Tex. 2016) .................................................................................... 2

*Centillion Data Sys., LLC v. Qwest Communs. Int'l*
    631 F.3d 1279 (Fed. Cir. 2011) ............................................................................................. 6

*Fujitsu Ltd. v. Netgear Inc.*
    620 F.3d 1321 (Fed. Cir. 2010) ......................................................................................... 6, 8

*Moleculon Research Corp. v. CBS, Inc.*
    793 F.2d 1261 (Fed. Cir. 1986) ............................................................................................. 2

*NTP, Inc. v. Research in Motion, Ltd.*
    418 F.3d 1282 (Fed. Cir. 2005) ............................................................................................. 7

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*
    843 F.3d 1315 (Fed. Cir. 2016) ........................................................................................... 12

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*
    30 F.4th 1109 (Fed. Cir. 2022) ............................................................................................ 13

*Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*
    754 F.2d 345 (Fed. Cir. 1985) ............................................................................................. 13

*Sysmex Corp. v. Beckman Coulter, Inc*
    Civil Action No. 19-1642-JFB-CJB, 2022 U.S. Dist. LEXIS 97623
    (D. Del. May 26, 2022) .................................................................................................. 1, 13

*Tinnus Enters., LLC v. Telebrands Corp.*
    846 F.3d 1190 (Fed. Cir. 2017) ............................................................................................. 2

*Vita-Mix Corp. v. Basic Holding, Inc.*
    581 F.3d 1317 (Fed. Cir. 2009) ............................................................................................. 7

*Warner-Lambert Co. v. Apotex Corp.*
    316 F.3d 1348 (Fed. Cir. 2003) ......................................................................................... 6, 7

**I.      INTRODUCTION**

The Court should deny Defendant's Motion. TQ Delta's damages model complies with Section 286. TQ Delta's model accounts for the full scope of Defendant's infringement during the damages period: both Defendant's (1) <u>direct</u> infringement during the period (*i.e.*, after August 13, 2015) and its (2) <u>indirect</u> infringement—during the damages period—for products sold prior to August 13, 2015 that continued to be used by Defendant's customers (and thus directly infringed). That Section 271 provides for different types of infringement does not "circumvent" Section 286. Mot. at 1. TQ Delta's model simply accounts for <u>all</u> of Defendant's infringement during the damages period, not just its acts of direct infringement. *See, e.g.*, *Sysmex Corp. v. Beckman Coulter, Inc.*, Civil Action No. 19-1642-JFB-CJB, 2022 U.S. Dist. LEXIS 97623, at *34 n.11 (D. Del. May 26, 2022) (denying summary judgment of no induced infringement because the patentee "seeks damages for acts of inducement that occurred after the damages period began to run," even though the defendant sold the products prior to that date).

While couched in terms of Section 286, Defendant's motion is really a challenge to TQ Delta's indirect infringement claim for pre-August 15, 2015 sales. And there is at least a genuine issue of material fact on that issue. As to the underlying direct infringement, there is substantial evidence that Defendant's customers, such as AT&T, have used Defendant's products—DSL modems with multi-year life spans that are supported with repairs and software updates—in the damages period, including those sold before August 13, 2015. That use is an infringing act under Section 271(a). There is likewise substantial evidence that Defendant, including after August 13, 2015, committed acts of indirect infringement under of Section 271(b) and/or (c).

Defendant's chief complaint is an evidentiary one: that "everything TQ Delta relies on is circumstantial evidence." Mot. at 6. That argument is legally flawed. "A patentee is entitled to rely on circumstantial evidence to establish infringement: 'If [Defendant] is arguing that proof of

1

inducing infringement or direct infringement requires direct, as opposed to circumstantial evidence, we must disagree. It is hornbook law that direct evidence of a fact is not necessary.'" *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1204 (Fed. Cir. 2017) (quoting *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986)). In this case, the evidence illustrates that TQ Delta is entitled to have a jury hear all of its inducement claims.

## II.   RESPONSE TO STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

Whether there is sufficient evidence of a genuine issue of material fact for a jury to consider all of TQ Delta's indirect infringement claims.

## III.   RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Admitted.
2. Denied.
3. Admitted.
4. Admitted.
5. Denied.
6. Denied.
7. Denied.
8. Denied.
9. Denied.
10. Denied.
11. Admitted.

## IV.   APPLICABLE LAW

This Court is familiar with the summary-judgment legal standards in the context of motions for summary judgment of no induced infringement. *See, e.g.*, *Allergan Sales, LLC v. Sandoz, Inc.*, 211 F. Supp. 3d 907, 914, 921–32 (E.D. Tex. 2016).

V.     ARGUMENT

   A.   **There Is Sufficient Evidence Of Acts Of Direct Infringement By Defendant's Customers**

      1.   **Defendant's Customers Have Used The Products**

There is substantial evidence that Defendant's DSL products sold prior to August 13, 2015 were being used after that date. The first sales of the accused 5031, 5168, 5268, NVG589, and NVG599 products were in ▮▮▮▮▮ period, depending on the model. *See* Dkt. 340-2 at 11 (Schedule A-2). Defendant designs its products for a ▮▮▮▮▮. Baker Depo. (Exh. 1) at 25:3–26:11. The NVG589 and NVG599 products tended to have ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ *Id.* at 26:1–11.

▮▮▮▮▮ From this evidence, a reasonable jury could return a verdict of induced infringement.

3

Despite this evidence, Defendant claims that "TQ Delta has no evidence from which it can show that the service providers themselves used the DSL CPE products sold *prior* to 2015 during the *post*-2015 damages period," speculates that all of the products could be "sitting in a warehouse or truck or in an end user's home, unused in a box," and argues that there is no evidence that the products "were ever provided to end-users." Mot. at 8 (emphasis in original).[1]

Defendant's positions defy commonsense. They are also wrong. In addition to the evidence above, ample evidence supports TQ Delta's claims, including documents Defendant withheld until the last days of fact discovery (and after the relevant depositions),[2] shows that units sold before August 15, 2015 remained deployed after that date.

As one example, in a presentation containing June 2016 data Defendant (then known as ARRIS) identified approximately ▮▮▮ at that time (the "Installed Base") (COMMSCOPE068829 (attached as Exh. 4) at 25—▮▮▮



---

[1] All emphases are supplied unless otherwise noted.

[2] Fact discovery closed on August 19, 2022 after being extended four days. Dkt. No. 249. On August 15, CommScope had produced only 52,517 pages of documents. On the last two days of discovery (*i.e.*, Aug. 18 and 19), CommScope produced 19,590 pages (37% more). After the close of fact discovery, CommScope has since produced an additional 56,541 pages.

4

According to own Defendant's data, there were ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Dkt. 340-2 at 11 (Schedule A-2). Thus, it stands to reason that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇ These numbers reflect a common-sense reality: if ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ that product will likely be in use a few years after the purchase.

Indeed, even as recent as ▇▇▇▇▇▇, Defendant's internal presentations show that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (COMMSCOPE046235 (attached as Exh. 5) at 57).



This evidence is also consistent with the deposition testimony about the products' lifespan.

---

[3] The document indicates that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Defendant's data shows that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Dkt. 340-2 at 11 (Schedule A-2). The difference is over ▇▇▇▇▇▇▇.

5

The last significant sales to ▓ of the 5031, 5168, 5268, NVG589, and NVG599 appear to be from ▓. *See* Dkt. 340-2 at 11 (Schedule A-2). Five-plus years later, ▓ of those devices are still deployed in ▓ network—even though, according to Defendant, ▓ ▓ Baker Depo. (Exh. 1) at 80:1–19. Defendant's claim that there is "no evidence" products sold before August 13, 2015 were used after August 13, 2015 is untrue.

## 2. Defendant's Customers' Use Was An Act Of Direct Infringement Under Section 271(a)

The use detailed above was an infringing "use" under Section 271(a). The asserted claims are system claims, and "to 'use' a system for purposes of infringement, a party must put the invention into service, i.e., control the system as a whole and obtain benefit from it." *Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1284 (Fed. Cir. 2011).

Defendant's customers put the invention into service, *i.e.*, they controlled Defendant's products as a whole in their networks and obtain the benefit from deploying those products. The end-users likewise use the connected products. As detailed above, Defendant's own evidence shows that it was more likely than not that products sold prior to August 13, 2015 remained deployed after August 13, 2015. Putting those products into service was an infringing use.

Defendant argues noninfringement because it claims that "the Accused Products can be, and in many cases are, used in non-DSL configurations" and there is no evidence that the products are deployed using a DSL service. Mot. at 8. This is legally irrelevant and factually incorrect.

The Law. Defendant improperly rewrites TQ Delta's system claims drawn to device capabilities as method claims reciting a series of steps. The *Fujitsu*, *Warner-Lambert*, and *Vita-Mix* cases on which Defendant's relies do not apply because all of them involved method claims,[4]

---

[4] *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010) ("The only independent claim describes a method for segmenting and transmitting a message."); *Warner-Lambert Co. v. Apotex*

6

which require performance of each method step to show direct infringement. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005). Direct infringement of TQ Delta's claims instead requires putting into service a device "capable of,"[5] "configurable to,"[6] or "operable to"[7] to provide certain functionality. *Centillion*, 631 F.3d at 1284 ("[D]irect infringement by 'use' of a system claim 'requires a party . . . to use each and every . . . element of a claimed [system].'").

Defendant rewrites this language out of the claims when it asserts that TQ Delta must show that the products were actually providing DSL service. The law does not require that.[8]

The *ACCO Brands* case that Defendant's cite is not the contrary. There, the claim required a locking system that contained a specific "pin," "security slot," and "slot engagement member" structure: the "pin" must "extend through the security slot after the slot engagement member is rotated to its locked position, thus prohibiting rotation into its unlocked position." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1310 (Fed. Cir. 2007). The accused product in *ACCO*

---

*Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003) ("[W]e note that there is no evidence in the record that Apotex has directly practiced or will ever practice any of the methods claimed in the neurodegenerative method patent, all of which are directed to a method for treating neurodegenerative diseases by administering gabapentin or another cyclic amino acid compound to a mammal."); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 (Fed. Cir. 2009) ("It is undisputedly possible to use the accused device as directed without ever practicing the claimed method.").

[5] *E.g.*, '048 Patent (Dkt. 1-5) at claim 5; '008 Patent (Dkt. 1-4) at claim 14; '411 Patent (Dkt. 1-7) at claims 11 and 14; '809 Patent (Dkt. 1-13) at claim 13).

[6] *E.g.*, '835 Patent (Dkt. 1-6) at claim 10. The Court construed "configurable to" as "able to be configured." Dkt. 169 at 23.

[7] *E.g.*, '354 Patent (Dkt. 1-10) at claim 10. The Court construed "operable to" as "configured to." Dkt. 169 at 23.

[8] Indeed, Defendants represented at the *Markman* hearing that "they will not argue that Plaintiff must prove that the accused devices are taken out of their packaging, plugged in, and turned on, but Defendants explained that they are arguing that the functionality must actually be built into the device." Dkt. 169 at 17.

7

*Brands* "could essentially be operated in two ways" to manipulate the lock's structure, one that met the specific "pin" structure (and thus infringed) and one that did not meet the "pin" structure (and thus did not infringe). *Id.* at 1310–1311. The only evidence of the infringing "pin" structure ever being completed was the patentee's expert's use of the lock; the defendant's customer materials only directed customers to implement the noninfringing structure. *Id.* at 1313. Because the patentee failed to show (1) specific instances in which customers used the infringing structure or (2) or that the accused device necessarily infringed the patent, the Court concluded that the patentee failed to prove induced infringement as a matter of law. *Id.*

This case is not *ACCO Brands*. Defendant's Motion does not contest that the accused products meet the elements of the asserted claims, *e.g.*, they are "capable of," "configurable to," and "operable to" perform the functionality of the asserted claims. There is thus no "noninfringing mode" of the accused products as there was in *ACCO Brands*. There are instead (1) specific instances of direct infringement (*e.g.*, the pre-August 13, 2015 devices that remained in the field after that date) and (2) it is the case that the accused products necessarily infringe given that they have the claimed DSL functionality programmed into the device. *Cf. Fujitsu*, 620 F.3d at 1329 ("Unless the claim language only requires the capacity to perform a particular claim element, we have held that it is not enough to simply show that a product is capable of infringement . . . .").

The Facts. Even if Defendant is correct that direct infringement requires proof that the products were providing DSL service, there is substantial evidence of that fact. These products were largely designed for AT&T to provide DSL service. Defendant calls the products ▇▇▇ products and lists ▇▇▇ in the model number (COMMSCOPE016571 (Exh. 2) at 1).

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



. Cooklev Opening Report (Exh. 6) at ¶¶ 649–652, 852, 885 (collecting ▓▓▓ evidence).⁹ Defendant's witnesses relied on ▓▓▓ DSL requirements to testify about how ▓▓▓ actually uses Defendant's products in the field. *See, e.g.*, Wauters Depo. (Exh. 3) at 105:19–106:8 ("▓▓▓"); Baker Depo. (Exh. 1) at 29:17–20 ("▓▓▓.").

From this evidence, a reasonable jury could conclude that the pre-August 13, 2015 accused products—which were ▓▓▓ and are called DSL products—were used for DSL service after that date. Indeed, according to Defendant's witness, a large portion of ▓▓▓ network is served by DSL. Wauters Depo. (Exh. 3) at 49:25–51:14.

While Defendant now claims that some[10] devices <u>could</u> be used for non-DSL services only (*i.e.*, a WiFi router connected to a fiber optic connection), Mot. 8–9, its Motion does not identify a single pre-August 13, 2015 product deployed that way. Defendant's witness was also unable to indicate how many devices—whether the pre-August 13, 2015 models or others—have actually been used as WiFi-only routers in a fiber optic connection (Wauters Depo. (Exh. 3) at 102:1–5):

---

⁹ *See also* Wauters Depo. (Exh. 3) at 61:24–62:21 ( ▓▓▓ ").

[10] Defendant does not allege that the 5031 product is fiber-optic capable. *See* Mot. at SUMF #5.

9

██████████████████████████████████████

██████████████████████████████████████

The evidence, however, shows that it was unlikely that Defendant's customers would repurpose the pre-August 13, 2015 products in this fashion—it would make little sense to connect a slow, obsolete DSL WiFi router to a fast fiberoptic service.[11]  The more likely use, based on the evidence, is that Defendant's customers would continue to use the products for DSL service, though perhaps for a slower, lower-tier service.  For example, Defendant's ████████████ ████████████████████████████████████████████████████████████████████████

████████████████   COMMSCOPE016571 (Exh. 2).  Defendant's witness explained that ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

Moreover, Defendant's documents show that its products continued ████████████

---

[11] The products became obsolete, in part, due to ████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

10

████. For example, the same ██████ presentation discussed above in connection with the ████████████████████████████████████████████████████. COMMSCOPE068829 (Exh. 4) at 11. Another presentation from the same ████████ period also shows that ████████████████████████████████████. COMMSCOPE068652 (Exh. 7) at 12. That presentation contains ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ *Id.* (highlighting added, image truncated).



These are DSL service parameters—and the document does not discuss using DSL products as WiFi routers connected to a fiber optic service. A DSLAM line-card, as Defendant's witness explained, refers to DSL equipment: ████████████████

████████████████████████████████████████

████████████████████████████████ Baker Depo. (Exh. 1) at 59:19–24; *see also* Cooklev Report (Exh. 6) at ¶ 279 (discussing DSLAM).

Similarly, "loop length" and "service profile" refers to DSL service—the length of the telephone wire "loop" and the type of VDSL2 profile, respectively. These facts are reflected in the VDSL2 testing of Defendant's product that TQ Delta's technical expert (Dr. Cooklev) directed,

11

showing a 500-meter loop and a VDSL2 profile known as 17a (Cooklev Report at pp. 849 and 831) (highlighting added, images truncated).

|  | Original |
|---|---|
|  | Value |
| VTU-O | Alcatel 7330 EVLT-N FLXTGS14340E20 |
| VTU-R | Pace5168NV 451319031306 |
| Loop | 500m |
| Comment | -140dBm/Hz 072822 082330 |

**TABLE 1: ALCATEL NOKIA 7330 ISAM CONFIGURATION PARAMETER SETTING**

| PARAMETER | SETTING |
|---|---|
| All parameters but those specified below | Default Value |
| XTSE | G.993.2 Annex A |
| Profile | 17a |
| Limit PSD Mask | Default |

\*   \*   \*   \*   \*

In sum, there is sufficient evidence of direct infringement by Defendant's customers.

**B.     There Is Sufficient Evidence Of Defendant's Indirect Infringement**

There is also sufficient evidence of indirect infringement during the damages period. Dr. Cooklev recounts much of that evidence in his expert report, including installation and administrative guides, customer training, services and support, software upgrades, firmware updates, and working with customers such as AT&T on the accused products. Cooklev Report (Exh. 6) at ¶¶ 1257–1265. This is the type of evidence that courts have found sufficient. The Federal Circuit has "affirmed induced infringement verdicts based on circumstantial evidence of inducement (e.g., advertisements, user manuals) directed to a class of direct infringers (e.g., customers, end users) without requiring hard proof that any individual third-party direct infringer was actually persuaded to infringe by that material." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1335 (Fed. Cir. 2016) (collecting authority). And Defendant is not even challenging this evidence as it relates to TQ Delta's inducement claims for products sold after August 13, 2015.

Defendant instead argues that TQ Delta's inducement theory for pre-August 13, 2015 sales is barred by *Roche* and *Standard Oil*. Mot at 4–5, 10. In those cases, however, <u>all</u> alleged acts of indirect infringement occurred <u>prior</u> to the damages period:[12] "In *Roche*, the Federal Circuit reversed the jury's verdict of induced infringement where all of the acts of inducement occurred before the damages period began to run." *Sysmex Corp.*, 2022 U.S. Dist. LEXIS 97623, at *34 n.11 (D. Del. May 26, 2022). But when a party "seeks damages for acts of inducement that occurred after the damages period began to run," that authority does not apply. *Id*.

This case is similar to *Sysmex*. There, the patentee asserted that the defendant "indirectly infringes the asserted patents with respect to the installed base (i.e., equipment that may have been itself sold prior to patent issuance)" as a result of the defendant's post-issuance activities, such as "providing training and instruction manuals to customers[.]" *Sysmex*, 2022 U.S. Dist. LEXIS 97623, at *30. That is analogous to TQ Delta's theory here: TQ Delta seeks to recover damages with respect to the products sold prior to August 13, 2015 (the "Installed Base") based on Defendant's activity after August 13, 2015, including providing training and instruction manuals to customers, firmware update, and repairs.

Like Defendant here, the *Sysmex* defendant argued at summary judgment that *Roche* "'directly supports' its argument that it cannot infringe the asserted patents based on its activity associated with the installed base." 2022 U.S. Dist. LEXIS 97623, at *34 n.11. The Court disagreed because, unlike *Roche*, the patentee sought damages for "acts of inducement that occurred after the damages period began to run." *Id.* The same reasoning applies here.

There is significant evidence of indirect infringement that occurred after August 13, 2015.

---

[12] *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 347 (Fed. Cir. 1985); *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1120 (Fed. Cir. 2022).

13

In addition to the evidence reproduced above, for example, Defendant [REDACTED]. Wauters Depo. (Exh. 3) at 25:11–27:23, 33:6–14 (discussing weekly meetings [REDACTED] T); *id.* at 72:18–73:8 (testifying that CommScope's Senior VP of Key Account Management for North America attended more than five meetings with [REDACTED]); COMMSCOPE068829 (Exh. 4) ("[REDACTED]" presentation).

Defendant provided [REDACTED]. *See, e.g.*, Baker Depo. (Exh. 1) at 60:22–65:16 ([REDACTED]); *id.* at 64:2–19 ([REDACTED]); Salazar Depo. (Exh. 8) at 42:15–43:21 ([REDACTED]) COMMSCOPE016571 (Exh. 2) at 2 ([REDACTED]) [REDACTED]); (COMMSCOPE068829 (Exh. 4) at 25 ([REDACTED]); COMMSCOPE068964 (Exh. 9) at 4 ([REDACTED]). These acts induced Defendant's customers to use the products (a violation under Section 271(b)) as well as contributed to infringement by providing the DSL software and hardware components that resulted in an infringing device (a violation under Section 271(c)).

Defendant claims that this evidence is insufficient to show intent that the product subsequently provides DSL service. Mot. at 5, 9, 10–11. That is incorrect for two reasons. First,



14

as detailed above, the Defendant's customers' deployment of the products—whether actively providing DSL service or not—is an infringing use. There is thus sufficient evidence that Defendant specifically intends its customers to deploy Defendant's products in response to Defendant's actions, such as deploying products receiving a software update or a repaired product.

But even if Defendant is correct that a specific intent to activate a DSL service is required, the record contains that proof as well. For example, Defendant's documents show that, ▮

▮

▮ COMMSCOPE068529 (Exh. 10) at 29. Fixing those problems and encouraging the customer to deploy the repaired product is evidence that Defendant specifically intended its customer activate the DSL functionality in that product. As another example, Defendant's software releases around the same period added ▮ COMMSCOPE068964 (Exh. 9) at 6, 8, 9. ▮ is a DSL functionality (it uses seamless rate adaptation in VDSL2). Cooklev Report (Exh. 6) at ¶¶ 784–785. Adding that feature to a software update and then deploying it to Defendant's customers similarly shows a specific intent for the customers to activate the DSL functionality in the software release.

This evidence, in total, shows that there is at least a genuine issue of material fact regarding Defendant's indirect infringement for products sold prior to August 13, 2015 and then used after that date. As a result, TQ Delta respectfully requests that the Court allow TQ Delta to present its full indirect infringement case to the jury and deny Defendant's Motion.

## VI. CONCLUSION

For the foregoing reasons, TQ Delta requests that the Court deny Defendant's Motion.

Dated: January 6, 2023

Respectfully Submitted,

/s/ Christian J. Hurt

William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com

Christian J. Hurt
Texas State Bar No. 24059987
churt@davisfirm.com

Rudolph "Rudy" Fink IV
Texas State Bar No. 24082997
rfink@davisfirm.com

Edward Chin
Texas State Bar No. 50511688
echin@davisfirm.com

Ty Wilson
Texas State Bar No. 24106583
twilson@davisfirm.com

**THE DAVIS FIRM PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661

Peter J. McAndrews
(Pro hac vice)
pmcandrews@mcandrews-ip.com

Rajendra A. Chiplunkar
(Pro hac vice)
rchiplunkar@mcandrews-ip.com

Ashley Ratycz (admitted *pro hac vice*)
aratycz@mcandrews-ip.com

**MCANDREWS, HELD & MALLOY, LTD.**
500 West Madison St., 34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100

**ATTORNEYS FOR PLAINTIFF
TQ DELTA, LLC**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document and all attachments thereto are being filed electronically in compliance with Local Rule CV-5(a). As such, this document is being served this January 6, 2023 on all counsel of record, each of whom is deemed to have consented to electronic service. L.R. CV-5(a)(3)(A).

/s/ Christian Hurt
Christian Hurt

17