# EXHIBIT 6

**DAVIS**
FIRM P.C.

**Bo Davis**

*Local. Strategic. Dedicated. Driven.*

March 10, 2022

**Via Electronic Mail**

Brett Schuman
Goodwin Procter LLP
Three Embarcadero Center, 28th Floor
San Francisco, CA 94111
bschuman@goodwinlaw.com

Re:    **CommScope's Production of Relevant Documents**
*TQ Delta, LLC v CommScope Holdings Company, Inc., et al.*; 2:21-cv-310-JRG (E.D. Tex.) (Lead Case)
*TQ Delta, LLC v. Nokia Corp., et al.;* 2:21-cv-309-JRG (E.D. Tex.) (Member Case)

Dear Counsel:

    I write on behalf of Plaintiff TQ Delta, LLC ("TQD") regarding the production of documents in the above-captioned cases. TQD hereby requests that Defendants CommScope Holding Company, Inc., CommScope Inc., ARRIS International Limited, ARRIS Global Ltd., ARRIS US Holdings, Inc., ARRIS Solutions, Inc., ARRIS Technology, Inc., and ARRIS Enterprises, LLC (together, "Defendants" or individually "You," or "Your") produce specific categories of documents as part of their duty, under paragraph 3(c) of the Court's Discovery Order, to produce all documents, electronically stored information, and tangible things in their possession, custody, or control that are relevant to the pleaded claims or defenses involved in the above-captioned actions.

    Below, we set forth specific categories of documents that we consider relevant to this case and in need of production. The following list is not meant to be exhaustive of Defendants' disclosure obligation but a starting point for Defendants' duty to produce all relevant documents.

    Please include the categories of documents listed below in your production to cover the period, unless otherwise stated, beginning from the date of first commercialization of each Accused Product up to the present.

**Definitions**

    For purposes of this letter, the following definitions apply:

1. "CommScope," "Defendant," "Defendants," "You" and/or "Your" mean CommScope Holding Company, Inc., CommScope Inc., ARRIS International Limited, ARRIS Global Ltd., ARRIS US Holdings, Inc., ARRIS Solutions, Inc., ARRIS Technology, Inc., and ARRIS Enterprises, LLC, and all their predecessors, successors, present and former partners, investors,

corporate parents, affiliated companies or corporations, direct or indirect subsidiaries, divisions, business units, and all past or present officers, directors, employees, agents, consultants, attorneys, servants, accountants, representatives, and all other persons acting, or purporting to act, on its or their behalf.

2. "TQD," "TQ Delta," or "Plaintiff" refers to plaintiff TQ Delta, LLC, and all its predecessors, successors, officers, directors, employees, agents, attorneys, servants, representatives, and all other persons acting or purporting to act, on its or their behalf.

3. "Accused Products," "Accused Instrumentality," and "DSL Products" means:

   a. every product, system, method, and/or instrumentality identified in TQD's Complaint and/or Plaintiff's Infringement Contentions and amendments and supplements to it, including all substantially similar products, systems, methods, and/or instrumentalities, and all associated computer hardware, software, and digital content;
   b. all products, systems, methods, and/or instrumentalities that are made, used, sold, offered for sale, and/or imported by Defendant for which Defendant seeks a declaration of non-infringement; and
   c. all products, systems, methods, instrumentalities, including customer premises equipment and central office equipment, that utilize or operate based upon and/or in compliance with the VDSL2 standards (e.g., ITU-T 993.2) as well as any other standard that requires implementation of VDSL2 such as G.Vector, the G.Bond standards (e.g., ITU- 998.2), the G.inp standards (e.g., ITU-T 998.4), and/or the G.fast standards (e.g., G.9701) or that have been claimed or advertised by Defendant as using or being operable or compliant with any of the foregoing standards, and components thereof, made by or for the Defendant for the ultimate sale to third-parties or sale/lease to customers by third- parties.

This definition includes, without limitation, CommScope's DSL Products, including consumer premises equipment, that have utilized the VDSL2 standards (e.g., ITU-T 993.2) as well as any other standard that requires implementation of VDSL2 such as G.Vector, the G.Bond standards (e.g., ITU- 998.2), G.inp standards (e.g., ITU-T 998.4), and the G.fast standards (e.g., G.9701).

4. "Accused Functionality" refers to the functionality illustrated by TQ Delta in its Infringement Contentions, amendments to it, or subsequent notices and disclosures, and any reasonably similar functionality that is incorporated into any of your products and services.

5. "Asserted Patents" or "Patents-in-Suit" refers to US Patent Nos. 7,453,881 ("the '881 Patent"), 7,570,686 ("the '686 Patent"), 7,844,882 ("the '882 Patent"), 8,090,008 ("the '008 Patent"), 8,276,048 ("the '048 Patent"), 8,462,835 ("the '835 Patent"), 8,468,411 ("the '411 Patent"), 8,937,988 ("the '988 Patent"), 9,094,348 ("the '348 Patent"), 9,154,354 ("the '354 Patent"), 9,485,055 ("the '055 Patent"), 10,567,112 ("the '112 Patent"), 10,833,809 ("the '809 Patent") and any other patents TQ Delta adds to its infringement contentions in this case.

6. "Document" and "Documents" shall have the broadest definition possible under Federal Rule of Civil Procedure 34 and Federal Rule of Evidence 1001. It shall include without limitation any writings, communications, correspondence, emails, drawings, graphs, charts, recordings, photographs, and images.   The preceding specifically includes information stored electronically, whether in a computer database or otherwise, regardless of whether such documents are presently in documentary form or not.

7. "Electronically stored information" or "ESI" means any document that can be or has been stored in electronic form on a server, tape, electronic media such as an internal or external hard drive, or any media whereby the document can be saved and be available for retrieval using any retrieval device, including a computer or server.

8. "Prior art" means all things, patents, publicly available patent applications, publications, disclosures, uses, sales, offers for sale, or other things, acts, or occurrences that qualify as prior art under 35 U.S.C. §§ 102 and/or 103 (including any amendments to these statutes) that Defendant contends relates to the scope or validity of one or more claims of any of the Asserted Patents.

9. "Source Code" means any set of instructions, directives, commands, abstractions, expressions, or representations capable of being interpreted, compiled, or executed by a computer, whether written in any command-line interface, compiled language, interpreted language, scripting language, data/query language, or markup language.

10. "ADSL" means asymmetric digital subscriber line.

11. "DSL" means digital subscriber line.

12. "VDSL" means very-high-bit-rate digital subscriber line.

13. "VDSL2" means the DSL protocol defined by the ITU-T G.993.2 standard as well as any other standard that requires implementation of VDSL2 such as G.Vector.

14. "ADSL2" means the DSL protocol defined by the ITU-T G.992.3 standard.

15. "ADSL2+" means the DSL protocol defined by the ITU-T G.992.5 standard.

16. "G.inp" means the DSL protocol defined by the ITU-T G.998.4 standard.

17. "G.bond" means the DSL protocol defined by the ITU-T G.998.1 standard or the ITU-T G.998.2 standard.

18. "G.fast" means the DSL protocol defined by the ITU-T G.9701 standard.

19. "DSL Standards" means the DSL standards defined in paragraphs 10-18 above.

20. "CPE" means customer premises equipment. "CO" means central office equipment. And "ODM" means Original Design Manufacturer.

21. The "Present Litigation" means the above-captioned lawsuit.


## Document Categories

1. Produce documents sufficient to show the corporate structure of all predecessors-in-interest, subsidiaries, parents, related corporations, partnerships, joint ventures, and affiliates of Defendant that have ever been involved in the manufacture, sale, offer for sale, use, marketing, or importation of any Accused Product.

2. Produce organizational chart documents sufficient to identify the organizational structure and responsibilities of Defendant's workgroups and departments, both generally and as it relates to the research, development, manufacturing, testing, marketing, distribution, sale, importation into the United States, and/or licensing of any Accused Product including, but not limited to, organizational charts and employee directories.

3. Produce indices, directories, file control documents, version control documents, and/or other such documents that are sufficient to show the location(s), custodian(s), type(s), and manner of organization of documents that concern the research, proposed research, conception, design, engineering, development, and/or testing of any Accused Product and/or any product constituting, comprising, or containing any Accused Product.  Where ESI is contained in a hierarchical file structure, this request specifically requires the production of each directory level containing the responsive ESI.

4. Produce all analyses of DSL standards-essential patents, including the total number of DSL patents, and technical or other analysis of the quality, essentiality, or importance of those patents.

5. Produce all United States and foreign patents and patent applications, and their file histories, assigned to Defendant, (a) related to, and/or describing any of the Accused Products and/or Accused Functionality, or (b) where at least one of the Asserted Patents was cited as prior art.

6. Produce all documents and things that Defendant is relying on to interpret the meaning of any of the asserted claims of each of the Asserted Patents or intends to use at a claim interpretation or *Markman* hearing in this action.

7.  Produce all documents referring or relating to the Asserted Patents, including documents reflecting any search, investigation, review, opinion, comparison, study, testing, evaluation, or analysis of any Accused Product or any of the Asserted Patents.

8.  Produce all documents reflecting or referring to communications among Defendant's employees or sales representatives and/or between Defendant and any third party (including any co-defendants in the Present Litigation) that refer or relate to any of the Asserted Patents or the Present Litigation.

9.  Produce all documents stating, asserting, analyzing, supporting, or refuting that any claim of the Asserted Patents is, or may be valid or invalid, enforceable or unenforceable, and/or noninfringed or infringed, either literally or under the doctrine of equivalents, by Defendant for any reason, including but not limited to any study, evaluation, analysis, investigation and/or opinion of counsel.

10. Produce all documents and things that were made available to, referred to, or used by any person or person(s) in generating any oral or written opinion received by Defendant, or performing any investigation or analysis on behalf of Defendant, regarding the validity/invalidity, enforceability/unenforceability, or infringement/non-infringement of any of the Asserted Patents.

11. Produce all documents and things relating to, referring to, and/or involving any prior art to, or any prior art search regarding, the inventions claimed in the Asserted Patents, which Defendant contends supports any assertion that any of the asserted claims of the Asserted Patents are invalid.

12. Produce all documents and things constituting, referring, or relating to any opinions or advice as to whether Defendant has committed any acts of infringement (including contributory infringement and/or induced infringement) of the Asserted Patents.

13. Produce all documents and things relating to any minutes, resolutions, or notes from any board of directors or other management meetings relating to, referring to, or involving Plaintiff's technology pertaining to the Asserted Patents, TQ Delta, and/or the Asserted Patents and/or any other patents claiming priority to the Asserted Patents, or this Present Litigation.

14. Produce documents sufficient to show which patent(s) You claim, contend, or have represented to others cover, practice, or have practiced each Accused Product, including documents that evince patent marking (on or via the product; technical, sales, or marketing material; and product packaging) and the periods such marking did or did not occur as to each Accused Product.

15. For each claim element in the Asserted Claims of the Asserted Patents that Defendant will seek or are seeking to have construed, or that has been identified by any other party as

requiring construction, produce all documents relating to, supporting, not supporting, or showing:

    a. Defendant's contentions as to the meaning and scope of the claim element;

    b. Defendant's contention, if any, that the claim element should be interpreted as a means-plus-function claim element under 35 U.S.C. § 112(6);

    c. the identity of any text in each Asserted Patent that Defendant contends supports its contentions as to the meaning and scope of the claim element;

    d. the identity of each figure, or portion thereof, in each Asserted Patent that Defendant contends supports its contentions as to the meaning and scope of the claim element;

    e. the identity of each citation to the prosecution history of each Asserted Patent that Defendant contends supports its contentions as to the meaning and scope of the claim element;

    f. the identity of each document outside of each Asserted Patent and its prosecution history that Defendant contends supports its contentions as to the meaning and scope of the claim element; and

    g. the identity of each person, declarant, and affiant, and the substance of that person's testimony, upon whose testimony Defendant intends to rely to support their contentions as to the meaning and scope of the claim element.

16. Produce documents sufficient to identify and "decode" all names, designations, versions, code names, model numbers, project names, model numbers, stock keeping unit number(s) (SKU), inventory numbers, stock numbers, and other references used to identify each Accused Products or and to the DSL chip(s), DSL chipset, DSL component(s) or DSL module(s) of the Accused Product.

17. For each Accused Product, produce documents sufficient to identify the manufacturer, product name, and model number of the components, including semiconductor chip(s), that provide, enable, or embody operation in accordance with one or more of the DSL Standards.

18. Produce documents sufficient to show how Defendant catalogs, classifies, categorizes, or otherwise groups, both internally and externally, its products, including all product families, product series, or other product groupings that include one or more of the Accused Products.

19. Produce documents relating to the Accused Functionality or *x*DSL functionality, including but not limited to the conception, research, design, development, testing, implementation, operation, features, use, and benefits thereof.

20. Produce documents relating to the software and/or hardware components in each of the Accused Products that perform the Accused Functionality or *x*DSL functionality, including but not limited to all functional, hardware, and software specification(s) describing, discussing, or relating to these components and documents sufficient to identify each of the internal and external part names and numbers, model names and numbers, versions,

manufacturers, suppliers, supported DSL Standards, supported operating mode(s) relating to these components.

21.    Produce all documents relating to Defendant's communications with the suppliers/manufacturers of the software and/or hardware components in each of the Accused Products that perform the Accused Functionality or *x*DSL functionality in the Accused Products concerning:

    a.  the components' compliance with the DSL Standards;
    b.  testing or operability of the components or the Accused Products with telephone/broadband carriers;
    c.  functionalities and/or technical requirements or specifications of the components; and
    d.  the components' Accused Functionality or *x*DSL functionality.

22.    Produce all documents relating to Defendant's communications with telephone/broadband carriers concerning:

    a.  the Accused Products' compliance with the DSL Standards;
    b.  testing and/or operability of the Accused Products with the telephone/broadband networks of the carriers;
    c.  any functionalities and/or features of the Accused Products that are required to be operable with telephone/broadband networks of the carriers;
    d.  any mandatory or optional features of the DSL Standards;
    e.  any features of the DSL Standards that are or are not implemented by the telephone/broadband carriers;
    f.  the Accused Product's performance or implementation of the Accused Functionality or *x*DSL functionality; and
    g.  the software and/or hardware components in the Accused Products that perform the Accused Functionality or *x*DSL functionality.

23.    Produce all documents relating to Defendant's communications with any third parties that have been involved in the design, manufacture, reselling, or distribution of the Accused Products and components thereof, concerning:

    a.  the Accused Products' compliance with the DSL Standards;
    b.  testing and/or operability of the Accused Products with telephone/broadband carriers;
    c.  the Accused Product's performance or implementation of the Accused Functionality or *x*DSL functionality; and
    d.  the software and/or hardware components in the Accused Products that perform the Accused Functionality or *x*DSL functionality.

24.    Produce all documents relating to the Accused Products' compliance with any section or subpart of the DSL Standards.

25. Produce all documents relating to the Accused Products' compliance or operability with any telephone/broadband carriers.

26. Produce documents sufficient to identify sections or subparts of the DSL Standards that are implemented and not implemented in the Accused Products or the components in the Accused Products that perform the Accused Functionality or $x$DSL functionality.

27. Produce all circuit board schematics describing, discussing, identifying, or relating to the relationship of the software and/or hardware components that perform the Accused Functionality or $x$DSL functionality to other components, including but not limited to memory components, in the Accused Products.

28. Produce documents sufficient to show each of the features of the Accused Products.

29. Produce documents sufficient to show any changes in the Accused Functionality, $x$DSL functionality, and technical functionality of the Accused Products and when any such changes were made.

30. Produce all documents and things relating to any comparison between each Accused Product and any claim of any of the Asserted Patents.

31. Produce documents sufficient to describe by name, document number, document type, or other organizing frameworks the available list of technical documents describing the Accused Products' structure, function, and operation.

32. Produce documents sufficient to describe by name, document number, document type, or other organizing frameworks, the list of technical documents describing the structure, function, and operation of the semiconductor chip(s) used in the Accused Product(s) to implement functionality relating to the DSL Standards.

33. Produce documents sufficient to decode any assigned meaning to Defendant's model number codes, code names, part codes, or other codes used to track Accused Products in Defendant's accounting systems or devices in development.

34. Produce all documents relating to, referring to, or involving Defendant's decisions to manufacture, utilize, deploy, market, or sell any Accused Products.

35. Produce documents sufficient to show the certification of compliance with the DSL Standards or any subpart thereof, whether optional or mandatory, for each Accused Product since the first commercialization of each Accused Product.

36. Produce all documents and things comparing different models and/or versions of the Accused Products or components of each Accused Product to one another.

37. Produce all documents related to any alleged acceptable non-infringing alternatives or substitutes or non-infringing alternative designs or technologies to the Accused Products and the DSL Standards for implementing broadband service or other service or product, including but not limited to documents relating to: any planning, testing, market introduction, and related financial analysis of same by Defendant and/or others; any alternatives that are alleged to have existed at any time; any alleged acceptability and feasibility (technologically and economically), availability, and non-infringement; any alternatives that are alleged to exist or would have existed or been available at the date of the alleged hypothetical negotiation (and/or the dates of first use, sale, offer for sale, and/or importation of the Accused Products); the date when You first became aware of each alleged alternative; the cost to implement each alleged alternative; Your use, implementation, study, testing at any time of each alleged alternative; and any consideration of alternatives at any time – including performance, price, and availability of the same.

38. Produce all documents and things sufficient to identify all testing of each Accused Product relating to compliance with any of the DSL Standards by and/or on behalf of Defendant.

39. For each Accused Product, produce reports or other documents summarizing certification test results relating to DSL.

40. Produce all documents and things that characterize whether the semiconductor chips used in any Accused Product are compliant with and/or compatible with any part of the DSL Standards. This includes, but is not limited to, correspondence, datasheets, and product specifications received from the chip supplier or manufacturer.

41. Produce representative copies of all assembly instructions, installation instructions, operator manuals, maintenance manuals, instructions for use, user guides, and any other instructions referring or relating to the Accused Products.

42. Produce all documents reflecting Your activities and efforts, directly or through intermediaries, to instruct, train, and encourage users and customers (including service providers, telephone/broadband carriers, and their subscribers/customers) to make, use, sell, or offer for sale the Accused Products or Accused Functionality.

43. Produce all documents related to training and technical support materials related to the Accused Products you have provided or made available to Your users, customers (including service providers, telephone/broadband carriers, and their subscribers/customers), partners, and distributors.

44. Produce all documents relating to how Defendant supports or supported the Accused Products, including how product literature is distributed, phone or internet support is provided, field support is provided, warranty support is provided, and any other assistance to operators, installers, service providers, resellers, or users of those devices.

45.    For each Accused Product, produce documents and things sufficient to identify all parts of the applicable DSL Standards it is or was compliant or compatible with.

46.    For each Accused Product, produce documents and things sufficient to identify all reports relating to compliance and/or compatibility with DSL Standards.

47.    Produce summary documents and things sufficient to show the manufacturer, product name, and model number of the semiconductor chip(s) used in each Accused Product(s) to implement functionality relating to the DSL Standards.

48.    Produce all specification(s) for each Accused Product and/or semiconductor chip contained therein to implement functionality relating to the DSL Standards. This includes, but is not limited to, marketing requirements documents, product data sheets, engineering specifications, design specifications, and other documents that refer to the anticipated or actual functionality of any of the Accused Products.

49.    For each Accused Product, produce documents sufficient to identify the hardware, firmware, and software components relating to the DSL Standard functionality for each Accused Product and the suppliers of such components.

50.    Produce each version of the software comprising or utilized with each Accused Product since the first commercialization of each Accused Product, by model number and software version.

51.    Produce all documents (including any specification, requirements, study, analysis, and report) that describe any modification made to third-party software included in any Accused Product, including but not limited to third-party software licensed under the GNU General Public License, including Operating System Kernel and networking protocol stack.

52.    Produce documents sufficient to show the default settings for any user-configurable settings for each Accused Product sold.

53.    For each of the Accused Products, produce the following:

      a.   A representative copy of the datasheet(s) and user manuals(s).
      b.   A representative copy of the "out of the box" setup instructions for each Accused Product.
      c.   A representative copy of the "online" setup instructions for each Accused Product.
      d.   A representative copy of the phone support setup help script used for assisting a customer with the setup of each Accused Product.
      e.   A representative copy of the phone support help script that includes an element resetting an Accused Product to its factory default settings.
      f.   Each field support guide, checklist, or other instruction to field support personnel that provides instruction on resetting user-configurable parameters to a factory

default parameter or other parameter selected by Defendant as part of a field troubleshooting procedure for an Accused Product.

g. All documentation provided with the purchase and/or sale of the Accused Product(s), including warranty terms, user guides, and installation guides.

54. Produce all documents relating to, referring to, and/or involving:

a. requests for proposal received by Defendant that relate to any of its Accused Products;

b. responses to requests for proposals for the Accused Products, including any exhibits, attachments, or other documents referred to therein;

c. documents created in the process of preparing responses to requests for proposals that relate to any of Defendant's Accused Products;

d. meeting minutes about additional discussions with the customers after Defendant submits its responses to requests for proposals and relating to the *x*DSL functionality of the Accused Products.

55. Produce all *x*DSL chip specifications and chip datasheets for each semiconductor chip used in the Accused Products.

56. Produce all documents made available by *x*DSL chip providers to Defendant that relate in any way to the *x*DSL functionality of the Accused Products.

57. Produce all documents describing or otherwise relating to the *x*DSL functionality of the Accused Products, including requests for changes to the *x*DSL functionality.

58. Produce all documents associated with the release of the Accused Product, including but not limited to Installation Guides, User Guides, and CLI Reference Guides, about the Accused Products.

59. Produce all requirements documents for the Accused Products, including but not limited to Product Requirements Documents.

60. Produce all documents relating to testing any *x*DSL aspects of the Accused Products, including but not limited to test protocols and parameters, testing purposes, and testing results.

61. Produce all documents and things that characterize whether the Accused Products are compliant with and/or compatible with any part of the DSL Standards. This includes, but is not limited to, correspondence, datasheets, and product specifications received from the chip supplier or manufacturer.

62. Produce all software and firmware intended for or used in any of the Accused Products, or any component thereof, that relates to any DSL functionality, including without limitation

(1) any software and firmware received from *x*DSL chip manufacturers for the Accused Products, (2) any software and firmware created and/or modified by Defendant, (3) any software and firmware created and/or modified by any ODM or other entity or person, and (4) any software and firmware installed in any of the Accused Products, or any component thereof.

63. Produce all Source Code for the Accused Products, or any component thereof that relates to any DSL functionality, including without limitation (1) any Source Code received from *x*DSL chip manufacturers for the Accused Products, (2) any Source Code created and/or modified by Defendant, (3) any Source Code created and/or modified by any ODM or other entity or person, and (4) any Source Code intended for or installed (after compilation) in any of the Accused Products, or on any component thereof.

64. Produce documents sufficient to identify the DSL Standards or aspects of DSL Standards to which the Accused Products comply, are compatible, and/or interoperable.

65. Produce documents sufficient to identify the number of DSL ports on each Accused Product.

66. Produce all agreements, licenses, contracts, purchase orders, and other documents relating to the Accused Products' design, fabrication, manufacture, testing, packaging, and/or assembly.

67. Produce all supply agreements for all Accused Products and any components thereof.

68. Produce all documents relating to any analysis of the Accused Products and/or commentary on DSL Standardized technology vs. other technologies or functions.

69. Produce all documents and things relating to, referring to, and/or involving any communications between Defendant and the ITU regarding each Accused Product.

70. Produce all documents and things relating to, referring to, and/or involving any communications between Defendant and any third-party manufacturer regarding compliance and/or interoperability of any Accused Product with one or more DSL standards.

71. Produce all documents and things instructing any third-party manufacturer or its agents to configure the Accused Functionality or DSL functionality of the Accused Products.

72. Produce all documents and things evidencing all reports and complaints made to any third-party regarding non-compliance of any Accused Product with one or more DSL Standards.

73. Produce documents relating to the telephone/broadband carrier(s) for each Accused Products, including but not limited to documents identifying the name of the telephone/broadband carrier(s), any testing done by Defendant or on behalf of Defendant to determine that the Accused Products operate with any carrier's telephone/broadband network

or complies with any telephone/broadband network carrier's requirements, and any certification received from any telephone/broadband network carrier(s).

74. Produce documents sufficient to identify the name and address of the third-party entities involved in the design or manufacture of the Accused Products and components thereof and the nature of the activities performed by the entities.

75. Produce all documents and things relating to, referring to, and/or involving patent license agreements or other grant of patent rights, licensing offers or agreements, settlement offers or agreements, covenants not-to-sue, and payment of royalties to which You are or have been a party, signatory, or beneficiary at any time that covers or relates to:

    a.  the Accused Products;
    b.  DSL chip(s), DSL chipset(s), DSL component(s), or DSL module(s) related to the Accused Products;
    c.  devices that are compatible and/or compliant with the DSL Standards;
    d.  DSL Standards for implementing broadband service related to the Accused Products;
    e.  the technology of the Asserted Patents and related patents;
    f.  digital subscriber line ("DSL") technology;
    g.  very-high-bit-rate digital subscriber line "VDSL" technology;
    h.  Fast Access to Subscriber Terminals ("G.fast") technology;
    i.  VDSL2 standards (e.g., ITU-T 993.2) as well as any other standard that requires implementation of VDSL2 such as G.Vector;
    j.  bonding standards for VDSL2 and ADSL2 (ATM and PTM);
    k.  G.INP standards (e.g., ITU-T 998.4);
    l.  G.fast standards (e.g., G.9701);
    m.  industry standards relating to DSL technologies, or similar technology as the Asserted Patents;
    n.  technology that is, in whole or in part, essential to the practice of the DSL Standards or one of their subparts.

76. Produce all documents and things relating to, referring to, and/or involving any indemnification agreements, indemnification obligations, indemnity requests, and offers of indemnity entered or made by Defendant or another person or entity about this Present Litigation, the Asserted Patents, the Accused Products, the DSL Standards, the Accused Functionality, and/or *x*DSL functionality.

77. Produce all agreements (e.g., supply agreements, sales agreements, or purchase agreements) between Defendant and its supplier(s) providing the terms (e.g., pricing terms, terms addressing indemnification for patent infringement, or firmware/software support terms) under which Defendant acquires any DSL chip(s)/chipset(s) used in an Accused Product.

88.  Produce all communications engaged in during business between an employee of Defendant, in such capacity, and another person concerning one or more DSL Standards.

89.  Produce documents and things sufficient to show any alleged conception and/or reduction to practice of any alleged invention relating to the DSL Standards.

90.  Produce all documents and things relating to, referring to, and/or involving positions taken by Defendant and/or Defendant's DSL chip suppliers as to whether any of the asserted claims of any TQ Delta Asserted Patents are essential to practice any DSL Standard.

91.  Produce all agreements (e.g., supply agreements, sales agreements, or purchase agreements) between Defendant and its customer(s) providing the terms (e.g., pricing terms, terms addressing indemnification for patent infringement, or firmware/software support terms) under which Defendant sells any of the Accused Products.

92.  Produce electronic documents sufficient to identify and show, separately for each Accused Product, and separately for the U.S. and outside the U.S. (e.g., international sales), from the date of the first sale or deployment, whichever is earlier, to the present, the following:

   a.  the number of units made by quarter;
   b.  the number of units sold/leased by quarter;
   c.  the number of units imported into the United States by quarter;
   d.  the number of units exported from the United States by quarter;
   e.  the product number, and/or any other designation or code used to identify the product;
   f.  the (gross and net) revenue realized, by quarter (where available)
   g.  the sales price;
   h.  direct and indirect costs (including but not limited to costs of goods sold, input costs, material costs, operating costs, bill of materials, research & development costs, marketing costs, manufacturing costs, sales costs, administrative expenses, royalty expenses), by quarter (where available);
   i.  profit (gross profits, operating profit, the net profit realized, net income, gross profit margins, contribution margins, operating profit margins, net profit margins), by quarter (where available);
   j.  revenue each quarter attributable to the sale/lease of each Accused Product.
   k.  an identification of each revenue and cost component; and
   l.  an identification of the methodology used to calculate the revenue, costs, and profit.

93.  Documents sufficient to show the date each of the Accused Products was first sold or offered for sale and, if discontinued, the date it was discontinued in the United States and outside of the U.S.

94.  Produce documents sufficient to ascertain for each Accused Product every name and version number of the software that has been used with each Accused Product.

145.  Produce all documents you rely on or reference in Your responses to TQ Delta's interrogatories.

146.  Produce all documents concerning any communications Defendant has had with any third party concerning this Present Litigation and/or any of the Asserted Patents, either generally or specifically.

147.  Produce all communications you have had with any named inventor of the Asserted Patents, inventor, or author of any prior art or patents reflecting the state-of-the-art that You have asserted or may use in this Lawsuit, and third-party witnesses that any party has subpoenaed in this Lawsuit.

148.  Produce all documents relating to Defendant's communications regarding the Present Litigation or the Asserted Patents, with any Defendant from TQ Delta's litigations in Delaware.

149.  Produce unredacted copies of transcripts of all depositions and trial testimony and declarations of Your personnel or witnesses (e.g., employees, other officers, retained experts) from other lawsuits relating to the Asserted Patents, technology of the Asserted Patents, and the DSL Standards.

150.  Produce all Documents and Things concerning the Present Litigation.

151.  Produce all Documents and Things identified in or used to prepare Defendant's disclosures under Federal Rule of Civil Procedure 26(a)(1) or responses to discovery requests in the Present Litigation.

TQ Delta requests that you produce such documents as soon as they are available and in no event later than the Court's April 22, 2022, deadline to substantially complete document production. TQ Delta is available to meet and confer regarding these requests to the extent that you do not agree to produce such documents.

Yours very truly,

Bo Davis

BD
cc:  all counsel of record (*via email*)