# EXHIBIT B

███████████████████

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| TQ DELTA, LLC, <br><br> Plaintiff, <br><br> v. <br><br> COMMSCOPE HOLDING COMPANY, INC., COMMSCOPE INC., ARRIS INTERNATIONAL LIMITED, ARRIS GLOBAL LTD., ARRIS US HOLDINGS, INC., ARRIS SOLUTIONS, INC., ARRIS TECHNOLOGY, INC., and ARRIS ENTERPRISES, LLC, <br><br> Defendants. | C. A. No. 2:21-cv-310 |

**Expert Report of Jonathan D. Putnam**

*[signature: Jonathan D. Putnam]*     August 29, 2022

**JONATHAN D. PUTNAM**     **AUGUST 29, 2022**

## TABLE OF CONTENTS

I. QUALIFICATIONS ............................................................................................................. 6
II. SCOPE OF ASSIGNMENT ................................................................................................ 8
   A. In General ....................................................................................................................... 8
   B. F/RAND Principles ...................................................................................................... 10
   C. Damages ....................................................................................................................... 11
   D. The Present Report ...................................................................................................... 12
III. SUMMARY OF OPINIONS ............................................................................................. 13
   A. Damages ....................................................................................................................... 13
   B. SEPs vs. Non-SEPs ...................................................................................................... 15
   C. FRAND Issues ............................................................................................................. 17
IV. TQ DELTA ......................................................................................................................... 19
   A. The Asserted Patent Families ...................................................................................... 19
      (1) Description and implementation ........................................................................ 19
      (2) Assumptions ....................................................................................................... 22
   B. The Aware Patent Portfolio .......................................................................................... 23
      (1) Background ........................................................................................................ 23
      (2) Aware's contribution to DSL standards ............................................................. 24
      (3) Description of portfolio and benefits ................................................................. 24
      (4) Existing patent licenses ...................................................................................... 25
V. COMMSCOPE .................................................................................................................... 27
   A. Background .................................................................................................................. 27
   B. Accused Products and Sales ......................................................................................... 30
VI. INDUSTRY BACKGROUND .......................................................................................... 30
   A. DSL Summary ............................................................................................................. 30
   B. History of Telecommunications ................................................................................... 31
   C. The Market for Broadband Services ............................................................................ 36
   D. DSL Technology .......................................................................................................... 39
VII. LEGAL AND ECONOMIC PRINCIPLES ................................................................... 45
   A. Patent Damages ............................................................................................................ 45
      (1) In general ............................................................................................................ 45
      (2) Apportionment and the causation of economic profit ....................................... 46
      (3) Fair market value ............................................................................................... 49
      (4) Comparable licenses ........................................................................................... 51
      (5) Unobserved contract terms ................................................................................ 54
   B. F/RAND-Related Issues ............................................................................................... 56
      (1) The ITU Common Patent Policy ........................................................................ 56
      (2) The ETSI IPR Policy .......................................................................................... 58
      (3) The economics of F/RAND ............................................................................... 62
      (4) The "incremental value of the invention" and its alternatives .......................... 68
      (5) The "top-down" approach .................................................................................. 73
      (6) The "smallest salable patent practicing unit" .................................................... 76
   C. The Hypothetical Negotiation Date ............................................................................. 82
VIII. TQ DELTA'S LICENSE AGREEMENTS .................................................................. 85
   A. The Zhone License ....................................................................................................... 85
   B. The Fujitsu License ...................................................................................................... 87

    C.   THE INTEL LICENSE ............................................................................................................... 88
    D.   THE ZYXEL LICENSE ............................................................................................................ 89
    E.   THE SIEMENS LICENSE ......................................................................................................... 91
        (1)    *Summary* ................................................................................................................... 91
        (2)    *Siemens as a willing licensee* ................................................................................. 92
    F.   THE COMPARABILITY OF THE TQ DELTA LICENSES TO THE HYPOTHETICAL LICENSE ................. 95
    G.   THE ADMISSIBILITY OF SETTLEMENT AGREEMENTS ............................................................. 104
        (1)    *The unique circumstances of the Family 3 trial* ................................................... 104
        (2)    *Balancing the potential for prejudice against probativeness* .............................. 107
        (3)    *Similarities with and without actual litigation* .................................................... 108
        (4)    *Factors to evaluate admissibility* ......................................................................... 108
    H.   TQ DELTA'S ESTABLISHED ROYALTY TERMS ...................................................................... 114
    I.   DISCOUNTS AND ADJUSTMENTS IN TQ DELTA'S LICENSES .................................................. 115
        (1)    *Regional adjustments* .......................................................................................... 115
        (2)    *Patent expiration adjustments* ............................................................................ 116
        (3)    *Prepayment and early payment discount* ............................................................ 116
        (4)    *G.inp rate* ............................................................................................................ 116
        (5)    *Summary* ............................................................................................................. 117

**IX.  THE AWARE LICENSE AGREEMENTS** ............................................................................... **117**
    A.   SUMMARY ........................................................................................................................ 117
        (1)    *ADI / Ikanos* ........................................................................................................ 118
        (2)    *SigmaTel / Metanoia* ........................................................................................... 121
        (3)    *NEC* ..................................................................................................................... 121
        (4)    *Siemens / Infineon / Lantiq* ................................................................................. 122
    B.   THE COMPARABILITY OF THE AWARE AGREEMENTS TO THE HYPOTHETICAL LICENSE .............. 125

**X.  COMMSCOPE-PRODUCED LICENSES** ................................................................................ **129**
    A.   SUMMARY ........................................................................................................................ 129
        (1)    *CommScope agreements* ...................................................................................... 129
        (2)    *Third-party agreements* ....................................................................................... 131
    B.   COMPARABILITY .............................................................................................................. 136
        (1)    *Technological comparability* ............................................................................... 137
        (2)    *Economic comparability* ..................................................................................... 139

**XI.  THE *GEORGIA-PACIFIC* FACTORS** .................................................................................. **142**
    A.   CHARACTERISTICS OF ACTUAL AND HYPOTHETICAL LICENSES ............................................ 143
    B.   RELATIVE TECHNICAL AND MARKET ADVANTAGES CONFERRED BY THE INVENTIONS .............. 144
    C.   PROFITABILITY OF THE PRODUCTS MADE UNDER THE PATENT .......................................... 145
    D.   COMPETITIVE AND BARGAINING POSITIONS OF THE PARTIES ............................................. 146
    E.   SUMMARY ........................................................................................................................ 148

**XII. DAMAGES METHODOLOGY – THE MARKET VALUE OF DSL TECHNOLOGY** ............. **149**
    A.   OVERVIEW ....................................................................................................................... 149
    B.   THE "VALUE OF DSL TECHNOLOGY" .................................................................................. 150
        (1)    *The productivity gain made possible by DSL technologies* .................................. 150
        (2)    *The next-best alternative to DSL* .......................................................................... 151
        (3)    *Pricing* ................................................................................................................ 161
        (4)    *"The value of the standard" and "standardization"* ............................................ 164
        (5)    *"Incremental value"* ........................................................................................... 166
    C.   MEASUREMENT OF THE VALUE OF DSL TECHNOLOGIES ..................................................... 167
        (1)    *Description* .......................................................................................................... 167

  (2) Data ........................................................................................................................... 167
  (3) Results ...................................................................................................................... 168
  (4) Sample size and statistical significance ................................................................ 170
  (5) Time-specific effects and the role of expectations ............................................... 171
  (6) Application .............................................................................................................. 173
 D. DIVISION OF THE GAINS FROM DSL ............................................................................ 173
  (1) In general ................................................................................................................. 173
  (2) In particular ............................................................................................................ 178
 E. PATENTS THAT CREATE DSL VALUE .......................................................................... 180
  (1) Patent families ......................................................................................................... 180
  (2) Data generation ...................................................................................................... 186
  (3) Patent sampling and technical analysis ................................................................ 187
  (4) Extrapolation from sample results ........................................................................ 189
  (5) The role of patent quality ....................................................................................... 189
  (6) Updated data ........................................................................................................... 192
 F. DAMAGES ..................................................................................................................... 193
  (1) Calculations ............................................................................................................ 193
  (2) Reconciliation with TQ Delta's licenses and offer ............................................... 194
  (3) Pre-2015 sales data ................................................................................................. 195
  (4) Convoyed sales ........................................................................................................ 195
 G. NON-INFRINGING ALTERNATIVES .............................................................................. 196
  (1) Essentiality and the availability and acceptability of "alternatives" .................. 196
  (2) The value of the standard as a whole ................................................................... 198
  (3) TQ Delta's F/RAND commitment .......................................................................... 199

**XIII. HOLD-OUT ................................................................................................................. 200**
 A. ECONOMIC OPPORTUNISM ........................................................................................... 200
  (1) Hold-up ................................................................................................................... 200
  (2) Hold-out .................................................................................................................. 203
 B. ECONOMIC ANALYSIS .................................................................................................. 204
  (1) The effects of hold-out ........................................................................................... 204
  (2) The costs of hold-out .............................................................................................. 205
 C. THE PRESENT CASE ..................................................................................................... 210
  (1) Background ............................................................................................................. 210
  (2) Market distortion and the costs of hold-out ......................................................... 214

**XIV. CONCLUSIONS ......................................................................................................... 217**

**EXHIBITS AND FIGURES**

| Exhibit 1 | Jonathan Putnam CV |
|---|---|
| Exhibit 2 | Documents reviewed and considered |
| Exhibit 3 | Royalty rate calculation for essential TQ Delta DSL patents |
| Exhibit 4 | TQ Delta rate card |
| Exhibit 5 | Summary of damages |
| Exhibit 6 | TQ Delta asserted patent families |
| Exhibit 7 | Summary of CommScope's agreements |
| Exhibit 8 | Comparison of Aware licenses with the hypothetical license |
| Exhibit 9 | FTTP vs. FTTx (DSL) cost summary |
| Exhibit 10 | FTTP vs. FTTx (DSL) costs saving regression results |
| Exhibit 11 | Expected DSL-essential patent families |
| Exhibit 12 | Citation rankings of TQ Delta DSL patents and other DSL SEPs |
| Exhibit 13 | TQ Delta essential patent family rates |
| Exhibit 14 | FTTP deployment strategies and tradeoffs |
| Exhibit 15 | CommScope's date of first infringement for accused products |
| Exhibit 16 | Summary of HHI calculations |
| Exhibit 17 | Summary of third-party licenses |
| Exhibit 18 | CommScope's gross profit |
| Exhibit 19 | Holdout model |
| Exhibit 20 | Revenue risk-adjusted discount rate |
| Exhibit 21 | NEP analysis |
| Exhibit 22 | Damages from holdout calculations |

| Figure 1 | Broadband internet service subscriptions and market penetration rates in the U.S. (2005-1H2016) |
|---|---|
| Figure 2 | History of Aware license reassignment |
| Figure 3 | Expected cost per premise for FTTN vs. FTTP |
| Figure 4 | Cost of FTTP and DSL + FTTx |
| Figure 5 | DSL patent sampling |
| Figure 6 | Number of homes passed in Verizon's FTTP deployment |
| Figure 7 | ASP and sales of CommScope and other companies |



28.

### C.  FRAND Issues

29. Implementers in SEP litigation typically provide a restatement of generic concerns about the supposed dangers of patent hold-up, royalty stacking, and a litany of other potential ills related to the licensing of SEPs, which they allege may produce inflated royalty rates. In general, I reserve my response to expert evidence that the Defendants may submit in support of any such claim to a future report. In the present report, however, I make some general observations:

    (a) The "implementer's FRAND paradigm," which I describe at length in a recent article,[18] is conceptually incorrect and empirically non-

---



[17]

[18] *See* J. Putnam, "Economic Determinations in 'FRAND Rate'-Setting: A Guide for the Perplexed," *Fordham Int. L. Rev. 41*(4) 953, at 976-82. For the purposes of analyzing and responding to the F/RAND issues in this case, I expressly incorporate this article by reference.

17

implementable. To the extent that a Defendants' expert shares that paradigm, his opinion will necessarily be incorrect as well.

(b) The F/RAND terms and conditions I derive are based on the "fair market value" of DSL technology, as reflected in general by arm's-length transactions in the market for data transmission technology (whether DSL or its alternatives), and in particular by transactions for TQ Delta's technology. "Fair market value" is "fair" *per se*.

(c) To the extent that any defendant seeks to rely on licenses negotiated by TQ Delta's predecessors in interest, those licenses reflect different patents covering different products, sold at different points in the production chain, at different time periods, under different competitive conditions, and under different legal rules. They are, in a word, not "comparable" to the hypothetical license. The application of their terms to the present case is discriminatory *per se*.

(d) An important dimension of the F/RAND context is the extent to which a standards implementer has engaged in economic opportunism ("holdout") and/or is an "unwilling licensee." Unlike the more frequently mentioned "holdup," "holdout" is conceptually well-defined, empirically calculable, and has been found by courts. CommScope's conduct meets the definition of holdout and/or an unwilling licensee.

30. The remainder of my report is organized as follows. Sections IV-VI provide background on TQ Delta, CommScope and the industry, respectively. Section VII covers relevant economic principles and (my understanding of) relevant legal

18

principles. Sections VIII and IX review TQ Delta's and its predecessor Aware's licenses, respectively, and evaluate their comparability with the hypothetical license between the parties. I discuss CommScope's licenses, as well as certain third-party licenses CommScope has produced, in Section X. In Section XI I briefly review the evidence, organized according to the *Georgia-Pacific* factors. Section XII provides the details of the damages computation for TQ Delta's asserted families. In Section XIII, I review the definition and identification of economic opportunism in the F/RAND context and apply that concept to CommScope. I also compute additional damages to account for the years CommScope (including its subsidiary, ARRIS) held out from taking a license to TQ Delta's portfolio. Section XIV gives a brief conclusion.

### IV. TQ DELTA

#### A. THE ASSERTED PATENT FAMILIES

##### (1) Description and implementation[19]

31. The Family 1B patent is related to the communication of diagnostic information over a communication channel using multicarrier modulation.[20] The claims of the '686 patent cover: a method and means of communicating diagnostic information, a diagnostic system and a multicarrier communication transceiver capable of

---

[19] Expert Report of Vijay Madisetti, Ph.D., on Infringement of the Family 4 and Family 6 Patents, August 29, 2022 ("Madisetti Report"). Opening Expert Report of Todor Cooklev, Ph.D, August 29, 2022 ("Cooklev Report"). Expert Report of Arthur Brody, Ph.D., on Infringement of the Family 1 and Family 10 Patents by CommScope, August 29, 2022 ("Brody Report").

[20] I understand that the exchange of diagnostic information across the DSL interface did not exist before the '686 patent was filed. Deposition of David Krinsky, August 1, 2022 ("Krinsky Deposition"), p. 15:8-19.