**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| TQ Delta, LLC,<br>　　　　　　*Plaintiff*,<br><br>v.<br><br>CommScope Holding Company, Inc., *et al.*,<br>　　　　　　*Defendants*. | Civil Action No.: 2:21-CV-00310-JRG<br><br>JURY TRIAL DEMANDED |

## TQ DELTA'S RESPONSE TO COMMSCOPE'S MOTIONS *IN LIMINE*

## TABLE OF CONTENTS

I.  ARGUMENT ................................................................................................. 1

    A.  CommScope MIL 1: Terms "Holdout," "Holdup," and "Unwilling Licensee" ...... 1

    B.  CommScope MIL 2: Privileged Testimony From Marcos Tzannes ........................ 3

    C.  CommScope MIL 3: Testimony Contrary to TQ Delta's 30(b)(6) Testimony ....... 6

    D.  CommScope MIL 4: Offers by CommScope During Settlement Negotiations .... 10

    E.  CommScope MIL 5: Contributions to Standard-Setting Organizations ............... 13

II.  CONCLUSION ........................................................................................... 15

## **TABLE OF AUTHORITIES**

### **Cases**

*Am. K-9 Detection Servs., Inc. v. Rutherfoord Int'l, Inc.*
No. 614CV1988ORL37TBS, 2016 WL 7183365 (M.D. Fla. May 16, 2016)....................7

*Butterfly-Biles v. State Farm Life Ins. Co.*
No. 09-CV-086-CVE-PJC, 2010 WL 346838 (N.D. Okla. Jan. 21, 2010) ......................7

*Echavarria v. Roach*
No. 16-CV-11118-ADB, 2022 WL 1473604 (D. Mass. May 10, 2022)............................8

*Ericsson, Inc. v. Apple, Inc.*
No. 2:21-cv-00376-JRG, Dkt. 291 at 9 (E.D. Tex. Nov. 29, 2022) .................................1, 2

*Genedics, LLC v. Meta Co.*
No. 17-1062-CJB, 2018 U.S. Dist. LEXIS 7845 (D. Del. Jan. 8, 2018) ...........................6

*Hawn v. Speedway LLC,*
No. 1:16-CV-359, 2018 WL 2192162 (N.D. Ind. May 14, 2018).....................................7

*In re Queen's Univ.*
820 F.3d 1287, 1301 (Fed. Cir. 2016) ...............................................................................4

*Indus. Hard Chrome, Ltd. v. Hetran, Inc.*
92 F. Supp. 2d 786 (N.D. Ill. 2000)...................................................................................7

*J. T. Eaton & Co. v. Atlantic Paste & Glue Co.*
CV-84-4438, 1987 U.S. Dist. LEXIS 16792 (E.D.N.Y. Aug. 31, 1987) ..........................4

*Lead GHR Enters. v. Am. States Ins. Co.*
3:17-mc-91-M-BN (N.D. Tex. Dec. 14, 2017)..................................................................7

*Optis Wireless Tech., LLC v. Apple Inc.*
No. 2:19-CV-00066-JRG, 2021 WL 2349343 (E.D. Tex. Apr. 14, 2021)........................2

*Saint Lawrence Commc'ns LLC v. ZTE Corp.*
No. 2:15-CV-349-JRG, Dkt. No. 458, 2017 WL 11517123
(E.D. Tex. Mar. 2, 2017) .................................................................................................13

*Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*
111 F.3d 1284, 1293–94 (6th Cir. 1997) .........................................................................12

*Visa U.S.A., Inc. v. First Data Corp.*
No. C-02-1786 JSW, 2004 U.S. Dist. LEXIS 17117 (N.D. Cal. Aug. 23, 2005) ..............4

*W.R. Grace & Co. v. Viskase Corp.*
    90 C 5383, 1991 WL 211647 (N.D. Ill. Oct. 15, 1991).........................................8

*Weatherford Tech. Holdings, LLC v. Tesco Corp.*
    No. 2:17-CV-00456-JRG (E.D. Tex. Nov. 14, 2018) ....................................7, 8

*WebXchange Inc. v. Dell Inc.*
    264 F.R.D. 123 (D. Del. 2010) ............................................................................4

## **Rules**

FED. R. EVID. 403 ............................................................................................1, 10

Plaintiff TQ Delta, LLC ("TQD") responds to Defendant CommScope's ("CS") Motions *in Limine* ("MILs") (Dkt. No. 452) and asks that the Court deny the MILs for the reasons below.

## I.      ARGUMENT

### A.      CommScope MIL 1: Terms "Holdout," "Holdup," and "Unwilling Licensee"

TQD respectfully requests that the Court deny CS's first MIL.  CS does not argue that the terms "holdout" and "unwilling licensee" are not relevant.  It only argues that these terms are unduly prejudicial under Rule 403.  This is incorrect.

The facts that CS held out and was (and continues to be) an unwilling licensee are relevant to, at least, the computation of the compensatory damages to TQD.  TQD's damages expert, Jonathan Putnam, Ph.D., opines that these facts impact the amount the parties would agree to at the hypothetical negotiation.  *See* Exh. A, Putnam Report at ¶¶ 29, 29(d), 318, and 352.  Dr. Putman observes that "holdout" is a well-defined and quantifiable economic phenomenon and, after recounting the negotiation history between the two parties, quantifies the amount of money CS owes TQD based on holdout.  *See id.* at ¶¶ 409–441.

The case CS cites—*Ericsson, Inc. v. Apple, Inc.*—is inapposite.  No. 2:21-cv-00376-JRG, Dkt. 291 at 9 (E.D. Tex. Nov. 29, 2022).  *Ericsson* is a breach of contract case involving cross-allegations that the parties breached their respective obligations with ETSI and under a previously consummated patent license.  *See id.* at Ericsson's First Amended Complaint, Dkt. No. 52; Apple's Counterclaims, Answer, and Affirmative Defenses to Ericsson's First Amended Complaint, Dkt. No. 68.  From the publicly accessible pleadings, it appears that the parties' alleged damages were their costs associated with failed negotiations and the pursuit of litigation.  *See id.* at Dkt. No. 52, ¶ 87 ("Apple's breach has caused Ericsson to suffer actual damages, such as Ericsson's costs and expenses in pursuing futile negotiations with Apple in an amount to be determined at trial."); Dkt. No. 68, ¶ 124 ("Apple also has been forced to defend groundless litigations and has incurred

substantial expense in doing so.").  Critically, the relevancy of how the potential licensee's holdout affects damages was apparently absent in that case.  Further, the parties had already entered into at least two patent licenses.  *See id*. at Dkt. No. 52, ¶ 48 ("Ericsson has . . . consummated two prior licenses with Apple pursuant to its FRAND Commitment.").  This means that the terms "holdout" and "unwilling licensee" were not factually accurate in *Ericsson*.  In this case, the converse is true.

CS's holdout is also relevant to TQD's claim for a declaratory judgment that CS is not entitled to a license on RAND terms and conditions.  *See* Dkt. No. 1 at ¶¶ 191–208.  This Court has recognized that when such a claim is before the jury, the plaintiff is "able to present evidence of [the defendant's] alleged bad faith and holdout . . . ." *Optis Wireless Tech., LLC v. Apple Inc.*, No. 2:19-CV-00066-JRG, 2021 WL 2349343, at *3 (E.D. Tex. Apr. 14, 2021).

The ambiguous scope of CS's MIL also leads to problems.  While CS explicitly states that its MIL only covers the use of three discrete terms—(1) "holdout," (2) "holdup," and (3) "unwilling licensee"—CS, in its briefing, takes issue with Dr. Putman's use of the expression "economic opportunism."  Mot. at 2.  It is unclear whether CS would, under this MIL, find it objectionable if TQD's damages expert explains to the jury, without using the actual term "holdout," how CS's pre-suit actions were economically opportunistic—*e.g.*, CS wrongly refused to take a license to TQD's standard-essential patents while, at the same time, other players in the industry did so, thereby instilling within CS a competitive advantage and the enjoyment of concomitant economic benefits.  Exh. A, Putnam Expert Report at ¶¶ 409–441.  If CS does find such testimony objectionable, then it has failed to sufficiently identify the metes and bounds of its MIL.  If CS does not find such testimony objectionable, then this MIL becomes an arbitrary limitation; if it is not overly prejudicial to disclose the substance of an economic theory, then it is

not overly prejudicial to use, before the jury, the correct and commonly used name for that economic theory—a "holdout."

The same problem is evident for the term "unwilling licensee."  The term is factually accurate, is not pejorative, and is similar to terms routinely used in patent cases (which CS's MIL does not cover), *e.g.*, "refused to take a license" or "rejected a license."  This jury—just as any jury in any patent infringement suit—is going to be well aware of CS's "unwilling[ness]" to a take a license.  In short, the terms "holdout" and "unwilling licensee" are uninflammatory and factually accurate characterizations of CS's relevant conduct.  This MIL should be denied.

## B.    CommScope MIL 2: Privileged Testimony From Marcos Tzannes

Marcos Tzannes is a named inventor on almost all the patents-in-suit and a technical litigation consultant for TQD.  *See* Exh. B, Tzannes Depo. Tr. at 39:2-4.  TQD intends to call Mr. Tzannes live to discuss the background of the technology at issue in this case, the problems he and his co-workers were attempting to solve, the inventions of the patents-in-suit, and the inclusion of those inventions in DSL standards.  CS seeks to use Mr. Tzannes's refusal to disclose privileged and work-product protected information during his deposition as the basis for preventing him from testifying on just about any topic at trial.  CS should not be allowed to do so.

CS broadly argues that Mr. Tzannes should not be allowed to testify about "essentiality, infringement, validity," and, in particular, about "any facts or analysis" related to: (i) whether any products in the industry infringe TQD's patents, (ii) any DSL-related equipment, (iii) what TQD's patents cover or claim, (iv) whether any of TQD's patents are standard essential or cover any standard, (v) whether any of TQD's patents are valid, (vi) whether any party is using TQD's patents without a license, or (vii) the asserted patents in this case.  Dkt. No. 452 at 2-4.  CS's basis for arguing that Mr. Tzannes basically cannot testify about anything is that Mr. Tzannes allegedly was instructed not to answer questions about these topics during his deposition, and, therefore, pursuant

████████████████████████████████      ████████████████

to the Court's Standing Order MIL No. 22, he cannot testify about them at trial.  But what CS seeks to exclude Mr. Tzannes from testifying on far exceeds the scope of the privileged and/or work-product information Mr. Tzannes refused to testify on.

During his deposition, CS repeatedly asked Mr. Tzannes about work he did for, or information he provided to, TQD in his role as a technical litigation consultant under the direction of litigation counsel.  TQD's counsel properly instructed Mr. Tzannes to not answer those questions[1] but also stated that CS was free to ask about issues that did not involve such privileged information.  *See* Exh. B, Tzannes Depo. Tr. at 55:16-25 ("If you want to ask him his views about things, absolutely, but where I'm cutting this off is you're asking these questions, and consistently so, what his discussions with TQ Delta have been. . . .  So if you want to ask him about what he thinks about Nokia's infringement, ask him that question. But the objection is you're asking it in terms of what he's communicated to TQ Delta.").

Defendants' counsel refused this invitation to examine Mr. Tzannes about facts and his non-privileged, non-work product understanding of the prior art background and use of the inventions by others.  Instead, Defendants' purposefully stuck with questions plainly intended to elicit privileged/work product information and an instruction not to answer.  *See* Dkt. No. 452 at

---

[1] Such information is protected by the attorney-client privilege and work-product doctrine.  *See WebXchange Inc. v. Dell Inc.*, 264 F.R.D. 123, 127-28 (D. Del. 2010) (documents prepared by a technical expert at the request of counsel relating to patent evaluation and technical advice and analyses regarding potential litigation are work product); *Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786 JSW, 2004 U.S. Dist. LEXIS 17117, at *16-17 (N.D. Cal. Aug. 23, 2005) ("'courts have extended the [attorney-client] privilege to the substantive advice and technical assistance' of agents of the attorney" (quoting 1 Rice, Attorney-Client Privilege § 3:3, at 14)); *J. T. Eaton & Co. v. Atlantic Paste & Glue Co.*, CV-84-4438, 1987 U.S. Dist. LEXIS 16792, at *10 (E.D.N.Y. Aug. 31, 1987) (communications with a technical consultant regarding litigation are work product).  Also, Mr. Tzannes is a registered patent agent (*see* Ex. B, Tzannes Depo. Tr. at 21:20-22), and communications with TQD relating to patent prosecution work he's done for TQD are privileged. *See In re Queen's Univ.*, 820 F.3d 1287, 1301 (Fed. Cir. 2016).

4

3-4; Exh. B, at, *e.g.*, 39:14-17 ("[D]id you ever do <u>any work for TQ Delta</u> where you assessed Nokia's portfolio or Nokia's products vis-à-vis TQ Delta's patents?"); 44:4-8 ("[Y]ou're not going to answer any of my questions with respect to any infringement or noninfringement opinions or advice <u>you've given to TQ Delta</u> over the years; is that correct?"); 40:21-23 ("Have you looked or assessed any consumer premises equipment, consumer modems <u>with respect to your work with TQ Delta</u>?"); 40:12-14 ("Have you ever looked at any CommScope materials <u>with respect to the your work for TQ Delta</u>?"); 41:11-20 ("Have you ever had technical <u>discussions with TQ Delta</u> that says, I think this patent should be read this way, or, I think this patent covers a particular ITU standard? . . . Is part of your <u>work for TQ Delta</u> to compare patent claims either issued or pending against any ITU or other standard setting organization standard?") (all emphasis added); *see also id.* at 39:20-41:4; 41:25-44:3; 53:22-55:4; 55:12-56:5; 109:4-111:17; 113:25-114:4; 116:19-117:18.  Defendants' strategy was undoubtedly calculated to paint Mr. Tzannes as having something to hide, to set up the present motion, and to silence the inventor at trial.  Indeed, CS never challenged those privilege objections in a motion to compel during the discovery period.

The scope of the subject matter that CS seeks to exclude Mr. Tzannes from testifying about is also not commensurate with the scope of information he was instructed to not disclose pursuant to privilege and work product objections.  Mr. Tzannes, as the inventor, should be able to testify about things like prior art DSL standards and their shortcomings, improvements he and his co-workers invented, the problems they solved (and how others failed to solve those problems), how the inventions are implemented in current DSL standards and standardized equipment, and the attendant benefits.  He has first-hand knowledge of these things as an inventor and from nearly 30 years of experience working on DSL standards.  This is independent of the privileged and/or work product protected information Defendants' counsel sought, which related to his work with TQD

████████████████████████        ████████████████

as a litigation consultant.  The non-privileged, non-immune information known to Mr. Tzannes is relevant and well accepted by courts,[2] and his testimony would not prejudice CS as Mr. Tzannes did not refuse to provide such testimony at his deposition.  However, precluding Mr. Tzannes—a named inventor on most of the patents-in-suit and 30-year DSL standards development contributor—from providing such testimony would prejudice TQD.

### C.  CommScope MIL 3: Testimony Contrary to TQ Delta's 30(b)(6) Testimony

TQD respectfully requests that the Court deny this MIL.  It is a discovery sanction cloaked as a MIL: CS moves to limit <u>all</u> of TQD's testimony (including the inventors and TQD's experts) to the testimony of TQD's Rule 30(b)(6) witness, Ms. Divine.  CS does not identify <u>any</u> Federal Rule of Evidence supporting that result.  Nor did CS request additional Rule 30b(6) testimony under the Federal Rules of Civil Procedure or claim that TQD's answers were inadequate.  It did not file a motion to compel such testimony during the discovery period.  CS had the opportunity to examine (and did examine) the inventors and TQD's technical experts.  It did not file a motion requesting additional time with any of TQD's witnesses—and it even failed to depose the lead inventor of TQD's patents (Mr. Tzannes) when TQD's counsel offered a second day with that witness.  Now, CS attempts to use an alleged lack of discovery to dismantle TQD's case.  TQD respectfully requests that the Court reject that tactic for the following three reasons.

<u>First</u>, the law weighs against CS's position.  "[I]t is well-settled that although a company is bound by its 30(b)(6) witness's testimony, that testimony does not constitute a judicial admission that 'formally and finally decides an issue'"; instead, "[t]he testimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used

---

[2] *See, e.g.*, *Genedics, LLC v. Meta Co.*, No. 17-1062-CJB, 2018 U.S. Dist. LEXIS 7845, at *27 n.5 (D. Del. Jan. 8, 2018) ("It is an easier inference that the testimony of inventors . . .  may be necessary for trial, in light of the important role inventor testimony tends to play in patent cases.").

for impeachment purposes" at trial.  *Butterfly-Biles v. State Farm Life Ins. Co.*, No. 09-CV-086-CVE-PJC, 2010 WL 346838, at *2 (N.D. Okla. Jan. 21, 2010) (quotation and citations omitted); *see also* 8A Wright & Miller, Federal Practice & Procedure: Civil 3d § 2103 at 469–71 ("But as with any other party statement, they [Rule 30(b)(6) deposition testimony answers] are not 'binding' in the sense that the corporate party is forbidden to call the same or another witness to offer different testimony at trial.") (collecting authority in fn. 25); *R & B Appliance Parts, Inc. v. Amana Co., L.P.*, 258 F.3d 783, 786 (8th Cir. 2001) ("A witness is free to testify differently from the way he or she testified in a deposition, albeit at the risk of having [being] impeached.").

CS does not address this law in its Motion.  It instead points to an Order on a motion *in limine* that was agreed—a fact CS omits—that required leave of Court before providing "[a]ny evidence, testimony, opinion, or argument that is inconsistent [with] the 30(b)(6) deposition testimony of Defendants on designated topics." *Weatherford Tech. Holdings, LLC v. Tesco Corp.*, Order on Motions *in Limine* (Dkt. 166) at 2, No. 2:17-CV-00456-JRG (E.D. Tex. Nov. 14, 2018) (cited at Mot. 5–6).[3]  But unlike the agreed-motion in *Weatherford*, when this issue has been disputed, courts have routinely denied this type of MIL.  *See, e.g.*, *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 92 F. Supp. 2d 786, 791 (N.D. Ill. 2000) (denying Motion *in Limine* excluding "[e]vidence which contradicts testimony given during defendants' 30(b)(6) deposition"); *Hawn v. Speedway LLC*, No. 1:16-CV-359, 2018 WL 2192162, at *3–4 (N.D. Ind. May 14, 2018) (denying Motion in *Limine* to preclude Defendant from deviating from Rule 30(b)(6) testimony and finding

---

[3] CS also cites an Order quoting the losing party's brief (a fact it omits) relating to a discovery dispute for the statement that Rule 30(b)(6) testimony is "binding on the corporation." *Lead GHR Enters. v. Am. States Ins. Co.*, Memorandum Opinion and Order (Dkt.7) at 7, No. 3:17-mc-91-M-BN (N.D. Tex. Dec. 14, 2017) (cited at Mot. 5–6).  "[A]lthough a corporation is 'bound' by Rule 30(b)(6) testimony," however, "it is not precluded from offering additional—perhaps even contradictory—testimony at trial." *Am. K-9 Detection Servs., Inc. v. Rutherfoord Int'l, Inc.*, No. 614CV1988ORL37TBS, 2016 WL 7183365, at *5 (M.D. Fla. May 16, 2016).

that the law on how "Rule 30(b)(6) testimony can be used or not used at trial" is "not in flux") (collecting authority); *Echavarria v. Roach*, No. 16-CV-11118-ADB, 2022 WL 1473604, at *8–9 (D. Mass. May 10, 2022) (denying Motion *in Limine* to "Bar Defendant City Of Lynn From Contradicting Its Rule 30(B)(6) Deposition Testimony" and directing plaintiff to "explore the inconsistencies between the trial testimony and prior testimony on cross-examination"); *Young v. Braum's, Inc.*, No. 5:19-CV-161-RWS-CMC, 2021 WL 4704899, at *2–4 (E.D. Tex. Apr. 12, 2021) (denying Motion *in Limine* to "prohibit Defendant . . . from [arguing or raising evidence on an issue] . . . unless Braum's, Inc. proves that it has uncovered new evidence not available to it at the time of Braum's Rule 30(b)(6) deposition"); *W.R. Grace & Co. v. Viskase Corp.*, 90 C 5383, 1991 WL 211647, at *2 (N.D. Ill. Oct. 15, 1991) ("If a Grace trial witness makes a statement that contradicts a position previously taken in a Rule 30(b)(6) deposition, then Viskase may impeach that witness with the prior inconsistent statement."). That outcome applies here.

Indeed, even in the *Weatherford* case, the Court allowed a new corporate representative to testify at trial and concluded that any inconsistency between that witness's testimony and the prior Rule 30(b)(6) deposition was a matter for cross examination. *Weatherford Tech. Holdings, LLC v. Tesco Corp.*, Order Denying Defendants' Motion to Quash Trial Subpoena of Paul Meeks (Dkt. 168) at 6, No. 2:17-CV-00456-JRG (E.D. Tex. Nov. 14, 2018) (emphasis added).

> Tesco is permitted to call its newly substituted corporate representative at trial, Mr. Sudodh Saxena, to testify as to matters both covered and not covered by Mr. Meeks. As Tesco's new corporate representative, Mr. Saxena is permitted to testify on matters within the corporation's knowledge. <u>To the extent that his answers are inconsistent with Mr. Meeks's 30(b)(6) testimony, Weatherford is permitted to use Mr. Meeks's 30(b)(6) deposition and his testimony at trial to impeach him</u>. Counsel for Weatherford is instructed to approach and seek leave of the Court before presenting any such impeachment evidence before the jury.

The *Weatherford* case does not support CS's position—and granting this Motion would conflict with settled authority. CS is free to use the Rule 30(b)(6) testimony for impeachment if

appropriate;[4] it is not free to preclude TQ Delta from proving its case.

Second, CS's claim of "prejudice" rings hollow.  This Motion is directed at limiting the testimony of Mr. Tzannes—the lead inventor of most of the patents.  Mot. at 6.  CS deposed Mr. Tzannes in this case.  In addition, CS deposed Mr. Tzannes in the Delaware proceeding, which also involved Families 2, 3, 4, and 6 (against CS's subsidiary 2Wire) as well as Family 9 (against co-defendant ADTRAN).  CS also examined Mr. Tzannes in two trials in Delaware (the trials for Families 2 and 3).  With all these opportunities to examine Mr. Tzannes, CS cannot credibly that it lacked an opportunity to obtain discovery.[5]

In addition, last summer, TQD offered Defendants yet another day of deposition time with Mr. Tzannes, but they did not pursue the deposition.  TQD initially designated Mr. Tzannes under Rule 30(b)(6) on a number of topics identical to the ones that he was examined on in Delaware.  Dkt. 452-7.  Defendants complained, and declined to conduct the Rule 30(b)(6) portion of Mr. Tzannes's deposition—or even ask Mr. Tzannes any questions relating to those topics at all.  Exh. B, Tzannes Depo. Tr. at 126:24–128:21, 216:16–23.  To provide a witness and avoid a dispute, TQ Delta designed Ms. Divine on those topics.  Defendants did not move to compel additional Rule 30(b)(6) testimony on the basis that Ms. Divine provided insufficient testimony.

Defendants instead requested another day with Mr. Tzannes.  The parties reached

---

[4] TQD also disagrees with CS's claim that Ms. Divine could "neither provide nor identify any knowledge of TQ Delta regarding the topics that concerned technical aspects of the Asserted Patents or the ideas or inventions claimed therein."  Mot. at 5.  The highlighted questions and answers do not support that claim.  *See, e.g.*, Dkt. 452-4 ("Q. . . . What was the project that the folks at Aware, . . . were they working on – when they came up with the idea that they put down in the application that led to the '686 patent? A. Well, you know, again, I wasn't – I wasn't at Aware. So, you know, I don't know that I know the internal project names and such.").

[5] Similarly, CS has also received expert reports from TQD's technical experts that discuss the patented technology.  CS has deposed those experts multiple times.

agreement on a four-hour deposition.  Exh. C, Sept. 2, 2022 Email from R. Fink ("This is intended to follow up and memorialize our agreements . . . . TQD will provide Mr. Marcos Tzannes for four hours.").  But despite the opportunity to further depose Mr. Tzannes, Defendants chose not to.

Third, in contrast, granting this Motion will unduly prejudice TQD.  It will impede TQD's ability to put on its case, including from presenting the facts and expert testimony explaining the patented technology.  CS does not show the Court the Rule 30(b)(6) topics it believes TQD is limited to, but CS indicated, during the meet-and-confer process, that the motion would apply to over a dozen topics across TQD's case, including:

- "The subject matter disclosed in and claimed by the Asserted Patents."

- "The conception, development, and reduction to practice of the alleged inventions claimed in the Asserted Patents, including, but not limited to, any Inventor's notebooks, notes, memos, emails, letters, reports, project proposals, timelines, drawings, sketches, product specifications, schematics, prototypes, diaries, files, appointment calendars, disclosures, and workbooks related to conception or reduction to practice."

- "The purported novel and nonobvious features of the Asserted Patents."

- "The differences between the Asserted Patents and the Prior Art to the Asserted Patents."

- "The benefits purportedly offered by practicing the claims of the Asserted Patents."

If CS believed that TQD was withholding discovery on those topics, the remedy was to seek additional discovery (*e.g.*, depose Mr. Tzannes when TQD offered or request an additional Rule 30(b)(6) deposition).  It is not to spring up before trial to preclude TQD from having the lead inventor and its experts discuss the subject matter of the asserted patents.

### D.     CommScope MIL 4: Offers by CommScope During Settlement Negotiations

First, CS's MIL provides no clear identification of what would be excluded by the MIL, and it should be denied on that basis.  CS only provides one page of argument on this MIL (of which about 1/3 is a restatement of Rule 403).  CS does not identify any specific documents, any

████████████████████████████████         ████████████████████

specific testimony, even generally describe what it considers an "offer," or identify, generally, the dates or types of documents it seeks to exclude as "offers."  Since CommScope does not explain what the MIL would apply to or provide any other way to identify its scope, CS has made assessing this MIL impossible, and it should be denied.  CS also asserts the MIL "will not prevent TQ Delta from addressing FRAND issues that relate to damages," apparently quoting from *St. Lawrence* (below), but this is unexplained.  If the parties can talk about the communications for one purpose (*e.g.*, damages), they should come in for all purposes.

Second, some of the legal claims for both parties turn on the evidence CS seeks to exclude, including about whether TQD satisfied its RAND commitment, whether RAND offers were made prior to filing suit, and CS's refusal of those offers.  *See* Dkt. No. 1, pp. 56-59 (TQD's Claim "N" and Prayer for Relief); Dkt. No. 17 at ¶¶ 98-100 (CS's Counterclaim for Breach of Contract).  The parties' pre-suit communications about a global portfolio license are material to these issues; essentially, they are the primary evidence for these claims.  For example, CS alleges "[p]rior to the filing of this lawsuit, TQ Delta and CommScope engaged in negotiations centered around CommScope licensing some or all of TQ Delta's patent portfolio." (Dkt. No. 17, p. 28).  But CS seeks to exclude facts of these negotiations, tying TQD's hands on these claims and allowing CS to present a one-sided story.  The evidence of these discussions cannot be excluded without prejudicing the merits of these claims.  CS' MIL should be denied.

Notably, CS does not exclude TQD's communications on the parties' claims.  In other words, CS only wants the evidence that helps it.  TQD does not believe that either party's relevant pre-suit communications are Rule 408 communications, but, if they are, then both parties' communications would be inadmissible, and there would not be evidence of the breach of FRAND claim.  That CS takes a one-sided position shows it understands the communications are not under

Rule 408. And, to the extent they otherwise might be under Rule 408, the Rule would exclude these acts, since they form the basis of the breach-of-contract claims. *See, e.g., Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293–94 (6th Cir. 1997) ("Rule 408 is ... inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions; e.g., … breach of contract.... Rule 408 does not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took place during compromise negotiations"); *see also* Rule 408, Committee Notes on Rules – 2006 Amendment (endorsing *Uforma*).

Third, CommScope's pre-suit communications are also relevant, other than for showing validity of the claim or the amount of damages, to the disputed claims in this case, including the RAND/breach claims. To begin with, the amounts CS recites are not what forms the damages portion of TQD's case. They are not being used to prove the "amount of the disputed claim." But, in addition to showing notice of TQD's position, the timing of CommScope's communications shows its failure to engage and provide TQD with requested information. Overall, they show that CS engaged in a relevant pattern of conduct that prevented the parties from reaching agreement, which is relevant to both the breach and the patent claims. Without CS's communications, including the amounts contained in them, TQD's positions cannot be understood. For example, some CS communications propose a structure to an agreement and TQD requests information to be able to understand this structure, which is not provided. TQD's requests and responses would be nonsensical without CS's side of the discussion.

CS's single case is readily distinguishable, and CS provides no clear authority for its position. In the only case CS cites, breach of was not tried to a jury, which is a critical fact that CS omits. As the Court explained in that case, "[t]here will be no allegations of a breach of a FRAND obligation within the presence of the jury":

This motion *in limine* is **GRANTED-IN-PART** and **DENIED-IN-PART** as follows: To the extent a party needs to discuss an alleged breach of a FRAND obligation, evidence regarding settlement discussions between the parties, or evidence regarding findings of a German court with regard to Motorola about whether a FRAND obligation was met, those things shall be done outside the presence of the jury. <u>There will be no allegations of a breach of a FRAND obligation within the presence of the jury</u>. However, FRAND issues that relate to damages, including what is a proper FRAND royalty rate, will be presented in the presence of the jury. Motorola may also present evidence that it did not receive an offer before the lawsuit was filed before the jury.

*Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 2:15-CV-349-JRG, Dkt. No. 458, 2017 WL 11517123, at *5 (E.D. Tex. Mar. 2, 2017) (underlined emphasis added, otherwise emphasis in original).  In that context, it is unsurprising that negotiations would not be discussed, since no allegations or evidence of breach could was being presented to the jury.

### E.    CommScope MIL 5: Contributions to Standard-Setting Organizations

There is no proper basis for precluding TQD from introducing evidence or argument at trial relating to or comparing the parties' respective contribution to the relevant DSL standards-setting organization (the ITU) or from referring to CommScope as an "implementer" who uses, without having paid for (*i.e.*, has taken), the intellectual property invented and owned by contributors like Mr. Tzannes, TQD, and its processor-in-interest, Aware, Inc.  *See* Dkt. No. 452 at 7.  Such evidence is relevant to at least the issue of damages, in addition to other issues.

In his expert report, TQD's damages expert, Dr. Jonathan Putnam, relies on the facts that TQD and Aware are innovators that contributed to the DSL standards while CS is an implementer of the DSL technology that TQ Delta/Aware contributed.  For example, he explains that a "standard-essential patent ("SEP") is, by definition, practiced by any implementer of the standard in question" and that FRAND terms "require[] that <u>each such implementer, including the Defendants</u>, pay for standardized technology on terms that do not place it at a competitive disadvantage."  Exh. A, Putnam Report, at 9 (emphasis added).  He further explains that "the

███████████████████████                      ████████████████████

damages to be paid by <u>CommScope represent payment by one implementer</u> for TQ Delta's portfolio of standard-essential patents, many of which (by definition) are used by all standard implementers." *Id*. at 13 (emphasis added).  He also discusses the contributions Aware made to DSL standards, and, in evaluating the bargaining position of the parties, explains that "TQ Delta is a contributor to the DSL standards, while CommScope is a leading producer of equipment that implements those standards." *Id*. at 24-25; 146.  In addition, in his damages model, he apportions the cost savings (or gains) of DSL by dividing them between implementers (like CS) and all standard essential patent ("SEP") holders (like TQD) and then further apportioned the SEP holders' share to the asserted TQD SEPs that read on each individual DSL standard.  *Id*. at 150-194.  He also explains that holdout by implementers is costly to innovators like TQD.  *Id*. at 215.

Thus, the distinction between implementers who take and use standardized technology and innovators who contribute to standards, on the other hand, is relevant to TQD's damages case.  It is also relevant to rebutting CS's criticism of Dr. Putnam's damages model, which includes, *inter alia*, splitting of the cost savings between innovators and implementers.  *See* Exh. D, Becker Report at 108-109, 112; Dkt. No. 346 at 10-11; Dkt. No. 400 at 4-5.  The jury should be allowed to consider this evidence in the context of the parties' relative contributions to DSL.

Accordingly, TQD should be able provide evidence that TQD/Aware is an innovator and contributor to the DSL standards and that CS and its predecessors are implementers who did not contribute to the standard and have taken and used the standardized inventive technology without compensation.  While CS may dislike these facts, any resulting prejudice to CS is not undue and does not outweigh their relevance.  Further, CS does not explain how the presentation of arguments and evidence relating to the parties' contributions to DSL standards would "confuse the issues and mislead the jury."  Dkt. No. 452 at 7.  Standards will be discussed in detail at trial, including that

they provide the benefit of a complete protocol with the contributions of innovators selected by the consensus of experts around the world.  That CS was able to implement those standards without any contribution of its own demonstrates the significant value to it of TQD's standard-essential DSL inventions.  There is no reason to think the jury will be confused or misled by the simple fact that Mr. Tzannes/Aware/TQD contributed to the DSL standards and CS implemented them without its own contribution or payment.

## II.  CONCLUSION

TQD asks the Court to deny CommScope's Motion for the reasons set forth above.

Dated: February 21, 2023

/s/ William E. Davis, III

William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com

Christian J. Hurt
Texas State Bar No. 24059987
churt@davisfirm.com

Rudolph "Rudy" Fink IV
Texas State Bar No. 24082997
rfink@davisfirm.com

Edward Chin
Texas State Bar No. 50511688
echin@davisfirm.com

Ty Wilson
Texas State Bar No. 24106583
twilson@davisfirm.com

**THE DAVIS FIRM PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661

Peter J. McAndrews
(*Pro hac vice*)
pmcandrews@mcandrews-ip.com

Rajendra A. Chiplunkar
(*Pro hac vice*)
rchiplunkar@mcandrews-ip.com

Ashley Ratycz
(*Pro hac vice*)
aratycz@mcandrews-ip.com

**MCANDREWS, HELD & MALLOY, LTD.**
500 West Madison St., 34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100

*ATTORNEYS FOR PLAINTIFF TQ DELTA, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document and all attachments thereto are being filed electronically in compliance with Local Rule CV-5(a).  As such, this document is being served this February 21, 2023 on all counsel of record, each of whom is deemed to have consented to electronic service.  L.R. CV-5(a)(3)(A).

/s/ William E. Davis, III
William E. Davis, III

17