IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

TQ DELTA, LLC.,                    (  CAUSE NO. 2:21-CV-310-JRG
                                   )
          Plaintiff,               (
                                   )
vs.                                (
                                   )
COMMSCOPE HOLDING COMPANY,         (
INC., et al.,                      )  MARSHALL, TEXAS
                                   (  MARCH 17, 2023
          Defendants.             )  9:00 A.M.
_____


VOLUME 1

_____

TRIAL ON THE MERITS


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE

_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
1                    A P P E A R A N C E S

2        FOR THE PLAINTIFF:    DAVIS FIRM, P.C.
                               213 N. FREDONIA ST., SUITE 230
3                              LONGVIEW, TEXAS  75601
                               (903) 230-9090
4                              BY: MR. RUDOLPH FINK
                                   MR. CHRISTIAN HURT
5                                  MR. WILLIAM DAVIS

6                              McANDREWS HELD & MALLOY, LTD
                               500 W. MADISON ST., 34TH FLOOR
7                              CHICAGO, ILLINOIS  60661
                               (312) 775-8000
8                              BY:  MR. PETER McANDREWS
                                    MS. ASHLEY RATYCZ
9
         FOR THE DEFENDANT:    ALSTON & BIRD, LLP-NC
10                             101 SOUTH TRYON STREET
                               SUITE 4000
11                             CHARLOTTE, NC  28280
                               (704) 444-1025
12                             BY:  MR. ROSS BARTON
                                    MR. MATTHEW STEVENS
13                                  MR. KIRK BRADLEY
                                    MS. KARLEE WROBLEWSKI
14
                               ALSTON & BIRD, LLP - ATLANTA
15                             ONE ATLANTIC CENTER
                               1201 WEST PEACHTREE STREET NW
16                             #4900
                               ATLANTA, GEORGIA  30309-3424
17                             (404) 881-7000
                               BY:  MR. MICHAEL DEANE
18
                               THE DACUS FIRM, PC
19                             821 ESE LOOP 323, SUITE 430
                               TYLER, TEXAS  75701
20                             (903) 705-1117
                               BY:  MR. DERON DACUS
21
         OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
22                             100 E. HOUSTON STREET
                               MARSHALL, TEXAS  75670
23                             (903) 923-8546

24

25
```

## <u>INDEX</u>

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| MARCOS TZANNES | |
| Direct By MR. McANDREWS........................................... | 179 |
| Cross By MR. STEVENS............................................. | 240 |
| Redirect By MR. McANDREWS........................................ | 281 |

```
1              THE COURT:  Thank you.  Be seated, please.
2         Good morning, ladies and gentlemen.  Thank you for being
3    here.
4         My name is Rodney Gilstrap, and I am the chief United
5    States District Judge for the Eastern District of Texas.  I
6    have lived in Marshall since 1981.  I practiced law in and
7    around this community and this part of the state for 30 years,
8    and then I was nominated for this position by the president,
9    confirmed by the Senate, and I've been on the bench as a
10   federal district judge since 2011.
11        I will start with a confession because they say
12   confession is good for the soul.  I was not born in Texas, but
13   I got here as quick as I could.  I came to Texas at the ripe
14   old age of 18 to enroll and attend college at Baylor
15   University in Waco, finished my undergraduate degree there,
16   and enrolled and graduated from Baylor Law School.
17        I am married.  My wife owns and operates a retail floral
18   business here in Marshall.  My children are grown, but I have
19   some perfect grandchildren.
20        Now, I tell you all these things about myself and my
21   background because in a little bit I'm going to ask each of
22   you-all to tell me and the rest of us the same kind of
23   information about yourselves and your background, and I think
24   you're entitled to know as much about me as I'm going to ask
25   you to tell me about each of yourselves.
```

1          Now, we're here this morning to engage in the selection

2    of a jury in a civil case involving allegations of patent

3    infringement.  If you'll indulge me for just a minute, I want

4    to briefly review with you how we came to have our American

5    civil jury trial system.  I think it's important for you to

6    understand why we're here.

7          If you go back in ancient history and if you begin with

8    the first five books of the Old Testament called the

9    Pentateuch, you'll find that the ancient Hebrew nation

10   impaneled juries to decide issues of property ownership and

11   property value.

12         The ancient Greeks began using a jury system about 1500

13   BC.  The Romans, as they did with many things, copied the jury

14   system from the Greeks, and the ancient Romans employed a jury

15   system.  And it was the Romans that brought the jury system to

16   what we now know to be Great Britain when they crossed the

17   English channel and conquered that island in the 4th century

18   AD.

19         And the jury system flourished in England, Great Britain,

20   from the 4th century AD until the 12th century, 800 years.

21   But in the 12th century a rather tyrannical king came to the

22   throne of England.  His name was King John.  And King John set

23   about doing things that created tremendous discord and

24   conflict between the king and all his nobles, and it led that

25   country nearly to the brink of a civil war.  And one of the

1   things King John did that was highly objectionable to his

2   nobles was he attempted to curtail the civil jury trial system

3   in England.

4       Thankfully, there wasn't a civil war.  Those disputes

5   were all resolved in a lengthy written document signed by the

6   king and all his nobles at a place called Runnymede.  That

7   document, which is an important historical instrument for any

8   democracy, is known as the Magna Carta.  And in the Magna

9   Carta, the king guaranteed the right to a trial by jury for

10  his subjects in England.

11      And so you can see that the jury trial system then later

12  made its way across the Atlantic Ocean when our British

13  colonial forefathers came to this continent, and the jury

14  trial system flourished in British North America for over a

15  hundred years until another rather tyrannical king came to the

16  throne of Great Britain.  This time his name was King George

17  III.

18      And like King John, King George III became embroiled in

19  many controversies with his British colonists here in North

20  America.  You've studied about that in American history.  And

21  those various disputes led our forefathers to determine that

22  ultimately they had no choice but to separate from England and

23  form our own independent nation.

24      And a part of that process involved a document being

25  drafted by Thomas Jefferson called the Declaration of

1    Independence.  And in the Declaration of Independence, Thomas

2    Jefferson set forth on behalf of all colonial subjects who

3    were subject to those disputes, he set forth all the reasons

4    why our forefathers thought and felt compelled to separate

5    from England.  And in the Declaration of Independence, one of

6    the specific reasons called out for why we must separate and

7    form our own independent nation was the king's efforts to

8    curtail the right to trial by jury.

9        And as you all know from studying history in school, we

10   did engage in a revolution, we did separate and form our own

11   independent nation, and we did succeed in creating the United

12   States of America.  And shortly after our independence, though

13   we had a brief period where we struggled with something called

14   the Articles of Confederation, we quickly came around to

15   drafting what is the supreme law of the land, the Constitution

16   of the United States.

17       And after the Constitution was ratified, there was an

18   immediate process to add 10 amendments.  Those 10 amendments

19   you've all known about.  They're called the Bill of Rights.

20   And if you look at those 10 amendments to the U.S.

21   Constitution, the Seventh Amendment guarantees the right to

22   trial by jury in a civil case for every American.

23       Those 10 amendments, the Bill of Rights, were all

24   ratified and became part of our Constitution in 1791.  So

25   since 1791, for well over 200 years, every American has had a

1   constitutionally-guaranteed right to have their civil disputes

2   resolved through a trial by jury.

3        So I want you to have some understanding of importance

4   and the significance of the trial by jury process, and that's

5   why you're here this morning.  And I want you to understand

6   that, in the Court's view, each of you in a very real way are

7   helping preserve, protect, and defend our Constitution,

8   particularly the Seventh Amendment, by answering the call to

9   jury duty and being here this morning and presenting

10  yourselves for jury service in this case.

11       I always tell citizens who appear for jury duty as you

12  have this morning that in my personal view jury service is the

13  second highest form of public service that any American can

14  render in my personal view.  The highest form of public

15  service are those young men and women that serve in our armed

16  forces.

17       Now, the lawyers for the parties are going to address you

18  the panel of potential jurors this morning.  They're going to

19  ask you various questions as a part of this process.  I want

20  you to understand, they are not seeking to inquire into your

21  personal affairs unduly.  Let me say that another way.

22  They're not trying to be nosy.  They're trying to help secure

23  relevant information to secure a jury of fair and impartial

24  jurors to hear the evidence in this case.  They're entitled to

25  ask the questions they're going to ask.

1          I want you to also understand these are some of the most

2     skilled and experienced trial lawyers in the United States.

3     They know the rules.  I do not expect them to ask any improper

4     questions.  If they should, I will not hesitate to stop them.

5     But you need to understand them asking the questions they will

6     of you later this morning as a part of this process is an

7     integral part of helping secure a fair and an impartial jury

8     to hear the evidence in this case.

9          Now, I don't know if this will happen this morning, it

10    rarely does, but I want to make you aware that if by chance

11    you should be asked a question that in your own personal view

12    is so personal and so private that you are not comfortable

13    answering it in front of everyone else, you have the option to

14    simply say, I'd like to talk about that with Judge Gilstrap.

15    And if that's your answer, I'll provide an opportunity where

16    you can answer that question outside of the presence of

17    everyone else on the panel.

18         But I want you to understand, ladies and gentlemen, I've

19    been doing this going on -- I'm in my 12th year.  I think

20    that's come up once or twice.  It doesn't come up very often.

21    But I want you to know it's an option if it should in your

22    particular case.

23         Now, the trial in this case is going to start today after

24    we've selected the jury, and I anticipate that it will extend

25    through all of next week.  This is the 17th, Saint Patrick's

1    Day.  Happy Saint Patrick's day to everybody.  Seven days from

2    now, Friday of next week, is the 24th.  I expect and hope we

3    will be finished on the 24th.

4         There is a small chance that we could carry over onto

5    Monday of the next week, which would be the 27th.  I don't

6    think that's likely; it's possible.  This is not an exact

7    science, the process of trying a case before a jury.  But I

8    have every reason to believe we'll be finished either a week

9    from today or at the very latest the following Monday.

10        Now, I need to know if there are any of you on the panel

11   who, if you were selected to serve on this jury, would have a

12   very serious conflict as to why you might not be able to be

13   here for that entire period of time.

14        And let me give you an example of what I'm talking about.

15   If you have a surgical procedure that's scheduled for you or

16   an immediate member of your family who is dependent upon you

17   and that can't be changed, that's a reason to let me know that

18   you have a conflict.

19        I want you to also understand, ladies and gentlemen, that

20   the reason jury service counts as important public service is

21   because it's inconvenient.  It's never easy; it's never

22   convenient to be on a jury.  So inconvenience or I really

23   would like to do something that I can put off 'til later,

24   those are not reasons to be excused from jury duty.  But if

25   there is a serious reason that can't be easily changed and it

1    impacts you personally, then that's something that I need to

2    know about.

3         If there's anybody that feels like they fall in that

4    category, would you raise your hands and let me make a note of

5    that?  Okay.  No. 14 and No. 10.  Anybody else in the jury

6    box?  All right.

7         Anybody in the gallery?  I don't see any other hands.

8         Okay.  No. 10 and No. 14.  Thank you.

9         All right.  At this time I'm going call for announcements

10   on the record in the case of TQ Delta, LLC., versus CommScope

11   Holding Company, Inc.; CommScope, Inc.; ARRIS International,

12   Ltd.; ARRIS Global, Ltd.; ARRIS U.S. Holdings, Inc.; ARRIS

13   Solutions, Inc.; ARRIS Technology, Inc.; and ARRIS

14   Enterprises, LLC.

15        And, counsel, as you give your announcements on the

16   record for your respective parties, please introduce the

17   members of your trial team and any corporate representatives

18   that you have with you.  We'll begin with the Plaintiff.

19        What says the Plaintiff?

20             MR. DAVIS:  Good morning, Your Honor.  Bo Davis on

21   behalf of the Plaintiff.  I'd like to introduce from TQ Delta

22   Ms. Abha Divine.  Also at counsel table with me is Ms. Tara

23   Trask.

24        Our trial team, Your Honor, is Mr. Pete McAndrews; Mr.

25   Christian Hurt, who's sitting back here.

1        Mr. Raj, would you stand up, please?  Thank you.

2        And Rudy Fink and, finally, Ms. Ashley Ratycz.

3        We're ready to proceed, Your Honor.

4            THE COURT:  Thank you, counsel.

5        What says the Defendants?

6            MR. DACUS:  Good morning, Your Honor.  Deron Dacus

7    here on behalf of CommScope and ARRIS.  And here with me as

8    part of the trial team are Ross Barton, Scott Stevens, Kirk

9    Bradley, and Karlee Wroblewski, Your Honor.

10       And our corporate representative, Your Honor, is

11   Mr. Steve Wauters.  And due to circumstances beyond our

12   control, he cannot be here today, but he'll be here on Monday

13   for the rest of the trial, Your Honor.

14       And we're ready to proceed, Your Honor.

15           THE COURT:  Thank you, counsel.

16           MR. DACUS:  Thank you.

17           THE COURT:  As I told you, ladies and gentlemen of

18   the jury, this is a patent case arising out of the patent laws

19   of the United States.  What the Plaintiff is claiming is that

20   its patents were infringed by the Defendants, and it's seeking

21   money damages because of that alleged infringement.  The

22   Defendants deny that they infringe any of the claims in the

23   Defendants' patents, and they contend that the Plaintiff's

24   patents are invalid.  Now, what I've just said is a very short

25   layman's version of what's at issue in this case.

1          I know you've all seen the video prepared by the Federal

2     Judicial Center this morning.  Having seen that, you know more

3     about patent cases than most people do in East Texas when they

4     appear for jury duty.  As I told you, the lawyers as a part of

5     this process are going to question members of the panel to

6     gather relevant information, exercise their rights called

7     peremptory challenges, and help the Court secure a fair and an

8     impartial jury to hear the evidence in this case.

9          I want you to understand this, ladies and gentlemen.

10     There are no wrong answers to any of the questions you'll be

11     asked by the lawyers as long as your responses to their

12     questions are full, complete, and truthful.  As long as your

13     responses are full, complete, and truthful, there are no wrong

14     answers.

15          As I mentioned, I don't think it's likely that any

16     improper questions will be asked.  If there are, I'll deal

17     with it.  But, again, these are very experienced trial

18     lawyers, and I think that's very unlikely.

19          One thing I do want to call your attention to, though,

20     before the lawyers begin with any questions, because I think

21     they may ask you about your ability to apply this if you're

22     selected to serve on this jury, is what we call the burden of

23     proof.  All cases must be proven by a certain amount of

24     evidence, and that amount of evidence is what's called the

25     burden of proof.

1          In a patent case like this, the jury may be called upon

2     to apply two different burdens of proof.  The jury may apply,

3     first, a burden of proof known as the preponderance of the

4     evidence.  I'll say that again--the preponderance of the

5     evidence.  And the jury may be called upon to apply a second

6     burden of proof known as clear and convincing evidence.  I'll

7     say that again--clear and convincing evidence.

8          Now, when you're responding to lawyers' questions about

9     the burden of proof, I need to instruct you that when a party

10    has the burden of proof on any claim or defense by a

11    preponderance of the evidence, that first burden I mentioned

12    to you, that means that the jury must be persuaded by the

13    credible and believable evidence that that claim or defense is

14    more probably true than not true.  Let me say that again--more

15    probably true than not true.  This is sometimes talked about

16    as being the greater weight and degree of credible testimony.

17         Let me give you an example I hope will be helpful.  In

18    front of me are our Courtroom Deputy and our court reporter.

19    In front of our court reporter is a statue of the Lady of

20    Justice.  She's blindfolded.  In her right hand lowered at her

21    right side is the sword of justice.  In her left hand raised

22    are the scales of justice.  Those scales are equal and

23    balanced in all respects, and that's where these parties

24    should start off in this trial--equal and balanced.

25         But over the course of this trial, the Plaintiff is going

1   to put all their evidence before the jury.  Think of it as

2   though the Plaintiff's going to put its evidence on one side

3   of those scales and then the Defendants are going to present

4   their evidence to the jury and think of it as though they will

5   be putting their evidence on the other side of those scales.

6        And when all the evidence is in, it's on one side or the

7   other of those scales, if a party has the burden of proof on

8   any issue by a preponderance of the evidence and in looking at

9   those scales they tip in favor of the party who has that

10  burden by a preponderance of the evidence, even if they tip

11  ever so slightly, then that party has met its burden of proof

12  to prove that issue by a preponderance of the evidence.

13       Now, on the other hand, in applying the second burden of

14  proof that I've noted for you as clear and convincing

15  evidence, that means -- clear and convincing evidence means

16  that you, the jury, must have an abiding conviction in the

17  truth of the parties' factual contentions and find that they

18  are highly probable.

19       Let me say that again--an abiding conviction that the

20  truth of the party's factual contentions are highly probable.

21  That's a different burden of proof than the preponderance of

22  the evidence.  It is a higher burden of proof than the

23  preponderance of the evidence.

24       If you imagine the same example and the scales of

25  justice, they start off equal.  Over the trial, the

 1    Plaintiff's evidence goes on one side, the Defendants'

 2    evidence goes on the other side, and when all the evidence is

 3    in, if a party has the burden of proof on any defense by clear

 4    and convincing evidence, then to meet that burden of proof,

 5    those scales must tip in that party's favor and they must

 6    definitely tip.  It's not sufficient that they tip ever so

 7    slightly.  They must definitely tip.  But if they do, then

 8    that party has met the burden of proof of clear and convincing

 9    evidence.

10        Now, neither of these two burdens of proof, ladies and

11    gentlemen, should be confused with a third and completely

12    different burden of proof that you've probably heard about on

13    television and in the movies called beyond a reasonable doubt.

14    Beyond a reasonable doubt is the burden of proof applied in a

15    criminal case.  It has absolutely no application whatsoever in

16    a civil case such as this.

17        Clear and convincing evidence is not as high a burden of

18    proof as beyond a reasonable doubt, but it is a higher burden

19    of proof than the preponderance of the evidence.

20        I give you these instructions in case the lawyers ask you

21    about your ability to apply these two burdens of proof to the

22    evidence if you're selected to serve as a juror in this case.

23        Now, before the lawyers begin their questioning, I'm

24    going to ask each of you, as I indicated when I started this

25    morning, to give all of us the same kind of information about

1    yourselves that I gave you about myself when I came out here.

2    All of you should have either in your hands or in the monitor

3    or somewhere readily available nine standard questions.

4         I'm going to ask each of you to answer those nine

5    standard questions for all of us, and let me tell you how

6    we're going to do that.  We have two of our court security

7    officers in the courtroom.  They each have a handheld

8    microphone.  They're going to bring that handheld microphone

9    to each of you one at a time.

10        When you get that microphone, please stand up, please

11   hold that microphone where it will do some good.  Don't hold

12   it down at your waist, hold it up near your mouth.  It's a

13   large room.  There are a lot of people here.  We need the

14   benefit of the amplification for that microphone so that we

15   can hear you clearly.  Hold that microphone near your mouth

16   and then answer those nine questions for us.  And then you'll

17   either hand it back to the Court Security Officer or you'll

18   pass it to the next person next to you if it's convenient.

19        And we're going to start with the first member of our

20   panel, Mrs. Welch, and then we're going to go through every

21   one one at a time on the panel.

22        Let me also say this, ladies and gentlemen.  During the

23   part of the process where the lawyers get to ask each of you

24   individual questions, if you're asked an individual question

25   by one of the lawyers, the Court Security Officer will bring

1    you a handheld microphone.  Wait until you get the microphone

2    and then stand up, then hold it near your mouth, and use that

3    to answer that question in the same way you're going to answer

4    these nine standard questions now.

5        All right.  So we'll begin with Mrs. Welch, Panel Member

6    No. 1.

7        If you'll answer those nine questions for us, ma'am?

8            THE PANEL MEMBER:  My name is Karen Welch.  City

9    where I live, Atlanta, Texas.  I have one daughter.  She died

10   in 2000.  She had seven kids, and now seven of them kids have

11   kids.  So I just have a lot of grandchildren running around my

12   feet.

13       Place of employment, David Boone Ministry, Meals On

14   Wheels.  I started this year in January.  I have one year of

15   college.

16       My husband is -- he passed in the 2000 so he don't work.

17       And no jury service.  No prior jury service.

18           THE COURT:  All right.  Thank you, Mrs. Welch.

19       Panel Member 2 is next.

20           THE PANEL MEMBER:  Hi.  My name is Krista Ruest.  I

21   live in Marietta.  I have six kids.

22       I do not work.  I'm a stay-at-home mom, home schooler for

23   16 years.  I have a high school diploma and a cosmetology

24   license.

25       My husband's name is John Ruest, and he works for the

1    Church of Jesus Christ Latter Day Saints.  He's a facility

2    manager, and he's worked there for about 16 years.

3          And I have served a civil case jury duty.

4                THE COURT:  How long ago was that and where was it?

5                THE PANEL MEMBER:  That was about 18 years ago in

6    Fort Worth.

7                THE COURT:  And was it in a state court or a federal

8    court?

9                THE PANEL MEMBER:  A state court.

10               THE COURT:  All right.  Thank you, ma'am.

11         Next is Panel Member 3.

12               THE PANEL MEMBER:  My name is Trevor Mehrens.  I

13   currently live in Longview.  I have two children.

14         I work at Trinity Rail.  I've been out there for about 13

15   years.  I did go to trade school for welding and have a high

16   school diploma.

17         My wife's name is Kelsey Mehrens, and she is working on

18   her third year working at Netty Williams.

19         And this is my first time doing jury duty.

20               THE COURT:  And what kind of work does your wife do,

21   sir?

22               THE PANEL MEMBER:  A schoolteacher.

23               THE COURT:  Okay.  Thank you.

24         Next is Panel Member 4, Mrs. Gage.

25               THE PANEL MEMBER:  My name is Kathy Gage.  I

1    actually don't live in a city, but our address is Hawkins,

2    Texas.  I live in a little community, Shady Grove, and it's in

3    Upshur County.  I have actually four children.  We adopted our

4    two grandsons.

5         And I worked at -- I'm retired, but I worked at Strategic

6    Fulfillment Group in Big Sandy, Texas, and I was a milling

7    operator, machine operator.  And I finished high school and I

8    went to Federal Business Institute in Tyler, Texas.

9         And my spouse's name is Darrell Gage, Sr.  He is -- he

10   was a member of Local 100 in Dallas, Texas, Palmers and Pipe

11   Fitters Union, and he worked there about 15 years.

12        And I had a civil jury that I was on many, many years

13   ago.

14              THE COURT:  Where was that jury service, ma'am?

15              THE PANEL MEMBER:  It was in Hawkins, Texas.

16              THE COURT:  Okay.  Thank you.

17        No. 5 is next, Ms. Lowery.

18              THE PANEL MEMBER:  My name is Brittanie Lowery.  I'm

19   from Atlanta, Texas.  I have two children, a boy and a girl.

20        I work at Ward Timber.  I'm the office manager so fun

21   office stuff.  I've worked there for nine years officially and

22   unofficially probably my whole life because it's a family

23   business.  I went to Baylor University and graduated with a

24   business degree.

25        My spouse is Brett Lowery.  He works at Ward Timber also.

1    He's our saw mill manager.  He's been there for about six

2    years.

3         And I have not done any jury service.

4              THE COURT:  Thank you, ma'am.

5         Panel Member No. 6, Mr. Hodges.

6              THE PANEL MEMBER:  Caleb Hodges; Bloomburg, Texas.

7    Got five kids.

8         Hodges & Son Construction and been there 20-plus years.

9    High school education.

10        Megan Hodges is my wife.  She's part-time, Hodges & Son

11   Construction, and then home schools the kids.  She's been

12   there about 16 years.

13        And no prior jury service.

14             THE COURT:  Thank you, sir.

15        No. 7 is next, Mrs. Alexander?

16             THE PANEL MEMBER:  My name is Labrisha Wilder

17   Alexander.  I have two children.

18        I work at Wilder Brothers Construction.  It's a family

19   company.  I've been there unofficially for about 30 years,

20   officially 12.  I have a high school diploma.

21        My spouse's name is Jackie Alexander.  He works at Wilder

22   Brothers Construction also.  He's been there since 2008.

23        And I served on one criminal case in Marion County.

24             THE COURT:  In state court.

25             THE PANEL MEMBER:  Yes.

```
1              THE COURT:  Thank you, ma'am.
2         All right.  Panel Member No. 8 is next.
3              THE PANEL MEMBER:  My name is Ivan Becerril.  I am
4    from Pittsburg, Texas, and I don't have any kids.
5         My place of employment is Healthcare Express in Mt.
6    Pleasant.  I am on the nursing staff and the radiology staff.
7    I've worked there for about eight months.  My education is an
8    Associate's degree in nursing from Navarro.
9         I don't have a spouse, and I've never served on a jury.
10             THE COURT:  Thank you, sir.
11        Next is No. 9, Mrs. Pattison?
12             THE PANEL MEMBER:  Hello.  My name is Melissa
13   Pattison.  I live in Jefferson, Texas.  I have two sons.
14        I work -- currently work at Brookshire's.  I've been in
15   all departments.  I'm currently in the meat department.  I've
16   been there seven years.  I have my GED.
17        My husband is Michael Pattison.  He works for General
18   Cable, also known as Prysmian.  He's a lab technician.  He
19   tests cable from all over the world.  He's been there I
20   believe 12 years.
21        And I've never served on a jury.
22             THE COURT:  Thank you, ma'am.
23        No. 10 is next.  Excuse me, No. 11.  No.  It's No. 10.
24   Go ahead.
25             THE PANEL MEMBER:  My name is Cathrine Martin.  I
```

 1   reside in Waskom, Texas.  I have four children.

 2        I'm currently employed as a registered nurse at Christus

 3   Good Shepherd Medical Center here in Marshall.  I work

 4   intermediate care.  I've been there for 15 months and was

 5   previously a hospice nurse.

 6        My husband is a plant and airframe maintenance.  He works

 7   with the Shreveport Regional Airport overnight maintenance on

 8   aircraft.  He's been there about three years.

 9             THE COURT:  What is his name, ma'am?

10             THE PANEL MEMBER:  Clinton Martin.

11             THE COURT:  Thank you.

12             THE PANEL MEMBER:  And I have never served on a

13   jury.

14             THE COURT:  Thank you, Mrs. Martin.

15        No. 11 is next, Mrs. Patel.

16             THE PANEL MEMBER:  My name is Reena Patel.  I live

17   in Marshall, Texas.  I have two boys.

18        I work with my husband.  We have -- we're in the hotel

19   industry, so I've been working with him for 21 years.  I'm

20   from South Carolina so I went to school -- high school there

21   and did college two years and did business law.

22        My husband's name is Dipen Patel, and he's also in the

23   hotel industry.  And he's been doing this for 38 years.

24        And I have never served on jury duty.

25             THE COURT:  And you-all operate hotels here in

1    Marshall?

2              THE PANEL MEMBER:  Yes, and Carthage.

3              THE COURT:  Which ones?

4              THE PANEL MEMBER:  We have the Motel 6, which was

5    Super 8, and in Carthage he built the Holiday Inn Express and

6    he sold that business.  And then we have partnership in all

7    around the U.S.

8              THE COURT:  Thank you.

9        All right.  No. 12 is next, Mrs. Lowery.

10             THE PANEL MEMBER:  Good morning.  My name is Nancy

11   Lowery.  I live here in Marshall.  One son, deceased.

12       My place of employment is Walmart.  I'm part of the asset

13   protection team.  I've been there -- July will be 29 years.

14   Education, vocational education through the University of

15   Tyler.

16       My spouse's name is William Lowery.  He's a retired cross

17   country truck driver.

18       And no prior service on a jury.

19             THE COURT:  And what team did you say at Walmart

20   you're a part of?

21             THE PANEL MEMBER:  Asset protection operations.

22             THE COURT:  And what do they do?

23             THE PANEL MEMBER:  I receive goods that come into

24   the store.

25             THE COURT:  Thank you very much, Mrs. Lowery.

1          THE PANEL MEMBER:  Uh-huh.

2          THE COURT:  Next is No. 13, Mr. Sundby?

3          THE PANEL MEMBER:  Hello.  My name is Brian Sundby.

4    I live in Longview, Texas.  I don't have any children.

5        Previous employment, worked at Texas Instruments and

6    Houston Lighting and Power.  How long?  Let's see.  Well, I'm

7    retired.  Education, associate of applied science and computer

8    networking.

9        I'm divorced.  I've been divorced for a long time.

10          THE COURT:  Any prior jury service?

11          THE PANEL MEMBER:  Yes.  I was on a civil case in

12   Harris County in Houston.

13          THE COURT:  Was that in state court or federal

14   court?

15          THE PANEL MEMBER:  It was -- when was that?  I guess

16   it was state.

17          THE COURT:  How long ago was that, sir?

18          THE PANEL MEMBER:  Oh, 40 years.

19          THE COURT:  Okay.

20          THE PANEL MEMBER:  Back in the 1981.

21          THE COURT:  Thank you very much.

22          THE PANEL MEMBER:  Right.

23          THE COURT:  No. 14 is next, Mr. Owens.

24          THE PANEL MEMBER:  Rodney Owens.  I got three boys.

25        I'm the owner of Soundwave, Incorporated, in Longview.

1    I've been there -- had that business I believe 19 years.  GED

2    and some college.

3         Spouse's name is Jody Ray.  She's an RN at Longview

4    Regional.  I believe she's been there almost 30 years.

5         And no prior jury.

6              THE COURT:  Thank you, Mr. Owens.

7         All right.  Next is Panel Member No. 15, Mr. Cheatham.

8              THE PANEL MEMBER:  David Cheatham.  I live in

9    Harleton.  We have five kids.

10        I retired from the City of Longview Police Department,

11   been retired two years.  Bachelor, criminal justice.

12        My wife's name is Nora Cheatham.  She retired after 20

13   years with the City of Longview Police Department.

14        No jury service.

15             THE COURT:  What did you do in law enforcement and

16   what does your wife do?

17             THE PANEL MEMBER:  She did -- she did patrol her --

18   her whole 20 years.  I did everything from patrol through

19   crimes against persons, homicide, crimes against

20   children--seven years of that, longest 20 years of my life.

21             THE COURT:  What was your -- what was your official

22   title when you retired?

23             THE PANEL MEMBER:  I just retired as a patrol

24   officer.  I actually went back on the street my last two years

25   and finished where I started in my first beat.

1          THE COURT:  Good.  Thank you, Mr. Cheatham.

2          THE PANEL MEMBER:  Because it was fun.

3          THE COURT:  Thank you.

4     Next is No. 16, Mr. Jennings.

5          THE PANEL MEMBER:  Hi.  I'm Dakota Jennings, and I'm

6     from Longview, Texas.  I don't have any children.

7     My place of employment is I work at AAON Coils, which is

8     an AC plant, and I'm an inventory specialist.  I have a high

9     school diploma.

10    I don't have a spouse and no prior jury.

11         THE COURT:  Thank you, sir.

12    Next is No. 17, Mrs. Lancaster?

13         THE PANEL MEMBER:  My name is Julie Lancaster.  I

14    have one child.

15    I am a self-employed hair dresser.  I've been there for

16    29 years.  I'm very busy.  I have an education in cosmetology.

17    My spouse is Donnie Lancaster.  He works in Longview at

18    Rail Serve.  He's an air brake technician.

19    And I have served on two juries.  I've been twice.  One

20    was 18 years, and one was 11 months ago.

21         THE COURT:  And where were those?

22         THE PANEL MEMBER:  In Linden, Texas.

23         THE COURT:  Both in Cass County in Linden, Texas?

24         THE PANEL MEMBER:  Yes, sir.

25         THE COURT:  Okay.  Thank you, ma'am.

1        No. 18, Mrs. Surman.

2              THE PANEL MEMBER:  Hi, my name is Lisa Surman.  I

3    live in Pittsburg.  I have two children and one grandchild on

4    the way in July.

5        We own our own business, Surman Construction.  We do

6    commercial concrete construction.  I do the accounting.  We've

7    had it for about 25 years.  I have two years of college.

8        My husband's name is Timothy Surman.  He is also owner

9    and operator.  He does the estimating and the day-to-day

10   operations for almost 25 years as well.

11       And no prior jury service.

12             THE COURT:  Thank you, ma'am.

13       If you'll hand that to the Court Security Officer, he'll

14   take it to Panel Member No. 19, Mr. Nenninger?

15             THE PANEL MEMBER:  Good morning, Judge.  My name is

16   Charles Nenninger.  I've lived in Marshall, Texas, since 1993.

17   I have three children.

18       I work for the Harrison County Courthouse in information

19   technology.  I've been there for 20 years.  Educational

20   background is associate's bachelor's and some graduate work.

21       Spouse's name is Karen, and she is a registered nurse at

22   Christus Good Shepherd in Longview, been there for 22 years.

23       And my prior jury service was over 40 years ago in

24   Missouri, both criminal and a civil case.

25             THE COURT:  And were any of those in federal court

1    or were they state court there?

2              THE PANEL MEMBER:  They were state.

3              THE COURT:  Thank you, sir.

4         Next is No. 20, Mr. Northcutt.

5              THE PANEL MEMBER:  Thank you, Your Honor.  My name

6    is Michael Franklin Northcutt, Jr.  I live in Longview, Texas.

7    I have two children.

8         I work for the Upshur County District Attorney's Office.

9    I'm an assistant district attorney.  I've been there two years

10   two months.  Graduated from Longview High School, the

11   University of Texas at Austin, South Texas College of Law.

12        My wife's name is Amy Northcutt.  She works at LeTourneau

13   University for eight years.

14        I served on a criminal jury in state court in Harris

15   County, Texas.

16             THE COURT:  Thank you, sir.

17        No. 21 is next, Mr. Lejune.

18             THE PANEL MEMBER:  My name is Caleb Lejune.  I'm not

19   married.  No kids or anything.

20        I had a two-year degree, so I had two years in general

21   studies at Panola College.  I got an $8,000 scholarship.

22   Hallelujah.

23             THE COURT:  What about your work experience?

24             THE PANEL MEMBER:  My work experience?  I work at

25   the Republic Cabinet Factory, been there eight months.  I'm

 1    basically a duster guy.  I use a dust machine to dust the

 2    pieces, been there about eight months.

 3         And only -- other than that, the only jury -- I did have

 4    jury service one time about -- I think about a year or so ago.

 5    It was state.  It was a murder case.  That's the only prior.

 6              THE COURT:  Where was that, sir?

 7              THE PANEL MEMBER:  Right here at the courthouse,

 8    sir, state court, yes, sir.

 9              THE COURT:  Harrison County courthouse?

10              THE PANEL MEMBER:  Yes, sir.  Yes, sir.

11              THE COURT:  Thank you.

12         All right.  No. 22 is next, Mr. Anderson.

13              THE PANEL MEMBER:  My name is Billy Anderson, and I

14    live in -- I got four kids.

15         And the place I'm employed is River City Iron & Metal.

16    I've worked there about 18 years.  Education, 12th.

17         My spouse's name is Linda Faye Anderson, and she's not

18    employed.  And I have worked there -- I mean, she unemployed.

19    And I worked -- I did community -- oh, lord.

20              THE COURT:  Any prior jury service, sir?  Any prior

21    jury service?

22              THE PANEL MEMBER:  No, sir.

23              THE COURT:  Okay.  And where do you live, Mr.

24    Anderson?

25              THE PANEL MEMBER:  Deberry, Texas.

1          THE COURT:  Thank you very much, sir.

2      Next is No. 23, Mr. Alford.

3          THE PANEL MEMBER:  I'm Mike Alford.  I live over in

4   Harleton.  Mr. Cheatham may know my two younger brothers.

5   They both just retired from law enforcement.  According to my

6   wife, I'm her only child.

7      I retired four years ago from the Longview Gas Plant.  It

8   was a gas processing plant over in White Oak.  I graduated

9   Harleton High and Kilgore College.

10     My wife is Kathy.  She retired about three years ago

11  after 35 years working for a dentist in the Longview area.

12     I have served civil and criminal cases in Harrison

13  County, but it's been a few years.

14         THE COURT:  Never in this court before?

15         THE PANEL MEMBER:  No, sir.  I was called one time

16  but excused.

17         THE COURT:  And tell me what you actually did for

18  the gas plant?

19         THE PANEL MEMBER:  I was a measurement technician.

20  The case I got let go on was a -- dealt with stripper wells,

21  Railroad Commission, and they decided I might know too much,

22  so they let me go from it.

23         THE COURT:  All right.  Thank you, Mr. Alford.

24     Next is No. 24, Mrs. Brown.

25         THE PANEL MEMBER:  Good morning.  My name is Shelia

1    Brown.  I live in Waskom.  I have three adult children.

2         I'm retired.  I previously worked for a state -- Texas

3    Health and Human Services.  I was in management.  We

4    determined benefits for needy families of Texas.  I worked

5    there 35 years.  I have high school and some college.

6         My spouse was Sammy Brown.  He's now deceased.

7         No prior jury service.

8              THE COURT:  Thank you, ma'am.

9         No. 25 is next, Miss Neeley.

10             THE PANEL MEMBER:  My name is Rebecca Neeley.  I

11   live in Pittsburg.  I don't have any children.

12        I work at Guaranty Bank & Trust as a loan specialist.

13   I've been there for two and a half years, and I have my high

14   school diploma.

15        I get married in eight short days.  So as long as nothing

16   goes past 4:00 on Friday, I'm fine.  He works for the

17   Wyland Company --

18             THE COURT:  Just bring him up here, and I'll take

19   care of it.

20             THE PANEL MEMBER:  He works for the Wyland Company

21   actually here in Marshall for oil field.  He deals with

22   chemicals.  He's worked there for going on a year.

23        And no prior jury service.

24             THE COURT:  Thank you, ma'am.

25        Next is No. 26, Ms. Russell?

1          THE PANEL MEMBER:  Good morning.  I'm Deborah

2    Russell.  I have three wonderful children, 10 great

3    grandchildren that I love dearly.

4          I work for Davita Pinecrest Dialysis here in Marshall and

5    I've lived in Marshall all of my life and a Texan definitely

6    all of my life.  And I've worked at Davita for four years now,

7    will be in April.

8          No spouse.  I've been happily divorced for 20 years at

9    least.

10          And I have never been called as a juror.  Thank you.

11          THE COURT:  Thank you, ma'am.

12          No. 27 is next, Mrs. Moreno.

13          THE PANEL MEMBER:  My name is Lora Moreno.  I have

14    one grown adult child.

15          I work at Academy Sports & Outdoors in the footwear

16    department.  If you need shoes, come see me.  I've been there

17    about three and a half years.  I have a Bachelor's in

18    management.

19          My spouse's name is James Moreno.  He has been happily

20    retired from Eastman for 42 years but decided to go back to

21    work at S & B for about a year.

22          And no prior jury service.

23          THE COURT:  Do you work at the Academy location in

24    Longview or Shreveport?

25          THE PANEL MEMBER:  Longview.

 1             THE COURT:  Thank you.

 2        All right.  No. 28 is next.

 3             THE PANEL MEMBER:  I'm Russell Romano.  I live in

 4   Jefferson, Texas.  I have three children, two of which have

 5   moved out and only have a 13-year-old left at home.

 6        I work for Edward Jones as a financial advisor, been

 7   there for about nine and a half years.  I have a high school

 8   diploma, a little bit of college, Series 7, Series 66

 9   licenses.

10        No spouse, and I've never served on a jury.

11             THE COURT:  Thank you, sir.

12        No. 29 is next, Mrs. Skidmore?

13             THE PANEL MEMBER:  I'm Lula Skidmore.  I live in

14   Atlanta, Texas.  I have five grown children.  I'm a housewife.

15             THE COURT:  Mrs. Skidmore, hold that a little

16   closer.  You're pretty far back from me.

17             THE PANEL MEMBER:  I'm sorry.  I quit school in 11th

18   grade to get married.  Dumb idea.

19        My spouse's name is William Skidmore.  He's an RN at

20   Transcend Hospice, and he's been there for three years.

21        And I've never served on a jury.

22             THE COURT:  Thank you.

23        No. 30 is next, Mr. Heller.

24             THE PANEL MEMBER:  Robert Heller, Sr.  I have

25   two -- well, I live in Gilmer, Texas.  I have two children.

1          I work at Neighbors Drilling Solutions.  I've been there

2     for 11 years.  I'm a technician.  I have high school and some

3     college.

4          My wife is Julie Heller, and she's a stay-at-home mom.

5          And no prior jury service.

6               THE COURT:  All right, sir.  Thank you very much.

7          No. 31 is next, Miss Simpson.

8               THE PANEL MEMBER:  Hi.  My name is Shelby Simpson.

9     I'm from Daingerfield, Texas.  I do not have any children.

10         I work at Eastman Chemical, and I am a senior production

11    specialist and that involves inventory and production.  I've

12    been there going on four years.  I have a high school diploma

13    and a college degree.

14         I am not married.  And I have served a criminal case in

15    Daingerfield, and it was for a state court.

16              THE COURT:  And what's your degree in, ma'am?

17              THE PANEL MEMBER:  I'm sorry.  What was it?

18              THE COURT:  What is your degree in?

19              THE PANEL MEMBER:  Business administration and

20    management.

21              THE COURT:  All right.  Thank you very much.

22              THE PANEL MEMBER:  Thank you.

23              THE COURT:  Next is No. 32, Mr. Wilson.

24              THE PANEL MEMBER:  Good morning.  My name is Michael

25    Wilson.  I live in Harleton, Texas.  Proud father of two

1    semiadult children.

2        Work at McCoy's Building Supply as an operations

3    supervisor, been there about 11 years.

4        My wife, Donna, works at East Texas Baptist University in

5    the registrar's office as a secretary.  She has been there

6    about nine years.

7        And I have no prior jury service.

8            THE COURT:  Thank you.

9        No. 33 is next.

10           THE PANEL MEMBER:  Emily Roeder from Marshall,

11   Texas.  I have no kids.  I used to teach at Waskom Elementary

12   for 12 years and quit to take care of my parents who were ill.

13   Went to ETBU, got a Bachelor's degree.

14       My husband is Josh Roeder, works at Prysmian in

15   Scottsville.  He's a senior lab tech.  He's worked there for

16   about five years.

17       And never been a juror before.

18           THE COURT:  All right.  Thank you, ma'am.

19       Thank you very much, ladies and gentlemen.

20       Now I need to say a couple of additional things to you

21   before I turn the questioning over to the lawyers.

22       The jurors who are selected to serve in this case will

23   serve in the role as the judges of the facts, and the jury

24   selected in this case will make the sole determination about

25   what the facts are in this case.  Now, my job as the judge is

1    to rule on questions of law, evidence, and procedure, to

2    maintain the decorum of the court, and to oversee an efficient

3    flow of the evidence throughout the trial.

4        Also, I want to say a couple of things to you about our

5    judicial system that hopefully will put things in a proper

6    perspective for you.  In every jury trial, besides the parties

7    themselves, there are always three participants--the jury, the

8    judge, and the lawyers.

9        Now, with regard to the lawyers, it's important for you

10   to understand that in our judicial system we have what's

11   called an adversary system, which simply means that during the

12   course of the trial each of the parties will seek to present

13   their respective cases to the jury through their lawyers in

14   the very best light possible.

15       Now, it's no surprise to you that lawyers are sometimes

16   criticized in the media, but the Court's observed that some of

17   that criticism comes from a basic misunderstanding of our

18   adversary system in which the lawyers act as advocates for the

19   competing parties.

20       And as an advocate, a lawyer is ethically and legally

21   obligated to zealously assert his or her client's position

22   under the rules of our adversary system.  And by presenting

23   the best case possible on behalf of their clients, the lawyers

24   hopefully will enable the jury to better weigh the relevant

25   evidence to determine the truth and to arrive at a just

1    verdict based on that evidence.

2        This adversary system of justice has served our nation

3    well for over 200 years, since our founding, and America's

4    lawyers have always been and will be an integral part of the

5    process.  So as we go forward, even though it's possible I

6    might from time to time roll my eyes or grumble at the

7    lawyers, it's simply because I'm trying to make sure they stay

8    within the bounds of our adversary system.  But please keep in

9    mind they are simply doing their jobs, and it's important for

10   all of you to be aware of that as we go forward.

11       Also, ladies and gentlemen, I want you to know that with

12   regard to those of you who may be selected to serve on this

13   jury, I am going to do my very best throughout this trial to

14   make sure that you have no idea about what I think about the

15   evidence that you're going to hear over the course of the

16   trial, because determining the facts from the evidence is the

17   jury's job, it is not my job, and you should not take anything

18   you see or hear or think you see or hear as coming from me as

19   a factor to consider in determining the ultimate facts in this

20   case.

21       All right.  With this -- with that, rather, we're now

22   prepared to hear from counsel from both the parties.  We'll

23   begin with the Plaintiff.

24       Mr. Davis, you may address the panel on behalf of the

25   Plaintiff.  Would you like a warning on your time?

1          MR. DAVIS:  Yes, Your Honor.  May I please have five

2     minutes and one minute?

3          THE COURT:  I'll warn you with five minutes and one

4     minute remaining.  You may proceed.

5          MR. DAVIS:  Thank you, Your Honor.

6     Good morning, everyone.  This is the part where you get

7     to talk.  In fact, we want you to talk.  As Judge Gilstrap

8     mentioned, this is our opportunity to speak to you, to talk to

9     you and ask you some questions.

10     You don't know anything about the case yet.  You haven't

11     heard hardly anything.  And my first question to you-all is,

12     does anybody have any leanings one way or another, without

13     having heard any facts in the case, are you already leaning

14     towards one side or the other?  Anybody?  Do I see any hands?

15     Because I know sometimes when you got the envelope in the

16     mail, you got the letter in the mail with the questionnaire,

17     and you saw that, you may have thought, Oh, boy, I don't know

18     if I want to -- I don't know if I want to go do that.  I

19     understand.  This is a disruption to your lives, it is a

20     sacrifice, and I do want to say thank you for being here

21     because it means a lot to us.  And you're going to hear that,

22     if you're selected for this jury, you'll hear thank you many,

23     many times.  So we do mean that.  So thank you for being here.

24     I think we can all agree that we've probably all had

25     different life experiences.  We all agree with that?  Each of

 1    us has different backgrounds.  We've experienced different

 2    things in our lives.  And sometimes those experiences affect

 3    us in a way that, when we then encounter a later situation, we

 4    think, you know, you kind of start out already predisposed to

 5    one side or another of an issue.

 6        And that's what this process is about.  It's about just

 7    finding out your life experiences to see whether or not any of

 8    those life experiences may or may not start you, whether you

 9    intend it to or not because we all want to be fair, but

10    whether you intend it to or not, start you out leaning --

11    leaning one way or another.

12        And leaning doesn't disqualify you from -- from being on

13    the jury.  It's not -- so there's no fear of disqualification,

14    there's no fear of -- of your answers.  We just want honest

15    answers, and we just want you to tell us what you think.

16        So Judge Gilstrap has permitted me a few minutes, a brief

17    couple of minutes, to tell you a little bit more about this

18    case.  This is a patent case, as you've heard, and it's a

19    patent case where TQ Delta is the patent owner, and they own a

20    series -- a set of seven patents that are called standard

21    essential patents.  They relate to a technology called DSL

22    technology.

23        Now, it's our contention in this case that the Defendant

24    CommScope is infringing on those patents, and we're here to

25    help have that dispute resolved.  It's CommScope's contention

1    that they don't infringe, they think the patents are invalid,

2    they think we breached a contract, and they say there

3    shouldn't be any damages as a result.

4        So with that brief overview of the case, has -- does

5    anybody have any leanings one way another based just on those

6    facts?  Okay.  I don't see any hands.

7        And I'll also say, you folks in the jury box here and you

8    folks there in the first row and the second row, you guys are

9    really in the hot zone.  Okay?  In terms of where the

10   questions are coming from.  And you may think, well, if I

11   don't raise my hand, if I don't offer anything, I won't get

12   called on.  That's probably not true.  You folks in the back

13   there, I don't want you to feel like I'm ignoring you, but the

14   reality is it's less likely that you will -- you will make

15   this jury the way the process works.

16       Now, these patents relate to DSL technology.  Does

17   anybody have DSL in their home, DSL internet?  You get your

18   internet from maybe a phone company that provides DSL

19   internet?  Anyone?

20       Okay.  Thank you.  No. 7, Mrs. Alexander?

21            THE PANEL MEMBER:  Yes, sir.

22            MR. DAVIS:  You have DSL?

23            THE PANEL MEMBER:  Yes.

24            MR. DAVIS:  How long have you had it?

25            THE PANEL MEMBER:  About four years.

```
 1              MR. DAVIS:  Four years.  Are you happy with it?

 2              THE PANEL MEMBER:  Yes.

 3              MR. DAVIS:  If you don't mind standing up there, do

 4      you know anything about DSL technology?

 5              THE PANEL MEMBER:  When I turn my computer on, it

 6      comes up.

 7              MR. DAVIS:  That's how I was before this case.

 8      Okay.  So you have DSL.  Do you happen to know who made the

 9      DSL modem that sits in your house?  Have you ever looked at it

10      and seen a name on it?

11              THE PANEL MEMBER:  No.

12              MR. DAVIS:  Okay.  Okay.  Thank you, Mrs. Alexander.

13      You can sit down.

14          So this case deals with DSL technology, and I want to

15      tell you just real briefly what that -- what that means and

16      what specific technology in this case is about.

17          You may not have ever thought about this, but DSL

18      technology, the internet that comes to your house, it comes

19      over telephone wires.  Some of those telephone wires have been

20      hanging up there for a hundred years.  And you may not have

21      ever thought about it, but how do you get a high speed data

22      signal that provides reliable internet service over those

23      wires if the wires have been there that long?  They weren't

24      designed for that purpose.  They were designed simply to

25      handle an old landline telephone call.
```

1    Let me ask this.  Does anybody in the jury box still have

2  a landline?  Some of you do?  Okay.  Thank you.  So some of us

3  still have landlines; some of us don't.  I think a lot of

4  people may have jettisoned their -- their landline to just go

5  with their cell phone.  But the landlines are what those

6  telephone lines were designed for.  They weren't designed for

7  DSL technology.

8    So these patents and the technology in this case is about

9  how do you get high speed digital data over these old

10  telephone wires that weren't designed for that.

11    Can I ask anybody in the jury box, do you know anything

12  about DSL technology?  Does anybody know anything about

13  it--how it might work?  Nobody?

14    What about you folks in the first two rows there?  Okay.

15  Nobody knows anything about how DSL works?

16    And anybody in the back know anything?  Okay.  Thank you.

17    Does anybody have a technology, an internet service, in

18  their house called fiber?  Okay.  Thank you, sir.

19    Mr. Hodges, would you please stand up?  I just want to

20  ask you a real quick question.

21    Do you know the difference between fiber and DSL?

22         THE PANEL MEMBER:  No, sir.

23         MR. DAVIS:  Okay.  You don't have any knowledge

24  about that or --

25         THE PANEL MEMBER:  Just very, very little.

1          MR. DAVIS:  Maybe that it might be more expensive?

2     Is that your experience at all?

3          THE PANEL MEMBER:  It seems to be faster, I guess.

4          MR. DAVIS:  I'm sorry.  What did you say?

5          THE PANEL MEMBER:  It seems to be fast.

6          MR. DAVIS:  Okay.  It's fast?  All right.  Thank

7     you.  I appreciate that.

8          Now, let me ask whether anybody knows any of the folks

9     over here on this side of the room for CommScope.

10         First, Mr. Dacus, would you please stand up?

11         MR. DACUS:  Yes, sir.

12         MR. DAVIS:  This is Mr. Deron Dacus.  He's a lawyer

13    from over in Tyler.  Does anybody know Mr. Dacus?  Okay.  No

14    one knows Mr. Dacus?  All right.

15         Now, this is may be a long shot.  Mr. Ross Barnett [sic]

16    or Mr. Scott Stevens, Mr. Michael Deane, does anybody know

17    these lawyers?  They work for a law firm called Alston & Bird.

18    Okay.

19         And does anybody know who CommScope is?  Anybody ever

20    heard the name of the company CommScope?  Okay.

21         CommScope is the Defendant in this case, and they have

22    some other companies that are related to CommScope.  One is

23    called ARRIS.  Anybody heard of a company called ARRIS

24    or -- oh, excuse me.

25         Yes, sir, No. 19.  Mr. Nenninger?

```
 1              THE PANEL MEMBER:  Yes, sir.

 2              MR. DAVIS:  Would you please stand up?  You've heard

 3     of a company called ARRIS, sir?

 4              THE PANEL MEMBER:  We have several of their cable

 5     modems installed in various county locations for our remote

 6     locations.

 7              MR. DAVIS:  Okay.  And what kind of cable -- I'm

 8     sorry, you said cable modems?

 9              THE PANEL MEMBER:  Yes.  Our internet is deployed

10     through the cable modem.

11              MR. DAVIS:  Okay.  And, sir, do you understand

12     anything about DSL technology?

13              THE PANEL MEMBER:  Other than hooking it up and it

14     works.

15              MR. DAVIS:  Okay.  You don't know how it works or --

16              THE PANEL MEMBER:  Our equipment is on the back --

17     back end of it.  It's not on the front end.  It's provided by

18     local cable service.

19              MR. DAVIS:  What does your equipment do, sir?

20              THE PANEL MEMBER:  Provide network access for those

21     people and the internet.

22              MR. DAVIS:  Okay.  And so as IT director, what are

23     some other things that you do as part of your

24     responsibilities?

25              THE PANEL MEMBER:  Everything.
```

1        MR. DAVIS:  Everything?

2        THE PANEL MEMBER:  Phones, computers, audio/visual

3   equipment.

4        MR. DAVIS:  Okay.  And do you understand how to read

5   computer code at all, sir?

6        THE PANEL MEMBER:  I was trained in programming

7   while I was in college, but I have a real good network

8   technician who does all the routers and the switches and the

9   breaking down of the internet access to local users.

10       MR. DAVIS:  How long has it been since you've

11   reviewed computer source code?

12       THE PANEL MEMBER:  Other than updating web pages, I

13   don't touch that stuff anymore.

14       MR. DAVIS:  Okay.

15       THE PANEL MEMBER:  Getting a little long in the

16   tooth for that.

17       MR. DAVIS:  Me, neither, sir.  Thank you very much.

18   You may sit down.  I appreciate your answers there.

19      All right.  So I didn't see any hands when I was asking

20   about the folks on this side of the room.  I believe, Mr.

21   Northcutt, have you and I ever met, sir?

22       THE PANEL MEMBER:  Yes.

23       MR. DAVIS:  Okay.  And you live over in Longview?

24       THE PANEL MEMBER:  Yes, that's correct.

25       MR. DAVIS:  All right.  And you and I have known

1      each other in Longview before.  Correct?

2                THE PANEL MEMBER:  That is correct.

3                MR. DAVIS:  All right.  I just wanted to -- wanted

4      to get that out there.  And as the assistant district attorney

5      over in Longview.  Is that right?

6                THE PANEL MEMBER:  No, I'm in Upshur County now in

7      Gilmer.

8                MR. DAVIS:  In Gilmer?  All right.  And you heard

9      Judge Gilstrap describe the burdens of proof in this case?

10               THE PANEL MEMBER:  Yes.

11               MR. DAVIS:  And are you familiar with that

12     terminology?

13               THE PANEL MEMBER:  Yes.

14               MR. DAVIS:  So what I'd like to ask you is that in

15     this case there are going to be two different burdens of

16     proof.  The Plaintiff has a certain burden of proof, and for

17     other issues that the Defendant has the burden on, they have a

18     different burden.  Anything about that strike you as -- as

19     unfair or that something you couldn't apply in this case?

20               THE PANEL MEMBER:  No.  I could apply it.

21               MR. DAVIS:  Okay.

22               THE PANEL MEMBER:  It's different than the way we do

23     it in state court.  But, yes, I could apply it.

24               MR. DAVIS:  All right.  Thank you, Mr. Northcutt.  I

25     appreciate it.

1      Does anybody else -- does anybody else have any concern

2  or does it start you out leaning one way or another with the

3  fact that there is a different burden of proof for the

4  Plaintiff than there is for the Defendant and that the

5  Defendants' burden is higher on certain issues?  Does that --

6  does that just strike anyone as unfair or something that you

7  couldn't apply if the Court asked you to?  Okay.  I see no

8  hands.  Thank you very much.

9      Now, I wanted to ask about, one of the questions in your

10  jury questionnaire was what's your level of trust in the

11  government, and I saw all kinds of answers.  I saw some people

12  say, I have no trust at all; and others said, Somewhat.

13     So would -- Mr. Anderson -- I'm sorry.  Not Mr. Anderson.

14  Mr. Jennings, could you please tell me about your level of

15  trust in the government?  Do you trust the government at all,

16  sir?

17             THE PANEL MEMBER:  No, sir.

18             MR. DAVIS:  Okay.  And I'm asking you this because

19  patents are issued by a government agency, the United States

20  Patent and Trademark Office.  And I'm wondering whether or not

21  you have any -- whether maybe your lack of trust in the

22  government would start you out leaning one way or another in

23  this case because the patents come from a government agency.

24             THE PANEL MEMBER:  No, sir.

25             MR. DAVIS:  You don't think that starts you out or

1    starts CommScope out a little bit ahead of us?

2              THE PANEL MEMBER:  No, sir.

3              MR. DAVIS:  Okay.  Well, I appreciate your answers

4    there, sir.  Thank you.

5         What about anyone else as far as if you feel like

6    the -- you don't have a strong belief in the federal

7    government.  I understand there's parts of it we may not like.

8    But as far as the United States Patent and Trademark Office,

9    does anybody start out thinking, Oh, well, if that came

10   from -- those patents came from that office and that office is

11   part of the government, I'm already leaning towards CommScope?

12        Does anybody have that -- have that concern?  I don't see

13   any hands at all.  Okay.

14        If you don't mind, I'm going to call on Mr. Owens.  Mr.

15   Owens, please.

16        Does that start you out leaning one way or another in

17   terms of --

18             THE PANEL MEMBER:  No.  There's certain -- like you

19   were saying, there's certain parts that we don't trust.

20             MR. DAVIS:  Which part do you not trust?  The IRS?

21             THE PANEL MEMBER:  Yeah, a little bit.  Some of the

22   Senate and that type of thing.

23             MR. DAVIS:  I understand.

24             THE PANEL MEMBER:  Other than that, no, no, not at

25   all.

1          MR. DAVIS:  Okay.  And so in your view, Plaintiff

2     and Defendant in this case, equal footing?

3               THE PANEL MEMBER:  Yes.

4          MR. DAVIS:  Okay.  Thank you.  Thank you for your

5     answers.

6          So that was the -- I've talked to you a little bit about

7     the patent system.  Does anybody just fundamentally believe

8     patents shouldn't exist or I don't really like patents or I've

9     never thought about it but now that I'm here and I'm thinking

10    about it, I just don't know that patents are something that

11    I -- that I necessarily agree with?

12         Does anybody have those thoughts or those leanings?  All

13    right.

14         Can I -- Mrs. Moreno, No. 27.  Could you please hand her

15    the microphone?

16         I believe you indicated in your questionnaire that you

17    had strong feelings, and I just wanted to ask, I didn't -- you

18    didn't elaborate.  Do you have strong feelings about patents

19    or the patents system?

20              THE PANEL MEMBER:  To a certain extent.

21         MR. DAVIS:  To a certain extent.

22              THE PANEL MEMBER:  Like the patents for medicine,

23    it's regulation what can you put in there.

24         MR. DAVIS:  I understand.  And does your feelings

25    about medical patents or -- or patents related to medicine,

```
1    does that start you out leaning one way or another in this

2    case at all?

3              THE PANEL MEMBER:  Nope.

4              MR. DAVIS:  Okay.  Because you understand this case

5    is not about medicine.

6              THE PANEL MEMBER:  Yes, sir.

7              MR. DAVIS:  Well, I appreciate you.  Thank you for

8    your answer on that.

9         Mr. Sundby, I believe you had an answer about whether or

10   not patents should be protected -- or patents should

11   -- feelings about the patent system.  What are your feelings

12   about that, sir?

13             THE PANEL MEMBER:  I think they should be protected.

14             MR. DAVIS:  You do?

15             THE PANEL MEMBER:  Yes.

16             MR. DAVIS:  Okay.  And do your feelings about the

17   patent system start you out leaning one way or another in this

18   case?

19             THE PANEL MEMBER:  No.

20             MR. DAVIS:  I just want to be sure -- you looked

21   like there may have been something there, but it wasn't

22   something you felt was strong enough to say.  Even if it's

23   just a little bit of a leaning, I'd really appreciate knowing

24   about that.

25             THE PANEL MEMBER:  I just feel they should be
```

1    protected.

2              MR. DAVIS:  Okay.  And does that start you out

3    leaning in favor of CommScope at all in this case?

4              THE PANEL MEMBER:  No.

5              MR. DAVIS:  All right.  Thank you very much.

6         Does anyone have any technical training in the courtroom

7    today?  I know some of you probably do, technical training.

8    Okay.

9         I see, Mr. Nenninger, you have some technical training.

10   And can you please tell me a little bit about that?

11             THE PANEL MEMBER:  Well, it's in server setup,

12   switch setup, web page updating, things like that, phone

13   systems.

14             MR. DAVIS:  Okay.  And is that -- can you -- is that

15   just getting them to work -- plugging them in and getting them

16   to work or is it more complicated?

17             THE PANEL MEMBER:  It is much more complicated than

18   that, yes.  It's not like landlines.

19             MR. DAVIS:  So it's not just plugging it in.  Right?

20             THE PANEL MEMBER:  No, no.  So, yes, we have a very

21   large system in the county with multiple site locations and

22   connectivity and all that good business --

23             MR. DAVIS:  Okay.

24             THE PANEL MEMBER:  -- because everything's going to

25   cloud-based as opposed to local servers.

1          MR. DAVIS:  Yeah.  Thank you, sir.  I appreciate it.

2      Mr. Sundby, if I could come back to you.  I actually

3  meant to ask you this question.  I see that you worked for a

4  company called Texas Instruments.  Is that true?

5          THE PANEL MEMBER:  Yes.  I worked for Texas

6  Instruments in Dallas.

7          MR. DAVIS:  Okay.  And what did you do for them,

8  sir?

9          THE PANEL MEMBER:  Well, as a manufacturing

10  specialist.  We built computer chips for DLP, digital light

11  processing.

12          MR. DAVIS:  And those are the chips that go in the

13  televisions?

14          THE PANEL MEMBER:  Yeah, the televisions and

15  projectors and -- like that.

16          MR. DAVIS:  And did you have to have some technical

17  training to do that job?

18          THE PANEL MEMBER:  No, just stuff there.  I went to

19  Kilgore College and graduated there and applied for Texas

20  Instruments and got hired.

21          MR. DAVIS:  Okay.  Thank you, sir.  I appreciate

22  that?

23          THE PANEL MEMBER:  All right.  Thank you.

24          MR. DAVIS:  Mrs. Ruest, did I say your name right?

25          THE PANEL MEMBER:  It's Ruest.

1           MR. DAVIS:  I apologize.  Could I ask you a

2     question, please, ma'am?

3           THE PANEL MEMBER:  Sure.

4           THE COURT:  Let's take her a microphone, please.

5           MR. DAVIS:  You mentioned you were on a jury before?

6           THE PANEL MEMBER:  Yes.

7           MR. DAVIS:  And what jury was that or where was

8     that?

9           THE PANEL MEMBER:  In Fort Worth.

10          MR. DAVIS:  What kind of case was it?

11          THE PANEL MEMBER:  It was a civil case, and there

12    was a patient that he had been a patient at a hospital and he

13    was suing the hospital for neglect.

14          MR. DAVIS:  And did you reach a verdict in that

15    case?

16          THE PANEL MEMBER:  We did.

17          MR. DAVIS:  What was that verdict?

18          THE PANEL MEMBER:  The verdict was that the patient

19    was right, that he was neglected.  That wasn't -- I wasn't one

20    of the ones.  I believe it was 10 -- I think had to have 10,

21    and there was 12, and me and another lady disagreed.

22          MR. DAVIS:  All right.  Thank you.  I appreciate

23    that.

24       And, Mrs. Alexander, could I hear from you again?  I

25    think you were also on a jury?

```
 1                    THE PANEL MEMBER:  Yes.

 2                    MR. DAVIS:  Okay.  And what type of case was that?

 3                    THE PANEL MEMBER:  It was a juvenile criminal case,

 4       molestation case.

 5                    MR. DAVIS:  And what was the outcome?

 6                    THE PANEL MEMBER:  He was guilty.

 7                    MR. DAVIS:  And were you the foreperson?

 8                    THE PANEL MEMBER:  No.

 9                    MR. DAVIS:  Okay.  Thank you.  I appreciate that.

10            Has anyone else been on a jury?  I may have missed one or

11       two.  Anybody in the first couple of rows?

12            I know, Mr. Northcutt, you have.

13            Okay.  Thank you.

14            Mrs. Lancaster, would you please take the microphone?

15            What was the outcome of the case?

16                    THE PANEL MEMBER:  They were guilty, and it was

17       violence.

18                    MR. DAVIS:  Criminal case?

19                    THE PANEL MEMBER:  Yes.

20                    MR. DAVIS:  Okay.  And were you the --

21                    THE PANEL MEMBER:  We all agreed, yeah.

22                    MR. DAVIS:  Okay.  Thank you.

23            Now, I know that many of you asked on your questionnaires

24       or you answered on your questionnaires -- there was a

25       question about lawsuits and are there too many of them, and I
```

1    know that many people said, of course, there's too many

2    lawsuits.

3         But what I'd like to know is whether any of you feel like

4    because that you think there's too many lawsuits, that you

5    start out leaning one way or another in this case.

6         And so if I could hear from you, please, Mr. Mehrens?

7    Did I say that correct?  Thank you.

8         Mr. Mehrens, do you believe there are too many lawsuits?

9              THE PANEL MEMBER:  For sure.

10             MR. DAVIS:  Okay.  And how does that make you lean,

11   if at all, in this case as you're sitting here today?

12             THE PANEL MEMBER:  Honestly, I couldn't tell you.

13   Like, I'm pretty neutral right now.

14             MR. DAVIS:  Right.  Okay.

15             THE PANEL MEMBER:  But, yeah.  No more comments on

16   that.

17             MR. DAVIS:  Okay.  Right now you're not leaning one

18   way or another?

19             THE PANEL MEMBER:  No.

20             MR. DAVIS:  Okay.  And does the fact that my client,

21   TQ Delta, had to file a lawsuit, does that start you out

22   leaning one way or another?

23             THE PANEL MEMBER:  Not -- not necessarily.  Not

24   without asking more questions about it.  Right?

25             MR. DAVIS:  You'd like to know the facts.

```
 1                  THE PANEL MEMBER:  Yeah.

 2                  MR. DAVIS:  Thank you, sir.  I appreciate your

 3      answers on that.

 4          And, Mrs. Lowery, could I hear from you on that question,

 5      please?

 6                  THE COURT:  We have two Mrs. Loweries.

 7                  MR. DAVIS:  I'm sorry.  I meant to go to Juror No.

 8      12, Mrs. Lowery, in the back row.  Thank you.

 9                  THE PANEL MEMBER:  Yes, there's too many frivolous

10      lawsuits.

11                  MR. DAVIS:  And does that -- I'm sorry?

12                  THE PANEL MEMBER:  Do I have an opinion on this one?

13      No.  I don't have enough information to make that decision.

14                  MR. DAVIS:  You don't start out leaning one way or

15      another at all.

16                  THE PANEL MEMBER:  No.

17                  MR. DAVIS:  I appreciate your answer because you can

18      understand my client, as the client -- as the party who filed

19      this lawsuit, we'd be worried about that.  Right?

20                  THE PANEL MEMBER:  Yes.  I would be if I was in that

21      case or in that situation.  But I don't know either party one

22      way or the other, so -- sorry.

23                  MR. DAVIS:  That's fine.  I appreciate your honesty.

24      Thank you, ma'am.

25          Now could I hear from Mrs. Lowery in the front row?  Do
```

1    you have any thoughts on that question?  Do you agree?

2         THE PANEL MEMBER:  I feel like everyone has a right

3    to defend whatever they have.  So I'm equal.  I feel like

4    everyone should get a chance to...

5         MR. DAVIS:  Yeah.  No leanings starting out?

6         THE PANEL MEMBER:  No leanings.  No leanings.

7         MR. DAVIS:  Okay.  All right.  Thank you very much.

8      Mrs. Pattison, can I call on you, please?

9         THE PANEL MEMBER:  No, I have no -- I'm not leaning

10   in any way --

11        MR. DAVIS:  Okay.

12        THE PANEL MEMBER:  -- either way.

13        MR. DAVIS:  Okay.  I appreciate that.  Thank you

14   very much.

15     Now, I'd like to ask whether or not -- and you

16   may -- this may be an issue you've never thought about before,

17   but TQ Delta owns patents, and you're going to hear about

18   those patents if you're selected to be on this jury and you're

19   going to hear about the business of what they do and how

20   they -- how they operate and what their purpose is.  But one

21   thing that TQ Delta does not do is make a product.  And by

22   that, I mean they don't manufacture a DSL modem.  Okay?

23     Does the fact that TQ Delta does not manufacture DSL

24   modems like the Defendant CommScope, does that strike anybody

25   as maybe leaning one way or another at the beginning of this

1    case before you've heard any of the evidence?  No?

2            THE COURT:  You have five minutes remaining,

3    counsel.

4            MR. DAVIS:  Thank you, Your Honor.

5        Mrs. Ruest, could I please ask you?  It looked like you

6    made eye contact with me and I just wanted to see if you had

7    thoughts on that.

8            THE PANEL MEMBER:  I would just need to hear more

9    about it -- about that, yeah.

10            MR. DAVIS:  Okay.

11            THE PANEL MEMBER:  You know, owning patents and not

12    manufacturing them, you know, what -- what is the -- what

13    is -- what is the business in that?  You know, what is your

14    gain in -- in that if you're not going manufacture --

15            MR. DAVIS:  Uh-huh.

16            THE PANEL MEMBER:  -- if you're just going to hold

17    on to something and not let it progress?

18            MR. DAVIS:  Okay.

19            THE PANEL MEMBER:  Is that what we're --

20            MR. DAVIS:  That's exactly --

21            THE PANEL MEMBER:  -- talking about?

22            MR. DAVIS:  Well, that -- I appreciate your answer,

23    but that is -- you answered my question, so thank you.  But at

24    this stage, do you start out leaning at all?

25            THE PANEL MEMBER:  No, no.  I wouldn't say so.

```
1              MR. DAVIS:  You wouldn't say so?

2              THE PANEL MEMBER:  Yeah.

3              MR. DAVIS:  Okay.  Great.  Thank you very much.  I

4    appreciate that.

5         Does anyone else agree with Mrs. Ruest that, you know,

6    it's at least a question in your mind as to, wait a minute, if

7    you got a patent, you should be making a product?

8         No. 3, Mr. Mehrens, could I hear from you, please, sir?

9              THE PANEL MEMBER:  I was agreeing with you.  It's

10   mildly concerning.  Right?  If you own a patent, what are we

11   doing with it if we're not making it.  Right?  I just --

12             MR. DAVIS:  So --

13             THE PANEL MEMBER:  Yeah.

14             MR. DAVIS:  Go ahead.  I didn't mean to interrupt

15   you.

16             THE PANEL MEMBER:  So -- so back story or a little

17   bit -- more information about myself.  I have a brother-in-law

18   that has a patent.

19             MR. DAVIS:  Okay?

20             THE PANEL MEMBER:  Granted, I have learned more

21   about patents today than I have ever learned talking to him,

22   but, you know, I know what he -- he's doing with it and in

23   trying to use it.  So it's concerning potentially that you-all

24   have patents, but you don't manufacture them.  So it's like

25   you're controlling it almost.  Right?  I don't know.  But
```

1    definitely -- definitely more information to come.

2         MR. DAVIS:  Okay.  So let me ask you this:  Do you

3    start out leaning one way or another, knowing the fact that TQ

4    Delta doesn't manufacture a product -- and that's not the

5    whole story.  You'll hear everything about TQ Delta.  But does

6    that start you out leaning one way or another?

7         THE PANEL MEMBER:  Unfortunately, yes.  Yeah.

8         MR. DAVIS:  Okay.  Thank you.

9         THE PANEL MEMBER:  Just because of my -- my personal

10   reasons of knowing what my brother-in-law has gone through

11   with all of his.

12        MR. DAVIS:  Okay.  Can I ask you a question then?

13   If -- if the law, as Judge Gilstrap explains it to you or

14   instructs you, is -- is that making or whether or not TQ Delta

15   manufactures a problem [sic] doesn't diminish or affect the

16   rights of TQ Delta, would that -- would you be able to follow

17   those instructions?

18        THE PANEL MEMBER:  Yeah.  No, I can have a personal

19   opinion.  But you give me facts, I can understand that.  I

20   can -- I can leave my personal feelings out of that.  So --

21        MR. DAVIS:  Okay.  All right.  Thank you, sir.  I

22   appreciate that.

23      Now, the other thing I'd like to talk about in my few

24   remaining minutes is one of the issues in this case is

25   damages.  These are two businesses that are having a dispute,

 1   and the way to resolve that and part of your job as jurors is

 2   you're going to have to decide, if you decide there should be

 3   damages, what that amount should be.  And the amount that's

 4   going to be at issue in this case is a very high number.  It's

 5   $90 million.

 6        And I'd like to know from the outset if that number

 7   causes you, just on its own without knowing any facts, causes

 8   you to lean one way or another.

 9             THE COURT:  You have one minute remaining.

10             MR. DAVIS:  One minute?  Thank you, sir.

11        Could I just see a show of hands of anybody here in the

12   jury box, does that bother anyone and make you start leaning

13   one way or another just because of the fact that there is a

14   lot of money at issue in this case?  I don't see any hands

15   there.

16        What about you folks on the first two rows?  Does that

17   bother anybody or make you say, look, I don't care what the

18   facts are, I could never award that much money to anybody?  I

19   don't see any hands.  Thank you.  I appreciate that.

20        I have one final question before I sit down, and that is

21   if there was anything that, you know, you wished I'd asked,

22   I'm sitting here, I'm trying to find out if you have any

23   leanings one way or another, is there any question that you,

24   if only Mr. Davis had just asked this one question, I would

25   have raised my hand and would have said something?  Does

1    anybody have anything like that that they'd like to tell me

2    before I sit down and Mr. Dacus comes up here?

3         All right.  Well, thank you very much for your time.  And

4    if you're selected for this jury, we look forward to

5    presenting this case to you.

6         Thank you.

7              THE COURT:  All right.  Defendants may now address

8    the venire panel.  Mr. Dacus, would you like a warning on your

9    time?

10             MR. DACUS:  Yes, Your Honor.  Would you let me know

11   when I have five minutes, please?

12             THE COURT:  I'll warn you when you have five minutes

13   remaining.  You may proceed.

14             MR. DACUS:  Thank you.

15        Good morning.  As I said, I'm Deron Dacus, and it's

16   really my privilege to represent the men and women who work at

17   CommScope.  I want to say up front to you, and I know they

18   want me to say to you, a very sincere thank you for your jury

19   service.  It is not lost on anyone at this table that you have

20   things you need to be doing--tending to kids, grandkids; jobs

21   to be at.  And what I want you to know is we would not be here

22   if this case was not important to CommScope.  It's very

23   important.  And if you serve on the jury, I think it will be

24   pretty clear pretty soon why it's important.

25             The Judge does give us a few minutes just to talk about

1    at least our perspective of this case, so I want to do that.

2    It's not the time for me to present you with evidence, but as

3    I ask you questions today, I want you to know how we see the

4    case.

5         As TQ Delta's counsel told you, TQ Delta is not the

6    inventor on these patents.  They are an investment firm that

7    bought these patents from a company by the name of Aware.  And

8    when they bought the patents, they bought the patents from

9    Aware subject to a promise and an agreement that Aware had

10   made on how they could use these patents and what they could

11   charge folks in the industry for them.

12        MR. DAVIS:  Your Honor, I feel like this is beyond

13   overview of the case and into argument.  I'm going to object

14   at this time.

15        THE COURT:  I agree, Mr. Dacus.

16        MR. DACUS:  I'll stay with the facts.

17        THE COURT:  It needs to be either more high level or

18   you need to move on.

19        MR. DACUS:  Understood, Your Honor.

20        So at the end of the day, what I think you'll be asked in

21   this case, what I think the Judge will ask you, is whether or

22   not TQ Delta abided by that agreement.  The facts also will

23   show you at a high level that, with respect to this claim of

24   infringement, that the CommScope products do not use or

25   infringe the TQ Delta patents.

1       And as you've been told, there are seven patents at

2    issue, and we'll show you and prove to you that four of those

3    seven patents are, in fact, invalid.  And that's your decision

4    to make, of course.

5            THE COURT:  Now let's move on.

6            MR. DACUS:  Absolutely, Your Honor.  Thank you.

7       So here's what I want to do before I start asking you

8    questions.  You were kind enough to tell us a little about

9    yourself.  Before I start asking you questions, I want to be

10   --- return the favor and tell you a little bit about me.  I

11   wish it was interesting enough that someone was going to write

12   a book or make a movie, but that's not the case.

13      I grew up down the road in Gilmer, Texas; graduated from

14   Gilmer High School; was fortunate enough to get a baseball

15   scholarship and go to Texas A&M, was fortunate enough to

16   graduate from Texas A&M and then went to law school at Baylor

17   like Judge Gilstrap where I met my wife to whom I've been

18   married now for 29 years.

19      We have two kids, both of whom are out in the world

20   making their way now.  Neither of them have a spouse, but

21   since we're empty nesters, our greatest hope is that we have

22   some grandkids soon so that we have something to do.

23      Now, let me -- let me start with this, and that is, does

24   anyone know Bo Davis, the gentleman who's representing TQ

25   Delta and who was just talking to you?

1      I know you did, Mr. Northcutt.  Let me ask you just one

2  question about that, Mr. Northcutt.

3           THE PANEL MEMBER:  Yes.

4           MR. DACUS:  So sometimes we know folks just by

5  sight.  Sometimes we know folks because we go to dinner with

6  them and socialize with them.  Which is the case with you and

7  Mr. Davis?

8           THE PANEL MEMBER:  I think Mr. Davis no longer lives

9  in Longview, but we were in the same Sunday school class

10 briefly.  He had a daughter that was the same age as my

11 daughter, and they were in school together.  And I would see

12 him out around town.  I mean, we never went to dinner together

13 if that's what you're asking, but I would see him around town.

14          MR. DACUS:  So you know my question is, does that

15 give the TQ Delta folks any sort of advantage in this case at

16 all just because you know Mr. Davis?

17          THE PANEL MEMBER:  No, it does not.  I can follow

18 the law and be fair and impartial.

19          MR. DACUS:  You would listen to the evidence and

20 make a decision based on the evidence?

21          THE PANEL MEMBER:  Yes.

22          MR. DACUS:  All right.  Thank you, sir.

23      Mr. Davis introduced some other folks on his team--Mr.

24 Fink, Mr. Hurt, and others.  Did anyone know any of those

25 folks?  If you did, would you raise your hand and let me know?

1          And, of course, Mr. Pete McAndrews is sitting at the

2     table for TQ Delta.  Anyone know Mr. McAndrews?  Would you

3     raise your hand and let me know?  Okay.  Very good.

4          Let me ask you a question that I think is probably the

5     easiest one of the day, and that is, how many of you believe

6     that you should, when you make a promise or you make an

7     agreement, how many of you believe that you should keep that

8     promise or agreement that you made?  Raise your hand.

9          Is there -- and I'll ask the converse of that.  Anyone

10    believe that you don't have to keep your promises in your

11    agreements?  I'd like to know that, too.  Okay.

12         Let me ask you, Mr. Gage, if I could -- I mean, Mr.

13    Hodges, if I could, and he'll need the microphone, please,

14    sir.

15         Let me sort of refine what I asked you about keeping your

16    promises in agreements.  What if you figured out or you

17    learned that if you made your -- after you made your promise

18    or your agreement, that you could make more money if you broke

19    it?  Do you think in that circumstance, it's okay to break

20    your promise or your agreement?

21              THE PANEL MEMBER:  No, sir.

22              MR. DACUS:  Okay.  Would you hand the microphone to

23    Mrs. Lowery there?  I'm going to ask you the same question.

24              THE PANEL MEMBER:  Yes.

25              MR. DACUS:  Yes, Mrs. Lowery.  If you find out after

1    you make your promise that you could make more money if you

2    break your promise, do you think that's okay in that

3    circumstance?

4              THE PANEL MEMBER:  No.  You need to renegotiate.

5              MR. DACUS:  Okay.  What if you found out, Boy, I can

6    make a whole lot more money?

7              THE PANEL MEMBER:  No.

8              MR. DACUS:  Still not okay?

9              THE PANEL MEMBER:  No.

10             MR. DACUS:  So let me ask the whole panel, does

11   anybody here -- and it's fine, of course, if you do.  Does

12   anybody here believe that, look, if you find out you can make

13   more money after you made your promise or made your agreement,

14   then it's okay to break that promise or agreement?  Anybody in

15   that boat at all?  Okay.

16        Let me change topics on you.  And I'm going to ask you a

17   question, and I'm not asking in any sort of court setting.  As

18   the Judge said, I'm not here to pry into your personal

19   business in any way, so I mean this at a very high level.  How

20   many of you, and I'm sure it's a lot, have ever been falsely

21   accused of something?  And, again, I'm not talking about in a

22   courtroom.  I'm just talking about in everyday life, somebody

23   said you did something you didn't do.  Anybody in that

24   category?  Lots of folks.  Right?

25             So, Mr. Owens, let me ask you about that.  To be clear,

1      the Judge will want you to stand up.  I'm not asking any

2      details.  You understand?  So don't tell me any details.

3                    THE PANEL MEMBER:  Okay.

4                    MR. DACUS:  When you're in that situation, do you

5      feel like you have the right to defend yourself?

6                    THE PANEL MEMBER:  Sure.  Sure do.

7                    MR. DACUS:  You understand that CommScope is here

8      because they've been accused of wrongdoing.  You understand

9      that?

10                    THE PANEL MEMBER:  Yes.

11                    MR. DACUS:  And so when you get accused of

12      wrongdoing, you really have two choices.  Right?  You can

13      either tuck your tail and run or you can stand up and defend

14      yourself.  Do you agree?

15                    THE PANEL MEMBER:  Yes.

16                    MR. DACUS:  And do you think it's okay to stand up

17      and defend yourself?

18                    THE PANEL MEMBER:  Most definitely.

19                    MR. DACUS:  Anybody disagree with Mr. Owens?

20      Anybody think that if you get accused of something, then

21      you-all disagreed to it?  Okay.

22          Let me ask you this, Mr. Owens.  In your experience--and,

23      again, I'm not asking the details--did you find -- do you find

24      that sometimes when people accuse you of wrongdoing, that it's

25      frustrating because in order to tell your side of the story,

1    it takes a little bit of time and it takes someone to actually

2    listen to you so that you get the actual facts and truth out

3    there?

4              THE PANEL MEMBER:  Correct.

5              MR. DACUS:  That's frustrating, isn't it?

6              THE PANEL MEMBER:  It sure is, yes.

7              MR. DACUS:  Do you understand that in this case

8    CommScope's going to have to sit here and listen to these

9    folks put on their case before we get to talk?

10             THE PANEL MEMBER:  Yes.

11             MR. DACUS:  You'd be willing to sit there and listen

12   to all the evidence before you make a decision in the case.

13   Is that true?

14             THE PANEL MEMBER:  Correct.

15             MR. DACUS:  All right.  Thank you, sir.

16        Mrs. Ruest, can I ask you some questions, please, ma'am?

17   And I bet these will be easy for you.  Did I hear you say you

18   had six kids?

19             THE PANEL MEMBER:  Yes.

20             MR. DACUS:  And did I hear you say you home-schooled

21   them?

22             THE PANEL MEMBER:  Yes.

23             MR. DACUS:  You are a busy lady, aren't you?

24             THE PANEL MEMBER:  Yeah.

25             MR. DACUS:  So let me ask you this.  Did any of

1   those six kids, did they ever get in squabbles or little

2   fights?

3              THE PANEL MEMBER:  Oh, yeah.

4              MR. DACUS:  Oh, yeah.

5              THE PANEL MEMBER:  Yeah.  Sure.

6              MR. DACUS:  And let me ask you how you resolve it.

7   Now, being the good -- have you ever found that kids, when

8   they get caught squabbling or fighting, that those kids run to

9   their mama to tell their story first?

10              THE PANEL MEMBER:  Oh, yes, yeah.

11              MR. DACUS:  That always happens, doesn't it?

12              THE PANEL MEMBER:  Tends to.

13              MR. DACUS:  Do you know what is in us that makes us

14   want to tell our story first?  I don't.

15              THE PANEL MEMBER:  Well, you know, you don't want to

16   get in trouble.  You want to be the first one to tell your

17   side of the story.  And so you are already have that -- you've

18   got that at the beginning.  And, you know, if they come to you

19   crying and they're hurt, I mean, you're automatically on the

20   defense, you know, what -- what happened?

21              MR. DACUS:  Okay.  So let me ask you this.  Being

22   the good mom that you are, do you always accept that first

23   kid's story without getting to hear the second kid's story and

24   his version of the facts?

25              THE PANEL MEMBER:  Well, if I was being honest, I

```
 1    probably sometimes jump to conclusions depending on the kid,
 2    but I do try to hear both sides of the story.
 3              MR. DACUS:  Do you know why I'm asking you these
 4    --what seem to be silly questions?
 5              THE PANEL MEMBER:  So I can hear both sides of the
 6    story.
 7              MR. DACUS:  So you understand these folks at this
 8    table brought this lawsuit.  You understand that?
 9              THE PANEL MEMBER:  Yes.
10              MR. DACUS:  And so under the law, they get to talk
11    first and they get to put on their case first.  You understand
12    that?
13              THE PANEL MEMBER:  Yes.
14              MR. DACUS:  And we -- we have to go second, but we
15    do have a story to tell.  You understand?
16              THE PANEL MEMBER:  Uh-huh.
17              MR. DACUS:  And so in this case would you agree,
18    just like you do at home, to listen to both sides of the story
19    before you make a decision?
20              THE PANEL MEMBER:  Yes.  Yeah.
21              MR. DACUS:  Okay.  Thank you.  So you can
22    guess -- thank you very much.
23         You can guess what I'm going to ask the panel.  You know,
24    these folks are going to start their case today.  We won't get
25    to talk until next week.  Is there anyone who says, you know
```

1    what?  I just don't know if I can listen to the full story

2    before I make a decision.

3         Anybody in that boat?  Okay.  Very good.

4         Let me talk with a few of you on an individual basis

5    based on some of the responses.

6         So, Mr. Sundby, can I ask you a few questions, please,

7    sir?  Did you say you worked at Texas Instruments, sir?

8              THE PANEL MEMBER:  Yes, that's correct.

9              MR. DACUS:  Okay.  So sometimes when folks work at a

10   place, they love it.  Sometimes when folks work at a place,

11   they hate it.  Sometimes they respect their employer.

12   Sometimes they don't respect their employer.

13        So how do you feel about Texas Instruments?  Is it a

14   place that you respect the work that goes on there, you

15   respect the -- the company?  Just help me understand.

16             THE PANEL MEMBER:  Yeah, I respect them and I worked

17   there.  I have no complaints about them or, you know, anything

18   either way.

19             MR. DACUS:  Okay.

20             THE PANEL MEMBER:  I'd work there again.

21             MR. DACUS:  Perfect.  That's what I needed to know.

22   Let me ask you, while I have you, do you understand, sir -- I

23   heard you say earlier and I think I saw it in your

24   questionnaire also that you believe patents should be

25   protected.  Correct?

1           THE PANEL MEMBER:  Yes, that's correct.

2           MR. DACUS:  And you'll hear in the course of this

3    case we don't dispute that at all.  We agree a hundred

4    percent, and there's reasons for that.

5        Here's my question to you:  In this case, we believe four

6    of these seven patents are actually invalid and that we're

7    going to ask the jury to find that they're invalid.

8        My question to you, sir, is, given what you said about

9    patents, would you have any problem in finding a patent

10   invalid based on the law that Judge Gilstrap gives you?

11          THE PANEL MEMBER:  No.  As long as it's expired and

12   it's invalid.

13          MR. DACUS:  So to -- to make sure we're -- we're

14   clear here, you -- you saw the patent video this morning?

15          THE PANEL MEMBER:  Yes.

16          MR. DACUS:  Okay.  And you saw in the patent video

17   where it said that the process between the person who applies

18   for a patent and the Patent Office, it's sort of a secret

19   process and no one else participates in that.  Did you see

20   that?

21          THE PANEL MEMBER:  Yeah.

22          MR. DACUS:  Did you know that before you came to

23   court today?

24          THE PANEL MEMBER:  No.

25          MR. DACUS:  Candidly, before I started doing patent

1    cases, I didn't, either.  So what we expect to do in this case

2    is to present evidence that the Patent Office did not have,

3    and then we would ask the jury, whoever is on the jury, to

4    find that patent invalid based on the instructions that Judge

5    Gilstrap gives to the jury.  Do you understand that process?

6              THE PANEL MEMBER:  Oh, yeah.

7              MR. DACUS:  And you would have no -- if indeed we

8    show you that these patent concepts were not new, you would

9    have no problem finding that the patents are invalid.  Is that

10   fair?

11             THE PANEL MEMBER:  That's fair.

12             MR. DACUS:  Okay.  Thank you, sir.

13        So here's what I need to know from the whole group.

14   Before you came here today, you probably didn't know that

15   juries make the determination as to whether or not a patent is

16   valid or invalid.  So what I want to know, is there anyone who

17   has even the least bit of hesitation about finding a patent

18   invalid that the Patent Office has already issued?  Would you

19   raise your hand and let me know?  Okay.     Let's see.  Mrs.

20   Welch, can I talk to you?  Let me get you the microphone.

21        I probably should have asked you that question about

22   those kids.  You got a bunch of grandkids, it sounds like.

23             THE PANEL MEMBER:  And great grandkids, yes.

24             MR. DACUS:  So if we show you and prove to you that

25   these patents are invalid, would you have any problem finding

1    that, ma'am?

2              THE PANEL MEMBER:  No.

3              MR. DACUS:  Okay.  And let me reach over and talk to

4    Mrs. Alexander, if I could.

5         Before I ask you that ultimate question, let me ask you

6    this, Mrs. Alexander:  Did you say you served on a criminal

7    jury?

8              THE PANEL MEMBER:  Yes.

9              MR. DACUS:  Do you remember in that criminal jury

10   that the instructions to you were that the Defendant was

11   presumed innocent?

12             THE PANEL MEMBER:  Yes.

13             MR. DACUS:  Do you remember that?

14             THE PANEL MEMBER:  Yes.

15             MR. DACUS:  And based on what I heard you say, y'all

16   found the Defendant guilty.  Right?

17             THE PANEL MEMBER:  Yes.

18             MR. DACUS:  So even though there was a presumption

19   of innocence, y'all found enough evidence to find him guilty.

20   Correct?

21             THE PANEL MEMBER:  Correct.

22             MR. DACUS:  Here's why I ask you that.  I expect

23   that Judge Gilstrap is going to instruct you that a patent is

24   presumed valid.  Okay?  Just like in your criminal case.  If

25   we show you and prove to you that these concepts and these

1    patents were not new, would you be able to find them invalid

2    even though it's an issued patent?

3              THE PANEL MEMBER:  I think so.

4              MR. DACUS:  Okay.  That's what I need to know.

5    Thank you.

6         Mr. Mehrens, can I ask you one question, please, sir?  I

7    know from what you said this morning and from your

8    questionnaire that you said your brother-in-law had a patent

9    on a fishing lure.  Right?

10             THE PANEL MEMBER:  Yes.

11             MR. DACUS:  Okay.  So here's my question to you.

12   These folks at this table over here have patents.  You

13   understand?  Does the fact that your brother-in-law has a

14   patent on fishing lures cause you to lean in any way towards

15   the TQ Delta folks?

16             THE PANEL MEMBER:  No.

17             MR. DACUS:  Not in their favor?

18             THE PANEL MEMBER:  No.

19             MR. DACUS:  If you sat on this jury, you'd sit and

20   listen to the facts and make a decision based on the facts?

21             THE PANEL MEMBER:  Yes, sir.

22             MR. DACUS:  Can you hand that over to Ms. Lowery?

23   Because I think she may be in the same boat.

24        Did I read on the questionnaire that your father-in-law

25   has a patent?

1           THE PANEL MEMBER:  I was mistaken.  He worked with a

2    company and his designs were patented through the company, so

3    it's different.

4           MR. DACUS:  Anything about that that would cause you

5    to lean in favor --

6           THE PANEL MEMBER:  No.  They don't talk about it at

7    all.  It just came up a few times years ago.

8           MR. DACUS:  Perfect.  Thank you, ma'am.

9       Ms. Patel, can I ask you a question, please, ma'am?  I

10   heard you say this morning and I think I saw it on your

11   questionnaire that you studied business law in college.

12          THE PANEL MEMBER:  Yes.  I started off, but then I

13   got married, so -- to a business owner, and I did two years in

14   business law.

15          MR. DACUS:  Okay.  Just general business law?

16          THE PANEL MEMBER:  General.  General.

17          MR. DACUS:  Is there any reason why you didn't

18   become a lawyer?

19          THE PANEL MEMBER:  No.  I just -- I joined him in

20   the business and I started liking it, so I just stuck with

21   that.

22          MR. DACUS:  Understood.

23          THE PANEL MEMBER:  Maybe in the future.

24          MR. DACUS:  Understood.  So in those business law

25   courses did you learn anything about patents or how patents

1    work or the patent system?

2              THE PANEL MEMBER:  No, sir.

3              MR. DACUS:  Okay.

4              THE PANEL MEMBER:  No, sir.

5              MR. DACUS:  So anything about that business law

6    background that would cause you to lean one way or another

7    towards either party here?

8              THE PANEL MEMBER:  No, sir.

9              MR. DACUS:  Thank you very much.

10             THE PANEL MEMBER:  Thank you.

11             MR. DACUS:  Mr. Nenninger, I need to follow up with

12   you, if I could, sir.

13        So you have -- you work in an IT capacity; information

14   technology?

15             THE PANEL MEMBER:  That's correct.

16             MR. DACUS:  Okay.  And did I understand you to say

17   that you have some familiarity with how internet is provided

18   or internet service is provided to the county offices?

19             THE PANEL MEMBER:  Correct.

20             MR. DACUS:  And did I understand you to say it's

21   provided by cable?

22             THE PANEL MEMBER:  Through the local cable company,

23   yes.

24             MR. DACUS:  Right.  So you understand that internet

25   service can be provided in a number of different ways.

1    Correct?

2              THE PANEL MEMBER:  Yes, sir.

3              MR. DACUS:  One is DSL, another is through --

4              THE PANEL MEMBER:  Satellite; fiber.

5              MR. DACUS:  Yes, sir.  And as I understood it and

6    what I want to confirm is, your experience with modems is on

7    internet being provided through the cable television cables.

8    Correct?

9              THE PANEL MEMBER:  For some of our locations, yes,

10   sir.

11             MR. DACUS:  But you don't have any experience with

12   DSL?

13             THE PANEL MEMBER:  We had DSL in the county when we

14   first got here provided by AT&T, but that went away a long

15   time ago because of the slow speed and demand.

16             MR. DACUS:  And that's what I wanted to sort of

17   pinpoint.  So you have experience with DSL in the past, but

18   that has been replaced by providing it by cable now.  Is that

19   right?

20             THE PANEL MEMBER:  Provided by local phone service

21   now.  Correct.

22             MR. DACUS:  Okay.  That's what -- anything about any

23   of that that would cause you to lean towards one side or the

24   other in this --

25             THE PANEL MEMBER:  No, sir.

1           MR. DACUS:  Okay.  Thank you very much.

2      Ms. Pattison, can I ask you a question?  And when I said

3  the word 'cable', it triggered the question that I needed to

4  ask you.

5      I wrote down that your husband tests cable as part of his

6  job.

7           THE PANEL MEMBER:  Yes.

8           MR. DACUS:  What kind of cable are we talking about?

9           THE PANEL MEMBER:  Micro cable, windmill cables;

10  just every cable you can think of.

11          MR. DACUS:  Okay.  So not like cables just to hold

12  something.  You are talking about electrical cables that can

13  carry electrical current or --

14          THE PANEL MEMBER:  I believe so.  I believe.

15          MR. DACUS:  Okay.  Anything about that that would

16  cause you to lean one way or another here?

17          THE PANEL MEMBER:  No.

18          MR. DACUS:  And I think I had noted something on

19  your questionnaire also that I wanted to ask you specifically

20  about.

21      In this case if we show you and prove to you that these

22  four patents are invalid, would you have any problem rendering

23  a verdict?

24          THE PANEL MEMBER:  No.

25          MR. DACUS:  Okay.  Thank you, ma'am.

1      There is -- in the course of this case we're going to

2   talk about something called standards and standard setting

3   organizations.  And to be honest with you, I wasn't super

4   familiar with it before these kinds of cases.  And let me tell

5   you what we're talking about when I say 'standards'.

6      So if there's an electrical outlet here, that electrical

7   outlet needs to be able to handle any type of device that you

8   plug into it made by any manufacturer.  So there are standards

9   that govern what that -- how that electrical outlet should

10  work so that we can plug in whatever we have--phone, computer,

11  lamp, whatever.  And there are standard setting organizations

12  that oversee and direct and implement these standards.

13     So what I want to know is, does anyone here have any

14  experience or knowledge about standards or standard setting

15  organizations?  Anybody have that experience or knowledge?

16     Mr. Nenninger, is that just as a result of your

17  information -- your IT work?

18        THE PANEL MEMBER:  Yes.  The IEEE standards are

19  associated with a lot of things implemented within our Cisco

20  phone system.

21        MR. DACUS:  Anything about that that you think would

22  influence you if you sat on a jury in this case?

23        THE PANEL MEMBER:  No, sir.

24        MR. DACUS:  Thank you, sir.

25     Ms. Lancaster, can I ask you a question, please, ma'am?

1    And my first question is my most important.  I saw on your

2    questionnaire that you got some affiliation with JB Hot Links.

3              THE PANEL MEMBER:  Yes.

4              MR. DACUS:  What's the affiliation?

5              THE PANEL MEMBER:  My parents own it.

6              MR. DACUS:  The one in Gilmer or the one in Hughes

7    Springs?

8              THE PANEL MEMBER:  The one in Hughes Springs.

9              MR. DACUS:  Okay.  Does the one in Hughes Springs

10   have any affiliation with the one in Gilmer?

11             THE PANEL MEMBER:  No.

12             MR. DACUS:  Okay.  Do you know there's a JB Hot

13   Links in Gilmer?

14             THE PANEL MEMBER:  Yes, sir.

15             MR. DACUS:  Okay.  So here's my question to you.  On

16   the issue of these patents and the issue --

17             THE PANEL MEMBER:  I'm sorry.  I'm really lost when

18   it comes to all this.  Even the video I was a little confused

19   on.  I'm not going to lie.  So...

20             MR. DACUS:  Thank you for being honest.  And you

21   know what?  I bet most folks are in your shoes.

22             THE PANEL MEMBER:  Okay.

23             MR. DACUS:  But let me tell you that's not a

24   problem.  So what these lawyers' job is and our job is--and

25   you're going to hear from a bunch of experts in this case--is

1      to make this stuff understandable.  Okay?

2                  THE PANEL MEMBER:  Okay.

3                  MR. DACUS:  So if we do that and we show you that

4      these four patents, four of the seven that they bring forward

5      are invalid--in other words, like the video said, we show you

6      that it wasn't a new concept in the patent--would you have any

7      hesitation about finding them invalid?

8                  THE PANEL MEMBER:  If I can understand it, no.

9                  MR. DACUS:  Okay.  As long as we do what we're

10     supposed to do and prove it to you, you could do that.  Is

11     that right?

12                 THE PANEL MEMBER:  Yes.

13                 MR. DACUS:  All right.  Thank you, ma'am.

14                 THE COURT:  You have five minutes remaining,

15     counsel.

16                 MR. DACUS:  Thank you, Your Honor.

17         So I do want to talk a bit, just for a second, about what

18     Mr. Davis finished up with, and that is the amount of money

19     that TQ Delta is asking from CommScope.  And he told you

20     that's $90 million, and that's true.  That is what they're

21     asking for.

22         Here is what I need to know.  And let me -- the back row

23     Ms. Lowery, I hadn't had a chance to talk to you.  That's a

24     heck of a way to refer to you, isn't it?

25                 THE COURT:  Why don't you just say 'No. 12'.

1          MR. DACUS:  I will do that Your Honor.  That's much

2     better.  Thank you.

3          So Ms. Lowery, you understand that we hope you don't find

4     that CommScope infringes, and we hope you find these patents

5     are not invalid [sic], but if you sit on this jury you're

6     going to make that decision, not me.  You understand?

7               THE PANEL MEMBER:  Yes.

8               MR. DACUS:  Then they're going to ask you to award

9     $90 million.  So my question is, if you find CommScope

10    actually infringes these patents and you find the patents are

11    valid, would you also require them to prove what the

12    reasonable amount of money that's due to them would be?

13              THE PANEL MEMBER:  Yes.

14              MR. DACUS:  Okay.  In other words -- it's a poor

15    question.  I apologize.  But you don't think that just because

16    someone infringes a patent that the patent owner should be

17    able to demand whatever amount of money they want, do you?

18              THE PANEL MEMBER:  I don't know that.  I mean, are

19    we talking about he stole a Kleenex and I want 90 million or

20    are we talking about he stole half of the state and I want

21    90 million?  So I don't know.  I need more information.

22              MR. DACUS:  Perfect.  That's what I needed to know.

23    You'll listen to the facts and the evidence in the case and

24    based on what the law the Judge gives you you'll make a

25    decision on what the reasonable amount of money should be.

1    Is that fair?

2              THE PANEL MEMBER:  Yes.

3              MR. DACUS:  Okay.  Thank you.

4         Anyone else -- anyone disagree with Ms. Lowery?  In other

5    words, does anyone say, Hey, if you infringe the patent, then

6    whatever these folks want you ought to pay it?  Anybody in

7    that boat?  Okay.

8         The Judge has said I'm about out of time, so here's what

9    I'll close with.  I've done this for a while now, but I've

10   learned that I don't always ask the right questions.  You may

11   be sitting there thinking to yourself, You know what?  That

12   lawyer should have asked this question.  It sure would have

13   helped him and he would know I shouldn't be on this jury.

14        Is there anybody sitting there thinking along those lines

15   that there's something you should tell us but I didn't ask the

16   right question?  Anybody in that boat?

17        Okay.  I'll close by saying thanks very much for your

18   time and attention.  Those who get to serve on the jury, we

19   very much look forward to spending the next week with you and

20   present outstanding evidence.

21        That's all I have, Your Honor.  Thank you.

22             THE COURT:  Thank you.

23        Counsel, approach the bench, please.

24             (The following was had outside the hearing of the

25             jury panel.)

```
 1              THE COURT:  All right, Mr. Davis.  Does the

 2   Plaintiff have any challenges for cause?

 3              MR. DAVIS:  No, Your Honor; no challenges.

 4              THE COURT:  Mr. Dacus, does the Defendant have any

 5   challenges for cause?

 6              MR. DACUS:  No. 10 and 14 noted conflicts, but we

 7   don't have any for cause.

 8              THE COURT:  I will bring them up and talk to them.

 9         Also the venire member we talked about in chambers didn't

10   make the panel, so that's not an issue.

11         Thank you.

12              (The following was had in the presence and hearing

13              of the jury panel.)

14              THE COURT:  Ladies and gentlemen, I'm going to let

15   most of you have a recess in just a minute.  There are two of

16   you that I'm going to ask you to stay behind so that I can

17   talk to you here at the bench, and the two of you that I'm

18   going to ask to stay behind are Ms. Martin No. 10 and

19   Mr. Owens No. 14.  The rest of you I'm going to release for a

20   short recess.

21         I'm going to ask you to exit the courtroom through the

22   double doors.  And as you go out those double doors, just for

23   your own information, if you take a left and go around the

24   corner you'll find the water fountains and the restrooms.

25         I'm going to also ask you not to leave the building; to
```

1    stay on this floor inside the building.  With the lovely

2    weather we've had lately, you probably don't want to go

3    outside.  But don't go outside.  Stay inside the building.

4         The third thing I'm going to ask you is don't discuss

5    anything that happened in the courtroom this morning.  You're

6    free to talk to each other if you want to.  You're free not to

7    talk to each other if you don't want to.  But if you choose to

8    talk to each other, visit about anything you like--your

9    family, your children, your grandchildren, whether Baylor's

10   going to win the first game of March Madness later this

11   afternoon; whatever you want to talk about--but don't talk

12   about anything that's happened in the courtroom this morning.

13        Let me make this abundantly clear.  You have heard zero

14   evidence in this case.  Nothing you've heard this morning is

15   evidence in this case.

16        So talk about anything you'd like to, or just keep to

17   yourself and don't talk to anybody.  It's strictly up to you.

18   But if you choose to have a conversation with one or more

19   members of the panel, just don't discuss what's happened in

20   here this morning.

21        With that, I'm going to ask everybody but No. 10 and

22   No. 14 to exit the courtroom at this time, and we'll have you

23   back in here shortly.  Thank you.

24             (Whereupon, the jury panel left the courtroom.)

25             THE COURT:  Be seated, please.

 1          And counsel, approach the bench.

 2          Ms. Martin, would you come up and join us?

 3          Good morning.  How are you?

 4              THE PANEL MEMBER:  I'm good.

 5              THE COURT:  This is our microphone.  We're just

 6     going to talk quietly here.

 7          When we started this morning I asked if anybody had a

 8     serious impediment to being able to be here throughout the

 9     trial if they were selected, and you raised your hand.  Can

10     you tell me about that?

11              THE PANEL MEMBER:  I have two, actually.  Monday

12     morning I'm required to be at mandatory education for my

13     continuing nursing license, and if I skip that I am going to

14     be suspended licensing, which means I would not be able to

15     practice as a registered nurse right now at our local

16     hospital.

17          The second thing is I have a four-year-old daughter.  We

18     have never put any of them in daycare, and I would not be

19     there with her.

20              THE COURT:  So how is it that you see about your

21     four-year-old daughter and practice nursing at the same time?

22              THE PANEL MEMBER:  My husband works day shift and I

23     work night shift.  I work 7:00 p.m. to 7:00 a.m.

24              THE COURT:  And which healthcare facility do you

25     work at?

```
 1                THE PANEL MEMBER:  Christus Good Shepherd Medical

 2    Center here in Marshall.

 3                THE COURT:  Okay.  Now, having practiced law, I know

 4    about continuing education.  Ordinarily in our context as

 5    lawyers, it has to be completed before your anniversary date.

 6                THE PANEL MEMBER:  Yes.

 7                THE COURT:  Are you at the end of the cycle?

 8                THE PANEL MEMBER:  This is not taking a licensing.

 9    I would be suspended from the hospital.  We are required to

10    do continuing education there annually, and that annual for

11    Marshall specifically is on the 20th between 7:30 a.m. and

12    5:00 p.m. that day.  I am scheduled to be there between 12:30

13    and 2:30.

14                THE COURT:  And this is offered at the hospital

15    here?

16                THE PANEL MEMBER:  Yes.

17                THE COURT:  And it's a requirement --

18                THE PANEL MEMBER:  It is a requirement.

19                THE COURT:  Okay.  Mr. Davis, do you have any

20    questions of Ms. Martin?

21                MR. DAVIS:  I don't.

22                THE COURT:  Mr. Dacus?

23                MR. DACUS:  No, Your Honor.

24                THE COURT:  Ms. Martin, I'm going to let you join

25    the rest of the panel outside.  Just don't discuss anything
```

1    we've talked about in here.  Thank you, ma'am.

2        I'm going to excuse Ms. Martin.  This appears to be

3    something that's mandatory from her employer and not ordinary

4    continuing education she can make up at another time.

5        Mr. Owens, would you join us, please?

6        Good morning.

7            THE PANEL MEMBER:  Good morning.

8            THE COURT:  This is the microphone.  We're just

9    going to talk quietly here?

10           THE PANEL MEMBER:  Okay.

11           THE COURT:  When we started this morning, I asked if

12   anybody had a serious problem with being able to be available

13   throughout the trial, and you raised your hand.  Tell me about

14   that, please, sir.

15           THE PANEL MEMBER:  I own a business in Longview and

16   I've got 18 employees.  We recently had a fire, so part of our

17   business has been shut down.  So I've had contractors there

18   pretty much every day.  Half our store was flooded.

19       It's not that I can't serve, it's just in my mind things

20   that aren't getting taken care of there may interfere with a

21   little bit -- like right now I'm nervous to find out if

22   they're doing what they're supposed to be doing as far as

23   getting the store back open.  Like I say, about half the

24   store, about 5,000 square foot, got flooded.  We lost about

25   $40,000 worth of inventory.

```
 1            THE COURT:  Which store is it in Longview?

 2            THE PANEL MEMBER:  It's Big Daddy's Stereo.

 3            THE COURT:  Okay.

 4            THE PANEL MEMBER:  My brother -- I'm in partnership

 5    with my brother.  My brother is flying out I believe either

 6    Sunday or Monday to go to Vegas for a conference and he's

 7    taking two employees with him for training.

 8            THE COURT:  He's here now?

 9            THE PANEL MEMBER:  I think he's coming back from

10    Dallas today.

11        One of the things -- to be honest, I would really love to

12    serve.  If I knew that I could get those people -- I didn't

13    know -- in other words, I didn't know the trial could take a

14    week or six days.  If I could get some things lined out this

15    afternoon -- I don't know if we have a break where I could

16    call and make some stuff happen.  I could possibly say, Hey, I

17    may not be here this next week.

18            THE COURT:  We are going to have a break shortly

19    where those that are selected on the jury are going to have

20    lunch.

21            THE PANEL MEMBER:  Okay.

22            THE COURT:  That will be probably a 45-minute to

23    60-minute break.

24            THE PANEL MEMBER:  Okay.

25            THE COURT:  Then those that are selected on the jury
```

 1    will be back in here and we'll start the trial process.  But

 2    during the trial every hour or hour and a half I will

 3    generally take a recess --

 4                THE PANEL MEMBER:  Okay.

 5                THE COURT:  -- just so people get a chance to move

 6    and refocus.  You will have multiple opportunities to make

 7    phone calls?

 8                THE PANEL MEMBER:  Okay.  Okay.  Okay.  Okay.

 9                THE COURT:  All right.  And like I said, Mr. Owens,

10    I know this is a particularly hard time, but jury service is

11    always inconvenient.  It's never easy.

12                THE PANEL MEMBER:  Sure.

13                THE COURT:  But I think I understand your situation.

14        Is there anything else you need to let me be aware of

15    that you haven't mentioned?

16                THE PANEL MEMBER:  No, not as far as the business,

17    no, sir.  I think if I could take care of a knew things this

18    afternoon, I think it would be okay, but --

19                THE COURT:  And you mean line things out over the

20    telephone?

21                THE PANEL MEMBER:  Yeah.  Because I'm losing money

22    every day that that part of the business isn't running, you

23    know, and you don't know if insurance is going to pay and that

24    type of thing.

25                THE COURT:  Yes, sir.

1          Mr. Davis, do you have any questions?

2               MR. DAVIS:  I don't have any questions, no, sir.

3               THE COURT:  Mr. Dacus?

4               MR. DACUS:  No, sir.

5               THE COURT:  Mr. Owens, I'm going to let you join the

6     rest of the panel outside for recess.  Just don't discuss

7     anything we talked about here.

8               THE PANEL MEMBER:  Thank you.

9               THE COURT:  Thank you.

10         I'm not going to excuse Mr. Owens.

11              MR. DAVIS:  Okay.  Thank you, Your Honor.

12              THE COURT:  How long do you need to strike your

13    list?

14              MR. DACUS:  Twenty minutes.

15              THE COURT:  It's five after.  25 after, have them to

16    the Courtroom Deputy.

17              (The following was had in open court.)

18              THE COURT:  All right.  While counsel exercise their

19    peremptory challenges, the Court will stand in recess.

20                        (Brief recess.)

21              THE COURT:  Be seated, please.

22         Ladies and gentlemen, if you will listen carefully, as

23    your name is called please come forward and take a position in

24    the jury box.

25         Let me explain to you how we're going to do this.  I'm

1    going to seat eight members of the panel as the jury in this

2    case.  I'm going ask the first four jurors to position

3    themselves on the front row of the jury box, the second four

4    jurors, 5, 6, 7, and 8, to position themselves on the second

5    row or the back row of the jury box.  Whoever is called as the

6    first juror, if you will enter the front row of the jury box

7    and go all the way to the end and stand in front of the last

8    chair.  Juror No. 2, if you'll enter the front row of the jury

9    box and go down and stand in front of the third chair so there

10   is an empty chair between you and Juror No. 1.  I want to

11   space the first four jurors on the front row with a chair

12   between each of the four members and the second four members

13   of the jury on the second row with a chair between each of the

14   four members.  That way there will be plenty of room

15   throughout the trial.  Those will be the positions you'll be

16   in throughout the trial.

17       And I'm going to ask all eight members of the jury to

18   remain standing in the jury box until everybody is in place

19   and I give you further instructions.

20       So with that I'm going to ask Ms. Brunson our Courtroom

21   Deputy to call the names of the eight members of the panel

22   that have been selected to serve as jurors in this case.

23           THE CLERK:  Karen Welch, Trevor Mehrens, Kathy Gage,

24   Brittanie Lowery, Labrisha Alexander, Ivan Becerril, Dakota

25   Jennings, Julie Lancaster.

1           THE COURT:  All right.  Please be seated, ladies and

2      gentlemen.

3           Those of you on the panel that were not selected to serve

4      in this case, I'm about to release you.  Let me give you a

5      couple of instructions as you leave the courtroom.  If you

6      will exit to the right as you go through the double doors in

7      the back of the courtroom, you will pass directly past the

8      Clerk's Office.  Please be sure you stop in at the Clerk's

9      Office.  Leave these very valuable plastic numbers you have

10     pinned to your clothing.  We will use them again with the next

11     jury.  Don't take them home with you.

12          If you have any questions about your service today, if

13     you need any documentation for an employer to indicate where

14     you've been today rather than your place of work, any kind of

15     those logistical questions, Ms. Clendening and the Clerk's

16     Office will be happy to help you.

17          Also ladies and gentlemen those of you that weren't

18     selected, I want you to understand that you have performed

19     very real and important public service by being here.  We

20     could not have selected these eight citizens to be the jury

21     without all of you here.  And all of you had other places to

22     be this morning, other things to do in your lives that are

23     important, and you set those aside and you appeared as

24     summonsed and you presented yourself for jury service this

25     morning.  And even though you weren't selected, you have done

1   very real and important public service, and the Court

2   recognizes that, the Court thanks you for it.  And I speak on

3   behalf of not only myself and my staff but these parties,

4   these lawyers, everybody in this part of the courtroom

5   appreciates and values what you've done, because without you

6   the system could not work as it's intended.  So thank you,

7   ladies and gentlemen.  Thank you very much.

8        Those of you not selected to serve on this jury are now

9   excused.

10                 (Whereupon, the jury panel left the courtroom.)

11                 THE COURT:  Be seated, please.

12        All right.  At this time I'm going to ask Ms. Brunson as

13  Courtroom Deputy to administer the oath to the members of the

14  jury.

15        Ladies and gentlemen, if you'll stand, please, and raise

16  your right hands.

17                 (Whereupon, the oath was administered by the Clerk.)

18                 THE COURT:  Please be seated.

19        Ladies and gentlemen, I'm about to excuse you for lunch.

20  I need to give you a few instructions before I do that.

21        First of all, I have entered an order that throughout

22  this trial lunch will be brought to you each day in the jury

23  room by the Clerk's Office.  You will not need to leave the

24  building.  You will not need to bring your Lunch.  You will

25  not need to go out in the community and find a place to obtain

 1    lunch.  Lunch will be brought to you each day in the jury

 2    room.  And that will be more convenient for you, it will save

 3    us time, it will allow us to move the trial of this case

 4    forward more efficiently.

 5         Also, ladies and gentlemen, while you're at lunch today,

 6    please take an opportunity to let Ms. Clendening have a

 7    working cell phone number for you.  It is possible that during

 8    the course of this trial something unexpected might arise

 9    where we would need to reach you overnight or before you are

10    back in court the next morning.  That's not likely, but in the

11    unlikely event that were necessary, she would need a good

12    working cell phone number for each of you.  So please make

13    sure you share that with her over the lunch break.

14         Also, I need to give you a few additional instructions

15    about your conduct as jurors.

16         First of all, ladies and gentlemen, do not discuss this

17    case with anyone.  And when I say don't discuss the case, I

18    mean don't communicate about it in the broadest possible

19    terms.  One of the fundamental rules of the jury trial system

20    is that when you retire to the jury room after all the

21    evidence has been presented to you over the course of the

22    trial and you will be asked at that point to answer certain

23    questions which will be given to you by me in writing, those

24    written questions will be discussed by the eight of you among

25    each other in the jury room in an effort for you to reach a

1    unanimous decision about how to answer those questions.

2         It is absolutely fundamentally essential that the only

3    information you have to draw upon in answering those questions

4    must have come from the trial of this case, from the witnesses

5    who testified under oath and subject to cross examination

6    during the course of the trial, and the documents and other

7    tangible evidence that the Court has admitted under the rules

8    of evidence into evidence as exhibits in the trial.  The

9    witnesses' testimony, the exhibits the Court has admitted,

10   those must be the sole source of the information that you draw

11   upon to answer the questions that will be asked of you after

12   all of the evidence has been presented.

13        Therefore, it is absolutely essential that there be no

14   outside information that becomes a part of this process.  You

15   are not to consider your own personal experiences with

16   anything that's presented during the trial.  You're not to do

17   any outside research.  If you hear something during the course

18   of the trial, you're not to go home at night and get on the

19   internet and try to find out anything more about it.  You're

20   not to research anything about the case, not anything about --

21   don't pull up the biographies of these lawyers.  Don't do

22   searches of these parties.

23        It is absolutely essential that the only information you

24   have to draw upon when you answer the questions which the

25   Court will present to you after all the evidence is presented

1   must come only from the evidence presented in this courtroom

2   during this trial.  Therefore, it is absolutely essential that

3   you not communicate with anyone during the course of the

4   trial.

5        And that means not with the eight of yourselves.  Until

6   all the evidence is presented and I direct you to retire to

7   the jury room and to deliberate on those questions, which you

8   will hear referred to as the verdict in this case, it is

9   absolutely essential that you not communicate with anyone,

10  including the eight of yourselves.

11       Now, when you've heard all the evidence, when you've

12  heard my instructions on the law, when you've heard counsel's

13  closing arguments and I direct you to retire to the jury room

14  and to consider those questions set forth in the verdict form

15  and render answers to those questions, at that point, but not

16  until, you not only may discuss the evidence among yourselves;

17  you must discuss the evidence among yourselves in an effort to

18  reach a unanimous decision about how to answer those

19  questions.  But until that point you must not only not

20  communicate in any way with anyone else about this case; you

21  must not communicate among yourselves about this case.

22       So when you're on recess, when you're on lunch, when

23  you're leaving the courthouse and walking down the front steps

24  together, you're not to talk about the evidence.  You're not

25  to discuss any of the testimony.  It's only after all the

 1    evidence is presented, after the final instructions have been

 2    given to you on the law which I will supply and the arguments

 3    have been presented, the closing arguments have been presented

 4    by the lawyers, and I direct you to deliberate on your

 5    verdict, then everything changes and you must discuss the

 6    evidence.  But before then you must not communicate in any way

 7    about the evidence.

 8        If you do, and if you allow any information to come in

 9    other than the testimony of the witnesses and the evidence

10    presented during this trial, then it risks the entire process

11    and it may, depending on how it happens, if it happens, it may

12    cause me to discharge you, declare a mistrial, to impanel a

13    new jury, and to start this process all over again.  And there

14    will be literally tons of time and effort and money wasted if

15    that should happen.

16        So of all the instructions I give you, all of them are

17    important, but I give you this one first because it may be the

18    most important of all the instructions I give you.  You must

19    not communicate with anybody about this case in any way.

20        And again, when I say 'communicate', I mean it in the

21    broadest sense of the word.  If any of you are social media

22    users, don't post anything on Facebook, don't tweet on

23    Twitter, don't use Instagram, don't use any social media

24    platform.  That's communication.  Don't email, don't text,

25    don't write a letter, don't talk to anybody--communication in

 1      the broadest sense of the term.  Do not communicate with

 2      anyone about this case.

 3           And let me just say this just out of human experience.

 4      When we get finished today and you go home, wherever you live,

 5      unless you live alone, whenever you walk through the door the

 6      first thing you're going to hear is, Well, what happened in

 7      federal court in Marshall today.  Don't even try to answer

 8      that question, because if you even try to answer it you'll

 9      almost assuredly violate this instruction I'm giving you.  So

10      when you get that question, when you walk through the door,

11      just say, That very stern federal judge told me not to talk

12      about it and I'm not going to talk about it until I've been

13      released as a juror and the trial is over.  Blame it on me.

14      That's part of why I'm here.  But don't communicate in any way

15      with anyone about this case.

16           Also, ladies and gentlemen, I don't think it's likely--as

17      a matter of fact, I think it's unlikely--but this is an

18      important case and there are no unimportant cases that make it

19      to a jury trial in a federal court, so because it's an

20      important case, it is possible that some third party, some

21      outside person may try to approach you during the course of

22      the trial and attempt to influence you as to how you might

23      decide the issues in this case.  If that should happen, you

24      should immediately tell Ms. Clendening, she'll inform me, and

25      the Court will deal with it.  I don't think it's likely, but I

1    can't tell you it is beyond the realm of possibility.  So if

2    that should happen, if you're approached by anybody as a juror

3    during this trial, either here or at home or wherever, and

4    anything about that seems awkward or improper to you in any

5    way, then you should let Ms. Clendening know and she'll advise

6    me.  Again, I don't think it's likely, but I can't tell you

7    that's beyond the realm of possibility.

8         Also, ladies and gentlemen, over the course of this

9    trial--this is a small courthouse as federal courthouses go;

10   there are one set of steps and one entrance going in and out

11   through the front of the building--invariably there are going

12   to be times as you come in the mornings, as you leave in the

13   evenings, when you're on breaks for lunch, that you may come

14   in contact with one or more of these lawyers or one or more of

15   the witnesses or one or more of the support staff that are

16   working with these two trial teams.  Let me just tell you, if

17   that should happen they're not going to speak to you.  If you

18   come in tomorrow morning and one of these lawyers is walking

19   down the steps in the opposite direction and passes right by

20   you, he or she's not going to say, Good morning, how are you

21   doing, because I have instructed them not to communicate with

22   you in any way.  So if that happens and somebody related to

23   this trial in any way walks right by you and doesn't engage in

24   conversation, is not friendly and gregarious, like we mostly

25   are in East Texas, do not hold that against them.  Do not

1    think they are being rude or unfriendly; understand that they

2    are following my instructions.  Because, again, it goes back

3    to that first instruction--you must have no information and no

4    communications from any source other than the testimony

5    presented under oath during the trial subject to cross

6    examination, and the documents and exhibits that the Court

7    admits into evidence, and that must be the sole universe of

8    the information that you have before you and that you draw

9    upon when at the end of the trial you retire to deliberate on

10   your verdict and come up with answers to the questions you'll

11   be asked.

12        That's a fundamental principle in this whole process, and

13   many of these instructions, like the one about the trial teams

14   not communicating with you, all relate back to that first

15   premise--that that is the sole basis upon which you should

16   decide how to answer the questions in the verdict form.

17        Let me give you one other bit of information then I'm

18   going to release you for lunch, ladies and gentlemen.

19        Over the course of the last soon to be 12 years, I have

20   had jurors tell me, because I uniformly -- after the trial is

21   over I will visit with the members of the jury and I will

22   thank them for your service, and during those discussions

23   after the trials are over, jurors in this area tell me over

24   and over again they would much rather be here a longer day

25   each day and be away from their homes and their work and their

1    family a shorter total number of days than if it were done the

2    other way.

3         I know judges in other parts of the country who start at

4    10:00 in the morning and they quit at 4:00 in the afternoon

5    and they don't hold court on Friday so they can catch up with

6    all their other business.  That's not the way I will try this

7    case.  We will start each morning at 8:30.  We will have a

8    break for lunch, we'll have a mid-morning recess where you'll

9    have a chance to stretch your legs and get a drink of water,

10   we'll have an afternoon recess, maybe two, but we won't stop

11   at 4:00.  And we won't stop at 5:00.  We will probably go

12   somewhere in the neighborhood of 6:00 each evening.

13        And if we start at 8:30 and we go to 6:00 and we take

14   limited breaks, we can try this case in a week or close to it.

15   If we do it like it's done in some other places where you

16   start mid-morning and you quit early afternoon, it will take

17   us two weeks or longer to try this case.  So be aware, let the

18   people that you live with understand what your approximate

19   schedule is going to be over the course of this trial.

20        You'll need to -- I know many of you -- there are six

21   counties that make up the Marshall Division from which jurors

22   are drawn for trials in this court, so I know several of you

23   have distances to drive each morning and each evening going

24   back and forth.  Plan for that.  Check the weather.  Juries

25   are like a convey of ships--we only move as fast as our

1    slowest member.  And we can't start each morning if there are

2    seven of you here.  We have to have all eight before we can

3    start.

4         So it's important that you be here on time, and if we

5    will work hard over a shorter number of days, we can finish

6    the trial than if we have a less demanding schedule but it

7    took twice as many days to complete the process.  So bear that

8    in mind.  Let those you live with know what your schedule is

9    going to be.

10        As I say, lunch will be brought to you each day in the

11   jury room.  It should be there now.

12        And with those instructions, ladies and gentlemen, you're

13   excused for lunch.  You should retire to the jury room.

14             (Whereupon, the jury left the courtroom.)

15             THE COURT:  Be seated, please.

16        Counsel, are there issues or questions that need to be

17   raised with the Court before we recess for lunch?

18        Anything from the Plaintiff?

19             MR. DAVIS:  No, Your Honor.

20             THE COURT:  Anything from the Defendants?

21             MR. DACUS:  No, Your Honor.

22             THE COURT:  All right.  It is five minutes until

23   noon.  We'll try to break about 45 or 50 minutes, and we'll

24   reconvene shortly before 1:00.

25             With that the Court stands in recess.

1              (Lunch recess.)

2         THE COURT:  Be seated, please.

3    Subject to the Court's preliminary instructions, is the

4  Plaintiff prepared to go forward with its opening statement?

5         MR. DAVIS:  We are, Your Honor.

6         THE COURT:  Is Defendant ready?

7         MR. DACUS:  Yes, Your Honor.

8         THE COURT:  Let's bring in the jury, please.

9         (Whereupon, the jury entered the courtroom.)

10         THE COURT:  Welcome back from lunch, ladies and

11  gentlemen.  Please have a seat.

12    Ladies and gentlemen of the jury, I have some additional

13  instructions I need to give you on the record before we

14  proceed to hear the opening statements from the attorneys for

15  the parties and then get on to the witnesses and the evidence.

16    You've been sworn as the jurors in this case, and as I've

17  told you, you, the jury, are the sole judges of the facts and

18  you will decide and determine what all the facts are in this

19  case.

20    As the judge, I'll give you instructions on the law to

21  apply, I'll decide questions of law, procedure, and evidence

22  that arise during the trial, and I'm responsible for

23  maintaining the decorum of the courtroom and overseeing the

24  flow of the evidence in an efficient manner.

25    At the end of the evidence, I'll give you detailed

1    instructions about the law that you are to apply in deciding

2    this case and, as I mentioned earlier, I will then give you a

3    list of questions that you are to answer.  This list of

4    questions is called the verdict form.  And your answers to

5    those questions must be unanimous, and those answers, those

6    unanimous answers to those questions will constitute the

7    jury's verdict in this case.

8         Now, let me briefly tell you what this case is about.  As

9    you understand, this case is a patent infringement case where

10   allegations of patent infringement have been made.  This case

11   involves a dispute regarding seven issued United States

12   patents.  I know you've all seen the patent video prepared by

13   the Federal Judicial Center as we've talked about earlier.

14   Patents are granted or denied by the United States Patent and

15   Trademark Office, sometimes simply called the PTO for short.

16   You'll probably hear it called the PTO during this trial.  You

17   may also hear it called simply the Patent Office.

18        The United States Patent and Trademark Office is an

19   agency of the United States government.  It is a part of the

20   U.S. Department of Commerce.  A valid issued United States

21   patent gives the patent holder the right for up to 20 years

22   from the date the patent application is filed to prevent

23   others from making, using, offering to sell, or selling the

24   patented invention within the United States, or from importing

25   it into the United States without the patent holder's

1    permission.  A patent is a form of property called

2    intellectual property and, like all forms of property, a

3    patent may be bought or sold.

4        A violation of the patent holder's rights is called

5    infringement, and a patent holder may try to enforce a patent

6    against persons it believes to be infringers by filing a

7    lawsuit in a United States District Court, and that's what we

8    have in this case.

9        Now, the process of obtaining a patent is called patent

10   prosecution.  To obtain a patent, you first file an

11   application with the U.S. Patent and Trademark Office, the

12   PTO.  The PTO, as I mentioned, is an agency of the United

13   States government, and it employs trained examiners who review

14   applications for patents.  Once an application is filed, an

15   examiner is assigned to review that application by the PTO.

16       The application includes within it something called a

17   specification.  The specification contains a written

18   description of the claimed invention telling what it is, how

19   it works, how to make it, and how to use it.  The

20   specification concludes or ends with one or more numbered

21   sentences.  These numbered sentences are called the patent

22   claims.  And when a patent is granted by the PTO, it's the

23   claims at the end of the patent that define the boundaries of

24   its protection and give notice to the public of those

25   boundaries.

1        Now, patent claims may exist in two different forms

2   referred to as independent claims or as dependent claims.  An

3   independent patent claim does not refer to any other claim

4   within the patent--it's independent.  And it's not necessary

5   to look at any other claim within the patent to understand

6   what an independent claim covers.

7        On the other hand, a dependent patent claim refers to at

8   least one other claim within the patent.  A dependent claim

9   includes each of the elements or limitations from that other

10  claim or claims to which it refers or, as we sometimes say,

11  from which it depends, as well as the additional elements or

12  limitations set forth within the dependent claim itself.

13       As a result, to determine what a dependent claim covers,

14  it's necessary to look at both the dependent claim and those

15  other -- that other claim or claims to which it refers or from

16  which it depends.

17       Now, the claims of the patents in this suit use the

18  word 'comprising'.  Comprising means including or containing.

19  A claim within a patent that includes the word 'comprising' is

20  not limited to the methods or devices having only the elements

21  that are recited in the claim, but covers methods or devices

22  that it can include additional elements.

23       Let me give you an example.  If you consider a claim that

24  covers a table, and it recites it is a table comprising a

25  table top, legs, and glue, that claim will cover any table as

1    long as it contains a table top, legs, and glue, even if it

2    contains other structures, such as leaves to expand the size

3    of the table top or wheels to go on the ends of the legs.

4         Now, that's a simple example about the

5    word 'comprising' and what it means.  In other words, it can

6    have other features in addition to those that are covered by

7    the patent.

8         Now, after an applicant files an application with the

9    PTO, an examiner is assigned to review the application and the

10   examiner reviews what's been submitted to determine whether or

11   not the claims presented are patentable--that is to say,

12   appropriate for patent protection--and whether or not the

13   specification adequately describes the invention that's

14   claimed.

15        In examining the application, the examiner reviews

16   certain other information about the state of the technology

17   that existed at the time the patent application was filed.

18   The PTO, acting through the examiner, searches for and reviews

19   this type of information that was either publicly available or

20   that might have been submitted by the applicant, and this type

21   of information about the state of the technology that existed

22   at the time the application was filed is called prior art.

23        Now, the examiner reviews this prior art to determine

24   whether or not the invention claimed is truly an advance over

25   the state of the art at the time.  Prior art is defined by

1    law, and I'll give you specific instructions later as to what

2    constitutes prior art.  However, in general, prior art

3    includes information that demonstrates the state of the

4    technology that existed before the claimed invention was made

5    or before the application for a patent was filed with the PTO.

6         A patent also contains within it a list of certain prior

7    art that the examiner has considered when the patent issues.

8    Usually on the front page, it lists the prior art that has

9    been examined prior to the issuance of that patent.  The items

10   within this list of prior art are called the cited references.

11        Now, after the prior art search and an examination of the

12   application, the examiner then informs the applicant in

13   writing of what the examiner's found and whether the examiner

14   considers any of the claims to be patentable, in which case

15   they would be allowed.  And this writing from the examiner to

16   the applicant is called an office action.

17        Now, if the examiner rejects the claims, the applicant

18   has an opportunity to respond to the examiner to try to

19   persuade the examiner to allow the claims.  The applicant also

20   has an opportunity to change or amend the claims or to submit

21   altogether new claims.  And this process, these papers that

22   are generated in the back and forth between the applicant and

23   the examiner, these are called the prosecution history.

24        And this process between the examiner and the applicant

25   may go back and forth for some time until the examiner is

1    ultimately satisfied that the application meets the

2    requirements for a patent, in which case the application

3    issues as a United States patent, or, in the alternative, if

4    the examiner ultimately concludes that the application should

5    be rejected, then no patent is issued.  Now, sometimes patents

6    are issued after appeals within the Patent Office or to a

7    court.

8        Now, to help you follow the evidence in this case, I'm

9    going to give you a brief summary of the positions of the

10   competing parties.

11       As you know, the party that brings or initiates a lawsuit

12   is called the plaintiff.  The Plaintiff in this case is TQ

13   Delta, LLC, which you will hear referred to throughout the

14   trial simply as either the Plaintiff or as TQ Delta.

15       And as you also know, the party against whom a lawsuit is

16   brought or initiated is called the defendant.  There are

17   several Defendants in this case, and they are:  CommScope

18   Holding Company, Inc.; CommScope, Inc.; ARRIS U.S. Holdings,

19   Inc.; ARRIS Solutions, Inc.; ARRIS Technology, Inc.; and ARRIS

20   Enterprises, LLC, which you will hear referred to throughout

21   the trial collectively as either the Defendants or simply as

22   CommScope.  If you hear the word 'CommScope', it will mean all

23   of those entities as Defendants I've identified for you.

24       Now, as I told you during jury selection, this case

25   involves allegations of patent infringement brought by TQ

1    Delta against CommScope.  And as I've already mentioned, there

2    are seven United States patents at issue that have been

3    asserted in this case.  The asserted patents are United States

4    Patent No. 7,570,686, United States Patent No. 7,453,881,

5    United States Patent No. 8,276,048, United States Patent No.

6    8,090,008, United States Patent No. 8,462,835, United States

7    Patent No. 8,468,411, and United States Patent No. 9,154,354.

8        And as you may have heard in the video this morning,

9    patents are commonly referred to by their last three digits.

10   So in this case Patent No. 7,570,868 will be referred to

11   during the trial simply as the '868 patent.  You might hear

12   someone called it the '686 [sic] Patent.  And Patent No.

13   7,453,881 likewise will be referred to as the '881 or the '881

14   Patent.  Patent No. 8,276,048 will be referred to as the '048

15   or '048 Patent.  Patent No. 8,090,008 will be referred to as

16   the '008 Patent.  Patent No. 8,462,835 will be referred to as

17   the '835 or the '835 Patent.  And Patent No. 8,468,411 will be

18   referred to as the '411 or the '411 Patent.  And Patent No.

19   9,154,354 will be referred to as the '354 or the '354 Patent.

20       These patents collectively will be referred to at various

21   times as the patents-in-suit.  You may also hear them referred

22   to collectively as the asserted patents.  And these asserted

23   patents, ladies and gentlemen, generally relate to digital

24   describer [sic] line, or DSL, technology.

25       Now, the Plaintiff TQ Delta contends that the CommScope

1    Defendants are infringing certain claims within these asserted

2    patents by importing, making, leasing, or selling products

3    within the United States that include their patented

4    technology.  TQ Delta alleges that CommScope's infringement is

5    willful.

6        Tq Delta also alleges that CommScope has induced and

7    continues to induce infringement by others.  Finally, TQ Delta

8    contends that it's entitled to money damages in the form of a

9    reasonable royalty as a result of that infringement.

10       Now, the CommScope Defendants deny that they are

11   infringing any of the claims in any of the asserted patents.

12   They are denying that any infringement is, in fact, willful.

13   They contend that the asserted claims of the patents-in-suit,

14   at least four of them, have been anticipated or are obvious in

15   light of the prior art and, thus, would be invalid.

16       The DSL technology in the asserted patents is governed by

17   certain technical standards.  A standard, ladies and

18   gentlemen, is a uniform design for a product.  Companies make

19   devices in accordance with the same standards so that the

20   devices made by different manufacturers can work together in

21   the same ecosystem.

22       This is why a hair dryer made by one company plugs into a

23   wall socket just like an electric razor made by another

24   company plugs into the same wall socket or an electric knife

25   in the kitchen plugs into the same wall socket.  The plug is

1    designed and made in conformance with the standard so that

2    everybody who makes products will have a plug that fits the

3    same type of wall socket that is available throughout the

4    United States.

5           I hope that example's helpful to you.

6           These standards are set by what are known as standard

7    setting organizations, which you might hear referred to for

8    short as SSOs.  In this case you're going to hear specifically

9    about the International Telecommunication Union, otherwise

10   known as the ITU.  The ITU oversees the development of digital

11   subscriber line, or DSL, technology.  The ITU is a standard

12   setting organization.

13          Now, if a patent implements technology that is covered by

14   a standard and it would not be technically possible to

15   implement the standard without infringing the patent, then the

16   patent is called a standard essential patent, or an SEP.  And

17   this means that if a company makes a device that implements a

18   standard that's covered by a standard essential patent, then

19   that company may need to obtain a license to use that

20   technology.

21          The ITU has a policy called its common parent policy, or

22   CPP -- excuse me, common patent policy, CPP.  The common

23   patent policy requires the owners of standard essential

24   patents to license their patents on specific terms.

25          The ITU requires that owners of standard essential

1    patents that relate to DSL technology grant licenses to others

2    on terms that are fair, reasonable, and non-discriminatory.

3    This is known as FRAND, F-R-A-N-D, which again stands for

4    fair, reasonable, and non-discriminatory.

5         If a company agrees to license its standard essential

6    patents on FRAND terms, fair, reasonable, and

7    non-discriminatory, then that commitment forms a contract

8    between the company and the respective standard setting

9    organizations.  So, for example, if Company A owns a standard

10   essential patent related to DSL technology and is prepared to

11   grant licenses on FRAND terms, fair, reasonable, and

12   non-discriminatory, then that promise forms a contract between

13   Company A and the ITU, the standard setting organization.

14        Now, if Company B, a second company, implements a

15   standard covered by the ITU, then Company B is considered a

16   third-party beneficiary to the contract between Company A and

17   the ITU, the standard setting organization.  This means

18   Company B can enforce the terms of the contract between the

19   standard essential patent owner and the standard setting

20   organization, including the right to obtain a patent from the

21   standard essential patent owner on fair, reasonable, and

22   non-discriminatory terms.

23        Now, in this case the CommScope Defendants contend that

24   the Plaintiff, TQ Delta, has breached its obligation to offer

25   the asserted patents for license on FRAND terms and

1    conditions.  TQ Delta denies that it has breached its

2    obligation to offer the asserted patents for license on FRAND

3    terms and conditions.  And I'll give you further instructions

4    on FRAND terms and conditions at the conclusion of the trial.

5         Now, I know, ladies and gentlemen, that there are a lot

6    of new words and a lot of new concepts that have been thrown

7    at you since you've arrived at the courthouse this morning.

8    I'm going to define a lot of those terms and words for you as

9    we go through these instructions.  The attorneys in the case

10   are going to help you with their opening statements.  The

11   witnesses are also going to help you, as they go through their

12   testimony, to understand these words and these concepts.  So

13   please do not feel overwhelmed at this early stage.  It will

14   all come together as we go through this trial, I promise you.

15        Now, one of your jobs in this case is to decide whether

16   or not the asserted claims of the asserted patents have been

17   infringed.  You'll also be asked to decide whether certain of

18   the asserted claims are invalid.  If you decide that any claim

19   from the patents-in-suit has been infringed by the Defendant

20   and is not invalid, then you'll need to decide whether or not

21   that infringement has been willful.  You will also need to

22   decide what amount of money damages should be awarded to the

23   Plaintiff as compensation for that infringement.

24        And, finally, you'll need to decide whether the

25   Plaintiff, TQ Delta, has breached its contractual obligation

1    to offer to the CommScope Defendants a license to the asserted

2    patents on fair, reasonable, and

3    non-discriminatory--FRAND--terms.

4         Now, my job in this case is to tell you what the law is,

5    to handle rulings on evidence and procedure, and to oversee

6    the trial, as well as to maintain the proper decorum of the

7    courtroom.

8         In determining the law, ladies and gentlemen, it is

9    specifically my job as the judge to determine the meaning of

10   any of the language from the asserted claims coming from the

11   patents-in-suit that needs to be interpreted, and I've already

12   determined the meanings of certain language from the asserted

13   claims coming from the patents-in-suit, and you must accept

14   those meanings that I've arrived at that will be given to you,

15   and you must apply my interpretations or constructions of that

16   language throughout the trial with regard to any issues you

17   are asked to deal with, including whether or not any claim has

18   or has not been infringed and whether or not any claim is or

19   is not invalid.

20        You're going to be given a document in a few minutes that

21   sets forth those constructions or interpretations that I've

22   already reached about certain language that was in dispute

23   from within the asserted claims in this case.

24        Now, for any claim language that I have not provided you

25   with a specific definition of, then you should apply the plain

1    and ordinary meaning of that language.  But if I have supplied

2    you with a definition, sometimes called a construction, you

3    are to apply my definition or construction to that language

4    from the claims throughout this case.

5         However, my interpretation of any language from the

6    claims should not be taken by you as an indication that I have

7    any personal opinion regarding the issues of infringement,

8    invalidity, or the other issues in this case.  Those issues,

9    ladies and gentlemen, are yours alone to decide.

10        Now, I'll provide you with more detailed instructions on

11   the meaning of the claims before you retire to deliberate and

12   reach your verdict.  In deciding the issues that are before

13   you, you are going to be asked to consider specific legal

14   rules, and I'll give you an overview of those rules now, and

15   then at the conclusion of the case, I'll give you more

16   detailed instructions.

17        The first issue that you're asked to decide in this case

18   is whether the CommScope Defendants have infringed any of the

19   asserted claims from the patents-in-suit.

20        Infringement, ladies and gentlemen, is determined and

21   assessed on a claim-by-claim basis.  And TQ Delta, the

22   Plaintiff, must show by a preponderance of the evidence that a

23   claim has been infringed.  Therefore, there can be

24   infringement as to one claim but no infringement as to another

25   claim.

1           There are also a few different ways that a patent can be

2   infringed, and I'll explain the requirements for these

3   different types of infringement to you in detail at the

4   conclusion of the case.  But, in general, a defendant may

5   infringe the asserted patents by making, using, selling, or

6   offering for sale within the United States, or importing into

7   the United States, a product meeting all the requirements of a

8   claim from the asserted patents or a product that practices

9   all of the required steps from a claim within the asserted

10  patents.  And I'll provide you with more detailed instructions

11  on these requirements regarding infringement at the conclusion

12  of the case.

13          Now, the second issue that you're going to be asked to

14  decide is whether the asserted patents are invalid.

15  Invalidity is a defense to infringement.  Therefore, even

16  though the U.S. PTO, the United States Patent and Trademark

17  Office, has allowed the asserted claims and issued the

18  patents, and even though an issued United States patent is

19  presumed under the law to be valid, you, the jury, must decide

20  whether those claims are, in fact, invalid after hearing all

21  of the evidence presented over the course of this trial.

22          You may find the patent claim to be invalid for a number

23  of reasons, because it claims subject matter that is not new

24  or is obvious.  For a patent claim to be invalid because it is

25  not new, the Defendants must show by clear and convincing

1    evidence that all of the elements of that claim are

2    sufficiently described within a single previously printed

3    publication or patent.  Again, we call these items prior art.

4    If a claim is not new, ladies and gentlemen, it is said to be

5    anticipated by the prior art.

6        For a patent claim to be invalid because it is obvious,

7    the Defendants must show, again by clear and convincing

8    evidence, that the claim would have been obvious to a person

9    of ordinary skill in the field of the technology of the patent

10   at the relevant time.  You'll need to consider a number of

11   questions in deciding whether the invention claimed in the

12   asserted patents is obvious, and I'll provide you with more

13   detailed instructions on these issues at the conclusion of the

14   trial.

15       If you decide that any claim from the patents-in-suit has

16   been infringed and that claim is not invalid, then you'll need

17   to decide whether the infringement that the Defendants have

18   committed is, in fact, willful.  If you decide that any of the

19   claims from the patents-in-suit have been infringed and are

20   not invalid, you'll also then need to decide what amount of

21   money damages should be awarded to the Plaintiff TQ Delta to

22   compensate it for that infringement.

23       A damage award, ladies and gentlemen, in a patent case

24   must be adequate to compensate the patent holder for the

25   infringement, and in no event may the damage award be less

1   than what the patent holder would have received if they had

2   been paid a reasonable royalty for the use of its patented

3   technology.  However, the damages that you award, if any, are

4   meant to compensate the patent holder, and they are not meant

5   to punish the Defendants, and you may not include in any

6   damages award an additional amount as a fine or a penalty or

7   whatever is above what is necessary to fully compensate the

8   patent holder for the infringement.

9        Also, patent damages cannot be speculative, and TQ Delta,

10  the Plaintiff, must prove the amount of its damages for the

11  alleged infringement by a preponderance of the evidence.  I'll

12  give you more detailed instructions on the calculation of

13  damages for the alleged infringement of the patents-in-suit at

14  the conclusion of the trial, including giving you specific

15  instructions with regard to the calculation of a reasonable

16  royalty.

17       The third issue that you're going to be asked to decide

18  is whether TQ Delta has breached its contractual obligation to

19  the ITU by failing to offer to CommScope a license to the

20  asserted patents on FRAND terms.  If you decide that TQ Delta

21  has breached a contractual obligation, then you will need to

22  decide what amount of money should be awarded to CommScope as

23  compensation for that breach.

24       In deciding whether or not a party has breached a

25  contractual obligation, there are four questions that you'll

1    need to be -- that you will be called upon to answer at the

2    end of the case.  The first question is whether TQ Delta had a

3    contractual obligation.  The second is whether TQ Delta

4    violated any of these contractual obligations.  The third is

5    if TQ Delta violated a contractual obligation, whether there

6    is a defense excusing that violation.  And, fourth, if any of

7    the obligations were violated and there are no defenses, what

8    are the amount of damages, if any, for that breach of

9    contract, that violation.

10        Now, CommScope, the Defendants, have the burden of

11   proving its alleged breach of contract by a preponderance of

12   the evidence, and as I told you during jury selection, this

13   means proof that establishes that CommScope's claims are more

14   likely true than not true.

15        Now, if you find that TQ Delta violated any of its

16   contractual obligations, you will be asked to determine what

17   damages, if any, should be awarded for those violations.  This

18   includes the option of CommScope seeking nominal damages.  The

19   fact that a party may choose to seek nominal damages should

20   have no impact on your analysis of the party's breach of

21   contract claims, and I'll give you more detailed instructions

22   on the calculation of damages at the conclusion of the trial.

23   However, ladies and gentlemen, the fact that I'm instructing

24   you on damages does not mean that TQ Delta or CommScope is or

25   is not entitled to recover damages.

1          Now, you're going to be hearing from a number of

2     witnesses over the course of this trial, and I want you to

3     keep an open mind while you're listening to the evidence and

4     not decide any of the facts until you've heard all the

5     evidence.  This is important.  While the witnesses are

6     testifying, remember you, the jury, will have to decide the

7     degree of credibility and believability to allocate to the

8     witnesses and to the evidence that they present.

9          So while the witnesses are testifying from the witness

10    stand, you should be asking yourselves things like this:  Does

11    this witness impress you as being truthful?  Did he or she

12    have a reason not tell the truth?  Does he or she have any

13    personal interest in the outcome of the case?  Does the

14    witness seem to have a good memory?  Did he or she have an

15    opportunity and ability to observe accurately the things that

16    they've testified about?  Did the witness appear to understand

17    the questions clearly and answer them directly?  And, of

18    course, does this witness' testimony differ from the testimony

19    of any other witness?  And if it does differ, how does it

20    differ?  These are some of the kinds of things that you should

21    be thinking about and listening for while each witness is

22    testifying.

23          I also want to talk to you briefly, ladies and gentlemen,

24    about expert witnesses.  When knowledge of a technical subject

25    may be helpful to the jury, a person who has special training

1    and experience in that particular technical field, we call

2    them an expert witness, that kind of a witness is permitted to

3    testify to you, the jury, about his or her opinions on those

4    technical matters.

5        However, you're not required to accept an expert witness'

6    opinions or any witness' opinions for that matter.  It's up to

7    you to decide whether you believe what an expert witness or

8    any witness says and whether you believe it's correct or

9    incorrect, whether you want to believe what they say or not

10   believe what they say, and how much weight, if any, you want

11   to give to the testimony they offer.

12       Now, I anticipate that there are going to be expert

13   witnesses testifying in support of both sides in this case.

14   But when they do, it's going to be up to you to listen to

15   their qualifications.  And when they give an opinion and

16   explain the basis for that opinion, you will have to evaluate

17   what they say, whether you believe it, and what degree, if

18   any, that you want to give that opinion weight.

19       Remember, ladies and gentlemen, judging and evaluating

20   the credibility and the believability of each and every

21   witness is an important part of your job as jurors.

22       Now, during the trial it's possible that there will be

23   testimony from one or more witnesses that are going to be

24   presented to you through what's called a deposition.  In

25   trials, it's difficult to get every witness here in person at

1    the time it's needed so that they can testify from the witness

2    stand.

3        So before the trials begin, before a trial begins, the

4    lawyers from both sides take the depositions of the witnesses.

5    In a deposition, the witness is present, they're sworn and

6    placed under oath, a court reporter is present just like in

7    open court today.  The lawyers for the competing parties are

8    present and that witness, after being placed under oath, is

9    asked questions by the lawyers and gives answers or responses.

10   Those answers -- those questions and the answers or responses

11   are taken down.  Often they are recorded by video recording

12   equipment.

13       Now, it's important for you to understand that during the

14   course of this trial if witnesses are presented to you by

15   deposition rather than appearing in person, that you will be

16   seeing clips of those depositions that are put together.

17       Let me explain it this way.  When a witness is deposed,

18   their deposition is taken.  It's usually allowed that the

19   deposition can go as long as seven hours.  So seven hours of

20   questions and answers get asked of this particular witness.

21   It may be, when it comes to the time to present their

22   testimony at trial, that the lawyers who are offering that

23   testimony will decide that only 15 minutes of that seven hours

24   of testimony is relevant and appropriate to offer to the jury.

25       You do not have to listen to seven hours of testimony to

1   get the 15 minutes that are relevant.  Those 15 minutes can be

2   cut out and spliced together, it may be two minutes here,

3   three minutes there, and six minutes here.  It can all be

4   spliced and put together and presented to you as an edited

5   video or deposition.  And that way you and I don't have to

6   listen to seven hours to get 15 minutes' worth of testimony.

7        But as a part of that process, unavoidably, you are going

8   to see little clicks or gaps or things that indicate that

9   splicing and editing has taken place.  You may hear different

10  voices from different lawyers asking questions at different

11  times.  There are going to be little differences.  I won't

12  call them irregularities.  I will call them differences that

13  you are going to hear.  That's because that seven hours has

14  been cut down to, in this example, 15 minutes.

15       When that happens, don't get focused on the little

16  glitches or clicks or different voices or the differences.

17  Listen to the questions, listen to the answers, focus on

18  what's asked and what's said, even though these other things

19  may be present.  And by doing that, we can all avoid having

20  seven hours of presented testimony when only 15 or 20 minutes

21  of it may be important.  Keep that in mind as we have

22  deposition witnesses later in the case.

23       You do need to understand, and I am telling you, that

24  deposition testimony is just as important and you should pay

25  just as close attention to it as you would a witness who

1    appears live and testifies from the witness stand.  And to the

2    same extent possible, you should judge the testimony of a

3    witness presented by deposition as to their believability and

4    credibility just as you would judge any other witness,

5    including those that will testify live from the witness stand.

6         Also, ladies and gentlemen, during the course of the

7    trial you're going to be shown various documents that the

8    Court has admitted as exhibits in this case.  Some of those

9    documents may have portions of them that have been redacted

10   or, as we might otherwise say, blacked out.  That's because

11   there may be information in those documents that is not

12   relevant to what's going on in this case and you do not need

13   to see it or focus on it.  Some of it may be confidential

14   business information that doesn't relate to any of the issues

15   that are involved in this trial.

16        There are reasons why those blacked out portions or

17   redactions are in there.  When you are shown documents in this

18   trial that may have redactions in them, just like the glitches

19   in the video depositions, don't focus on the part that's

20   blacked out.  Don't try to guess what was said that's been

21   redacted.  Focus on what's there and visible and readable.

22   Focus on the part that isn't redacted, if there are redactions

23   in the document.

24        Any of the redactions that are in documents you're going

25   to be shown are because I ordered them, so I've already

1    determined that's not appropriate or necessary for you to

2    think about.  Don't focus on what's been redacted; focus on

3    what has not been redacted in the documents and the exhibits

4    that you might be shown during the course of the trial.

5         Now, during the course of the trial, all this being said,

6    it's still possible that at various times the lawyers are

7    going to raise objections.  And it's the duty of an attorney

8    to object when the other side offers testimony or other

9    evidence that the lawyer believes is not proper under the

10   rules of the Court.  Upon allowing the testimony or other

11   evidence to be introduced over the objection of an attorney,

12   the Court does not, unless expressly stated, indicate by doing

13   that that I have any opinion as to the weight or effect of

14   that evidence.  Again, that decision as to the weight or

15   effect of the evidence is up to you, the jury.

16        You are the sole judges of the credibility and

17   believability of each and every one of the witnesses and what

18   weight and effect, if any, to give to all the evidence that

19   will be presented during this trial.

20        Unequivocally, ladies and gentlemen, I want to compliment

21   the lawyers in the courtroom in your presence because, prior

22   to today, through pretrial hearings and procedures that you

23   were not present for, the Court has gone through many issues

24   with the attorneys to try and streamline this trial.

25        One of the issues we've gone through is the issue of

1    which exhibits are properly admissible into evidence.  And

2    there have been many, many, many documents presented during

3    those pretrial hearings, both from the Plaintiff that the

4    Defendant objected to and from the Defendant that the

5    Plaintiff objected to, that the Court has already considered.

6    And I've heard the arguments for and against the admission of

7    those documents.  Some of them I've ruled can be admitted.

8    Some of them I've ruled can't be admitted.

9         The bottom line is the proper documents that can be

10   admitted, that I've already ruled on those disputes, have

11   already taken place.  So you won't have to sit here during

12   that trial and listen to those objections and responses and

13   back and forth between the lawyers.  That's already been done.

14   And whether you understand it or not, that has saved you many

15   hours of sitting those chairs.  I had the privilege of sitting

16   up here many hours by going through that process.

17        But that has already been done, and that means if a

18   document is presented to you during this trial as an exhibit,

19   it means I've already determined it's admissible.  So none of

20   that preliminary process has to be presented during the trial.

21   The lawyers can simply present it, put it in a proper context

22   with a witness, and let it be seen by you the members of the

23   jury.  And that has saved you a lot of time.

24        However, it's still possible that objections are going to

25   arise during the trial.  If I should sustain an objection to a

1    question addressed to a witness, then you, the jury, must

2    disregard the question entirely, you may draw no inference

3    from its wording, and you may not speculate about what the

4    witness would have said if I had allowed them to answer the

5    question.

6         On the other hand, if I overrule on objection to a

7    question addressed to the witness, then you should consider

8    the question and the answer just as if no objection had been

9    made.

10        You should know, and I touched on this earlier during

11   jury selection, you should know that the law of the United

12   States permits a United States district judge to comment to

13   the jury on the evidence, but such comments from the judge to

14   the jury on the evidence are simply an expression of the

15   judge's personal opinion and the jury is free to disregard

16   those comments in their entirety because, as I've told you,

17   you, the jury, are the sole judges of the facts in this case.

18   You, the jury, are the sole judges of the credibility and

19   believability of each and every witness.  And you, the jury,

20   are the sole judges as to how much weight, if any, you want to

21   give to all the evidence that will be presented during this

22   trial.

23        That being the case, even though the law permits me to

24   comment to you on my views as to the evidence, I'm not going

25   to do that.  I'm going to try very hard not to comment on the

1    evidence so that you have no idea what I think about the

2    evidence, because determining the facts from the evidence is

3    your job, it's not my job in this case.  So you should not

4    take anything you hear or see or think you hear or see as

5    coming from me as a factor to consider in ultimately deciding

6    what the facts are in this case.

7         Now, our court reporter, Mr. McRoberts, who's seated in

8    front of me, he's going to take down everything that's said

9    during this trial, and that recording, that transcription of

10   everything that's asked and everything that's answered,

11   everything that's said, that will be reduced to writing at

12   some future date.  It's not going to be printed and available

13   as a written transcription for you-all to consider and review

14   when the evidence is complete and you're in the jury room

15   deliberating on your verdict.

16        In other words, ladies and gentlemen, you won't have the

17   written transcription of the questions and the answers.  You

18   will have to rely on your memory of the questions and the

19   answers and the evidence that's been presented during this

20   trial.

21        The transcription prepared by the court reporter is

22   prepared so that if there is an appeal of this case to a

23   higher court, that will then be available for that appellate

24   court to use, but it's not going to be available to you, the

25   jury, which means, again, you are going to have to rely on

1    your memory of the evidence throughout the trial.

2         Now, in a few moments you're each going to be given a

3    juror notebook and in these notebooks, as I'll mention in a

4    few minutes, there are places for you to take notes if you

5    wish to.  It's up to each of you to decide whether you're

6    going to take notes and, if you are, how extensive those notes

7    should be.  But remember any notes that you take over the

8    course of the trial are aids to your memory only.  They're for

9    your own personal use.  You still have to rely on your memory

10   of the evidence, which is why you need to pay close attention

11   to the testimony of each and every witness.

12        And a juror should not abandon his or her recollection of

13   the evidence, their memory of the evidence, just because some

14   other juror's notes might indicate something different.  Your

15   notes, if you take them, are to refresh your memory and

16   recollection of the evidence, and that's the only reason you

17   should take them.

18        Now, I'm going to ask at this point the Court Security

19   Officer to pass out these juror notebooks to each member of

20   the jury.

21                  (Pause in proceedings.)

22        THE COURT:  Thank you, Mr. Latham.

23        In these notebooks, ladies and gentlemen, you're going to

24   see that you have a copy of each of the asserted patents in

25   this case.

1        You're also going to find a section in those notebooks

2    where language from the claims that's been raised by the

3    parties has been construed and interpreted by the Court.  On

4    one side, you'll see the actual language from the claims

5    that's been questioned, and on the other side you'll see the

6    constructions or the definitions that the Court has reached.

7    Again, you are required to apply my definitions regarding that

8    language to the issues that you're asked to decide in this

9    case.

10        Behind that section in those notebooks about the language

11    of the claims that the Court has interpreted or construed, you

12    are going to find a section of witness pages.  It should have

13    tabs on there for each witness who might testify during the

14    trial.  That's to help you find the appropriate tab for the

15    witness easily when they're called to testify.  And behind

16    each of those tabs, you should have a sheet with a

17    head-and-shoulders photograph of the witness and their name.

18        Also, a good portion of that page will be ruled lines if

19    you want to take notes about that witness' testimony on that.

20    If you need additional space to take notes and you opt to take

21    notes, you're also going to find in the back of those

22    notebooks a new legal pad that you can use to take notes on

23    throughout the trial.  Again, it's up to each of you whether

24    you want to take notes and how extensive or otherwise you want

25    those notes to be.

1        And I believe you'll find a pen somewhere in the front

2   pocket in case you don't have one to take notes with, again if

3   that's something you determine you want to do.

4        Now, these notebooks, ladies and gentlemen, should be in

5   your possession pretty much at all times.  When you leave each

6   day, I'm going to ask you to take them to the jury room and

7   leave them on the table in the jury room so they'll be there

8   the next morning.  When we recess during the trial and take a

9   break, unless I tell you otherwise, you should take the

10  notebooks with you to the jury room and not leave them here in

11  the courtroom.

12       There may be, however, periods where we're going to take

13  a short recess, you're only going to be out of the jury box

14  for a short period of time, that I may say, ladies and

15  gentlemen, you may simply leave your notebooks closed and in

16  your chairs.  And if I tell you that, then you don't need to

17  take them back to the jury room; you can just close them and

18  leave them in your chairs.  But unless I instruct you

19  otherwise, they need to be in your possession or they need to

20  be secure in the jury room.  They don't need to be left around

21  where anybody who shouldn't would have access to them.

22       Now, in a moment we're going hear opening statements from

23  the lawyers in the case.  These opening statements, ladies and

24  gentlemen, I want to explain to you, these are supposed to be

25  a roadmap of what each side expects their evidence will show

1    you.  And you should remember that what the lawyers tell you

2    in this case is not evidence.  It's what they believe the

3    evidence will show.

4        And, again, it's up to you to watch and listen and

5    observe throughout the trial and see if the evidence does, in

6    fact, show you what they believe and tell you they hope it

7    will show you.  What the lawyers tell you is their impression

8    of the evidence, and they have a duty to try and point out

9    what they believe the evidence is.  But, remember, what the

10   lawyers tell you is not evidence.

11       Now, let me give you a brief structural overview of how

12   the case will proceed.

13       After I finish these instructions, the Plaintiff will

14   present their opening statement.  They'll lay out for you

15   verbally what they believe the evidence is going to show over

16   the course of the trial.  Then the Defendants will present

17   their opening statement and they will lay out for you verbally

18   what they believe the evidence is going to show you over the

19   course of the trial.

20       Then we will begin with the actual evidence.  We will

21   start with the Plaintiff first, and the Plaintiff will present

22   its witnesses.  And the witnesses presented by the evidence

23   [sic] is called the Plaintiff's case in chief.  The Plaintiff

24   will call its witnesses, the witnesses will be sworn and

25   testify from the witness stand.

1          After the Plaintiff is through directly examining the

2    witnesses, then the Defendant has an opportunity to

3    cross-examine the witnesses.  After the cross-examination and

4    the back and forth when all the questions have been asked of

5    that witness, they will step down and the next Plaintiff's

6    witness will take the witness stand and we will go through all

7    the Plaintiff's witnesses.

8          When the Plaintiff has put on all their witnesses and

9    they've been examined, either testifying live or by

10   deposition, as I've already talked to you about, then the

11   Plaintiff will rest the Plaintiff's case in chief.

12         Then the Defendant will present its evidence in the same

13   way.  They'll call their witnesses, they'll be sworn, they'll

14   be examined and cross-examined, and the Defendant will call

15   all their witnesses.  When the Defendant has presented all of

16   its witnesses, the Defendant will rest what's called the

17   Defendants' case in chief.

18         At that point the Plaintiff has the option of calling

19   what are called rebuttal witnesses to rebut what the

20   Defendants have shown.  They may call rebuttal witnesses, they

21   may not call rebuttal witnesses.  It's up to them.  They have

22   that option.  If they do, then they'll present their rebuttal

23   witnesses, and when they're finished, that will end the

24   Plaintiff's rebuttal case.

25         When all the witnesses are through, if there's a rebuttal

1    case from the Plaintiff, then at the end of that, or if there

2    is no rebuttal case from the Plaintiff, at the end of the

3    Defendants' case in chief, that will be when all the evidence

4    has been presented.  And when all the evidence has been

5    presented to you, I will give you my final instructions on the

6    law, and then the parties will present their closing arguments

7    presented by their attorneys.

8         And when you've heard my final instructions and when the

9    attorneys for the parties have presented their closing

10   arguments, then I will instruct you to retire to the jury room

11   and to deliberate on your verdict.  And I will send back with

12   you at that time a written document that sets out the various

13   questions that you're to ask [sic], which will, as I've told

14   you, your answers which need to be unanimous, those answers to

15   those questions will constitute the jury's verdict in this

16   case.  And that's structurally how the trial will go on.

17        Now, at this point we're ready to hear opening statements

18   from the attorneys.  But before we do that, we've been here

19   awhile.  I would like each of you to have the opportunity, if

20   you want to, to just close your notebooks and just stand up

21   where you are and stretch a little bit.  If you have a bottle

22   of water, get a drink of water.  I don't want you to leave the

23   jury box, but take a moment to stretch and kind of refresh.

24   And then once you've done that, we'll then proceed with the

25   opening statements.

 1          And you're each welcome to have a bottle of water with

 2     you in the jury box throughout the trial.  It's available to

 3     you in the jury room.  If anybody needs one and doesn't have

 4     one, we can bring one to you.

 5                    (Pause in proceedings.)

 6          THE COURT:  All right.  I hope that's helpful.

 7          All right.  With these instructions, ladies and

 8     gentlemen, we'll proceed to hear opening statements from the

 9     parties.

10          The Plaintiff may present its opening statement to the

11     jury.

12          MR. DAVIS:  Thank you, Your Honor.

13          THE COURT:  Would you like a warning on your time,

14     Mr. Davis?

15          MR. DAVIS:  Yes, Your Honor.  May I have 15 minutes

16     and five minutes?

17          THE COURT:  I'll warn you when you have used 15

18     minutes and when you have -- when you have 15 minutes

19     remaining and when you have five minutes remaining.

20          MR. DAVIS:  Thank you, Your Honor.

21          THE COURT:  You may proceed with opening statement

22     when you're ready.

23          MR. DAVIS:  May it please the Court.

24          Good afternoon, members of the jury.  Welcome back from

25     lunch.  I hope you had a good lunch.

1    And as I told you this morning, my name is Bo Davis, and

2    I'm here representing and speaking on behalf of TQ Delta this

3    afternoon.

4    The reason we're here is because for the last 10 years

5    the Defendant in this case, CommScope, has been infringing

6    seven United States patents issued to a man named Marcos

7    Tzannes and now owned by a company called TQ Delta.  These are

8    seven of almost 200 patents that TQ Delta and Mr. Tzannes have

9    worked on and invented, and these seven patents represent

10   technology related to DSL high speed internet.

11   CommScope has been aware of these patents since at least

12   2013 when we sent them a letter, when we reached out to them

13   and we told them that we believed their products that comply

14   with standards were infringing TQ Delta's standard essential

15   patents.

16   Now, we believe that the evidence will show that, as we

17   sit here today, CommScope continues to infringe these patents

18   and it will continue to do so in the future until this dispute

19   is resolved.  Not only have they infringed the patents, but

20   they've done it willfully and they have refused to compensate

21   TQ Delta for the inventive work that it has done and that Mr.

22   Tzannes has done.  And this is what brings us to the

23   courthouse today.  This is how our system works.

24   The right to trial by jury is protected by the Seventh

25   Amendment to the Constitution.  It's in the Bill of Rights.

```
1    And when we think of that right, we often think of the right

2    of the parties to have a right to have a jury decide their

3    disputes.  But what I'd like you to think about is that it's

4    also your right.  It's your right to decide the type of

5    conduct that we're going accept in this community.  So it's

6    not just TQ Delta's right or CommScope's right, but it's your

7    right.

8        And I think that's really what the founders intended.

9    They really intended that members of the community would be a

10   part of the process because the founders trusted that you and

11   your collective wisdom were the best ones to judge disputes

12   between members of the community.

13       Now, I recognize that you being here is a sacrifice.  I

14   really do.  I know that there are things you'd rather be

15   doing.  I know that this takes away from your life.  But I

16   hope that you will look at this as an opportunity to

17   participate in what has made this country great, at least in

18   part.  And so I do want to say that and thank you for your

19   sacrifice.  We respect your time, and we will be as efficient

20   with that as possible.

21       Not only did Congress -- I'm sorry, the founding fathers,

22   when they were framing the Constitution and laying out the

23   foundation of the rights that are going to -- that will be a

24   part of our country, provide for a right to jury trial, but

25   they believed that the protection for innovation was so
```

1    fundamental and so important that they also put that in the

2    Constitution.  Article I, Section 8, of the Constitution says,

3    "To promote the progress of science and useful arts, by

4    securing for limited times to authors and inventors the

5    exclusive right to their respective writings and

6    discoveries."

7         That's what we have here in these seven patents.  We have

8    discoveries by a man named Mr. Tzannes.

9         Now, as you heard in the patent video this morning, once

10   a patent is issued, the patent holder is entitled to exclude

11   others from using the patent.  If someone is using your

12   patent, if they come on your property, that is called patent

13   infringement.  Just like if you owned a piece of land and you

14   had timber on that land and someone came on your land and cut

15   down your trees, that would be something that is not right.

16   That would be something that's not permitted under the law in

17   the same way patent infringement is not permitted under the

18   law because the inventions are protected by patents.

19        And there's a special kind of infringement in this case.

20   It's called willful infringement.  When someone does something

21   knowingly with callous disregard for others, with callous

22   disregard for a high probability that they're going to be

23   infringing a patent, it's called willful infringement.  And

24   that in a nutshell is why we're here today.  CommScope for 10

25   years has been using patents owned by TQ Delta and inventions

1    created by Mr. Tzannes.

2        Now, I said a patent is like property, and I want to tell

3    you a little bit about why that is.  You each have copies of

4    the patents in your jury notebooks.  I'm showing you a copy of

5    the '411 Patent.  Feel free to look at it if you'd like, but

6    you don't have to.

7        I just want to orient you to the parts of the patent

8    because, on the first page, you'll see information like the

9    name of the inventor and the last three numbers, which are how

10   we'll refer to the patent at times.  You'll see some dates

11   that talk about when the invention was first disclosed to the

12   Patent Office.  You'll see figures.  And then as you flip

13   through it, you'll see a description of the invention where

14   the patent owner has taught the world how to make the

15   invention.

16       At the end, you'll see a list of numbered paragraphs.

17   These numbered paragraphs are the claims, and the claims, like

18   a deed to property, are what define the metes and bounds of

19   the invention.  And if someone is using your patent, each of

20   these claims will be found in their product.

21       The patents at issue in this case, there are seven of

22   them.  And I'm not going to read them all to you.  You're

23   going to hear about them.  You're going to hear them referred

24   to throughout the case because it's our burden to prove

25   infringement, and we welcome that burden.  We're very happy to

1    present our infringement case to you, because we think there

2    is evidence that will show you well beyond the preponderance

3    of the evidence standard that we have to use that CommScope is

4    infringing these patents.

5         Now, because there are so many patents in this case, we

6    also refer to these patents for shorthand and I'm listing the

7    these shorthand names that you may hear throughout this -- the

8    presentation of evidence so that we're not constantly having

9    to refer to a bunch of numbers.

10        I mentioned during jury selection what the products that

11   are at issue in this case are about.  It's DSL modems.  These

12   are the modems that sit in your house that connect to

13   telephone networks and that allow you to receive high speed

14   internet data to your home.

15        CommScope designs and makes DSL modems.  Their largest

16   customer is AT&T.  Ninety percent of the modems they sell,

17   they sell to AT&T who then provides them to U.S. customers

18   when you subscribe to DSL service.  Every time CommScope sells

19   a DSL modem to AT&T, they commit an act of infringement.

20   Every time CommScope supports AT&T in the use of those DSL

21   modems through firmware upgrades, through technical support,

22   they infringe the patents related -- the seven patents at

23   issue in this case.

24        I'd like to spend a minute to tell you a little bit

25   about -- a little bit more about DSL technology.

1          Some of you in this room may have DSL technology, and I

2     didn't realize this before I met Mr. Tzannes.

3          And, Mr. Tzannes, would you please stand up?

4          This is Mr. Tzannes.  He's the inventor on six of the

5     seven patents at issue in this case.  And for the other

6     patent, he was head of the group at a company called Aware

7     that developed the technology that became that seventh patent.

8          And I didn't know this before I met Mr. Tzannes, but he

9     explained to me how DSL technology works.  And I was surprised

10    to learn that, you know, the high speed internet data that

11    travels to your home is going over telephone wires that have

12    been hanging in the air sometimes for as long as a hundred

13    years.  These telephone wires were installed 50, 60, 70, 100

14    years ago, and they were not designed for high speed internet

15    traffic.  They were designed for simple landline telephone

16    calls.  And because of that, putting high speed data onto this

17    network creates a lot of problems.

18         But why would you want to do that?  Why would you want to

19    put high speed internet on the phone lines to begin with?

20    Well, I don't -- some of you like me remember in the

21    late '90s, there was this big revolution that happened.

22    Right?  The internet revolution.  All of a sudden, we could

23    get internet to our homes through, if you remember in the

24    late '80s, early '90s, dial-up service.  I don't know if you

25    remember dial-up service, America Online.

1          Then internet grew, we needed faster internet.  And when

2     we needed faster internet, many companies were competing to

3     get into the market to provide you and me DSL service.

4          AT&T was a phone company, but they wanted to become a

5     high speed data company.  So how could they do that?  Well,

6     they didn't have a high speed network.  What they had were old

7     phone lines.  So if they wanted to become an internet company,

8     they could either lay new cable all over the country or they

9     could use their old telephone lines.

10         Around this time in the late '90s, DSL technology was

11    emerging and DSL technology provided a way for AT&T to become

12    a high speed data network company without laying new cables;

13    using their existing phone lines, the phone lines that they

14    had probably spent a hundred billion dollars installing and

15    maintaining over the years.

16         So what option do you think AT&T went with?  Did they go

17    build a new network or did they use DSL technology over their

18    existing lines?  For the last 20 years, they have offered DSL

19    technology, and that market has enabled CommScope to sell over

20    35 million DSL modems to consumer -- to AT&T which then go

21    into consumers' houses.

22         Now, DSL is a very complicated technology.  Even though

23    it's running over old telephone lines, the technology that

24    enables it is complicated, and you're going to hear that very

25    quickly.  Mr. Tzannes is going to be our first witness.  He's

1    going to take the stand, and he's going to explain to you the

2    problems of DSL and how he solved them.     But the reason

3    it's a problem is for something called noise.  When you put

4    high speed signals on DSL lines, they're very susceptible to

5    noise.  And the noise comes from everything.  It comes from

6    your microwave, your air conditioner, to the weather, the

7    lightning storm we had last night, to radio towers.  It

8    interferes with the signal and it creates a bunch of problems.

9    And the patents at issue in this case address the problems

10   associated with noise, problems that, if we couldn't fix, you

11   wouldn't have DSL.

12        Now, you've heard these are standard essential patents.

13   That was a new term to me.  I wasn't sure exactly what that

14   meant.  But the analogy that's been used by the Court so far

15   is like a wall plug.  They are all designed the same so all

16   plugs can fit in them.  For DSL, it is a similar concept.

17   It's a similar concept in that you have to design the products

18   the same way so that they all work together.  And in designing

19   them the same way, in setting that standard, you want to make

20   sure that you have the best solutions to the problems you face

21   in the industry.

22        So when your invention gets presented to the standards

23   body and the body adopts the invention into the standard, your

24   patents become what are called standard essential.  This is

25   the ITU, the International Telecommunications Union.  It's

1    made up of companies and representatives from countries from

2    all over the world.  It's an international organization.  They

3    meet together on a regular basis to solve problems associated

4    with DSL.  And the ITU adopts standards that set out the way

5    that the products should be made.

6         And all of the inventions in this case, the seven patents

7    that are at issue in this case, are what are called standard

8    compliant.  They've been contributed to the ITU.  Five of the

9    seven patents are what are called standard essential.  And

10   what does that mean for purposes of this case?  It means that

11   if you sell a product that is incorporated into the standard,

12   then you're necessarily infringing the patent.

13        And CommScope sells products that comply with the

14   standards.  The three standards at issue in this case are

15   VDSL2, G.INP and G.bond.

16             THE COURT:  You've used 15 minutes, counsel.

17             MR. DAVIS:  Thank you, Your Honor.

18        CommScope admits that their products comply with the

19   standards.  Here is a data sheet from their own product

20   literature where they say VDSL2 support, support for bonded

21   profiles, and G.INP, the three standards at issue in this

22   case.

23        I'd like to give you now a quick overview of some of the

24   key events in the case and a time line of those events.

25   The seven patents at issue in this case were all disclosed to

1    the Patent Office from the years 1999 to 2006 through what's

2    called a provisional application.  And what does that mean?

3    That means you filed an application where you've told the

4    Patent Office that you have inventions that will then later

5    become patents.

6        The standards at issue in this case were adopted and

7    finalized and promulgated by the ITU in 2005, 2006, and 2010.

8    You're going to hear testimony from Mr. Tzannes that he's been

9    involved with the ITU for over 30 years, that he's attended

10   these meetings, he's led groups, he's received awards, and his

11   involvement in the standards body is extraordinary.  He's

12   essentially dedicated his life to developing DSL technology.

13   It's just what he's done with his life, and he's very proud of

14   that work.  He's proud of the work he's done there.

15       Each of the inventions, not only did he attend the

16   meetings, but he taught others in the industry about his

17   inventions.  He taught them, he showed them.  You're going to

18   see images of his testimony -- I'm sorry, images from him

19   actually at the white board teaching other members of the

20   community how to solve problems.  And what you're going to

21   hear is that not only were those problems presented to the

22   ITU, but every member of the group adopted -- agreed to adopt

23   the inventions into the standards.

24       Now, TQ Delta.  You're going to hear from Ms. Abha

25   Divine.  She's the managing director of TQ Delta.  She used to

1    work at AT&T.   TQ Delta's business is managing and continuing

2    the development of the Tzannes patents.   TQ Delta acquired the

3    patents from a company called Aware in 2012.

4        In 2013, TQ Delta did what it -- one of the things that

5    are a central part of its business which is to approach

6    people, companies like CommScope, who are using patents that

7    they don't have permission to use, and try to negotiate a

8    license.

9        In 2015 TQ Delta sent a letter to CommScope, and in this

10   letter they asked to initiate licensing discussions.   They

11   said, we would like to sit down and talk, we'd like to talk

12   about your products, we'd like to tell you about our

13   technology.   They attached a PowerPoint presentation that

14   provides an overview of the patents, the standards, and how

15   their products infringe.

16       Now, what happened after this?   You're going to hear that

17   from this point forward, CommScope began essentially a

18   calculated plan to delay as long as possible the resolution of

19   this issue.   They decided to ignore, they decided to withhold,

20   and they did not engage in good faith negotiations with TQ

21   Delta to resolve this issue.   You going to hear about that

22   later.   You're going to hear all about CommScope's conduct and

23   how they have essentially said, we don't want a license

24   because we don't like your standard royalty rates, we don't

25   like your standard licensing terms.

1      But others in the market have accepted TQ Delta's

2   licensing terms:  In 2017, a company called Zone.  '18, a

3   company called Fujitsu.  Siemens, Zyxel, Nokia, we're going to

4   walk through each of these licenses.  We're going to show you

5   that TQ Delta's royalty rates were not only fair and

6   reasonable, but as part of their obligation to the ITU for

7   owning standard essential patents, they couldn't deviate from

8   them because, remember, it works both ways.  If you want to

9   offer licenses on reasonable and non-discriminatory terms,

10  CommScope doesn't get to dictate what those terms are,

11  especially when other companies have already taken licenses.

12  You have to be fair and consistent to those companies as well.

13      Now, our burden of proof on infringement in this case is

14  the preponderance of the evidence, and you heard His Honor

15  describe that -- that burden and what it means.  Well, what it

16  means essentially is if in the scales of justice, the scales

17  tip ever so slightly in our favor, even just a feather, we've

18  met our burden.

19      And we welcome the burden for infringement.  We believe

20  we have more than sufficient evidence.  You're going to hear

21  evidence from four experts.  I'm not going to introduce them

22  all right now, but these are four experts that have PhDs and

23  that understand this technology inside and out.  They're going

24  to walk you through the claims.  They're going to show you

25  where the claims line up with the standards and, therefore,

1    become standard essential patents.

2         They're going to show you in CommScope's own product

3    documents.  They're going to look at the source code.  Source

4    code is not something that anybody has access to, but through

5    this litigation we've been able to get access to that source

6    code.  And in the code, it shows where CommScope is infringing

7    the patents.

8         And, finally, you're going to hear something called the

9    Uber matrix, which I thought was an interesting name, but this

10   is the requirements document that AT&T sends CommScope and

11   says, you need to have these features in your product.  And

12   when your largest customer tells you that they want something

13   in your product, you bet you're going to put it in there.  And

14   we're going to show you for each of the features and

15   functionalities that are at issue in this case, CommScope

16   said, yes, we'll put it in there.  It's compliant.

17        But, finally, we're also going to provide you with

18   product testing.  We set up a testing environment where we

19   could actually test these DSL modems and watch the data that's

20   being sent back and forth.  And we captured the data, and the

21   test results from that data are going to show that, yes, there

22   is more than enough evidence, more than enough evidence, that

23   CommScope infringes.

24        CommScope has a series of reasons why we're here today.

25   One of those reasons they say is, we don't infringe.  They

1     say, we just don't do it.  Even though our products are

2     compliant, even though, you know, we go to the ITU and we were

3     in the meetings, and we know Mr. Tzannes and those kind of

4     things, we just don't think we do it.

5          And I'm going to submit to you that, as you hear the

6     evidence, I'd like you to hear what they're saying and what

7     they're not saying, because CommScope didn't do any testing.

8     It's their products.  They know how they work better than

9     anyone.  They could have tested them, but they didn't.  You're

10    not going to hear any testing evidence from CommScope.  What

11    you're going to hear is criticism of the testing we did.

12    Okay.  Well, if we got our testing wrong, where's the right

13    testing?

14         The next thing you're going to hear from CommScope is,

15    okay, well, maybe we did infringe, maybe we do, but the

16    patents are just bad, they're invalid, the Patent Office got

17    it wrong.

18         I want to submit to you that this red ribbon on the front

19    of these patents actually means something.  It means something

20    that when the Patent Office and the folks there who are

21    trained specialists in their field to do this job of analyzing

22    patents and deciding whether or not to grant patents.

23         They say they got it wrong.  They say they got it wrong.

24    They say they never should have issued the patents.  And

25    because of that, the burden of proof is clear and convincing

1    evidence.  And that is not just tipping a little bit, but it's

2    the great weight and the preponderance of the evidence.  You

3    have to have an abiding conviction that these patents are

4    invalid.  And I'll submit to you that CommScope will not be

5    able to carry their burden to show invalidity.

6         Now, we talked about willful infringement.  And this is a

7    type of infringement that exists when Defendants' conduct in

8    the face of patents rises to the level of a callous disregard,

9    a willful negligence, a willful blindness.  And in this

10   situation, CommScope was at the ITU meetings.  CommScope

11   itself actually voted to adopt the standards themselves, the

12   standards that Mr. Tzannes contributed to.  When he

13   contributed his inventions to the ITU and they became

14   incorporated into the standard, CommScope was there.  And not

15   only were they there, but these are some of the forms that are

16   filled out when you want to contribute your inventions to the

17   standard.

18             THE COURT:  You have five minutes remaining.

19             MR. DAVIS:  Thank you, Your Honor.

20        The first one is called a standards contribution.  And a

21   standards contribution is basically a paper you write when

22   you're contributing your idea to be included in the standard.

23   Mr. Tzannes filled out one of those for all the patents at

24   issue in this case.

25        And then on the right is a patent statement where you

1    tell the ITU, I have patents that are covered -- I have

2    patents that now cover the standard that you've adopted.

3    Those were filled out, those were submitted for all of them.

4    These are all public documents.  So even if CommScope says,

5    well, you know, we never heard about you, they were in the

6    meetings, they were on notice through the -- through the

7    contributions and the statements.

8         But not only that, we actually reached out to them as I

9    showed you earlier.  We sent them a letter in 2013.  And over

10   the next 10 years, there were dozens of emails, multiple phone

11   calls, at least two in-person meetings where we sat down and

12   we showed them, Here is how you infringe.  We sent them a

13   packet of material this long.  It was so long you couldn't

14   even send it in paper.  We had to send them a link to

15   download.  And it had claim charts.  And it walked through and

16   it said, here's the claim, here's the evidence, here's the

17   claim, here's the evidence.  We told them how they infringed.

18        How did they respond?  We don't do it.  Did they ever

19   write back and tell us, We don't -- let me show you how we

20   don't infringe?  No.  They just ignored it.  They just ignored

21   it.

22        And it wasn't until -- oh, and by the way, there's this

23   issue of the breach of contract.  They say we broke our

24   promises.  Those licenses, all these licenses, they have TQ

25   Delta's standard royalty rates.  So their -- their whole claim

 1     that we broke a promise and we didn't offer them the same

 2     discounts that someone else got, what the evidence you're

 3     going to hear is that all of these licenses have TQ Delta's

 4     standard rates and we offered them those rates from day one.

 5     Okay?

 6         We offered them the rates multiple times over the years.

 7     They wouldn't take it.  And they never once came back to us

 8     and said, We don't think these rates are fair because someone

 9     else has gotten different rates.  They never said that.  They

10     just said, Here's some rates, we like these rates, they're 90

11     percent discounted, we'd like that.

12         Well, of course they would.  Who wouldn't like a 90

13     percent discount?  Everybody would.  But TQ Delta didn't just

14     break its promises.  The reason it couldn't agree to a 90

15     percent discount is because, if it did, it would be

16     discriminating against those who paid the standard rates.  It

17     can't do that.  So not only did TQ Delta uphold its promise,

18     it's CommScope who was trying to get us to break our promise,

19     our promise not only to the ITU but to the other licensees.

20         So I wanted to just address that and get that out of the

21     way because I just -- I just -- it's -- the licenses will

22     speak for themselves when you hear them.

23         Now, finally, when you get to damages in this case, we

24     have an expert, Dr. John Putnam.  He's a Ph.D. from Yale.

25     He's going to come, and he's done a proper damages analysis.

1    And I want to tell you real quickly, damages law looks to what

2    a reasonable royalty -- it says, in no event less than a

3    reasonable royalty for the use made of the invention by the

4    infringer.

5        So where do you look to understand damages?  You look to

6    the amount of the use.  You look to the Defendants' use.  And

7    if you use less, then you pay less.  If you use more, you pay

8    more.  And in this case CommScope has used these inventions

9    36,079,576 times.  And when you've sold that many units, the

10   royalty rate and the damages in this case is $89 million.

11       And at the end of all this evidence, that is what we're

12   going to ask you to award and not a penny less because when

13   you hold out for 10 years and when you say, we don't infringe

14   standard essential patents that we know that Mr. Tzannes was

15   in the meetings, and when you say we don't think the patents

16   are valid, and even if the patents are valid, we shouldn't

17   have to pay very much, they should.  They should have to pay

18   every penny of what they've used.

19       Members of the jury, thank you.  We look forward to

20   presenting our case to you.

21       Thank you, Your Honor.

22       THE COURT:  All right, counsel.

23       Defendants may now present their opening statement to the

24   jury.

25       Mr. Dacus, would you like a warning on your time?

```
 1                MR. DACUS:  If you'd let me know when I have five

 2      minutes left, please, Your Honor?

 3                THE COURT:  I will certainly do that.

 4                MR. DACUS:  Thank you.

 5                THE COURT:  You may proceed.

 6                MR. DACUS:  Thank you, Your Honor.

 7           Good afternoon.  Let me start this afternoon where I

 8      started this morning, and that is to say, on behalf of the men

 9      and women who work at CommScope, a very sincere thanks to you.

10      I said to you this morning that we would not be here if this

11      case was not important, and that's the truth.  We would not

12      be.  This case is very important to CommScope, and at least

13      from CommScope's perspective, it really has broader

14      importance.

15           You saw just a minute ago TQ Delta's lawyer pull up the

16      U.S. Constitution and show you that, in fact, our founding

17      fathers put the patent law into the Constitution.  And that's

18      very true.  The part he didn't highlight is the purpose of

19      patents, and the purpose of patents is to promote the progress

20      of science.

21           Now, you may think that because CommScope finds itself

22      sued in a federal courthouse in Marshall, Texas, over patents,

23      that CommScope is somehow mad at the patent system or doesn't

24      respect the patent system.  And I know the very first thing

25      they want me to say to you is, nothing could be further from
```

1    the truth.  In fact, it's 180 degrees opposite from that.

2    CommScope has the utmost respect for the patent system, and in

3    many respects is here to protect the integrity of that very

4    patent system.  Let me explain to you why.

5         CommScope is a company that's drawing now on close to 50

6    years of existence, founded in 1976, headquartered in Hickory,

7    North Carolina, and they've got a facility right up the road

8    in Richardson, right outside of Dallas.  They themselves are

9    an innovator.  They have more than 15,000 patents.  CommScope

10   has more than 15,000 patents.  So when I tell you that they

11   respect the patent system and they respect the integrity of

12   the patent system, that's because they themselves are an

13   innovator and one who seeks and obtains patents for their

14   products and their inventions.

15        Now, I'm going to move off of CommScope a little bit, but

16   I'm going to give you one sort of fun fact.  In 2008 when the

17   Dallas Cowboys built their new stadium in Arlington, and for

18   any of you who've ever -- you've seen it on television or in

19   person, you know that when Jerry Jones and the Cowboys built

20   that stadium, they only wanted the best products.  So the

21   folks at CommScope were chosen to provide the connectivity and

22   the products for Cowboys AT&T stadium.

23        Now when I tell you that, does that mean that we win this

24   case?  Of course not.  Of course not.  But the reason I tell

25   you that is because I think it's some proof of the hard work

1    that the engineers at CommScope have gone through to produce

2    products, and it's a recognition in the public that, in fact,

3    they do have some of the very best and brightest engineers

4    and, as a result, some of the very best products.

5         What's the product we're here talking about?  You've

6    heard a little bit about it already.  It's this -- you'll hear

7    it referred to as a modem, and you'll hear it referred to

8    sometimes as a CPE, a consumer premises equipment.  So either

9    time you hear those terms, that's what we're talking about.

10   That's the thing that you see there on the left.  That's the

11   product that's accused of infringement here.

12        The thing you see in the middle is an integrated circuit

13   board that is found within that CPE.  And then the thing you

14   see on the right is actually a semiconductor chip.  And what

15   you'll come to know through the evidence in this case is that

16   the features and the functions in these seven patents that

17   they're here to complain about are actually found in this

18   Broadcom semiconductor chip.

19        Now, why did I say Broadcom?  I said Broadcom because

20   CommScope actually does not make this chip.  It's made by a

21   company by the name of Broadcom.  Broadcom's a sort of one of

22   the best and brightest American companies.  They supply the

23   vast majority of these chips to this industry.  And we buy

24   them.  We buy those chips, and we put them on the integrated

25   circuit board and then put them in the CPE.

1        Now, who sits at the other table?  TQ Delta.  You've

2   heard a little bit about them.  You're going to hear more as

3   the case goes on.  You now -- you know from what was said this

4   morning and what Mr. Davis just said to you that TQ Delta

5   actually bought these patents from a company called Aware.

6        He talked a lot about Mr. Tzannes.  Mr. Tzannes, I'm sure

7   you'll hear, worked at a company called Aware.  And in 2012,

8   Aware decided to sell these patents, and TQ Delta stepped in

9   and bought them.  And as Mr. Davis said, TQ Delta's business

10  is now managing and continuing development of those patents.

11  That's their sole business.  They don't make or sell any

12  products using these patents.

13       Now, in any lawsuit, I think it's important to step back

14  and talk about the history of how we get to this courthouse

15  here in March of 2023.  And I think it's particularly

16  important here because I think it's particularly important to

17  some of the questions that you're going to be asked to answer.

18       You've heard a little bit about this standard setting

19  organization, the ITU, the International Telecommunications

20  Union.  You've heard both the Judge and TQ Delta's lawyer tell

21  you what standards are, using the wall outlet as an example.

22       Here's the thing I want to put a little finer point on

23  and talk to you about because I think it's important for what

24  you're here to do.  You may have seen in the TQ Delta's

25  opening slide presentation, they showed this big room with all

1    these people sitting around a table and looking at people

2    presenting.  That was a standard setting organization meeting,

3    and that's what I'm representing here.  I've got just a few

4    people sitting around a table, but really there are in the ITU

5    thousands and thousands of members in the ITU.

6        And so what happens is, at least as what's relevant to

7    what you're doing here, companies within the ITU, sitting in

8    these organization meetings, they make contributions or

9    recommendations that they hope are adopted by the standard.

10   And sometimes those contributions or recommendations are

11   actually patented.  So the person sitting around the table

12   says, hey, I've got this contribution I want to make, and they

13   actually have a patent on it.

14       Now, that's a very important part of the story here, and

15   I'm going to focus on it.  But before I do, I want you to

16   understand that these standards that we're talking about in

17   these seven patents here, the standards are hundreds and

18   hundreds of pages long.  They contain thousands and thousands

19   of features.

20       So to the extent that you're under any impression that

21   these seven patents somehow constitute the whole of the

22   standards, not the case, and the evidence will show you that.

23   They're a tiny, tiny fraction of these standards.  These

24   patents are a tiny fraction of the standards.

25       Now, here's the part I want to emphasize that TQ Delta's

1    lawyer didn't talk about.  When you are a member of ITU and

2    you go to make a contribution, you have to tell the ITU

3    whether or not you have patents.  So what you see on the

4    screen and what you'll hear in the evidence here in this

5    courtroom, this is the guideline from the ITU.  And what it

6    says is, if any party participating in the work of the ITU

7    should from the outset, from the very beginning, draw the

8    attention of the director of the ITU to any known patent or to

9    any known pending patent application, either their own or of

10   other organizations.

11        So the ITU says, Look, if you're making contributions and

12   you have a patent, you need to tell us, or even if someone

13   else is, you need to tell us that they have patents.  It's

14   very important and here's why.

15        You see those words at the top where it says, prevents

16   holdup?  This is why this promise in this agreement that we're

17   going to talk a lot about is so important.  The standard

18   setting organization does not want people who make

19   contributions and have patents to show up years later for

20   people who used the standard, either by making equipment like

21   us or consumers who actually use it, and hold them up for a

22   lot of money, hold them up for unreasonable amounts of money

23   because that patent is included.

24        You heard the judge instruct you that when you're a

25   member of the ITU, you sign a contract.  And we're going to

 1    look at it.  And the standard setting organization, the ITU,

 2    is trying to prevent this holdup.  They don't want people

 3    showing up years later and demanding unreasonable amounts of

 4    money.  And at the end of the day, I'm going to tell you

 5    that's exactly what's going on in this case.

 6        Here's the contract that the Court was talking to you

 7    about.  So Aware, who was the owner of the patents at the

 8    time, they were in this standard setting organization, they

 9    signed this contract.  It says, "The patent holder is prepared

10    to grant a license to an unrestricted number of applicants on

11    a worldwide, non-discriminatory basis and on reasonable terms

12    and conditions."

13        Now, this is the one Aware signed, and you'll see that

14    once TQ Delta bought these patents, they had to sign the same

15    thing.  What does this mean?  I actually wrote it down.  So

16    what TQ Delta's lawyer told you is that means they have to

17    treat everyone in the industry fair and consistent.  And he's

18    right.  That's the only thing that he said almost that I agree

19    with.

20        What the contract with the ITU says is, you can't favor

21    one company that uses these patents over another.  You have to

22    treat them in a non-discriminatory, fair, and consistent

23    manner.  In other words, you can't charge one company much

24    more than another for whatever reason.  You can't do it.  And

25    that makes sense if you think about the policy.  Standard

1    setting organizations don't want people who make contributions

2    with patents to then treat people unfairly.  I mean, the

3    purpose of these standards is so that essentially the world

4    can use them and everyone has reasonable access to them.  And

5    we'll show you the guidelines behind that purpose in the

6    course of this trial.

7         I heard TQ Delta's lawyer, you remember he showed you

8    that slide where he said these other companies have taken a

9    license, meaning they've paid them money.  And we're going

10   look at those in detail.  And he's right.  Other people have

11   paid them money.  But what they have requested of CommScope is

12   absolutely not consistent with what they've requested of other

13   people.

14        He also said to you, and I wrote it down, he said that

15   what these other licensees have paid is TQ Delta's standard

16   rates.  I want you to remember that.  He said to you that what

17   they have paid is TQ Delta's standard rates.  We're going to

18   look at that closely because I don't think that's the case.

19   At the end of the day, the Judge is going ask you whether or

20   not TQ Delta has breached this promise and this agreement that

21   they made to the ITU.

22        What you'll come to know is, after this standard was

23   adopted, that DSL has declined since the early 2000s, the use

24   of DSL.  You heard this morning, you may remember, and you'll

25   hear in the course of the evidence, there's lots of ways to

1    get your internet service--through your cable TV provider,

2    through your satellite, through fiberoptics, wirelessly, lots

3    of different methods to get it, and DSL has been in decline.

4        You'll see evidence in the case that Aware, who was the

5    owner of these patents before TQ Delta, they had failed to be

6    able to license these patents.  They failed to be able to get

7    any revenue on these patents.  And as a result, they decided

8    to sell them in 2012.  And in 2012, TQ Delta bought well over

9    150 patents from Aware, and they paid roughly about a little

10   over a hundred thousand dollars per patent.

11       One very important thing happened in the course of that

12   sale.  What you see on the screen is Exhibit 81, and you'll

13   see this in the trial.  This is sort of the pitch package that

14   Aware put together when they were selling these DSL patents.

15   And they said to anyone, including TQ Delta, hey, be aware

16   that if you buy these patents, they have this FRAND obligation

17   with them.  They said, we participated in the ITU and because

18   of that there's a FRAND obligation, and that limits what you

19   can receive as a royalty on these patents.

20       They went further.  If you look up here at the top, they

21   told them, hey, we, Aware, as the owner, we have licensed

22   these patents twice.  That means we've gone out and charged

23   people for these patents.

24       What's the effect of that?  Well, remember what their

25   contract says and remember what their own lawyer said to you

1    this morning--they have to treat everyone fair and consistent

2    with those first two contracts.  And I'm going to show you and

3    will show you they're not doing that.  What they seek here is

4    not consistent at all with those first two licensing

5    agreements.

6        This is an excerpt from those first two licensing

7    agreements.  You'll see that what they did is they licensed

8    the chip that was contained in these products for somewhere

9    between 6 percent and 1 percent of the sales price.  It says

10   IC, that's the integrated circuit, that's the chip.  You'll

11   see that, roughly speaking, at this time the chip sold for

12   $10, somewhere in that vicinity.  So somewhere between 60

13   cents and 10 cents per piece of equipment is what they were

14   charging.

15       We'll show you that not only are their offers to us not

16   consistent with that, they're not consistent with the other

17   licensees who signed on, and they have absolutely breached

18   their RAND and FRAND agreement, and because of that, they're

19   not entitled to receive the monies they seek here.

20       Because we told them that, they filed a lawsuit.  And as

21   you know from what the Court said, in this lawsuit you're here

22   to decide a couple of other questions.  In addition to this

23   breach of agreement, you need to decide whether or not these

24   patents are infringed.

25       I'm confident that none of you, before you came to court

1    today, had probably done an infringement analysis.  So I want

2    to spend just a few minutes kind of talking through how that

3    analysis is going to go.  It's not -- it's not my job to tell

4    you how to answer, but I do want to make sure, as you hear the

5    evidence in the case, that you know how to apply it to what I

6    think the Court will tell you the law is.

7         So a patent is infringed only if the accused product,

8    that's that CPE piece of equipment, includes each and every

9    element in the patent claim.  And you remember the claim are

10   those words at the back of the patent that define what the

11   invention is.  All of that is sort of abstract.  I want to

12   kind of give you an example.  And I know it's a simple

13   example.  It's an example someone gave to me when I started

14   doing patent law, and it helped me.

15        Assume that someone has a patent on a soccer ball and

16   assume that that patent says it's made of leather stitched

17   together, filled with air, and round in shape.  That's what

18   the claim says.  Now, assume that soccer ball patent owner

19   sues a football maker.  Well, the football maker would come to

20   court and he would say or she would say, it's made of leather

21   stitched together, it's filled with air, but it's oblong in

22   shape, it's not round in shape, and, therefore, there's not

23   infringement.

24        That's what you do.  You compare whatever they say

25   infringes to the claim.  That's how it works.  And if one word

1    is missing, Your Honor's already instructed you on this, you

2    heard it on the video this morning, if there's one word

3    difference between the product and the claim, then there is no

4    infringement.  And that's not a technicality.  That makes

5    sense.  A football is very different from a soccer ball even

6    though there's only one word different.  That's the type of

7    analysis you're going to do in this case.

8         So here's what I want to do.  I'm going to take one

9    patent.  I don't have time to go through them all--and kind of

10   show you a preview of what I think the evidence will show.

11        We're going to present several different experts.  We

12   enlisted the help of several different experts, each with a

13   particular expertise in these areas.  They will testify from

14   the stand, and they'll make these comparisons for you.

15        So for the '048 Patent, you'll see from the claim

16   language that it involves allocating shared memory,

17   transmitting or receiving a message during initialization,

18   specifying--and this is the important part--a maximum number

19   of bytes of memory.  A maximum number of bytes of memory.

20   That's what the claim requires.

21        What I think TQ Delta will tell you is that time delay,

22   which is in our products and in the standard, is the same

23   thing as memory.  So I want you to remember that.

24        Memory is not the same thing as time delay.  Here's how

25   you -- here's what I think the evidence will show you in that

1    regard.  Remember that the VDSL2 standard is what's important

2    in this case.  It's what being accused.  But there was a VDSL1

3    standard.  Now, it was never put in commercial products, but

4    there was a standard, and it used an amount of memory.

5    Remember the claim says the word 'memory'.  VDSL1 used memory.

6    But when they were talking about and proposing the second

7    version, VDSL2, Texas Instruments, right up the road here,

8    they proposed a different way to do it.  They proposed a time

9    delay.

10        And you see these excerpts from Exhibit 61 that you'll

11   see in the trial, and what they say is it's specified in terms

12   of a time delay, not in terms of an amount of memory.  Not in

13   terms of an amount of memory.

14        And they say the actual amount of memory required is

15   implementation specific.  That means we're taking it out of

16   the standard, and each person that builds these products can

17   decide on their own.

18        You may say, well, did that proposal get adopted?  The

19   answer is absolutely.  The proposal and recommendation that

20   Texas Instruments made was adopted into the standard so that

21   now you have time delay as opposed to memory.  So when they

22   say to you, Hey, our products are standard compliant, that's

23   true, they are.  But the standard doesn't operate in the same

24   way that their patent does.  And because of that, there's no

25   infringement.

1      Now, let me say one thing about this standard essential

2  patent issue.  You heard them say that their patents are

3  standard essential.  They say that.  Don't get confused.  The

4  standard setting organization, the ITU, they've never said

5  these patents are essential.  That's what TQ Delta says.  So

6  don't think that that's something that the organization, the

7  ITU, said.  That's not -- that's not accurate.

8      At the end of the day for this '048 Patent, and we'll

9  show you for others, we'll walk through the same methodology,

10  what I would recommend to you, because we have seven patents,

11  when there's someone on the stand talking, one of the experts,

12  about the patent, you can open up to it, and when the expert

13  says, hey, you can't find this in the patent, the product

14  doesn't match up to the patent, you can just put an X beside

15  that limitation.  That way, when you go back in the jury room

16  and you have seven patents and you're trying to remember,

17  you'll know if you've got a little X beside that limitation,

18  that there's no infringement.  You don't have to take notes,

19  but that's something I would recommend to you since we've got

20  seven patents here and not just one.

21      The second question you're going to answer, as the Judge

22  told you, you're here to determine whether or not these

23  patents are valid.  And I saw TQ Delta's lawyer hold the

24  patents up and say, look at there at that red ribbon.

25      And I'm going to tell you I'm concerned, because you

1    heard from the video this morning, you've heard from the

2    Judge's instructions, red ribbon or not, you are the ones that

3    make the determination on validity.  You are the ones.  And

4    there's a very good policy reason for that.  You heard it in

5    the video, you heard it from the Judge, the Patent Office did

6    not have the information that you're going to have.  The

7    information you're going to hear, you'll be the first people

8    to decide the validity of the patents based on the full amount

9    of information.

10       Every one of us in our lives have made decisions based on

11   facts we had in front of us that we would absolutely fight to

12   the death to say they were the right decision.  Right?  Only

13   to learn some additional facts later and realize that we

14   weren't actually right because we didn't have all the facts.

15       So we're not here saying that the Patent Office doesn't

16   know what they're doing or that they made mistakes even.

17   We're saying they didn't have all the information.  The

18   concept behind invalidity, as you heard this morning on the

19   video and from the Judge, is were these concepts in these

20   patents new, were they new, were they the first to have them

21   or did they exist before these patents.

22       We're going to show you that they weren't new for these

23   four patents, not all seven, just four of them.  For these

24   four, we'll show you that these concepts in the patents were

25   not new.  And, again, that's our burden to show you, and

1      here's how we'll do it.  Again, I'm not going to go through

2      all four, but I'll take one and give you an example so that

3      you kind of have a roadmap and a preview of how this will play

4      out from the stand.

5           So let's take the '686 Patent.  This is a patent that in

6      broad language deals with diagnostic information, trying to

7      diagnose whether or not there are problems.  Okay?  What the

8      patent talks about, in addition to other things, is these DMT

9      symbols that are mapped to one bit of the diagnostic message

10     and that receive idle channel noise information.  Okay?

11          And so you say, and this is what you'll hear from the

12     stand on the evidence, well, was that new?  Was that Mr.

13     Tzannes -- by the way, Mr. Tzannes wasn't the inventor, and

14     I'll show you in just a second on this.  But the question is,

15     is that actually new or did someone have this concept and this

16     idea before this patent?

17          And what the evidence will show you is, if you look there

18     on the left, there was a sort of a predecessor standard to

19     VDSL called ADSL.  And you'll see that a company called AT&T,

20     a company that you've certainly heard of, had a proposal, had

21     these ideas and these concepts before the '686 Patent was

22     filed.

23          In addition to that, and I think probably more

24     importantly, we asked the two inventors.  You heard the Court

25     talk about deposition testimony?  Deposition testimony is

1    where we get to ask these folks questions under penalty of

2    perjury, they raise their right hand, they swear to tell the

3    truth, we'll show you their video here.

4        So we asked these inventors, remember those two concepts

5    that I just showed you, DMT symbols and idle channel noise

6    information.  So David Krinsky, the inventor, we said to him,

7    did you invent the concept of idle channel noise, information

8    testing?  Probably not.  And you'll see, when you watch this

9    video, I want you to watch -- it says, probably not there.

10   But when you see his video, you'll almost see him chuckle

11   because it's so absurd that anyone would suggest that he

12   invented it.

13            THE COURT:  You have five minutes remaining.

14            MR. DACUS:  Thank you, Your Honor.

15       Then Mr. Pizzano, second inventor.  By the way, Mr.

16   Tzannes, nowhere on this patent.  He said, We used the one bit

17   per symbol messaging scheme.  You remember?  That's map to one

18   bit of the diagnostic message.  That's supposedly what was new

19   in the patent.

20       We asked him, Well, did you pull that from the ITU

21   standard?  And he said, We reused existing standardized

22   symbols.  Think about that.  What you're supposed to have in a

23   patent is something new.  And what he said is, we reused

24   existing.  That's 180 degrees opposite of new.  So that's the

25   evidence that you're going hear from the stand.

1        I sort of pause here and emphasize because I know jurors,

2   when we say to you we want you to find a patent invalid, I

3   know you pause and say, well, prove it to me or show me.  This

4   is the proof you're going to see.  The patent is not new, and

5   those four should be invalidated.

6        I'm going to wind up here.  What you'll hear is evidence

7   here, in order to get to their $90 million, they ask for as

8   much as $2.99 for each one of those CPE products that we sell.

9        Now, let me say a couple of things about that.  One, you

10  may say, well, that doesn't sound like a whole lot of money,

11  $2.99.  You will come to know that this is a very competitive

12  industry.  You will come to know that profit margins are very

13  slim.  And you'll come to know that the number of patents in

14  these standards are hundreds, hundreds of patents in these

15  standards, not just these seven.  All these people

16  contributing -- many of these people contributing have

17  patents.

18       And what you'll ultimately see through the evidence is

19  that Aware originally, and now TQ Delta, they have charged

20  others in the industry much, much less, much less than what

21  they seek to charge us.  And because they're violating that

22  very important RAND agreement or RAND promise that they made

23  related to these patents, they are not entitled to the monies

24  that they seek here.

25       I think that's a fair summary of what you're going to

1   hear and see over the next week.  We appreciate very much your

2   time.  We look forward to presenting the evidence to you.

3   I'll say one last time just so I can sleep better this

4   weekend, please remember we don't get to put on our case until

5   next week and please wait until you hear all of the evidence

6   to make a decision.  Thank you very much.

7        Thank you, Your Honor.

8             THE COURT:  Does either party wish to invoke the

9   Rule?

10            MR. DAVIS:  Yes, Your Honor, Plaintiff does.

11            THE COURT:  All right.  And do I gather that your

12   invocation of the Rule would exclude expert witnesses and

13   corporate representatives?

14            MR. DAVIS:  Yes, Your Honor.

15            THE COURT:  All right.  The Rule has been invoked as

16   clarified in the record, which means that if you are a fact

17   witness in this case and you're not the corporate

18   representative for a party, then you should remain outside the

19   courtroom while the other witnesses testify and until you are

20   called to testify.

21        Now, before I ask the Plaintiff to call their first

22   witness, we're going to take a very short recess, ladies and

23   gentlemen.  This is one of those times where you can just

24   simply close and leave your notebooks in your chairs.  I don't

25   expect this to be long.  But take an opportunity to stretch

 1    your legs get a drink of water.

 2        We'll be back and begin with the Plaintiff's first

 3    witness in just a minute.  Follow all my instructions,

 4    including not to discuss what has been presented to you so far

 5    or discuss the case among yourselves.

 6        The jury is excused for recess.

 7              (Whereupon, the jury left the courtroom.)

 8              THE COURT:  Court stands in recess.

 9                    (Brief recess.)

10              THE COURT:  Be seated, please.

11        Are you prepared to call your first witness, Mr. Davis?

12              MR. DAVIS:  Yes, we are, Your Honor.  Mr. McAndrews

13    will do the direct examination.

14              THE COURT:  That will be fine.  Let's bring in the

15    jury, please.

16              (Whereupon, the jury entered the courtroom.)

17              THE COURT:  Welcome back, ladies and gentlemen.

18    Please have a seat.

19        We'll begin with the Plaintiff's case in chief.

20        Plaintiff call your first witness.

21              MR. DAVIS:  Your Honor, Plaintiff calls Mr. Marcos

22    Tzannes, and direct examination will be by Mr. Pete McAndrews.

23              THE COURT:  All right.  Mr. Tzannes, if you'll come

24    forward and be sworn by our Courtroom Deputy, please.

25              (Whereupon, the oath was administered by the Clerk.)

```
 1              THE COURT:  Please come around, sir, have a seat at

 2   the witness stand.  Why don't you pull that microphone just a

 3   little closer.  Thank you.

 4        All right, counsel.  You may proceed with direct

 5   examination.

 6              MR. McANDREWS:  Thank you, Your Honor.

 7                        MARCOS TZANNES, SWORN,

 8   having been duly sworn, testified under oath as follows:

 9                        DIRECT EXAMINATION

10   BY MR. McANDREWS:

11   Q.   Good afternoon, Mr. Tzannes.  Would you please introduce

12   yourself for the jury?

13   A.   My name is Marcos Tzannes.

14   Q.   And did you invent the patents TQ Delta is asserting in

15   this case?

16   A.   I'm the inventor on six of the seven patents in this

17   case.

18   Q.   Are you familiar with the seventh patent?

19   A.   Yes, I am.  The two inventors on that case were on my

20   team at a company called Aware.  I presented the problem to

21   them and they worked out the solution, explained it to me.

22   So, yes, I was there for that.

23   Q.   So what technologies do the patents in this case

24   generally relate to?

25   A.   They relate to technology called DSL, also known as
```

1    digital subscriber line, which is a technology that takes

2    standard old telephone lines and basically converts them into

3    high speed data pipes.

4    Q.   So how many people use DSL these days?

5    A.   Today in the world, more than 500 million people use DSL.

6    Q.   When did you start working on DSL technology?

7    A.   I started working on DSL when I was in graduate school in

8    1991.

9    Q.   Are you familiar with the standards in this case?

10   A.   Yes, I am.

11   Q.   How are you familiar?

12   A.   So after I came out of graduate school in 1992, I started

13   working at the DSL standards.  So I've been working up there

14   for over 30 years.

15   Q.   Do you have other patents, Mr. Tzannes?

16          THE COURT:  Just a moment.  You got that turned off?

17      I'm sorry.  I apologize.  Let's continue.

18   Q.   (BY MR. McANDREWS)  Do you have patents in addition to

19   the patents asserted in this case, Mr. Tzannes?

20   A.   Yes, I do.

21   Q.   About how many?

22   A.   I have about 100 patents on DSL total.

23   Q.   So where did you go to college?

24   A.   So I got my undergraduate college degree at the

25   University of Central Florida in Orlando, a Bachelor's degree

1    in electrical engineering.

2    Q.    Did you go to graduate school?

3    A.    Yes.  I went to the University of California-Berkeley,

4    and I got a Master's degree there under a National Science

5    Foundation fellowship.

6    Q.    What is a National Science Foundation fellowship?

7    A.    So a National Foundation Fellowship is a scholarship

8    that's given to undergraduate students to pursue a Ph.D. in

9    graduate school.  It covers your room, your board, your

10   tuition.  It's like -- it's like -- for engineering nerds like

11   me, it's like a full ride.  It's the best thing you can get.

12   Q.    So did you get your Ph.D.?

13   A.    No, I did not get my Ph.D.

14   Q.    And what did you do instead?

15   A.    Well, what happened was in my first -- after my first

16   year in graduate school, I went and took a job at a small

17   start-up called Aware in Boston.  And after that summer, I

18   decided to quit the Ph.D. program and to drop out of school.

19   Q.    So why -- why did you decide to do that?

20   A.    Well, I realized while I was there that actually what I

21   enjoyed rather than studying things was to actually build

22   things, and I kind of figured out that I have kind of a knack

23   for solving problems that others had not been able to solve

24   before.

25   Q.    So was leaving graduate school an easy decision?

1   A.   No, it wasn't.  I mean, I had a full scholarship.  So

2   I -- I mean, the original idea was I was going to get a Ph.D.

3   and become a university professor, which is what my dad was.

4   So my parents were really not happy about it.

5   Q.   Did you regret your decision to drop out?

6   A.   No, I don't.  I didn't and I don't.  It ended up being

7   the best decision I ever made.  I went to this small company

8   Aware.  And we -- along with my colleagues, we put together a

9   team, and we developed this DSL technology that, you know,

10  ended up getting internet to, you know, hundreds of millions

11  of people all over the world.

12  Q.   So when did you join Aware?

13  A.   I joined Aware in 1992.

14  Q.   And what did you do when you first got there?

15  A.   So Aware at that point in time was focused on different

16  technology called image compression.  And so my brother and I

17  started there at the same time, and we founded this digital

18  subscriber line, this DSL group, at Aware.

19  Q.   So what made you decide to want to start a DSL group?

20  A.   So I was studying a technology called multicarrier

21  modulation, and that is an advanced wave communicating

22  over -- of communicating signals, and multicarrier modulation

23  was just starting to be applied to DSL.

24  Q.   So what did founding the DSL group involve?

25  A.   So the first thing that I had to do was basically go out

1    and hire a bunch of engineers, you know, the best -- the best

2    engineers that I could find.

3    Q.   So, Mr. Tzannes, you recognize this photograph on the

4    screen?

5    A.   Yes, I do.

6    Q.   And what are we seeing here?

7    A.   So this is a photograph from a long time ago with -- at

8    one point, this was our team.  These are the engineers that I

9    hired.  And I'm in the back here.  You can see me.  That's me.

10   I have a lot more hair at that point.  And the other -- the

11   other engineers are all these guys that ended up working on

12   DSL with me.

13   Q.   So how many people did you end up having in the DSL

14   group?

15   A.   We ended up having over a hundred people.  So this was

16   early on.

17   Q.   And what kind of people did you recruit for your group?

18   A.   So we had to recruit really smart men and women because

19   DSL is very difficult.  And so these guys -- and most of them

20   had master's, PhDs, in electrical engineering and computer

21   science.

22   Q.   So at a high level, what is DSL?

23   A.   So at a high level, we've heard this a couple of times

24   already, what DSL is is it takes the standard old phone

25   lines -- I think maybe the next slide.  Yep.  -- standard old

1   phone lines that the telephone calls, these phone lines, POTS,

2   plain old telephone service, and it took these phone lines and

3   it converted them and -- and, you know, so we developed this

4   technology.  And they were able to convert them into high

5   speed data rate pipes to people's homes.

6   Q.    So is DSL a complex technology?

7   A.    Yes, it is very complex because, you know, when the --

8   when the telephone companies put in these phone lines, they

9   never intended to use them for this purpose.  They were used

10  for voice calls.  And so it was -- you know, the -- the -- the

11  technology to do that and to actually -- the algorithms that

12  go into making that work is what we did at Aware.

13  Q.    So is it difficult to get high speed data over phone

14  lines?

15  A.    Yes, it is.  If you go to the next slide, it can explain.

16        So when we speak, we speak in what's known as the voice

17  band.  So the frequencies that are coming out that we can hear

18  are in a very -- very narrow bandwidth known as 4,000 Hertz.

19  And so that's this normal range that phone lines were designed

20  to operate in.

21        But if you want to transmit a DSL signal, the DSL

22  signals, they don't -- they're not in the 4,000 Hertz range.

23  They're in a 30 million Hertz range.  So what ends up

24  happening is the signal that's traveling on that phone line,

25  when it -- when it goes, you know, basically seven and a half

1   thousands times wider than the original voice signal does, a

2   lot of really bad things start happening and it's a very

3   difficult problem to solve.

4   Q.   So are there challenges in communicating above the voice

5   band over telephone lines?

6   A.   Yes.  So the two -- two main challenges -- I would

7   categorize them as two main challenges.  The first challenge

8   is that phone lines are, you know, they're connecting homes.

9        In the previous slide, if you could just go back for a

10  second, what happens is, you know, everybody lives near a

11  central office.  So the central office is where the phone

12  company has all their -- all their telephone equipment, the

13  switches, and every person is basically -- lives within the

14  United States or 95 percent of us at least live within four or

15  five miles of one of these central offices.  So we have a

16  phone line that connects our house to the telephone company.

17       So when you talk over these phone lines, it works -- it

18  works quite well.  But when you send a DSL signal over these

19  phone lines, if you send a DSL signal, for example, two miles

20  from the central office to a person's home, that signal

21  will -- while it's traveling, will get really, really, really

22  small.  In fact, it will get 10,000 times smaller than it was

23  originally.

24       And so in order to recover that signal, you need to have

25  this technology inside the homes to actually compensate for

1    that and fix the problem that it's so small.

2    Q.   So are there any other challenges?

3    A.   Yes.  The other challenge is -- is noise.  If you can go

4    two slides ahead.

5         So the -- when we talk on the phone, you know, we don't

6    hear these types of noises.  But when DSL signals are

7    transmitted, things you wouldn't expect to interfere, actually

8    interfere with the DSL signals.  Appliances in the home that

9    have power supplies, those power supplies interfere with

10   our -- with DSL signals.  They actually cause -- they disrupt

11   them.

12        The weather changes.  So if your weather changes between,

13   you know, 90 -- say in the morning it's 70 degrees and it goes

14   down to 60 degrees at night, that actually affects the DSL

15   signal.  Lightning affects the DSL signal.  AM radio affects

16   the DSL signal.  So all of these things were -- were causing

17   problems to the DSL signals when they were being transmitted.

18   Q.   Why wouldn't these same noise sources affect voice

19   communications?

20   A.   Well, voice communications, I mean, the phone line was

21   designed for this, so they actually have shielding around

22   them.  You've probably seen it.  And this shielding does a

23   good job protecting the voice signals, but it doesn't do a

24   good job protecting the signals -- the DSL signals.

25   Q.   So why does noise matter in a DSL system?

1    A.   Because noise is something that we've all experienced

2    even if you don't know it, exactly why it's happening.  When

3    you are watching a movie or something and you see it

4    pixelating or freezing, that actually is noise.  And that

5    noise is often caused from these sources.  Or when you're on

6    the internet and you're trying to download something that's

7    really slow, that could be caused by noise like this.

8    Q.   So in the early '90s, when you started DSL at Aware, was

9    it common to use DSL?

10   A.   No.  Back then, it was DSL had -- I mean, internet -- the

11   internet had not taken off, and so DSL was not very common.

12   Q.   By the late '90s, had that changed?

13   A.   Yes.  It had changed.  And as some of you know, I mean,

14   by then the internet was an incredible opportunity for

15   all -- all the -- many companies.  And telephone companies

16   like AT&T realized that they could use this infrastructure

17   that they had, these phone lines that were literally

18   connecting every single person in America.

19        I mean, AT&T -- not AT&T, but the telephone companies

20   have actually strung one and a half billion miles of phone

21   line across the U.S., and that infrastructure is -- was a --

22   was a huge asset to them.  What they could do -- well, what

23   they were using it for was voice, but what they could do now

24   is actually take that and convert it into an infrastructure

25   that would enable them to provide DSL service literally to

1    every single person in America.  So it was a big deal.

2    Q.   So is DSL still used today?

3    A.   DSL is still used today, yes.  And now -- I mean, we use

4    it for all the things that, you know, we enjoy.  You know,

5    Netflix and Amazon Prime, whatever you watch, Zoom calls--all

6    that stuff uses DSL.

7    Q.   So what did Aware develop for DSL?

8    A.   So what we did at Aware was we developed the technology

9    that goes inside the boxes, you know, this box that's inside

10   your house, the technology that actually fixes all these noise

11   problems, all this attenuation problem, and makes sure that

12   you can get the highest possible data rate.  It's kind of like

13   the brains of what's inside that device.

14   Q.   Did Aware partner with other companies?

15   A.   Yes.  We had several partners.  We were the leading

16   technology provider for DSL in the world.  So what we

17   are -- our main partner was a company called Lantiq, also

18   known as Infineon.  And they were our -- one of our first

19   partners.  They were one of the first companies that we

20   deployed DSL with.

21        And that strategic partnership with them enabled us to

22   learn a lot about how to create new inventions for DSL.  We --

23   we worked with them for 10 years and developed -- so we would

24   develop technology, and they would put that technology inside

25   their semiconductors and sell it to other companies.

```
1    Q.   Did Aware have other partners?

2    A.   Yes.  We had several partners.  A big one was Analog

3    Devices, but other ones that you may know was companies like

4    Intel, AMD, Lucent, ST Micro, Tarnex (ph), Fujitsu, NEC in

5    Japan.  So all the companies that build chips, semiconductors.

6    Q.   So what did Aware's partners do with the DSL technology?

7    A.   So what the partners would do is we would -- we would

8    create the inventions and create the technology, and then we

9    would work with them to incorporate that technology with

10   software, firmware, designs, into their -- into their

11   semiconductors.  And then they would fabricate or manufacture

12   those semiconductors and sell that, those semiconductors,

13   to -- to other people.

14   Q.   So did Aware make any physical products for DSL?

15   A.   No.  Aware -- we did not make physical products.  What we

16   -- we developed the technology at Aware, and that's -- so what

17   we did, if you -- you can think about almost like three

18   phases.  The first phase is you develop the inventions and the

19   new technology, which is actually the hardest part.

20        The second phase is when you are putting that technology

21   into a form that can be put into -- into products, and that

22   would be software, it would be designs.  So we would develop

23   that as well at Aware.

24        And then we would take that and actually work with a

25   company that built the physical products, incorporating into
```

```
 1    their products.  That process took years, by the way.  And

 2    then that would be sold off to the -- to other companies.

 3         So they built the physical products.  Aware did not.

 4    Q.   So what was your primary work at Aware?

 5    A.   So I led the -- so I started the group, and I led the

 6    team of engineers we -- for several generations of this DSL

 7    technology while I was there.

 8    Q.   Did you have any other roles?

 9    A.   Yes.  I also was the person who went to these standards

10    groups you've been hearing about.  This is the organizations

11    where the DSL standards are -- are created.

12    Q.   So what is an industry standard?

13    A.   So an industry standard or a DSL standard is a document,

14    a specification, and it's -- it's big.  And what it has inside

15    of it is the exact way that you build the device.

16         So if you're -- if you're building a cell phone, it tells

17    you exactly how to build that cell phone so that it

18    communicates with another cell phone.  And by having two

19    manufacturers build their devices the exact same way,

20    according to the standard, you can assure that if you have a

21    cell phone that's built by Samsung or, you know, one of the

22    other -- some company, it can talk to a cell phone that is

23    actually built by Apple.  And that happens because both of

24    those companies built theirs according to the same standard.

25    Q.   So who develops standards?
```

1  A.   They are developed by the standards organizations.  And

2  there are many of them.  But what happens at these standards

3  organizations is companies go there, all the companies that

4  are interested in this industry, go there and they

5  agree -- first we -- we -- you put in -- you develop the

6  technology that's going to go in there.  So you write the spec

7  all together, everybody gets together, you know, and has a

8  common specification and agree to use that in the products.

9  Q.   So where are DSL standards developed?

10 A.   So DSL standards are developed in a place called the ITU,

11 also known as the International Telecommunications Union.  And

12 that is a multinational international standards body that is

13 in Geneva, Switzerland.  And it is -- the members are

14 companies like Aware is a company, TQ Delta is a member, and

15 these companies -- but the other members are actually

16 administrations, actual countries.

17      And the reason that countries are a part of it is that,

18 you know, you have to make sure that the signals actually

19 cross -- travel across borders so you can talk to someone in

20 the U.S., you can talk to someone in Japan.  So even the

21 countries are involved in agreeing to use common standards.

22 Q.   How much work have you done with the ITU?

23 A.   I started working in the ITU on DSL in 1997.  So I've

24 worked there for about 25 years.

25 Q.   Now, do you recognize this slide?

1    A.    Yes.

2    Q.    And can you tell me what's going on here?

3    A.    So this is from 2012.  And that's the chairman of the ITU

4    there, and he is giving me a -- an award or appreciation that

5    the work that I had done at the ITU on DSL.

6    Q.    Does ITU give out recognitions like this very often?

7    A.    You know, I don't know if they've given it out for other

8    technologies, but I'm the only person to get this for DSL.

9    Q.    So how many meetings have you attended over the years for

10   ITU?

11   A.    Well, I've attended hundreds of meetings, and I actually

12   calculated that I've spent 10,000 hours in meeting rooms

13   designing these products.

14   Q.    Is that all the time you've put into DSL development?

15   A.    No, because when you go -- before you go to the meeting,

16   you actually have to prepare and actually come up with a

17   design because everybody is proposing their own design.  And

18   so more time probably is spent outside of that, actually.

19   Q.    So who participates in the ITU meetings?

20   A.    So the companies that participate are the ones that are

21   interested in -- in DISL standards.  So the examples would be,

22   you know, technology providers like Aware and TQ Delta.  The

23   other companies would be chip manufacturers, for example, like

24   we've heard Broadcom and others.  And then it would be

25   telephone companies so AT&T, you know, Bell South.  But also,

1   you know, France Telecom, British Telecom, they're all there.

2   Q.   So why would competing companies come together like that?

3   A.   Because the purpose of the standard is to create the

4   biggest possible market and everybody -- so if it's a good

5   standard, everybody wins.  So even though they are competing,

6   we get together, agree on a common standard, and, you know, it

7   makes the market bigger for everybody and everybody is

8   successful.

9   Q.   Where do ITU meetings take place?

10  A.   So the meetings take place about once a year in Geneva,

11  Switzerland.  That's where the main meetings happen.  It's a

12  two-week long meeting.  And then there's interim meetings that

13  happen every two months or so.  And they occur -- they rotate

14  because all the companies are from all over the world.  So

15  they rotate between the -- between the U.S., Europe, and Asia,

16  hosted by different companies.

17  Q.   So does this require a lot of travel?

18  A.   Yes.  Traveling is part of the job, yeah.

19  Q.   So about how many people participated in creating DSL

20  standards?

21  A.   So I think it varied over time.  But the way to think of

22  it is really there's kind of two groups of people.  You have

23  the group of a hundred or so companies that were the ones who

24  were interested in DSL standards, and then you have the

25  smaller group of maybe 10 engineers or so who are actually, or

1    less, who are actually doing the real nitty-gritty, kind of

2    nuts-and-bolts design work.  Those are the guys who are

3    actually putting together the actual -- the actual standard.

4    Q.    Do you recognize this photograph?

5    A.    Yes.

6    Q.    Can you tell me what's going on here?

7    A.    So this is a photograph from probably the late '90s.  I'm

8    circled in the middle there, and this is from one of the

9    larger group meetings where you have a hundred people.  So

10   this -- the way that these meetings are set up is they're

11   pretty formal.  In front of every person is their name, like

12   what company they come from.  So you can see an individual

13   from Nortel in the front there.  My placard back there would

14   say Aware.

15        But you have got countries there, too.  So this guy here

16   actually, this guy right here, he actually was from the U.S.

17   State Department.  So he has -- because the U.S. State

18   Department is there, so he would have something that would say

19   literally United States of America in front of him.

20   Q.    So what would occur in these larger meetings?

21   A.    In the larger meetings is where the actual final standard

22   was approved.  So this is where, when the standard was --

23   everybody had worked on it, the smaller technical group had

24   kind of generated the standard that -- it would appear in

25   front of all these folks, and they would approve it or not

1    approve it.

2    Q.   Would CommScope have a representative in this room?

3    A.   Yes.  CommScope would have a representative in this room.

4    Q.   Can you tell me what's happening in this slide?

5    A.   So this is an example of the smaller group.  So here I'm

6    at the -- at the white board, and this is one of these groups

7    where I'm actually explaining some of my technology to the

8    other people in the smaller group committee.  And this is the

9    way the kind of the real work happened to generate these

10   standards.

11   Q.   Can you identify any of the people in this photograph?

12   A.   Yes.  These are several guys that I've known for many

13   years.  The one to the right of me there kind of facing us, he

14   is from Alcatel Nokia.  There's a couple of people from

15   Nortel.  The guy whose back is to us, the closest, is actually

16   from Analog Devices, a friend of mine.  He was one of the --

17   one of our partners.

18   Q.   So did CommScope participate in these small meetings?

19   A.   So, I mean, CommScope was -- was probably in -- in the

20   back of the room listening to part of this meeting, but they

21   were not involved in the actual technical discussions that

22   were happening in the meetings.

23   Q.   So did any technology contribution from CommScope ever

24   end up in the DSL standard?

25   A.   No.  CommScope didn't make any contributions that ended

1    up being adopted by the standard.

2    Q.   Do you recognize this photograph?

3    A.   Yes.

4    Q.   And what are we seeing here?

5    A.   This is like a more modern version of what it looks like

6    today.  So we have big screen TVs, and, you know, the -- this

7    is what the ITU looks like today.

8    Q.   So who are the people up on the stage in front?

9    A.   Those are the chairmen or chairladies of the group, and

10   they are the ones who are the leaders of the committee.

11   Q.   Were you ever up on the stage in front like that?

12   A.   Yes.  I -- I -- when I started in 1997, I chaired several

13   committees, eight actually committees, and I was the chairman

14   of one of the standards that's in this case called G.bond.

15   You'll hear about a lot.  So I chaired that committee.

16   Q.   So, generally speaking, how does the ITU create the DSL

17   standards?

18   A.   So generally the way it works is the telephone company

19   will come to the ITU and will inform -- I mean, the engineers

20   there of the problems that they may be having with their

21   service or some requirement that they have.  And then the

22   standard people or the -- the committee members, we get

23   together and we try to figure out a solution to those

24   problems.  That often requires developing new technology that

25   had not been developed before.

1          And so then every -- everybody who has a good idea brings

2     that idea in, and there is a huge -- there is a discussion and

3     an evaluation process, and we pick the best one.  We pick the

4     best idea to solve the problem.

5     Q.   So how does that -- how long does the technical

6     evaluation take?

7     A.   It takes a really long time.  I mean, typically it

8     takes -- it can -- at least four or five years just to --

9     pick -- just to create one standard.

10    Q.   So did you propose solutions to the problems identified

11    by phone companies?

12    A.   Yes, I did.

13    Q.   Were your inventions always selected into the standard?

14    A.   No, certainly not.  I mean, many were but not all of

15    them.

16    Q.   Did you feel comfortable sharing your inventions with the

17    ITU?

18    A.   Yes, yes, we did, because if it was something new and it

19    was inventive, we would have filed a patent on it.  And that's

20    the whole idea is that you file a patent at the U.S. Patent

21    Office, then you -- and as long as the patent is granted, then

22    you have that intellectual property right.  And so then you

23    can disclose it to others and you know that your right is

24    protected.

25    Q.   Is there a process to notify the ITU that the technology

1    you contributed is patented?

2    A.   Yes, there is.

3    Q.   And how does that work?

4    A.   You submit what's known as a patent declaration.  So this

5    is a form that you submit to the ITU, and you tell them that,

6    you know, my company has patents that are going into this

7    standard that you're approving.

8    Q.   Have Aware and TQ Delta submitted any such patent

9    statements?

10   A.   Yes, we have.

11   Q.   About how many?

12   A.   We've submitted 140 -- 140 patent statements.

13   Q.   And how do you know that?

14   A.   Well, I was the person who submitted them, but also

15   because I looked recently on the website.  You can go on the

16   website, the ITU website, and search.  If you search for Aware

17   or TQ Delta, you'll see that all the patent statements are

18   there available to anyone to see, and there's 140 of them.

19   Q.   So what are the DSL standards at issue in this case?

20   A.   The main DSL standards, there's three of them.  The first

21   one is called VDSL2.  I think we have a slide for this, do we?

22   Q.   Yes.

23   A.   VDSL2, which stands for very high speed DSL 2.  The

24   second one is called G.INP, also known as G.998.4.  We're not

25   going to call it that.  You're going to hear G.INP, and the

1    third is called G.bond.

2    Q.   Did you submit a patent statement for all three of these

3    standards?

4    A.   Yes, we did.

5    Q.   Do you recognize this document?

6    A.   Yes.

7    Q.   And what is it?

8    A.   This is a patent statement that is submitted for the

9    VDSL2 standard.

10   Q.   And --

11   A.   And as you can see here, it states that -- this call-out,

12   it states that, the patent holder believes to hold granted

13   patents and/or pending applications whose use would be

14   required to implement the above ITU-T recommendation.  So in

15   the ITU, they call recommendations -- they call standards,

16   recommendations.  It's the same thing.

17   Q.   Do you recognize this document?

18   A.   Yes.  This is for G.INP, the licensing or patent

19   declaration for G.INP.

20   Q.   And how about this document?  Do you recognize this

21   document?

22   A.   This is the patent declaration for G.bond.

23   Q.   And did you work on all three of the standards, these

24   three standards, at the ITU?

25   A.   Yes, I did.

1    Q.   Do you have any idea how long you spent working on these

2    standards?

3    A.   For over 15 years.

4    Q.   How does the ITU vote on what goes into a standard?

5    A.   The ITU doesn't really vote.  The ITU uses what's --

6    something known as consensus to approve a standard.

7    Q.   What is consensus?

8    A.   Consensus is -- it's not a majority vote type thing.

9    It's actually harder to get.  What it means is that even a

10   single company can actually delay the approval of a standard.

11   Q.   So were there any objections to the three standards in

12   this case when they were approved?

13   A.   No.  All three standards were approved by what's known as

14   unanimous consent, which means no one -- everyone approved it.

15   Q.   Was CommScope one of the companies that agreed to the

16   approvals?

17   A.   Yes, they were.

18   Q.   Now, how long did you work at Aware?

19   A.   I worked at Aware for 20 years.

20   Q.   And what did you do after you left Aware?

21   A.   After I left Aware, along with my brother Michael

22   Tzannes, we started a small business called Tzannes Patent

23   Management, and what we do is we provide consulting services

24   for patent, patents, and technology issues.

25   Q.   So who are the customers of the Tzannes Patent

1  Management?

2  A.   Well, we really only have one primary customer, and that

3  has been TQ Delta.  And we've work with them for over 10

4  years.

5  Q.   So why is your brother part of Tzannes Patent Management?

6  A.   My brother is an electrical engineer like me.  He

7  actually has a Ph.D. in electrical engineering, and he is very

8  knowledgeable and he worked on DSL like me for many years.

9  Q.   And how did you start working for TQ Delta?

10 A.   So after my brother and I, Michael Tzannes, left Aware,

11 we were approached by Abha Divine, and she told us that

12 after -- so TQ Delta had just acquired -- just purchased all

13 of Aware's patents on DSL.  And so she told us that they were

14 still interested in developing new technology for DSL.  And I

15 mean, this was an amazing opportunity for us.  So we were very

16 excited to start working with them on developing new -- new

17 technology, continue doing basically what we had done at

18 Aware.

19 Q.   So what did you do to continue to develop new DSL

20 technology for TQ Delta?

21 A.   Well, the first thing that TQ Delta did was to join the

22 ITU, because that's a critical part of being involved in the

23 DSL industry, and then we went to -- you know, we continued to

24 go to the standards meetings and develop -- and try to come up

25 with new solutions to these problems.

1   Q.   Can you provide an example of a new solution you've made

2   for TQ Delta?

3   A.   Yeah.  We invented a new type of low power mode for --

4   for DSL devices.  So one of the things that happens is that a

5   lot of these devices, they are always on, like even when you

6   go to bed at night, your little modem by your computer there

7   is still running.  So that's expensive and power -- and it

8   consumes power.  So we came up with a new way to actually make

9   sure that during the off times, that would be going to low

10  power mode and save power and electricity costs.

11  Q.   So is this invention adopted into the ITU DSL standards?

12  A.   Yes.  The ITU adopted this into their standards.

13  Q.   Now, what else do you do for TQ Delta?

14  A.   So I also help them with something called patent

15  prosecution, which you may have heard about already, which is

16  when you file patents with the Patent Office, there's a

17  process to do that.  And I help them with that process for

18  both in the U.S. and internationally how to file patents.

19  Q.   Do you do anything else for TQ Delta?

20  A.   Yes.  I also help them with technical support in their

21  licensing efforts.  So when you are licensing to companies,

22  you often have technical discussions to explain to them why

23  technology is being used.  And so I would be involved in that.

24  And in the cases where unfortunately you end up in litigation,

25  I would help with that, too.

```
1    Q.   So how much has TQ Delta paid your company?

2    A.   So we've done a lot of work for TQ Delta over the years.

3    I calculated that over the past 10 years, my -- my company has

4    been paid around $800,000 a year to -- for TQ Delta work.

5    Q.   And do you get to keep all of that money?

6    A.   No.  I mean, we run a small business.  So I -- my salary

7    or what I take home probably is in the $300,000 range per

8    year.

9    Q.   Are you being paid by TQ Delta for your testimony here

10   today?

11   A.   No.

12   Q.   Do you have any ownership stake in TQ Delta?

13   A.   No, I do not.

14   Q.   How much -- do you make any additional money depending on

15   what the jury decides?

16   A.   No, I don't.

17   Q.   So this is Exhibit 1.  It's U.S. Patent No. what we've

18   been referring to as the '881 Patent.  Do you recognize this

19   patent?

20   A.   Yes, I do.

21   Q.   Are you an inventor?

22   A.   Yes.  I am one of the inventors.  The other inventors are

23   Ed Reiter and Chris Cahill.

24   Q.   Do you have the patent here with you today?

25   A.   Yes.  This is -- you've seen this already.  This is the
```

1    ribbon copy of the patent that you get from the Patent Office

2    with a seal on it.

3    Q.    And how do you think of the '881 Patent?

4    A.    I think of this patent as the bonding patent.

5    Q.    And what is bonding?

6    A.    So bonding is -- I think the next slide helps.  Bonding

7    is when you take two phone lines that go to a person's home,

8    and you use them to get a higher data rate to that home.  So

9    many homes in the U.S. actually have more than one phone line

10   going to them, and so it makes a lot of sense to actually try

11   to find a way to use both those phone lines to increase the

12   data rate going to people's homes.

13   Q.    So what problems did bonding address?

14   A.    So this is very early on in the deployment of DSL.  What

15   was happening was the telephone companies were seeing that

16   they were facing two problems.  The first problem they were

17   facing was that some homes were just too far away from these

18   central offices.  So they could have been four or five miles

19   away, and at that point the actual data rate they could get

20   over these phone lines was very, very low for DSL.  It wasn't

21   enough to provide really good internet access.

22        So the idea was, at least the original idea was, we could

23   just use two phone lines and double the data rate because if

24   you have one that does that, you get two, you get double the

25   data rate and that would actually get them to better -- to

1    provide DSL to those -- those other companies, the other

2    people.

3          The other problem was that even for people who were

4    close, they wanted to get higher data rates to them because

5    they're competing with cable companies, of course.  So if they

6    could double the data rate they offered to everybody, that was

7    a huge, huge advantage to them.

8    Q.   So did you invent the general idea of bonding?

9    A.   No.  We did not invent the idea of using two phone lines.

10   Of course not.  We -- we invented, though, the technology that

11   was needed to actually address the problems that you face when

12   you really try to do that in the real world.

13   Q.   So what real-world problems did you face?

14   A.   So one of the problems we faced was that no two phone

15   lines, even if they are going to the same home, they're just

16   not the same.  We thought they would be the same and we could

17   double the data rate, but actually that wasn't the case.

18         If you go to the next slide, please.

19         So it was mentioned earlier, these phone lines have been

20   installed over a hundred years.  And, I mean, to put it -- I

21   mean at this point they are basically -- many cases it's just

22   a complete mangled mess.  So even though two phone lines are

23   going to one home, one may be going, you know, straight to the

24   home, the other one may have gone to some house that didn't

25   exist anymore and now it's going to that home.

1    So the end result was that the original idea that we're

2    going to have these two nice clean phone lines just wasn't

3    true.

4    Q.   So why does it matter that the phone lines are not alike?

5    A.   Because when they're not alike, they don't have the same

6    data rate.  Remember, the idea was we could just double the

7    data rate.  But when we ended up doing it, you ended up

8    saying, let's say you had the first phone line that could do

9    20 megabits a second.  You took the second phone line, and it

10   only did 10 megabits per second.  So you weren't actually --

11   you weren't actually getting the doubling of the data rate

12   that you thought you were going to be getting.

13   Q.   So why does it matter if the data rates are not the same?

14   A.   Well, yeah, there was another problem that came up where

15   we didn't have the same data rates, and this is where I'm

16   going to have to explain a little bit how bonding works.

17       So if you think about what happens when you're trying to

18   send something down two phone lines, you're going to

19   have -- let's say you're trying to send a large file or a

20   large document that has pages.  You would -- you would try to

21   send, let's say, you know, you try to send the pages.  And if

22   you send -- the first page would, for example, go down the

23   first phone line.  The second page would go down the second

24   phone line.  The third page was back on the first phone line.

25   So like the odd pages are going down the first phone line and

1    the even pages are going down the second phone line.  And at

2    the other side, you need to put them back in the right order.

3    Right?  So the person can read it.

4        Now, the problem we had was that when the data rates were

5    really different, the first phone line, all the data would

6    arrive -- the pages would arrive very quickly, and the other

7    one would take a long time to arrive because it was a much

8    lower data rate.  So you had like all the odd pages there and

9    you have to store all this data, all these pages, while you're

10   waiting for the other pages to come.

11       Now, this is a simple example with pages, but imagine if

12   it was video.  You have to store, you know, seconds' worth of

13   a movie which actually is, you know, megabytes of data at the

14   other side, and that storage is a big deal.

15   Q.   So why is storing a big deal?

16   A.   Storing is a big deal because storage or memory is

17   probably in most cases the most expensive component in any

18   device.  I mean, when you buy a cell phone, you know, think

19   about how much the price goes up when you want to get more

20   memory or storage on that cell phone.

21       So, you know, with bonding with different data rates, you

22   know, you end up having to put all this, memory it was making

23   the devices a lot more expensive.

24   Q.   So what was the existing solution to bonded lines with

25   different data rates?

1   A.   The existing solution was to just take the different data

2   rates, and so if you had one that was at 20, the other one was

3   at 10, and just, you know, throttle back the one that was at

4   10 so that those were at 20 so they are at the same data rate.

5   Because if they are at the same data rate, then they arrive at

6   the same time.

7        But guess what happens.  If you do that, you had this one

8   that was at 20, you would throttle it back to 10, and you

9   combined it with another one at 10, you're back to 20 megabits

10  again.  You didn't gain anything.  Right?  So it didn't

11  really -- it didn't really them higher data rates.

12  Q.   So did you invent a better solution at Aware?

13  A.   Yes, we did.

14  Q.   And what was that?

15  A.   So Ed Reiter, Chris Cahill, and I, we came up with the

16  idea that we could actually modify the way the transceivers

17  work and make changes to them.  In particular, we made change

18  to a function which is called the interleaving function.

19  You're going to hear about this function quite a bit in this

20  case because it's a really important function inside DSL

21  transceivers.  We could modify the way the interleaving

22  function worked so that there was a coordination between the

23  interleaving function on these two devices, and even though

24  the data rates were different, the data would still arrive at

25  the same time.

1    Q.   So did you pass your bonding solutions on to the ITU?

2    A.   Yes, we did.

3    Q.   Do you recognize this document, Exhibit 119?

4    A.   Yes.  This is -- this is the -- this is a contribution

5    that I made in Clearwater, Florida, in 2001.  And this is

6    what's -- these are these technical contributions where you

7    propose your idea.

8         In this particular contribution, I was actually proposing

9    to start the project to develop this technology because at

10   this point bonding was not even standardized in the ITU.  So

11   this was the proposal to start this G.bond project at the ITU.

12             THE COURT:  Let me interrupt for a minute.

13        Mr. Tzannes, the question was, do you recognize this

14   document.  You said yes, and then you started telling us about

15   Clearwater and then we went to contributions to the technical

16   stuff.

17        Let the lawyer ask the questions individually and answer

18   them individually.

19             THE WITNESS:  I'm sorry.

20             THE COURT:  It's not an invitation to give a

21   narrative.

22             THE WITNESS:  I'm sorry.

23             THE COURT:  No problem.  Just want to make sure you

24   understand how it's supposed to work.

25             THE WITNESS:  Yeah.  I got a little excited, Your

1    Honor.

2            THE COURT:  Let's continue on that basis, Mr.

3    McAndrews.

4            MR. McANDREWS:  Thank you, Your Honor.

5    Q.   (BY MR. McANDREWS)  So did the ITU accept this proposal?

6    A.   Yes.

7    Q.   Is it the only contribution you've submitted to the ITU?

8    A.   No, it is not.

9    Q.   And do other ITU members submit contributions?

10   A.   Yes, they do.

11   Q.   Okay.  Are ITU contributions generally available to the

12   public?

13   A.   No.  They are available to ITU members.

14   Q.   So what does it take to become an ITU member?

15   A.   Well, becoming an ITU member is a little complicated

16   because it's an international body.  So the first thing you

17   need to do to become an ITU member is you actually need to get

18   permission from the U.S. State Department.  Individuals can't

19   become ITU members.  You have to be a company to become an ITU

20   member.

21       And then you have to actually -- you have to pay the

22   annual membership fee, which is -- it's a Swiss organization.

23   So it's 30,000 Swiss francs, which is about 32,000 U.S.

24   dollars per year.

25   Q.   So did the ITU give you a special role in the development

1   of the bonding standard?

2   A.   Yes, they did.

3   Q.   And what role is that?

4   A.   I chaired the G.bond group for 10 years.

5   Q.   And how long did it take to complete the bonding

6   standard?

7   A.   This particular standard took about four-and-a-half

8   years.

9   Q.   And did the standard include your patented technology?

10   A.   Yes, it did.

11   Q.   Was CommScope at the meeting where the bonding standard

12   was approved?

13   A.   Yes, they were.

14   Q.   Do you know whether your bonding invention is widely used

15   in DSL devices?

16   A.   Yeah.  In my experience, in my opinion, it is used on all

17   DSL devices.

18         MR. STEVENS:  Objection, Your Honor.  He said he

19   provided an opinion.

20         THE COURT:  Do you have a response, Mr. McAndrews?

21         MR. McANDREWS:  Your Honor, I can rephrase the

22   question.

23         THE COURT:  All right.  This is a fact witness.

24   He's not an expert.  He's not entitled to give opinions, and

25   he's not entitled to testify beyond his personal knowledge.

1     So rephrase your question that calls for his personal

2     knowledge.

3              MR. McANDREWS:  Yes, Your Honor.

4     Q.   (BY MR. McANDREWS)  Mr. Tzannes, do you have personal

5     knowledge of whether your DSL bonding inventions are used in

6     DSL devices?

7     A.   Yeah.

8              MR. STEVENS:  Your Honor, same objection.  That

9     calls for opinion testimony.

10             THE COURT:  I'll overrule that.  He can answer that

11    question.

12             THE WITNESS:  In my personal experience,

13    these -- the bonding patents are used by the CommScope devices

14    because they are required for the bonding standard.

15             MR. STEVENS:  Your Honor, I renew my objection.

16    Move to strike that.  He's now offered an opinion about a

17    CommScope product.  It's an infringement opinion.  And, Your

18    Honor, I can approach and explain that more if you'd like or I

19    can go through what we talked about at the pretrial conference

20    on this.

21             THE COURT:  Well, the question called for bonding

22    with DSL devices.  It didn't specify CommScope devices.  He's

23    conditioned his answer upon his personal knowledge and

24    experience.

25             I'm going to sustain the objection to the extent he goes

1    beyond what was asked and talks specifically about CommScope

2    devices, but the fact that he's prefaced his answer on his own

3    personal knowledge is perfectly fine.

4        Let's do this.  Restate the question, Mr. McAndrews.

5        MR. McANDREWS:  Yes, Your Honor.

6    Q.   (BY MR. McANDREWS)  So, Mr. Tzannes, do you know whether

7    devices that practice the bonding standard would use your

8    invention?

9        MR. STEVENS:  Your Honor, same objection.  Might I

10   approach?  It might make it a little bit easier.

11       THE COURT:  Approach the bench, counsel.

12       (The following was had outside the hearing of the

13       jury.)

14       MR. STEVENS:  This is where in his deposition he was

15   asked whether he knew or had opinions about whether his

16   patents were adopted in the standard or standard essential

17   patents, and he was instructed not to answer as privileged.

18   So this is the part where not only do I believe it to be going

19   into expert testimony, but these are the questions for which

20   he was instructed not to answer at his deposition.

21       THE COURT:  What's your response to that, Mr.

22   McAndrews?

23       MR. McANDREWS:  Your Honor, if I may go grab a

24   notebook, I can show you where almost this exact question was

25   asked and it was answered.

```
 1              THE COURT:  You may go get the notebook.

 2              MR. McANDREWS:  Thank you.

 3              THE COURT:  And we'll wait on you.

 4              MR. McANDREWS:  I apologize, Your Honor.  I don't

 5    have a copy to hand you, but I can provide this.  So these are

 6    questions by CommScope's attorney at Mr. Tzannes' deposition.

 7    Some of the highlighting --

 8              THE COURT:  This is July 13, 2022, deposition.

 9              MR. McANDREWS:  That's correct.

10              THE COURT:  This is page 131, Mr. Stevens, and 132

11    just so you can follow along.

12              MR. STEVENS:  Thank you.

13              THE COURT:  And you're referring me to the

14    highlighted portions here, Mr. McAndrews?

15              MR. McANDREWS:  Yes, Your Honor.

16              THE COURT:  I don't see him invoking or I don't see

17    him responding to an invocation of the privilege here, but

18    everything he says is conditioned upon it being his opinion.

19         We addressed this topic in pretrial, and I thought I made

20    it clear he's certainly free to talk about what he knows of

21    his own personal knowledge, but he's not an expert under 702,

22    he hasn't provided a report, and him giving opinion testimony

23    at trial is an unfair ambush to the Defendant.

24         I'm not going to let him give opinions.  But what he

25    knows of his own personal knowledge, he can certainly testify
```

1    to.  I don't -- I mean, there's nothing in this section where

2    he's been asked a question and refused to answer it under

3    privilege or been instructed not to answer it based on

4    privilege.

5                MR. STEVENS:  May I show you a different section on

6    that?

7                THE COURT:  If you can refer me to something

8    different.

9                MR. STEVENS:  Here on page 42, and here he was asked

10   directly about standards.

11               THE COURT:  42 of the same deposition?

12               MR. McANDREWS:  Yes, Your Honor.

13               THE COURT:  Let's turn back to it.

14               MR. STEVENS:  And specifically, once you get there,

15   I'll direct you to line 6 through 10.  I also have it where

16   he's been asked, Have you done any analysis or opinion whether

17   any products infringe, and he was instructed not to answer

18   that question as well.

19               THE COURT:  What's your response to this portion of

20   page 42 of the deposition where he clearly is instructed not

21   to answer?

22               MR. McANDREWS:  So, Your Honor, the context -- and

23   this was briefed, but the context here is the examiner, which

24   was Mr. Stevens at the time on behalf of Nokia, was in context

25   asking for the work product of Mr. Tzannes operating as a

1    litigation consultant for TQ Delta.

2         Later on, when Mr. Kline who was representing CommScope

3    was asking similar questions but leaving out of it what was

4    clearly intended to elicit work product information when he

5    left that out of the question.

6         And that's why Mr. Tzannes was saying -- he didn't mean

7    opinion in the sense of expert opinion; he meant, in my

8    personal view, independent of the work I've done for TQ Delta.

9    I know this because the product practices the standard, and I

10   believe my patents to be standard essential, is what he was

11   saying.

12        Here the questions were in the context -- uniformly

13   context of what did you do for TQ Delta as a litigation

14   consultant.

15             MR. STEVENS:  And, Your Honor, I just strenuously

16   disagree with what he just said.  I'll read my question:  Do

17   you believe that any of the asserted patents in this case are

18   essential to any ITU standard?

19        I did not ask him to divulge to me anything that he's

20   told TQ Delta.  I'm just asking if he had such an opinion.  I

21   didn't ask him if he'd done it in the context of a litigation

22   consultant or any other context.  This is just an open

23   question and just a blanket objection instruction not to

24   answer.

25             THE COURT:  Well, separate and apart from the issue

1    about him being instructed not to answer at deposition, it's

2    no different in my view, Mr. McAndrews, if he says, in my

3    personal opinion this is this way, than it is to say because

4    I've conducted some test or I'm an expert or I know from

5    experience it's this way.

6        When he says, In my opinion, he is in effect saying, I

7    don't know of my own personal knowledge, I am opining that

8    this is this way, and whether the basis of that opinion is

9    what he knows in his own mind or what he thinks or what test

10   he has conducted or anything else, he's beyond his own

11   personal experience when he says, I'm giving you my opinion.

12   Where the opinion comes from doesn't change the fact that it's

13   opinion and not personal experience.

14       So I'm going to sustain the objection on the basis that

15   it calls for opinion testimony.  And I think that effectively

16   at this juncture moots the issue about whether he was

17   instructed or not instructed to answer the question.

18       Now, I'm not telling you, Mr. Stevens, that curtails your

19   right to examine this within the rules of procedure and

20   evidence on cross-examination.  All right?

21            MR. STEVENS:  Well, can I ask a question, if I

22   could, Your Honor?  I don't want to run afoul of your motions

23   in limine about --

24            THE COURT:  If you have any concerns about running

25   afoul of the Court's orders in limine, I suggest you approach

1    before you ask the question and get clarification.

2              MR. STEVENS:  Thank you, Your Honor.

3              THE COURT:  I'm just trying to make it clear I'm not

4    trying to circumscribe your ability to cross-examine on this

5    issue.

6              MR. STEVENS:  Thank you, Your Honor.

7              THE COURT:  But I'm going sustain the objection that

8    he's calling for testimony that's of an opinion nature from a

9    lay fact witness, at least as to this material.

10        Now, if you want to go forward, if you want to back up

11   and go around another direction, as long as this man doesn't

12   give opinion testimony and he testifies from what he knows of

13   his own personal experience, I think that's fine.

14        Perhaps he should have gotten his Ph.D. and been a

15   college professor because he's been lecturing up there for at

16   least an hour.  And maybe that's just his natural way of

17   communicating, but it needs to be -- that's why I stopped him

18   about launching in a narrative.  We need to tighten up this

19   examination and make it specific questions and specific

20   answers.

21             MR. McANDREWS:  May I ask a question, Your Honor?

22             THE COURT:  You may.

23             MR. McANDREWS:  So can he say, because he would know

24   this personally because he both invented the subject matter

25   and was at the standards meeting where it was adopted, can he

1    say that I know my inventions are in the standard?

2            THE COURT:  I think you can ask him, are your

3    inventions covered by the standard, and he can say yes or no.

4    And if you want to challenge him on whether he has any basis

5    of his own personal knowledge to know that, you can revisit on

6    cross-examination.

7        But when he says, it's my opinion that this, or I think

8    this, or it seems to me, then he is getting beyond what he

9    actually knows.  If you ask it as a yes or no question or as a

10   declaratory statement one way or the other, he will either say

11   I don't know or he'll answer it.

12       If he answers it and opposing counsel doesn't think he's

13   got a basis for it, he can review on cross, well, you really

14   don't know that because you didn't do this, you didn't know

15   this, he can address it fairly on cross-examination.  But the

16   form of the question doesn't call for an opinion the way

17   you've tendered it.

18           MR. McANDREWS:  Understood.

19           THE COURT:  Do we have other questions?

20           MR. STEVENS:  If the question is going to be, does

21   one of your patented ideas appear in the standard, if that's

22   what's being contemplated here, is that going to allow me on

23   cross-examine to elicit the fact that during his deposition he

24   was not willing to tell me anything he's done with all respect

25   to the testing and all of that?

```
 1              THE COURT:  Let's see where the rest of the direct
 2   goes.  And if you have -- if you think a door's been opened to
 3   cover something on cross, then I'm not going to stand in the
 4   way of it if I agree with you.  But you probably need to get
 5   my reviews on it before you do it.
 6              MR. STEVENS:  Understood.  Thank you.
 7              THE COURT:  Okay.
 8              MR. McANDREWS:  Thank you, Your Honor.
 9              (The following was had in the presence and hearing
10              of the jury.)
11              THE COURT:  I apologize, ladies and gentlemen.
12         Let's continue with the direct examination, counsel.
13   Q.   (BY MR. McANDREWS)  So on the slide, I have Exhibit 2.
14   It's what we've called the '686 Patent.  Are you familiar with
15   Exhibit 2, Mr. Tzannes?
16   A.   Yes.
17   Q.   And you have that patent here with you today?
18   A.   Yes.  This is the -- the ribbon copy of this patent.
19   Q.   So how do you think of the '686 Patent?
20   A.   I think of this as the truck roll patent.
21   Q.   And what is a truck roll?
22   A.   A truck roll is something that the telephone companies
23   call when they have to actually send a technician out to your
24   house to fix a problem, they have to roll a truck.  And, you
25   know, if you complain about something, then they do what they
```

1    call a truck roll.

2    Q.    Are truck rolls a problem in the industry?

3    A.    Yeah.  Truck rolls are not desirable at all because they

4    are expensive; they require personnel; they require, you know,

5    trucks; and they take time because, you know, you complain and

6    then you have to schedule an appointment and generally

7    everybody is, you know, annoyed with truck rolls.

8    Q.    So how did the truck roll patent come about?

9    A.    So the truck roll patent came about from the fact that

10   we had learned from telephone companies that they were

11   experiencing these issues with noise that I mentioned before,

12   and in some cases the noise that was being caused by these

13   various sources were getting so bad that the actual DSL

14   service would stop working or would be really, really slow,

15   and the customers were calling and complaining about it.

16   Q.    So how did the truck roll patent solve this problem?

17   A.    Well, yeah, so when people complained, the truck roll

18   would have to be rolled out, obviously.  So we wanted to try

19   to find a way to avoid these truck rolls from happening.  And

20   I presented this problem to two engineers of mine who were in

21   the group with me, Bob Pizzano and David Krinsky, and they

22   came up with a new idea on how to solve that problem.

23   Q.    And what did that involve?

24   A.    So what they realized is that they could modify the way

25   these devices worked, the transceivers devices worked, and

1    actually they could get it to where this -- the modem, as

2    we're calling it, actually operated like a handheld device,

3    almost like the one that the actual technician would bring

4    inside the home, and so that they could remotely gather all

5    this data without actually having to send the technician out

6    there to pick it up, and then the data would be sent back to

7    the central office for the technician to analyze.

8    Q.    Did they fix any problems with sending the test

9    information back to the central office?

10   A.    Yes, they did, because if you think about it, that was

11   the problem to begin with--that communication line was really

12   noisy.  So now we're trying to send the data back over -- that

13   communication over the phone line that is not working, and

14   that was the problem that they had to solve.

15   Q.    And how did they solve that problem?

16   A.    They came up with a new method of transmitting data over

17   that channel that was -- or that phone line that was really

18   noisy that was really, really robust.  And by 'robust', you

19   know, it means that it was -- it could basically make it

20   through the channel even if the noise was very, very high.

21   Q.    So did you pass the solution on to the ITU?

22   A.    Yes, we did.

23   Q.    Do you recognize this document?  It's Exhibit 123 on the

24   screen.

25   A.    Yes, I do.

1  Q.   And what is it?

2  A.   This is a contribution that I made to the ITU presenting

3  -- it's RN-043.  It was presented in Red Bank, New Jersey, in

4  May of 2001, and it proposed to the ITU this truck roll

5  solution problem that Bob Pizzano and Dave Krinsky came up

6  with.

7  Q.   Did the ITU adopt the solution you presented?

8  A.   They did.  The ITU eventually adopted this, yes.

9  Q.   Was CommScope at the meeting where the standard this went

10 into was approved?

11 A.   Yes, they were there.

12 Q.   On the screen here they have Exhibit 4, deinterleavers,

13 what we referred to as the '008 Patent.  Are you an inventor

14 on this patent?

15 A.   Yes, I am.

16 Q.   And do you have it here with you today?

17 A.   Yes.  This is the '008 patent.

18 Q.   And how do you think of the '008 Patent?

19 A.   I think of this patent as the phase scrambling patent.

20 Q.   And what is phase scrambling?

21 A.   Phase scrambling is something that is -- solves an

22 important problem that arrives in multicarrier modulation.

23 Q.   What is multicarrier modulation?

24 A.   So multicarrier modulation is a transmission technology

25 that is really the best technology that's out there today.  So

1    cell phones, WiFi, DSL, they all use multicarrier, like many

2    carrier -- multicarrier technology.

3    Q.   Is there such a thing as single carrier modulation?

4    A.   Yes, there is.  Single carrier is the type of modulation

5    that was used more in the past.  So AM radio and FM radio and

6    broadcast TV over the air with the antennas, that is done with

7    single carrier modulation.

8    Q.   So is multicarrier better because it has more than one

9    carrier signal?

10   A.   Yes, it is.  When you have many carriers like that, you

11   can actually send the signal at higher data rates and you can

12   send over longer distances.

13   Q.   Are there any problems associated with multicarrier

14   modulation?

15   A.   Yes, there are.  You know, whenever you design something

16   more complex, problems arise, and the biggest problem that

17   arises in multicarrier, or one of the problems at least, is

18   something known as the PAR problem.  You'll hear this a

19   lot--P-A-R, PAR problem.

20   Q.   And what does PAR stand for?

21   A.   PAR stands for peak to average power ratio.

22   Q.   And what is the PAR problem you mentioned?

23   A.   So this is a little difficult to explain, but the PAR --

24   when you have a multicarrier system, it is not transmitting

25   one carrier; it's actually transmitting actually thousands of

1   carriers.  So imagine it's almost like having thousands of

2   radio stations that are being transmitted and all of these are

3   going over this tiny little -- tiny little phone line.

4       Now, there are instances where -- when you send all these

5   wave forms, all these carriers, they will add up because they

6   are on top of each other.  They'll add up on top of each other

7   in a coherent way such that a very large peak like a spike is

8   created in the wave form.  And when that spike, that peak

9   happens, the actual equipment can't transmit large peaks and

10  they chop it off.  So the peak is chopped off, and that

11  creates a bunch of problems.

12      It's kind -- I will explain an example when something

13  like that would happen.  It's almost like they have to be

14  transmitting the same information.  So an example would be

15  like if all the AM radio stations were transmitting the exact

16  same song, then that kind of peak could occur.

17  Q.   So does that sort of sending a multiple things happen in

18  DSL?

19  A.   Yes, it does.  That idea of sending many things that are

20  the same happens in DSL transceivers during a phase called

21  initialization.  Initialization is when the transceiver first

22  turns on and when it learns the environment, because the

23  transceivers don't actually know -- they need to learn

24  basically how far they are from the central office, the noise

25  environment.  So they're intelligent devices.  In order to

1   learn these things, they need to send signals that actually

2   have this characteristic.  And when they send those signals,

3   this PAR problem happens.

4   Q.   So did you develop a solution to this problem?

5   A.   Yes.  I came up with a new type of phase scrambling,

6   and what this phase scrambling would do is it would actually

7   modify, scramble, these carriers in such a way so that even

8   though they're transmitting the same information, the spike

9   didn't happen anymore.

10  Q.   Was phase --

11            THE COURT:  Let me stop again.  I want to make sure

12  the witness understands what the Court expects of him.

13            THE WITNESS:  I'm sorry.

14            THE COURT:  You just got a question, "Did you

15  develop a solution to this problem?"  You said, "Yes," and

16  then without another question you said, I came up with a new

17  type of phase scrambling and this is how phase scrambling

18  works.  What should happen is, Did you come up with something?

19       Yes, I did.

20       What did you come up with?

21       I came up with phase scrambling.

22       How does phase scrambling work?

23       Well, it works this way.

24       Discrete questions and discrete answers --

25            THE WITNESS:  I'm sorry.

```
1              THE COURT:  -- not an invitation to give us a

2     lecture.  Okay.

3              THE WITNESS:  I understand.

4              THE COURT:  I guarantee you, Mr. McAndrews will ask

5     as many questions as it takes to get the information across,

6     but you need to stop when you've answered his question and let

7     him ask the next one.  Okay?

8              THE WITNESS:  Okay.  Sorry about that.

9              THE COURT:  I just want to make sure you understand

10    because that's the way it works.  As I've said in many other

11    trials, this is not a conversation on the street corner.  This

12    is an examination under oath in federal court, and there are

13    specific rules as to how it should be done, and I want to make

14    sure we follow those rules.  Okay?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  All right.  Let's proceed.

17             MR. McANDREWS:  Thank you, Your Honor.

18    Q.   (BY MR. McANDREWS)  So was phase scrambling known as a

19    general concept prior to your invention?

20    A.   Yes.

21    Q.   And how was it known?

22    A.   Phase scrambling was known as a general concept because

23    others had used it, but they had not used it actually to solve

24    the problems that I was facing in this particular issue with

25    DSL signals that were transmitting the same information.
```

```
1    Q.    So did your phase scrambling invention work in practice?

2    A.    Yes, it did.

3    Q.    Did you pass the solution on to the ITU?

4    A.    Yes.

5    Q.    Did the ITU adopt your solution?

6    A.    Yes, they did.

7    Q.    Did they adopt it into any particular standards?

8    A.    Yes.  They adopted it into the VDSL2 and the G.INP

9    standards.

10   Q.    Was CommScope at the meeting -- or the meetings, I guess,

11   where G.INP and VDSL2 standards were approved.

12   A.    Yes, they were there.

13   Q.    So on the screen I have Exhibit 6.  It's what we refer to

14   as the '835 Patent in this case.  Are you an inventor on this

15   patent?

16   A.    Yes, I am.

17   Q.    Do you have it here today?

18   A.    Yes, I do.

19   Q.    And how do you think of the '835 Patent?

20   A.    I think of the '835 Patent as the DSL reboot patent.

21   Q.    And what is DSL reboot?

22   A.    So DSL reboot is something that occurs when a transceiver

23   reboots itself.  It's similar to what happens when you reboot

24   a computer and it takes a long time to reboot, to start up

25   again.  It takes several minutes.
```

1   Q.   So what was causing these DSL reboots?

2   A.   They were being caused by certain types of noise.  This

3   is -- you know, the problem that I was saying earlier that

4   would actually be so detrimental, that the actual DSL

5   transceiver couldn't keep operating so it would actually have

6   to start up again and reboot.

7   Q.   So what was your solution to the DSL reboot problem?

8   A.   So what I figured out -- and actually I'm not the only

9   inventor on this -- sorry.  I'm the only inventor on this one.

10        But what I figured out was that there was a way to

11   reconfigure the DSL transceiver, in particular, the forward

12   error correction and interleaving parameters while the

13   transceiver was still operating.  So normally you need to do

14   that through a reboot, but I figured out a way to do that

15   while it was still operating so we could actually address the

16   noise changes, solve the problem without actually having to go

17   through this lengthy reboot process.

18   Q.   So were the concepts of interleaving and forward error

19   correction known before your invention?

20   A.   Yes, they were known.

21   Q.   Did you use them in a novel way here?

22   A.   Yes.  The -- I used them in a novel way, yes.

23   Q.   And how so?

24   A.   Well, they had not been used, as I was saying earlier,

25   to actually modify them in a DSL system to address this

1    specific DSL reboot issue.

2    Q.   So do you pass the solution on to the ITU?

3    A.   Yes, I did.

4    Q.   On the screen is Exhibit 121.  Do you recognize this

5    document?

6    A.   Yes.

7    Q.   And what is it?

8    A.   It is a proposal that I made to the ITU in Millbrae,

9    California, in 2004.

10   Q.   And this describes the DSL reboot problem?

11   A.   Yes, it does.

12   Q.   Or your solution to the DSL reboot problem?

13   A.   Yes, it does.

14   Q.   Did the ITU adopt this solution you proposed?

15   A.   Yes, they did.

16   Q.   Into what standard?

17   A.   They adopted it into the VDSL2 standard.

18   Q.   Was CommScope at the meeting where the VDSL2 standard was

19   approved?

20   A.   Yes, they were there.

21   Q.   So on the screen is Exhibit 5.  It's what we referred to

22   as the '048 Patent.  Are you an inventor on this patent?

23   A.   Yes, I am an inventor along with Michael Lund.

24   Q.   Do you have the patent here with you today?

25   A.   Yes.  Here is the ribbon copy.

```
 1   Q.   And how do you think of the '048 Patent?

 2   A.   I think of this as the memory savings patent.

 3   Q.   Did the memory savings patent solve any problems?

 4   A.   Yes, it did.

 5   Q.   And what were those?

 6   A.   It solved -- the problem that the memory savings patent

 7   was solving was actually reducing the cost of -- of DSL

 8   equipment.  In particular, we were looking at reducing the

 9   cost of the interleaver.

10   Q.   And what was the solution?

11   A.   So what Michael Lund and I came up with was the idea of

12   actually sharing the memory between the interleaving function.

13   There is also a corresponding deinterleaving function.  The

14   interleaving is for the transmitting, the deinterleaving is

15   for the receiving.  So we figured out that we could actually

16   dynamically share these memories between the two, and by doing

17   that, we could save memory.

18   Q.   Did you invent the general concept of interleaving or

19   deinterleaving?

20   A.   No.

21   Q.   So what -- what does your invention solve here?

22   A.   It solves the way that interleaving and deinterleaving

23   would work in a dynamic way.  So previously they always would

24   be static, these memories.  They would be fixed allocation.

25   And this now works in a way that's dynamic and shared between
```

1    the two functions.

2    Q.   So was this a good solution?

3    A.   It was a good solution, and we actually were able --

4    when we finally figured out how to get it to work, we were

5    able to save half of the memory, which was significant.

6    Q.   Isn't this more complicated, though?

7    A.   It's more complicated to do, but it saves a lot of

8    memory.

9    Q.   So what challenges did you face in getting the memory

10   sharing patent to work?

11   A.   So one of the challenges we faced is that in order for

12   this sharing to work where the two functions are dynamically

13   sharing, and we had to coordinate that between the two

14   transceivers.  We have two transceivers always here.  There is

15   one in the central office and one in the home.  So we had to

16   actually design some new memory-sharing messages, and these

17   messages would be communicated between the transceivers.  And

18   that was the way that we could make sure that the whole system

19   would work.

20   Q.   Did your solution result in any savings for any

21   companies?

22   A.   Yeah.  Like I said earlier, we -- we ended up saving 50

23   percent of the memory.

24   Q.   Did you pass this solution on to the ITU?

25   A.   Yes, we did.

1    Q.   Did you pass the entirety of this solution, including the

2    memory-sharing aspect to the ITU?

3    A.   We passed the messages, the messaging protocol aspect, to

4    the ITU.

5    Q.   Do you know whether the messaging aspects were adopted

6    into the DSL standards?

7              MR. STEVENS:  Your Honor, I object.  The question is

8    while the patent is being shown.  There's an implication here

9    he's talking about some idea in the patent.  So if we're going

10   to show the patent on the screen, I don't think he should be

11   able to opine about that.

12             THE COURT:  The question before the witness is, do

13   you know whether the messaging aspects were adopted into the

14   DSL standards.  That's a straight-up question he either knows

15   the answer to or he doesn't.  And there's nothing wrong with

16   the patent being on the screen when he asked it or answers it.

17        So I'm going to overrule your objection.  You can revisit

18   this on cross-examination, but this is a perfectly acceptable

19   question if the witness has personal knowledge of how to

20   answer it.

21             MR. STEVENS:  Understood, Your Honor.

22             THE COURT:  Do you want to restate the question, Mr.

23   McAndrews?

24             MR. McANDREWS:  Yes, Your Honor.

25   Q.   (BY MR. McANDREWS)  So do you know whether your

1    memory-saving solution was adopted into the DSL standards?

2    A.    The messaging part of it was.

3    Q.    Thank you.

4          So on the slide here, I have Exhibit 7.  It's what we

5    refer to as the '411 Patent.  Are you an inventor on this

6    patent, Mr. Tzannes?

7    A.    Yes, I am.

8    Q.    Do you have it here with you today?

9    A.    Yes.  This is the patent here today.

10   Q.    And how do you think of the '411 Patent in this case?

11   A.    I think of this as the impulse noise patent.

12   Q.    And what is impulse noise?

13   A.    Impulse noise is a type of noise that exists in DSL

14   systems, and it's basically very short bursts of noise that is

15   very high that destroys the DSL signal when it happens.

16   Q.    And what kind of problems does that create?

17   A.    Well, the problem it creates is that it causes errors.

18   So this is another example where you would notice in your home

19   pixelation or low -- low data rates.

20   Q.    So what kind of solution did you come up with?

21   A.    So the solution was to actually use a retransmission

22   scheme for inside the DSL transceiver.

23   Q.    And how does your retransmission approach work?

24   A.    Can you just show the next slide?  Maybe that will just

25   help to give some context.

1     So normally when a -- when a packet is transmitted or

2   something or an envelope, you can think of it as being

3   transmitted between the two transceivers.  Under normal

4   conditions, it will get through.  But when impulse noise

5   happens, for example, lightning is an example of impulse

6   noise, when lightning happens, it will basically destroy that

7   envelope from getting through.

8     So the idea for retransmission is that when you -- when

9   the central office site sends something, it keeps a copy of

10  it, a copy of the letter, for example, inside the central

11  office, and it sends it across to -- to your home.  If it gets

12  hit by impulse noise, the other side sends a message back and

13  says, send me the letter again, basically.

14    And so then the letter is available and he sends it back.

15  Because he's stored it in memory, again it sends it back to

16  your home.  And that's -- that's what retransmission is.

17  Q.    So did you invent the general concept of retransmission?

18  A.    No, I did not.

19  Q.    What aspects of retransmission did you improve?

20  A.    So the retransmission scheme that I worked on actually

21  solves the specific problem for DSL systems and inside a DSL

22  transceiver for transmitting data -- user data, which had not

23  been done before.

24  Q.    Were there parts of your invention that were challenging?

25  A.    Yeah.  One of the -- one of the parts of the invention

1    that's challenging is that retransmission schemes like these,

2    they start increasing the memory again.  So we're -- you know,

3    we have this problem where we're trying to decrease memory,

4    but now the storage of the envelope, you have to store these

5    envelopes on both sides actually, both at the central office

6    and the CPU side.

7          So while you're storing these envelopes or this data, you

8    end up increasing the memory.  And so as the data rates get

9    very, very high, that storage becomes very, very large and

10   it's expensive.

11   Q.   Was there a cost benefit from your invention?

12   A.   Yes.  So there was a cost benefit for my invention, yes.

13   Q.   And about how much?  Can you estimate the cost benefit?

14   A.   The benefit was, again, about 50 percent of the memory

15   was saved.

16   Q.   What aspects of this invention did you pass to the ITU?

17   A.   So what we passed to the ITU was the messaging required

18   to actually coordinate what ended up being the sharing of

19   memory.  The way we saved the memory was by sharing this

20   interleaver memory and retransmission memory together.  By

21   doing that, we saved memory, but it also required these new

22   messages to be transmitted.

23   Q.   I'm showing you Exhibit 120 on the screen.  Do you

24   recognize this exhibit, Mr. Tzannes?

25   A.   Yes, I do.

1    Q.    And what is it?

2    A.    This is a contribution that I made in Ghent, Belgium, in

3    2006.

4    Q.    Did the ITU adopt the solution proposed in this -- in

5    this contribution?

6    A.    Yes.  This was a contribution to proposed user

7    transmission for VDSL2, and it was adopted.

8    Q.    So I'm showing on the screen Exhibit 8.  It's what we've

9    been referring to as the '354 Patent so far.  Do you recognize

10   this, Mr. Tzannes?

11   A.    Yes, I do.

12   Q.    Are you an inventor on this patent?

13   A.    Yes, I am.

14   Q.    And do you have it here with you today?

15   A.    Yes.

16   Q.    And how do you think of the '354 Patent?

17   A.    I think of this as the ROC, or ROC patent.

18   Q.    So what problem did you solve with the ROC patent?

19   A.    Well, this was one other problem that we discovered when

20   we first started deploying DSL, was that actually your

21   neighbor's DSL was actually affecting your own DSL.

22         So if you go to the next slide, maybe it will help.

23         So what was happening is the signals were interfering

24   from your neighbor's DSL into yours.  So if -- and what in

25   particular would happen is if your neighbor turned his DSL off

1   at night and turned it back on again in the day, it would

2   actually interfere with your service, and -- and in many cases

3   your service would just stop working.  So it was -- it was a

4   big problem.

5   Q.   And at a high level, what was the solution?

6   A.   So I developed a new way to actually modify the way that

7   the system was working so that was -- communication could

8   continue by sending what's known as this ROC or ROC message

9   back to the central office to actually reconfigure the line to

10  work in the presence of this noise.

11  Q.   So how did the ROC message work if there was this noise

12  on the line?

13  A.   So in multicarrier systems, as you recall, there are

14  thousands of carriers.  And so what I realized we could do was

15  we could take a small subset of those carriers and dedicate

16  them to just send that particular signal.  And we would take

17  those carriers, and we'd transmit them at a much lower data

18  rate with a much higher margin, as it's known.  And by doing

19  that, you could actually get the signal through, get the

20  message through even though the data rate -- even though the

21  actual noise was there.

22  Q.   So did you pass this solution on to the ITU?

23  A.   Yes, I did.

24  Q.   Did the ITU adopt your solution?

25  A.   Yes, they did.

1    Q.    Into which standard did they adopt your solution?

2    A.    They adopted it into the VDSL2 standard and the G.INP

3    standard.

4    Q.    And was CommScope there when the VDSL2 and G.INP

5    standards were approved?

6    A.    Yes, they were.

7              MR. McANDREWS:  I pass the witness, Your Honor.

8              THE COURT:  All right.  Before we proceed with

9    cross-examination, we're going to take a short and probably

10   our final recess of the day, ladies and gentlemen.

11        You can simply close your notebooks and leave them there

12   in your chairs.  I suggest you take this opportunity to

13   stretch your legs, get a drink of water, and we'll be back

14   shortly and continue with the cross-examination of Mr. Tzannes

15   by the Defense counsel.

16        So with that, the jury's excused for recess.

17              (Whereupon, the jury left the courtroom.)

18              THE COURT:  Mr. Stevens, what's your estimated time

19   on your cross?

20              MR. STEVENS:  45 minutes to an hour, Your Honor.

21              THE COURT:  All right.  And who is your next

22   witness, Mr. Davis?

23              MR. DAVIS:  Ms. Abha Divine, Your Honor.

24              THE COURT:  What's your estimate on her direct?

25              MR. DAVIS:  45 minutes, Your Honor, maybe an hour.

```
 1              THE COURT:  All right.  We'll do the best we can.

 2   Let's keep this recess to about 10 minutes or less.

 3        Court stands in recess.

 4                         (Brief recess.)

 5              THE COURT:  Be seated, please.

 6        Are you prepared to proceed with cross examination,

 7   Mr. Stevens?

 8              MR. STEVENS:  I am, Your Honor.

 9              THE COURT:  All right.  Let's bring in the jury,

10   please.

11              (Whereupon, the jury entered the courtroom.)

12              THE COURT:  Please be seated.

13        All right.  We will proceed with cross examination of the

14   witness by the Defendants.

15        You may proceed, Mr. Stevens.

16              MR. STEVENS:  Thank you, Your Honor.

17                     CROSS EXAMINATION

18   BY MR. STEVENS:

19   Q.   Good afternoon, Mr. Tzannes.

20   A.   Good afternoon.

21   Q.   I just want to touch on a couple of technical topics.

22   DSL is not the only way to bring internet to your house.

23   True?

24   A.   That's true.

25   Q.   There's other things, like cable modems.  Is that
```

1    correct?

2    A.   Yes.

3    Q.   There's other technologies like fiberoptic.  Is that

4    right?

5    A.   Yes.

6    Q.   People could use a satellite.  Is that true?

7    A.   Yes.

8    Q.   And people could use their cell phone or have a small

9    cell tower in their house.  Is that right?

10   A.   Yes, that's true.

11   Q.   Okay.  Now, when you said during your direct examination

12   that things like Netflix and Zoom come over DSL, how you get

13   Netflix or Zoom in your house is dependent upon what type of

14   internet provider you have.  Right?  It's not exclusive to

15   DSL.  Is that right?

16   A.   That's true.

17   Q.   Okay.  So I don't want anyone to be left with a

18   misimpression that if you ever watched a show on Netflix or

19   you've ever had a Zoom meeting, that you you're necessarily

20   using DSL?

21              THE COURT:  Just a minute, Mr. Stevens.  What you

22   don't want the jury to be left with the impression is not a

23   question.  You're not here to make sidebar comments to the

24   jury; you're here to ask this witness questions.  So ask him

25   a question, but don't make a statement unless you want to

1    testify.

2                    MR. STEVENS:  Understood, Your Honor.  Thank you.

3                    THE COURT:  All right.  Let's proceed.

4    Q.   (BY MR. STEVENS)  So Netflix and Zoom, just because I'm

5    using those does not mean I'm using DSL.  Is that correct?

6    A.   That's true.

7    Q.   And to the typical American consumer nowadays, if you

8    have a cable modem it's probably going to be faster than DSL.

9    Is that true?

10   A.   I don't know.  Not necessarily.

11   Q.   And if you have a fiberoptic communication to your house

12   today, it's probably going to be faster than DSL.  Is that

13   true?

14   A.   Fiberoptic probably will be faster.

15   Q.   What do you have to your house?

16   A.   I have -- well, my current house I have a cable modem.

17   Q.   Okay.  I just want to put up just real quickly slide 3

18   from your presentation, PDX.Tzannes.3 here.

19        Sir, I believe that you told the jury that this is

20   showing a, quote, standard old phone line.  That's not what

21   we're seeing on this slide.  True?

22   A.   Oh, yeah.  I guess -- yeah, that's a -- not quite correct

23   as far as the number of pairs.  Is that what you're getting

24   at?

25   Q.   That's an ethernet cable.  Right?

1    A.   Yeah.

2    Q.   This would take -- whether you have cable or fiberoptic,

3    that would take it from the modem to your computer or some

4    other device.  Right?

5    A.   Yeah.  This was a graphic, yeah.

6    Q.   Okay.

7             MR. STEVENS:  We can take that down.

8    Q.   (BY MR. STEVENS)  Let's talk a little bit about

9    standardization, and I'd like to talk about the ITU and

10   the standardization process.  Is that okay, sir?

11   A.   Yes.

12   Q.   Great.  The ITU's members include hundreds of companies

13   from over -- hundreds of companies from over 100 countries.

14   True?

15   A.   Yes, that's true.

16   Q.   Okay.  And there's over 20,000 engineers active at the

17   ITU.  Is that right?

18   A.   I don't know the number, but I'm sure that's probably

19   close, yes.

20   Q.   Okay.  And the ITU, it's not just corporations;

21   universities can be members, if they like.  Is that true?

22   A.   I think -- yeah, I think they have a membership class for

23   universities, yep.

24   Q.   And research organizations can be members.  Is that

25   right?

```
1    A.   Yeah, of course.
2    Q.   And, as you said, even countries, government
3    organizations can be members.  That's also true.  Right?
4    A.   Yes.
5    Q.   So you don't -- it's not strictly limited to
6    corporations.  That would be incorrect if someone were to
7    say that.  Fair?
8    A.   Yes.
9    Q.   Okay.  And we talked about the ITU.  It's part of a
10   charter of the United Nations, and so people from other
11   countries join it as well.  Is that right?
12   A.   That's correct.
13   Q.   And the U.S. State Department doesn't have to approve who
14   joins the ITU from other countries.  Is that right?
15   A.   Yeah, not the U.S. State Department.  Every country has
16   their own rules on how you can join the ITU.
17   Q.   So it would be incorrect if someone were to state that
18   the State Department of the U.S. must approve you before you
19   can be an ITU member.  That would be incorrect.  Is that
20   right?
21   A.   Well, I was speaking for U.S. companies, but yeah, if
22   you're outside the U.S. you would not need to do that.
23   Q.   And so when a standard comes out of the ITU, that's the
24   work of a whole bunch of different companies.  Correct?
25   A.   Yes.
```

```
 1    Q.   And when you vote on a standard, that's something --

 2    some people call it to ratify the standard or the ratification

 3    process.  Do I have that right, sir?

 4    A.   That's not the right term, but that's okay, yeah.

 5    Q.   What would you prefer I say instead of 'ratify'?

 6    A.   'Approve'.

 7    Q.   'Approve'.  Okay.  Now, before someone were to approve a

 8    standard, all of the ITU members have access to that to know

 9    what they're approving.  Is that fair?

10    A.   Do you mean -- I just want to make sure I understand what

11    you mean.  You mean -- there's different phases of the

12    approval At what phase are you talking about?

13    Q.   Well, if someone's going to approve something, they have

14    to see it first.  Is that fair?

15    A.   Yes, yes.

16    Q.   Okay.  So if some document or standard is going to be put

17    up for voting or for the approval process, that's circulated

18    to the ITC membership.  Correct?

19    A.   The ITU membership, yes.

20    Q.   I beg your pardon.  ITU membership.  Thank you.

21    A.   Yes.

22    Q.   So if we look at your slide 9, you put up three different

23    standards here.  Let's just peek at that real quick.

24    PDX.Tzannes.9.

25         So on the left we see a standard, and that would have
```

1    been adopted in December of 2011.  Do I see that, sir?

2    A.   Yeah, sometimes these dates -- right.  So I believe

3    that's the date when it was approved.

4    Q.   Okay.  So by this date, when we see this approval date

5    right -- there's the G. some number, there's a parentheses,

6    and then there's a month and a year.  Do you see that, sir?

7    A.   Yes.

8    Q.   Sand so when we see that, that's when this standard was

9    approved by the ITU membership.  Is that correct?

10   A.   That's correct.

11   Q.   And so all the members of the ITU had access to these

12   documents before that point in time.  Is that right?

13   A.   They had access to -- yes.  I mean, they had access to

14   the draft prior to approval.  That's right.

15   Q.   And I think -- if I heard you right, I think you said

16   that, quote, all companies that are interested in DSL were

17   part of the ITU at the time.  Is that right?

18   A.   I said the companies that are interested in DSL

19   standards, I think I said.

20   Q.   Okay.  So when somebody makes a contribution at the ITU,

21   or when the ITU has a draft or a final recommendation, that is

22   disseminated or otherwise made available to all the persons

23   interested in that technology.  Is that correct?

24   A.   I'm sorry.  It was kind of a long question.  Could you

25   repeat it?  I just want to make sure I heard it right.

1    Q.   Sure.  For example, when someone submits a contribution

2    to the ITU, that is either disseminated or otherwise made

3    available to the membership of the ITU.  Correct?

4    A.   Sort of.  I mean -- sort of available.  It's not

5    available -- during the interim meetings, present

6    contributions are made, and they're not -- they don't end up

7    at the plenary meetings right away, which is the big meetings.

8    So, I mean, let's say -- that's close enough, I'd say.  Okay.

9    Q.   Okay.  So when you made a contribution --

10   A.   Right.

11   Q.   -- and then you went to a meeting, you'd get an agenda

12   beforehand.  Isn't that correct?

13   A.   That's correct.

14   Q.   And that agenda would often have links.  If you wanted to

15   download everyone else's contributions you could do that.  Is

16   that right?

17   A.   That's correct, yes.

18   Q.   And that was circulated among the membership of the ITU.

19   Is that fair?

20   A.   Yes.

21        MR. STEVENS:  Okay.  So if we can pull up Exhibit

22   119.

23   Q.   (BY MR. STEVENS)  And this is one of the documents that

24   you brought up during your direct testimony.

25        So, for example, here, this is something you submitted in

1    advance of a meeting in December of 2001.  Correct?

2    A.   Yes.

3    Q.   Okay.  And so the membership of the ITU would have had

4    access to this document when you submitted it before you

5    actually talked about it here in Clearwater, Florida.  Is that

6    right?

7    A.   Yes.  It depends on when the document was actually

8    uploaded, so, you know, usually a week before, depending on

9    when you upload the document, then it would become available.

10   Q.   Okay.  Whether it was a day before or a week before, the

11   document, sir, would be available before the meeting.  Is that

12   correct?

13   A.   It depended -- I mean, it seems like it's important the

14   date.  It kind of depended on the type of meeting.  So in this

15   kind of a meeting, typically the deadlines for submitting

16   them -- I think they changed over time.  It could have been

17   the Thursday before or the Tuesday before.  I don't remember

18   the exact dates.

19   Q.   Okay.  Thank you, sir.

20        And while we're here, this is one of the contributions

21   that you talked about during your direct testimony.  Do you

22   remember that, sir?

23   A.   Yes, it is.

24   Q.   And you jointly made this along with AMD.  Is that right?

25   A.   That's correct.

1    Q.   And here you are proposing to start a new project.  This

2    is the G.bond one you are proposing to start a new project.

3    Is that right?

4    A.   Yes.

5    Q.   This technical contribution doesn't include any alleged

6    solution to any bonding problem.  Is that right?

7    A.   That's correct.

8    Q.   And G.bond you said was the work of hundreds of engineers

9    over four and a half years.  Is that right, sir?

10   A.   No.

11   Q.   Took you four and a half years to standardize G.bond.  Is

12   that right?

13   A.   That's correct.

14   Q.   And many other companies made contributions over those

15   four and a half years.  True?

16   A.   There was a handful of companies that made contributions.

17   Q.   Okay.  It wasn't all Aware.  There were other companies

18   that were at the table for G.bond that were also coming up

19   with other contributions and ideas.  Right?

20   A.   Yeah, that's correct.

21           MR. STEVENS:  Okay.  We can take that down.

22   Q.   (BY MR. STEVENS)  So let's talk about the standards

23   themselves.  You, sir, were aware you didn't invent DSL.

24   True?

25   A.   No, of course not.

1   Q.   Okay.  You didn't invent something called ADSL, one of

2   the specific flavors.  You didn't invent that.  Is that right?

3   A.   You mean the entire ADSL technology?

4   Q.   Sure.

5   A.   No.

6   Q.   You didn't invent VDSL.  Is that true?

7   A.   No.

8   Q.   To go into an entire standard, there's literally

9   thousands of ideas that are submitted by different companies.

10  Is that right?

11  A.   No, that's not right.

12  Q.   It's not right that to come up with VDSL there were

13  thousands of ideas that had to go into that?

14  A.   I wouldn't call them ideas.  Thousands of companies don't

15  submit ideas.  I mean, there's -- that's not the way it works.

16  Q.   I didn't say thousands of companies, sir.  It might not

17  have been that many number of companies, but a lot of

18  different people contributed a lot of different ideas or

19  proposals in coming up with VDSL.  Is that right?

20  A.   Yes, that's right.  I was just -- okay.  Yes.

21  Q.   And there were some other things that you talked about

22  with your counsel during direct examination.  I just want to

23  make sure that I heard you right, so I want to go through some

24  concepts and I want to make sure that I heard you right that

25  these are not concepts that you invented.  Do you understand

```
1   my question so far?

2   A.   Yes.

3   Q.   Okay.  I heard you talk about retransmission.  That's not

4   something that you invented.  True?

5   A.   Yes.  I said that.

6   Q.   Okay.  And you talked about an interleaver or a

7   deinterleaver.  Again, not something you invented.  Is that

8   right?

9   A.   Yes.  I said that.

10  Q.   Shared memory.  Not something that you invented.  Is that

11  right?

12  A.   You mean the general concept of shared memory?

13  Q.   Yeah, sharing memory.

14  A.   Yeah.  The general concept, no.

15  Q.   Forward error correction.  Again, that's not something

16  you invented.  Correct?

17  A.   That's correct.

18  Q.   Bonding.  That's not something you invented.  Correct?

19  A.   That's correct.

20  Q.   Phase scrambling.  That's also not something that you

21  invented.  Is that right?

22  A.   Well, I explained a specific type of phase scrambling

23  that I invented.

24  Q.   Sir, my question was did you invent phrase

25  scrambling--yes or no.
```

1    A.    Again, the general concept, no.

2    Q.    Okay.  So phase scrambling was a known concept in

3    telecommunications before you went to the Patent Office with

4    the ideas that you talk about in the '008 Patent.  Is that

5    true?

6    A.    Yes.

7    Q.    Okay.  Testing for idle channel noise.  That's not

8    something you invented.  Is that correct?

9    A.    Yes.

10   Q.    Okay.  So before we leave the standards, if I heard you

11   right on your direct, you talked about three different

12   standards--VDSL, G.bond and G.INP.  Is that right?

13   A.    That's right.

14   Q.    So we are not here this week to talk about ADSL.  Is that

15   fair?

16   A.    That's right.

17   Q.    Okay.  And then just to make sure that we're not confused

18   between VDSL1 and VDSL2, none of the patents that we're here

19   to talk about have anything to do with VDSL1.  Is that right?

20        I'll withdraw and ask a different question.

21   A.    Yes.

22   Q.    VDSL1 wasn't commercialized.  It wasn't widely adopted.

23   Is that fair?

24   A.    That's fair.

25   Q.    Okay.  So when we hear about VDSL, that's generally a

```
 1    reference to VDSL2 as opposed to 1.  Is that fair?

 2    A.    Yes.

 3    Q.    Okay.  And products -- you're not aware of any products

 4    that are backwards compatible with VDSL1.  Is that fair?

 5    A.    That's true.

 6    Q.    Okay.  Now, when Aware, your prior company -- again,

 7    Aware and TQ Delta, two completely different entities.  Do I

 8    have that right, sir?

 9    A.    Yes.

10    Q.    Aware is a company even today.  Is that right?

11    A.    Yes.

12    Q.    You can buy stock.  It's a publicly-traded company.  Is

13    that right?

14    A.    Yes.

15    Q.    Okay.  Now, when Aware was contributing to the ITU, Aware

16    made promises to license any patents related to the standards.

17    Is that right?

18    A.    Yes.  Aware made this FRAND license we have been talking

19    about.

20    Q.    Okay.  And you walked through some of those on your

21    direct testimony.  Did I see that right, sir?

22    A.    Yes.  I showed the forms.

23    Q.    Okay.  Now, you will agree with me that when Aware makes

24    that declaration, nobody at the ITU confirms that that's, in

25    fact, correct.  Is that right?
```

```
 1    A.   That's correct.

 2    Q.   In fact, the ITU explicitly says that it does not decide

 3    whether any of any company's patents are actually essential to

 4    the standard.  Is that true?

 5    A.   That's true.

 6    Q.   Okay.  So just because you make a declaration doesn't

 7    make it so.  Do we agree with that?

 8    A.   Doesn't make what so?

 9    Q.   Just because you make a declaration at the ITU that you

10    believe you may have patents that relate to the standard, that

11    doesn't necessarily make it so.  Is that right?

12    A.   Yes, that's true.

13    Q.   Okay.  And again, when Aware made these commitments to

14    the ITU, they agreed to license the patents on a

15    non-discriminatory basis and on reasonable terms.  Is that

16    right, sir?

17    A.   Yes, it is.

18    Q.   Okay.  And we've heard this before, but just to make

19    sure, sometimes that's called a RAND or a FRAND commitment.

20    You've heard those terms before, sir?

21    A.   Yes, I have.

22    Q.   Okay.  Now, I want to talk a little bit about the

23    business of Aware.  Is that okay?  And that was your former

24    company.  You're not with them anymore today.  Is that right?

25    A.   That's right.
```

1    Q.   Okay.  Aware was in the business of chip design,

2    semiconductor chip designs.  Do I have that right?

3    A.   Yes.

4    Q.   Okay.  And in the DSL space, Aware's customers were

5    semiconductor chip companies.  Is that true?

6    A.   That's true.

7    Q.   You rattled off four or five names during your direct

8    testimony.  Every single one of those is a chip maker.  Is

9    that right?

10   A.   Yes.

11   Q.   And what those semiconductor companies do is they

12   manufacture or fabricate chips.  Right?

13   A.   That's true.

14   Q.   And one of your jobs I believe was to create some of the

15   software or algorithms that would be used on that chipset.  Is

16   that right?

17   A.   Yes.

18   Q.   Okay.  So the hardware you were doing, the software you

19   are doing, that was all for the chipset.  Correct?

20   A.   Yes.

21   Q.   Now, ultimately Aware got out of the DSL business and

22   sold it off.  Is that right?

23   A.   Yes.

24   Q.   And was -- you had mentioned that when you joined Aware

25   it was a small company.  When did it go public?

1   A.   In 1996.

2   Q.   Okay.  So you joined around '92.  Do I have that right?

3   A.   Yeah.

4   Q.   But it was a public company from when you were there from

5   1996 until 2012.  Is that right?

6   A.   Yes.

7   Q.   Okay.  Now, again, ultimately Aware made the business

8   decision to get out of the DSL business.  Is that true?

9   A.   Yes.

10  Q.   And as part of that, Aware sold off a bunch of patents to

11  several different companies.  Is that right?

12  A.   Yes.

13  Q.   They didn't all go to TQ Delta; some of them went to

14  other companies.  Is that true?

15  A.   Yes.

16  Q.   And, in fact, you were involved in Aware's effort to try

17  to shop or to sell off its patent portfolio.  Is that right?

18  A.   Yes.

19        MR. STEVENS:  If we could pull up Exhibit 81, the

20  first page, please.

21  Q.   (BY MR. STEVENS)  This is one of the documents that you

22  and a couple of other folks created in order to -- again, to

23  shop or to sell the patents.  Do I have that right?

24  A.   Yes.

25  Q.   In fact, that's your name there, the third name listed on

```
1    that cover page.

2    A.   Yes.

3    Q.   And the one above, it's your brother?

4    A.   Yes.

5             MR. STEVENS:  All right.  I'd like to pull up page

6    114 of this exhibit, please.

7    Q.   (BY MR. STEVENS)  And this is -- again, this is one of

8    the slides in the slide deck you presented.  Is that right?

9    A.   Say that again.

10   Q.   This is one of the slides in the presentation deck that

11   you created.  Is that right?

12   A.   I just want to clarify that I actually didn't create

13   these slides.  I was part of the technical slides, so this is

14   more on the business side of things.

15   Q.   Okay.  Well, one of the things that you did when you

16   created this presentation was you told the world that there's

17   already, quote, DSL portfolio encumbrances.  Did I read that

18   right, sir?

19   A.   That's what it says there, yes.

20   Q.   And what that means is Aware had already licensed the

21   patents.  Is that true?

22   A.   Well, what it says there is there were two active

23   licenses.

24   Q.   And one of those was to a company called Lantiq.  Is that

25   right?
```

1   A.   Yes.

2   Q.   And if we go down to the bottom, you also say in this

3   slide there's a FRAND license obligation.  Do I see that

4   right?

5   A.   Yes, that's what it says.

6   Q.   And below that it says, "Participated in ITU DSL

7   standards setting body FRAND obligation."  Do I read that

8   right?

9   A.   Yes, that's what it says.

10   Q.   And this is, again, a presentation that you shared with

11   several companies, including TQ Delta.  Is that right?

12   A.   Yes.

13   Q.   And again, what FRAND means is fair, reasonable, and

14   non-discriminatory, just like Judge Gilstrap told us a little

15   bit earlier.  Is that right?

16   A.   Yes.

17   Q.   So you were telling -- anyone who was interested in the

18   patents, you were telling them that Aware had committed to

19   license these patents on these FRAND terms.  Is that right?

20   A.   Yes.

21   Q.   And that obligation would follow with the transfer of the

22   patents to a new owner.  Is that right?

23   A.   That's correct.

24   Q.   Okay.  Now, after Aware sold off the DSL business and

25   sold its patents, you left the company.  Is that correct?

A.    Yes.

Q.    Now, you were compensated while you were with Aware.  Is that fair?

A.    Yeah, of course.

Q.    And you were compensated relating to your work on patents.  Is that true?

A.    Well, my work at Aware was working a lot with patents, so yeah, I was compensated.  I had a salary at Aware.

Q.    Okay.  All right.  You told me you had a salary at Aware.  Right?  You were compensated or received a bonus every time you filed a patent or had a patent issued.  Is that right?

A.    That's true, yes.

Q.    And then when the patents were being sold off, you got a commission for selling the patents.  Is that right?

A.    That occurred in one case.  It was one case; not for the TQ Delta portfolio or for any -- it was for one specific in the past.  That happened one time, yes.

Q.    Okay.  So salary, bonus with every patent, and a commission for one of the sales of the patents.  Do I have that right?

A.    Yes.

Q.    And then when you left Aware, you cashed in your stock options and you got over a million dollars as you walked away.  Is that right?

A.    I mean, part of the compensation at a small company is

1    stock options, so yes, I -- when I left I sold them.

2    Q.   Okay.  So you got compensated four different ways

3    relating to these patents.  Is that right?

4    A.   Yes, that's true.

5    Q.   Okay.  Now, after you left Aware, you and your brother

6    Michael formed Tzannes Patent Management.  Do I have that

7    right, sir?

8    A.   Yes.

9    Q.   And that was in or around August of 2012.

10   A.   That's right, yeah.

11   Q.   And Tzannes Patent Management started to work with

12   TQ Delta, you know, pretty much right after you formed it.

13   Is that right?

14   A.   Yes.

15   Q.   And that's been by far your biggest client over the past

16   decade.  Do I have that right?

17   A.   Yes.

18   Q.   Now, you talked about different roles you had with the

19   company, and one of the things that you said on your direct

20   examination was that you've been a litigation consultant for

21   them for over 10 years.  Is that right?

22   A.   Yes, I've helped them with all the licensing efforts,

23   including litigation.

24            MR. STEVENS:  Your Honor, might I approach for a

25   moment?

1          THE COURT:  You may.

2          (The following was had outside the hearing of the

3          jury.)

4          MR. STEVENS:  So --

5          THE COURT:  Just wait until we get opposing counsel

6    up here.

7       All right.  What is it, Mr. Stevens?

8          MR. STEVENS:  I wanted to ask Your Honor if I can

9    ask questions about his work as a litigation consultant where

10   he was instructed not to answer at his deposition -- he

11   wouldn't tell me the work he was doing with TQ Delta over the

12   past 10 years on that front.  I think the questions during

13   direct elicited that testimony and opened the door.

14         THE COURT:  Well, I'm not personally or intimately

15   familiar with what you tried to ask him in deposition, and I

16   haven't reviewed his deposition in advance of this trial, so

17   to the extent you can be precise about what you're wanting to

18   go into, it would be helpful.

19         MR. STEVENS:  I can show you my questions, Your

20   Honor.  It's the ones I have put a box around with my pen.

21   This is from his deposition.

22         THE COURT:  Let me ask you, Mr. McAndrews, do you

23   have a response to -- or an objection to what Mr. Stevens has

24   just raised with me?

25         MR. McANDREWS:  I do.  So clearly this question here

1    he's asking about his work as a litigation consultant.  This

2    was the problem we had with the questions, the way he was

3    asking these.  In context and you can see right here in

4    particular he wants to know about Mr. Tzannes' role as

5    litigation consultant, what he did at the direction of

6    counsel, what he told his lawyers as TQ Delta's lawyers

7    representing TQ Delta and Mr. Tzannes during the course of

8    this litigation.

9         If he wants to ask him about things that are not done at

10   the direction of counsel or -- and he's going to leave out

11   what Mr. Tzannes was telling his lawyers and what his lawyers

12   were telling him, he's free to do that, but these questions

13   clearly are attempting to elicit work product and privileged

14   information.

15             MR. STEVENS:  So here's the issue I have, Your

16   Honor.  He's come up and told a big story, and I'm not allowed

17   to know whether this story has changed over the past 10 years,

18   either in light of hearing what TQ Delta wants to say or how

19   it was told when he first came with TQ Delta.

20        I'm not asking about attorney/client privilege

21   information; I'm simply asking these questions, What did you

22   tell TQ Delta about these patents after they hired you, and

23   they were uniformly instructed not to answer those questions.

24   And this is just two examples.  It goes on and on.

25             THE COURT:  Let me ask you this, Mr. Stevens.

1      Assume for purposes of discussion that I allow you to ask

2      these questions, and assume for purposes of discussion

3      Mr. Tzannes answers those questions.  Are you then going to

4      be up here again asking me to let you show the jury that

5      previously he didn't answer those questions based on

6      instructions from counsel?

7              MR. STEVENS:  Yes.  In fact, that's the question I'm

8      going to ask him.  I'll say, When I tried to ask you the same

9      questions that your counsel did just a few minutes ago, at

10     your deposition you were uniformly -- you would not tell me

11     the same information.

12             THE COURT:  Well, I'll allow you to ask the

13     questions you want to ask.  If Mr. McAndrews, based on the

14     questions you ask, objects based on privilege, then I'll hear

15     that objection.  If either I overrule that objection or he

16     doesn't object, if you ask the question and he gives a

17     substantive answer, I do not intend to let you then go back

18     simply for effect and try to show the jury that you didn't get

19     an answer earlier.

20         If you want to elicit the information and you get the

21     information, then I think that's all you're entitled to.

22     This seems to me as if you're trying to create an opportunity

23     to prejudice the Plaintiff by what happened in this

24     deposition.

25             Now, if you ask the question and there's an objection

1    that I sustain or -- we'll just have to see where that goes.

2    But if you ask the question and you get an answer from this

3    witness and it's something that his counsel instructed him not

4    to answer on deposition, you've gotten your answer and you're

5    not going to come back and prejudice this witness after you've

6    already gotten the material you asked for because previously

7    in the deposition you didn't get it.

8              MR. STEVENS:  Let me clarify the question I would

9    intend to ask, because it might be different than you expect.

10             THE COURT:  That's why we're up here--to try to get

11   it straight.

12             MR. STEVENS:  I would ask him, When I inquired about

13   the subject matter, you refused to tell me the answer at your

14   deposition.  That would be the question I would ask.  I don't

15   have to say it was privileged, but you would not provide me

16   that information.

17             THE COURT:  You're entitled to ask him for

18   information.  You're entitled to see what answer you get.

19   If he doesn't answer or if he's instructed not to answer,

20   that may or may not open the door to what happened in his

21   deposition.  But you're not going to go up there and say, On

22   your deposition I asked you X and you refused to answer me,

23   didn't you.

24             MR. STEVENS:  Okay.

25             THE COURT:  If you want to ask him what is X and he

1    gives you an answer, then you're not going to then say, Well,

2    at your deposition you refused to answer what is X.

3              MR. STEVENS:  Okay.

4              THE COURT:  We're talking about the substance here

5    versus the form, and it seems to me your intent on showing the

6    jury that the form of this exchange during the deposition was

7    he refused to answer a question or he was instructed not to

8    answer a question.

9              MR. STEVENS:  The thrust of what I'm trying to get

10   at is that this was information that he was -- that he did not

11   provide me, for whatever reason, when he was asked at his

12   deposition.  Yes, Your Honor, that is the thrust of the

13   question.  If you're telling me that that's okay, I'll do it.

14   If you tell me it's not okay, I won't do it.

15             THE COURT:  I'm telling you that for the purpose of

16   showing you didn't get it at the deposition and ignoring the

17   desire to get substantive information is not okay.  If you

18   want to ask him for the same information substantively and he

19   answers you, then you've gotten an answer to your question and

20   you're not going to then go back and say, Well that's not what

21   you did at your deposition.

22             MR. STEVENS:  Understood.

23             THE COURT:  Is that clear?

24             MR. STEVENS:  It is clear now.  Thank you.

25             MR. McANDREWS:  Your Honor, if I may?

1          THE COURT:  Now, if he asks the same question in the

2     same way, you're going to have to decide whether you want to

3     stand up and object to it based on privilege or not.

4          MR. McANDREWS:  Your Honor, it sounds like that's

5     exactly what he's intending to have happen here, and it's

6     going to create the exact sort of privilege that your standing

7     motion in limine order prevents--that he is not supposed to be

8     asking a question that is going to elicit a privilege

9     objection because it makes it appear that we're hiding

10    something.

11         THE COURT:  Let me see that sheet again.

12         MR. STEVENS:  There are several pages, Your Honor.

13    Feel free to flip through them.

14         THE COURT:  Let's just take the first one for

15    example.  The question is, "Do you believe that any of the

16    asserted patents in this case are essential to the ITU

17    standard?"  That on its face is not privileged.

18         MR. McANDREWS:  I agree he can ask that question.

19         THE COURT:  You told me repeatedly that the reason

20    he was instructed at deposition not to answer it was because

21    in the context of the examination you believed it invaded the

22    privilege.  We're not in the context of the examination.  We

23    are talking about targeted individual questions.  He can ask

24    that.

25         MR. McANDREWS:  I agree, Your Honor.

1          THE COURT:  And if the witness answers it, he's not

2     then going to say, But at your deposition I asked you that and

3     you wouldn't tell me or you were instructed not to.  If you

4     get an answer, whether he says yes, I do believe it, or, No, I

5     don't, you've gotten an answer.  Are we straight on that?

6          MR. McANDREWS:  Yes, Your Honor.

7          MR. STEVENS:  Now I have a question.  Can I inquire

8     with a him whether he's had the opportunity in the past decade

9     as a litigation consultant to have these conversations with

10    TQ Delta?

11         THE COURT:  To have what conversations?

12         MR. STEVENS:  To have conversations about

13    essentiality or infringement or what the patents are about.

14    HAS he had -- in the past 10 years has he informed TQ Delta

15    about these things.

16         THE COURT:  Well, let's put it this way.  I'm not

17    going to permit you to intentionally ask a question that you

18    are convinced in advance of asking it is going to draw an

19    objection that it's privileged.  I don't want to have a

20    privilege fight in front of this jury.  Okay?

21         MR. STEVENS:  I think I know --

22         THE COURT:  If you want real substantive information

23    that doesn't call for privileged communications, then ask the

24    question, and if he doesn't answer it or if counsel objects

25    and refuses to let him answer it, then that may open the door

1      to what you want to do, but you can't open the door yourself.

2              MR. STEVENS:  I understand.

3              THE COURT:  Do we have anymore concerns about where

4      we're headed?  Everybody clear?

5              MR. McANDREWS:  So it sounded like when we first

6      came up here he wanted to know if Mr. Tzannes has changed his

7      story.  What Mr. Tzannes put in the slide deck before TQ Delta

8      acquired the patent portfolio, that's fine; he was not a

9      litigation consultant to TQ Delta.  In fact, he was in the

10     seller's role.  Right?  We never claimed privilege.  That's

11     why he has the slide deck that has claim charts in it.

12             THE COURT:  I understand.

13             MR. McANDREWS:  But if he wants to attempt to

14     inquire into what Mr. Tzannes did since being hired by TQ

15     Delta as a litigation consultant, then remember he was

16     involved in litigation going back all the way to early 2013 on

17     behalf of TQ Delta, back when CommScope's affiliate was first

18     pursued to Delaware.

19         It sounded like what he wanted to say is has he changed

20     his story through the years as a litigation consultant.  That

21     would be improper.  However, if he wants to ask him about what

22     happened before the sale when there is no privilege, there is

23     no work product, that's okay.  And if he wants to ask him

24     things about what he now knows but not in a way that says,

25     What did you tell TQ Delta, I think that's okay, too.

```
 1              THE COURT:  Do you have an intention to go outside
 2     of what Mr. McAndrews just --
 3              MR. STEVENS:  It's difficult for me to swallow the
 4     notion that I shouldn't be able to ask the witness, Have you
 5     told the party something different over the past 10 years.  I
 6     find that to be a difficult proposition.  But beyond that, I
 7     mean, if I can't ask that question -- if you tell me I can't
 8     ask that question, I can't ask it.
 9              THE COURT:  Let's do this.  I think we covered it
10     enough.  If Mr. Stevens on cross asks a question of the
11     witness that you believe is privileged, Mr. McAndrews, then
12     you need to not get into an argument in front of the jury
13     about privilege and what it is and why it applies; you need to
14     ask to approach the bench and we'll sort it out up here.  It
15     is my hope we do not have to do that.  Okay?
16              MR. McANDREWS:  Understood.
17              MR. STEVENS:  Understood.
18              MR. McANDREWS:  Thank you, Your Honor.
19              (The following was had in the presence and hearing
20              of the jury.)
21              THE COURT:  All right, counsel.  You may continue
22     with cross examination.
23              MR. STEVENS:  Thank you, Your Honor.
24     Q.   (BY MR. STEVENS)  So where we left off, you have been a
25     litigation consultant for TQ Delta over the past decade.  Do I
```

1    have that right?

2    A.    Yes.

3    Q.    And when you went through your slide deck with TQ Delta's

4    counsel, you put up four total contributions.  Is that right?

5    A.    Yes.

6    Q.    And there are seven patents in this case.  Fair?

7    A.    Yes.

8    Q.    So for three of the patents you did not display a

9    contribution that had anything to do with those patents during

10   your direct examination.  Is that true?

11   A.    That's true.

12   Q.    And then one of them was, again, the concept of starting

13   the group.  It did not include anything technical.  Is that

14   right?

15   A.    That's true.

16   Q.    Okay.  Sir, of the seven patents, you're aware that four

17   of them have expired.  Is that right?

18   A.    Yes.  I wasn't aware, but yeah.

19   Q.    Okay.  So the '008 Patent, that one about phase

20   scrambling, that's already expired.  Right?

21   A.    Again, I didn't realize it.  It doesn't really matter,

22   but yeah.

23   Q.    Expired back in November of 2020.  Is that true?

24   A.    Okay.

25   Q.    The '686 Patent expired back in 2022, last year.  Is that

1   right?

2   A.   Okay.

3   Q.   The '354 Patent, that expired two years ago back in early

4   2021.  Do I have that right, sir?

5   A.   I'll take your word for it.  I haven't checked, so yeah.

6   Q.   And then the patent that you call the bonding patent, the

7   '881 Patent, that expired also in 2022, last year.  Is that

8   right?

9   A.   Okay.

10  Q.   Now, were you -- you were in the courtroom for Mr. Davis'

11  opening presentation.  Is that right?

12  A.   Yes, I was here.

13  Q.   And you saw him put up a timeline of the provisional

14  application date and the standards date.  Is that right?

15  A.   Yes.

16  Q.   And the provisional application date doesn't tell us when

17  the patent actually issued.  Is that fair?

18  A.   That's -- yes, that's the invention date.

19  Q.   And during that intervening period of time, as folks saw

20  during the patent video, there's a back and forth with the

21  Patent Office.  Is that right?

22  A.   That's right.

23  Q.   And claims can change over the years?

24       MR. McANDREWS:  Your Honor, may I approach?

25  Objection --

1                THE COURT:  A approach the bench, counsel.

2                (The following was had outside the hearing of the

3           jury.)

4                THE COURT:  What's the issue, Mr. McAndrews?

5                MR. McANDREWS:  Where Mr. Stevens is going is a

6      violation of standing motion in limine No. 7.  He is going to

7      attempt to suggest that the process of writing claims after

8      the standard is known to the public to read -- so that the

9      claims are written so they read on the standard is

10     inappropriate.  He is suggesting --

11               THE COURT:  He hasn't done anything of the type so

12     far.  He simply asked very generic information about the

13     patent application process.  Now, you may be concerned that's

14     where he's headed, but I've heard nothing that violates MIL 7

15     at this point.  If he crosses that line and tries to

16     communicate that there's something wrong or improper about

17     seeking patent protection on claims that cover a competitor's

18     product, whatever the MIL covers, you can certainly raise that

19     then, but we're not there yet.

20               MR. McANDREWS:  Understood.

21               THE COURT:  And peremptory objections don't serve us

22     a lot of good.  You need to wait until he crosses the line.

23     He hasn't crossed that line so far.

24               MR. McANDREWS:  I figured it was the next question.

25     I just didn't want the two --

1            THE COURT:  Well, as long as we're up here,

2     Mr. Stevens, are you intending to go down the path that

3     Mr. McAndrews is afraid you're going to go down?

4            MR. STEVENS:  I'm not going to suggest there's

5     anything wrong with it; I'm just going to suggest the timeline

6     that they put up has other dates that aren't there and here

7     are some other dates.

8            THE COURT:  I've heard nothing so far that makes me

9     think there's an objection to be sustained at this point.

10    You're certainly free to raise another one if and when we get

11    to that.  Okay?

12            MR. McANDREWS:  Thank you, Your Honor.

13            THE COURT:  All right.

14            (The following was had in the presence and hearing

15            of the jury.)

16            MR. STEVENS:  May I proceed, Your Honor?

17            THE COURT:  You may proceed, counsel.

18            MR. STEVENS:  Thank you.

19        So if we could bring up DDX 8.2, please.

20    Q.   (BY MR. STEVENS)  And this is an excerpt of the timeline

21    that Mr. Davis showed during the opening.  Do you remember

22    seeing something that looked like this?

23    A.   Yes, I do.

24    Q.   I want to make sure we are a hundred percent clear.  The

25    seven dates sort of just above the timeline but on the left,

1    these dates right over here, those are the dates that I think

2    Mr. McAndrews asked you were the provisional patent

3    applications.  Is that right?

4    A.   Yes.

5    Q.   Okay.  So those are the first applications.  Those aren't

6    the actual filing dates of any of these specific applications

7    for these patents.  Is that right?

8    A.   That's right.

9    Q.   Okay.

10             MR. STEVENS:  If we can take that down and look at

11   DDX 8.3.

12   Q.   (BY MR. STEVENS)  So let's just peek at one of the

13   patents.  We were talking about the '354 Patent.  That patent

14   actually wasn't filed until late 2014 or early 2015.  Is that

15   right?

16   A.   That is right.

17   Q.   And it didn't issue until 2015.  Is that right?

18   A.   That's right.

19   Q.   And so that's to the right of the standard date.  Those

20   came out after the standard.  Is that right?

21   A.   Yes.

22   Q.   Okay.  And if we look at DDX 8.4, this is about the

23   '835 Patent.  So that patent itself was filed in 2010.  Is

24   that right?

25   A.   Sorry.  I don't -- yeah.  That's right.

1    Q.   And it issued in 2013.  Is that right?

2    A.   That's right.

3    Q.   And both of those dates are after the VDSL2 standard was

4    adopted.  True?

5    A.   That's correct.

6    Q.   And if we go to DDX 8.5, one more with the '411 Patent.

7    This was filed in 2010.  Is that right?

8    A.   Yes.

9    Q.   And issued in 2013.  Correct?

10   A.   Yes.

11   Q.   And so it issued after the G.INP standard.  Do I have

12   that right, sir?

13   A.   Yes.

14   Q.   Okay.  Now, I think I heard you --

15            MR. STEVENS:  We can take that down.

16   Q.   (BY MR. STEVENS)  I think I heard you on direct suggest

17   that TQ Delta the entity is an innovator.  Did I hear that

18   right?

19   A.   Yes.

20   Q.   Okay.  I am correct, though, that in your time in 10

21   years with TQ Delta, you filed one new patent application.

22   Is that right?

23   A.   We filed one new patent application that has many

24   inventions in it, yes.

25   Q.   Okay.  And that's to something called low power mode.

```
 1    Did I hear you right?

 2    A.   Yes.

 3    Q.   And that's not asserted in this case.  Right?

 4    A.   No.

 5    Q.   One of your roles at TQ Delta is to look at the

 6    competition, who's in the market with actual devices.  Is

 7    that right?

 8    A.   That's not my role, no.

 9    Q.   No?

10    A.   No.

11    Q.   All right.  Well, let's look at Exhibit 81 at slide 16.

12    We'll go back to the presentation that you made to TQ Delta

13    while with Aware.  Do you see the slide, sir?  Again, it's

14    Exhibit 81, slide 16.  Do you see that there?  Do you see the

15    slide in front of you?

16    A.   What is this from?  I forgot.

17         MR. STEVENS:  Let's go back to page 1.  I don't want

18    there to be confusion.

19    Q.   (BY MR. STEVENS)  Again, this is the PowerPoint

20    presentation that you and your brother made as you were trying

21    to shop the patents around to other companies.  Do I have that

22    right?

23    A.   Yes.

24    Q.   All right.  I'd like to look at slide 16 here.  And at

25    the bottom, the second -- not the last bullet point but the
```

```
1    one right above it, it says, "Primary VDSL CPE

2    suppliers."  Did I read that right, sir?

3    A.   Yeah, that's what it says there.

4    Q.   Okay.  And then it lists five different companies.  Do I

5    have that?  Is that right?

6    A.   That's what it says, yeah.

7    Q.   And the first company and the third company, 2Wire and

8    Pace, those are all now part of CommScope.  Is that right?

9    A.   Yes.

10   Q.   But there's other competition.  CommScope's not the only

11   people in the market.  Is that true?

12   A.   Yeah.  At this point in time that was true, yeah.

13   Q.   There was a company called AVM.  Is that right?

14   A.   Yes.

15   Q.   And there is a company called Zyxel, and another company

16   called Huawei.  Is that right?

17   A.   Yes.

18   Q.   And both Zyxel and Huawei are based in Asia.  Is that

19   correct, sir?

20   A.   Yes.

21            MR. STEVENS:  We can take that down.

22   Q.   (BY MR. STEVENS)  Now, over the course of your time at

23   TQ Delta, you've helped them put together letters to different

24   companies.  Is that right?

25   A.   I was not involved in that.
```

1    Q.    Okay.  Have you looked at any company's products for

2    TQ Delta during your time there?

3    A.    What do you mean by 'look at'?

4    Q.    I'm just asking you if -- I'll withdraw the question.

5          You've gone to some meetings on behalf of TQ Delta.

6    Right?

7    A.    Yes.

8    Q.    And when they were trying to get other companies to pay

9    them, you went to some meetings.  Corrects?

10   A.    When you were what?  I'm sorry.

11   Q.    When TQ Delta was attempting to get other companies to

12   pay it, you went to some meetings with those companies.  Is

13   that right?

14   A.    I attended meetings with some of the companies during the

15   technical discussions of those meetings.

16   Q.    Okay.  I just want you to confirm for me you never had a

17   meeting with a company called Broadcom, did you?

18   A.    I was never at a meeting with Broadcom with TQ Delta.

19   Q.    Excuse me?

20   A.    Yes.

21   Q.    To the best of your knowledge, TQ Delta's never sent a

22   letter or a licensing offer or a demand to a company called

23   Broadcom.  Is that right?

24   A.    Just to clarify, you're talking about things that I'm not

25   really involved in.  I'm kind of a technical guy, so I don't

1   know what TQ Delta has done.

2   Q.   Okay.  I'm just asking for whatever knowledge you have,

3   and if you don't have any, that's fine.

4   A.   I don't have any knowledge.

5   Q.   Okay.  And again, Broadcom is a semiconductor.  It's a

6   chip company.  Is that right?

7   A.   Yes.

8   Q.   And other chip companies were licensed by Aware.  Is that

9   true?

10  A.   Yes, that's true.

11  Q.   So, for example, and I know there's been some corporate

12  mergers over the time, but Lantiq, Intel, Infineon, MaxLinear,

13  those are all companies that had a license by virtue of Aware.

14  Is that right?

15  A.   So those companies were -- I would call them more Aware

16  partners, so they had -- we had -- we would license technology

17  to them, so it wasn't -- it was not -- and again, I'm not an

18  expert on this, but from what I know because I was on the

19  technology side, it was not a pure patent license, if that's

20  what you're getting at.

21            MR. STEVENS:  Your Honor, I object as

22  non-responsive.

23            THE COURT:  I'll sustain that.  Restate the

24  question.

25  Q.   (BY MR. STEVENS)  Yes or no, Lantiq, Intel, MaxLinear,

1    Infineon, have license to Aware's portfolio stemming back from

2    Aware's days.  Is that right?

3    A.    They have a license to certain parts of Aware's

4    portfolio.

5    Q.    Okay.  Broadcom does not.  Right?

6    A.    Broadcom does not.

7    Q.    Okay.  And again, to the best -- you don't have any

8    personal knowledge that TQ Delta's ever reached out to

9    Broadcom and you yourself have never met with Broadcom on

10   behalf of TQ Delta.

11   A.    That is correct.

12   Q.    Okay.  Sir, you're not an investor in TQ Delta.  True?

13   A.    That's true.

14   Q.    You don't own any part of TQ Delta.

15   A.    Yes.

16   Q.    Okay.  Now, during the opening -- let me --

17           MR. STEVENS:  If I could have slide 4 from the

18   opening, PDX.opening.4.

19       I'll just take the document camera, if I can; if it's all

20   right.

21   Q.    (BY MR. STEVENS)  Do you remember seeing this slide

22   during the opening, sir?

23   A.    Yes.

24   Q.    And I notice the top it says "Marcos Tzannes's patents."

25   I want to make sure I'm a hundred percent clear.  You don't

 1  own any of these patents.  True?

 2  A.   Yes.

 3  Q.   TQ Delta owns each of these seven patents; not you.  Is

 4  that right?

 5  A.   Yes.

 6  Q.   Now, TQ Delta hasn't shared with you any cut or any part

 7  of any licensing money it's ever received from anyone else.

 8  Is that true?

 9  A.   Yes.

10  Q.   And so for all of the $90 million that we've heard today

11  that TQ Delta is going to be asking for in this case, you

12  don't expect to see a penny of that.  Is that right?

13  A.   That's right.

14  Q.   You don't expect them to share any of that with you.  Is

15  that true?

16  A.   That's true.

17            MR. STEVENS:  I pass the witness, Your Honor.

18            THE COURT:  Is there redirect from the Plaintiff?

19            MR. McANDREWS:  Yes; very brief, Your Honor.

20            THE COURT:  All right.  Proceed with redirect.

21                    REDIRECT EXAMINATION

22  BY MR. MCANDREWS:

23  Q.   Mr. Tzannes, when contributions are made to the ITU, are

24  they always in writing?

25  A.   No.

1    Q.   How else can they be made?

2    A.   Many contributions are made verbally.  I mean, we're

3    designing in the meetings, so you can make contributions,

4    write them on the board, discuss them with other people.

5    Q.   So the picture that we saw of you earlier standing at the

6    white board, is that an example of presenting an idea to the

7    ITU orally?

8    A.   Yes, it is.

9    Q.   Now, you were shown a timeline very recently in your

10   examination, a timeline that asked you to confirm that some

11   patents were filed.  The patent for -- the patent in case, you

12   know, the patent application for the patent in the case was

13   filed after a standard had already been issued.  Do you recall

14   that question?

15   A.   Yes, I do.

16   Q.   What is your understanding about the priority date that

17   you're entitled to for a patent that might be filed later?

18   A.   Well, all that really matters is the invention date; not

19   when you actually file the patent.  So you can file a patent

20   later than the actual invention date.  Is that what you're

21   getting at?

22   Q.   Well, I'm asking you the question.  So the -- and what do

23   you understand about the provisional filing date?  What does

24   that do for you?

25           MR. STEVENS:  Objection; calls for a legal question,

1    Your Honor.

2           THE COURT:  He's asked for his own personal

3    knowledge.  Overruled.  If he has any personal knowledge.  He

4    may -- the answer maybe, I don't know.  But restate the

5    question.

6    Q.   (BY MR. McANDREWS)  Mr. Tzannes, what is your

7    understanding about the effect of a provisional filing date as

8    an inventor?

9    A.   That is the date of the invention and that is the date

10   that as long as that invention -- that's the date that really

11   matters as far as the invention goes.

12   Q.   So whether something is prior art, is it measured against

13   the provisional filing date?

14   A.   That's the date; not the issue date.

15           MR. McANDREWS:  Pass the witness, Your Honor.

16           THE COURT:  Is there further cross examination?

17           MR. STEVENS:  No, Your Honor.

18           THE COURT:  All right.  You may step down,

19   Mr. Tzannes.

20       Ladies and gentlemen, the next witness is going take

21   some considerable length and we're not going to start another

22   witness this late on a Friday afternoon, so we're about to

23   recess until Monday morning.  I want to cover a few things

24   with you before we actually do that.

25           First of all, it's very important that over the weekend

 1    and continuing through the remainder of the trial you follow

 2    all the instructions I've given you, including among them,

 3    perhaps at the top of the list, not to communicate with

 4    anybody about this case in any way.  I've stressed that

 5    previously.  I want to stress it one more time.

 6         And I will tell you, I would just about bet if I were a

 7    betting person that when you get home somebody's going to ask

 8    you what happened in court today.  Again, blame it on me,

 9    don't even try to go there, just tell them you can't talk

10    about the case at all.  So please be careful to follow all my

11    instructions, including that one among the others.

12         Also I'm going to ask you to be back Monday morning so we

13    can start at 8:30 in the morning.  That means you'll need to

14    plan your travel time, you'll need to check the weather, and

15    try to arrange your travel so that you're here in the jury

16    room by about 8:15 or 8:20.  And Ms. Clendening will have some

17    breakfast snacks and some juice and things like that for you,

18    but try to be here so that you can be ready to go at 8:30

19    Monday morning.

20         Now, that's not a promise that I'll be on the bench and

21    be bringing you into the courtroom at 8:30.  There are

22    sometimes things that come up that I don't expect, but I'm

23    going to shoot for you being back in the jury box and us

24    starting with the next witness at 8:30 Monday morning.  And

25    we'll follow the same kind of daily schedule I talked about.

1   You'll also have the same provision of lunch being brought to

2   you from the Clerk's Office on Monday and the rest of this

3   trial.

4        With that, please take your notebooks as you leave the

5   courtroom and leave them closed on the table in the jury room.

6   Please travel safely to your homes.  Have a good weekend.  Get

7   some rest, and we'll be back in the saddle first thing Monday

8   morning.

9        The jury's excused at this time.

10           (Whereupon, the jury left the courtroom.)

11           THE COURT:  Please be seated.

12       Mr. Barton, Mr. Davis, you will recall we had a

13   discussion in chambers earlier today about the multitude of

14   objections to deposition testimony for Monday.  I asked the

15   parties to meet and confer and to try their best to resolve

16   those, and if not completely resolve them substantially narrow

17   them.

18       Can you give me, both of you, some kind of an update on

19   where you are and what progress has been made?

20           MR. DAVIS:  Your Honor, no progress has been made

21   since this morning's meeting, but we will certainly turn to

22   that as soon as we adjourn.

23           THE COURT:  Does that mean because nobody's tried to

24   make any progress or does that mean you tried to make progress

25   and you've been unable to do so?

1          MR. BARTON:  So, Your Honor, at least on our side

2     we've been re-evaluating the objections and we'll be

3     withdrawing some of them.  We just have not had an opportunity

4     to meet and confer with the other side.

5          THE COURT:  Okay.  Well, that's probably all right

6     because we have the weekend before us, but when I ask for the

7     parties to meet and confer on another issue as may come up

8     later in the trial, I understand that some of you are at the

9     trial table conducting the trial, but you have enough

10    resources on both sides of this case that you can walk and

11    chew bubble gum at the same time, and I expect those other

12    parallel meet and confer efforts to be ongoing and not wait

13    until the trial stops for the day.  It's not a problem now

14    because you have the weekend before you, but going forward if

15    we should be in a similar situation, I'll have that

16    expectation.

17         MR. BARTON:  Yes, sir.

18         THE COURT:  Mr. Davis, you have Ms. Divine to put on

19    next.  Is that correct?

20         MR. DAVIS:  That's correct, Your Honor.

21         THE COURT:  Is it your intention to follow her with

22    one or more of these deposition witnesses?

23         MR. DAVIS:  That was our intent, Your Honor, but we

24    can evaluate that if it would be of benefit.

25         THE COURT:  I just do not want to get into a

1    position of having an interruption or disruption in the trial

2    because of unresolved objections to a deposition witness,

3    which is why I have a standard practice of requiring that

4    those kind of disputes be brought to me earlier than the day

5    before the day they're going to be presented.

6         Now, here's what I want you to do.  I want you to meet

7    and confer on these.  I want you to update the Court by email

8    to my staff by 5:00 on Sunday afternoon as to where you stand

9    on these deposition designations.  And to the extent that

10   they're not completely resolved, then I'll take them up with

11   you early Monday morning in hopes that we can get a

12   substantially narrowed group of disputes out of the way before

13   we start.

14        If necessary, we will probably have a recess after

15   Ms. Divine, given the length of time you've indicated she's

16   going to be on the stand.  We will get the deposition disputes

17   out of the way before we're ready for the next witness after

18   Ms. Divine.  The sooner we can get that done the better.  All

19   right?  And I'm going to ask for cooperation from both sides

20   in pursuing that goal.

21        All right.  Any questions on that?

22             MR. BARTON:  No, sir, Your Honor.

23             MR. DAVIS:  No, Your Honor.

24             THE COURT:  All right.  Also for your information,

25   counsel, as of right now the parties have expended a total of

1    2 hours, 13 minutes, and 34 seconds of your designated trial

2    time.  That's allocating 1 hour, 27 minutes, and 23 seconds to

3    the Plaintiff, and 46 minutes and 11 seconds to the Defendant.

4         All right.  Are there any -- also one other thing.

5    Please be prepared or have someone on your trial teams

6    prepared before I bring the jury in Monday morning to go on

7    the record from the podium and read into the record those

8    items from the list of pre-admitted exhibits that have been

9    used during today's portion of the trial.  And we will do that

10   on a rolling basis each morning before I bring in the jury,

11   but I want to remind you to be ready to do that first thing

12   Monday morning before the jury comes in.

13        Now, are there questions or issues from either side that

14   I need to hear about before we recess for the weekend?

15             MR. DAVIS:  Nothing from the Plaintiff, Your Honor.

16             MR. BARTON:  Nothing from Defense, Your Honor.

17             THE COURT:  All right.  I will see you Monday

18   morning.

19        Court stands in recess.

20             (The proceedings were concluded at 5:45 p.m.)

21

22

23

24

25

1       I HEREBY CERTIFY THAT THE FOREGOING IS A

2       CORRECT TRANSCRIPT FROM THE RECORD OF

3       PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4       I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5       FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6       COURT AND THE JUDICIAL CONFERENCE OF THE

7       UNITED STATES.

8

9       S/Shawn McRoberts              03/17/2023

10      _____DATE_____
        SHAWN McROBERTS, RMR, CRR
11      FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25