```
1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
2                          MARSHALL DIVISION

3    TQ DELTA, LLC.,                    (  CAUSE NO. 2:21-CV-310-JRG
                                        )
4            Plaintiff,                 (
                                        )
5    vs.                                (
                                        )
6    COMMSCOPE HOLDING COMPANY,         (
     INC., et al.,                      )  MARSHALL, TEXAS
7                                       (  MARCH 21, 2023
             Defendants.               )  8:30 A.M.
8    _____

9                             VOLUME 3

10   _____

11                       TRIAL ON THE MERITS

12

13             BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE

14

15   _____

16

17

18

19

20

21                   SHAWN McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
22                    MARSHALL, TEXAS  75670
                         (903) 923-8546
23              shawn_mcroberts@txed.uscourts.gov

24

25
```

A P P E A R A N C E S

FOR THE PLAINTIFF:     DAVIS FIRM, P.C.
                       213 N. FREDONIA ST., SUITE 230
                       LONGVIEW, TEXAS  75601
                       (903) 230-9090
                       BY: MR. RUDOLPH FINK
                           MR. CHRISTIAN HURT
                           MR. WILLIAM DAVIS
                           MR. TY WILSON


                       McANDREWS HELD & MALLOY, LTD
                       500 W. MADISON ST., 34TH FLOOR
                       CHICAGO, ILLINOIS  60661
                       (312) 775-8000
                       BY:  MR. PETER McANDREWS
                            MS. ASHLEY RATYCZ
                            MR. RAJENDRA CHIPLUNKAR

FOR THE DEFENDANT:     ALSTON & BIRD, LLP-NC
                       101 SOUTH TRYON STREET
                       SUITE 4000
                       CHARLOTTE, NC  28280
                       (704) 444-1025
                       BY:  MR. ROSS BARTON
                            MR. MATTHEW STEVENS
                            MR. KIRK BRADLEY
                            MS. KARLEE WROBLEWSKI


                       ALSTON & BIRD, LLP - ATLANTA
                       ONE ATLANTIC CENTER
                       1201 WEST PEACHTREE STREET NW
                       #4900
                       ATLANTA, GEORGIA  30309-3424
                       (404) 881-7000
                       BY:  MR. MICHAEL DEANE


                       THE DACUS FIRM, PC
                       821 ESE LOOP 323, SUITE 430
                       TYLER, TEXAS  75701
                       (903) 705-1117
                       BY:  MR. DERON DACUS

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
                       MARSHALL, TEXAS  75670
                       (903) 923-8546

## <u>INDEX</u>

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| TODOR COOKLEV, PH.D. | |
| Direct By MR. HURT | 6 |
| Cross By MR. BARTON | 46 |
| Redirect By MR. HURT | 91 |
| Recross By MR. BARTON | 100 |
| Redirect By MR. HURT | 103 |
| VIJAY MADISETTI | |
| Direct By MR. CHIPLUNKAR | 107 |
| MR. STEVENS | |
| Redirect By MR. CHIPLUNKAR | 166 |
| Recross By MR. STEVENS | 169 |
| PETER HELLER, PH.D. | |
| Direct By MR. WILSON | 170 |
| Cross By MR. BARTON | 179 |
| MICHAEL ANDREW TZANNES | |
| Voir Dire By MR. STEVENS | 186 |
| Direct By MR. FINK | 197 |
| Cross By MR. STEVENS | 217 |
| Redirect By MR. FINK | 233 |
| JAMES DANIEL SHEAD | |
| BY DEPOSITION | 191 |
| STEVEN WAUTERS | |
| Direct By MR. DAVIS | 236 |
| Cross By MR. BARTON | 268 |
| Redirect By MR. DAVIS | 286 |

1                  THE COURT:  Be seated, please.

2         Are the parties prepared to read into the record those

3    items from the list of pre-admitted exhibits used during

4    yesterday's portion of the trial?

5                  MR. WILSON:  Yes, Your Honor.

6                  THE COURT:  Please proceed.

7                  MR. WILSON:  Your Honor, Ty Wilson on behalf of

8    Plaintiff TQ Delta.

9         And on Monday March 20th, 2023, at trial, TQ Delta

10   admitted the following exhibits:  Exhibit 13, Exhibit 14,

11   Exhibit 15, Exhibit 16, Exhibit 17, Exhibit 18, Exhibit 19,

12   Exhibit 20, Exhibit 21, Exhibit 22, Exhibit 23, Exhibit 24,

13   Exhibit 28, Exhibit 29, Exhibit 30-B, Exhibit 31, Exhibit 39,

14   Exhibit 67, Exhibit 70, Exhibit 71, Exhibit 72, Exhibit 107,

15   Exhibit 108, Exhibit 110, Exhibit 117, Exhibit 124-A and -B,

16   Exhibit 135-A, -C, and -D.

17                  THE COURT:  All right.  Any objections to that

18   rendition from Defendants?

19                  MS. BEATON:  No, Your Honor.

20                  THE COURT:  Do Defendants have a similar rendition

21   to offer into the record?

22                  MS. BEATON:  Yes, Your Honor.

23                  THE COURT:  Please proceed.

24                  MS. BEATON:  Erin Beaton on behalf of CommScope.

25         The Defendants' exhibits on Monday, March 20, 2023, were:

1    Exhibit 36-A, Exhibit 36-B, Exhibit 37, Exhibit 38-A, Exhibit

2    38-E, Exhibit 38-D, Exhibit 65-A, Exhibit 65-B, Exhibit 78,

3    Exhibit 79, and Exhibit 86.

4              THE COURT:  All right.  Any objection from Plaintiff

5    as to Defendants' rendition?

6              MR. WILSON:  No objections from Plaintiff, Your

7    Honor.

8              THE COURT:  All right.  Thank you, counsel.

9         Doctor Cooklev, you are still on the witness stand

10   testifying.  If you'll return to the witness stand, please,

11   sir, and I remind you you remain under oath.

12        Mr. Hurt, you may go to the podium and prepare to

13   continue your direct.

14        And as they're doing that, let's bring in the jury,

15   please.

16              (Whereupon, the jury entered the courtroom.)

17              THE COURT:  Good morning, ladies and gentlemen.

18   Welcome back.  It's good to see you.  Please have a seat.

19        We will continue with the direct examination by the

20   Plaintiff of Doctor Todor Cooklev where we left off yesterday.

21        Mr. Hurt, you may continue with your direct examination

22   when you're ready.

23              MR. HURT:  Thank you, Your Honor.

24        And, Mr. Diaz, can we pull up slide 102, please?

25        And, Your Honor, may I approach the witness with the

1   clicker for the demonstratives?

2          THE COURT:  You may.

3                TODOR COOKLEV, Ph.D., PREVIOUSLY SWORN,

4   having been duly sworn, testified further under oath as

5   follows:

6                    DIRECT EXAMINATION continued

7   BY MR. HURT:

8   Q.   And do you recall before we broke yesterday evening,

9   Doctor Cooklev, we were talking a little bit about the

10  benefits of the inventions that are reflected in this patent,

11  the '411 Patent?

12  A.   I do.

13  Q.   And can you give the jury a brief overview of the '411

14  Patent, please?

15  A.   The '411 Patent is entitled Packet Retransmission, and

16  the subject is memory sharing when we have retransmission.

17  Q.   And which claim of the '411 Patent are you going to

18  present today?

19  A.   I will be discussing claim 18 of the '411 Patent.

20  Q.   And are you going to present your analysis for this

21  patent in the same way that you did yesterday for the '048

22  Patent?

23  A.   Yes, I will.

24  Q.   Okay.  And in your opinion, do the CommScope accused

25  products infringe claim 18 of the '411 Patent?

1   A.   All of the accused products infringe claim 18 of the '411

2   Patent.

3   Q.   And are you going to be putting a green checkmark next to

4   each of these claim elements then?

5   A.   Yes.

6   Q.   What is the first claim element that you analyzed in

7   claim 18?

8   A.   The first claim element is, "A transceiver capable of

9   packet retransmission comprising."

10  Q.   And in your opinion, do the CommScope accused products

11  include that limitation?

12  A.   Yes, all of the accused products include this limitation.

13  Q.   Can you explain to the jury, please, how you arrived at

14  that conclusion based on the evidence?

15  A.   This limitation includes a term that was defined by the

16  Court, and I applied the Court's definition in my analysis.

17  And all of the accused products include this limitation.

18       Also, the G.INP standard, which is the other standard

19  that is relevant to this patent, it clearly says that it

20  describes itself as a standard for physical retransmission.

21  Q.   And that G.INP standard, is that Exhibit 25-A in this

22  case?

23  A.   Yes, that is Exhibit 25-A.

24  Q.   And in your opinion, Doctor Cooklev, are the accused

25  products transceivers under the Court's construction as it

1    applies to claim 18 for the same reasons you were talking

2    about yesterday for claim 5 of the '048 Patent?

3    A.   Yes, they are.

4    Q.   And so did you put the green checkmark for this element?

5    A.   Yes, I put the green checkmark.

6    Q.   What is the next claim element in claim 18 that you

7    analyzed?

8    A.   The next claim element is a "receiver portion capable of

9    receiving a plurality of packets, identifying at least one

10   packet of the plurality of packets as a packet that should be

11   retransmitted."

12   Q.   And in your opinion, do the CommScope accused products

13   meet that limitation?

14   A.   Yes, they do.  All of the accused products meet this

15   limitation.

16   Q.   And can you go back one slide, Doctor Cooklev?

17        MR. HURT:  Your Honor, we're about to get into some

18   source code.  I request that the Court be sealed at this time.

19        THE COURT:  All right.  Based on counsel's request

20   and to protect confidential and proprietary information, the

21   Court will order the courtroom sealed.

22        I'll direct that all persons present who are not subject

23   to the protective order entered in this case excuse themselves

24   and remain outside the courtroom until it's reopened and

25   unsealed.

1                          (Courtroom sealed.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    (Courtroom unsealed.)

15          THE COURT:  All right.  The courtroom is unsealed.

16      You may continue, Mr. Hurt.

17  Q.   (BY MR. HURT)  Can you describe for the jury, Doctor

18  Cooklev, some of the loop diagnostic mode testing that you did

19  for Doctor Brody?

20  A.   Yes, I can.

21          So regarding the loop diagnostic mode, I did similar type

22  of testing with the same test equipment, and I observed that

23  the modems do implement loop diagnostic mode and they exchange

24  messages that are described in the loop diagnostic mode

25  procedures.

1        So this is a screenshot of the graphical user interface.

2    So this screenshot is produced by the instrumentation

3    equipment that I use.  And the screenshot identifies the

4    R-PRM-LD message.  That message is part of the loop diagnostic

5    mode, and I think the screenshots also says that this is loop

6    diagnostic rode.

7        Also, the actual signals on the line as captured by the

8    instrumentation equipment, they are also shown on this

9    screenshot.  And the spectrum of the signal shows that this

10   signal is -- for example, is obtained using multicarrier

11   modulation.

12   Q.   And did your testing show to you, Doctor Cooklev, that

13   the accused products implement loop diagnostic mode as per the

14   VDSL2 standard?

15   A.   Yes.

16   Q.   Can you describe for the jury some of the tests that we

17   saw yesterday for Doctor Brody relating to the robust overhead

18   channel?

19   A.   So this is the -- also part of the test that I did

20   regarding the robust overhead channel.  So in this test,

21   because I captured all the messages and all the signals

22   actually exchanged by the modem and the central office

23   equipment that was used, so the -- on this -- I prepared

24   this -- this information based on my tests.

25       The green line shows the signal-to-noise ratio for each

1    carrier, and the red or dark red line at the bottom shows the

2    number of bits allocated to each carrier.  And based on these

3    results, we see that there are two sets of carriers.  This is

4    the first set highlighted in blue here.  There will be one --

5    as Doctor Brody explained, one SNR margin.  And now we see

6    another set of carriers, and for this set there is a different

7    SNR margin.

8    Q.   And did these tests show to you that the accused products

9    implement different SNR margins like Doctor Brody was talking

10   about yesterday?

11   A.   Yes.

12   Q.   What analysis did you do for Doctor Madisetti?

13   A.   So for Doctor Madisetti, I did, first, phase scrambling

14   testing.  So I did a thorough testing of phase scrambling to

15   determine whether or not the accused products implement phase

16   scrambling as phase scrambling is described in the VDSL2

17   standard.

18        And so I -- based on capturing the -- completely

19   capturing the signal that was produced by the modem, I was

20   able to -- so I put the results in an Excel spreadsheet, and I

21   was able to calculate the phase before phase scrambling and

22   the phase after phase scrambling.  And my results confirm that

23   all of the accused products implement phase scrambling as

24   described by the VDSL2 standard.

25   Q.   And can you describe for the jury the simulations that

1    you ran for Doctor Madisetti as it related to that reduction

2    in PAR issue you were looking into?

3    A.    So I was asked to perform a software simulation to

4    determine the benefit of phase scrambling.  So the benefit is

5    proportional to the reduction in a parameter called

6    peak-to-average power ratio.  And this is the result of my

7    software simulation.  The results on the top here are the

8    peak-to-average power ratio without phase scrambling.

9         So we see that without phase scrambling, the

10   peak-to-power average ratio is high, which is disadvantageous

11   in practice.  And when phase scrambling is used as described

12   in the standard, then we see that significant reduction in the

13   peak-to-average power ratio.  So that's the result of my

14   simulation.

15   Q.    So is the top part here, is that showing that peak power

16   without the phase reduction?  I'm sorry.  Without phase

17   scrambling?

18   A.    Yeah.  That is the peak-to-average power ratio without

19   phase scrambling, yes.

20   Q.    And then if you use phase scrambling, this blue then, I

21   assume, would represent that reduction.  Right?

22   A.    The blue line is the peak-to-average power ratio with

23   phase scrambling.  The reduction is just -- is the difference

24   between the two.

25   Q.    Okay.  What testing did you do for Doctor Madisetti on I

1   think what was referred to as the DSL reboot patent earlier?

2   A.   And regarding this -- the online reconfiguration about

3   which I think Doctor Madisetti will be testifying, I was asked

4   to perform a test to determine whether or not online

5   reconfiguration as described in the standard is supported.

6   And I concluded that it is.  This is a screenshot of my test

7   result showing that the interleaver reconfiguration is

8   supported.

9   Q.   And do you remember yesterday we heard some

10  testimony -- deposition testimony from Mr. Baker that AT&T was

11  requesting G.vector in the product?  Do you remember that?

12  A.   Yes, I do.

13  Q.   And when a product is configured or configurable for

14  G.vector, is this part of the VDSL2 standard for online

15  reconfiguration a mandatory feature?

16  A.   Yes, it is.

17  Q.   Is this all of the testing and simulations that you are

18  going to provide today?

19  A.   I believe, yes.

20  Q.   What's the next and, I think, final section of your

21  presentation today?

22  A.   I was asked to analyze and provide some opinions related

23  to damages.

24  Q.   And what is -- in your opinion, Doctor Cooklev, does

25  CommScope induce infringement by its customers such as AT&T?

1    A.    Yes, CommScope induces infringement by its customers.

2    Q.    And can you explain to us how the evidence

3    shows -- supports your opinion?

4    A.    So I reach this conclusion because CommScope designs its

5    products for a life span of five to seven years.  I think

6    yesterday in the deposition testimonies from CommScope's

7    witnesses, we saw that.  So a product that was sold five to

8    seven years ago would be still in use.  Right?  Five to seven

9    years later.

10          During this time CommScope provides frequent software and

11   firmware updates.  I think, according to the deposition of

12   CommScope witnesses, CommScope provides updates, I mean,

13   sometimes every two to three months and maybe sometimes every

14   four months.  And when CommScope provides these firmware and

15   software updates, CommScope induces infringement.

16          Also, CommScope provides services, repairs, and support.

17   CommScope frequently meets with its customers.  Well, AT&T is

18   an important customer for them.  And CommScope also provides

19   customer training.

20   Q.    So is it the case that if a product was sold to AT&T,

21   say, in 2013, it would still be in use five to seven years

22   later, in your view?

23   A.    Well, yes, exactly.  Based on the testimony of

24   CommScope's witnesses, a product sold in 2013 would be used

25   by -- until about 2020, and maybe even a little bit after

1    that.

2    Q.   And if there were software updates to that product, you

3    know, two years later, three years later, four years later, is

4    it your opinion that those software updates would induce the

5    ongoing use of that same product?

6    A.   Yes.

7    Q.   What is the next --

8    A.   Yeah, these are the --

9    Q.   What is the next issue relating to damages you are here

10   to talk about today?

11   A.   I was asked to analyze the -- what is the smallest

12   saleable patent practicing unit.  And in my analysis, I

13   examined the hardware schematic of a representative of the

14   accused products.  So this schematic is blown up a little bit

15   on -- on this slide.

16        The conclusion that I reached is that the Broadcom chip

17   is not a patent-practicing entity.  The chip alone does not

18   practice the asserted claims.  Well, to begin with, the chip

19   needs to be powered, so some power supply circuitry will be

20   required.  But that alone is not enough for the chip to

21   practice the asserted claims.  What is needed is some line

22   drivers are needed, some interface circuitry going to the

23   phone jack.

24        On the -- in addition, an analog front end is required,

25   but that is still some -- there are other components external

1    to the chip that are necessary for this chip to function.  So

2    I concluded that it is the entire product that -- and that is

3    the smallest saleable patent-practicing unit.

4    Q.   What is it next damages issue you are going to be

5    addressing today?

6    A.   I was asked to respond to CommScope's analysis of

7    non-infringing alternatives, and -- well, CommScope made some

8    very general arguments about non-infringing alternatives.

9    These very general arguments, they made it virtually

10   impossible to analyze in any -- with any specifics any

11   non-infringing alternatives.

12       In reality, CommScope did not identify any viable

13   non-infringing alternatives to the asserted patents.

14   Q.   And in your analysis, are you aware of any way that

15   CommScope could provide the functionality that's accused in

16   this case of providing DSL without infringing these patents?

17   A.   No.  I am not aware of any non-infringing alternatives.

18   Q.   What's the next issue you're going to address today?

19   A.   I was asked to determine -- to come up with a list of how

20   many patents are likely essential for DSL, and the way I did

21   that is I worked very closely with TQ Delta's damages expert,

22   Doctor Putnam.  And initially just based on some -- based on

23   this search of key words such as DSL or digital subscriber

24   line, Doctor Putnam came up with almost 15,000 patents

25   that -- in which these -- these key words appear.

1          Well, that's a very large list for someone to analyze, so

2     Doctor Putnam recommended the use of a patent database called

3     Derwent Innovations Index.  And the reason this database is

4     convenient is because it classifies patents using different --

5     different key words, using different terms.  So it's

6     convenient for classification of patents.

7          And I examined -- I examined this database and identified

8     the categories in which patents that are likely DSL standard

9     essential would be.  I also examined the key words that this

10    patent database uses and came up with a list of key words such

11    that if a patent uses one of these key words, then I

12    considered it less likely to be standard essential.

13         And so there were many patents that used these key words

14    that, in this way, I didn't have to analyze.  So the patents

15    that did not include these key words were 1,100 patents that

16    Doctor Putnam compiled, and I received that list.

17         And then I analyzed this list of more than a thousand

18    patents to determine which patents are likely essential for

19    DSL.  I analyzed this in two rounds.  In the first round,

20    relatively quickly I was able to eliminate from further

21    consideration about 900 patents of these 1100.  And then the

22    200 patents that looked like there's a chance they could be

23    essential, I analyzed more carefully, and then I came up with

24    33 patents that are likely standard essential.  I provided

25    this list to Doctor Putnam.

1    Q.   And then can you describe for the jury the last analysis

2    you're presenting about memory savings for the '048 and '411

3    Patents?

4    A.   So the -- these results, I was asked to analyze the

5    benefits of the '048 Patent and the '411 Patent.  I testified

6    yesterday that these patents lead to a reduction in the memory

7    needed and, therefore, a reduction in the memory that is

8    needed.

9        So I analyzed what would be the increase in chip area if

10   these patents are not practiced, and I concluded that there

11   would be between 7.69 percent to 10 percent increase in chip

12   area without the benefit of the '048 Patent, and there would

13   be between 15.38 percent to 20 percent in chip area without

14   memory sharing as specified in the '411 Patent.

15       And Doctor Heller was -- was able to analyze the cost

16   benefits of these patents.

17   Q.   And what ultimately was the results of your analysis for

18   both the '048 and '411 Patents as it related to cost savings?

19   A.   So based on the analysis of Doctor Heller, the cost

20   savings due to the '048 Patent are between 5.77 percent to 7.5

21   percent, and the cost savings due to the '411 Patent are

22   between 11.54 percent to 15 percent.

23   Q.   And is it the case for the '048 Patent, the chip area

24   without using the patents would be about seven-and-a-half to

25   10 percent larger?  Is that right?

1    A.   Yes.

2    Q.   And for the '411 Patent, is it the case that if CommScope

3    wasn't using these patents, that chip area would be somewhere

4    between 15 and 20 percent larger?

5    A.   Yes.

6    Q.   Thank you.

7              MR. HURT:  No further questions.  I pass the

8    witness, Your Honor.

9              THE COURT:  All right.  Ladies and gentlemen, we're

10   going to take a short recess, and then we'll proceed with

11   cross-examination by the Defendant.

12        If you'll simply close your notebooks and leave them in

13   your chairs, don't discuss the case among yourselves, and

14   follow all my other instructions, please, and we'll be back

15   here shortly.  And try to keep this to about 10 or 12 minutes

16   so we can keep going.

17        The jury's excused for recess.

18              (Whereupon, the jury left the courtroom.)

19              THE COURT:  The Court stands in recess.

20                    (Brief recess.)

21              THE COURT:  Be seated, please.

22        Mr. Barton, are you prepared to proceed with

23   cross-examination of the witness?

24              MR. BARTON:  Yes, I am, Your Honor.

25              THE COURT:  All right.  Let's bring in the jury,

1    please.

2              (Whereupon, the jury entered the courtroom.)

3              THE COURT:  Welcome back, ladies and gentlemen of

4    the jury.  Please have a seat.

5         As I mentioned just before recess, we'll continue with

6    the cross-examination of the witness by Defense counsel.

7         Mr. Barton, you may proceed.

8              MR. BARTON:  Thank you, Your Honor.  And I believe

9    we already distributed binders.

10                      CROSS EXAMINATION

11   BY MR. BARTON:

12   Q.   Good morning, Doctor Cooklev.

13   A.   Good morning.

14   Q.   We've never met before.  Correct?

15   A.   I don't think so.

16   Q.   Okay.  Well, my name is Ross Barton, and I'm one of the

17   attorneys for CommScope, and I'm going to ask you a few

18   questions about your opinions.  Okay?

19   A.   Okay.

20   Q.   All right.  Let's start at the beginning and talk about

21   your role as an expert.  Is that okay?

22   A.   I'm okay with it.

23   Q.   All right.  So your job as an expert in this case is to

24   provide objective opinions.  Is that fair?

25   A.   That is correct.

1    Q.   And you don't have any personal interest at stake in this

2    case, do you?

3    A.   I do not.

4    Q.   So you're just here to call balls and strikes.  Is that

5    fair?

6    A.   I'm here to give objective opinion.

7    Q.   Okay.  So before we get into the details of your

8    opinions, I want to make sure I understand a little bit about

9    your relationship with the Plaintiff.  Is that okay?

10   A.   Okay.

11   Q.   Now, you understand that the patents in this case, all

12   seven of them, came from a company called Aware.  Right?

13   A.   Yes.

14   Q.   And if I understand correctly, you were an employee of

15   Aware from about 2000 to 2002.  Is that correct?

16   A.   That's correct.

17   Q.   Okay.

18          MR. BARTON:  Now, Ms. Brunson, can I have the

19   projector, please?  Thank you.

20   Q.   (BY MR. BARTON)  And this was your slide that you

21   presented to the jury regarding your professional background.

22   Correct?

23   A.   Yes.

24   Q.   Okay.  And you list here DSL standards experience.  And I

25   believe, and I wrote this down, that you testified that you

1    worked at the ITU.  Is that correct?

2    A.    I was not working for the ITU.  I attended standards

3    committee meetings that -- ITU committee meetings.  In that

4    sense, I worked at the ITU.

5    Q.    Okay.  But when you were working at the ITU, you were

6    actually an Aware employee.  Correct?

7    A.    That's correct.

8    Q.    Okay.

9                MR. BARTON:  You can take that down, Ms. Brunson.

10   Q.    (BY MR. BARTON)  Now, that time period, 2000 to 2002,

11   that was right in the thick of it when DSL was being

12   developed.  Is that fair?

13   A.    I think that's fair.

14   Q.    And during that time period, you were literally on

15   Aware's payroll.  Right?

16   A.    Yes, I was.

17   Q.    Okay.  Now, the way you became an employee at Aware is

18   you approached Aware and asked for a job.  Right?

19   A.    I think that can be said.

20   Q.    Well, that's correct.

21   A.    Yes.  Yes.

22   Q.    Okay.  And, in fact, you specifically reached out to Mr.

23   Tzannes to ask for a job.  Right?

24   A.    That's correct.

25   Q.    And it was, in fact, Mr. Tzannes who gave you that job at

1    Aware.  Right?

2    A.   Yes.

3    Q.   And then you went to work at Aware, and Mr. Tzannes was

4    your boss.  Correct?

5    A.   Yes.

6    Q.   He was your mentor.  Correct?

7    A.   Yes.

8    Q.   Fair to say you were working pretty closely with Mr.

9    Tzannes while you were an employee of Aware.  Right?

10   A.   Yes.

11   Q.   Okay.  And eventually you and Mr. Tzannes became pretty

12   good friends.  Right?

13   A.   I have Mr. Tzannes in high regard, and I like to think

14   that, in addition to the professional relationship, that there

15   was a -- there was some personal friendship that will

16   naturally develop, I think.

17   Q.   Sure.  So you and your wife would go out with Mr. Tzannes

18   and his wife to dinner.  Is that fair?

19   A.   We didn't particularly dine that much, but perhaps once

20   or twice, yes.

21   Q.   Okay.  And after you left Aware in 2002, you maintained

22   that personal relationship with Mr. Tzannes.  Right?

23   A.   Yes, to -- yes, I think so.

24   Q.   Okay.  In fact, we can agree, Doctor Cooklev, that your

25   relationship with Mr. Tzannes is perhaps the reason you got

1    the call in this case from TQ Delta's experts to be an expert.

2    Right?

3    A.    I mean, I can't speak for TQ Delta.  Maybe that played

4    some role.

5    Q.    Okay.  Now, in this case you've been hired by TQ Delta to

6    offer opinions on infringement and validity.  Right?

7    A.    Yes.

8    Q.    And just so we're clear, your opinion has been that every

9    claim you've evaluated in this case has been both valid and

10   infringed.  Right?

11   A.    Yes, that is my opinion.

12   Q.    Okay.  Let's explore why you may have that opinion.  Is

13   that okay with you?

14   A.    That's fine.

15   Q.    Okay.  Now, Doctor Cooklev, you're a named inventor on a

16   number of patents.  Right?

17   A.    Yes.

18   Q.    Okay.

19          MR. BARTON:  Ms. Brunson, if I can have the camera

20   again, please.

21   Q.    (BY MR. BARTON)  And, again, this is the slide you put up

22   while Mr. Hurt was establishing your credentials as an expert

23   in the field.  Right?

24   A.    Yes.

25   Q.    And down here at the bottom left corner, you say,

1    inventor on 30-plus U.S. patents.  Right?

2    A.    Yes.

3    Q.    And you made a point during your direct to say not just

4    30-plus but 32 precisely.  Fair?

5    A.    Yes.

6    Q.    Okay.  Now, what you didn't tell the jury was that a

7    bunch of those patents, those 32 patents, are actually patents

8    that belonged to Aware at some point.  Right?

9    A.    Yes.

10   Q.    Okay.  In fact, Doctor Cooklev, at least 21 of your 32

11   patents are Aware patents.  Right?

12   A.    They originate from -- and date back from my work at

13   Aware, yes.

14   Q.    Okay.  And when you were at Aware and you were filing

15   those patent applications that matured into patents, you were

16   paid about $1500 per patent application.  Is that right?

17   A.    I believe that's correct.  I think that's a typical rate

18   that companies use to compensate when a patent application is

19   filed.

20            MR. BARTON:  Object as non-responsive, Your Honor.

21            THE COURT:  The witness properly answered the

22   question when he said, "I believe that's correct."  That

23   portion of the answer will remain.  I'll sustain the objection

24   as to the balance of the answer.

25        Let's proceed.

```
1    Q.   (BY MR. BARTON)  Now, in addition to not telling the jury

2    about where those patents originated, you also didn't tell

3    them anything about who your co-inventors were on those 21

4    patent applications, did you?

5    A.   I did not.

6    Q.   Okay.  You didn't tell the jury that for each and every

7    single one of those 21 patents that you were awarded while you

8    were at Aware, Mr. Tzannes was a named co-inventor.  You

9    didn't tell them that, did you?

10   A.   No, I did not.

11   Q.   In fact, for the 21 Aware patents you list in your

12   resume, Mr. Tzannes is the first named inventor on every

13   single one of those patents, isn't he?

14   A.   I think that's correct.

15   Q.   So one of your qualifications to be an expert in this

16   case are your patents in this space, and every single one of

17   those Aware patents has Mr. Tzannes as a co-inventor.  Right?

18   A.   That's correct.

19   Q.   All right.  Now, I want to talk a little bit, Doctor

20   Cooklev, about your work experience after you left Aware.  Is

21   that all right?

22   A.   Okay.

23   Q.   Okay.  Now, since 2002, you've been a professor.  Right?

24   A.   Yes.

25   Q.   At a number of different schools.  Right?
```

1   A.   Yes.

2   Q.   Okay.  But during that time, that same time period from

3   2002 to present, last 21 years or so, you've also been a

4   consultant.  Right?

5   A.   Yes.  From time to time, yes.

6   Q.   And in the last few years at least, you have provided

7   consulting services as an expert in patent cases.  Right?

8   A.   Yes.

9   Q.   And to be clear, Doctor Cooklev, this case isn't the

10   first time you've provided expert testimony on behalf of a

11   patent holder, is it?

12   A.   This is not the first time.

13   Q.   Okay.  And the reason, Doctor Cooklev, you keep getting

14   hired by patent owners is because they can count on you to say

15   that whatever patents you look at are valid and infringed.

16   Right?

17   A.   I disagree with that.

18   Q.   Okay.  Well, when you gave us your expert report, you

19   also provided your resume to us.  Right?

20   A.   Yes.

21   Q.   And in your resume, you listed off your legal consulting

22   activities over the last five years.  Correct?

23   A.   Yes.

24   Q.   And can we agree that there were around 10 different

25   legal consulting engagements you listed in your resume during

1    that five-year look-back period, Doctor Cooklev?

2    A.   I have not counted them, but I'll -- if you say 10, I'll

3    take your word for it.

4    Q.   Okay.  And in every single one of those 10 engagements,

5    you represented the patent owner, haven't you?

6    A.   Yes.

7    Q.   Okay.  But, in fact, Doctor Cooklev, there are some other

8    legal consulting activities you've done in the past five years

9    that you didn't put in your resume, aren't there?

10   A.   I -- at the moment I do not recall.

11   Q.   Okay.  Well, you've worked as a consultant for a company

12   called Smart Mobile in the last five years.  Right?

13   A.   Yes, I have.

14   Q.   And that's not in your resume, is it?

15   A.   I -- maybe I have not updated the resume, and maybe I

16   listed the cases in which I have been deposed, and I don't

17   think I have been deposed in connection with my work for Smart

18   Mobile.

19   Q.   You've also worked for a company called 3G Licensing in

20   the last five years.  Correct?

21   A.   Yes, I was engaged by them in connection with another

22   case.

23   Q.   Okay.  And that's not in your resume, either, is it?

24   A.   Again, I -- maybe I'll have to take your word for it.  I

25   try to provide -- to list all the cases for which I have been

1    deposed.  It's possible that I've missed a case.

2    Q.   Okay.  Another case or another company you worked for is

3    a company called Flexiworld.  Right?

4    A.   Yes.  I have submitted two or three declarations.

5    Q.   And, again, that's not in your resume, is it?

6    A.   Well, maybe I'll take a look for that.

7    Q.   Sure.  It's tab 4?

8    A.   Normally I try to list all of the cases on my resume,

9    again, for which I have been deposed.  It is possible that

10   occasionally I have missed something.

11   Q.   Okay.  Now, the one thing that each of those three

12   companies, which are Flexiworld, 3G Licensing, and Smart

13   Mobile, half of the ones you did list in your resume, Doctor

14   Cooklev, is that each one of them is also a patent holder.

15   Right?

16   A.   They are patent owners, yes.

17   Q.   And in each one of those matters, Doctor Cooklev, you

18   opined that the patents are valid.  Correct?

19   A.   That was my opinion, yes.

20   Q.   Okay.  And for the matters you did list in your resume,

21   in every single one of those matters, every single one, you

22   came to the conclusion that all the patents you were looking

23   at were either valid or infringed or both.  Right?

24   A.   The -- I think that's correct.

25   Q.   Okay.  So stated another way, Doctor Cooklev, at no point

```
 1    in the last five years of your consulting career have you
 2    provided an opinion that any patent is not infringed by a
 3    defendant.  Right?
 4    A.   Well, that was a little too broad, but the -- the cases
 5    that I have been worked on, yes.  If we limit it to those
 6    cases, yes.
 7    Q.   And at no point in the last five years have you provided
 8    an opinion that any patent is invalid, have you?
 9    A.   Well, you mean provided an opinion in an expert report,
10    in a declaration, or provided just a verbal opinion?
11    Q.   Have you provided an expert report or testimony in any
12    case that a patent is invalid in the last five years?
13    A.   No, I have not.
14    Q.   Let's turn to the substance of your opinions, Doctor
15    Cooklev.  Is that okay?
16    A.   That's fine.
17    Q.   Now, just so the jury's clear, and I think Mr. Hurt
18    touched on this at the end, but you were asked to look at a
19    lot of different issues in this case.  Right?
20    A.   That's correct.
21    Q.   And you understand that CommScope is going to have an
22    opportunity to call its own experts to present their opinions.
23    Right?
24    A.   That's correct.
25    Q.   And you know that CommScope's experts disagree with your
```

1    opinions.  Right?

2    A.    I understand that.

3    Q.    All right.  So just to be clear, of the seven patents at

4    issue in this case, you're only here to offer the jury

5    opinions about three of those seven.  Right?

6    A.    Yes.  I testified earlier about three patents.

7    Q.    And that's the '881, '048, and '411 Patents.  Right?

8    A.    Yes.

9    Q.    So you don't have any opinions regarding infringement of

10   the other four patents.  Right?

11   A.    Well, I described what I was asked to do and what I did

12   earlier this morning.

13   Q.    So let me maybe rephrase.  You didn't provide any

14   testimony or opinions in your expert report regarding

15   infringement of the other four patents in this case.  Right?

16   A.    I was not asked to provide an opinion on that, and I'm

17   not testifying about that ultimate conclusion.

18          MR. BARTON:  We can take down the -- thank you, Ms.

19   Brunson.

20   Q.    (BY MR. BARTON)  So for the three patents you did look

21   at, the '881, '048, and '411 Patents, you, of course,

22   determined that they are infringed.  Right?

23   A.    Yes.

24   Q.    And you also provided some technical analyses regarding

25   damages.  Right?

1    A.    Yes, that's correct.

2    Q.    So, for example, you gave some opinions that TQ Delta's

3    damages expert, Doctor Putnam, relied on in coming up with the

4    damages theory in this case.  Right?

5    A.    Yes.  It's my understanding that my analysis is used by

6    Doctor Putnam.

7    Q.    And specifically one of the things you opined on relating

8    to damages was something called the smallest saleable

9    patent-practicing unit.  Right?

10   A.    Yes.

11   Q.    And what that is, the smallest saleable patent-practicing

12   unit, is the smallest item that practices the patented

13   invention that is sold as a single unit.  Right?

14   A.    Yes.

15   Q.    The smallest saleable patent-practicing unit isn't

16   defined by what else is required to make that product work in

17   a commercial embodiment, is it?

18   A.    I do not understand what else.  I'm sorry.  I do not

19   understand the question.

20   Q.    Okay.  Well, you know, in order to know what the smallest

21   saleable patent-practicing unit is, you have to make a

22   determination about what is required to practice the patent.

23   Right?

24   A.    Yes.

25   Q.    And your conclusion for the three patents you looked at

```
 1    was that the entire modem or the entire main board of that

 2    modem, not just the Broadcom chipset, was the smallest

 3    saleable patent-practicing unit.  Right?

 4    A.   Yes.

 5    Q.   And you understand that CommScope's experts disagree with

 6    that.  Fair?

 7    A.   I think that's fair to say.

 8    Q.   Now, your reasoning, if I understood correctly, is based

 9    on the fact that the asserted claims in those patents recite a

10    transceiver.  Do I have that right?

11    A.   That is one reason for my opinion.

12    Q.   Well, it's the opinion you gave.  Right?

13    A.   Again, that is one basis for my opinion.

14    Q.   Okay.  Now, in your opinion, Doctor Cooklev, there are

15    more things in the chip than just the Broadcom chip.  Strike

16    that.  There are more things in the product than just the

17    Broadcom chip that make up the transceiver.  That was your

18    testimony.  Right?

19    A.   I mean, for example, yes, that's one of the bases for my

20    opinion.

21    Q.   And one of the things you pointed to was something called

22    an analog front end.  Right?

23    A.   Yes.

24    Q.   But you know that none of the claims of the three patents

25    you looked at cite an analog front end.  Right?
```

1    A.   I think that's correct.

2    Q.   And you also know that the Court's construction of

3    transceiver doesn't say anything about analog front end, does

4    it?

5    A.   I think that's correct.

6    Q.   Now, in addition to your smallest saleable

7    patent-practicing unit analysis we just talked about, you also

8    provided other damages-related opinions to Doctor Putnam.

9    Right?

10   A.   I am not exactly sure what at the moment.  I gave

11   complete testimony a short while ago.

12   Q.   I want to ask you questions about this process.  Okay?

13   A.   All right.

14   Q.   Okay.  So one of the things you testified about was your

15   opinion relating -- or work you did relating to the number of

16   patents that are essential to the DSL standards.  Right?

17   A.   Yes.

18   Q.   And I think you said this is something you worked closely

19   with with Doctor Putnam.  Do I understand that correctly?

20   A.   Yes.

21   Q.   Now, Doctor Putnam is TQ Delta's damages expert.

22   Correct?

23   A.   Yes.

24   Q.   And we'll hear from him a little later in trial.  Right?

25   A.   Yes.

```
1    Q.   So what you were doing in your analysis was you were

2    trying to figure out the total number of patents, the universe

3    of patents with claims that are likely essential to DSL

4    standards.  Right?

5    A.   Yes.

6    Q.   So when I say total number, you understand that includes

7    not just TQ Delta essential patents, but patents belonging to

8    anybody that have claims that are essential to the DSL

9    standards.  Right?

10   A.   Yes.

11   Q.   And that would include patents from companies like

12   CommScope.  Right?

13   A.   Potentially.

14   Q.   Intel.  Right?

15   A.   Potentially.

16   Q.   Alcatel is another possible one.  Right?

17   A.   Potentially.

18   Q.   Okay.  And what Doctor Putnam was going to do with that

19   information is try to figure out what percentage of the

20   universe of patents that are essential to DSL belong to TQ

21   Delta.  Right?

22   A.   That is my understanding.

23   Q.   Have you heard of that called a top-down analysis before?

24   A.   I'm not sure that I am familiar with that.

25   Q.   Okay.  But the goal is to identify the total universe of
```

1    patents that are essential to DSL and then figure out how much

2    of that belongs to TQ Delta.  Right?

3    A.   That is my understanding.

4    Q.   And you were providing inputs to him in that process.

5    Right?

6    A.   That is my understanding, yes.

7    Q.   And then Doctor Putnam then used your inputs to figure

8    out how much TQ Delta's patents are worth.  Correct?

9    A.   That is my understanding.

10   Q.   Okay.  So we're clear, if the universe of essential DSL

11   patents is small, then TQ Delta's share of that pie is going

12   to be bigger.  Right?

13   A.   I mean, that -- Doctor Putnam probably will -- is in a

14   better position than me to answer.  I can only apply simple

15   math.

16   Q.   Okay.  But you understand if there is only 20 essential

17   DSL patents in the universe--right?--belonging to all these

18   different companies and TQ Delta has 10 of them, then TQ Delta

19   can say it has 50 percent of the DSL essential patents.

20   Right?

21   A.   I think the math is right.

22   Q.   But if your analysis revealed that there are a thousand

23   essential patents and TQ Delta still only has 10, then TQ

24   Delta's share is going to be much, much lower.  Right?

25   A.   Again, the math is right.

1   Q.   All right.  So let's look at how you got Doctor Putnam

2   what you considered to be the universe of DSL essential

3   patents.  Okay?

4   A.   Okay.

5   Q.   So I believe you testified that you worked with Doctor

6   Putnam and his team to come up with these search terms to

7   identify a relevant universe of potential DSL standard

8   essential patents.  Right?

9   A.   Yes.

10  Q.   And that's what we see here.  You used search terms that

11  come up with 14,848 potential standard essential patents.

12  Right?

13  A.   Yes.

14  Q.   That's about 15,000, I think you said.  Fair?

15  A.   Fair.

16  Q.   Okay.  Then what you did is you identified a list of

17  keyword terms that you thought would make it less likely that

18  the patent claims of those patents would be standard

19  essential.  Right?

20  A.   Yes.

21  Q.   Basically terms you used to knock out certain patents as

22  being less likely to be essential.  Right?

23  A.   Well, you said knock out.  I mean, they are -- they just

24  are determined less likely to be standard essential.

25  Q.   Okay.  So you took those terms, those keyword search

```
 1    terms, and you gave them to Doctor Putnam so he could filter

 2    out patents out of those 15,000 patents.  Right?

 3    A.   Again, those that are less likely, yes.

 4    Q.   And what you got back from Doctor Putnam at this point is

 5    a list of 1100 patents out of 15,000 that you then took a

 6    closer look at.  Right?

 7    A.   That's correct.

 8    Q.   Okay.  So of those nearly 15,000 patents in the first

 9    set, there were 13,748 that you never took a look at.

10    Correct?

11    A.   That is correct.

12    Q.   So that's about 92 percent of the universe of potentially

13    essential patents that you never laid eyes on.  Right?

14    A.   Well, it is a statistical technique.  Yes, I did not

15    analyze because this is a statistical technique.  Those almost

16    14,000 patents were considered less likely to be standard

17    essential.

18    Q.   Well, let's talk about some of the terms you gave to

19    Doctor Putnam to get rid of those 13,748 patents.  Okay?

20    A.   Okay.

21    Q.   And one of the terms you identify is the word 'switches'.

22    Right?

23         MR. BARTON:  Mr. Carrillo, if we could pull up a

24    demonstrative.

25    Q.   (BY MR. BARTON)  Now, I listed on this side the full
```

1    terms.  Okay?

2    A.   Okay.

3    Q.   And you see there I've highlighted word 'switches'.

4    Right?

5    A.   Yes.

6    Q.   And keeping in the same vein, one of the other terms you

7    used to eliminate patents from consideration was 'switching'.

8    Correct?

9    A.   Yes.

10   Q.   So if the claims of one of those 15,000 patents had the

11   word 'switching' in it, you determined it was less likely to

12   be standard essential.  Right?

13   A.   Yes.

14   Q.   Okay.  But you know, Doctor Cooklev, that one of the

15   asserted claims at issue in this trial has the word

16   'switching' in the claim language itself.  Right?

17   A.   I do not remember at the moment all the claims.  I

18   apologize.

19   Q.   You don't know that claim 10 of the '835 Patent contains

20   the phrase 'the switching occurs on a predefined forward error

21   correction code word boundary'?

22   A.   No.  I -- I was familiar with that.  I just said I did

23   not remember all the claims off the top of my head, if I may.

24   Q.   In fairness, my question wasn't, do you remember all the

25   claims.  Do you understand that claim 10 of the '835 Patent

 1   includes the word 'switching'.  Correct?

 2   A.   Again, if you say so.

 3   Q.   Okay.  And you also know that, as we'll hear from Doctor

 4   Madisetti, the '835 Patent is most definitely essential to the

 5   DSL standards, in his view.  Right?

 6   A.   I think he will -- he will be able better than me to

 7   answer that question.

 8   Q.   So you don't know?

 9   A.   I do not want to -- I mean, as I said, he will be able

10   better than me to answer the question.

11   Q.   So to be fair, Doctor Cooklev, you don't know if your

12   knock-out terms -- excuse me, your keyword search terms

13   excluded some of the very patents at issue in this case.  Is

14   that your testimony?

15   A.   I do not know that.

16   Q.   Okay.  There are some other terms you used to exclude

17   patents to review.  Right?  A lot of them here.  Correct?

18   A.   There are a number of -- of terms, yes.

19   Q.   Okay.  Some of those other terms seem to have nothing to

20   do with DSL, like karaoke and burglar.  Do you see that?

21   A.   Yes.

22   Q.   Okay.  But there are also some technical terms that you

23   included in these exclusionary search terms, too.  Right?

24   A.   Yes.

25   Q.   Terms like voice, diode, echo, electrostatic, cellular,

```
 1   voltage, antenna, address, telephone call.  Right?
 2   A.   Yes.
 3   Q.   And in your view, those technical terms are so far afield
 4   from DSL technology, that you felt they should be grouped
 5   together with terms like karaoke and burglar.  Correct?
 6   A.   Well, whether they are so far from DSL or just a little
 7   far, I mean, it's -- they are on this list.  Just
 8   to -- because it wasn't possible for -- even for me to analyze
 9   15,000 patents, I analyzed only 1100 patents.
10   Q.   Well, they are far enough afield for you to not review
11   13,000 patents.  Right?
12   A.   Excuse me?
13   Q.   I'll withdraw that question.
14        These terms, Doctor Cooklev, you testified that you used
15   the Derwent report for those?  Correct?
16   A.   Yes.
17   Q.   How many of those terms are actually from Derwent?
18   A.   I mean, the way I understand the question, all of them.
19   Q.   Would it surprise you to learn that we discovered that
20   only 43 out of 360 of them were from Derwent?
21   A.   I don't think this -- again, to the best of my
22   recollection right now, I don't think this was raised in any
23   expert report.
24             MR. BARTON:  Object as non-responsive.
25             THE COURT:  Restate your question.
```

```
 1              MR. BARTON:  Okay.  I'll just move on, Your Honor.

 2    Q.   (BY MR. BARTON)  There are some other search terms,

 3    Doctor Cooklev, that I need you to explain to me.  Okay?

 4    A.   Okay.

 5    Q.   All right.  One of the words you included as a keyword

 6    search term to eliminate certain patents is klystrons.  Doctor

 7    Cooklev, can you explain to the jury what klystrons, plural,

 8    are?

 9    A.   I am afraid I cannot right now.

10    Q.   So you don't even know what that term means.  Right?

11    A.   No, not -- not at the moment.

12    Q.   Okay.  Another term on your keyword list that you used to

13    eliminate patents from review is the word franking.  Can you

14    explain to the jury what franking is?

15    A.   I cannot at the moment.

16    Q.   So, again, you just don't know what that term means.

17    A.   I think, since the meaning of terms is an important

18    issue, I think that's correct.

19    Q.   Another word is simply shown here as de.  What does that

20    mean, Doctor Cooklev?

21    A.   You know, I'm just not sure at the moment.

22    Q.   When this term 'de' was applied to exclude some of these

23    13,000 patents you didn't look at, do you know whether it

24    would have excluded patents with claims that recited

25    deinterleavers?
```

```
 1   A.   I don't think so, but at the moment I'm not completely
 2   sure.
 3   Q.   So you don't know, do you?
 4   A.   Maybe I don't think so is a little more accurate answer.
 5   Q.   Okay.  But you do know that deinterleaving is a pretty
 6   important term in this case.  Right?
 7   A.   Yes.
 8   Q.   You spent several hours talking about deinterleaving on
 9   direct.  Right?
10   A.   Yes.
11   Q.   Okay.  Now, finally, you made sure -- you wanted to make
12   sure in your keywords that you excluded any patent with the
13   term non-fossil in it.  Right?
14   A.   Yes.
15   Q.   Okay.  But apparently terms -- words or patents with the
16   term 'fossil' in it was something you'd want to take a closer
17   look at.  Correct?
18   A.   I don't think that's correct as stated.
19   Q.   All right.  Let's go back to your process.
20        Once you had these --
21        MR. BARTON:  If I could have the projector?  Thank
22   you.
23   Q.   (BY MR. BARTON)  Once you had these 1100 patents, you
24   manually reviewed them by reading them and marking them up.
25   Right?
```

```
 1   A.   Yes.

 2   Q.   And ultimately you concluded that from your 1100 patents,

 3   there were only 33 patents that were likely essential to one

 4   or more of the DSL standards.  Right?

 5   A.   Yes.

 6   Q.   And that, taking us back, that's the universe.  There's

 7   33 patents in the universe of patents that you look at that

 8   are essential.  Right?

 9   A.   I don't completely agree.  These are likely standard

10   essential, so that is the language that I use.  So as likely

11   standard essential, yes.

12   Q.   And some of these patents are TQ Delta patents, and some

13   of them belong to other companies in the industry.  Right?

14   A.   Yes.

15   Q.   And, again, Doctor Cooklev, you understand that Doctor

16   Putnam used your results to draw conclusions about how much

17   money he thinks CommScope would owe if they infringed.  Right?

18   A.   Yes.  That's my understanding.

19   Q.   Now, one of the 33 patents you determined was likely

20   standard essential was the '411 Patent you talked about on

21   direct.  Right?

22   A.   Yes.

23   Q.   So let's be real clear, Doctor Cooklev.  The '411 Patent

24   is not standard essential.  Right?

25   A.   As I testified, whether yesterday or today, but strictly
```

1   speaking, it is not standard essential.

2   Q.   Okay.  So right now we know that some of the patents you

3   identified as likely standard essential are, in fact, not

4   standard essential.  Right?

5   A.   Well, I said that although strictly speaking and I think

6   this is important in this case, strictly speaking, it is not.

7   In practice, implementors do practice the '411 Patent.

8   Q.   Is the '411 Patent standard essential?  Yes or no.

9   A.   I think I answered that, strictly speaking, it is not.

10  Q.   Okay.  We also know that in your analysis you did exclude

11  patents as less likely to be essential that TQ Delta is here

12  today saying are essential, like the '835 Patent.  Correct?

13  A.   I am not sure that I can agree with that.

14  Q.   Because you don't know what's in the '835 Patent.  Right?

15  A.   At the moment I -- I do not.

16  Q.   Okay.  Now, as part of your analysis, you identified four

17  patents owned by another company called Sisvel as likely

18  essential to the DSL standards.  Right?

19  A.   I do not remember at the moment the list of companies

20  that own these -- these patents.

21  Q.   Okay.  Well, see if we can refresh your recollection.

22  You should have your expert report available to you.  And if

23  you will turn to paragraph 1314.

24  A.   1314?

25  Q.   Correct.

```
 1   A.   Yes.  I'm there.

 2   Q.   Do you see in that paragraph -- do you have it in front

 3   of you, sir?

 4   A.   Yes, I do.

 5   Q.   Okay.  And do you see in that paragraph where you

 6   identified five patents owned by Sisvel amongst the 1100

 7   potentially essential?

 8   A.   Yes, I do.

 9   Q.   And then you determined further that there were four of

10   them that, after your manual review process, you determined to

11   be likely essential.  Right?

12   A.   Yes.

13   Q.   Now, in your opinion, Doctor Cooklev, these Sisvel

14   patents are essential to DSL, but they are less valuable than

15   the TQ Delta patents asserted here.  Right?

16            MR. HURT:  Objection, Your Honor.  May we approach?

17   This relates to a pretrial ruling.

18            THE COURT:  Approach the bench.

19            (The following was had outside the hearing of the

20            jury.)

21            THE COURT:  What's your objection, Mr. Hurt?

22            MR. HURT:  The objection is 403.  This was struck

23   out of Doctor Becker's report on this Sisvel comparability.

24   So there's no analysis in the case that any of the Sisvel

25   patents are technologically comparable or not.  And now,
```

through cross-examination, we're having a line of questioning

that's trying to back door that comparability opinion that the

Court struck for lacking an adequate support through this

witness.

And so we'd object on that basis that it's not relevant

to any issue in the case.  And it's highly prejudicial

given -- for the reasons that the Court struck it on the

*Daubert* basis.  You can't get through cross --

THE COURT:  I understand your objection.

What's your response, Mr. Barton?

MR. BARTON:  Your Honor, this expert has testified

that he provided information to Doctor Putnam to form the

basis of Doctor Putnam's damages theory.  Doctor Putnam

testifies at length that every single standard essential

patent has the same value.  This witness took an exact

opposite position in his report in the section dealing with

the information he fed to Doctor Putnam.

I should be able to explore the contradictory positions

taken by TQ Delta's experts regarding the value of standard

essential patents.

THE COURT:  Obviously I don't have Doctor Putnam's

report in front of me or have it memorized.  To what extent

does Doctor Putnam rely upon this type of opinion testimony

from Doctor Cooklev?

MR. BARTON:  Doctor Cooklev's inputs to Doctor

1    Putnam's analysis are the foundation for his top-down

2    analysis.  And after a bunch of machinations, he gets to the

3    point where he says every single patent -- every standard

4    essential patent is worth 33 cents.

5              THE COURT:  Mr. Hurt, do you have any response?

6              MR. HURT:  I don't believe that's an accurate

7    characterization.  My understanding is that Doctor Putnam uses

8    that average to be conservative in his analysis.  There is not

9    a comparison between the TQ Delta patents and the Sisvel

10   patents in any way that's done --

11             THE COURT:  Well, if Doctor Becker's report that

12   relied on this material was circumscribed through *Daubert* and

13   that's no longer part of what he's been able -- Doctor

14   Becker's been able to testify to, then I think your objection

15   has merit.

16        But it appears that there may be more than one expert

17   that relied or at least the allegation is relied on this

18   testimony and this opinion testimony from Doctor Cooklev.  If

19   I need to get Doctor Putnam's report and see if there really

20   is a nexus between this opinion testimony from Doctor Cooklev

21   and what Doctor Putnam says, then I can do that.  But I'm

22   going to have to send the jury out and get the report and

23   we're going to have to dig into it.

24             MR. BARTON:  I want to be real clear, Your Honor.

25   So what this expert, Doctor Cooklev, does is he goes through

1    this top-down analysis where he knocks things out, he comes

2    down to 33 patents, then it's extrapolated out to come to a

3    total number in the universe of essential patents, and Doctor

4    Putnam then uses that to get to his top-down number and to

5    apportion TQ Delta's share.

6        He then analyzes it all and comes up with a conclusion

7    that every single patent is -- of TQ Delta's is worth the

8    same.

9        And all I'm trying to explore is an opinion from this

10   expert on the value of standard essential patents in the set

11   that he gave to Doctor Putnam.  I'm not trying to introduce

12   this via Doctor Becker.  We're simply trying to show that TQ

13   Delta's experts are not aligned on the notion that every

14   patent is worth the same.

15            THE COURT:  All right.

16            MR. BARTON:  Every essential patent, I should say.

17            THE COURT:  Do you dispute that assertion, Mr. Hurt,

18   that Doctor Putnam does, in fact, rely on Doctor Cooklev's

19   opinions of this type for a material purpose?

20            MR. HURT:  Yes, Your Honor.  What Doctor Putnam

21   relies on is the numbers that Mr. Barton mentioned.  There's

22   no reliance on Sisvel or any other companies.  But to the

23   extent --

24            THE COURT:  I mean, if you two are going to sit up

25   here and tell me different stories about what Putnam does and

1    doesn't rely on, the only way I can handle it is get the

2    report and dig into it.

3              MR. BARTON:  I think we're aligned on what he relies

4    on, which is to say, he relies on the numerical inputs of this

5    witness that here is the universe of standard essential

6    patents.

7         Doctor Putnam then takes that and concludes that here's

8    the numbers, the dollar values I'm going to assign to them

9    based on the theory that they're all of equal value.  This

10   witness provided opinion testimony in his report saying, in

11   that set he provided to Putnam, they are not all of equal

12   value.  That's all I'm trying to establish.

13             MR. HURT:  I think that's okay, Your Honor, if

14   that's the question.

15             THE COURT:  All right.  While I have you two here, I

16   noticed you -- Mr. Barton, you referred Doctor Cooklev to his

17   report, and then you asked him yes or no questions about what

18   his report did or didn't cover.

19        If you're going to use his report to impeach him, then he

20   needs to be refreshed without reciting what's in there, and

21   then you need to ask him the question after he's been

22   refreshed.  And if he gives an answer inconsistent with what's

23   in his report, then you can ask for leave to publish the

24   report.

25             But, otherwise, you need to ask him what his opinions are

 1   and not have him refer to his report.  The only reason to

 2   refer to his report is potentially for impeachment.

 3            MR. BARTON:  I understand.  And I thought I was

 4   refreshing his recollection.  So I wasn't trying to impeach

 5   him or publish it.  I thought I had refreshed his

 6   recollection.  That's all, Your Honor.  So I apologize.

 7            THE COURT:  Typically when you refresh recollection,

 8   you refer the witness to a given opportunity to review it

 9   rather than turn to this paragraph, this paragraph says such

10   and such, doesn't it.  I mean, it seemed like a pretty cursory

11   refreshment to me.  But, anyway, if it's not impeachment, then

12   we understand each other.

13            MR. BARTON:  Yep.

14            THE COURT:  All right.  Given this colloquy up here,

15   I'll permit Mr. Barton to explore the issue as you both agreed

16   to and identified, but not further.  Okay?

17            MR. BARTON:  Understood.

18            THE COURT:  Understood?

19            MR. HURT:  Thank you, Your Honor.

20            THE COURT:  All right.

21            (The following was had in the presence and hearing

22            of the jury.)

23            THE COURT:  Let's proceed.

24   Q.   (BY MR. BARTON)  So, Doctor Cooklev, we agree that in

25   your review you concluded or you opined that the Sisvel

1    patents are not of the same value as the TQ Delta ones.

2    Correct?

3    A.   I'm not sure I can completely agree.  I'm providing an

4    analysis from a technical perspective, and you emphasized the

5    word 'value'.  And I am not an expert to determine how

6    valuable Sisvel's patent portfolio or TQ Delta's patent

7    portfolio would be.

8    Q.   So you're not here to testify that the technical value

9    correlates to the monetary value.  Is that fair?

10   A.   I don't think so.

11   Q.   It's not fair?

12   A.   I wouldn't say that the technical -- you said technical

13   value does not correlate to the monetary value, and I do not

14   agree with that.

15   Q.   Okay.  Did you analyze the other 33 patents that you

16   identified as likely standard essential, did you analyze them

17   to determine the relative value of those patents?

18   A.   Well, my analysis is completely stated in my expert

19   report, and I am not completely sure what you mean by relative

20   value.

21   Q.   Did you analyze the full set of 33 likely standard

22   essential patents that were the result of this process to

23   determine whether some were more valuable than others?

24   A.   All of my opinions are stated in my expert report.  And

25   if you point me to a paragraph in my report, maybe I could

```
 1    give a better answer.  So questions such as valuable or
 2    relative value, then I'm -- I'm not quite certain right now.
 3              MR. BARTON:  Object as non-responsive, Your Honor.
 4              THE COURT:  Overruled.  Effectively the witness is
 5    saying he doesn't understand, as I read the response.  Either
 6    restate the question or move on.
 7              MR. BARTON:  I'm going to move on, Your Honor.
 8    Q.   (BY MR. BARTON)  And, Doctor Cooklev, I want to ask you
 9    some questions about your infringement analysis for the '881
10    Patent.  Is that okay?
11    A.   Okay.
12    Q.   All right.  And the '881 Patent is the last one you dealt
13    with in your presentation, and that's the one that deals with
14    bonded transceivers.  Right?
15    A.   Yes.
16    Q.   Okay.  So, first of all, I want to make sure the jury
17    really understands what that feature is.  Is that okay?
18    A.   Yes.
19    Q.   So when we're talking about bonding, we're talking about
20    a situation where the data coming to and from the customer's
21    home is carried over two lines.  Right?
22    A.   Yes.
23    Q.   We're talking about bonding.  We're bonding those two
24    lines together.  Right?
25    A.   Yes.
```

1    Q.   So, practically speaking, bonding is something that's

2    only used when the customer in their home has two separate

3    phone lines coming into their house or home.  Right?

4    A.   Yes.

5    Q.   So if the customer has just one phone line coming into

6    their house, they can't take advantage of this feature, can

7    they?

8    A.   If there is only one phone line, yes, they cannot.

9    Q.   And to be clear, Doctor Cooklev, you understand that the

10   BGW210 modem accused in this case, the physical box itself

11   cannot connect two separate phone lines without a separate

12   connector that allows those phone lines, those two phone

13   lines, to be connected.  Right?  You know that.

14   A.   Do I know -- at the moment I do not recall stating that

15   or giving this opinion.

16   Q.   So you never bothered to figure out whether the CommScope

17   products as sold to CommScope's customers can connect to two

18   phone lines without the addition of other equipment?

19   A.   In my opinion, six of the seven accused products are

20   capable of bonding.

21   Q.   My question, Doctor Cooklev, was you never bothered to

22   figure out whether the BGW210, product of the highest volume

23   in this case, can connect to two phone lines without the

24   addition of other equipment, did you?

25   A.   I'm not sure I agree entirely with what is said.  The

1  BGW210 is capable of bonding, which is the relevant inquiry

2  for my -- in my analysis.

3  Q.   Well, we talked, Doctor Cooklev, that in order to do

4  bonding, you have to have two phone lines.  Right?

5  A.   Yes.

6  Q.   Those phone lines have to hook into the box.  Correct?

7  A.   You have to have two phone lines.

8  Q.   And those phone lines have to be connected to the box

9  somehow.  Correct?

10  A.   They have to be connected somehow.

11  Q.   And you don't know whether the BGW210, the physical box

12  itself, can even accept two separate phone lines, do you?

13  A.   Based on my analysis, the BGW210 is capable of bonding

14  and will accept two phone lines.

15  Q.   It will accept phone lines into the back of that box.

16  That's your testimony.

17  A.   Well, it is capable of bonding, yes.

18  Q.   So it will accept two physical phone lines into the back

19  of that box.  Is that your testimony?

20  A.   Well, or it may be -- it can accept two phone lines.  It

21  can accept two phone lines.

22  Q.   Okay.  Now, we can agree that claim 17 of the '881 Patent

23  recites a transmission parameter value used, quote, to reduce

24  a difference in latency between the bonded transceivers.

25  Right?

1    A.    I think that's correct.

2    Q.    And so what that means is if the first phone line has

3    this data rate, a high data rate, and the other phone line has

4    a lower data rate, we're going to shrink that difference.

5    Right?

6    A.    Shrink the difference in data rate?

7    Q.    Sorry.  I misspoke.  I'll withdraw the question and ask a

8    better one.  Okay?

9    A.    Okay.

10   Q.    So what we're talking about in this patent is if we have

11   one line that has a high latency and another line that has a

12   lower latency, this patent talks about using a parameter to

13   reduce the difference in latency.

14   A.    Using transmission parameters to reduce the difference in

15   latency.

16   Q.    Reduce the difference.  Right?

17   A.    Yes.

18   Q.    Okay.  And we can all agree that reducing a difference in

19   latency like that is something different than just reducing

20   latency.  Correct?

21   A.    It's -- we're looking at the difference in the latency of

22   the two lines.

23   Q.    Right.  The difference, not the overall latency.  Right?

24   A.    Not the overall latency.

25   Q.    Okay.  And words are important.  Fair?

```
 1   A.    Yes.

 2   Q.    And you were here when Mr. Dacus did the football/soccer

 3   ball analogy.  Right?

 4   A.    I was here.

 5   Q.    And you understand that if the accused products don't

 6   reduce a difference in latency, there's no infringement.

 7   Right?

 8   A.    Well, I -- you are asking me to assume something that I

 9   know is incorrect.

10   Q.    No.  I'm asking if you understand, in performing your

11   infringement analysis, that if the accused product does not

12   reduce the difference in latency, then there's no

13   infringement.  Right?

14   A.    I agree that if the claim is not met, there wouldn't be

15   infringement.

16   Q.    Okay.  And the claim wouldn't be met if it doesn't reduce

17   a difference in latency.  Right?

18   A.    The claim wouldn't be met if the claim language is not

19   met.

20          MR. BARTON:  Object as non-responsive, Your Honor.

21          THE COURT:  Sustained.

22   Doctor Cooklev, you need to answer the question that's

23   asked.  Mr. Hurt's going to have an opportunity to follow up

24   on anything that needs to be readdressed after Mr. Barton's

25   finished with his cross-examination.  But until that happens,
```

1    you need to answer the question as it's asked.  All right?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  All right.  Let's proceed.

4    Q.   (BY MR. BARTON)  Let me ask it again.  You agree that

5    your infringement analysis, if the accused product does not

6    reduce a difference in latency, then there is no infringement.

7    Right?

8    A.   Yes.

9    Q.   Okay.  And the code you point to in the accused product

10   is something or a feature called max differential delay.  Do I

11   have that right?

12   A.   I believe you did.  I don't have it in front of me, but I

13   believe you did, yes.

14   Q.   Okay.  And max differential delay is a variable that, as

15   its name suggests, sets a maximum latency between two bonded

16   signals.  Right?

17   A.   That is the max differential delay.

18   Q.   It's the maximum difference.  Right?

19   A.   Yes, it is --

20   Q.   Go ahead.

21   A.   It is related to the maximum latency difference.

22   Q.   Okay.  So what it says is, you can't get that difference

23   any higher than this number.  Right?

24   A.   I think with that detail, maybe we have to look at

25   something more specific in order for me to agree.

1    Q.   Okay.  Well, in your direct testimony, I believe you

2    testified that this variable, maximum differential delay, is

3    something that reduces a difference in latency.  Am I

4    understanding that correctly?

5    A.   Not quite.

6    Q.   Okay.  Well, let's move on and let's look at the '048

7    Patent.  Okay?

8    A.   Okay.

9    Q.   And just to orient or reorient the jury, the '048 Patent

10   is one of the shared memory patents you testified about.

11   Correct?

12   A.   Yes.

13   Q.   And the other shared memory patent is the '411.  Right?

14   A.   Yes.

15   Q.   Okay.  You were here for Mr. Tzannes' testimony.

16   Correct?

17   A.   Yes.

18   Q.   And you heard him testify about certain things become

19   adopted into the standard.  Right?

20   A.   I heard his testimony, yes.

21   Q.   Okay.  Just to be clear, though, Doctor Cooklev, the

22   technology of the '048 Patent was not adopted into the

23   standard, was it?

24   A.   Well, I wouldn't quite agree with that.

25   Q.   You can agree that it is not essential.  Right?

1  A.   I said that, strictly speaking, it is not essential.  I

2  can explain, but the standard does refer -- the standard

3  itself refers to shared memory.

4  Q.   So in your view, the '048 Patent is not standard

5  essential but was adopted into the standard.  Is that right?

6  A.   And there are questions the answer to which is not really

7  binary.  I think I explained everything that, strictly

8  speaking, it is not essential, but largely the -- what is

9  claimed in the patent, largely we can see that it is present

10 in the standard.

11 Q.   Largely but not completely.  Correct?

12 A.   I mean, that -- that comes to something that's

13 reasonable.  I said, strictly speaking, it is possible, it is

14 possible to build equipment that does not comply.  That's

15 possible.  It's just it's not being done.

16 Q.   Okay.  Let's turn to the substance of your opinions on

17 the '048.  Now, you understand that the key dispute for the

18 '048 Patent is whether the accused products transmit or

19 receive a message specifying a maximum number of bytes of

20 memory available to be allocated to the deinterleaver.  Right?

21 A.   I believe that is correct.

22 Q.   Okay.  And I want to make sure I heard you right.  The

23 thing in your testimony that you said in the CommScope

24 products satisfies this limitation is a field and a message

25 called max_delay_octets.  Do I have that right?

```
 1    A.    That is part of the O-PMS message.  Yes.

 2    Q.    Got it.  And in your opinion, max_delay_octets specifies

 3    a maximum number of bytes of memory.  Right?

 4    A.    Yes.  The standard says so.

 5    Q.    Okay.  And I think you even said you know that it's a

 6    maximum because max is max.  Right?

 7    A.    Yes.

 8    Q.    But delay is not delay.  Right?

 9    A.    Well, I'm not sure what you mean.

10    Q.    Okay.  Doctor Cooklev, I'm assuming that you from time to

11    time have to fly on a plane.  Is that fair?

12    A.    Yes.

13    Q.    Okay.  And if you're anything like me, sometimes those

14    flight schedules don't go according to plan.  Does that sound

15    familiar?

16    A.    Yes.

17    Q.    Okay.  Sometimes a flight is delayed.  Right?

18    A.    Yes.

19    Q.    And when the airline tells you the flight's delayed,

20    they'll tell you how long it's delayed.  Right?

21    A.    Usually, yes.

22    Q.    It might be 30 minutes; might be two hours.  Fair?

23    A.    Yes.

24    Q.    Okay.  And that's because, as we all know, delay is

25    measured in time.  Right?
```

```
 1    A.   Yes.

 2    Q.   Okay.  You've never had American Airlines call you up and

 3    tell you that your flight out of D/FW is 300 miles delayed,

 4    have you?

 5    A.   I have not yet.

 6    Q.   Okay.  Let's turn to the '411 Patent.  Is that okay?

 7    A.   Yes.

 8    Q.   Now, this is another one of the shared memory patents.

 9    Right?

10    A.   Yes.

11    Q.   And this one, again, it's shared memory between the

12    interleaver and deinterleaver.  Correct?

13    A.   Yes, associated with the retransmission function.

14    Q.   Okay.  And if I understand correctly, for the '411 Patent

15    you were looking at both VDSL2 and another standard called

16    G.INP.

17    A.   Yes.

18    Q.   And what is G.INP?

19    A.   G.impulse noise protection.

20         MR. BARTON:  Okay.  And can we, Mr. Carrillo, pull

21    up I believe Exhibit 25.

22    Q.   (BY MR. BARTON)  This is the G.INP standard.  Right?

23    A.   Yes.

24    Q.   Okay.  And under the section where it says series G

25    transmission, it has the title of this one which is "Improved
```

```
 1    Impulse Noise Protection for DSL Transceivers."  Right?

 2    A.    Yes.

 3            MR. BARTON:  And if we could go to the third page

 4    and just blow up that or expand the summary section, please.

 5    Q.    (BY MR. BARTON)  And what it tells us here is G.INP

 6    specifies techniques beyond those identified in the existing

 7    DSL recommendations, including G.992.3.  Right?

 8    A.    Yes.

 9    Q.    Okay.  So G.992.3 is what is actually -- sorry.  Let's go

10    to the end of it.  And you say G.993.2.  Right?

11    A.    If we go to the end, yes.

12    Q.    Okay.  And G.993.2 is VDSL2.  Correct?

13    A.    Yes.

14    Q.    Okay.  And so what G.INP is is something that adds onto

15    the VDSL2 standard.  Is that fair?

16    A.    Yes.

17    Q.    It is an extension of that VDSL2 standard.  Right?

18    A.    Yes.

19    Q.    Okay.  So the only question on the '411 Patent is --

20    again, just so we're crystal clear, the technology of the '411

21    Patent, just like the last patent you talked about, was not

22    adopted into the standard, was it?

23    A.    My answer would be the same as for the '048 Patent.

24    Q.    Was the '411 Patent adopted into the standard?  Yes or

25    no.
```

1   A.   I said I think a moment ago that some questions don't

2   quite have yes or no answers, and that although, strictly

3   speaking, yes, it is possible to build equipment that is

4   compliant with the standard and doesn't practice the '411

5   Patent, in practice this is not so.

6   Q.   I didn't ask you about compliance and building products;

7   I asked was the '411 Patent adopted into the standard.  Yes or

8   no.

9   A.   And again, sometimes the answer is a little bit more

10  complex than just yes or no, but the standard did -- the

11  standard did include and did adopt techniques that are claimed

12  in the -- claimed by the '411 Patent.

13  Q.   But not all of what's claimed in the '411 Patent.

14  Correct?

15  A.   Well, it's -- I just, I think I answered that.  Strictly

16  speaking -- I said I adopted the conservative approach in my

17  analysis, and in reaching this conclusion that it is possible

18  to build equipment that doesn't share memory, it's just that

19  the accused devices are not like this.  The standard did adopt

20  the parameters in the O-PMS message max_delay_octet downstream

21  0 and downstream 1, and there is also max_delay_octet

22  downstream.  So it adopted the techniques that enabled memory

23  sharing when we have written transmission.

24           MR. BARTON:  I object as non-responsive, Your Honor.

25           THE COURT:  Sustained.  Doctor Cooklev, You have to

1    answer the questions as it's asked, not as you would prefer

2    that it be asked.  The question was, "Was the '411 adopted

3    into the standard?"  Was it adopted into the standard; was it

4    not adopted into the standard.  Answer that question, please.

5              THE WITNESS:  Yes, Your Honor.

6         Yes, it was adopted.

7    Q.   (BY MR. BARTON)  But it's not essential, is it?

8    A.   Strictly speaking, it's not.

9              MR. BARTON:  Pass the witness, Your Honor.

10             THE COURT:  All right.  Redirect.

11        Proceed when you're ready, Mr. Hurt.

12             MR. HURT:  Thank you, Your Honor.

13                        REDIRECT EXAMINATION

14   BY MR. HURT:

15   Q.   Doctor Cooklev, how long ago were you employed at Aware?

16   A.   More than 20 years ago.

17   Q.   And does your relationship with Mr. Tzannes influence any

18   of your opinions in this case?

19   A.   No.

20   Q.   And do you remember when you were asked about the various

21   other expert engagements that you've taken on?

22   A.   Yes, I do.

23   Q.   When you're asked to take on a case, do you evaluate how

24   strong that case is?

25   A.   I do examine the patents, yes.

1  Q.   And would you take on a case if you didn't think it had

2  merit?

3  A.   No.  I would say no.

4  Q.   Have you ever declined an engagement or potential

5  engagement?

6  A.   Yes, I have.

7          MR. HURT:  Mr. Diaz, if you would pull up slide

8  No. 180 to Doctor Cooklev's report.

9  Q.   (BY MR. HURT)  And, Doctor Cooklev, do you remember the

10 questions you were asked about smallest saleable patent

11 practicing unit?

12 A.   Yes.

13 Q.   And do you understand the Court construed that term as

14 requiring some type of shared circuitry between a transmitter

15 portion and a receiver portion?

16 A.   Yes.

17 Q.   And is that shared circuitry limited to what's in the

18 Broadcom chip?

19 A.   No, it is not.

20 Q.   And can you identify on this diagram for the jury where

21 that shared circuitry under the Court's construction of

22 'transceiver' is located?

23 A.   There's a lot of shared circuitry between the transmitter

24 portion and the receiver portion.  The shared circuitry

25 includes starting from the phone jack.  There's isolation,

1   there are line drivers, so the shared circuitry includes at

2   least these components.  But other components external to the

3   chip that enable this chip to operate, they also share.  They

4   are not separate for the transceiver and the transmitter and

5   the receiver portion.

6   Q.   And do you recall some questions about the two phone

7   jacks for the BGW210?

8   A.   I do remember.

9   Q.   And do you see on this diagram there is an RJ14 jack

10  labeled No. 5?

11  A.   Yes.

12  Q.   Is RJ14 a standard that allows for two phone lines?

13  A.   Yes.

14  Q.   And can you explain to the jury how this piece of the

15  figure shows that the BGW is configurable to and actually can

16  be used to perform bonding?

17  A.   Yes.  Well, this phone jack will accept two phone lines.

18  Actually this was the motivation why bonding.  It made sense

19  to develop bonding.  So -- and we see here -- from the phone

20  jack we see the two -- we see the circuitry for the two

21  transceivers leading to and from the phone jack.

22  Q.   And I want to ask you a question about the -- let me

23  strike that.

24       Do you remember when Mr. Barton asked you if all of your

25  opinions in this case were only for the three patents?  Do you

1    remember that?

2    A.    Generally, yes.

3    Q.    For your opinions that relate to damages such as the

4    smallest saleable patent practicing unit, the inducement

5    evidence, these other issues, what patents did those apply to?

6    A.    They apply to all of the asserted patents.

7    Q.    So would that be all seven?

8    A.    All seven.

9    Q.    Okay.

10            MR. HURT:  Mr. Diaz, can you go to slide 182,

11   please?

12   Q.    (BY MR. HURT)  Do you remember questions, Doctor Cooklev,

13   about your analysis you performed for Doctor Putnam --

14   A.    Yes.

15   Q.    -- relating to standard essential patents?

16   A.    Yes.

17   Q.    And do you remember -- I tried to count, but I lost

18   count.  Do you remember about how many times Mr. Barton

19   said your analysis excluded patents from consideration?

20   A.    I think he said that.

21   Q.    Did you exclude from consideration any patents?

22   A.    No, I did not.  I just -- some were in this way deemed

23   less likely to be standard essential.

24   Q.    And can you explain for the jury a little bit how your

25   process would use the search terms to sample some patents at

 1   a little bit lower rate and sample others at a higher rate?

 2   A.   Yes.  So because evaluating 15,000 patents is just too

 3   much.  It's a very large set of patents.  So as a result of

 4   applying these key words, these key words did not eliminate

 5   completely.  They don't say if these key words are present the

 6   patent is absolutely not DSL standard essential.  That is not

 7   the case.  It's just that it's considered less likely.  And

 8   it's my understanding that based on these key words, Doctor

 9   Putnam sampled them or included them just at the lower rate.

10   He -- after my analysis is done, he extrapolated to -- for the

11   purpose of his analysis.

12   Q.   And do you remember questions about on the -- do you

13   remember getting questions about these search terms?

14   A.   Yes, I do.

15   Q.   And can you explain for the jury how you used this

16   Derwent Innovation Index to get these terms?

17   A.   Well, these are terms that I found that the Derwent

18   Innovations database included.  It's -- I found them

19   essentially there and that's why I came up with these key

20   words.

21   Q.   Do you remember he asked you a question about one word

22   that was just 'de'.  Do you remember that?

23   A.   Yes.

24   Q.   And he suggested -- do you remember that he suggested

25   that 'de' would hit on something like deinterleaving.  Do you

1    remember that?

2    A.    Yes, I do remember.

3    Q.    In the 1100 patents that you reviewed, did they include

4    that -- did they include terms like deinterleaving or

5    demultiplexing or other terms that start with the letters

6    'de'?

7    A.    I believe, yes, the word deinterleaver did appear in the

8    1100 patents.  So it was not in the sense eliminated by -- as

9    a result of the key word 'de'.

10   Q.    And about how long was your expert report in this case,

11   sir?

12   A.    I submitted an expert report that's about 1,100 pages; in

13   that neighborhood.

14   Q.    Do you think that 'de' may have just been a typo in the

15   table?

16   A.    It's -- I don't want to preclude that.  It's -- it is

17   possible.  An expert report that's more than a thousand pages

18   is quite a bit.

19   Q.    But, in any event, did the term 'de' move into the less

20   likely bucket patents that had words like deinterleaving or

21   deinterleaver?

22   A.    No.

23          MR. HURT:  If you could, Mr. Diaz, pull up slide

24   No. 51.

25   Q.    (BY MR. HURT)  Do you recall on cross examination,

1    Professor Cooklev, questions --

2            MR. HURT:  Actually, Your Honor, this is source

3    code, so let me ask to seal the courtroom for this question.

4            THE COURT:  All right.  At counsel's request and to

5    protect the confidential information, I'll order the courtroom

6    sealed at this time.  I'll direct that all persons present who

7    are not subject to the protective order that's been entered in

8    this case should excuse themselves and remain outside until

9    the courtroom is reopened and unsealed.

10                       (Courtroom sealed.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                       (Courtroom unsealed.)

24            THE COURT:  All right.  The courtroom is unsealed.

25      You may proceed with additional cross examination.

1     MR. BARTON:  Thank you, Your Honor.

2                    RECROSS EXAMINATION

3    BY MR. BARTON:

4    Q.   Doctor Cooklev, I want to pick up where Mr. Hurt ended.

5    He was asking you something about comments in source code and

6    you were explaining that to the jury.  Do you remember that?

7    A.   Yes.

8    Q.   Now, you and I both know comments aren't compiled.

9    Right?

10   A.   Yes; they are not.

11   Q.   And what that means, you could write anything in the

12   comment to source code and it's not going to impact in any way

13   what that product does.  Right?

14   A.   Yes, in general that's correct.

15   Q.   Okay.  Now, I want to ask you some questions about this

16   Derwent -- these search terms you listed.

17                    MR. BARTON:  And actually, Mr. Carrillo, if we could

18   pull up the final build to that demonstrative, please.

19   Q.   (BY MR. BARTON)  You recall questions about this.  Right?

20   A.   I do.

21   Q.   All right.  And one of the terms we talked about was

22   'de'.  Right?

23   A.   Yes.

24   Q.   Okay.  So we don't know what klystrons are and we don't

25   know what franking is.  Right?

```
 1   A.   As far as definition, yeah, we don't know.

 2   Q.   Okay.  What does 'de' by itself mean?

 3   A.   I cannot at the moment give a definition.

 4   Q.   Is that the post code for Germany?

 5   A.   Not in this context.

 6   Q.   Okay.  So it could just be a typo is what I thought you

 7   explained to Mr. Hurt.  Right?

 8   A.   It's -- I mean, I don't want to rule out that

 9   possibility.

10   Q.   So we don't even at this point know which terms you

11   applied in this analysis, do we?

12   A.   Not entirely correct.  Even if to the extent -- even if

13   this is a typo, all the other terms are correct.

14   Q.   Well, what should it have been?

15   A.   Excuse me?

16   Q.   If it's a typo, what should 'de' have been?

17   A.   You know, I just -- I don't remember at the moment.

18   I could not possibly remember and answer this question.

19   Q.   Okay.  Now --

20             MR. BARTON:  If I could have the projector,

21   Ms. Brunson.

22   Q.   (BY MR. BARTON)  To be clear, Doctor Putnam gave you

23   14,848 potential standard essential patents.  Right?

24   A.   He came up with this list, yes.

25   Q.   You worked together with him to develop that.
```

1    A.   I think in -- yes.

2    Q.   You worked closely with him to develop that.  Right?

3    A.   Yes.

4    Q.   Okay.  And he went from 14,848 to 1100 potential SEPs

5    that you manually reviewed.  Correct?

6    A.   Yes.

7    Q.   So that is 13,748 patents that were filtered as a result

8    of that process.  Right?

9    A.   They were sampled at the lower rate.  So you used the

10   word 'filtered', and for this reason I'm not sure I could

11   entirely agree with the word 'filtered'.

12   Q.   Let's see if you can agree with this.  You do not lay

13   eyes on a single one of those 13,748 patents.  Correct?

14   A.   Yes.

15   Q.   Okay.  And the reason is, I believe you said, is it would

16   just be too much to analyze that many patents.  Right?

17   A.   Yes.

18   Q.   Now, you've worked for TQ Delta for a while now.  Right?

19   A.   I have.

20   Q.   And you've been paid, by my account, more than half a

21   million dollars by TQ Delta.  Does that sound right?

22   A.   Not for this case.

23   Q.   Over the course of your work for TQ Delta, you've been

24   paid more than half a million dollars.  Correct?  Simply yes

25   or no.

1    A.    Over the last 10 years, yes.

2    Q.    Okay.  And you understand, because you were here in court

3    the other day, that TQ Delta is seeking $89 million from

4    CommScope in this case.  Right?

5    A.    Yes, I understand.

6    Q.    But it just would have been too much work to look at

7    those patents.  Right?

8    A.    I believe yes.

9    Q.    Okay.

10          MR. BARTON:  No further questions, Your Honor.  Pass

11   the witness.

12          THE COURT:  Further redirect?

13          MR. HURT:  Yes, Your Honor.

14          THE COURT:  All right.

15                    REDIRECT EXAMINATION

16   BY MR. HURT:

17   Q.    Doctor Cooklev, for the words that were in your process

18   in the Derwent process, would you have copied those from the

19   Derwent Index?

20   A.    Yes.

21   Q.    Would that have included that 'de' term?

22   A.    Yes.  That's the process that I followed for all of the

23   key words.

24   Q.    And do you recall the question about the code comments?

25   A.    Yes, I do.

1   Q.   Does that comment in the code accurately reflect how the

2   code works?

3   A.   Yes, it does.

4   Q.   Counsel seemed to suggest that the code might work

5   differently.  Do you remember that?

6   A.   I do remember.

7   Q.   Did HE SHOW you any other code to prove that point?

8   A.   No.

9   Q.   Did any of CommScope's experts point to any other source

10  code in the CommScope accused products that would show that he

11  is right about how they work?

12  A.   I don't think so.

13  Q.   Okay.

14          MR. HURT:  No further questions.  Pass the witness.

15          THE COURT:  All right.  Additional cross

16  examination, Mr. Barton?

17          MR. BARTON:  No, Your Honor.

18          THE COURT:  Okay.  Doctor Cooklev, you may step

19  down, sir.

20      Ladies and gentlemen of the jury, we're about 20 minutes

21  until 12:00.  The next witness is going to be at least a

22  couple of hours.  We're going to break for lunch a little

23  early.  I suspect Ms. Clendening either has it there waiting

24  for you or it will be there shortly.

25          Please take your notebooks with you to the jury room

1    during the lunch break.  Let me remind you to follow all my

2    instructions, including not to discuss anything about the case

3    with each other.  And we will break for about somewhere

4    between 45 and 50 minutes and then we'll reconvene.

5         With that the jury's excused for lunch.

6              (Whereupon, the jury left the courtroom.)

7              THE COURT:  Be seated, please.

8         Counsel, I've reviewed what's previously been submitted

9    with regard to a proposed set of final jury instructions and a

10   suggested verdict form in this case.  I think the Court and

11   the parties would mutually benefit by revisiting of those

12   topics, and I'm going to direct that the parties jointly meet

13   and confer and prepare and submit again an updated and a

14   revised purported final jury instruction and verdict form.

15   I'd like to have that transmitted to my staff in Word form no

16   later than 3:00 tomorrow.  If you'll do that, please, the

17   Court will appreciate it.

18        With that, we stand in recess for lunch.

19                        (Lunch recess.)

20             THE COURT:  Be seated, please.

21         Plaintiff, are you prepared to call your next witness?

22             MR. DAVIS:  We are, Your Honor.

23             THE COURT:  And this is Doctor Madisetti?

24             MR. DAVIS:  Correct, Your Honor.

25             THE COURT:  All right.  If you'll bring in the jury,

1    please, Mr. Turner.

2              (Whereupon, the jury entered the courtroom.)

3              THE COURT:  Welcome back, ladies and gentlemen.

4    Please have a seat.

5         I want the jury to know I do know how to tell time.  I

6    told you 45 to 50 minutes, and we're about an hour and 20

7    minutes.  There are things that come up sometimes that relate

8    to the case that you don't necessarily need to know about or

9    be involved in, but I do want you to know I do know how to

10   tell time.  I'm sorry we're a little late.

11        All right.  Plaintiff call your next witness.

12             MR. DAVIS:  Your Honor, Plaintiff calls Doctor Vijay

13   Madisetti to the stand.

14             THE COURT:  All right.  Doctor Madisetti, if you

15   would come forward and be sworn by Ms. Brunson, our Courtroom

16   Deputy.

17             (Whereupon, the oath was administered by the Clerk.)

18             THE COURT:  Please come around, have a seat on the

19   witness stand.

20        Mr. Chiplunkar, you may go to the podium and prepare for

21   the direct examination.

22        Am I correct, Mr. Davis, any binders have already been

23   distributed?

24             MR. DAVIS:  That's correct, Your Honor.

25             THE COURT:  All right.  Thank you.

```
 1              MR. CHIPLUNKAR:  Afternoon.  My name is Raj
 2    Chiplunkar, and I am here on behalf of TQ Delta.
 3                  VIJAY MADISETTI, Ph.D., SWORN,
 4    having been duly sworn, testified under oath as follows:
 5                      DIRECT EXAMINATION
 6    BY MR. CHIPLUNKAR:
 7    Q.   Sir, please introduce yourself to the members of the
 8    jury.
 9    A.   My name is Vijay Madisetti.
10    Q.   And what do you do, Mr. Madisetti?
11    A.   I am a professor at Georgia Tech in Atlanta.
12    Q.   And, Professor Madisetti, can you please tell us
13    something about yourself?
14    A.   I am married to Anita.  I have a son, Raj, who is also a
15    student at Georgia Tech.  I've lived in Atlanta for about 30
16    years.
17    Q.   And why are you here today, Professor?
18    A.   I'm here to offer opinions on infringement.
19    Q.   And are there any specific patents you are here to
20    provide opinions on?
21    A.   Yes.
22    Q.   And would that be the '008 Patent, or the phase
23    scrambling patent, and the '835, or the DSL reboot patent
24    claims?
25    A.   Yes.
```

```
1    Q.   And are you being compensated for your time?

2    A.   Yes.

3    Q.   And is your compensation dependent on the outcome of this

4    case or your testimony?

5    A.   No.

6    Q.   Have you prepared a presentation that you'll be using

7    today?

8    A.   I have.

9    Q.   And is what's shown on your screen the first slide of

10   this presentation?

11   A.   Yes.

12            MR. CHIPLUNKAR:  Your Honor, may I publish the

13   slides to the jury?

14            THE COURT:  You may, assuming that you qualify this

15   witness as an expert.

16            MR. CHIPLUNKAR:  Thank you, Your Honor.

17   Q.   (BY MR. CHIPLUNKAR)  Professor, please describe your

18   education qualifications to the jury.

19   A.   I have an undergraduate degree in electronics and

20   electrical communications.  And then I went to Berkeley in

21   California, obtained my Ph.D. in electrical engineering and

22   computer sciences.

23        Since then, I've been teaching at The Georgia Tech, which

24   is a top university in Atlanta.  I've been teaching there for

25   30 years.  I teach, do research, develop new technologies, and
```

1    advise students.

2    Q.   Can you provide some high points regarding your research

3    work?

4    A.   I do a lot of research for various agencies, including

5    the U.S. government.  I worked on defense-related projects for

6    the Air Force, for the Army.  I also work with the industry

7    for leading-edge research for the past 30 years.

8    Q.   Have you authored any textbooks that are used by

9    students?

10   A.   Yes.  I like writing books.  My first book was in 1995 on

11   the extreme left.  Since then, I've authored about a dozen

12   books, and some of these books are written there, and they

13   include communications signal processing, more recently in

14   cloud computing.

15   Q.   And the opinions that you're going provide today relate

16   to multicarrier communications and interleaving.  Correct,

17   Professor?

18   A.   Yes.

19   Q.   Have you done any work in the work of multicarrier

20   communications and interleaving?

21   A.   Yes.  I've done research.  I teach courses on that area.

22   Here is an example of a paper from that time frame that

23   specifically focuses on multicarrier, which is OFDM.  It also

24   looks specifically at interleaving, and this was work that I

25   did in early 2000 time frame.

1   Q.   And, now, the '835 Patent also relates to error

2   correction.  Correct?

3   A.   Yes.

4   Q.   Have you done any work in that area?

5   A.   Yes.  Here are some examples of the work I've done in

6   error correction codes and forward error correcting codes

7   since the mid 1990s.  Here are a couple of examples of papers

8   that are published on these techniques.

9   Q.   And you will be relying on DSL standards today for your

10  opinions.  Right?

11          MR. STEVENS:  Objection, Your Honor; leading.

12  Q.   (BY MR. CHIPLUNKAR)  What standards --

13          THE COURT:  Just a minute, counsel.  You need to let

14  the Court respond whenever an objection's raised.  I'm going

15  to sustain that.  You may rephrase it in a non-leading form.

16  Q.   (BY MR. CHIPLUNKAR)  What standards have you relied on

17  for your opinions today?

18  A.   I've been relying on DSL standards which is digital

19  subscriber loop.

20  Q.   Has any of your research influenced DSL standards?

21  A.   Yes.  Since the '90, I've worked on -- since the '80s,

22  I've worked on several areas that are directly related to

23  digital subscriber loops.

24       Here is an example of a paper from 1989 that I believe

25  has influenced certain ITU standards, for example, the G961

1    one where I specifically looked at multilevel codes that are

2    also being used in the standard, for example.  These are some

3    of the examples of the work.

4        I've also made proposals to the T1D1 Standards Committee

5    which is the precursor of the T1E1 Standards Committee that

6    creates the DSL standards.

7    Q.   And have you received any awards related to your teaching

8    and research?

9    A.   Yes.

10   Q.   And what are these awards?

11   A.   Here are a couple of examples.  One of them is the Terman

12   Award that was awarded to me by the American Society of

13   Engineering Education.  This is awarded for contributions to

14   the profession while under the age of 45.  And there on the

15   right is an award from my students who typically award these

16   to who they like.

17   Q.   Now, are you a member of any professional organizations,

18   Professor?

19   A.   Yes.  I'm a member of the IEEE, which is the largest

20   professional organization in the world with 350,000 members,

21   and I was fortunate to be elected as a fellow of the IEEE,

22   which is a sort of unusual distinction that the society

23   offers.

24            MR. CHIPLUNKAR:  Your Honor, at this time TQ Delta

25   offers Professor Madisetti as an expert in the field of

1    communication systems, including DSL systems and the subject

2    matter of the '008 and '835 Patents.

3            THE COURT:  Is there objection?

4            MR. STEVENS:  No objection, Your Honor.

5            THE COURT:  Without objection, the Court will

6    recognize this witness as an expert in those designated

7    fields.

8        Please continue, counsel.

9    Q.   (BY MR. CHIPLUNKAR)  Professor Madisetti, what opinions

10   have you formed regarding CommScope's accused products in the

11   '008 and the '835 Patent claims?

12   A.   I have -- I have offered opinions and present analysis of

13   these that CommScope's accused products practice claim 14 of

14   the U.S. Patent 8,090,008 and CommScope's accused products

15   practice claim 10 of the U.S. Patent 8,462,835.

16   Q.   Professor Madisetti, which CommScope products infringe

17   claim 14 of the '008 and claim 10 of the '835 Patent?

18   A.   I listed these here.  They include the 5168N, the 5168NV,

19   the 5268AC, the BGW210, the NVG448, the NVG44X, and the

20   NVG599, and the Pace 5031NV.

21       And these utilize the DSL chipsets on the right:  the

22   Broadcom 63168, the Broadcom 63148, and the Broadcom 63168,

23   and Broadcom 6368, three chips.

24   Q.   And which document did you rely on for this information?

25   A.   I rely on CommScope's supplemental response to ROG No. 8.

1   Q.   Have you relied on any specific DSL standards for your

2   infringement opinions today?

3   A.   Yes.

4   Q.   Which specific standard?

5   A.   I rely on the VDSL2 standard, which is G.993.2.

6   Q.   And do the accused products implement the VDSL2 standard?

7   A.   Yes.

8   Q.   And what evidence did you rely on to conclude that a

9   CommScope product operates in accordance with the VDSL2

10  standard?

11  A.   The data sheets that I show here.  The data sheets

12  include the data sheets for BGW210 and others.  These are

13  Exhibit 17, 19, 23 that explicitly show support for VDSL2,

14  which is G.993.2.

15       On the next page, we have additional products that rely

16  on Exhibits 18 and 21 that also show support for VDSL2.

17  Q.   And are these product data sheets CommScope product data

18  sheets?

19  A.   Yes, sir.

20  Q.   Is there any other evidence from CommScope that you

21  relied on to conclude that the products support VDSL2?

22  A.   Yes.

23  Q.   And what is that evidence?

24  A.   This is Exhibit 71 that other experts have also talked

25  about.  It's called the CommScope's UberMatrix that reflects

1    joint work between CommScope and AT&T, as reflected in the

2    Miller deposition testimony on page 127.

3    Q.   And does the UberMatrix support your opinion that the

4    accused products are compliant with the VDSL2 standard?

5    A.   Yes.  As shown below in the Excel spreadsheet, it is

6    shown on the left that it's VDSL.  And on the right, it shows

7    that it's with a value of C.  C says compliant.

8    Q.   And now for which particular accused product is this

9    UberMatrix?

10   A.   This particular product is for BGW-2 10.

11   Q.   Did you similar Uber matrices for the other accused

12   products?

13   A.   Yes, I did, and I confirmed they were all compliant.

14   Q.   What portion of the VDSL2 standard provides a definition

15   for standard compliance?

16   A.   The VDSL2 standard, for example, uses the words 'shall'

17   and 'must'.  That is an example of words that are used for

18   compliance.

19   Q.   Is there any other evidence that would support your

20   opinion that the products at issue here comply with the

21   mandatory requirements?

22   A.   Yes.  As Doctor Yu, who I cite here in his deposition

23   transcript, page 92, confirms that the Broadcom chips that --

24   that are used in the accused products meet the mandated

25   requirements of the G.993.2 standard, which is Exhibit 34.

1   Q.   What evidence did you rely on in arriving at your

2   infringement opinions?

3   A.   I looked at a lot of evidence--the standard itself, the

4   data sheets, deposition testimony, the UberMatrix, the block

5   diagrams.  I looked at the source code.  I evaluated it.  I

6   looked at the source code specifications.

7        I also relied on product testing and simulations done by

8   Doctor Cooklev.

9   Q.   Why did you rely on the VDSL2 standards?

10  A.   Because the claims that are asserted have been adopted

11  into the VDSL standard, and they are also essential to the

12  VDSL2 standard.  And the products that are accused are also

13  compliant with the VDSL2 standard.

14  Q.   Did you analyze the source code for the CommScope accused

15  products?

16  A.   Yes.

17  Q.   And who developed the source code that you analyzed?

18  A.   Both CommScope and Broadcom.

19  Q.   And does the source code for the accused products

20  implement claim 14 and 10?

21  A.   Yes.

22  Q.   Does the source code that you analyzed implement the

23  portions of the VDSL2 standard that you rely on for your

24  infringement opinions?

25  A.   Yes.

1    Q.    Now, did you analyze the source code for all the accused

2    CommScope products?

3    A.    Yes.

4    Q.    Did you identify any differences between the source code

5    for the accused products as they relate to the claims?

6    A.    There were no substantial -- there were no substantial

7    differences.  They were materially the same.

8    Q.    Professor Madisetti, please provide the jury with some

9    basic information regarding the '008 Patent?

10   A.    The '008 Patent is the phase scrambling patent.  It's

11   shown on this particular slide.  It is Exhibit No. 4.  And it

12   was -- it's the U.S. Patent 8,090,008.

13   Q.    Now, has this patent expired, Doctor Madisetti?

14   A.    Yes.  I believe it was expired a year or two ago.

15   Q.    And now while the patent was in force, what is your

16   opinion regarding the infringement of the claims of this

17   patent?

18   A.    My opinion was then that these products practice the

19   claims of the '008 Patent.

20   Q.    What are the inventions of the '008 Patent related to?

21   A.    The inventions are important and they relate specifically

22   how to improve multicarrier systems to solve certain problems

23   that it identified as related to peak-to-average power ratio.

24   Q.    Professor Madisetti, do the CommScope products include

25   infringed claim 14 of the '008 patent?

```
 1    A.    Yes.

 2    Q.    What is the first element of claim 14 that you analyzed?

 3    A.    The first element of claim 14 is the preamble, and it

 4    recites, "a multicarrier system, including a first transceiver

 5    that uses a plurality of carrier signals for modulating a bit

 6    stream, wherein each carrier signal has a phase characteristic

 7    associated with the bit stream."

 8    Q.    Now, did the Court provide a meaning for the term

 9    'transceiver'?

10    A.    Yes.

11    Q.    And what was that meaning?

12    A.    As stated on the slide, it's "a communication device

13    capable of transmitting and receiving data where the

14    transmitter portion and the receiver portion share at least

15    some common circuitry."

16    Q.    And, now, what is depicted on this slide, Professor?

17    A.    It's a block diagram or a schematic from the BGW210,

18    which is one of the accused products.

19    Q.    Now, did you apply the Court's construction of

20    transceiver to the BGW210 product?

21    A.    Yes.  The transceiver shown includes a processor and

22    shared common circuitry, which is the analog front end, which

23    is the isolation transformer and the jack.  And all these are

24    portions that are related to transmitting and receiving data.

25    Q.    Now, what is the transceiver here?
```

1    A.    The transceiver here is the entire product.

2    Q.    And who designs this transceiver?

3    A.    This is Exhibit 24.  And, similarly, I've also opined on

4    Exhibit 13, 22, 28, and 29, and this transceiver was designed

5    by, I believe, CommScope.

6    Q.    And what is a shared common circuitry in the BGW210?

7    A.    It's shown in yellow.  It's the portions related to

8    transmitting and receiving that are shared.  They include DFE.

9    They include the analog front end, which does the transmitting

10   and receiving.  They include the isolation transformer and

11   also the connecting circuitry such as the jack.

12   Q.    Did you look at similar schematics for the other accused

13   products?

14   A.    Yes.  And I list them as Exhibit 13, 22, 28, and 29 for

15   example.

16   Q.    And do those products also meet the definition of

17   transceiver?

18   A.    Yes, they also satisfy this limitation.

19   Q.    Now, what in the VDSL standard are you relying on for the

20   claimed bit stream?

21   A.    I'm relying on something called SOC messages, which are

22   special operations channel messages.

23   Q.    And what are some examples of SOC messages that are

24   transmitted by CommScope's products?

25   A.    Yes.  As described in Exhibit 34, the VDSL2 standard,

1    they are the RP medley class of messages shown in yellow, and

2    they include the R message 2, R-TPS-ACK, the R-PMS, and the

3    R-PMD.

4           MR. CHIPLUNKAR:  Your Honor, at this time Professor

5    Madisetti will be discussing Broadcom confidential code.  We

6    request the Court to seal the courtroom.

7           THE COURT:  All right.  Based on counsel's request

8    and to protect confidential information, I'll order the

9    courtroom sealed.

10       As a part thereof, I'll direct that all persons present

11   who are not subject to the protective order that's been

12   entered in this case should excuse themselves and remain

13   outside the courtroom until it's reopened and unsealed.

14       This will also seal this portion of the record or the

15   transcript.

16                       (Courtroom sealed.)

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13                              (Courtroom unsealed.)

14            THE COURT:  Mr. Stevens, you may proceed with

15    cross-examination when you're ready.

16            MR. STEVENS:  Thank you, Your Honor.

17                          CROSS EXAMINATION

18    BY MR. STEVENS:

19    Q.    Good afternoon, Doctor Madisetti.

20    A.    Good afternoon, sir.

21    Q.    We've met a couple of times before, haven't we?

22    A.    Yes.

23    Q.    Okay.  One of the things that I heard you say on your

24    direct was that the patents that you looked at were adopted

25    into the standard.  Did I hear you right about that?

1   A.   Yes.

2   Q.   Okay.  And remind me:  When was the VDSL2 standard

3   adopted?

4   A.   I don't remember the exact date.

5        MR. STEVENS:  Let's pull up Exhibit 34, please, if

6   we can look at the cover of that document.

7   Q.   (BY MR. STEVENS)  Does this refresh your recollection,

8   sir?

9   A.   Yes.

10  Q.   And so when did the VDSL2 standard actually publish?

11  A.   It would be 12 of 2011.

12  Q.   Okay.  So December of 2011.  Do I have that right?

13  A.   Yes.

14  Q.   Okay.

15       MR. STEVENS:  We can take that down.

16  Q.   (BY MR. STEVENS)  Now, the '008 Patent, which is Exhibit

17  4.

18       MR. STEVENS:  If we could bring that up.

19  Q.   (BY MR. STEVENS)  When did the '008 Patent actually

20  issue?

21  A.   It issued on January 3rd, 2012.

22  Q.   Okay.  So the '008 Patent issued after the standard was

23  adopted.  Is that right, sir?

24  A.   Yes.

25  Q.   Okay.

1   A.   It depends on the provisional that was in 2000, sir.

2   Q.   The '008 Patent issued after the standard was adopted.

3   Correct?

4   A.   The date, yes.

5   Q.   Okay.  So let's look at the other patent.  It's Exhibit

6   6.  This is the '835 Patent that you looked at.  This issued

7   in June of 2013.  Is that right, sir?

8   A.   Yes.

9   Q.   And so the '835 Patent also issued after the standard was

10  adopted and published at the ITU.  Is that right?

11  A.   Yes.

12  Q.   Okay.  Thank you.

13       Now, you agree with me, as we've heard throughout this

14  trial, sir -- let me withdraw the question.

15       It's true, sir, that the ITU doesn't look at patents and

16  determine whether there's a correspondence between patents and

17  standards.  Is that right?

18  A.   I cannot offer an opinion on that, counsel.

19  Q.   Because you don't know?

20  A.   No.  Because I'm not sure what you're referring to.

21  Q.   The ITU doesn't look at patents to determine whether

22  they're essential to any standard.  Is that right?

23  A.   At a high level, yes.  The declarants describe patents as

24  being essential.

25  Q.   Well, not at the ITU.  Isn't it true, sir, that at the

1    ITU, you just say that we believe we have patents relevant to

2    a standard, and you don't identify any patents.  Isn't that

3    how it happens at the ITU, sir?

4    A.   As I said, counsel, I would have to look at some specific

5    documents.  My understanding is that it's the declarants that

6    describe certain technology as being covered by the patents.

7    Q.   Yes or no, sir:  Do declarants at the ITU, do they ever

8    specify a patent number specifically?

9    A.   I don't know.

10   Q.   Okay.  So let's look again at Exhibit 34.

11        MR. STEVENS:  And if we could go to the fourth page

12   of that document, please, sir.

13   Q.   (BY MR. STEVENS)  And it says, intellectual property

14   rights, and I'd like to look at that first paragraph under

15   there and the second sentence.

16        MR. STEVENS:  If we could get that highlighted.

17   Q.   (BY MR. STEVENS)  I just want to make sure I'm reading

18   this right, sir.

19        Am I correct that it says, "ITU takes no position

20   concerning the evidence, validity, or applicability of claimed

21   intellectual property rights, whether asserted by ITU members

22   or others outside of the recommendation development process."

23        Did I read that correct, sir?

24   A.   Yes, you read that.

25   Q.   Okay.  So the ITU doesn't do anything to suggest that a

1    patent is or is not standard essential.  Is that right?

2    A.   Again, I don't have an opinion on that, counsel.

3    Q.   I'm not asking for an opinion, sir.  I'm asking for a

4    fact.  You do understand that the ITU doesn't do anything to

5    look at a patent and say whether it's standard essential or

6    not.  That's not the ITU's job.  Is that right?

7    A.   I don't know for sure, counsel.

8    Q.   Okay.

9         MR. STEVENS:  We can take that down.  Thank you.

10   Q.   (BY MR. STEVENS)  Now, you didn't yourself actually

11   examine any of the CommScope accused products in this case.

12   Is that right?

13   A.   I did look at the source code myself.

14   Q.   Sir, did you examine the products?

15   A.   The physical products?

16   Q.   Yes, sir.

17   A.   I did not.

18   Q.   Did you run any testing yourself in this case, sir?

19   A.   Not myself.  I directed Doctor Cooklev to test for me.

20   Q.   And that test happened somewhere outside the United

21   States.  Is that right?

22   A.   The testing occurred in the UK at the direction of myself

23   and Doctor Cooklev.

24   Q.   Sir, yes or no, you weren't there in the UK for that

25   testing.  Is that right?

```
 1    A.    No, I wasn't.

 2    Q.    Okay.  And you didn't yourself run any simulations in

 3    this case.  Is that right?

 4    A.    I did not run myself.  I requested Doctor Cooklev.

 5    Q.    Okay.  So anything about testing or simulations that you

 6    discussed during your direct testimony, that was Doctor

 7    Cooklev, the last gentleman who testified.  That was him who

 8    did that.  Right?

 9    A.    At my direction.

10    Q.    Okay.  And in the process of forming all of the opinions

11    that you gave related to infringement, you had never spoken

12    with Doctor Cooklev at all when you offered those opinions.

13    Is that correct?

14    A.    I disagree.  I spoke with him many times.

15    Q.    Let me get this straight.  Am I right that you did not

16    happen to talk to Doctor Cooklev in the course of preparing

17    your reports in this case?  Is that true?

18    A.    During the preparation of the report, yes.

19    Q.    Okay.  Thank you, sir.

20          Now, I'd like to discuss the '835 Patent for a moment, if

21    we can, sir.  Okay?

22    A.    Sure.

23    Q.    Now, neither Aware nor Mr. Tzannes invented forward error

24    correction.  True?

25    A.    Yes.
```

1   Q.   Neither Aware nor Mr. Tzannes invented interleaving.  Is

2   that right?

3   A.   General interleaving, yes.

4   Q.   In fact, the '835 Patent itself tells us that it was a

5   standard practice for communication systems to use

6   interleaving in combination with forward error correction.

7   Correct?

8   A.   Are you referring to a portion of the patent, sir?

9   Q.   Sure.  I'm asking you, does the patent tell us that it

10  was already known technology before the patent in a

11  telecommunications system to use interleaving in combination

12  with forward error correction?

13  A.   Again, if you point me to the specific portion, I can

14  confirm that.

15  Q.   We can look at column 1, lines 34 through 37.

16  A.   One second, sir.  Column 1, 34 --

17  Q.   To 37.

18  A.   Yes.

19  Q.   Okay.  That column tells us it was standard practice for

20  communication systems to use interleaving in combination with

21  forward error correction before Aware ever went to the PTO

22  with this application.  Correct?

23  A.   Yes.  As per column 1, lines 34 to 37, where it talks

24  about correcting errors due to impulse noise.

25  Q.   Okay.  And neither Aware nor Mr. Tzannes invented an

1    inverted sync signal or a sync flag.  Correct?

2    A.   I don't have an opinion on that, counsel.

3    Q.   Okay.  Now, one of the analogies that you shared in your

4    report was that this patent is sort of like waving a flag.  Is

5    that right?

6    A.   Again, the patent is -- the claim defines the invention.

7    Q.   Sir, isn't it true that in your report you drew an

8    analogy about a white flag at a NASCAR race?

9    A.   Yes.

10   Q.   Okay.  Do you know whether's such thing as a checkered

11   flag at a NASCAR race?

12   A.   I know there's a checkered flag, but I'm not sure what

13   it's used for.

14   Q.   Do you know whether there's a green flag at a NASCAR

15   race?

16   A.   Again, my knowledge is limited, counsel.

17   Q.   Okay.  Do you know if there's a yellow flag in a NASCAR

18   case?

19   A.   I think there is.  Again, I don't know the specific

20   reasons.

21   Q.   Okay.  So the NASCAR flag analogy that you reported in

22   your report, that was something that counsel put in your head.

23   Is that fair?

24   A.   No.  I was just using flag because it mentioned flag, not

25   to dive deeply into NASCAR.

1    Q.    Okay.  And NASCAR has been using flags since long before

2    this patent came around.  Is that fair?

3    A.    Different types of flags.

4    Q.    Okay.  Now, in your testimony you talked about a feature

5    called dynamic D.  Did I hear that correctly, sir?

6    A.    Yes.

7    Q.    And you agree that dynamic D is an entirely optional

8    portion of the VDSL2 standard.  Correct?

9    A.    It is an optional portion, yes.  It's an optional portion

10   of the standard, but it's still essential.

11   Q.    Okay.  Let's unpack that a bit.  It's optional, which

12   means you don't have to do it.  Correct?

13   A.    Yes.

14   Q.    All right.

15   A.    You don't have to implement it.  Yes.

16   Q.    Right.  So if I'm building a VDSL2 chip or if I'm

17   building a VDSL2 product, I don't have to build dynamic D into

18   it.  Correct?

19   A.    You don't have to unless you are required to.

20   Q.    Okay.  And if I'm a network operator putting one of these

21   into practice, I don't have to turn on dynamic D.  Is that

22   correct?

23   A.    Yes.  You have a choice.

24   Q.    Okay.  Does AT&T use dynamic D in its network whatsoever?

25   A.    I believe so, yes, because it requires the use of the

1    G.vector specification as per UberMatrix, and so, therefore,

2    it requires dynamic D.

3    Q.   Okay.  So it's your testimony that AT&T in the real world

4    uses dynamic D in its network.  That's your testimony.

5    Correct?

6    A.   Yes, based on evidence that I reviewed and also the

7    evidence that I've heard in the courtroom.

8    Q.   Can you show me any evidence that you talked about during

9    your direct examination that shows that AT&T ever uses dynamic

10   D in its network?

11   A.   Yes.  UberMatrix, look at UberMatrix, line number 407,

12   you'll find that AT&T requires G993.5 conformance, which is

13   the G.vector specification that specifically requires dynamic

14   interleaver.

15   Q.   So that's G.vector, sir.  Let me ask you about VDSL2.

16   All right?  For VDSL2, does AT&T use dynamic D?  Yes or no.

17   A.   Yes, because it's used in combination with G.vector.

18            THE COURT:  Let me interrupt for a minute.

19       Counsel, you're perfectly entitled to ask any question

20   you want to ask.  You're not entitled to constrain the witness

21   to a yes or no.

22       If the question calls for a yes or no and the witness is

23   non-responsive, then you raise that objection with me, but you

24   don't say, here's your question and these are the only ways

25   you can answer it.

1    Just ask your question, and if the answer is not

2  responsive to your question, I'll deal with it if you raise it

3  as an objection.  All right?

4         MR. STEVENS:  Thank you, Your Honor.

5         THE COURT:  Let's proceed.

6  Q.  (BY MR. STEVENS)  So, again, I just want to make sure

7  that -- I'll withdraw that.

8       Putting aside G.vector, if we're just talking about

9  VDSL2, is it your testimony that AT&T actually uses that in

10  their network?

11  A.  Yes.

12  Q.  Okay.  Thank you, sir.

13       Now, you talked about transceivers during your direct

14  testimony.  Do I recall that?

15  A.  Yes.

16  Q.  All right.  And the Broadcom chipsets have a transceiver

17  in them.  Is that right?

18  A.  The accused products have -- that include the Broadcom

19  chipset have a transceiver.

20  Q.  Well, on the -- I'm asking you about the Broadcom chipset

21  itself.  That includes the analog front ends that you spoke

22  of.  Is that right?

23  A.  Yes.

24  Q.  Okay.  And Broadcom itself when it has the data sheets on

25  these chips says that they include a transceiver.  Correct?

1   A.   Yes.

2   Q.   Okay.  So within that Broadcom chipset is a transceiver

3   with an analog front end that is there for sending and

4   receiving.  Correct?

5   A.   No.  The transceiver -- there is one in the Broadcom

6   chipsets and there's also in the accused products.

7   Q.   Okay.  So let's look at Exhibit 15, please.  On the third

8   paragraph, it says --

9   A.   Hold on a second, sir.

10  Q.   Take your time.

11  A.   Okay.

12  Q.   It says the BCM63146 is integrated multimode ADSL2+ VDSL2

13  transceiver and analog front end.  Did I read that correctly,

14  sir?

15  A.   Yes.

16  Q.   And if we look at the top of the right column, the first

17  bullet point says that on this chipset includes an integrated

18  multimode ADSL 2, VDSL2 transceivers and analog front end.  Is

19  that correct, sir?

20  A.   Yes.  You are reading from the data sheet.

21  Q.   Of the Broadcom chipset.  Is that correct?

22  A.   Yes, sir.

23  Q.   So everything that we see there is on the chipset.  Is

24  that true, sir?

25  A.   Everything on this data sheet is on the Broadcom chipset.

1   Q.   Okay.  Thank you.

2        MR. STEVENS:  We can take that down.

3   Q.   (BY MR. STEVENS)  And during your direct testimony when

4   you referred to source code, you referred to Broadcom source

5   code.  Is that right?

6   A.   I referred to CommScope and Broadcom source code.

7   Q.   Did you actually show any source code that's CommScope

8   source code as opposed to Broadcom's?

9   A.   I didn't show any CommScope's source code during my

10  testimony today.  I do refer to that in my report.

11  Q.   Okay.  So during your direct testimony today to the jury,

12  you only showed Broadcom source code.  Is that correct?

13  A.   Yes.

14  Q.   Thank you.

15       So I'd like to talk about the '008 Patent.  Is that all

16  right, sir?

17  A.   Yes, sir.

18  Q.   Now, neither Aware nor Mr. Tzannes invented the concept

19  of phase scrambling.  Is that right?

20  A.   I don't have an opinion on that, counsel.

21  Q.   In your research, long before this patent, you were

22  dealing with phrase scrambling in telecommunication systems.

23  Is that right?

24  A.   Not in this context.

25  Q.   Sir, in telecommunications, was your research involving

1    phase scrambling?  Is that something you did before this

2    patent?

3    A.   I don't recall.

4    Q.   Okay.  And the concept of peak-to-average power ratio or

5    PAR, that was a known concept before Mr. Tzannes or Aware ever

6    went to the Patent Office.  Is that right?

7    A.   The definition of PAR was known.

8    Q.   Okay.  And pseudorandom number generators were known

9    before Aware or Mr. Tzannes went to the Patent Office.  Is

10   that right?

11   A.   Yes.

12   Q.   Now, now you're aware for there to be infringement, each

13   and every limitation of the claim needs to be in the product.

14   Is that right?

15   A.   Yes.

16   Q.   If one thing is missing, that means there can't be

17   infringement.  Correct?

18   A.   Yes.

19   Q.   All right.  Now, if we talk about the claim of the '008

20   Patent that you --

21        MR. STEVENS:  And let me withdraw that, if I can,

22   Your Honor.

23   Q.   (BY MR. STEVENS)  You had mentioned during your direct

24   testimony the claims of the patent, and I just want to make

25   sure that you are offering an opinion just as to one single

1    claim.  Do I have that right, sir?

2    A.    Yes.  I understand we were limited to just one claim.

3    Q.    Okay.  And so you've not provided an infringement

4    analysis on anything but one single claim of the '008 Patent.

5    Is that right?

6    A.    In this testimony today?  Yes.

7    Q.    Okay.  And one of the aspects that's required by the '008

8    Patent is computing a phase shift for each carrier signal.  Is

9    that right, sir?

10   A.    The complete -- yes, it's a portion of a limitation

11   14[b].

12   Q.    Okay.  I'll read the whole thing just to -- just to make

13   sure that we all have it.  Computing a phase shift for each

14   carrier signal based on the value associated with that carrier

15   signal.  Did I hear that right, sir?

16   A.    Yes.

17   Q.    Okay.  So, again, the claim requires computing a phase

18   shift for each carrier signal.  Is that right, sir?

19   A.    Yes, based on the value associated with that carrier

20   signal.

21   Q.    Okay.

22         MR. STEVENS:  Now, if we could bring up Exhibit 34

23   and look at table 12.70, please.

24         THE WITNESS:  Okay.

25         MR. STEVENS:  It's in section 12.3.6.2.  There we

1   go.

2   Q.   (BY MR. STEVENS)   And this is the table that you

3   discussed with your counsel during your direct testimony.   Is

4   that right?

5   A.   Yes.

6   Q.   Okay.  And what we see here in this table is the angle of

7   rotation.  That's going to be the phase shift.  Is that right,

8   sir?

9   A.   You're computing a phase shift.

10  Q.   Sir, my question -- I withdraw that.

11       What we see here in the middle column is the angle of

12  rotation.  Is that right, sir?

13  A.   Yes.  The middle column is titled Angle of Rotation.

14  Q.   And that's how much we're going to rotate the phase.

15  That's the phase shift.  Correct?

16  A.   That's the angle of rotation.

17  Q.   Okay.  So just to put this in context, am I right that if

18  we start at 12 on a clock and we were to rotate it by pi over

19  2, where would we end up on that clock?

20  A.   What do you mean by clock, counsel?

21  Q.   A clock, like that clock right over there on the wall?

22  If we start at noon with the hour hand pointing straight up,

23  we rotate that by pi over 2, where would that leave us?

24  A.   You would add 90 degrees, and you would be at the 6

25  number.

1   Q.   If I start straight up at noon and I rotate by 90

2   degrees, where am I going to be on that clock?

3   A.   You would be adding 90 degrees, and you would be at 6.

4   Q.   Okay.  So you think starting straight up and adding 90

5   degrees puts you straight down?

6   A.   Oh, sorry.  90 degrees puts you at 3.

7   Q.   Okay.  All right.

8   A.   Yeah, yeah.

9   Q.   So if I start at noon, a pi over 2 rotation would put me

10  at 3 on that clock.  Right?

11  A.   By adding 90 would give you 3.

12  Q.   All right.  If I start at noon and I have the angle of

13  rotation at pi, then I'd be at 6:00 straight down.  Right?

14  A.   You would add 180 degrees, and you would be at 6.

15  Q.   Okay.  Now, the first angle of rotation here is 0.  Is

16  that right?

17  A.   Yes.

18  Q.   So if I start at noon on that clock and I don't rotate at

19  all, where am I going to be?

20  A.   You are rotating, but you are rotating by 0.

21  Q.   Okay.  So you believe a clock starts at noon and it stays

22  at noon, you believe that to be a rotation.

23  A.   The way it is described in section 12.3.6.2, you are

24  computing the angle of rotation by adding a 0 or a 90 or a 180

25  or a 270.  So I would call it as adding a 0.

1    Q.   And, sir, any number where you add 0 to that number is

2    still that number.  Is that right?

3    A.   The value is still the same, but you have done the

4    addition.  It doesn't change.

5    Q.   Okay.  So 9 plus 0 is 9.  Is that right?

6    A.   Yes, addition.

7    Q.   15 plus 0 is still 15.  Is that right?

8    A.   Yes.

9    Q.   All right.  And I want to look at a sentence, the middle

10   sentence right above the table there.

11           MR. STEVENS:  If we could highlight that part that

12   starts the sub-carrier right in the middle there.  There we

13   go.  Thank you, sir.

14   Q.   (BY MR. STEVENS)  Now, Doctor Madisetti, just check me

15   and make sure I'm reading right.  Does it state, quote, the

16   sub-carrier with index 0 DC shall not be rotated?  Did I read

17   that correctly, sir?

18   A.   Yes.

19   Q.   And during your testimony, your direct testimony, I heard

20   you to say shall is an absolute requirement.  Is that right?

21   A.   Yes, in the context of standards, yes.

22   Q.   Okay.  So what this tells us is that the sub-carrier with

23   index 0 shall not be rotated.  Is that what it says, sir?

24   A.   Yes, that's what it says.

25   Q.   Thank you.

         1              MR. STEVENS:  Your Honor, I pass the witness.

         2              THE COURT:  Is there redirect from the Plaintiff?

         3              MR. CHIPLUNKAR:  Yes, Your Honor, a few more

         4     questions.

         5              THE COURT:  All right.  Please proceed with redirect

         6     whenever you're ready, Mr. Chiplunkar.

         7                         REDIRECT EXAMINATION

         8     BY MR. CHIPLUNKAR:

         9     Q.   Professor Madisetti, counsel asked you some questions

        10     regarding the dates of the '008 Patent.

        11     A.   Yes, counsel.

        12     Q.   And when was -- what is the provisional date of the '008

        13     Patent?

        14     A.   I believe that it is dated -- in the first column it

        15     shows line -- it shows that it's filed -- the provisional

        16     application was filed on November 9th, 1999.  Now it's

        17     clearer.

        18     Q.   And did Mr. Marcos Tzannes disclose the inventions in the

        19     provisional application?

        20     A.   Yes.

        21     Q.   And the date of the provisional application is before the

        22     date of the VDSL2 standard.  Correct?

        23     A.   Yes, more than 10 years before.

        24     Q.   So Mr. Marcos Tzannes came up with this idea that was

        25     adopted in the VDSL2 standard 10 years before the VDSL2

1    standard?

2    A.    That's right.  More than 10 years.

3          MR. STEVENS:  Objection; leading, Your Honor.

4          THE COURT:  Avoid leading, counsel.  I'll sustain

5    the question.  I'll sustain the objection, rather.

6    Q.    (BY MR. CHIPLUNKAR)  When did Mr. Tzannes disclose the

7    invention --

8    A.    In November 1999.

9          THE COURT:  Okay.  Doctor Madisetti, make sure the

10   attorney has finished the question before you answer, please.

11         THE WITNESS:  I'm sorry, Your Honor.

12         THE COURT:  That's all right.

13         Please continue.

14   Q.    (BY MR. CHIPLUNKAR)  When did Mr. Tzannes disclose the

15   invention that is in claim 14 of the '008 Patent?

16   A.    On November 9th, 1999.  Counsel, I can't hear you

17   clearly.

18   Q.    Sorry.

19   A.    Yeah.

20   Q.    And when was the VDSL2 standard that counsel showed you

21   dated?

22   A.    I believe it was dated December of 2011, which is more

23   than 10 years later.

24   Q.    Counsel asked you some questions regarding the date of

25   the '835 Patent.  Do you recall that?

```
 1   A.   Yes.
 2   Q.   And what is the provisional application filing date of
 3   the '835 Patent?
 4   A.   It states here that it was filed on March 24th, 2004.
 5   Q.   And what is the date of the VDSL2 standard that he showed
 6   you?
 7   A.   It was more than 10 years later.  I believe December of
 8   2011.
 9   Q.   Counsel asked you some questions regarding the numbering
10   of some carrier signals.  Do you recall that?
11   A.   Yes.  He was referring to DC 0 as not being rotated at
12   all.
13   Q.   What is the plurality of carrier signals that you're
14   relying on for your infringement opinions?
15   A.   My theory of infringement does not rely on carrier DC
16   carrier 0.  The plurality of carrier signals I rely upon are
17   1, 11, 21, and others shown in blue.
18   Q.   So even if -- so if carrier 0 is not rotated, does that
19   change your infringement opinion?
20   A.   It does not because I have shown a plurality that
21   satisfies the claim.
22            MR. CHIPLUNKAR:  I have no more questions.  Pass the
23   witness.
24            THE COURT:  All right.  Is there further
25   cross-examination?
```

1          MR. STEVENS:  Yes, Your Honor.

2          THE COURT:  All right.  Let's proceed with

3    additional cross-examination.

4                    RECROSS EXAMINATION

5    BY MR. STEVENS:

6    Q.   On that very last point, Doctor Madisetti, again, when we

7    read the claim together, it requires calculating a phase shift

8    for each carrier.  Is that correct, sir?

9    A.   No, sir.  It's each carrier of the plurality.

10   Q.   Okay.  So each carrier of the plurality we have to

11   compute a phase shift for.  That's what the claim requires.

12   Right?

13   A.   Yes, as stated in the claim.

14   Q.   Okay.  And then let's look again at what I had on the

15   screen, Exhibit 34 at that table.  And what the standard tells

16   me, and I just want to confirm I am reading it right, sir, is

17   the sub-carrier with index 0 DC shall not be rotated.  That's

18   what the standard says.  Correct?

19   A.   Yes.

20   Q.   Okay.

21          MR. STEVENS:  I pass the witness, Your Honor.

22          THE COURT:  Is there additional direct?

23          MR. CHIPLUNKAR:  No, Your Honor.

24          THE COURT:  All right.  Then you may step down,

25   Doctor Madisetti.

```
 1                    THE WITNESS:  Thank you, Your Honor.

 2                    THE COURT:  You're quite welcome.

 3              Plaintiff, call your next witness.

 4                    MR. DAVIS:  Your Honor, Plaintiffs call Dr. Peter

 5      Heller to the stand.

 6                    THE COURT:  All right.  Doctor Heller, if you will

 7      come forward and be sworn, please.

 8                    (Whereupon, the oath was administered by the Clerk.)

 9                    THE COURT:  Please come around, sir, have a seat on

10      the witness stand.

11              Are there binders to distribute here, counsel?

12                    MR. WILSON:  No binders, Your Honor.

13                    THE COURT:  All right.  Mr. Wilson, you may proceed

14      with direct examination.

15                    MR. WILSON:  Thank you, Your Honor.

16                         PETER HELLER, Ph.D., SWORN,

17      having been duly sworn, testified under oath as follows:

18                         DIRECT EXAMINATION

19      BY MR. WILSON:

20      Q.   Could you please introduce yourself to the jury, sir?

21      A.   Yes.  My name is Peter Heller.

22      Q.   And what topics are you going to be discussing today?

23      A.   I'm here to talk about the size, area, of DSL chips and

24      specific functions on those chips.

25      Q.   Did you prepare any materials to help the jury understand
```

1    your testimony today?

2    A.   Yes, I did.  I prepared a slide show.

3            MR. WILSON:  Your Honor, could I publish the slide

4    show as a demonstrative in front of the jury?

5            THE COURT:  Without objection, you may.

6    Q.   (BY MR. WILSON)  Doctor Heller, did you prepare slides

7    summarizing your qualifications?

8    A.   Yes, and that's this slide here.

9    Q.   Could you, please, tell us about your educational

10   background?

11   A.   Sure.  I got a Bachelor's in mathematics at University of

12   North Carolina and then went on to Princeton to get my

13   master's and Ph.D. in mathematics.

14   Q.   Have you held any academic appointments?

15   A.   Yes, I have.  I -- after getting my doctorate at

16   Princeton, I worked as an instructor and a lecturer of math at

17   Massachusetts Institute of Technology, MIT.  Later, I also

18   served as an adjunct faculty in electronics engineering at a

19   Northeastern in Boston.

20   Q.   How many years of experience do you have, Doctor Heller,

21   in the field of DSL chip design?

22   A.   I have over 20 years' experience in that area.

23   Q.   Could you tell us about your employment background?

24   A.   Sure.  After teaching at MIT, I worked briefly at PTC and

25   then came to Aware where I worked for 19 years.  I assembled a

1    team of a chip designers there which I led.  I had

2    responsibility for all the chips that Aware built.  We built

3    over 30 DSL chips.

4        I brought that team into Lantiq and subsequently brought

5    the team into Qualcomm where we worked on WiFi chips.

6    Q.   Have you personally designed DSL chips?

7    A.   Yes, I have.  As I said, over 30 of them.

8    Q.   Can you please give us a particular example of a DSL chip

9    you have designed?

10   A.   Yeah, sure.  One -- a good example would be the VINAX

11   chip.  We designed that in 2005 as the VDSL2 standard was

12   being finalized.  It was the world's first fully compliant

13   VDSL2 chip.  It was fabricated in 2006.

14       We later -- I later designed a number of chips for both

15   Aware, Infineon, Lantiq, and some other Aware customers.

16   Q.   What do you currently do for a job, Doctor Heller?

17   A.   Well, after 25 years in the electronics industry, I

18   decided to switch gears and pursue a long-held passion.  So I

19   went back to architecture school, and now I work as an

20   architect for a firm in Boston, DiMella Shaffer, where I

21   design senior living communities.

22            MR. WILSON:  Your Honor, at this time we would like

23   to offer Doctor Heller as an expert in the field of

24   semiconductor microchip design, including DSL microchips?

25            THE COURT:  Is there objection?

1              MR. BARTON:  No objection, Your Honor.

2              THE COURT:  Without objection then, the Court will

3    recognize this witness as an expert in those designated

4    fields.

5              Please continue, counsel.

6              MR. WILSON:  Thank you, Your Honor.

7    Q.   (BY MR. WILSON)  What were you asked to do in this case,

8    Doctor Heller?

9    A.   I was asked to assess actually how much space on a VDSL2

10   microchip is taken up by the interleaver and retransmission

11   memory.

12   Q.   How did you reach an answer to this question?

13   A.   Well, there really were two parts to it.  The first one

14   was going to the standard at G.993.2 that we keep talking

15   about.  The standard describes different functions that need

16   to be performed as part of the VDSL2, and it prescribes

17   specific ranges of parameters.

18        If you follow through the consequences of those parameter

19   choices, four things like codeword size and interleave depth,

20   you very quickly arrive at a number which is the minimum

21   amount of memory you need in order to support standard

22   compliant interleaving and retransmission.

23   Q.   After conducting your analysis, what conclusion did you

24   reach for this question?

25   A.   I concluded that 10 to 15 percent of the area of the

 1    VDSL2 functionality in the chip is required for the

 2    interleaver and retransmission memory.

 3    Q.   Stepping back, Doctor Heller, could you please tell us

 4    what a microchip is actually made out of?

 5    A.   Yeah.  And this is going to help just explain some of the

 6    terms we are talking about.

 7         So chips are made out of -- microchips are made out of

 8    silicon, which is a mineral.  It's like iron, and you see some

 9    crystals of silicon on the left.  Those crystals are sliced

10    into thin disks which are called wafers.

11         And then in the middle photo, you see what happens with

12    the wafer.  You see it's being held by a technician in a chip

13    fabrication plant in that photo.  The wafer is, you know, cut

14    into all these die or scored to identify all these rectangular

15    regions and then processed with light, chemicals, and electric

16    wires are deposited to turn each of those little rectangles

17    into a die.  And that's the photo on the right.

18         So we've actually transformed the silicon element into

19    transistors and wired them together at a microscopic level and

20    made many of them on a single wafer like that.  And then it's

21    diced up, and so the individual squares are called die.  And

22    that's a bare silicon die.

23         But then, by itself, it's very vulnerable.  So you have

24    to put it in a plastic package, and you get the image in the

25    bottom right where you encase that die in a plastic package

 1    and brought out big thick metal wires to connect it to the

 2    other devices on the circuit board.

 3    Q.    What aspects of a microchip have the highest costs

 4    associated with them?

 5    A.    So it's that bare die that's actually the most -- by far

 6    the most expensive part of the chip.  Here is some data from a

 7    professor at UC-Davis which aligns well with my own experience

 8    of over 20 years of building chips, that out of the total

 9    manufacturing cost for building a chip, anywhere from, say, 65

10    to 80 percent of the cost is the cost of the bare die.

11         The other components of the cost are that plastic

12    package, assembling it, and testing it.

13    Q.    For your analysis, Doctor Heller, what was the particular

14    DSL chip you looked at?

15    A.    So I looked at one of the chips we designed.  This is the

16    Lantiq VRX 288.  We designed this chip in around 2008, 2009.

17    It's fully compliant with VDSL2 and G.INP.  It was offered in

18    the marketplace from 2009 through 2012.  And it also supports

19    the 30A profile, the most demanding profile in the VDSL2

20    standard.

21    Q.    For this particular DSL chip, how is the DSL portion

22    designed?

23    A.    Let's go to the next slide.

24         And this is a block diagram that shows as you take these

25    DSL algorithms satisfied in the standard and try to turn them

1   into an electronic device, you really partition it into a

2   processor, that's the programmable part that the C code, the

3   source code, is compiled down to run on.  And on the bottom,

4   you have all these hardware accelerators, and they kind of do

5   the heavy lifting.  They are very specific.  They each do one

6   thing really well.

7   Q.   And for your analysis, Doctor Heller, did you concentrate

8   on one part of the accelerator in particular?

9   A.   Yeah, I did.  I looked at the interleaver retransmission

10  hardware accelerator.

11  Q.   And looking at the hardware, the interleaver

12  retransmission hardware accelerator, what is this made out of?

13  A.   Yeah.  So this one, it's mostly memory.  It's actually

14  like no more than five percent logic.  I mean, every

15  accelerator is a mixture of logic--that's 'and' 'and/or' gates

16  that actually do computations, do things like add numbers--and

17  memory that hold data like a chalkboard would.

18       And so every one of these accelerators is a mixture of

19  logic and memory.  Some of them have a lot of logic like the

20  type of main filtering block.  But the interleaver

21  retransmission, it's almost all memory.  It's 95 percent

22  memory because mostly it's just holding data and then

23  shuffling it around.

24  Q.   How is memory in a microchip measured?

25  A.   So we measure memory in bits.  Right?  A bit is a 1 or a

```
 1   O.   Then if you have 8 bits, that's a byte.  If you have a

 2   thousand bites, that's a kilobyte.  If you have million bytes,

 3   that's a megabyte, which in megabytes and gigabytes, you know

 4   that from buying a smart phone.  So it's really how we just

 5   measure memory in chips in terms of bits and bytes.

 6            THE COURT:  Could you slow down just a little bit

 7   please, Doctor Heller?

 8            THE WITNESS:  Yes, sir.

 9            THE COURT:  Thank you.

10       Go ahead, counsel.

11            MR. WILSON:  Thank you, Your Honor.

12   Q.   (BY MR. WILSON)  Memory on a microchip, how does it

13   actually take up physical space on the microchip surface?

14   A.   So every bit of memory is made up of -- is held by a

15   group of several transistors, and then bits are independent.

16   So the more bits of memory you have, the more transistors you

17   have.  It scales linearly.

18   Q.   In the interleaver and retransmission hardware

19   accelerator, does the interleaver functionality and

20   retransmission functionality use separate memories or

21   different memories?

22   A.   Oh, we use a shared memory.  We would use -- we would

23   have several memory blocks that would function as a pool that

24   could be then assigned, allocated, to interleaving or

25   retransmission.
```

1    Q.   And you personally have designed DSL chips that have the

2    shared memory functionality?

3    A.   Absolutely.  That VINAX chip I mentioned back at the

4    introduction from 2005, that had shared memory, and every

5    subsequent DSL chip we built after that had shared memory.

6    Q.   Why did you design DSL chips with shared memory?

7    A.   Because it's more efficient.  It saves space.  Rather

8    than have kind of separate blocks of memory for each different

9    function from the maximum you might need for each one, by

10   combining them together you can actually use the memory where

11   you need it and you don't have as much extra lying around.

12   And, therefore, you make a smaller, better chip.

13   Q.   Doctor Heller, after considering this particular part of

14   this particular chip, what is your conclusion about how many

15   bytes are required for interleaver and retransmission memory?

16   A.   Yes.  So from the, you know, the careful reading of the

17   ITU standard, 65,536 bytes are the minimum required memory for

18   interleaving and retransmission to support VDSL2 and G.INP.

19   Q.   And what percent of the area for the VDSL2 functionality

20   of a DSL chip is taken up by this memory?

21   A.   Yeah.  Those 65,536 bytes, so if we're building a chip

22   with minimal amount of memory required, that's 10 to 15

23   percent of the area of the VDSL2 part of the chip.

24   Q.   How do you know that that percent is the correct one?

25   A.   Because that was my job.  I was responsible for the area

1    of our devices.  I was being held to that number by my

2    management by organization for many years, so I had to know

3    these things.

4    Q.   Thank you, Doctor Heller.

5            MR. WILSON:  Pass the witness, Your Honor.

6            THE COURT:  Cross-examination by the Defendants?

7            MR. BARTON:  Yes, Your Honor.

8            THE COURT:  All right.  Proceed when you're ready,

9    Mr. Barton.

10           MR. BARTON:  Thank you, Your Honor.

11                        CROSS EXAMINATION

12   BY MR. BARTON:

13   Q.   Good afternoon, Doctor Heller.

14   A.   Good afternoon.

15   Q.   We've not met before, have we?

16   A.   No.

17   Q.   Okay.  Now, did I hear correctly during your direct

18   testimony that you were at Aware for 19 years?

19   A.   Yes, that's correct.

20   Q.   What was the -- the rough window of time you were there?

21   A.   Oh, it started December 17th, 1990, and it ended in

22   November of 2009.

23   Q.   Okay.  And do I understand it correctly that Aware is a

24   company that Mr. Michael Tzannes founded?

25   A.   He did not found it actually.  I joined it before he did.

1    Howard Reznikov founded it.  Michael joined shortly after I

2    did.

3    Q.    Okay.  And then Mr. Marcos Tzannes worked there as well.

4    Right?

5    A.    Yes, he did.

6    Q.    So I'm assuming you're pretty familiar with him?

7    A.    I am familiar with him, yes.

8    Q.    Fair to sat you are good friends?

9    A.    I'm friendly acquaintances with them.

10    Q.    Okay?

11    A.    We worked together for many years in a positive way.

12    Q.    Okay.  Now, if I understood correctly, you were

13    responsible for building and leading Aware's chip design team.

14    Right?

15    A.    Yes.

16    Q.    And during that time, my understanding is that your team,

17    the team you led, was first to market with a number of ITU

18    standard compliant chips.  Is that right?

19    A.    Yes, that's our belief.

20    Q.    Was Aware actually making the chips or were they

21    designing the chips for somebody else to make?

22    A.    Good question.  Both.  We -- some of the -- in all cases,

23    we were designing chips for others to make.  In some cases,

24    others undertook the fabrication of the chips and selling of

25    them.  And so we would often fabricate our own designs as part

1    of -- for example, we did that for that our first VDSL2 plus

2    compliant chip.  And one of our customers took that exact GDS2

3    and brought it to market.  That GDS2 is like the final image

4    that you map onto the wafer to make the chip.

5         So we -- we were not in the chip business ourselves, but

6    we produced the final level of detail description of a chip

7    for production for some of our customers.

8    Q.   And the chips that you would design at Aware would comply

9    with the ADSL2, VDSL2, and G.INP standards.  Right?

10   A.   Yes.

11   Q.   And what that means as a practical matter is that the

12   functionality of those standards was in the chips.  Right?

13   A.   Yes.

14   Q.   Is it fair to say that your testimony here for the jury

15   is about the chips?  Right?

16   A.   Yes.  I am here to speak about the chips.

17   Q.   Okay.  And one of the things you testified about was

18   shared memory.  Right?

19   A.   Yes.

20   Q.   And if I understand correctly, what you just told us was

21   that that shared memory was on the chips that your team

22   designed.  Right?

23   A.   Yes.

24   Q.   Now, eventually you left Aware and went to a company

25   called -- is it Lantiq?

1    A.   However you want to say it.

2    Q.   How did you say it?

3    A.   I said it Lantiq.

4    Q.   Okay.  And when you left to go to Lantiq, that was in

5    connection with the sale of Aware's chip design business.

6    Right?

7    A.   Yes.

8    Q.   And when that happened, when you went from Aware to

9    Lantiq, you understand that Lantiq received a license to

10   Aware's DSL patents.  Right?

11   A.   I have a vague understanding of that, yeah.

12   Q.   Fair enough.  But you knew that when Lantiq made a chip,

13   that it can make those chips without fear of a lawsuit from

14   Aware.  Is that fair?

15   A.   Yes.

16   Q.   And isn't it true as well that Lantiq knew that its

17   customers, the people that Lantiq sold its chips to, could buy

18   Lantiq's chips and put them in their products without fear of

19   being sued by Aware on DSL patents.  Right?

20   A.   That is not an area I have knowledge of.

21   Q.   So you just don't know?  Is that fair?

22   A.   Yeah.  I don't know.

23            MR. BARTON:  Pass the witness, Your Honor.

24            THE COURT:  Is there further direct?

25            MR. WILSON:  No further direct, Your Honor.

```
 1              THE COURT:  All right.  You may step down, Doctor
 2    Heller.
 3              THE WITNESS:  Thank you very much.
 4              THE COURT:  You're welcome.
 5         Plaintiff, do I understand you have a deposition witness
 6    to offer at this time?
 7              MR. DAVIS:  That's correct, Your Honor.
 8              THE COURT:  All right.  Proceed with your witness by
 9    deposition.
10              MR. DAVIS:  Your Honor, Plaintiff calls Mr. Jim
11    Shead from CommScope by deposition.  The time allotments are
12    15 minutes for the Plaintiff and 5 minutes for the Defendant.
13              THE COURT:  Proceed with this witness by deposition.
14              MR. DAVIS:  Thank you, Your Honor.
15              THE COURT:  Are we having a technical problem with
16    the audio?
17              MR. DAVIS:  We are, Your Honor.
18              THE COURT:  All right, then.  Let's do this so we
19    don't waste any time.
20         Ladies and gentlemen, I was planning to recess after this
21    short deposition.  We'll go ahead and recess now, ladies and
22    gentlemen, and hopefully during the interim this question or
23    issue can be worked out.
24         Members of the jury, if you'll simply close your
25    notebooks and leave them in your chase, please.  If you'll
```

 1    follow all my instructions, including not to discuss the case

 2    with each other, we will be back here shortly and hopefully

 3    continue with the deposition witness.

 4        The jury's excused for recess at this time.

 5            (Whereupon, the jury left the courtroom.)

 6            THE COURT:  Counsel, I have a request, and that is

 7    if you will speak with your support staff behind the bar,

 8    there have been instances today where people have entered and

 9    left the courtroom and they've done so rather noisily.  And

10    when the mechanism on the back door makes a sound, there are

11    at least two or three members of the jury who turn every time

12    to see who is coming and who is going.          That door

13    will open and close quietly.  I've done it myself.  You need

14    to insist that staff opens and closes it and enters and leaves

15    as quietly and discreetly as possible not to distract the

16    jury.  All right?

17            MR. DAVIS:  Yes, Your Honor.

18            MR. DACUS:  Understood.

19            THE COURT:  We'll make this a short recess.  The

20    Court stands in recess.

21                    (Brief recess.)

22            THE COURT:  Be seated, please.

23        I understand we're ready to proceed with the deposition

24    witness?

25            MR. STEVENS:  May I raise a quick issue, Your Honor?

1          THE COURT:  I guess you may.

2          MR. STEVENS:  I have been informed that the next

3     live fact witness that Plaintiff intends to call was in the

4     courtroom for portions of testimony before he testifies which

5     I believe violates the Rule.  We'd ask the Court's with the

6     Court's blessing to voir dire the witness before he takes the

7     stand to see if the Rule has been violated.

8          THE COURT:  And who specifically are you talking

9     about, Mr. Stevens?

10          MR. STEVENS:  Michael Tzannes.

11          THE COURT:  Mr. Davis, do you have anything to say

12     on this?

13          MR. DAVIS:  Your Honor, I've looked into the matter

14     and in fact Mr. Tzannes did come in.  I've been told that he

15     came in for the last minute, and it was an inadvertent.  But

16     he did come in for the last minute of Mr. Heller's testimony.

17          THE COURT:  All right.  Well, obviously he needs to

18     be voir dired outside the presence of the jury.  The jury's

19     out of the room.  I understand that there's going to be a

20     deposition played in between, but I see no reason why you

21     can't take him on voir dire now.

22          MR. STEVENS:  Thank you, Your Honor.  Happy to do

23     so.

24          THE COURT:  Mr. Tzannes, where are you in the

25     courtroom?  Or are you outside of the courtroom now?

```
 1              MR. DAVIS:  He's outside the courtroom right now,

 2   Your Honor.

 3              THE COURT:  Why don't you go get him, Mr. Davis.

 4              MR. DAVIS:  Yes, Your Honor.

 5              THE COURT:  I assume this will be brief, Mr.

 6   Stevens?

 7              MR. STEVENS:  I'm sorry, Your Honor?

 8              THE COURT:  I assume this will be brief?

 9              MR. STEVENS:  Oh, very brief.

10              THE COURT:  Mr. Tzannes, please come forward.  I'm

11   going to ask you to be to sworn be I our Courtroom Deputy.

12              (Whereupon, the oath was administered by the Clerk.)

13              THE COURT:  All right.  Why don't you come around,

14   have a seat on the witness stand very briefly.  There are some

15   questions that will be asked about your presence in the

16   courtroom before you were called to testify.  This is not when

17   your ordinary testimony will be given.  We'll do that later.

18              THE WITNESS:  Okay.  Thank you, Your Honor.

19              THE COURT:  Mr. Stevens, you may proceed.

20                  MICHAEL ANDREW TZANNES, SWORN,

21   having been duly sworn, testified under oath as follows:

22                     VOIR DIRE EXAMINATION

23   BY MR. STEVENS:

24   Q.   Mr. Tzannes, it's true, is it not, that you walked into

25   the courtroom with Mr. Fink during Mr. Heller's testimony?  Is
```

1    that right?

2    A.    It is true.

3    Q.    And you sat in one of the back rows over on the left

4    side.  Is that right?

5    A.    Right side as we're looking out, but yes.

6    Q.    Thank you.  And you sat there for a bit.  Mr. Fink moved

7    up to the front of the room.  Is that right?

8    A.    Correct.

9    Q.    And then Mr. Fink moved to the back of the room a couple

10   of minutes later.  Is that right?

11   A.    Yes, and told me to leave.

12   Q.    And then you excused yourself for a few minutes.  Right?

13   A.    For the rest of the time, yes.

14   Q.    And did you not come back in before Mr. Heller was

15   completed?

16   A.    No, I did not, sir.

17   Q.    So your testimony is that you were not in this room for

18   the last minute or two -- in addition to being earlier in the

19   room, you were not in the room for the last minute or two of

20   Mr. Heller's testimony?

21   A.    I was not, sir.

22   Q.    Okay.  Has anybody shown you any transcripts of anything

23   that's happened in this courtroom so far in this case?

24   A.    No, sir.

25   Q.    Have you talked to your brother, Marcos Tzannes,

1   before -- at any point in time since the trial has started?

2   A.   I certainly have talked to my brother since the trial has

3   started.

4           MR. DAVIS:  Your Honor --

5   Q.   (BY MR. STEVENS)  Did you talk to your brother about --

6           THE COURT:  Go ahead.

7   Q.   (BY MR. STEVENS)  Did you talk to your brother about the

8   contents of his testimony?

9   A.   I did not.

10  Q.   Your brother didn't ask -- didn't tell you any questions

11  he was asked on the stand or the subject matter of his

12  testimony at all?

13  A.   No, he did not.

14  Q.   Okay.

15          MR. STEVENS:  Thank you, Your Honor.

16          THE COURT:  All right.  Does Defendant have any

17  objection to the testimony of Mr. Tzannes in light of that

18  voir dire?

19          MR. STEVENS:  I do, Your Honor.  He was in the room

20  for Mr. Heller's testimony.

21          THE COURT:  It appears that you have established he

22  was in the room for some very small portion of Doctor Heller's

23  testimony.  There's been no establishment that he heard it,

24  understood it, considered it, internalized it.  For all I

25  know, he may have been playing tic-tac-toe on his cell phone.

1   So there's been nothing to establish facts that would

2   disqualify him or limit his ability to testify as a fact

3   witness.

4       You had your opportunity to voir dire, and the Court will

5   consider that any objection to Mr. Tzannes' testimony, in

6   light of the voir dire that's been freely given, is overruled.

7               MR. STEVENS:  Understood, Your Honor.

8               THE COURT:  All right.  Now you may step down, Mr.

9   Tzannes --

10               THE WITNESS:  Thank you, Your Honor.

11               THE COURT:  -- and you may leave the room until you

12   are called to testify.

13       The Court finds there has been a technical violation of

14   the Rule, but there's been no establishment of a substantive

15   violation that would impede the witness' ability.

16       All right.  Mr. Davis, are you prepared to go forward

17   with your witness by deposition?

18               MR. DAVIS:  We are, Your Honor.

19               THE COURT:  All right.  I just want to note one

20   thing.  I'm going to charge that time to the Defendant.  I

21   also am going to advise counsel that there have been repeated

22   problems with the overnight meet-and-confer process, as I have

23   spoken with you at length about in chambers, including among

24   other things the failure to advise the Court with any

25   specificity as to objections, the failure of the parties to

1    attach disputed demonstratives or other documents, the

2    parties' failure to specify or attach portions of disputed

3    depositions for presentation to the jury, vague and imprecise

4    objections such as this calls for testimony beyond the

5    expert's testimony -- excuse me, beyond the expert's reports

6    when the particular expert would have filed multiple reports

7    of thousands of pages and the parties apparently have expected

8    the Court to comb through all those documents to see whether

9    there was or wasn't any support in the reports of the expert

10   for the questions asked.

11        These kind of ongoing failures on the parts of the party

12   which have been clearly delineated to the parties by the Court

13   have caused the Court to waste considerable time.  Over the

14   lunch hour today, I expended at least 20 minutes with the

15   parties going over deposition designation and

16   counterdesignation disputes that could have and would have

17   been resolved earlier and without the use of that time, had

18   they complied with the Court's rules and instructions.

19        Therefore, I am deducting 20 minutes of trial time, 10

20   minutes from each side, to make up for the very late start

21   after lunch.  You recall I told the jury I knew how to read a

22   clock, but there were things that arose that caused me to be

23   later than starting back from what I estimated for them.

24        And if the parties can't comply with the Court's pretrial

25   directives on how to submit overnight disputes for prompt and

1    reasonable resolution by the Court, I will continue to take

2    whatever actions necessary.  Hopefully, a very minor 10-minute

3    per side charge will send a message to you that I'm serious

4    about the repeated instructions I've been giving you in

5    chambers.

6         All right.  With that explanation, let's bring in the

7    jury.

8              (Whereupon, the jury entered the courtroom.)

9              THE COURT:  Please be seated, ladies and gentlemen.

10        Now, Mr. Davis, are you prepared to present your

11   deposition witness?

12             MR. DAVIS:  We are, Your Honor.

13             THE COURT:  Please call your witness and identify

14   them for the record.

15             MR. DAVIS:  Your Honor, Plaintiffs call Mr. Jim

16   Shead by deposition.  The time is 4 minutes and 48 seconds for

17   the Plaintiff and 2 minutes and 12 seconds for the Defendant.

18             THE COURT:  All right.  Proceed with this witness by

19   deposition, please.

20             MR. DAVIS:  Yes, Your Honor.

21             JAMES DANIEL SHEAD, BY SWORN DEPOSITION,

22   Q.   What is your full name, sir?

23   A.   James Daniel Shead, but I go by Jim.

24   Q.   And, Mr. Shead, where do you live?

25   A.   I live in Austin, Texas.

1    Q.    What company do you work for, Mr. Shead?

2    A.    I work for a company called CommScope Technologies.

3    Q.    What is your job title at CommScope now?

4    A.    Senior corporate counsel for litigation.

5    Q.    And what did you do to prepare for your testimony on

6    CommScope's behalf today?

7    A.    So in addition to my own knowledge, I met with my

8    attorneys, plural--attorneys plural.

9    Q.    Just to be clear, Mr. Shead, did you call anybody other

10   than your attorneys to ask them any questions to prepare for

11   your testimony today?

12   A.    No.

13   Q.    Do you see the topic here:  For each alleged acceptable

14   alternative to the accused products, the identity of any

15   patents that CommScope believes or have stated or represented

16   to others, whether externally or internally, are practiced by

17   each said acceptable alternative.

18         Do you see that?

19   A.    That's what the topic says, yes.

20   Q.    So are there any patents that CommScope is aware of

21   responsive to this topic?

22   A.    My understanding is that there's not any alleged

23   acceptable alternatives.

24   Q.    And for this topic here, what efforts has CommScope

25   undertaken to identify the patents and/or patent claims that

1    are essential to the practice of any of the DSL standards

2    related to this case?

3    A.   I mean, I'm not aware of any efforts.  I understand -- I

4    think TQ Delta's expert did this analysis.  I'm unaware of any

5    efforts initiated by CommScope.

6    Q.   Does CommScope contend there are any patents or patent

7    applications that it has that cover all or part of the accused

8    functionality within the accused products?

9    A.   I'm not aware of such a contention.

10   Q.   Do you see here on the second line where it says, TQ

11   Delta has not made any offers on FRAND terms?

12   A.   That's correct.

13   Q.   What is the basis of CommScope's position there?

14   A.   Of the rates that they have offered, they do not strike

15   us as FRAND terms.

16   Q.   And why is that, Mr. Shead?

17   A.   Well, as disclosed to Ms. Divine and Mr. Bernstein, TQ

18   Delta's rates, totaling over two dollars per box in some

19   instance, would take up approximately half of the profit for

20   some of the boxes, given that some of the features are

21   optional, some of the features are not standard essential, and

22   some of the features are not actually used by our customers.

23   Taking half of the profit for an entire box does not strike us

24   as fair and reasonable.

25   Q.   Mr. Shead, so my understanding of what you're saying is

1   that the -- that CommScope's position is that the offer is not

2   a FRAND offer because the rates are too high.  Is that

3   correct?

4   A.    The rates that they are offering are -- are out of

5   proportion with the technology contained, as we understand it,

6   with respect to our profit margin on this technology.

7   Q.    And come back around to it, they weren't FRAND because

8   CommScope considers those rates to be too high proportionally

9   to its profit on the boxes.  Is that correct?

10  A.    So in some cases it's -- it's half of the profit that we

11  make on the box.  The product -- the boxes may be subject to

12  other patent pools, and spending half of the profit for a

13  particular box is not FRAND.

14  Q.    Does CommScope have any contention, knowledge, or belief

15  regarding what constitutes a reasonable, non-discriminatory

16  licensing term under applicable ITU patent policies?

17  A.    I believe that will be the subject of expert testimony.

18  I don't know as I sit here.

19  Q.    Prior to this suit, did CommScope ever make a

20  determination that the -- or form a belief that the rates that

21  were offered by Delta were not RAND or FRAND rates under

22  applicable ITU patent policies?

23  A.    I don't know.

24  Q.    So they may have been RAND or FRAND rates under

25  applicable ITU patent policy, CommScope just doesn't know?

1    A.   I don't know.  I imagine our expert will opine on that at

2    length.

3    Q.   And does CommScope have any licensing policies and

4    practices related to the patent rights of others?

5    A.   Generally, everything is just a case-by-case basis.

6    Q.   And what do you mean by everything is just a case-by-case

7    basis, Mr. Shead?

8    A.   There is no official policy.  Every matter is examined on

9    its own merits.

10   Q.   Mr. Shead, is there any written patent-licensing policy

11   at CommScope?

12   A.   No.

13   Q.   Mr. Shead, what policies, procedures, or approaches, if

14   any, does CommScope have related to valuing technology,

15   including patented technology?

16   A.   So no written policy.  It's a case-by-case evaluation.

17   Q.   What is CommScope's understanding of DSL industry

18   licensing practices?

19   A.   I don't believe CommScope has an understanding of DSL

20   industry licensing practices, although this may be the subject

21   of expert report.

22   Q.   Does CommScope have any understanding of DSL industry

23   licensing practices?

24   A.   I'm unaware of any, although this may be the subject of

25   expert testimony.

1   Q.   And what does CommScope do to monitor the ITU-T TSB

2   patent database?

3   A.   Unaware of any efforts by CommScope.

4   Q.   And does CommScope ever review the ITU-T TSB patent

5   database?

6   A.   I'm unaware of any efforts to review that database.

7            MR. DAVIS:  This concludes the deposition, Your

8   Honor.

9            THE COURT:  All right.  Call your next witness.

10            MR. DAVIS:  Plaintiffs call Dr. Peter Heller.  I'm

11   sorry.  Excuse me, Your Honor.  Plaintiffs call Dr. Michael

12   Tzannes to the stand.

13            THE COURT:  All right.  If you'll bring him in from

14   outside the courtroom, we'll proceed.

15        Mr. Fink, you may go to the podium.

16            MR. FINK:  Thank you, Your Honor.

17            THE COURT:  If you'll come forward, please, Mr.

18   Tzannes.  I'm going to ask you to be sworn again, please.  I

19   want the jury to see you take the oath.

20            THE WITNESS:  Very good.

21            (Whereupon, the oath was administered by the Clerk.)

22            THE COURT:  All right.  Now if you'll come around

23   and have a seat on the witness stand, please, sir.

24        All right, Mr. Fink.  You may proceed with direct

25   examination.

1          MR. FINK:  Thank you, Your Honor.

2          MICHAEL ANDREW TZANNES, SWORN,

3    having been duly sworn, testified under oath as follows:

4                     DIRECT EXAMINATION

5    BY MR. FINK:

6    Q.    Would you please state your name, sir?

7    A.    Michael Andrew Tzannes.

8    Q.    And, Mr. Tzannes, where do you live?

9    A.    I live in Boston, Massachusetts.

10   Q.    Briefly, would you summarize your education for us,

11   please, sir?

12   A.    I have an undergraduate, a master's, and a Ph.D. in

13   electrical engineering with a focus on communication systems.

14   Q.    And, Mr. Tzannes, are you familiar with the company Aware

15   that sold its patents to TQ Delta?

16   A.    Yes, I am.

17   Q.    How are you familiar with Aware?

18   A.    I was at Aware for 22 years, and was CEO of Aware from

19   1998 until 2010, and then was executive chairman until late

20   2011, and then ran a group we called Patent Management

21   Operations until I left in 2012.

22   Q.    So you were in charge of Patent Management Operations at

23   the company that sold its patents to TQ Delta?

24   A.    Yes, I was.

25   Q.    Doctor Tzannes, are you familiar with Aware's agreements

1    to license patents from the late 1990s to 2012?

2    A.    I am very familiar with those, yes.

3    Q.    And how are you familiar, Doctor Tzannes?

4    A.    Well, I was CEO most of the time.  And before I was CEO,

5    I started the licensing group at the licensing business at

6    Aware.  So I either personally negotiated and signed those

7    agreements, or after I became CEO, people who worked for me

8    signed those agreements.

9    Q.    And what was Aware's business, Doctor Tzannes?

10   A.    We were a licensing company.  So we would design and

11   develop technology and create licensable products from that

12   technology.

13   Q.    And, Doctor Tzannes, what type of technology did Aware

14   develop?

15   A.    Well, there had been an advancement in mathematics in the

16   early '90s called wavelets.  And we were looking to apply

17   wavelets to a number of areas, and we ended up looking into

18   communications.  I joined, after the Ph.D., to look at

19   applying wavelets to communication systems, and we focused on

20   DSL technology, but we also did other things like wireless

21   communications.

22   Q.    And, Doctor Tzannes, did Aware manufacture any products?

23   A.    We did not.

24   Q.    And, Doctor Tzannes, what have you done since leaving

25   Aware in 2012?

1    A.   I did some individual investing.  I joined the board,

2    mainly of small companies.  I started a company about nine

3    years ago that we sold to Facebook last year.

4    Q.   And, Doctor Tzannes, how would you respond to somebody

5    who says that a technology company that doesn't manufacture

6    products is not a real company?

7    A.   I wouldn't agree with that.  I think it's -- it's sort of

8    nonsense.  There are a lot of companies, technology companies,

9    that don't manufacture their own products.  I can think of

10   many examples.

11        Apple makes phones.  We're all familiar with those.

12   Apple is certainly a real company, but they don't actually

13   manufacture their own phones.  They sell them, they put their

14   name on them, but they don't manufacture them.

15   Q.   And, Doctor Tzannes, what types of companies wanted to

16   license Aware's DSL technology while you were CEO?

17   A.   One example was Siemens, a company called Siemens.

18   Q.   And what did Siemens want from Aware?

19   A.   A semiconductor device, a chip, a piece of silicon that

20   would take our DSL technology and allow them to make a chip

21   that they could sell to DSL device manufacturers.

22   Q.   And what year did Siemens approach Aware?

23   A.   1997, 1998.

24   Q.   And did Aware enter into a contract with Siemens?

25   A.   We did, indeed.

1   Q.   Was DSL high speed internet even available in 1998?

2   A.   No.  As a matter of fact, it wasn't yet a market that was

3   known to consumers.

4   Q.   If there was not yet a high speed DSL market, what is

5   your understanding of why Siemens wanted Aware's technology?

6   A.   Well, there was -- there was a lot of anticipation that

7   there was going to be a big market for this.  Phone companies

8   were looking for new ways to get money from their subscribers

9   instead of just plain old telephone service, and DSL looked

10  very promising as a way for them to offer data service,

11  broadband.  And Siemens was interested in building chips to

12  address that opportunity.

13  Q.   And, Doctor Tzannes, what type of contract did Aware have

14  with Siemens?

15  A.   We executed a licensing and development agreement which

16  is often called a joint development agreement.

17  Q.   And what is a joint development agreement, Doctor

18  Tzannes?

19  A.   A joint development agreement is something where we

20  provide technology to our customer, but we also put a group of

21  our engineering team and their engineering team together to

22  work together to develop a product, in this case a chip for

23  DSL devices.  And that's what our joint development agreement

24  with Siemens was focused on.

25  Q.   And what did Aware get from the Siemens relationship?

1    A.    I can think of five distinct things that -- that we got

2    from that Siemens relationship.

3    Q.    And what was the first thing, Doctor Tzannes?

4    A.    The first thing was that at that time the market was

5    non-existent, and they effectively created a chip market for

6    us.  By working with a multinational giant company like

7    Siemens, we were able to take our technology and make it

8    available to the market in very low cost, high volume chips.

9    And that meant that there could be a consumer market for DSL.

10   Q.    And, Doctor Tzannes, what was the second thing that Aware

11   got from Siemens?

12   A.    I described earlier the development project of working

13   together to develop chips.  We would get paid for that.  So

14   over the years that we worked with Siemens, we were paid

15   millions of dollars for engineering work that we did with

16   their engineering teams.

17   Q.    And what was the third thing?

18   A.    We had a lot of intellectual property at the company, and

19   we were developing new intellectual property in patents.  And

20   Siemens allowed us to keep all of those patents, to continue

21   to own them, and that allowed us to have the opportunity to

22   license them to other people.

23   Q.    And what was the fourth thing that Aware got from

24   Siemens?

25   A.    We also executed a license with them for rights to our

1    patents, so the right for them to use our patents.  And we got

2    paid for that when they sold the devices we developed

3    together, which were chips.

4    Q.   And, Doctor Tzannes, what is the fifth thing that Aware

5    got from Siemens?

6    A.   One of the really important things that we got with

7    Siemens was the ability to participate in the rollouts of the

8    devices we built together of these chips.  And the reason

9    that's important is the best way to learn about a market is to

10   understand its problems.

11        So when we rolled out the first chips, we understood what

12   was -- what was not working as well or what could be improved,

13   and based on that we were able to come up with new

14   technologies and often new standards.  And that allowed us to

15   really build the business around licensing multiple

16   generations of DSL technology.

17   Q.   And, Doctor Tzannes, if a company had come to you as the

18   CEO of Aware and only wanted a license to your patents, what

19   would you have called that?

20   A.   We sort of refer to that as a naked patent license.

21   Q.   And why do you refer to that as a naked patent license?

22   A.   Because it doesn't involve anything other than a right to

23   use our patents.  It's just a patent license.

24   Q.   And would Aware have given, in your experience as a CEO,

25   the same monetary terms to a company that was asking for a

1    naked patent license as it did to a company that it was in a

2    joint development agreement with?

3    A.   We would not.

4    Q.   And why not?

5    A.   For the reasons I mentioned above, these five points that

6    I -- that I went through.  There was tremendous financial

7    benefit to us from those things.  So other than just the

8    royalty for a naked patent license, we were benefiting in

9    financial ways and in building our business ways through the

10   relationship we had in the joint development agreement.

11   Q.   And in your understanding as CEO, how would the terms

12   have been different for just a naked patent license?

13   A.   They would have been higher, the rates for just a naked

14   patent license would have to have been higher.

15             MR. FINK:  Mr. Diaz, could you pull up Exhibit 65-B,

16   appendix B, on the screen, please?  And, Mr. Diaz, would you

17   zoom in on this part down at the bottom, royalties for VDSL

18   products?  Thank you.

19   Q.   (BY MR. FINK)  Doctor Tzannes, do you see this image here

20   on the screen?

21   A.   Yes, Mr. Fink, I do.

22   Q.   And do you recognize what it's showing?

23   A.   I do see what it's showing, yes.

24   Q.   And what is that?

25   A.   This is a royalty table between Aware and Siemens for

1    VDSL products.  So in this case VDSL products are chips that

2    Siemens is selling for the VDSL market.  This, I believe, is

3    a -- is a document or is a table that appeared in several

4    agreements between Aware and Siemens--once in 2007; it

5    appeared again in 2009.  When we -- when we sold a group

6    within the company to Siemens, we restated this table.  And?

7    This table is actually a follow-on to a prior table that

8    existed for VDSL products that was agreed to in 2004, I

9    believe.

10   Q.   And, Doctor Tzannes, do you recall how the royalty

11   structure in this Siemens agreement came about?

12   A.   I do.  As you can see here, it's a percentage of the net

13   sales price of VDSL products.

14   Q.   And, Doctor Tzannes, I believe you say this is a Siemens

15   agreement.  Why does it say Infineon up at the top there?

16   A.   So we're going to be using these names interchangeably

17   today.  So Siemens became Infineon, became Lantiq.  So those

18   are all the same company.  They were the same people on the

19   side of Siemens, Infineon, and Lantiq, and they were

20   reorganizations.  They were financial things that happened.

21   But effectively for the purposes of these discussions, they

22   were the same company.

23   Q.   And, Doctor Tzannes, do you recall why this agreement

24   structured the royalty as a percentage of the net sales price?

25   A.   Yes, I do.

1    Q.   And why was that, Doctor Tzannes?

2    A.   Well, when we first reached these agreements with -- with

3    Infineon or Siemens, the market didn't really exist as I

4    described earlier so we really didn't know what these products

5    could sell for.  Neither of us knew that, neither Siemens nor

6    Aware.  So we agreed that we would sort of join in the risk.

7    If the products could be sold for a lot of money, we would

8    make more money.  If the products had to have a lower price,

9    we would make less.  So the percentage reflected that sharing

10   of risk.

11   Q.   And, Doctor Tzannes, do you see that this first entry

12   here is 18,438,389?

13   A.   I do, yes.

14   Q.   And do you know why that's different than the 20 million

15   units below that?

16   A.   I think it's because at this point in time -- so, yes, I

17   do.  I think it's because at this point in time we were

18   accounting for units that had already sold in the past.

19   Q.   And, Doctor Tzannes, did Aware have an obligation to

20   license under RAND terms from the ITU?

21   A.   Yes, we did.

22   Q.   And what is your understanding of Aware's RAND

23   obligation?

24   A.   It means that if a company comes to Aware and wants a

25   license to our patents, patents that are required for a -- a

1   standard, an ITU standard, we have to grant that license on

2   fair, reasonable, and non-discriminatory terms, FRAND terms as

3   they're called, and those -- the amount that we license them

4   for are often called FRAND rates.

5   Q.   And, Doctor Tzannes, what do you mean by those rates have

6   to be fair?

7   A.   So when we think about FRAND rates at Aware in this time

8   period, we were always thinking about naked patent licenses.

9   So I'll use an example to describe this because, even though

10  I've been doing this for a long time, I still find it

11  complicated and I find an example easier.

12      So if Company A comes to Aware and wants to license our

13  patents, we do so and we reach a rate with them.  So we set a

14  rate for Company A.  And then Company B comes and wants to

15  license patents, and we reach a rate with Company B.  Now is

16  when the FRAND obligation and the FRAND rates become a

17  question.

18      If Company A and Company B are similar companies, those

19  rates should be similar.  So we have to be consistent in the

20  rates that we grant to people who want our patents.  Another

21  way to think about it is that if Company A and Company B are

22  not similar, then the rates should not be the same.

23  Q.   And, Doctor Tzannes, briefly what do you mean by similar

24  there?

25  A.   Well, in this context of -- of this industry, is the

```
1    company we are talking about a chip company?  Is it a modem or
2    a transceiver company?  Is it a company with whom we have a
3    joint development agreement or is it a company with whom we
4    don't have a joint development agreement?  Those are some
5    examples.
6            MR. FINK:  Mr. Diaz, would you please pull up the
7    first page of Exhibit 81, please?
8    Q.   (BY MR. FINK)  Doctor Tzannes, do you recognize this
9    document here?
10   A.   Yes, I do.
11   Q.   And were you involved in creating this document?
12   A.   I was part of a group of -- a team of people who created
13   this document, yes.
14           MR. FINK:  Mr. Diaz, would you please turn to page
15   114 of this document?
16   Q.   (BY MR. FINK)  Doctor Tzannes, do you see this outline
17   here on the screen?
18   A.   Yes, I do.
19   Q.   And are you familiar with this from your time at Aware?
20   A.   Yes, I am.
21   Q.   And, Doctor Tzannes, overall, what was Aware saying on
22   this slide?
23   A.   So what we were saying on the slide in the -- in the
24   second bullet, for example, we were talking about the fact
25   that we had FRAND license obligations, which is what I just
```

1    described earlier.  And in the first bullet, we were telling

2    on this slide that we had active licenses with certain

3    companies, and they're listed here:  Ikanos and Lantiq.  And

4    now Lantiq is Infineon is Siemens, just for filling in the

5    confusion here, hopefully.

6    Q.   And, Doctor Tzannes, what was Aware telling a purchaser

7    like TQ Delta with a slide like this?

8    A.   Well, the first bullet was telling them that we had

9    licenses with chip companies, the chip companies being Ikanos

10   and Lantiq.  And the second bullet, I was simply saying we had

11   a FRAND license obligation.

12   Q.   And, Doctor Tzannes, what if a modem company had told you

13   at the time that it believed that the rates were set by these

14   Ikanos/Lantiq agreements?  Would you have agreed with that?

15   A.   I would not have agreed with that.

16   Q.   And why not, Doctor Tzannes?

17   A.   Because these rates were not FRAND rates.

18   Q.   Is there a reason why you're saying they're not FRAND

19   rates?

20   A.   Well, yeah.  Let's go back to a little more, again, the

21   Company A/Company B detail.  The -- and I'll pick one of the

22   two--Lantiq, the Siemens agreement.

23        Company A is Siemens, and Company A is a chip company,

24   semiconductor company, and is a company with whom we have a

25   many-year joint development agreement.  Company B in your

1    example is a modem company, so not a chip company, a modem

2    company, and a company with whom we do not have a many-year

3    license agreement.

4         So whatever rate we set with company A, Siemens, would

5    not be applicable to Company B, the modem company, because

6    they were not similar companies.

7    Q.   Doctor Tzannes, what would you have said to a modem

8    company in 2009 that came to you at Aware and said they wanted

9    the same Siemens royalty rates because they are FRAND rates?

10   A.   I wouldn't have agreed with that.  I wouldn't have been

11   able to do that.

12   Q.   And why not, Doctor Tzannes?

13   A.   Well, really the only way that a modem company coming in

14   2009, since we've got a specific time now, it's a slightly

15   different discussion, would be for that company to get into I

16   guess a time machine and go back to 1998 and become a chip

17   company and develop multiple generations of technology with us

18   and make a market, make a chip market with us, and sign

19   multiple joint development agreements with us, and then they

20   would look to us similar to what Siemens looked to us in 2009.

21        And if they were able to do that, then I would be

22   obligated to give them a similar licensing rate.  If they're

23   not able to do that, I cannot actually give them a similar

24   licensing rate because they are not similar.

25   Q.   Doctor Tzannes, how long did Siemens have an agreement

1   with Aware?

2   A.   Over 10 years.  From 1998 until -- I think 2009 was the

3   last agreement we signed with Siemens.

4   Q.   And, Doctor Tzannes, was that Siemens agreement amended

5   from when you first signed it in 1998?

6   A.   Yes.

7   Q.   Do you know how many times?

8   A.   25, 30 times.  Multiple times per year.

9   Q.   And to be clear, Doctor Siemens, sorry, strike that.

10       To be clear, Doctor Tzannes, was Siemens acquired by

11   another company?

12   A.   So technically Siemens spun off its chip group from

13   Siemens into a company called Infineon, which is why we saw

14   the name Infineon in our previous document.

15   Q.   And when was that?

16   A.   That was in 1999.  So right after we did our first

17   agreement.

18   Q.   And when Siemens became Infineon, did they inherit the

19   same agreement from Aware's perspective that it had with

20   Siemens?

21   A.   Yes, they did.  Yes.

22   Q.   And did Aware continue to work with the same people at

23   Infineon that it had at Siemens?

24   A.   For the most part, yes.

25   Q.   And so was Infineon acquired by another company?

1    A.   A similar transaction, Infineon ended up spinning off

2    part of its business into another company called Lantiq, which

3    is why we see Lantiq occasionally up here.  And that happened

4    in 2009, I believe.

5    Q.   And from Aware's perspective, did Lantiq then inherit the

6    relationship and the agreement that Aware had with Siemens?

7    A.   Yes, they did.

8    Q.   And did Aware continue to deal with the same people at

9    Lantiq that it had at Infineon and then at Siemens?

10   A.   For the most part, yes, of course.

11   Q.   And do you know at what happened to the company after

12   that?

13   A.   I do just because I've had friends Lantiq when it was --

14   when it was spun out.  Lantiq was acquired subsequently by

15   Intel in about 2015.

16   Q.   And did Aware sell its DSL group in 2009?

17   A.   We did.

18   Q.   And who did Aware sell it to?

19   A.   We sold the DSL group to Lantiq.

20   Q.   And why did Aware sell that group to Lantiq?

21   A.   Really it was financial reasons.

22   Q.   And can you explain what those financial reasons are,

23   Doctor Tzannes?

24   A.   Yes.  So when we started in the licensing business in the

25   late '90s, we had been very successful.  We had lots of

1    licensees; we were signing lots of joint development

2    agreements.

3         And over time the chip industry, the part of the DSL

4    industry that built and sold these semiconductor devices,

5    consolidated a lot.  Some of it was acquisition.  Some of it

6    was because some companies didn't make it.  And by the time

7    2008, 2009, rolled around, there were only a small number of

8    chip suppliers, and most of them were not paying us license

9    fees.  Most chips, to speak precisely.  Most chips being sold

10   were not paying us license fees.

11   Q.   And when Aware sold its business to Lantiq, did it keep

12   its royalty rates the same?

13   A.   Yes, we did.

14   Q.   And why was that?

15   A.   We really didn't even discuss it to the best of my

16   recollection.  We wanted business to remain the same.  They

17   were still going to be selling chips.  They had done a lot of

18   good for us, as I described, over the years.  They had helped

19   us create a market and build a business.

20        They were also buying a group of ours, the group that was

21   designing silicon devices for years, and they were making them

22   Lantiq employees.  So they were taking a large percentage of

23   our company, giving them jobs, and allowing them to continue

24   doing what they had been spending their career doing, which

25   was designing and building DSL chips.  So they were very happy

1    about that, and that made us happy as well.

2    Q.   And, Doctor Tzannes, did Aware retain anything related to

3    DSL when it sold that group to Lantiq?

4    A.   Yes, we did.

5    Q.   And what did Aware retain?

6    A.   We retained our intellectual property rights.  We

7    retained our patents.

8    Q.   And why did Aware do that?

9    A.   We did that because we believed that they were -- they

10   were very valuable, and we believed that there would be

11   opportunities for us to make money from them, to generate

12   shareholder value from licensing those patents -- from

13   licensing the patents.

14   Q.   And did Aware eventually end up deciding to sell those

15   patents?

16   A.   Yes, Mr. Fink, we did decide to sell the patents.

17   Q.   And when?

18   A.   We decided in 2011, and I think we -- we completed the

19   sale in 2012.

20   Q.   And why did Aware decide to sell its patents at that

21   time?

22   A.   We decided to sell them because the board of Aware and

23   our -- our shareholders -- Aware was a public company, so

24   we -- we were beholden to our shareholders.  They were

25   concerned that trying to license patents on our own was going

1    to cause problems.

2         And the problems they were worried about was, first of

3    all, potential retaliation back to our business.  We were

4    still in business as a company.  We were no longer selling DSL

5    licenses, but we were selling DSL test products.  So there was

6    fear that if we went and started litigating in the industry

7    that we were selling into, different products into, there

8    could be a retaliation back to that business.

9         Some of our board members were afraid that there could be

10   personal retaliation for becoming involved in patent

11   litigation suits.  And there was also concern that it was

12   going to take a lot of time and potentially a lot of money to

13   ever realize any actual gains from patent licenses.  So for

14   that reason, the board decided that we should try to sell our

15   patent portfolios.

16   Q.   And, Doctor Tzannes, did Aware ever attempt to get a DSL

17   company to take a naked patent license?

18   A.   No.  In fact, we never did.

19   Q.   Why not?

20   A.   For largely for the reasons I mentioned above.  We felt

21   that it would inevitably become something that could become

22   problematic for us.

23             MR. FINK:  Mr. Diaz, would you please put slide 13

24   of Defendants' opening up on the screen, please?

25   Q.   (BY MR. FINK)  Doctor Tzannes, do you see this image here

1    on the screen?

2    A.    Yes, I do.

3    Q.    Do you understand what this image is?

4    A.    Yes, I do.

5    Q.    And what do you understand it to be?

6    A.    So a Form 10-K is a form that a publicly-traded company

7    has to file every year.  It's called an annual report, and it

8    outlines the results for the year.

9    Q.    And is this from a year that you were involved in Aware's

10   patent management operations?

11   A.    Yeah, this is for the year 2011.  I was executive

12   chairman most of that year, and I was running the patent

13   management operations after that.

14   Q.    And, Doctor Tzannes, do you see this highlighted language

15   here on the screen?

16   A.    Yes, I do.

17   Q.    And so, Doctor Tzannes, do you understand -- what is your

18   understanding of what this highlighted language is telling us?

19   A.    It says that our patent licensing revenue during the last

20   three years was limited to an insignificant amount of revenue.

21   Q.    And, Doctor Tzannes, does that mean regarding DSL

22   royalties?

23   A.    This has nothing to do with DSL royalties.  We reported

24   in this form the royalties from our DSL joint development

25   agreements in a different place in a line in the financial

1    statements called royalties.  So this doesn't have anything to

2    do with DSL royalties.

3    Q.   What is this referring to, then, Doctor Tzannes?

4    A.   So this refers to licenses that we may have executed, and

5    these would be naked patent licenses that we may have executed

6    outside of DSL.  For example, we had written some MP3 audio

7    patents, and we had successfully licensed them in a naked

8    patent licensing program.  And that would be an example of the

9    kind of revenue that would be in this patent management line.

10   Q.   Doctor Tzannes, what ultimately happened to the DSL

11   portfolio that were retained?

12   A.   We ended up selling it to TQ Delta for $16 million in

13   2012.

14   Q.   And do you believe that was a good price?

15   A.   No.  I think we probably could have done better if we had

16   gone ahead and tried to license these patents on our own.

17              MR. FINK:  Pass the witness.

18              THE COURT:  Cross-examination by the Defendants?

19              MR. STEVENS:  Yes, Your Honor.

20              THE COURT:  Please proceed, Mr. Stevens.

21              MR. DACUS:  May we approach, Your Honor?

22              THE COURT:  You may distribute binders.

23                      (Pause in proceedings.)

24              THE COURT:  All right.  Let's proceed with cross.

25              MR. STEVENS:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. STEVENS:

Q.   Doctor Tzannes, I want to pick up on your analogy about
company A and company B.  Is that okay?

A.   Yes, sir.

Q.   And I think -- and correct me if I'm wrong, but I think I
heard your testimony to be that if company A gets a rate and
Company B approaches the patent owner at a later point in time
and is a similarly-situated company, then FRAND compels
company B to get a similar rate.  Is that right?

A.   Yes.

Q.   Okay.  So if Company A were to get a rate on a certain
standard of something like either 14 cents or 68 cents for
given years, and then Company B were there later and
they -- and the patent owner was attempting to charge that
company $1.66, that would violate the FRAND obligations.  Is
that right?

A.   Well, you have to -- I would say no, first of all.

Q.   Okay.  Again, two companies are similarly-situated.  You
think it's okay to charge company A either 14 cents or 68
cents depending upon the year, and try to charge company B
$1.66 for the same standards.  You think that's okay.

A.   You didn't explain to me how they are similarly-situated,
which is a very important part of the comparison between
companies A and B.

1    Q.   I want you to assume that they are similarly-situated.

2    Let's say they are competitors, they make competitive

3    products.  Is that okay, sir?

4    A.   That may not be enough to make them similarly-situated.

5    Q.   Okay.  Let's just take whatever your definition in your

6    mind is of similarly-situated.  Is that okay?

7    A.   Okay.

8    Q.   And if company A were to take a license and have to pay

9    either 14 cents or 68 cents depending upon the year, and the

10   same patent owner goes over to company B for the same standard

11   and tries to say, you need to pay me $1.66, that would violate

12   the FRAND obligation.  Is that right?

13   A.   Not necessarily, because if Company A -- I'll pick one of

14   the two.  If either company A or company B were providing some

15   other benefit--I'm assuming I'm Aware on the other side of

16   this--some other benefit to Aware, then that would become a

17   factor in addition to just the royalty rate.

18        So that has to be taken into consideration because it's

19   not necessarily just money that matters for Aware, yes.

20   Q.   Let's assume that they're naked licenses as you used that

21   term.

22   A.   Okay.

23   Q.   All right?  So let's assume similarly-situated companies.

24   Is that fair?

25   A.   Yes.

1    Q.   And let's assume they're both naked licenses.

2    A.   Yes.

3    Q.   Okay?  Again, if a patent owner were to say, all right,

4    company A, we'll let you do it with either 14 cents or 68

5    cents, and they sign that license, and then later they were

6    trying to get $1.66 out of a similarly-situated company, also

7    for a naked license, wouldn't that violate the FRAND

8    commitment?

9    A.   Are we talking about the same time frame, same years?

10   Q.   Let's say the years in question are the same.  Obviously

11   there's company A and then a later point in time there's

12   company B, just like in your hypothetical.

13   A.   I think if the patents that are being discussed are

14   identical and the use of the patents, in other words, the

15   products that companies A and B are the same, and the areas in

16   which those products are being sold are the same, and

17   potentially the volume, you didn't talk at all about what the

18   volume of these different products might have been, but

19   assuming they are also the same, it's possible that that would

20   be something that you would need to be careful about.  But you

21   have to really look into the details in great detail.

22   Q.   Okay.  I want to go back to your time at Aware.

23   A.   Yes.

24   Q.   Is that fair, sir?

25   A.   Sure.

1    Q.   Now, one of the documents that you discussed on your

2    examination was the license agreement between Infineon and

3    Aware.  Is that right?

4    A.   I did, yes.

5    Q.   Okay.

6    A.   Today, you mean.

7    Q.   I'm sorry.  If I misspoke, I meant today.

8    A.   Yes.

9    Q.   Okay.

10         MR. STEVENS:  If we could pull up Exhibit 65-B,

11   please.

12   Q.   (BY MR. STEVENS)  And this is a copy of that 2007

13   agreement between Infineon and Aware.  Is that right, sir?

14   A.   I don't see 2007 here, but I'll take your word for it.

15   Q.   Okay.  Now, in your relationship between those companies,

16   this in 2007 marked a new start of rights and obligations

17   between the parties.  Is that right?

18   A.   To the best of my recollection, what this was was an

19   attempt by our two companies to put what had been a number of

20   amendments that were sort of hastily often put together into

21   one single agreement.

22   Q.   Perhaps I didn't ask a good question.  This agreement

23   that we see on the screen, this represents a new start of

24   rights and obligations between these two companies.  Is that

25   correct, sir?

```
 1   A.   I'm not sure it does.  What I'm saying is I think it
 2   represented a recap of a lot of things that had been written
 3   in other agreements into one place.
 4   Q.   Okay.
 5   A.   It may have also had something new related to a new
 6   technology, but I'm not sure.
 7   Q.   Okay.
 8   A.   I'd have to look at the whole agreement.
 9   Q.   And you do agree with me this is called a license
10   agreement.  This is not termed a joint development agreement
11   at the top.  Is that right?
12   A.   This says license agreement.  It probably talks about
13   development inside the agreement.
14   Q.   So I'd like to look at the bottom of this page, the
15   whereas clause that spills over to the next page.  And it
16   says, "Whereas, this agreement shall also be regarded as a new
17   start of rights and obligations and both parties have the
18   common understanding that all claims of either party arising
19   out of or in connection with agreements concluded between the
20   parties prior to this agreement shall be regarded and treated
21   as fulfilled by the other party."
22        Did I read that correctly, sir?
23   A.   Yes, you did.
24   Q.   Thank you.
25        And in this license agreement, Aware provided a license
```

1   to Infineon for VDSL and any other related derivative or

2   extension standards.  Is that correct, sir?

3   A.   Relying on memory -- I'm not seeing that on the screen,

4   but relying on memory, that's -- that could be true.

5   Q.   Okay.

6   A.   We did that at some point.  I'm not sure if it was this

7   agreement.

8   Q.   All right.  Well, let's look at section 1.31 on page 5,

9   please.

10  A.   Okay.

11  Q.   And, again, here 1.31 right in the middle --

12  A.   Yes, I see it.

13  Q.   And, sir, so the VDSL technology defined in this

14  agreement was VDSL2 and any other related derivatives or

15  extensions.  Is that right?

16  A.   Correct.

17  Q.   And G.bond is a derivative or extension of VDSL.  Is that

18  right?

19  A.   I don't think so.

20  Q.   Okay.  And G.INP is a derivative or extension of VDSL?

21  A.   I don't think that's -- I mean, we'd have to look at the

22  definition of derivative extensions if you'd like.

23  Q.   Okay.  So you don't know about G.INP one way or the

24  other?

25  A.   I don't think it was either, but I would rather get

1    refreshed on the definition of derivative and extensions if

2    that's okay.

3    Q.   Okay.  And I'd like to look at the royalty terms that you

4    discussed with your counsel.

5            MR. STEVENS:  If we could go to page 27 of this

6    agreement.

7    Q.   (BY MR. STEVENS)  At the bottom we see royalties for VDSL

8    products.  Do you see that, sir?

9    A.   Yes.  This looks like what we were looking at earlier.

10   Q.   Yes, sir.  And you said that the VDSL product in question

11   here was the chipset.  Is that right?

12   A.   It's the chip that Infineon -- in this case, I think they

13   were called Infineon built.  It was a digital device.

14   Q.   Okay.  And if we look at the next two pages, the price

15   that we saw on that page would actually go down if the chip

16   included other functionalities.  Is that correct, sir?

17   A.   Yes, it is.

18   Q.   Okay.  And then --

19           MR. STEVENS:  We can take that down.

20   Q.   (BY MR. STEVENS)  -- there came a point in time where you

21   sold off your DSL business.  Is that right?

22   A.   There is a caveat to what you just said about it going

23   down.

24   Q.   Okay.  Mr. Fink will have all the opportunity --

25   A.   Oh, I'm sorry.  Thank you.

```
1    Q.   All right.  There came a point in time after the

2    agreement that we just looked at that you sold off your

3    business line.  Is that right?

4    A.   We -- as I said earlier, we decided to sell the group,

5    yes.

6    Q.   And that occurred in early 2009.  Is that right?

7    A.   Yeah, I think it -- I think the agreement was in late

8    2009, but yes.

9    Q.   Okay.  Let's look at Exhibit 65-A, please.

10   A.   Okay.

11   Q.   And this is the 2009 agreement between Aware and Lantiq.

12   Is that right?

13   A.   Yes, sir.

14   Q.   And this agreement was after you had already sold off the

15   business.  Is that right?

16   A.   I think it was at the same time actually.

17   Q.   Okay.  Let's look at the second page, and the second

18   whereas clause.  It says, "Whereas, the parties have entered

19   into the asset purchase agreement according to which Aware

20   sells certain of its assets and liabilities of its DSL

21   technology and home networking technology to Infineon or its

22   designee, and the transactions contemplated by such asset

23   purchase agreement shall be completed as of the date hereof."

24        Did I read that correctly, sir?

25   A.   You did, yes.
```

1    Q.    So from this day forward, you did not have a joint

2    development understanding with respect to DSL chips.  Is that

3    correct?

4    A.    That is correct.

5    Q.    All right.

6              MR. STEVENS:  And, again, if we look at the appendix

7    B, which bears the production number Aware 96?  Aware 96.  So

8    there you go.  Perfect.  Thank you.

9    Q.    (BY MR. STEVENS)  So at the bottom of this, we see the

10   royalties in this agreement.  Is that correct, sir?

11   A.    Yes, we do.

12   Q.    And, again, the VDSL product here is the chip.  Is that

13   correct, sir?

14   A.    Yes, it is.

15   Q.    And over the next two to three pages, again, the price

16   would actually be lower, it would be diluted in the event that

17   the chip Lantiq was selling had functionality beyond that of

18   DSL.  Is that correct, sir?

19   A.    Opportunity for me to add the caveat--if the selling

20   price of the chip was increased due to that additional, the

21   things being added.

22   Q.    Fair enough.  So in the event that the chip that Lantiq

23   made had a higher price because it had some other technology

24   on it, then the royalty would actually be lower than what we

25   see here on the screen.  Is that right?

1   A.   Correct, the concept being that if there -- if in this

2   case Infineon is adding value that is creating a more valuable

3   chip, we would agree that our percentage should go down a

4   little bit.

5              MR. STEVENS:  We can take that down.

6   Q.   (BY MR. STEVENS)  Now, there came a point in time after

7   you were CEO and after you were the chairman of the board that

8   you were in charge--and I'm going to get this wrong so correct

9   me--of patent management or --

10  A.   So we had called it two different things.

11  Q.   Okay.

12  A.   So you're forgiven, I guess.  Patent licensing operations

13  for a while, and then we called it patent management

14  operations.  And I was in charge of that group, yes.

15  Q.   And one of the things that you did while in charge of

16  that group is you sold certain patents to TQ Delta.  Is that

17  right?

18  A.   Yes, sir.

19  Q.   And you didn't sell TQ Delta all of Aware's DSL patents;

20  they got a fraction.  Is that true?

21  A.   Well, they got most of them.  We kept a small number

22  because, as I mentioned earlier, we had a testing diagnostics

23  business that we were still aspiring to build.  So we kept

24  some patents that related to DSL tests and diagnostics.

25  Q.   Okay.  So when you sold certain patents to TQ Delta, you

1    kept some.  Correct?

2    A.   A small number, yes.

3    Q.   And those patents related generally to diagnostics.  Is

4    that correct?

5    A.   Generally, yes.

6    Q.   All right.  And were you the one -- I withdraw that.

7         You were involved with the patent purchase agreement

8    between Aware and TQ Delta.  Is that right?

9    A.   I was in -- yes, I was involved.

10   Q.   Okay.  And one of the things that you did in the

11   PowerPoint presentation that you looked at with your counsel

12   is you told TQ Delta about the FRAND obligations.  Is that

13   right?

14   A.   I told TQ Delta and anyone who had that -- that

15   presentation was shown to a number of companies, but anyone

16   who was looking at that presentation was being told that we

17   had a FRAND obligation at the ITU.

18   Q.   Okay.

19             MR. STEVENS:  If we could pull up Exhibit 62,

20   please.

21   Q.   (BY MR. STEVENS)  Sir, this is the patent purchase

22   agreement between Aware and TQ Delta.  Is that right?

23   A.   Yes, sir.

24   Q.   And if we look at section 5.3, which is called Standards

25   Obligations on page 4, the section --

1          MR. STEVENS:  There we go.  Thank you.  If we could

2     blow that up.

3     Q.   (BY MR. STEVENS)  The agreement states purchaser -- and

4     I'm going to add parenthetically, purchaser here is TQ Delta.

5     Is that right?

6     A.   Yes, I believe so, yes.

7     Q.   So when we see purchaser, it's TQ Delta.  When we seller,

8     that's Aware.  Do I have that right, sir?

9     A.   Yes.

10    Q.   Okay.  So "purchaser acknowledges that seller has

11    committed to certain licensing obligations with respect to the

12    licensing of standard essential assigned patents as set forth

13    in Schedule F and the documents referenced therein."  That's

14    one of the things that you actually put into the contract in

15    selling the patents to TQ Delta.  Is that correct, sir?

16    A.   Is schedule F a list of patents?

17    Q.   Sir, did I read this --

18    A.   Yes, you read this correctly.  I'm sorry.  Yes, sir.

19    Q.   Thank you.

20         Now, one of the things that was on your mind when Aware

21    was selling its patents to TQ Delta was, well, what if TQ

22    Delta doesn't honor its obligation, is there a possibility

23    that someone might sue Aware.  That was one of the

24    circumstances that was on your mind as someone at Aware at the

25    time.  Is that right?

1    A.   I don't recall that being on my mind at all.

2    Q.   You don't recall that being on your mind at all?

3    A.   No.

4    Q.   You don't require -- you don't remember requiring TQ

5    Delta to sign up to defend you in the event that you were ever

6    sued because they breached the obligation that Aware

7    originally had.  You don't remember that?

8    A.   I don't remember that, but -- but I -- I could see how

9    the lawyers at Aware would argue for that.  I'm not saying it

10   didn't happen.  I'm saying I don't remember it.

11   Q.   Okay.

12            MR. STEVENS:  Well, let's look together at Schedule

13   F.  It's on the page bearing production number Aware 1855,

14   please.  So if we could blow up the second half of the top

15   paragraph.  There we go.  Thank you.

16   Q.   (BY MR. STEVENS)  On the fourth to the bottom line, I

17   want to make sure I read this right, sir.  And, again,

18   purchaser is TQ Delta, seller is Aware.  Is that correct, sir?

19   A.   Yes.

20   Q.   Purchaser, TQ Delta, agrees to indemnify seller, Aware,

21   and seller's assigns and successors in interest, for all legal

22   fees, costs, damages, and awards incurred by, or imposed on,

23   seller or seller's assigns or successors in interest, as a

24   result of, or related in any way to, purchaser's or

25   purchaser's assigns or successors in interest, non-compliance

1   with such standards obligations.

2        Did I read that correctly, sir?

3   A.   Yes, you did.

4   Q.   So one of the things you required TQ Delta to do is to

5   indemnify you, that means pay your legal fees and pay any

6   costs in the event that Aware got sued because they breached

7   the commitment.  Is that correct, sir?

8   A.   Yes, we did.

9   Q.   All right.

10            MR. STEVENS:  Now, if we look back a little bit

11   earlier in this agreement at page -- production number Aware

12   1824.  It's Schedule B.

13   Q.   (BY MR. STEVENS)  And you mentioned a moment ago that TQ

14   Delta did not get all the patents Aware had at the time.

15   Aware decided to keep certain patents for itself.  That's what

16   you said a few minutes ago.  Right?

17   A.   So this is a TQ Delta agreement.  Yes, that's correct.

18   Q.   You had a Schedule B here is excluded assets.  These are

19   patents of Aware's that you did not give to TQ Delta, did not

20   sell to TQ Delta.  Is that right?

21   A.   I'm sort of taking your word for it.  But, yes, it says

22   excluded assets.

23   Q.   All right.  And if we go down to the seventh row, we see

24   a particular United States patent.  Do you see that, sir?

25   A.   Yes.

```
1    Q.    And it's Patent No. 6,658,052.  Did I read that right?

2    A.    You did, yes.

3    Q.    And the title of that patent that did not go to TQ Delta

4    is "Multicarrier modulation system with remote diagnostic

5    transmission mode."  Do I have that right, sir?

6    A.    Yes, sir.

7    Q.    Do you appreciate that this is in the exact same family

8    as one of the asserted patents in this case?

9    A.    Do I appreciate that?

10   Q.    Do you know that?

11   A.    I don't know that.

12   Q.    So, in fact, certain of the families -- you didn't even

13   sell the entire family to TQ Delta.  You only sold them a

14   limited number of patents within a certain patent family.  Is

15   that right?

16   A.    That's what you're telling me, sir.

17   Q.    Okay.  Do you have any reason to think I'm wrong about

18   that?

19   A.    No.  I suspect you -- you aren't tell me something that's

20   not true.

21   Q.    Okay.  Do you know who Aware ultimately sold this '052

22   Patent to?

23   A.    I do not.

24   Q.    Are you aware that a couple of years later, Aware sold

25   off these patents to Broadcom?
```

1    A.   I do vaguely recall that that took place.  I was no

2    longer at Aware, so I -- but I think I heard that from

3    someone, yes.

4    Q.   So Broadcom actually owns some of the patents in this

5    same family that we're here to talk about in this trial.  Is

6    that right, sir?

7    A.   Apparently, yes.

8    Q.   Okay.

9         MR. STEVENS:  We can take that down.

10   Q.   (BY MR. STEVENS)  So when you left Aware, you went

11   to -- you started with your brother Tzannes Patent Management.

12   Is that right?

13   A.   Among other things.  But, yes, we did do that.

14   Q.   And TQ Delta has been your biggest client with that

15   company over the past decade.  Is that right?

16   A.   Correct, yes.

17   Q.   Now, just to be clear, you're not an investor, you don't

18   have any ownership interest in TQ Delta.  Is that right?

19   A.   No, I do not.

20   Q.   And so they're not going to share with you any proceeds

21   they get from any licensing.  Is that right?

22   A.   That is correct.

23   Q.   Okay.  In your 10 years, one of your roles has been a

24   litigation consultant to TQ Delta.  Is that fair?

25   A.   I guess, yes.

1    Q.   Did you tell Ms. Divine or others at TQ Delta about the

2    rates that Aware had charged Lantiq and Infineon as part of

3    your role with them?

4    A.   I did not, no.

5    Q.   Okay.

6             MR. STEVENS:  Your Honor, I pass the witness.

7             THE COURT:  All right.  Is there redirect, Mr. Fink?

8             MR. FINK:  Briefly, Your Honor.

9             THE COURT:  Please proceed with redirect

10   examination.

11                    REDIRECT EXAMINATION

12   BY MR. FINK:

13   Q.   Mr. Tzannes, earlier counsel showed you I guess part of

14   an agreement that had an indemnification clause.  Do you

15   recall that?

16   A.   I do.  It was -- who was it between?  I'm sorry.  We

17   looked at a lot of agreements.  I think it was between Aware

18   and TQ Delta.  Correct?

19   Q.   I believe so, sir.

20   A.   Yes, I do recall that.

21   Q.   And in your experience as a CEO, are indemnification

22   clauses common in selling products or assets?

23   A.   Yeah.  I would look at that language as -- as a -- as a

24   CEO as sort of standard language that lawyers would want to

25   put into any agreement involving sales of assets.

1    Q.    And are you aware of anyone ever threatening to sue Aware

2    related to TQ Delta?

3    A.    No, I am not.

4              MR. FINK:  No further questions.

5              THE COURT:  Additional cross?

6              MR. STEVENS:  No, Your Honor.

7              THE COURT:  All right.  You may step down, Doctor

8    Tzannes.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  You're welcome.

11             MR. DAVIS:  May Doctor Tzannes be excused?

12             THE COURT:  Any objection from Defendants?

13             MR. BARTON:  No objection, Your Honor.

14             THE COURT:  All right.  Doctor Tzannes, you are

15   excused, which means you're free to stay with us, you're also

16   free to leave.  You're no longer subject to the Rule.

17        Counsel, approach the bench, please.

18             (The following was had outside the hearing of the

19             jury.)

20             THE COURT:  All right.  Am I correct Plaintiff's

21   going to call Defendants' corporate rep adversely at this

22   point?

23             MR. BARTON:  Yes, Your Honor.

24             THE COURT:  Okay.  And remind me who that is, Mr.

25   Dacus?  You said he wasn't here during voir dire.

1           MR. DACUS:  It's Steve Wauters.

2           THE COURT:  Steve Wauters.

3           MR. DACUS:  Yes.

4           THE COURT:  Okay.  And he is the gentleman who's

5     been at your table.

6           MR. DACUS:  Yes, Your Honor.

7           THE COURT:  Okay.  How long do we expect this

8     witness to take?

9           MR. DAVIS:  An hour, 20, 30 minutes at the most,

10    Your Honor, is my expectation.

11          THE COURT:  And I assume a longer cross?  You are

12    basically going to put on your direct as your cross?

13          MR. DACUS:  Not a whole lot longer.  We are going to

14    do that, but it won't be 30 minutes or so.

15          THE COURT:  Okay.  All right.  Let's go.  Thank you.

16          (The following was had in the presence and hearing

17          of the jury.)

18          THE COURT:  Plaintiff, call your next witness,

19    please.

20          MR. DAVIS:  Your Honor, Plaintiff calls Steven

21    Wauters to the stand.

22          THE COURT:  All right.  If you'll come forward and

23    be sworn, Mr. Wauters.

24          (Whereupon, the oath was administered by the Clerk.)

25          THE COURT:  Please come around, have a seat on the

1    witness stand.

2         Ladies and gentlemen of the jury, just so you'll

3    understand, Mr. Wauters is here as the corporate

4    representative of CommScope, and him being called by the

5    Plaintiff is what we lawyers call being called adversely,

6    which means that the Plaintiff gets to examine him as if it

7    were a cross-examination and is permitted to lead the witness.

8         And then Defendants will cross-examine him in a way they

9    would do a direct examination of the witness.  The rules are a

10   little bit reversed when you have an adversely-called witness.

11   Just for informational purposes.

12        Mr. Davis, you may proceed.

13             MR. DAVIS:  Thank you, Your Honor.

14                   STEVEN WAUTERS, SWORN,

15   having been duly sworn, testified under oath as follows:

16                   DIRECT EXAMINATION

17   BY MR. DAVIS:

18   Q.   Good afternoon, Mr. Wauters.

19   A.   Good afternoon.

20   Q.   I'm Bo Davis.  I represent the Plaintiff TQ Delta in this

21   case.  You and I have never met before.  Correct?

22   A.   Correct.

23   Q.   It's nice to meet you.

24        You were not here on Friday for opening statements.  Is

25   that right?

1    A.   That's correct.

2         MR. DAVIS:  Can I please have

3    Plaintiff's -- Defendants' opening slide 3, please, Mr. Diaz?

4    Q.   (BY MR. DAVIS)  This slide was shown to the jury during

5    opening statements by CommScope.  Do you see here, sir, where

6    CommScope identified that it owns 15,000-plus global patents

7    and patent applications?

8    A.   Yes, I do.

9    Q.   And it's true, sir, isn't it, that CommScope is not

10   asserting any of those patents as prior art to any of TQ

11   Delta's patents.  Correct?

12   A.   I am not aware if that's the case or not.

13   Q.   And it's also true, is it not, sir, that none of these

14   15,000-plus DSL patents -- I'm sorry, global patents are DSL

15   standard essential patents?  Isn't that correct?

16   A.   I believe some of these are related to DSL patents.

17   Q.   But none of them are standard essential.  Isn't that

18   correct?

19   A.   I do not know.

20   Q.   Okay.  And were you here when Mr. Marcos Tzannes, the

21   inventor, testified, sir?

22   A.   Was that also on Friday?

23   Q.   Yes, it was.

24   A.   I was not here Friday.

25   Q.   Okay.  So if that -- if Mr. Tzannes testified that he was

```
1    unaware that CommScope had ever submitted any contributions

2    for any inventions to the ITU, would you have any reason to

3    disagree with that?

4    A.   I'd have to defer to my legal team and technical experts.

5    Q.   But you're not aware as you sit here?

6    A.   I'm not.

7    Q.   And you are here on behalf of CommScope?

8    A.   That is correct.

9    Q.   You are their corporate representative?

10   A.   Yes, I am.

11   Q.   And you speak for the entire company.  Is that right?

12   A.   Yes, I do.

13   Q.   Okay.  Now, do you know whether or not the installation

14   that CommScope made for the Dallas Cowboys stadium, do you

15   know whether that uses DSL?

16   A.   For Dallas Cowboy stadium, I believe it does not utilize

17   DSL.

18   Q.   Okay.

19   A.   Based on my knowledge.

20   Q.   And you understand from your time here in the courtroom

21   this week, that this case is about DSL?

22   A.   Yes, correct.

23   Q.   And so if the Dallas Cowboys stadium doesn't use DSL,

24   then whatever technology installation CommScope did for the

25   Cowboys is really irrelevant to this lawsuit.  Would you agree
```

```
 1   with that?

 2   A.   Correct.

 3   Q.   Okay.  Thank you.

 4           MR. DAVIS:  You can take that down, please, Mr.

 5   Diaz.

 6           THE COURT:  Mr. Wauters, adjust the microphone a

 7   little closer to you, please.

 8           THE WITNESS:  Yes, Your Honor.

 9           THE COURT:  Thank you.  Go ahead, Mr. Davis.

10           MR. DAVIS:  Thank you, Your Honor.

11   Q.   (BY MR. DAVIS)  Would you agree with me, sir, that

12   CommScope does believe that its own patents are important?

13   A.   Absolutely.

14   Q.   And if somebody were using CommScope's patents without

15   permission, that CommScope wouldn't just sit idly by and let

16   that happen.  Is that correct?

17   A.   That is correct.

18   Q.   CommScope would do something about that?

19   A.   Yes.

20   Q.   They might send a letter.  Is that true?

21   A.   What practices we would use, I'd have to again defer to

22   my legal team on how they would actually approach the

23   situation.

24   Q.   Okay.  So you don't have any opinion one way or another

25   whether it would be reasonable to send a letter to someone
```

1  that you believe is using your patents without permission.

2  A.   Again, I'm not familiar with the exact processes that our

3  legal team uses in order to go actually challenge a patent.

4  Q.   So you're not aware whether CommScope's ever sent a

5  letter to anyone about their patents?

6  A.   I am personally not familiar.

7  Q.   Okay.  What about on behalf of the company?  You don't

8  know?

9  A.   I do not know.

10  Q.   Okay.  So is it safe to say that your personal knowledge

11  on behalf of CommScope here today, you don't know one way or

12  another?

13  A.   I am not familiar with the details on how our legal team

14  again goes off and enforces our patents and engages with other

15  companies.

16  Q.   Would you agree that sending a letter is usually a -- is

17  a reasonable thing to do?

18  A.   It would seem to me that would be reasonable, yes.

19  Q.   It would at least put someone on notice--right?--that

20  there is at least a question or a concern by the patent owner

21  that someone is using their patents without permission.

22  A.   It would seem reasonable possibly also combined with

23  other lines of communication as well.

24  Q.   And CommScope actually has -- would take additional steps

25  to protect its patents, wouldn't it?

```
1    A.   Yes, we would.

2    Q.   I mean, you would even go so far as to file a lawsuit,

3    wouldn't you, if somebody was on your -- using your patents,

4    on your property, refusing to stop, you would have to file a

5    lawsuit to make them stop, have a jury decide the issue, and

6    to make them stop.  Is that right?

7    A.   Again, I'd have to defer to my legal team relative to

8    how -- what steps they would take between initial notification

9    and ultimately filing a lawsuit.  Again, I'm not familiar with

10   the exact details on how we would approach all those

11   situations.

12   Q.   You would agree with me that ultimately, if -- if letters

13   don't work, if phone calls don't work, if exchanging

14   information doesn't work, that's the only thing a patent owner

15   can do to enforce and protect their patents.

16   A.   I don't know if those are the only things that we could

17   do.  Again, I'm not familiar with the -- with the details of

18   how we would actually approach each of those patent dispute

19   situations.

20   Q.   Well, you're not aware -- can you give me an example of

21   something else you could do that, when everything else had

22   failed, negotiations, discussions, can you give me an example

23   of anything else you could do as a last resort to enforce your

24   patents against someone?

25   A.   Again, I'm not -- I'm not familiar with the -- with the
```

1    processes that we would utilize in those situations.

2    Q.   Okay.  Now, CommScope's been described as an innovative

3    company.  Would you agree with that?

4    A.   Yes, sir.

5    Q.   And CommScope, though, had no DSL CPE division within its

6    company before it acquired ARRIS.  Is that correct?

7    A.   That is correct.

8    Q.   Okay.  And so all of the innovation for DSL CPE devices,

9    it actually acquired from another company.  Is that correct?

10   A.   That is my understanding, yes.

11   Q.   You don't think there's anything wrong with acquiring

12   innovation from one company and then owning it and being proud

13   of it, do you?

14   A.   I agree.

15   Q.   Okay.  And the same thing would apply to patented

16   technology.  Wouldn't you agree with that?

17   A.   Correct.

18   Q.   And the company that you acquired, ARRIS, that company

19   actually acquired another company called 2Wire.  Correct?

20   A.   I believe that 2Wire was acquired by Pace, and my

21   understanding then is that ARRIS acquired Pace.  So I believe

22   that's the sequence.

23   Q.   So CommScope acquired ARRIS, ARRIS had previously

24   acquired Pace, Pace had previously acquired 2Wire.

25   A.   That's my understanding.

1    Q.   And now all those companies are rolled up into CommScope.

2    Correct?

3    A.   Yes.

4    Q.   And so what was originally four different companies has

5    now become one.  Is that right?

6    A.   Correct.

7    Q.   Okay.  And are you aware, sir, that during the last 10

8    years of discussions between TQ Delta and CommScope, that is

9    the period of time during which CommScope acquired ARRIS?

10   A.   Yeah.  CommScope acquired ARRIS nearly four years ago, so

11   that was within -- obviously within the last 10 years.

12   Q.   And are you aware, sir, that during the course of the

13   negotiations over the last almost 10 years between CommScope

14   and my client TQ Delta, there was a period of time in which

15   CommScope said, hey, can we put our discussions on pause while

16   we finish the acquisition of ARRIS?  Are you aware of that?

17   A.   That's my understanding.

18   Q.   And TQ Delta acceded to that.  Correct?  They waited

19   during that time to then pick up discussions after you had

20   completed --

21   A.   I believe that's the case, yes.

22   Q.   Okay.  Thank you.

23        MR. DAVIS:  Could I have Exhibit 68, please, Mr.

24   Diaz?  Could I have paragraph 2 on the second page?

25   Q.   (BY MR. DAVIS)  You've seen this document in court this

 1    week, Mr. Wauters?  This is the patent licensing disclosure

 2    statement that TQ Delta signed?

 3    A.   I don't recall specifically seeing this throughout this

 4    week, but I'll take your word for it.

 5    Q.   Do you recognize seeing documents like this at all?

 6    A.   Yes.

 7    Q.   Okay.  And as I mentioned, this is a patent licensing

 8    disclosure statement.  And are you aware of what that is, sir?

 9    A.   Generally speaking, yes.

10    Q.   So this is the form that a patent owner will fill out

11    when there has been technology incorporated into a standard

12    that the patent owner believes is covered by patents.

13    Correct?

14    A.   Okay.

15    Q.   And what the patent owner is committing to do is to be

16    prepared to grant a license to an unrestricted number of

17    participants on a worldwide non-discriminatory basis and on

18    reasonable terms and conditions.  Do you see that, sir?

19    A.   Yes, I do.

20    Q.   And CommScope has been aware of TQ Delta for at least the

21    last 10 years.  Correct?

22    A.   My understanding is that the initial discussions occurred

23    in 2013.  So that's the extent of my knowledge of how far back

24    it goes.

25    Q.   Okay.  And CommScope's also been aware of Aware, the

1    company, from before that.  Correct?

2    A.   I'm not sure about the -- the understanding or

3    the -- again, I apologize, no pun intended, for the awareness

4    of Aware prior to TQ Delta.  So I'm not sure what -- what

5    history was there prior to TQ Delta reaching out in 2013.

6    Q.   CommScope is a member of the ITU, is it not?

7    A.   I do not personally know.  I assume we are.

8    Q.   Aware -- ARRIS was a member of the ITU, correct, the

9    company that CommScope acquired?

10   A.   I do not know.

11   Q.   What about 2Wire?  Do you know whether they're a member

12   of the ITU?

13   A.   I do not know.

14   Q.   Again, unfortunately, you weren't here for opening

15   statements, but your lawyer put up a slide that showed 2Wire

16   and Aware at a table at the ITU.  Would you take my word for

17   that?

18   A.   I'll take your word for it, yes.

19   Q.   Okay.  And so is it reasonable to assume then that 2Wire

20   was aware of Aware from -- from its interactions at the ITU?

21   A.   I would not know the details of what was in that picture

22   and what conclusion could be actually drawn from that.

23   Q.   Okay.  You weren't here, either, for Mr. Tzannes'

24   testimony, but he testified that Mr. -- that himself, when he

25   would be in the small group meetings teaching, 2Wire or ARRIS

```
 1    or one of the CommScope entities would be in the room with
 2    him.
 3         Have you read his transcript at all or do you have any
 4    basis to agree or disagree with that?
 5    A.   I have no basis to agree or disagree on that.
 6    Q.   You didn't come prepared to talk about that issue.
 7    A.   No, I did not.
 8    Q.   Okay.  He also testified that CommScope would be involved
 9    in the larger group meetings.  Are you aware of that at all?
10    A.   No, I'm not.
11    Q.   And are you aware of whether or not if CommScope or ARRIS
12    or 2Wire or Pace, if -- whether they've been combined or
13    whether they are still individual, if they are all in that
14    room when the standard gets adopted, all those companies have
15    to vote to adopt the standard.  Is that your understanding of
16    how that actually works?
17    A.   I do not understand.  I do not have knowledge of the
18    actual inner workings of how the ITU works and -- and those
19    processes.
20    Q.   And the ITU, obviously having sat in this courtroom for
21    at least the last two days, has come up a lot, hasn't it?
22    A.   Definitely.
23    Q.   So it's an important issue in this case.  And it's
24    policies, its procedures, how it works, what it means, that's
25    all very important to this case, isn't it?
```

```
1    A.   Yes, it is.

2             MR. DAVIS:  Could I have that Exhibit 68, please,

3    Mr. Diaz, again?

4    Q.   (BY MR. DAVIS)  And you understand what an applicant is,

5    don't you, sir?

6    A.   Yes, I do.

7    Q.   An applicant is someone who is applying for something.

8    They want something so they're making a request to receive it.

9    Right?

10   A.   Yes.

11   Q.   You wouldn't consider CommScope to be an applicant to

12   TQ Delta for a license to its patents, would you?

13   A.   I would -- no, I don't believe so.

14   Q.   And they're certainly not willing to take a licence here

15   in this courtroom this week, are they?

16   A.   I don't believe so.

17   Q.   And beginning in 2013 up until 2021, they weren't willing

18   to take a license at all, were they?

19   A.   I think we did make an offer to acquire the utilization

20   for the license from TQ Delta, so an offer was made.  So by

21   virtue of that, I would say, yeah, there was interest in

22   trying to establish a license agreement with TQ Delta.

23   Q.   And that offer that was made--we talked about that I

24   believe on Monday when Ms. Divine was testifying--you got to

25   see that offer.  Correct?
```

1   A.   Correct.

2   Q.   And do you recall that that offer was actually not made

3   until 2021?

4   A.   I believe that's correct.

5   Q.   So from before 2021 when that offer was made all the way

6   back to 2013 when TQ Delta first reached out to CommScope,

7   CommScope was not willing to take a license at all during that

8   time period, were they?

9   A.   I believe we were willing to take a license based on a

10   fair and reasonable rate actually having been negotiated.

11   Q.   CommScope never actually applied for a license, did it?

12   It never made an offer, did it?

13   A.   I don't believe we made an offer prior to that one.

14   Q.   And you understand that during that whole time period,

15   from 2013 when TQ Delta first reached out until 2021 when

16   CommScope made its offer, TQ Delta was wanting to make an

17   offer to CommScope.  Correct?

18   A.   I know an offer was not made from TQ Delta beyond

19   referencing what I believe is called I believe the rate card,

20   so essentially I think the standard rates.  So I don't think

21   anything was ever offered beyond that.  And I think that was

22   the hope of CommScope was that we'd be able to negotiate

23   something that we felt was fair and reasonable.  We didn't

24   consider the rate card to be fair and reasonable.

25   Q.   I understand that, sir, but I'm just asking whether or

1    not TQ Delta was willing to enter into a license with

2    CommScope.

3    A.   Yes, but at the standard rates or at the rate card.

4    Q.   Uh-huh.  And TQ Delta was asking CommScope for its sales

5    information during that period of time from 2013 to 2021.

6    Correct?

7    A.   That's my understanding.

8    Q.   CommScope never provided it.

9    A.   That's correct.

10   Q.   Okay.  And you understand that TQ Delta said that it

11   needed that information in order to be able to make a

12   proposal.  You understand that?

13   A.   I understand that.

14   Q.   Okay.  TQ Delta also shared technical information with

15   CommScope, didn't it?

16   A.   I don't know what specific technical information was

17   exchanged.

18   Q.   Okay.  Well, you heard Ms. Divine testify on Monday.

19   Correct?

20   A.   Yes, I did.

21   Q.   And we looked at some of those documents, and she

22   testified that they shared technical -- detailed technical

23   information about the patents, how they worked with the

24   standards, claim charts.  In fact, some of those claim charts

25   were so big that they had to provide a link to download them.

1    A.    Okay.

2    Q.    Do you remember that testimony, sir?

3    A.    Yes, I do.

4    Q.    Okay.  CommScope never provided any information like that

5    to TQ Delta, did they?

6    A.    I do not know what specific detail information we

7    provided back over to TQ Delta.  Again, I'd have to defer to

8    my legal team on what specifically was exchanged.

9    Q.    So you don't know one way or another.  Is that your

10   testimony?

11   A.    I do not.

12   Q.    Okay.  And what we know is that the only thing -- well,

13   we know that they didn't produce their sales data.  Correct?

14   A.    Correct.

15   Q.    And we know that they didn't -- you don't know whether

16   they offered any technical information to say -- one way or

17   another to explain to TQ Delta that, Hey, you know, your

18   patents don't really cover a standard, or our products don't

19   work the way you think they do.  That information was never

20   provided.  Correct?

21   A.    I'm not aware of what information was provided from

22   CommScope over to TQ Delta.

23   Q.    It would be reasonable, don't you think, sir, if there's

24   a disagreement about an issue, to exchange information in

25   order to try to work the issue out?

1   A.   Well, again, my understanding of the situation was that

2   we were asking TQ Delta -- we were expecting to enter into

3   negotiation on fair and reasonable terms, and that never --

4   that process never got underway, so we never got beyond the

5   initial offer of, again, what was on the rate card.

6   Q.   Well, you got the offer from TQ Delta that was TQ Delta's

7   standard rates.  Correct?

8   A.   That's my understanding.

9   Q.   And then over the course of the next -- that offer was

10  first made to CommScope in 2017.  Isn't that right?

11  A.   Referring to rate card, my understanding is that goes

12  back actually originally to the original offer I believe in

13  2013.

14  Q.   What are you referring to when you say 'rate card', sir?

15  A.   Standard rate is based on my discussions with the legal

16  team is what we've been directed to by TQ Delta from the

17  initial discussions.

18  Q.   Is that the range of rates that we talked about with

19  Ms. Divine?

20  A.   I believe it was just the different rates depending on

21  the actual patent itself.

22  Q.   So the 90 cents for VDSL2?  That rate?

23  A.   I believe that's the rate, yes.

24  Q.   All right.  I can represent to you--and we talked about

25  this with Ms. Divine--that was communicated to CommScope in

1   2017.

2   A.   Okay.

3   Q.   Okay?

4        And from 2017 until 2021, roughly four years, there was

5   no response from CommScope.  2021 was the first time that

6   CommScope made any kind of a counteroffer or any kind of a

7   proposal to TQ Delta.  Isn't that correct, sir?

8   A.   That's my understanding.  That was the initial offer that

9   we made back over to TQ Delta.

10  Q.   And that's eight years after the first correspondence in

11  2013.  Correct?

12  A.   Sounds right, yes.

13            MR. DAVIS:  Could I have Exhibit 81, please,

14  Mr. Diaz?

15  Q.   (BY MR. DAVIS)  You've seen this document in court this

16  week.  Correct, Mr. Wauters?

17  A.   This cover page isn't familiar to me.

18  Q.   You haven't seen this document at all this week or --

19  A.   I don't recall.  We've seen a lot of documents this week.

20  I apologize.

21  Q.   That's all right.  I understand.

22       You're aware that this is a presentation that Aware made

23  to TQ Delta related to the sale of its patent portfolio.

24  A.   Okay.

25  Q.   Okay.  And this document --

```
 1              MR. DAVIS:  If we could have page 5 of this
 2   document, Mr. Diaz.
 3   Q.   (BY MR. DAVIS)  There has been some discussion about
 4   dates related to patents in this case, and this document was
 5   prepared by Aware and it was provided to TQ Delta.  Would you
 6   agree with me on that?
 7   A.   I'll take your word for that.
 8   Q.   Okay.  And the date that Aware provided to TQ Delta as
 9   part of the acquisition was the date of -- was something
10   called a priority date.  Do you see that?
11   A.   I see that.
12   Q.   Okay.  Because a priority date is a very important date
13   in the life of a patent, isn't it?  Is that right, sir?
14   A.   I'm not aware of what the priority date represents.
15   Q.   Okay.  Well, you're not aware at all -- as to what it
16   means at all in terms of how patents work?
17   A.   General understanding of how patents work.  I do not
18   specifically understand what the priority date is.
19   Q.   Okay.  All right.  Well, the priority date is the date
20   that the invention is first disclosed to the Patent Office.
21   Could you at least agree with me on that?
22   A.   I'll again take your word on that.
23   Q.   Okay.  And there are patents that can be filed later that
24   claim priority to the priority date.  Are you aware of that,
25   sir?
```

1    A.    I'm not.

2    Q.    Okay.  And once a patent application is filed claiming

3    priority to an earlier application, it may take years for that

4    patent to actually issue.  Are you aware of that?

5    A.    I am aware that it does take years for patents to be

6    actually -- to actually be issued.

7    Q.    And during that time, the Patent Office is examining the

8    patent.  Correct?

9    A.    It's my understanding, yes.

10   Q.    Okay.  And so if a patent issues much later, that doesn't

11   really say anything about when it was invented, does it?

12   A.    That's my understanding.

13   Q.    Okay.  And really the -- given all of that, would you not

14   agree with me that the most important date in terms of a

15   patent is going to be the date that the patent -- the priority

16   date of the patent?

17   A.    I don't know if it's the most important date.  I would

18   imagine it's a very important date.  I don't know if it is the

19   most important date.

20   Q.    Okay.

21          MR. DAVIS:  Could we have slide 10, please,

22   Mr. Diaz?  Thank you.

23   Q.    (BY MR. DAVIS)  On this slide, Mr. Wauters, do you

24   recognize what a VDSL DSLAM is?

25   A.    Yes, I do recognize that.

1  Q.   Now, that's the central office equipment that sits at an

2  AT&T office.  Correct?

3  A.   Could be in a central office or it could also be in a

4  cabinet on the side of the street somewhere.

5  Q.   It could be in a cabinet, in a box.  Correct?

6  A.   Correct.

7  Q.   And it serves a neighborhood?

8  A.   Yes, sir.

9  Q.   Okay.  And there is fiber going to the box.  Correct?

10  A.   That's correct.

11  Q.   And then from the CO to all the residences and homes and

12  consumers in the neighborhood, you have telephone wires.  Is

13  that right?

14  A.   Correct.  From the central office or, again, from that

15  street-side cabinet inside a neighborhood you would have a

16  twisted pair of wires going into the individual houses.

17  Correct.

18  Q.   And so even though there is -- there may be fiber going

19  to the CO, whether that's in a central office or in a cabinet

20  in a neighborhood, from there to the residence is telephone

21  wires.  Correct?

22  A.   That's correct.

23  Q.   And those telephone wires require DSL.

24  A.   That's correct.  To require DSL to provide internet

25  service.  Correct.

```
1    Q.   And the DSL modems that CommScope sells sit in the

2    houses.  Is that correct?

3    A.   That is correct.

4    Q.   And that DSLAM, that CO device, can serve multiple

5    residences within the neighborhood.

6    A.   Yes.

7    Q.   Right?

8         And as new residences move in -- residents move in, you

9    don't necessarily have to sell or install another DSLAM, do

10   you?

11   A.   No.

12   Q.   Those things are -- the CO devices are scalable.

13   Correct?

14   A.   They are, but typically the DSLAMs are sized at a certain

15   point, and sometimes you might have to add an additional

16   chassis if you've reached a certain level of subscription rate

17   within that area where they might actually go beyond that

18   first -- I'll call it the first DSLAM; they might have to add

19   an additional DSLAM to increase the actual capacity.

20   Q.   And that would be sliding a new board in?

21   A.   It could be adding more cards.  It could be adding an

22   additional shelf.  It would just really depend on what was put

23   in there on day one.

24   Q.   So there is a limit to each CO device, but it is

25   scalable.  Isn't that right?
```

```
1    A.    Sure.

2    Q.    And so for each individual resident that moves into a

3    neighborhood, they have to have a new CPE device.  Correct?

4    A.    That's correct.  Unless they -- I believe if -- I believe

5    AT&T actually had a service where you could actually move --

6    like if you are within an area, you could actually, like, say,

7    move from one apartment to the next; you could actually take

8    your CPE with you.  So you wouldn't necessarily in every

9    instance have to get a new CPE.

10   Q.    And that's if you're an existing subscriber.  Correct?

11   A.    That's correct.

12   Q.    If you are a new subscriber moving into a neighborhood

13   and AT&T sends you a new CPE device, a new modem, that

14   connects into the DSLAM.  Correct?

15   A.    Correct.  And that CPE they send you could be either a

16   brand new unit or it could be a refurbished unit, and --

17   because a lot of times when subscribers cancel their service,

18   their old CPE would go back to AT&T, AT&T would refurbish it,

19   and then send it back out for the next subscription.

20   Q.    Okay.  And you would agree with me --

21         MR. DAVIS:  Could we have the next slide, please,

22   Mr. Diaz, page 11?

23   Q.    (BY MR. DAVIS)  -- in 2013, when Aware made this

24   presentation, that the number of DSL subscribers had been

25   steadily increasing from 2009 to 2015.  Correct?
```

1   A.   That's what this chart is showing.

2   Q.   Uh-huh.

3          MR. DAVIS:  And can you blow up down here at the

4   bottom, Mr. Diaz, where it says 'source'?

5   Q.   (BY MR. DAVIS)  It's very grainy, but that says

6   Infonetics Research.  Have you heard of Infonetics?

7   A.   I have.

8   Q.   Infonetics is a research group.  Correct?

9   A.   I believe so.

10   Q.   Thank you.

11          MR. DAVIS:  Can we come back out, please, Mr. Diaz?

12   Q.   (BY MR. DAVIS)  And in 2013, DSL was 64.8 percent of

13   global broadband access market.  Isn't that right?

14          In 2010.

15   A.   So you're saying in -- okay.  2010?

16   Q.   Let me start over with that question.

17   A.   Okay.

18   Q.   In 2010 the DSL was 64.8 percent of global broadband

19   access market.  Correct?

20   A.   According to this slide and according to this research,

21   apparently that's what it's claiming.

22   Q.   And VDSL2 was the fastest growing DSL market.  Correct?

23   A.   Again, according to this slide, that's what it says.

24   Q.   Okay.

25          MR. DAVIS:  Could I have the next slide, please,

1    Mr. Diaz?

2    Q.   (BY MR. DAVIS)  And this slide is titled "DSL Service

3    Provider Subscribers."  Correct?

4    A.   Correct.

5    Q.   And AT&T was quoted as saying, "U-verse is now an

6    annualized revenue stream of $6.9 billion that grew at a rate

7    of 57 percent."  Correct?

8    A.   Yes.

9            MR. DAVIS:  Mr. Diaz, can I have Defendants' opening

10   statements, please?  And if I could have I believe it's slide

11   5.  I'm sorry.  It's the slide where there's the graph and the

12   red arrow going down.  Yes.  Thank you very much.  Slide 12.

13   Q.   (BY MR. DAVIS)  You weren't here for opening statements.

14   Correct, Mr. Wauters?

15   A.   Correct.

16   Q.   Well, counsel for CommScope showed this slide to the jury

17   and said that essentially DSL was going down between 2006 and

18   2015.  And that seems to be what he's communicating on this

19   slide.  Correct?

20   A.   That's what it appears to communicate, yes.

21   Q.   And he's got this big red arrow going down to the right.

22       Now, that slide, this graphic comes from the document

23   we've just been talking about.  Would you take my word for

24   that?

25   A.   Yes.

1    Q.   Okay.  And what counsel for CommScope did was cut just a

2    portion of that document and put it on a slide and told the

3    jury DSL market is going down.

4            MR. DAVIS:  Can we go back to Exhibit 81, please,

5    Mr. Diaz?  And if I could have slide 16 again.  I'm sorry.

6    Slide 15.

7    Q.   (BY MR. DAVIS)  This is the graphic that was with the

8    image that was cut out.  It says at the top here "CO Port

9    Revenues."  Do you see that, sir?

10   A.   Yes.

11   Q.   And so when Mr. Dacus told the jury that DSL revenues

12   were declining dramatically with a big red arrow, he was using

13   a graphic for CO port revenues.  Do you see that?

14   A.   I do see that.

15   Q.   Okay.  Now, CO is not CPE.  Correct?

16   A.   Yes.

17   Q.   Okay.

18           MR. DAVIS:  Could I have the next slide, please?

19   Q.   (BY MR. DAVIS)  CPE revenues show -- tell a different

20   story, don't they?

21   A.   According to this chart, yes.

22   Q.   CPE revenues, which is the DSL modems that CommScope

23   sells, from 2006 to 2015 peaked around 2015 and started to

24   taper off, but nowhere the dramatic decline as the CO

25   revenues.  Correct?

```
 1    A.   Correct.

 2    Q.   And what we also see in this slide is that the darker

 3    shading is ADSL.  Correct?

 4    A.   Correct.

 5    Q.   And that would be the older version of DSL.  Correct?

 6    A.   Correct.

 7    Q.   And the newer version of DSL is called VDSL.  Right?

 8    A.   Yes.

 9    Q.   And as we see -- we march along the graph here, we see

10    that the percentage of VDSL subscribers is going up compared

11    to the prior year.  Correct?

12    A.   Yeah; slightly.

13    Q.   Uh-huh.  But it is increasing.  Correct?

14    A.   It is, yes.

15    Q.   And the primary VDSL CPE suppliers in 2013, one of them

16    was 2Wire.  Correct?

17    A.   That's my understanding, yes.

18    Q.   And one of them was Pace?

19    A.   Yes.

20    Q.   Okay.  Both companies now owned by CommScope.  Correct?

21    A.   Yes.

22         MR. DAVIS:  If I could have Exhibit 135-A, please,

23    Mr. Diaz.

24    Q.   (BY MR. DAVIS)  Now, this is the offer that CommScope

25    made to TQ Delta in 2021.  Correct?
```

1   A.   Yes, I believe so.

2   Q.   And in its offer, CommScope proposes, potentially, to pay

3   certain rates for the various standards.  Correct?

4   A.   Correct.

5   Q.   Now, you've heard throughout this trial ADSL is not an

6   issue in this case, but the other three, VDSL, G.INP, and

7   G.bond are.  And CommScope also proposes that there will be

8   this graduated volume discount off of these rates.  Correct?

9   A.   Correct.

10  Q.   And by this time in 2021 when CommScope made this offer

11  to TQ Delta, TQ Delta had entered into four different

12  licenses.  Are you aware of that?

13  A.   I am.

14  Q.   Okay.  And those licenses had each been sent to CommScope

15  for their review.  Correct?

16  A.   The four -- can you please repeat that?

17  Q.   Sure.  The licenses, the Zhone license, the ZyXEL

18  license, the Siemens license, the Fujitsu license, those

19  licenses has been sent to CommScope for their review in the

20  settlement -- in the licensing negotiations.  Correct?

21  A.   I'm not familiar if those licenses were sent over to us

22  or not.

23  Q.   Okay.

24       MR. DAVIS:  Could I have Exhibit 135-D, please,

25  Mr. Diaz?  I'm sorry.  135-D.  There we go.  Could I have the

1    first paragraph, please?

2    Q.   (BY MR. DAVIS)   This is a letter from TQ Delta to

3    CommScope.  Correct?

4    A.   Correct.

5    Q.   And it's dated August 2021.  And it says, "The volume

6    discounts you propose are not consistent with TQ Delta's

7    licenses"  doesn't it?

8    A.   I see that.

9    Q.   It goes on to say, "I'm particularly puzzled by your

10   statement given that you are aware of the details of those

11   agreements."  Correct?

12   A.   I see that.

13   Q.   So doesn't it suggest that CommScope has received those

14   licenses?

15   A.   That's what it suggests.

16   Q.   Okay.  And it says that the licenses that TQ Delta has

17   offered to CommScope are consistent with TQ Delta's other

18   licenses.  Correct?

19   A.   That's what it says here, yes.

20   Q.   Okay.  And the rates that TQ Delta offered CommScope are

21   90 cents for VDSL.  Correct?  Do you know, sir?

22   A.   I believe that's what you-all -- that TQ Delta offered.

23   Q.   Okay.

24   A.   Yeah.

25        MR. DAVIS:  And if I could have Exhibit 135-B,

1   please, Mr. Diaz?  And if I could have page 3 of 6.  And the

2   top four items there.  Thank you.

3   Q.   (BY MR. DAVIS)  If designated to operate and/or capable

4   of operating in accordance with VDSL2, it's 90 cents per unit.

5   Correct?

6   A.   I see that.

7   Q.   25 cents per unit for G.INP.  Do you see that?

8   A.   Yes.

9   Q.   Okay.  And 70 cents per unit if capable of operating with

10  G.bond.  Do you see that?

11  A.   Yes.

12  Q.   And this is Exhibit 135-B, which is a licensing proposal

13  TQ Delta sent to CommScope in 2017.  Are you aware of that,

14  sir?

15  A.   Yes.

16  Q.   Okay.  I'm sorry.  This was in 2021.  Are you aware of

17  that, sir?

18  A.   Yes.

19  Q.   Okay.  And yet CommScope came back and made a proposal

20  that suggested significant discounts off of these rates.

21  Correct?

22  A.   Correct.

23        MR. DAVIS:  Could I have, please, back to 135-D?

24  And if I could have page 1353, please, Mr. Diaz.

25  Q.   (BY MR. DAVIS)  And do you see here, sir, this is an

1    email from Mr. Jim Shead at CommScope?

2    A.   Yes.

3    Q.   And we heard his deposition played just a little earlier

4    this afternoon?

5    A.   Yes.

6    Q.   And it says, "Hi, Bruce.  Thanks for following up."  And

7    they're talking about this proposal we just looked at.  And

8    Mr. Shead is saying, We believe the structure is accommodating

9    for prior licenses.

10       Do you have any information about why he believed that

11   structure is accommodating for the prior licenses?

12   A.   I do not have that detail.

13   Q.   Okay.  It certainly isn't accommodating for the Fujitsu

14   license, is it?

15   A.   I'm not -- I do not know.

16   Q.   Well, the Fujitsu license didn't have the same kind of

17   discounts that CommScope was proposing, did it?

18   A.   I don't know the details of the Fujitsu license

19   agreement.

20   Q.   Okay.  In fact, the Fujitsu license had no discounts.

21   Are you aware of that, sir?

22   A.   I'm not.

23   Q.   Okay.  And as Ms. Divine testified to, the only licensees

24   for DSL equipment that had ever received a discount were Zhone

25   and ZyXEL, and they received discounts of 25 percent.

1    Correct?

2    A.    I believe that was what was reviewed yesterday, yes.

3    Q.    Okay.

4    A.    But I believe there was also additional adjustments on

5    their additional discounts as well is what I think our legal

6    team walked through yesterday.

7    Q.    Yeah.  And those adjustments, though, those were not

8    discounts, were they?  Those were pre-payments for future

9    sales.  Correct?

10   A.    I believe we just contended that they were discounts

11   based on the arguments that I think the -- or, again, our

12   legal team provided yesterday.

13   Q.    Okay.  But you understand TQ Delta's position in this

14   case is that those are pre-payments for future sales.

15   Correct?

16   A.    I understand TQ Delta disputed that those are discounts

17   or not.

18   Q.    Right.  And they were also an adjustment for rest of the

19   world for countries where TQ Delta didn't have any patents.

20   You understand that.  Right?

21   A.    Again, I understand that's the position of TQ Delta, yes.

22   Q.    All right.  Thank you very much.

23              MR. DAVIS:  Your Honor, at this time I pass the

24   witness.

25              THE COURT:  All right.  Ladies and gentlemen, before

 1   we proceed with cross examination by the Defendants, we're

 2   going to take a short recess.  This will probably be the last

 3   recess of the day and I'm going to try to keep it short.

 4        If you will, simply leave your notebooks closed in your

 5   chairs, follow all my instructions, and we'll be back here

 6   shortly to continue.

 7        The jury's excused for recess.

 8             (Whereupon, the jury left the courtroom.)

 9             THE COURT:  The Court stands in recess.

10                       (Brief recess.)

11             THE COURT:  Be seated, please.

12        Mr. Barton, are you prepared to proceed with cross

13   examination of this witness?

14             MR. BARTON:  I am, Your Honor.

15             THE COURT:  All right.  Let's bring in the jury,

16   please.

17             (Whereupon, the jury entered the courtroom.)

18             THE COURT:  Welcome back, ladies and gentlemen.

19   Please have a seat.  We will proceed with cross examination of

20   the witness by the Defendants.

21        Mr. Barton, you may proceed.

22             MR. DAVIS:  Excuse me, Your Honor.  Is there a

23   witness binder?

24             MR. BARTON:  There is not.

25             MR. DAVIS:  Okay.  Thank you.

```
 1              MR. BARTON:  May I proceed, Your Honor?
 2              THE COURT:  You may proceed.
 3                        CROSS EXAMINATION
 4   BY MR. BARTON:
 5   Q.    Good afternoon, Mr. Wauters.
 6   A.    Good afternoon.
 7   Q.    Let's back up and do introductions.  Can you state your
 8   full name for the record, please?
 9   A.    Steven Wauters.  I go by Steve.
10   Q.    Okay.  Mr. Wauters, can you tell the jury a little bit
11   about yourself?
12   A.    Sure.  I was born and raised in San Antonio, Texas.  My
13   wife and I are both from there; high school sweethearts.  Went
14   off to Texas A&M where I ended up getting a Bachelor's degree
15   in electrical engineering.  And while I was there I started
16   interning in the telecom industry; started working for a
17   company called Alcatel.  That was one of the original
18   companies that was building DSL-type products from more of the
19   network electronics side, like in a central office and the
20   remote terminals.  So that's how I started my career kind of
21   interning there.  And then ultimately went to work for them up
22   in Dallas after I graduated.  And then -- and I was originally
23   in kind of like network engineering and then ultimately got
24   into sales, account management.
25              And was lucky enough to move back to San Antonio, because
```

1    that's where SBC was headquartered, and they ultimately became

2    AT&T.  And they were one of our major customers.  So moved

3    back to San Antonio around 2000, and had been there ever

4    since.

5        I've since changed companies a few times; went to -- was

6    always more of in the access side of the network, so worked at

7    Alcatel for several years on DSL, and then fiber to the home.

8    I went to go work for a start-up for a few years that's kind

9    of in the space that got bought by Ericsson, and at Ericsson

10   learned a lot about wireless communications, so understood

11   that side of the business.

12       And I've been at CommScope now for right about 12years.

13   And during that time frame, as well, I've been able to -- or

14   had the opportunity to get to know also the cable company side

15   of the business.  So this would be like cable modems and how

16   those types of companies deploy their networks as well.  So

17   it's been a fun ride, and, again, glad to still be in San

18   Antonio and working in this segment.

19   Q.   I'm going to do my best to slow down, and I think we

20   should -- might -- I might ask you do your best to slow down

21   as well.

22   A.   Yes, sir.

23   Q.   Is that fair?

24   A.   Yes, sir.

25   Q.   Okay.

```
 1              THE COURT:  Because if you don't I'll ask you to

 2   slow down.

 3              THE WITNESS:  Yes, Your Honor.

 4              MR. BARTON:  Trying to get ahead of it, Your Honor.

 5   Q.   (BY MR. BARTON)  So what do you do for CommScope?

 6   A.   So I'm the senior vice president of key account

 7   management for North America for CommScope, and what that

 8   essentially means is my team is responsible for sales and

 9   executive relationships with some of our largest customers

10   within this region.  So that would include companies like

11   AT&T, Verizon, T-Mobile.  Also work with companies like

12   Comcast and Charter Communications.  And so we are responsible

13   for really all of our lines of business selling into those

14   large and strategic customers for CommScope.

15   Q.   Are you a lawyer?

16   A.   No, I am not.

17   Q.   Not a patent litigator?

18   A.   I am not.

19   Q.   Okay.  Can you tell the jury a little bit about

20   CommScope?  And let's start by telling them when CommScope

21   was founded.

22   A.   Sure.  So CommScope was founded in I believe it was 1976,

23   and it started up in Hickory, North Carolina, and that's where

24   we're still headquartered today.  And the company was started

25   really with the focus on designing and manufacturing coax
```

1    cable, which was starting to become high demand as cable

2    companies were starting to put coax all over the country to

3    provide video services into all of our homes.  And so that's

4    where we really got our start is really focusing on that.

5         And then over the years we've expanded tremendously into

6    other areas of business.  Some of it's been -- organically

7    kind of just developed on our own.  Some of it's been through

8    various different acquisitions.  And so now today we actually

9    design and manufacture various different products that go into

10   networks for telephone companies, wireless companies, cable

11   companies.  We also make equipment that goes into data centers

12   for companies like Amazon and Facebook.  So it's a pretty

13   broad portfolio that we now have and that we designed and we

14   continue to manufacture.  So we've come a long way since 1976.

15   Q.   In view of the breadth of that portfolio of activities,

16   is the company divided into any segments?

17   A.   Yes, we are.  So we're divided in four, what we call our

18   core segments.  And so those four segments -- I'll kind of

19   walk through them, try to take my time here a little bit.

20        But the first one is outdoor wireless.  And so that's

21   going to be the equipment that goes up on cell towers.  So if

22   you look at a cell tower, you see those big rectangular panels

23   up there.  We make the majority of those antennas for North

24   America.  So again, T-Mobile, Verizon, AT&T buy a lot of that

25   equipment and kind of the ancillary equipment that goes around

1    those products.

2         Indoor networks.  So this is the organization where we

3    actually have WiFi access points and in-building cellular-type

4    solutions to put into buildings, like this courthouse, so we

5    can all have our devices -- obviously not having our devices

6    here in this court, but make our devices work inside of

7    buildings.

8         And then we have our cable and connectivity group.  And

9    so that's the team that's focused on fiberoptic cable and

10   actually putting a lot of the infrastructure into place for

11   fiber to the home type of deployments that are really starting

12   to gain momentum, especially here in the U.S.

13        And then the last core segment is what we call our access

14   networks solution group.  And so this is the team that's

15   building really more of the network electronics that would go

16   into central offices and these street-side cabinets for the

17   cable companies.

18        So those are the main four segments that we have at

19   CommScope.

20             THE COURT:  Let's see if we can break these

21   narrative questions up into smaller segments.  Okay.

22             MR. BARTON:  Certainly.

23             THE COURT:  All right.

24   Q.   (BY MR. BARTON)  So Mr. Wauters, I'll ask you just to

25   focus on my question and answer that, and then we'll keep

```
 1    going.  Okay?
 2    A.   Yes.
 3    Q.   All right.  So what business segment does CommScope's
 4    DSL product line we've been talking about here fall under?
 5    A.   That actually resides in what we call home networks.
 6    Q.   Is home networks one of CommScope's core segments that
 7    you just described?
 8    A.   No, it is not.
 9    Q.   Why not?
10    A.   It was determined about two years ago that we would
11    ultimately spin off this -- the home networks part of our
12    business, and part of the reason of that is that the
13    profitability of those products within home networks, i.e.,
14    CPE, really did not kind of stack up very well compared to the
15    profitability of the rest of the company.
16    Q.   Does CommScope have a research and development budget?
17    A.   We do.
18    Q.   About how big is it per year?
19    A.   It's over $600 million for the last several years each
20    year.
21    Q.   And is intellectual property important to CommScope?
22    A.   Very much so.
23    Q.   Does CommScope have any patents?
24    A.   We have over 15,000 patents.
25    Q.   And I take it you take intellectual property pretty
```

1    seriously?

2    A.   Very seriously.

3    Q.   Okay.  Now, let's focus on the CommScope DSL business.

4    And if you could tell the jury, when did CommScope first start

5    selling DSL technology?

6    A.   First started selling DSL technology in the early 2000s.

7    Q.   And was that CommScope as we know it today selling that

8    activity, or was that other companies?

9    A.   It was through the acquisition of other companies we

10   spoke about awhile ago--2Wire, Pace, those types of companies

11   going back to early 2000s.

12   Q.   Okay.  So speaking of some of those acquisitions, can you

13   explain to the jury why CommScope acquired ARRIS?

14   A.   Some of the main reasons we purchased ARRIS, really I'd

15   say there's kind of two main purposes of it.  One of them was,

16   again, with our cable customers, CommScope was selling fiber

17   cable, coax cable to these cable customers like Fidelity and

18   Comcast and Charter, so CommScope was selling that type of

19   gear.

20        ARRIS was selling more the network electronics.  So we

21   saw a lot of synergy by acquiring ARRIS so that we could

22   actually provide an end-to-end solution over to the cable

23   companies by combining the two organizations.  And the same

24   thing kind of went for in-building where CommScope -- we had a

25   big portfolio of kind of in-building cellular solutions, but

1   we didn't have WiFi, and that's what ARRIS had.  So again,

2   buying ARRIS allowed us to kind of combine those portfolios

3   and be able to take care of a building all at the same time

4   with all technologies.

5   Q.   And just remind us, when did CommScope purchase ARRIS?

6   A.   It's been nearly four years; four years next month.

7   Q.   And in that four-year period since CommScope acquired

8   ARRIS's DSL business, has the DSL CPE modem business been

9   successful?

10  A.   It has not been successful.

11  Q.   Why not?

12  A.   The sales of those DSL modems has significantly decreased

13  over that time period.

14  Q.   What are some of the reasons that CommScope is seeing

15  behind that decrease in sales?

16  A.   What we've seen, a lot is subscribers are just really

17  changing the way that they are actually getting their internet

18  connection and their broadband connections into their homes.

19  So what -- there's a couple of different things that have

20  happened.

21       Within the telephone companies--and telephone companies

22  are the typical ones that have deployed DSL over the

23  years--telephone companies are now investing more in bringing

24  fiber to the home to their customers.  So we've seen a lot of

25  subscribers inside of telephone companies switch over to

1    fiber.  And then we've also seen a lot of DSL subscribers

2    actually move away from the telephone companies and over to

3    the cable companies, because with that coax connection into

4    your home you dynamically get 300, 500 megs, maybe even a gig,

5    a gigabit worth of internet speed, which is really fast,

6    versus on DSL where you're typically going to be capped out at

7    maybe about 40 megabits per second.  So for maybe the same

8    price, maybe a little bit more, you can get, I mean, sometimes

9    five, six, 10 times the speed and move over to cable company.

10   So we've seen a lot of decline in DSL because of that.

11        And then last, but not least, there is also satellite

12   offerings.  And then there is a wireless offering.  So you can

13   actually get home internet from companies like T-Mobile and

14   from Verizon.

15   Q.   How have those alternatives that you just discussed

16   impacted the demand that CommScope is seeing for its DSL modem

17   products?

18   A.   We've seen the demand come down tremendously.

19   Q.   So you saw a slide that Mr. Davis showed you that

20   suggested that the demand for DSL modems has really crashed.

21   Is that accurate?

22   A.   It has, yes.

23   Q.   Okay.  Who is CommScope's largest customer for DSL

24   modems?

25   A.   AT&T.

1            MR. BARTON:  At this point, Your Honor, I would

2     request that the courtroom be sealed for confidential

3     information.

4            THE COURT:  All right.  Based on counsel's request

5     and to protect confidential information, I'll order the

6     courtroom sealed.  I'll direct that all persons present who

7     are not subject to the protective order that's been entered in

8     this case exit the courtroom and remain outside until it is

9     reopened and unsealed.

10                        (Courtroom sealed.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Courtroom unsealed.)

2              THE COURT:  All right, counsel.  We're unsealed.

3    You may proceed.

4              MR. BARTON:  Thank you, Your Honor.

5    Q.   (BY MR. BARTON)  Now, Mr. Wauters, what is the single

6    biggest driver of product costs in CommScope's DSL modems?

7    A.   My understanding is the Broadcom DSL chipset.

8    Q.   For those chipsets, those DSL chipsets that CommScope

9    purchases from Broadcom, does CommScope have any ability to

10   modify the source code in those Broadcom chips?

11   A.   I am not aware of any way to modify that.

12   Q.   And why is that?

13   A.   My understanding is that the source code that Broadcom

14   loads onto their chips--and again, this is source code that

15   they load on the chip before they ship it to us and other

16   manufactures--that's code that they generate that's, my

17   understanding, is used worldwide across multiple manufacturers

18   of DSL modems and that are used across multiple customers,

19   service providers around the world.  So it's not something

20   that they would necessarily want really anybody kind of

21   tweaking or adjusting on a per-product basis or per-modem

22   basis.  That's my understanding.

23   Q.   Now, earlier, Mr. Wauters, you mentioned CommScope has

24   over 15,000 patents.  Did I get that right?

25   A.   Yes.

1    Q.   Do some of those 15,000-plus patents relate to DSL

2    technology?

3    A.   Yes.

4    Q.   So whether they're standards essential or not, CommScope

5    has patents covering DSL technology?

6    A.   It's my understanding, yes.

7    Q.   Okay.  Does CommScope recognize that there are other

8    innovators out there in the DSL space?

9    A.   Definitely.

10   Q.   And is CommScope willing to pay innovators for their

11   technology?

12   A.   Absolutely.

13   Q.   What types of factors does CommScope consider when

14   evaluating licensing offers?

15   A.   I think it really boils down to, I mean, again, fair and

16   reasonable types of royalties.  Right?  And then also just

17   what's going on with the business and the terms that we get

18   relative to the ability to utilize those licenses.  I think

19   all of it, all that -- all those kind of variables come

20   together and really would help -- it would really help define

21   essentially what we're willing to negotiate for individual

22   licenses.

23   Q.   Okay.  Now, Mr. Wauters, you had some back and forth with

24   Mr. Davis about the licensing offers.  Right?

25   A.   Yes.

1    Q.    From CommScope's perspective, has TQ Delta ever offered

2    CommScope a license that is fair and reasonable?

3    A.    I don't believe so.

4    Q.    Now, when did TQ Delta first approach CommScope or its

5    predecessor entities?

6    A.    I believe it was 2013.

7    Q.    And when it made offers to CommScope, are those rates

8    that CommScope offered from TQ Delta's -- sorry.  Those rates

9    that TQ Delta offered to CommScope, were those fair and

10   reasonable rates, in CommScope's view?

11   A.    I don't believe so.

12   Q.    Did CommScope consider the relative decline in the DSL

13   market when evaluating these rates?

14   A.    Yes, we did.

15   Q.    Why would it evaluate that?

16   A.    We have to obviously pay attention to what's going on

17   with our business and our margins, what our opportunities look

18   like going forward.  And so, as I mentioned, the business has

19   been declining for several years, and then also the margins

20   have been declining over these years because we've gotten a

21   lot of price pressures from companies like AT&T, we've seen a

22   lot of competition come in, foreign competitors coming in that

23   have also driven down the price of these DSL modems.  That's

24   also happened over the course of the last several years.  And

25   it definitely didn't help with the pandemic and the supply

1  chain challenges that came out of that for the last three

2  years where our costs went up on anything from chips to the

3  plastic to make the box that forms the basis of the DSL modem,

4  to transportation.  All these factors came into play, and so

5  all of that comes into that decision factor.

6  Q.   Despite all those factors, did CommScope ever make TQ

7  Delta an offer?

8  A.   We did.

9  Q.   Did CommScope do that because it believed that it

10  infringed these patents?

11  A.   Absolutely not.

12  Q.   So why did it make TQ Delta an offer, then?

13  A.   Really the -- I mean, our intention was to try to

14  negotiate a deal with them so ultimately we wouldn't have to

15  litigate it; we wouldn't end up in a courtroom like this.  So

16  our intention was to try to come up with a compromise with

17  them, and that's why we offered the lump sum plus the other

18  licensing arrangement in that offer.

19      And also, frankly, we want to keep -- stay focused on

20  designing and building products.  Right?  We don't want our

21  business to be disrupted on events like this.  And, I mean,

22  this obviously can take a lot of resources away from our focus

23  areas inside of our company, and so that definitely was the

24  intent of making that offer over to TQ Delta.

25  Q.   Were you in court the past couple of days and able to see

1    the licenses that TQ Delta has actually entered into with your

2    competitors?

3    A.   Yes, I've seen those.

4    Q.   And just to be clear, is ZyXEL a competitor?

5    A.   Yes, they are.

6    Q.   Are they a direct competitor?

7    A.   Yes.

8    Q.   Now that you've seen those licenses and what those other

9    companies actually paid, does CommScope still believe that the

10   offers it's received from TQ Delta are not fair, reasonable,

11   and non-discriminatory?

12   A.   We do not believe that they are fair and reasonable.

13   Q.   Okay.  I want to ask you a little bit about products.

14        Are you familiar with CommScope's DSL products?

15   A.   Fairly familiar, yes.

16   Q.   Okay.  And we heard a little bit earlier today something

17   called dynamic D and vectoring.  Do you recall that?

18   A.   Yes.

19   Q.   What is CommScope's understanding as to whether AT&T ever

20   deployed vectoring?

21   A.   My understanding is that AT&T trialed vectoring, but they

22   ultimately decided not to upgrade their network to support

23   vectoring.

24   Q.   Why not?

25   A.   So, first, it would require them to go through all of

1    those DSLAMs we've seen in some of these slides that are

2    either inside of a central office or in a street-side cabinet.

3    There is individual line cards in all of those DSLAMs, and my

4    understanding is that in order to actually enable vectoring

5    inside the DSL network, AT&T would have to go through and swap

6    out all those cards.  So it would be a very big investment on

7    their network infrastructure, their network electronics, and

8    they've opted to obviously spend their money on fiber to the

9    home instead.  So they've opted to not go down to vectoring

10   path, is my understanding.

11   Q.   Okay.  The final thing, Mr. Wauters.  I believe at the

12   beginning of your adverse direct from Mr. Davis, he asked

13   about the CommScope deployment in Cowboys stadium.  Do you

14   recall that?

15   A.   Yes.

16   Q.   I think he said something like if it's not DSL it's not

17   relevant.  Do you recall that?

18   A.   That's correct.

19   Q.   Okay.  So I know Mr. Davis made it clear you weren't here

20   during opening statements, but I want to show you some of

21   TQ Delta's slides they used during opening statements.  Is

22   that okay?

23   A.   Yes.

24   Q.   All right.  The first one -- I'll enlarge this a little

25   bit.  It says 'DSL modems'.  Do you see that product?

```
 1    A.   I see that.

 2    Q.   Are you familiar with that product?

 3    A.   I am.

 4    Q.   Okay.  Let me show you the next slide.

 5         Let's just focus on this one for the time being.  You've

 6    seen this slide.

 7    A.   Yes.

 8    Q.   Okay.  Is this a DSL modem?

 9    A.   It is not a DSL modem.

10    Q.   What is it?

11    A.   That is a cable modem.

12    Q.   Does it have any DSL functionality whatsoever?

13    A.   No.

14              MR. BARTON:  Pass the witness, Your Honor.

15              THE COURT:  Redirect, Mr. Davis?

16              MR. DAVIS:  Yes, Your Honor.

17              THE COURT:  All right.  Let's proceed.

18              MR. DAVIS:  Thank you.

19                      REDIRECT EXAMINATION

20    BY MR. DAVIS:

21    Q.   So as I understand your testimony, Mr. Wauters,

22    CommScope's not really interested in DSL anymore.  Is that

23    the message you're trying to send?

24    A.   It is a declining revenue for us, there's no doubt.

25    Q.   But over the last 20 years DSL's been an important
```

1   technology in this country, hasn't it been?

2   A.   It has.

3   Q.   Yeah.  And the patents that are at issue in this case

4   were -- have a priority date dating back to the late '90s.

5   Correct?

6   A.   Yes.

7   Q.   And are you aware, sir, that patents have a life span of

8   roughly 20 years?

9   A.   Yes, I am.

10  Q.   So CommScope has essentially used DSL technology for the

11  last 20 years and is now done with it.  Is that your

12  testimony?

13  A.   I wouldn't say that we're done with it.

14  Q.   But you spun it out into a different company?

15  A.   It's not a different company; it's a segment still within

16  CommScope, and we've announced publicly that our intention is

17  to ultimately spin off our entire CPE division.

18  Q.   Does that mean sell it?

19  A.   That means sell it; sell it, turn it into its own

20  publicly-traded company.  Essentially take it from being

21  inside of CommScope to it being outside of CommScope.

22  Q.   And when you acquired ARRIS in 2016, how much did you pay

23  for it?

24  A.   I don't recall the actual purchase price off the top of

25  my head of ARRIS.  I apologize.

```
 1    Q.   Does $7 billion --

 2    A.   That sounds right, yes.

 3    Q.   Sounds right?

 4         So for the last -- you paid $7 billion in 2016 for ARRIS.

 5    A.   Uh-huh.

 6    Q.   You've now used DSL technology for 20 years.  Some of the

 7    patents -- you've heard mentioned about some of the patents in

 8    the TQ Delta portfolio have expired, and they'll expire over

 9    the next four or five years.  Correct?

10    A.   Yes.

11    Q.   Okay.  So as of four or five years ago you were willing

12    to spend $7 billion to invest in DSL technology.  Correct?

13    A.   We invested $7 billion in ARRIS as a whole, and at that

14    time our CEO addressed the fact that part of the ARRIS deal

15    was acquiring their CPE business and acknowledged that it was

16    in decline and was obviously not a favorable part of that

17    acquisition.

18    Q.   And yet CommScope has sold 36 million units over the last

19    six years, seven years; something like that?

20    A.   I don't know for sure what the number is.

21    Q.   Okay.  You were asked on direct examination to assume a

22    hypothetical that a DSL modem costs roughly a hundred dollars.

23    Correct?

24    A.   Correct.

25    Q.   And you understand that for the three standards at issue
```

1    in this case, TQ Delta's royalty rate, its standard royalty

2    rate comes out to roughly $1.89?

3    A.    That's my understanding.

4    Q.    And CommScope could very well have, if it was willing to

5    respect TQ Delta's patent rights, charge AT&T $1.89 instead of

6    $100 when it sold 36 million units of DSL modems to it,

7    couldn't it?

8    A.    I don't agree with that.

9    Q.    Okay.  You didn't factor into your pricing the cost of

10   using other people's patents.  Correct?

11   A.    I don't know what was built into the price estimates.

12   Q.    Well, you testified on direct that you factored into it

13   the cost of design, didn't you?

14   A.    I don't believe I said that.

15   Q.    I think you did.  If memory serves me, you said that the

16   profit margins on your products relate -- are factored into

17   the cost of design, manufacture, transport.  Those are costs

18   that have to come out of your overall selling price to

19   determine your profits.

20   A.    That's correct.

21   Q.    And you didn't mention patent licensing, did you?

22   A.    Patent licensing would be -- I mean, if it did apply to

23   that product, it obviously would be considered part of the

24   cost.

25   Q.    And that's what we're here for the jury to determine is

1  whether you should have factored into your cost the cost of

2  using someone else's patents.  Isn't that why we're all here?

3  A.   I don't think it's -- I disagree.

4  Q.   Okay.  You did testify that the single biggest driver is

5  cost.  Correct?

6  A.   Can you please clarify the question?  Single biggest

7  driver for what?

8  Q.   For your profit margins.

9  A.   Yes, margins are derived directly from cost, yes.

10  Q.   Right.  And you didn't include patent licensing in that

11  list of things you talked about on --

12  A.   I believe I said -- I gave some examples of where costs

13  could be derived from, but I just said that also that

14  ultimately it's the total cost of that product which would

15  be -- which would include items or other factors beyond just

16  the examples that I shared with the jury.

17  Q.   And you didn't testify, though, that you actually have

18  any costs built into that for patent licensing.  Correct?

19  A.   I didn't represent it as one of those -- I didn't offer

20  it up as an example.  I'm not sure if any sort of patent

21  licensing is included in that current cost of the DSL modem.

22  Q.   Now, you also testified about the Broadcom chip.

23  Correct?

24  A.   Yes, I did.

25  Q.   And you testified that, Hey, we can't change anything;

1    the chip is the chip when we get it.  Right?

2    A.   That's my understanding.

3    Q.   And you've heard a lot of testimony here this entire week

4    about whether or not -- about the Broadcom chip.  Correct?

5    A.   Yes.

6    Q.   Okay.  And, in your view, as I understand your position

7    in this case, Broadcom is where all the infringement's

8    occurring.  Correct?

9    A.   I did not say that.

10   Q.   Okay.  You haven't heard your lawyers talk about that in

11   their examinations of witnesses this week?

12   A.   I've heard them talk about Broadcom.

13   Q.   Okay.  And you didn't understand the point that they were

14   trying to make?

15   A.   I believe the point they were trying to make is that we

16   get this product from Broadcom; there's not really a way for

17   us to alter it and alter the source code.  I don't recall --

18   and I don't recall us specifically stating that the

19   infringement is on Broadcom, though.

20   Q.   Oh, okay.

21   A.   I don't recall it.

22   Q.   Okay.  Thank you.

23        Now, you understand from Ms. Divine's testimony that

24   Nokia has also taken a license to TQ Delta's patents.

25   Correct?

1   A.   It's my understanding, yes.

2   Q.   And Nokia makes the CO equipment; the central office

3   equipment.

4   A.   They do make central office equipment, yes.

5   Q.   And Nokia's been making central office equipment for many

6   years.  Correct?

7   A.   Yes, they have.  I believe they've also made CPE as well.

8   Q.   And Nokia is AT&T's biggest customer, just like you.

9   A.   They're one of their -- AT&T is one of Nokia's largest

10  customers, is my understanding.

11  Q.   Okay.  And yet Nokia agreed to pay not only TQ Delta's

12  royalty rates but a higher rate for a U.S. only license.

13  Correct?

14  A.   My understanding is that that was also accompanied with

15  a -- I forget the actual terminology, but there was another

16  agreement signed to the rest of the word.

17  Q.   And that was a standsill agreement.  Correct?

18  A.   That's my understanding, yes.

19          MR. DAVIS:  Pass the witness, Your Honor.

20          THE COURT:  Additional cross, Mr. Barton.

21          MR. BARTON:  No, sir, Your Honor.

22          THE COURT:  You may step down, Mr. Wauters, and can

23  return to the Defendants' table as their corporate

24  representative.

25          Ladies and gentlemen, my understanding from counsel is

```
 1   the next witness is about two hours in duration, so we're not
 2   going to start a two-hour witness at a quarter till 6:00.
 3   We're going to stop for the day at this juncture.  We'll pick
 4   back up in the morning.
 5        I'm going to ask you as you leave the courtroom to go
 6   through the jury room, leave those notebooks on the table
 7   closed there so they'll be waiting for you securely before you
 8   come back in the morning.
 9        I'm going to continue to compliment you on your
10   punctuality being here ready to go, and I'm going to ask you
11   continue to do the same thing.  Check the weather, check all
12   the other conditions, make arrangements so you can be here so
13   that we can start right at or as close as possible to 8:30.
14        Travel safely to your homes this evening.  Have a good
15   evening.  And with that -- and, of course, you would expect me
16   to say follow all my instructions including not to discuss the
17   case with anyone.
18        And with that you are excused until tomorrow morning.
19             (Whereupon, the jury left the courtroom.)
20             THE COURT:  Be seated, please.
21        All right, counsel.  For your information, the Court's
22   records show that the Plaintiff has used 10 hours, 40 minutes,
23   and 53 seconds of designated trial time and has 4 hours and 20
24   minutes remaining.  The Defendants have used 6 hours and 14
25   minutes and 4 seconds and have 8 hours and 46 minutes, more or
```

1    less, remaining.

2        Let me encourage you one more time, in addition to

3    everything I've discussed with you in chambers, to be diligent

4    and professional and effective with your meet and confer

5    efforts overnight.  If there are disputes that can't be

6    reasonably resolved, the Court's available as a resource for

7    you, but the Court can't help you if you send me incomplete

8    information that's unsupported.

9        So I'll expect a report to my staff by or before 10:00

10   this evening if there are disputes in there that are

11   surviving.  At that point I'll expect a full documented

12   explanation of what they are.  I'll also expect you to

13   continue to work until tomorrow morning to try and narrow, if

14   not completely resolve, those matters.

15       If there are matters that despite those continuing

16   efforts are still unresolved, I'll be available to meet with

17   you in the morning, and hopefully I will have had delivered to

18   me information that allows me to be efficient and productive

19   in responding to your disputes.

20       And I will, as I've done once today already, I will take

21   corrective action if those goals are not met.  There's no

22   reason they shouldn't be, and I've stressed this to you

23   repeatedly in chambers, I've stressed it on the record once

24   earlier today, and I'm stressing it to you again.

25       I'll also look for the revised and updated joint

1    submission on a proposed charge and verdict form by 3:00

2    tomorrow, as I previously ordered in this case.

3         Is there anything else from either Plaintiff or Defendant

4    before We recess for the evening?

5         Mr. Davis, anything from Plaintiff?

6              MR. DAVIS:  Your Honor, the only thing is that may

7    Peter Heller, Dr. Peter Heller be excused?

8              THE COURT:  I assume there's no objection.

9              MR. BARTON:  No objection.

10             THE COURT:  Doctor Heller's excused.

11             MR. DAVIS:  Thank you, Your Honor.

12             THE COURT:  Anything else from the Plaintiff?

13             MR. DAVIS:  No, Your Honor.

14             THE COURT:  Anything from the Defendants, Mr.

15   Barton.

16             MR. BARTON:  No, Your Honor.

17             THE COURT:  We stand in recess until tomorrow.

18             (The proceedings were concluded at 5:45 p.m.)

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts            03/21/2023

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12        .

13

14

15

16

17

18

19

20

21

22

23

24

25