1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
2                        MARSHALL DIVISION

3    TQ DELTA, LLC.,              (  CAUSE NO. 2:21-CV-310-JRG
                                  )
4            Plaintiff,           (
                                  )
5    vs.                          (
                                  )
6    COMMSCOPE HOLDING COMPANY,   (
     INC., et al.,                )  MARSHALL, TEXAS
7                                 (  MARCH 24, 2023
             Defendants.          )  8:00 A.M.
8    _____

9                            VOLUME 6

10   _____

11                       TRIAL ON THE MERITS

12

13            BEFORE THE HONORABLE RODNEY GILSTRAP
               UNITED STATES CHIEF DISTRICT JUDGE

14

15   _____

16

17

18

19

20

21                   SHAWN McROBERTS, RMR, CRR
22                    100 E. HOUSTON STREET
                     MARSHALL, TEXAS  75670
23                       (903) 923-8546
                  shawn_mcroberts@txed.uscourts.gov

24

25

```
1                        A P P E A R A N C E S

2         FOR THE PLAINTIFF:    DAVIS FIRM, P.C.
                                213 N. FREDONIA ST., SUITE 230
3                               LONGVIEW, TEXAS  75601
                                (903) 230-9090
4                               BY: MR. RUDOLPH FINK
                                    MR. CHRISTIAN HURT
5                                   MR. WILLIAM DAVIS

6                               McANDREWS HELD & MALLOY, LTD
                                500 W. MADISON ST., 34TH FLOOR
7                               CHICAGO, ILLINOIS  60661
                                (312) 775-8000
8                               BY:  MR. PETER McANDREWS
                                     MS. ASHLEY RATYCZ
9                                    MR. RAJENDRA CHIPLUNKAR

10        FOR THE DEFENDANT:    ALSTON & BIRD, LLP-NC
                                101 SOUTH TRYON STREET
11                              SUITE 4000
                                CHARLOTTE, NC  28280
12                              (704) 444-1025
                                BY:  MR. ROSS BARTON
13                                   MR. MATTHEW STEVENS
                                     MR. KIRK BRADLEY
14                                   MS. KARLEE WROBLEWSKI

15                              ALSTON & BIRD, LLP - ATLANTA
                                ONE ATLANTIC CENTER
16                              1201 WEST PEACHTREE STREET NW
                                #4900
17                              ATLANTA, GEORGIA  30309-3424
                                (404) 881-7000
18                              BY:  MR. MICHAEL DEANE

19                              THE DACUS FIRM, PC
                                821 ESE LOOP 323, SUITE 430
20                              TYLER, TEXAS  75701
                                (903) 705-1117
21                              BY:  MR. DERON DACUS

22        OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                100 E. HOUSTON STREET
23                              MARSHALL, TEXAS  75670
                                (903) 923-8546
24

25        THE COURT:  Be seated, please.
```

1          Counsel, before the Court proceeds to conduct a formal

2     charge conference regarding the final jury instructions and

3     verdict form, let me inquire if there are exhibits that were

4     used during yesterday's portion of the trial that were used

5     for the first time and need to be read into the record as we

6     have this week.

7          Are there additional exhibits that need to be read into

8     the record?

9               MR. WILSON:  There are, Your Honor.

10              THE COURT:  Let's get that done, please.

11              MR. WILSON:  Your Honor, Ty Wilson on behalf of

12    Plaintiff TQ Delta, and at trial on March 22nd, 2023, TQ Delta

13    admitted Exhibit 41 and Exhibit 118, just those two.

14              THE COURT:  Any objection from Defendants?

15              MS. BEATON:  No, Your Honor.

16              THE COURT:  Do Defendants have a similar rendition

17    to offer?

18              MS. BEATON:  Yes, Your Honor.

19              THE COURT:  Please proceed.

20              MS. BEATON:  Erin Beaton on behalf of CommScope.

21              Yesterday, March 23rd, 2023, Defendants admitted

22    Exhibit 59 and Exhibit 76.

23              THE COURT:  All right.  Any objections to that from

24    the Plaintiff?

25              MR. WILSON:  There's no objections, Your Honor.

1                  THE COURT:  Thank you, counsel.

2          All right.  That having been completed, the Court will

3    now conduct a formal charge conference regarding the final

4    jury instructions and verdict form.

5          Yesterday at the conclusion of the evidence, after the

6    Court took up and considered motions from both parties offered

7    pursuant to Rule 50(a) of the Federal Rules of Civil

8    Procedure, the Court thereafter met with counsel for the

9    parties in chambers informally and at length and had a fulsome

10   discussion regarding matters related to the final jury

11   instructions and verdict form.

12         The Court was able to get important and constructive

13   input from counsel and discuss issues related to these

14   documents in a fulsome and constructive way.

15         The Court's taken into account the input received from

16   the parties through that informal charge conference and has

17   generated what it now believes to be the proper final jury

18   instruction and verdict form to present to the jury this

19   morning.

20         Before doing that, the Court will review these on the

21   record with counsel and allow either party to lodge such

22   objections to the same as they feel are necessary and

23   appropriate.

24         Counsel, the way I have traditionally done this, for

25   those not familiar with this Court's practice, is I've asked

1    that each side send a representative to the podium.  And then

2    we will begin with the final jury instructions, and I will go

3    through them page by page.  And at each page I'll ask if there

4    are any objections from either party.

5         At that juncture if you believe something's been included

6    which is improper or if you believe something necessary has

7    been omitted, you may raise that objection on the record.

8    Again, we'll do this on a page-by-page basis to ensure that

9    nothing is missed or overlooked unintentionally.

10        When we've done that with the final jury instructions,

11   we'll follow the same approach with regard to the verdict

12   form.

13        So with that, whoever's going to speak for Plaintiff and

14   whoever's going to speak for Defendants, please go to the

15   podium and I'll just ask you to stay there as we go through

16   the process to save us some time of going back and forth from

17   counsel table.

18        Mr. Deane and Mr. Fink.

19        All right.  Let's begin with the final jury instructions.

20   Turning to the cover page or first page of those final jury

21   instructions, is there objection here from either party?

22             MR. FINK:  None from the Plaintiff, Your Honor.

23             MR. DEANE:  None from the Defendant.

24             THE COURT:  All right.  Turning then to page 2, are

25   there any objections here from either party?

1              MR. FINK:  None from the Plaintiff, Your Honor.

2              MR. DEANE:  None from the Defendant, Your Honor.

3              THE COURT:  Next is page 3.  Are there objections

4      here?

5              MR. FINK:  None from the Plaintiff, Your Honor.

6              MR. DEANE:  None from the Defendant.

7              THE COURT:  Next is page 4.  Are there objections

8      here?

9              MR. FINK:  None from the Plaintiff.

10              MR. DEANE:  None from the Defendant, Your Honor.

11              THE COURT:  Turning then to page 5 of the final jury

12      instructions, is there objection here from either party?

13              MR. FINK:  None from the Plaintiff, Your Honor.

14              MR. DEANE:  None from the Defendant.

15              THE COURT:  Turning then to page 6, is there any

16      objection here?

17              MR. FINK:  None from the Plaintiff.

18              MR. DEANE:  None from the Defendant, Your Honor.

19              THE COURT:  Next is page 7.  Are there objections

20      here?

21              MR. FINK:  None from the Plaintiff, Your Honor.

22              MR. DEANE:  None from the Defendant.

23              THE COURT:  Turning to page 8, are there objections

24      here?

25              MR. FINK:  None from the Plaintiff, Your Honor.

```
1              MR. DEANE:  None from the Defendant.

2              THE COURT:  Next is page 9.  Are there objections?

3              MR. FINK:  None from the Plaintiff.

4              MR. DEANE:  None from the Defendant, Your Honor.

5              THE COURT:  Next is page 10.  Are there objections

6    here?

7              MR. FINK:  None from the Plaintiff, Your Honor.

8              MR. DEANE:  None from the Defendant.

9              THE COURT:  Turn to page 11, are there any

10   objections from either party?

11             MR. FINK:  None from the Plaintiff, Your Honor.

12             MR. DEANE:  None from the Defendant.

13             THE COURT:  Turning next to page 12, are there any

14   objections?

15             MR. FINK:  None from the Plaintiff, Your Honor.

16             MR. DEANE:  None from the Defendant, Your Honor.

17             THE COURT:  Next is page 13.  Are there any

18   objections?

19             MR. FINK:  None from the Plaintiff, Your Honor.

20             MR. DEANE:  None from the Defendant.

21             THE COURT:  Next is page 14.  Are there any

22   objections?

23             MR. FINK:  None from the Plaintiff, Your Honor.

24             MR. DEANE:  None from the Defendant.

25             THE COURT:  Next is page 15.  Are there objections?
```

1          MR. FINK:  None from the Plaintiff, Your Honor.

2          MR. DEANE:  None from the Defendant.

3          THE COURT:  Turning then to page 16.  Are there

4    objections?

5          MR. FINK:  None from the Plaintiff, Your Honor.

6          MR. DEANE:  None from the Defendant.

7          THE COURT:  Next is page 17.  Are there objections

8    here?

9          MR. FINK:  None from the Plaintiff, Your Honor.

10          MR. DEANE:  None from the Defendant.

11          THE COURT:  Next is page 18.  Are there objections

12    here?

13          MR. FINK:  None from the Plaintiff, Your Honor.

14          MR. DEANE:  There is an objection here for the

15    Defendant, Your Honor.

16          THE COURT:  State your objection.

17          MR. DEANE:  In the paragraph dealing with the

18    applicable priority date of the '686 Patent, the statement

19    that TQ Delta contends that the applicable priority for the

20    '686 Patent is no later than January 7th, 2000, we object to

21    that instruction because we believe there is no evidence on

22    the record of that date, and we also believe that there is no

23    instruction that would resolve the dispute that's listed

24    there.

25          THE COURT:  All right.  That objection is overruled.

1    Is there anything else from either party objecting to anything

2    on page 18?

3                MR. DEANE:  None from the Defendant, Your Honor.

4                THE COURT:  Then we'll turn to page 19 of the final

5    jury instructions.  Is there any objection here?

6                MR. FINK:  None from the Plaintiff, Your Honor.

7                MR. DEANE:  None from the Defendant.

8                THE COURT:  Next is page 20.  Are there objections

9    here?

10               MR. FINK:  None from the Plaintiff, Your Honor.

11               MR. DEANE:  None from the Defendant, Your Honor.

12               THE COURT:  Turning then to page 21, are there

13   objections here?

14               MR. FINK:  None from the Plaintiff, Your Honor.

15               MR. DEANE:  None from the Defendant, Your Honor.

16               THE COURT:  Turning to page 22, are there objections

17   here?

18               MR. FINK:  None from the Plaintiff, Your Honor.

19               MR. DEANE:  None from the Defendant, Your Honor.

20               THE COURT:  Next is page 23.  Are there objections

21   here?

22               MR. FINK:  None from the Plaintiff, Your Honor.

23               MR. DEANE:  None from the Defendant, Your Honor.

24               THE COURT:  Next is page 24.  Are there objections

25   here?

1          MR. FINK:  None from the Plaintiff, Your Honor.

2          MR. DEANE:  There is an objection here from the

3    Defendant, Your Honor.

4          THE COURT:  State your objection, please.

5          MR. DEANE:  Your Honor, in the paragraph that starts

6    with, The damages you award, there is a sentence that states,

7    "You must not award TQ Delta more damages than are adequate to

8    compensate for the infringement."  The Defendant objects to

9    the fact that that instruction does not limit the infringement

10   to the patents-in-suit and only the patents-in-suit.

11         THE COURT:  That objection's overruled.  Anything

12   further on page 24?

13         MR. DEANE:  None from the Defendant, Your Honor.

14         THE COURT:  Let's turn next to page 25.  Are there

15   objections here?

16         MR. FINK:  Yes, Your Honor.  From the Plaintiff, for

17   the first paragraph and the second sentence that begins, This

18   approach relies upon estimated costs, Plaintiff objects to the

19   language in that sentence and the following sentence and would

20   propose that the language be changed in the second sentence

21   to, This approach relies upon estimated costs, if any, that

22   the making, using, or selling of the accused products save.

23         And the following sentence, Plaintiff would change the

24   language to, In considering the amount of reasonable royalty

25   damages under the cost savings model, you should focus on

1  whether CommScope's making, using, or selling of the patented

2  technology avoided taking a different, more costly course of

3  action.  And the rest of the sentence would stay the same.

4      So essentially that's for the second sentence striking

5  the 'allowed it to' language and changing 'avoid' to

6  'avoided'.

7              THE COURT:  All right.

8              MR. FINK:  Thank you.

9              THE COURT:  Is that all of Plaintiff's objections,

10  Mr. Fink?

11             MR. FINK:  Yes, Your Honor.

12             THE COURT:  Okay.  That objection is overruled.

13      Anything further from either party on page 25?

14             MR. DEANE:  Yes, Your Honor.  Defendant also objects

15  to the same paragraph that the Plaintiff objected to.

16             THE COURT:  All right.  That objection is overruled.

17      There is on this page, counsel, an unintended typo where

18  the Court has put Defendant singular.  It needs to be

19  Defendants.  See if I can find it.

20             MR. DEANE:  Your Honor, I believe it's the second

21  line.

22             THE COURT:  No.  I think that's where it was, Mr.

23  Deane.  I think I've already corrected it before I got out

24  here.  The word Defendants on the second line should be plural

25  as there are multiple Defendants collectively referred to as

 1    CommScope.  But that's where it was.  And as I stated, in an

 2    earlier version I remember it being there, but I see that it's

 3    already been corrected.  So that will address that concern.

 4         Anything further from either party on page 25?

 5              MR. FINK:  So, Your Honor, just -- just to be clear,

 6    I believe what CommScope is saying, the version that the

 7    parties have, that it's the defendant singular on that second

 8    line?

 9              THE COURT:  Right.

10              MR. FINK:  Okay.

11              THE COURT:  This was caught after the email to you

12    and before I got out here.  So that's why I've got it

13    corrected and you don't.

14              MR. FINK:  Understood, Your Honor.

15              THE COURT:  But it will be Defendants plural.

16              MR. FINK:  No objection from Plaintiff.

17              THE COURT:  All right.  Let's turn to page 26 of the

18    final jury instructions.  Are there any objections here from

19    either Plaintiff or Defendants?

20              MR. FINK:  No objection from Plaintiff, Your Honor.

21              MR. DEANE:  No objection from Defendant, Your Honor.

22              THE COURT:  All right.  Turning to page 27, are

23    there any objections here?

24              MR. FINK:  No objection from Plaintiff, Your Honor.

25              MR. DEANE:  No objection from Defendant, Your Honor.

```
1            THE COURT:  All right.  And, counsel, you'll note

2   pages 26 and 267 contain all 15 of the Georgia Pacific

3   factors.  I gather neither party objects to the Court charging

4   this jury on all 15 factors.  Is that correct?

5            MR. FINK:  Plaintiff does not, Your Honor.

6            MR. DEANE:  No objection from Defendant, Your Honor.

7            THE COURT:  Is there any objection from either party

8   on page 27?

9            MR. FINK:  No objection from Plaintiff, Your Honor.

10            MR. DEANE:  No objection from Defendant.

11            THE COURT:  Then we'll turn to page 28 of the final

12   jury instructions.  Are there any objections here?

13            MR. FINK:  No objection from Plaintiff, Your Honor.

14            MR. DEANE:  No objection from Defendant.

15            THE COURT:  Next is page 29.  Are there any

16   objections here?

17            MR. FINK:  No objection from Plaintiff, Your Honor.

18            MR. DEANE:  No objection from Defendant, Your Honor.

19            THE COURT:  Next then is page 30.  Are there any

20   objections here?

21            MR. FINK:  No objection from Plaintiff, Your Honor.

22            MR. DEANE:  There is an objection from the

23   Defendant, Your Honor.

24            THE COURT:  State your objection, please.

25            MR. DEANE:  Your Honor, in the last full paragraph
```

1    where it discusses the patent expiration dates, it lists two

2    patents which are expired.  The Defendant objects to the fact

3    that a third patent is not listed, which is the '686 Patent,

4    which we believe expired on October 1st, 2022.

5              THE COURT:  Mr. Fink, does the Plaintiff have any

6    reason why that third patent, if in fact it has expired,

7    should not be listed there with the other two?

8              MR. FINK:  Plaintiff overall has no objection to

9    listing an expiration date for the '686 Patent.  I believe the

10   issue here was that the -- at least from the Plaintiff's

11   perspective, it's seeking damages from June 30, 2022.  So at

12   that, the patent has yet to expire.

13             THE COURT:  All right.  In other words, the period

14   of time through which the evidence has been presented to the

15   jury was a period of time when this particular patent was

16   still in force.

17             MR. FINK:  That's Plaintiff's understanding, Your

18   Honor.

19             THE COURT:  All right.  Then I'll overrule the

20   Defendants' objection.

21        All right.  Anything further on page 30 from either

22   party?

23             MR. FINK:  None from Plaintiff, Your Honor.

24             MR. DEANE:  None from the Defendant, Your Honor.

25             THE COURT:  Let's turn next to page 31.  Are there

1    objections here from either party?

2              MR. FINK:  None from the Plaintiff, Your Honor.

3              MR. DEANE:  None from the Defendant, Your Honor.

4              THE COURT:  Next is page 32.  Are there any

5    objections here?

6              MR. FINK:  Briefly from the Plaintiff, Your Honor.

7    For the, I guess, paragraph that begins, If you find that TQ

8    Delta has breached its contractual obligation, TQ Delta

9    objects to the instruction of compensatory damages here as it

10   does not believe that there has been evidence.

11             THE COURT:  All right.  That's overruled.  Anything

12   further on page 32?

13             MR. FINK:  None from Plaintiff, Your Honor.

14             MR. DEANE:  No objection from Defendant, Your Honor.

15             THE COURT:  All right.  Let's turn to page 33.  Are

16   there any objections here from either party?

17             MR. FINK:  None from the Plaintiff, Your Honor.

18             MR. DEANE:  None from the Defendant, Your Honor.

19             THE COURT:  All right.  Page 34, are there any

20   objections?

21             MR. FINK:  None from the Plaintiff, Your Honor.

22             MR. DEANE:  None from the Defendant, Your Honor.

23             THE COURT:  All right.  Page 35, are there any

24   objections?

25             MR. FINK:  None from the Plaintiff, Your Honor.

1          MR. DEANE:  None from the Defendant, Your Honor.

2          THE COURT:  All right.  And does page 35 represent

3    the final page in the version you gentlemen have?

4          MR. FINK:  Your Honor, I have page 36 at least.

5          THE COURT:  All right.  I want to make sure that we

6    are looking at the same thing.

7        Are there any objections from either party on the final

8    page being page 36?

9          MR. FINK:  None from the Plaintiff, Your Honor.

10          MR. DEANE:  None from the Defendant, Your Honor.

11          THE COURT:  All right.  Thank you, counsel.

12        Let's proceed to consider the verdict form in the same

13    manner.  Let's begin with that document, and we'll turn first

14    to the cover sheet or page 1.  Is there any objection here

15    from either party?

16          MR. FINK:  None from the Plaintiff, Your Honor.

17          MR. DEANE:  None from the Defendant, Your Honor.

18          THE COURT:  Turning to page 2 where various

19    definitions are set forward, are there any objections?

20          MR. FINK:  None from the Plaintiff, Your Honor.

21          MR. DEANE:  None from the Defendant, Your Honor.

22          THE COURT:  Page 3 where various instructions to the

23    jury are included, are there any objections?

24          MR. FINK:  None from the Plaintiff, Your Honor.

25          MR. DEANE:  None from the Defendant, Your Honor.

```
 1          THE COURT:  Turning, then, to page 4 where Question
 2   1 is found, are there any objections?
 3          MR. FINK:  None from the Plaintiff, Your Honor.
 4          MR. DEANE:  None from the Defendant, Your Honor.
 5          THE COURT:  Turning to page 5 where Question 2 is
 6   found, are there any objections?
 7          MR. FINK:  None from the Plaintiff, Your Honor.
 8          MR. DEANE:  None from the Defendant, Your Honor.
 9          THE COURT:  Turning, then, to page 6 where Question
10   3 is found, are there any objections?
11          MR. FINK:  None from the Plaintiff, Your Honor.
12          MR. DEANE:  None from the Defendant, Your Honor.
13          THE COURT:  Turning to page 7 where Questions 4A and
14   4B are found, are there any objections?
15          MR. FINK:  None from the Plaintiff, Your Honor.
16          MR. DEANE:  Your Honor, the Defendant has an
17   objection.
18          THE COURT:  State your objection.
19          MR. DEANE:  For Question No. 4A, Defendant objects
20   to the fact that the request to the jury is not split out
21   between induced infringement and direct infringement.
22          THE COURT:  All right.  That objection's overruled.
23      Anything further on page 7?
24          MR. DEANE:  None from the Defendant, Your Honor.
25          THE COURT:  Then we'll turn to page 8 of the verdict
```

1    form where Questions 5 and 6 are found.  Are there objections

2    here from either party?

3              MR. FINK:  Briefly, Your Honor.  Plaintiff objects

4    that the inclusion of a blank for compensation of damages on

5    breach of contract, which it does not believe have been proven

6    in any way.

7              THE COURT:  All right.  That objection's overruled.

8        Anything further?

9              MR. FINK:  None from the Plaintiff, Your Honor.

10             MR. DEANE:  None from the Defendant, Your Honor.

11             THE COURT:  Thank you.

12       We'll turn to page 9, which is the final page of verdict

13   form.  Are there any objections here from either party?

14             MR. FINK:  Oh, sorry, Your Honor.  May I briefly --

15   we had another objection on page 8.  I'm sorry.

16             THE COURT:  All right.  Just for completeness, let's

17   turn to page 8.

18       What was your additional objection, Mr. Fink?

19             MR. FINK:  For Question 5, Your Honor, Plaintiff

20   also objects that the statement of the contractual duty should

21   be a contractual duty to grant licenses regarding its standard

22   essential patents to CommScope on a worldwide reasonable and

23   non-discriminatory basis, not a -- yeah.  CommScope--sorry--TQ

24   Delta does not believe that the obligation was specifically

25   United States; that it was for a worldwide basis only.

1      THE COURT:  All right.  And the question does not,

2  as you can see, identify either on a U.S. or a worldwide

3  basis.  It's silent on that.

4      MR. FINK:  Yes, Your Honor.

5      THE COURT:  Okay.  All right.  Your objection's

6  overruled.

7      Anything else from either party on any of the provisions

8  in the verdict form?

9      MR. FINK:  None from Plaintiff, Your Honor.

10      MR. DEANE:  None from Defendant, Your Honor.

11      THE COURT:  All right.  Thank you, counsel.

12      That will complete the formal charge conference.  As I

13  indicated to you yesterday, I'll now produce eight printed

14  copies of the final jury instructions and one clean copy of

15  the verdict form, which I intend to send back to the jury

16  after my instructions are complete and closing arguments have

17  been heard.

18      Now that we are at this point, Mr. Davis, can you confirm

19  that you will be presenting the entirety of Plaintiff's

20  closing arguments?

21      MR. DAVIS:  Yes, Your Honor.

22      THE COURT:  All right.  Mr. Barton or Mr. Dacus,

23  either one, who will be presenting arguments for Defendants?

24      MR. DACUS:  I will be, Your Honor.

25      THE COURT:  All right.  You're not going to split

 1    your time with co-counsel.

 2             MR. DACUS:  That's correct.

 3             THE COURT:  All right.  Is there anything else from

 4    either party before I recess?

 5        When I come back in, I'll be prepared to bring in the

 6    jury and begin with the Court's final jury instructions.

 7        Anything further from Plaintiff?

 8             MR. DAVIS:  No, Your Honor.

 9             THE COURT:  Anything further from Defendants?

10             MR. DACUS:  No, Your Honor.

11             THE COURT:  Let me just simply say this while I have

12    you in the room without the presence of the jury.  The Court

13    considers that its final instructions to the jury and

14    counsel's closing arguments are the most serious part of a

15    very serious process.  Therefore, I do not want any

16    distractions or interruptions.  If you have a device, make

17    sure it is either out of this room or there is no physical way

18    it could make noise.  If you have something to say to someone

19    sitting next to you in the gallery, say it now.  I don't want

20    whispering, I don't want talking, I don't want moving, I don't

21    want papers being rustled or passed back and forth.  I want

22    you to be still, quiet, and respectful throughout the entire

23    process.

24        Does anybody have any questions about what the Court's

25    expectations are?  I don't see any, so you are now on

1    appropriate notice.

2         Thank you, counsel.  I'll be back shortly.  Until then,

3    the Court stands in recess.

4                        (Brief recess.)

5         THE COURT:  Be seated, please.

6         Counsel, is there anything from either party before I

7    bring in the jury and proceed with the Court's final

8    instructions?

9              MR. DAVIS:  No, Your Honor.

10             MR. DACUS:  No, Your Honor.

11             THE COURT:  All right.  Let's bring in the jury,

12   please.

13             (Whereupon, the jury entered the courtroom.)

14             THE COURT:  Good morning, ladies and gentlemen.

15   Welcome back.  Please have a seat.

16        Ladies and gentlemen of the jury, you have now heard all

17   the evidence in this case, and I'll now instruct you on the

18   law that you must apply.

19        I want you to understand that, when you retire to the

20   jury room, I'm going to send back for each of you your own

21   individual printed copy of these final instructions that I'm

22   about to give you orally.  So you can make notes if you'd like

23   to, but you're going to have your own written copy to refer to

24   and, quite honestly, I'd prefer you pay attention to my oral

25   instructions and listen carefully knowing that you'll have

1   your own copy to look at when you retire.

2       It's your duty to follow the law as I give it to you.  On

3   the other hand, and as I've said, you, the jury, are the sole

4   judges of the facts in this case.  Do not consider any

5   statement that I have made over the course of the trial or

6   make in the course of these instructions as an indication that

7   I have any opinion about the facts in this case.

8       Now, you're about to hear closing arguments from the

9   attorneys for the competing parties.  Statements and arguments

10  of the attorneys, ladies and gentlemen, are not evidence, and

11  they are not instructions on the law.  They are intended only

12  to assist you, the jury, in understanding the evidence and the

13  parties' competing contentions.

14      A verdict form has been prepared for you.  You will take

15  this form with you to the jury room.  And when you've reached

16  a unanimous agreement as to your verdict, you will have your

17  foreperson fill in the blanks in the verdict form reflecting

18  that unanimous agreement, then have it signed, dated by the

19  foreperson, and then notify the Court Security Officer that

20  you've reached a verdict.

21      Answer the questions in the verdict form from the facts

22  as you find them to be.  Do not decide who you think should

23  win this case and then answer the questions to reach that

24  result.  Again, your answers and your verdict must be

25  unanimous.

1          Now, in determining whether any fact has been proven in

2     this case, you may, unless otherwise instructed, consider the

3     testimony of all the witnesses, regardless of who may have

4     called them, and the stipulations of the parties as entered

5     into.  You may also consider all of the exhibits received and

6     admitted into evidence regardless of who introduced those

7     exhibits.

8          You, the jury, are the sole judges of the credibility of

9     all the witnesses and the weight and effect to give to all the

10    evidence.  In deciding the facts in this case, you may have to

11    decide which testimony to believe and which testimony not to

12    believe.  You alone are to determine the questions of

13    credibility or truthfulness of the witnesses.

14         And in weighing the testimony of the witnesses, you may

15    consider the witness' manner and demeanor on the witness

16    stand, any feelings or interest they may have in the case and

17    its outcome, any prejudice or bias about the case that the

18    witness may have, and the consistency or inconsistency of

19    their testimony, considered in the light of the circumstances.

20         Has the witness been contradicted by other evidence?  Has

21    he or she made statements at other times and in other places

22    contrary to what they said from the witness stand?  You,

23    ladies and gentlemen, must give the testimony of each witness

24    the amount of credibility and weight that you think it

25    deserves.

1          You should also keep in mind that a simple mistake does

2     not mean that the witness is not telling the truth.  You must

3     consider whether any misstatement was an intentional falsehood

4     or a simple lapse in memory, and what significance should be

5     attached to that testimony.

6          Now, as I've told you previously, the attorneys in this

7     case are advocates for the competing parties, and they have a

8     duty to object when they believe evidence is offered that

9     should not be admitted under the rules of the Court.

10         When the Court sustained an objection to a question

11    addressed to a witness, you must disregard that question

12    entirely, and you may draw no inference from its wording or

13    speculate about what the witness would have said if the Court

14    had allowed them to answer the question.

15         On the other hand, if an objection was overruled, then

16    you should treat the answer to the question and the question

17    just as if no objection had been made in the first place.  By

18    allowing the testimony or other evidence to be introduced over

19    the objection of an attorney, the Court did not indicate any

20    opinion as to the weight or effect of that evidence.  Again,

21    that is your responsibility.

22         Now, at various times during the course of the trial, it

23    was necessary for the Court to talk to the lawyers outside of

24    your hearing either here at the bench or by calling a recess

25    and talking to them when you were outside of the courtroom.

 1    This happens, ladies and gentlemen, because often during

 2    trials there are things that arise that do not involve the

 3    jury.  You should not speculate or guess about what was said

 4    during these discussions that took place outside of your

 5    presence.

 6         Now, there are two types of evidence that you may

 7    consider in properly finding the truth as to the facts in this

 8    case.  One is direct evidence, such as the testimony of an

 9    eyewitness.  Now, the other is called indirect or

10    circumstantial evidence, that is, the proof of a chain of

11    circumstances that indicates the existence or non-existence of

12    certain other facts.  As a general rule, the law makes no

13    distinction between direct evidence or indirect and

14    circumstantial evidence, but simply requires that you find the

15    facts based on all the evidence that's been presented during

16    the course of the trial.

17         Now, the parties may have stipulated or agreed to some of

18    the facts in this case.  And when the lawyers for both sides

19    stipulate as to the existence of a fact, then you must, unless

20    otherwise instructed, accept the stipulation as evidence and

21    consider the fact as proven.  The parties in this case have

22    stipulated to the following facts:

23         1.  Plaintiff TQ Delta, LLC, file its complaint in this

24    case on August the 13th, 2021, alleging that the Defendants

25    infringe certain claims of the patents-in-suit.  There are

1    seven patents-in-suit.  U.S. Patent No. 7,570,686, which

2    you've heard referred to throughout the trial as the '686

3    Patent; U.S. Patent No. 7,453,881, which you've heard referred

4    to as the '881 Patent; U.S. Patent No. 8,276,048, which you've

5    heard referred to as the '048 Patent; Patent No. 8,090,008,

6    which you've heard referred to as the '008, or the double-0

7    patent I think it was called at least once; U.S. Patent No.

8    8,462,835, which you've heard referred to as the 8-3-5 Patent

9    or the '835 Patent; U.S. Patent No. 8,468,411, which you've

10   heard referred to as the '411 Patent; and U.S. Patent No.

11   9,154,356 [sic] which you've heard referred to -- excuse me.

12   Patent No. 9,154,354, which you've heard referred to as the

13   '354 Patent.  And these patents have been referred to as the

14   patents-in-suit and also as the asserted patents.

15        Stipulation No. 2.  Plaintiff TQ Delta owns all rights

16   necessary to bring this action for the patents-in-suit.

17        3.  Plaintiff TQ Delta is a limited liability company

18   organized and existing under the laws of the state of

19   Delaware, having its principal place of business at 900 South

20   Capital of Texas Highway, Suite 150, Austin, Texas, 78746.

21        4.  Defendant CommScope Holding Company, Inc., is a

22   corporation organized and existing under the laws of the state

23   of Delaware.

24        5.  Defendant CommScope, Inc., is a corporation organized

25   and existing under the laws of the state of Delaware.

1    CommScope, Inc., is a wholly-owned subsidiary of CommScope

2    Holding Company, Inc.

3         6.   Defendant CommScope Holding Company, Inc., acquired

4    Defendants ARRIS Solutions, Inc., ARRIS Technology, Inc., and

5    ARRIS Enterprises, LLC, in 2019.

6         7.   Defendant ARRIS U.S. Holdings, Inc., is a corporation

7    organized and existing under the laws of the the state of

8    Delaware.  ARRIS U.S. Holdings, Inc., is a subsidiary of ARRIS

9    International, Limited.

10        8.   Defendant ARRIS Solutions, Inc., is a corporation

11   organized and existing under the laws of the state of

12   Delaware.  ARRIS Solutions, Inc., is a subsidiary of ARRIS

13   U.S. Holdings, Inc.

14        9.   Defendant ARRIS Technology, Inc., is a corporation

15   duly organized and existing under the laws of the state of

16   Delaware.  ARRIS Technology, Inc., is a subsidiary of ARRIS

17   Solutions, Inc.

18        10.  Defendant ARRIS Enterprises, LLC, is a corporation

19   organized and existing under the laws of the state of

20   Delaware.  ARRIS Enterprises, LLC, is a subsidiary of ARRIS

21   Solutions, Inc.

22        11.  ARRIS International, Limited, ARRIS Global, Limited,

23   ARRIS U.S. Holdings, Inc., ARRIS Solutions, Inc., ARRIS

24   Technology, Inc., and ARRIS Enterprises, LLC, maintain a

25   regular and established place of business at 4516 Seton Center

1   Parkway, Austin, Texas, 78659-5370, and/or at 5300 Hollister

2   Street, Houston, Texas, 77040.

3          12.   CommScope Holding Company, Inc., and CommScope,

4   Inc., maintain a regular and established place of business at

5   2601 Telecom Parkway, Richardson, Texas, 70852.

6          13.   On April the 4th, 2019, CommScope Holding Company,

7   Inc., acquired ARRIS International, Limited, becoming its

8   parent company.  Prior to CommScope Holding Company, Inc.'s,

9   acquisition of ARRIS International, Limited, ARRIS

10  International, Limited, acquired 2Wire, Inc.

11         14.   The priority dates for some of the patents-in-suit

12  are as follows:  October the 5th, 2021, for the '881 Patent;

13  October the 12th, 2004, for the '048 Patent; November the 9th,

14  1999, for the '008 Patent; March the 3rd, 2004, for the '835

15  Patent; April the 12th, 2006, for the '411 Patent; and April

16  the 18th, 2000, for the '354 Patent.

17         15.   The '686 Patent, the '881 Patent, the '008 Patent,

18  the '835 Patent, and the '354 Patent are subject to

19  commitments with the International Telecommunications Union,

20  which you've heard to referred to as the ITU.  These patents

21  are often referred to as standard essential patents, or SEPs.

22  The '048 Patent and the '411 Patent are not standard essential

23  patents and are not subject to the commitments to the ITU.

24         Now, certain testimony has been presented to you, ladies

25  and gentlemen, during the course of this trial through

depositions.  A deposition is the sworn recorded answers to questions asked to a witness in advance of the trial.  If a witness cannot be present to testify in person during the trial, then the witness' testimony may be presented under oath to the jury in the form of a deposition.

Before this trial began, the attorneys representing the parties in this case questioned these deposition witnesses under oath.  At that time a court reporter was present and recorded their sworn testimony.

Deposition testimony is entitled to the same consideration by you as testimony given by a witness in person from the witness stand in open court.  Accordingly, ladies and gentlemen, you should judge the credibility and importance of deposition testimony to the best of your ability just as if the witness had testified to you from the witness stand in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and the exhibits as you feel are justified in the light of common experience.  Said another way, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and the evidence in this case. However, you should not base your decision on any evidence not presented by the parties during the case, including your own

1    personal experience with any of the products that are at issue

2    in this case.

3         Now, unless I instruct you otherwise, you may properly

4    determine that the testimony of a single witness is sufficient

5    to prove any fact, even if a greater number of witnesses may

6    have testified to the contrary if, after considering all the

7    evidence, you believe that single witness.

8         Also, when knowledge of a technical subject may be

9    helpful to the jury, a person who has special training or

10   experience in that technical field--we call them an expert

11   witness--is permitted to state his or her opinions on those

12   technical matters.  However, ladies and gentlemen, you are not

13   required to accept those opinions.  As with any other witness,

14   it is solely up to you whether or not to rely upon the

15   testimony that's given.

16        Now, certain exhibits have been shown to you during the

17   trial that were illustrations.  We call these type of exhibits

18   demonstrative exhibits or simply demonstratives.

19   Demonstrative exhibits are a party's depiction, picture, or

20   model describing something involved in the trial.  If your

21   recollection of the evidence differs from the demonstratives,

22   then you should rely on your recollection.

23        Demonstrative exhibits are sometimes called jury aids.

24   Demonstrative exhibits, ladies and gentlemen, are not

25   evidence, but a witness' testimony concerning a demonstrative

1    exhibit is evidence.  Demonstrative exhibits will not be

2    available to you to review or consider during your

3    deliberations.

4        Now, in any legal action, facts must be proven by a

5    required amount of evidence known as the burden of proof.  The

6    burden of proof in this case is on the Plaintiff for some

7    issues and on the Defendants for other issues.  And there are

8    two burdens of proof that you will apply in this case.  One is

9    the preponderance of the evidence; the other is clear and

10   convincing evidence.

11       The Plaintiff in this case, TQ Delta, which I'll refer to

12   as the Plaintiff, technically their complete name is TQ Delta,

13   LLC, you've heard them referred to as the Plaintiff.  You've

14   also heard them referred to simply as TQ Delta.

15       The Plaintiff has the burden of proving patent

16   infringement by a preponderance of the evidence.  TQ Delta

17   also has the burden of proving that CommScope has actively

18   induced others to infringe the asserted patents by a

19   preponderance of the evidence.  TQ Delta also has the burden

20   of proving willful patent infringement by a preponderance of

21   the evidence, and TQ Delta also has the burden of proving

22   damages for any patent infringement by a preponderance of the

23   evidence.

24       A preponderance of the evidence, let me remind you, means

25   evidence that persuades you that a claim is more probably true

1    than not true.  Sometimes this is talked about as being the

2    greater weight and degree of credible testimony.

3         The Defendants in this case, CommScope Holding Company,

4    Inc., CommScope, Inc., ARRIS International, Limited, ARRIS

5    Global, Limited, ARRIS U.S. Holdings, Inc., ARRIS Solutions,

6    Inc., ARRIS Technology, Inc., and ARRIS Enterprises, LLC,

7    which I'll refer to collectively as the Defendants or

8    collectively as simply CommScope, have the burden of proving

9    by a preponderance of the evidence that TQ Delta breached its

10   contract with the ITU to grant licenses to standard essential

11   patents held by TQ Delta on fair, reasonable, and

12   non-discriminatory, as you heard it called FRAND, terms and

13   conditions.

14        Commscope also has the burden of proving invalidity as to

15   the challenged TQ Delta patent claims by clear and convincing

16   evidence.

17        Clear and convincing evidence, ladies and gentlemen,

18   means evidence that produces, in your mind, an abiding

19   conviction that the truth of the party's factual contentions

20   are highly probable.  Although proof to an absolute certainty

21   is not required, clear and convincing evidence requires a

22   greater degree of persuasion than is necessary for the

23   preponderance of the evidence standard.  If proof establishes,

24   in your mind, an abiding conviction in the truth of the

25   matter, then the clear and convincing evidence standard has

1    been met.

2        Now, as I previously told you, ladies and gentlemen,

3    these two burdens of proof are not to be confused with a

4    different and a third burden of proof known as beyond a

5    reasonable doubt, which is the burden of proof applied in a

6    criminal case, and as I told you, it has no application in a

7    civil case like this whatsoever.  Beyond a reasonable doubt is

8    a higher burden of proof or standard of proof than the

9    preponderance of the evidence and is a higher standard of

10   proof than clear and convincing evidence.

11       Now, as I did at the beginning of the case, I'm going to

12   first give you a summary of each side's contentions.  I'll

13   then provide you with detailed instructions on what each side

14   must prove in order to win on each of its contentions.

15       As I have previously advised you, this is an action for

16   patent infringement.  TQ Delta, the Plaintiff, contends that

17   CommScope, the Defendants, infringe certain claims of the

18   patents-in-suit.  Remember, there are seven patents-in-suit:

19   the '686 Patent, the '881 Patent, the '048 Patent, the '008

20   Patent, the '835 Patent, the '411 Patent, and the '354 Patent.

21       The Plaintiff, TQ Delta, contends that the Defendants,

22   CommScope, infringe the following claims of the

23   patents-in-suit:  Claim 36 of the '686 Patent, claim 17 of the

24   '881 Patent, claim 5 of the '048 Patent, claim 14 of the '008

25   Patent, claim 10 of the '835 Patent, claim 18 of the '411

1    Patent, and claim 10 of the '354 Patent.  These are the

2    asserted claims.

3         TQ Delta contends that CommScope has infringed the

4    asserted claims by making, using, selling, importing, or

5    offering for sale the 5031, the 5168, the 5268, the BGW210,

6    the NVG589, the NVG599, and the NVG44X, which I'll refer to as

7    the accused products.

8         TQ Delta also contends that CommScope has actively

9    induced others to infringe the asserted patents.

10        TQ Delta further alleges that CommScope's infringement of

11   the patents asserted was willful.

12        TQ Delta contends that it is entitled to money damages in

13   the form of a reasonable royalty for CommScope's infringement.

14        And TQ Delta has the burden to prove these issues by a

15   preponderance of the evidence.

16        On the other hand, the Defendants, CommScope, deny that

17   they infringe any of the asserted claims of the

18   patents-in-suit.  CommScope denies that it makes, uses, offers

19   for sale, sells, or imports any of the accused products that

20   infringe any of the asserted claims.  CommScope also denies

21   that it has induced others to infringe the asserted patents.

22   CommScope also denies that any alleged infringement was

23   willful.  And CommScope denies that it owes TQ Delta any money

24   damages.

25        CommScope also contends that all of the asserted claims

1   of the patents-in-suit are invalid as being obvious in light

2   of the prior art.  Invalidity is a defense to infringement,

3   and CommScope has the burden to prove invalidity by clear and

4   convincing evidence.

5         Let me take one minute, ladies and gentlemen.

6                    (Pause in proceedings.)

7              THE COURT:  Let me correct something.  CommScope

8   contends that four of the seven patents-in-suit are invalid as

9   being obvious in the light of prior art.  CommScope contends

10  that the '686 Patent, the '008 Patent, the '048 Patent, and

11  the '835 Patent are invalid as being obvious in the light of

12  prior art.  The other three patents are not challenged as

13  being invalid by the Defendants CommScope.

14        Commscope also alleges that the '008 Patent and the '835

15  Patent are invalid as being anticipated by the prior art.

16        Now, invalidity and infringement, ladies and gentlemen,

17  are separate and distinct issues, and your job is to decide

18  whether CommScope has infringed any of the asserted claims of

19  the patents-in-suit and whether those claims are invalid.

20        If you decide that any asserted claim has been infringed

21  and is not invalid, then you'll need to decide the amount of

22  money damages, if any, to be awarded to TQ Delta to compensate

23  it for that infringement.  If you decide that there was any

24  infringement and it was willful, that decision as to

25  willfulness should not affect your damages or any award that

1    you make in this case, and I will take willfulness into

2    account later, if you find it.

3         CommScope further contends that TQ Delta has breached its

4    commitment to the ITU by failing to offer to CommScope a

5    license to TQ Delta's standard essential patents on fair,

6    reasonable, and non-discriminatory terms.  These terms and

7    conditions are sometimes referred to as RAND, R-A-N-D,

8    commitments, you've heard them referred to as FRAND,

9    F-R-A-N-D, commitments.  And as I've previously instructed you

10   FRAND and RAND have been used interchangeably throughout this

11   trial, and for purposes of this trial you should consider them

12   to be the same.

13        Commscope also alleges that CommScope is entitled to

14   damages as a result of TQ Delta's breach of contract.

15   CommScope has the burden to prove that TQ Delta breached its

16   FRAND obligation by a preponderance of the evidence.

17        Now, before you can decide many of the issues in this

18   case, you'll first need to understand the role of the patent

19   claims.  The patent claims, ladies and gentlemen, are those

20   numbered sentences at the end of each patent.  The claims are

21   important because it's the words of the claims that define

22   what a patent covers.

23        The figures in the patent, the text in the patent, the

24   rest of the patent provides a description and/or examples of

25   the invention and it provides a context for the claims, but it

1    is the claims themselves that define the breadth of the

2    patent's coverage.  Each claim is effectively treated as if it

3    were a separate patent, and each claim may cover more or cover

4    less than another claim.  As a result, what a patent covers

5    depends, in turn, upon what each of its claims covers.

6         Now, you'll first need to understand what each claim

7    covers in order to decide whether or not there is infringement

8    of that claim and to decide whether or not the claim is

9    invalid.  The law says that it's my role to define the terms

10   of the claims and it's your role to apply my definitions to

11   the issues that you are asked to decide in this case.

12        Therefore, and as I've explained to you at the beginning

13   of the case, I've already determined the meaning of certain

14   language from the claims, and I've provided my definitions to

15   you in your juror notebooks, and you are to accept and use my

16   definitions of this language from the claims as being correct.

17   It's your job to take these definitions and apply them to the

18   issues that you're deciding, the issues of infringement and

19   invalidity.

20        Now, you should disregard any evidence presented at trial

21   that contradicts or is inconsistent with the constructions and

22   the definitions that I have given you.  For claim limitations

23   or language that I have not expressly construed--that is,

24   limitations that I have not interpreted or defined--you're to

25   apply and use the plain and ordinary meaning of that language

1    as understood by one of ordinary skill in the art, which is to

2    say, in the field of the technology of the patent at the time

3    of the alleged invention.

4        Now, the meaning of the words of the patent claims must

5    be the same when deciding both the issues of infringement and

6    the issue of validity.  As I say, you've been provided copies

7    of the asserted patents, all seven of them, in your juror

8    notebooks, and you may use them and refer to them throughout

9    your deliberations.

10       Now, several times in these instructions I have referred

11   to and will refer to a person of ordinary skill in the field

12   of the invention, or a person of ordinary ordinary skill in

13   the art.  It's up to you to decide the level of ordinary skill

14   in the field of the technology of the patent and what it is.

15       In deciding this, you should consider all the evidence

16   introduced at trial, including but not limited to:  (1) the

17   levels of education and experience of the inventor and other

18   persons actively working in the field; (2) the types of

19   problems encountered in the field; (3) prior art solutions to

20   those problems; (4) the rapidity with which innovations are

21   made; and (5) the sophistication of the technology.

22       The claims are intended to define in words the boundaries

23   of the inventor's rights.  Only the claims of a patent can be

24   infringed, ladies and gentlemen.  Neither the written

25   description nor the drawings of a patent can be infringed.

1    Each claim must be considered individually.

2         Now I'll explain to you what a claim defines -- how a

3    claim defines what it covers.

4         A claim sets forth, in words, a set of requirements.

5    Each claim sets forth its requirements in a single sentence.

6    If a product satisfies each of these requirements, then it is

7    covered by that claim.

8         There can be several claims in a patent.  Each claim may

9    be narrower or broader than another claim by setting forth

10   more or fewer requirements.  The coverage of a patent is

11   assessed on a claim-by-claim basis.  And in patent law, the

12   requirements of a claim are often referred to as the claim

13   elements.  They're often referred to also as the claim

14   limitations.

15        When a product meets all the requirements of a claim, the

16   claim is said to cover that product, and that product is said

17   to fall within the scope of that claim.  In other words, a

18   claim covers a product where each of the claim elements or

19   limitations is present in that product.  If a product is

20   missing even one limitation or element of a claim, the product

21   is not covered by the claim.  And if a product is not covered

22   by the claim, the product cannot infringe the claim.

23        Now, the beginning portion, or preamble, of a claim often

24   uses the word 'comprising'.  The word 'comprising', when used

25   in the preamble of a claim, means including but not limited

1    to, or containing but not limited to.  When comprising is used

2    in the preamble, if you decide that an accused product

3    includes all of the requirements of that claim, that claim is

4    infringed.  And that is true even if the accused product

5    contains other additional elements.

6        Take, for example, a claim to a table comprising a

7    tabletop, legs, and glue.  It would be infringed by any table

8    that includes a tabletop, legs, and glue even if that table

9    also contains other things such as leaves to expand the size

10   of the table or wheels to go on the ends of the legs.

11       Now, this case involves two types of patent claims:

12   independent claims and dependent claims.  In this case, claim

13   36 of the '686 Patent, claim 17 of the '881 Patent, claim 5 of

14   the '048 Patent, claim 14 of the '008 Patent, claim 18 of the

15   '411 Patent, and claim 10 of the '354 Patent are independent

16   claims.  Claim 10 of the '835 Patent is a dependent claim.

17       An independent claim, ladies and gentlemen, sets forth

18   all the requirements that must be met in order to be covered

19   by that claim.  It's not necessary to look to any other claim

20   in the patent to determine what an independent claim covers.

21       On the other hand, a dependent claim does not itself

22   recite all the requirements of the claim, but refers to

23   another claim for some of its requirements.  In this way the

24   claim depends from another claim.

25       A dependent claim incorporates all the requirements of

1    the claim to which it refers or, as we say, from which it

2    depends as well as all of its original limitations.  So to

3    determine what a dependent claim covers, it's necessary to

4    look at both the dependent claim and any other claim to which

5    it refers or from which it depends.  A product that meets all

6    the requirements of both the dependent claim and the claim to

7    which it refers or depends or from which it depends is covered

8    by that dependent claim.

9         Now, if a person or corporation makes, uses, sells, or

10   offers to sell within the United States, or imports into the

11   United States what is covered by a patent claim without the

12   patent holder's permission, that person or corporation is said

13   to infringe the patent.

14        In reaching your decision on infringement, keep in mind

15   that only the claims of the patent can be infringed, and you

16   must compare the asserted claims as I have construed them for

17   you to the accused products to determine whether or not there

18   is infringement.  This is the only correct comparison, the

19   asserted claims compared to the accused products.

20        Now, you should not compare the accused product with any

21   specific examples set out in the patent or with the prior art.

22   In deciding infringement, the only correct comparison is

23   between the accused products and the elements or limitations

24   of the claim that is asserted as the Court has construed them

25   for you.

1          You must reach your decision on each assertion of

2    infringement based on my instructions about the meaning and

3    scope of the claims, the legal requirements for infringement,

4    and the evidence presented to you by both of the competing

5    parties in this case.

6          I'll now instruct you about the specific rules that you

7    must follow to determine whether the Plaintiff TQ Delta has

8    proven that CommScope, the Defendants, have directly infringed

9    one or more of the asserted claims involved in this case.

10          A patent can be directly infringed even if the alleged

11   direct infringer did not have knowledge of the patent and

12   without the direct infringer knowing that what it did was

13   infringement of a claim.  A patent may also be directly

14   infringed even though the accused direct infringer believed in

15   good faith that what it did was not infringement of the

16   patent.

17          You must determine, separately for each asserted claim,

18   whether or not there is or is not infringement.  And in order

19   to prove direct infringement of an asserted claim, TQ Delta,

20   the Plaintiff, must prove by a preponderance of the evidence

21   that an accused product includes each and every limitation or

22   element of the claim.

23          In determining whether the accused product directly

24   infringes an asserted claim in this case, you must compare an

25   accused product with each and every one of the requirements or

1    limitations of that claim to determine whether that accused

2    product contains each and every requirement or limitation

3    recited in the claim.  An accused product infringes a claim if

4    it satisfies all the claim elements, even though it may also

5    be capable of non-infringing modes of operation.

6        However, if you find that an independent claim on which

7    another claim depends is not infringed, there cannot be

8    infringement of any dependent claim that refers directly or

9    indirectly to that independent claim.

10       And on the other hand, if you find that an independent

11   claim has been infringed, you must still decide separately

12   whether the product meets the additional requirements of any

13   claims that depend from that independent claim--that is,

14   whether those claims have also been infringed.  A dependent

15   claim includes all the requirements of any of the claims to

16   which it refers or from which it depends, plus the additional

17   requirements of its own.

18       Now, a claim requirement is literally present if it

19   exists in an accused product just as it has been described in

20   the claim language, either as I have explained or construed

21   that language to you, or if I did not explain it, as it would

22   have been understood by its plain and ordinary meaning to a

23   person of ordinary skill in the art.  If an accused product

24   omits any element recited in a claim, then you must find that

25   the accused product in question does not literally infringe

1    that claim.

2        So long as an accused product has each and every one of

3    the claim elements, infringement of that claim is shown, even

4    if the product contains additional features or elements not

5    required by the claims.

6        In this case, TQ Delta has also accused CommScope of

7    indirect infringement by actively inducing others to directly

8    infringe the asserted claims of the asserted patents.  As with

9    direct infringement, ladies and gentlemen, you must determine

10   whether there has been active inducement on a claim-by-claim

11   basis.

12       CommScope is liable for induced infringement of a claim

13   only if TQ Delta proves by a preponderance of the evidence

14   that:

15       1.   The acts have been carried out by CommScope's

16   customers that directly infringe that claim;

17       2.   CommScope has taken action during the time the

18   asserted patents were in force, intending to cause the

19   infringing acts to be carried out by its customers; and,

20       3.   CommScope has been aware of the asserted patents and

21   has known that the acts of its customers constitute

22   infringement of the asserted patents, or CommScope was

23   willfully blind to that infringement.

24       Willful blindness, ladies and gentlemen, is established

25   if CommScope believed that there was a high probability that

1    the acts, if taken, would constitute infringement of the

2    asserted claims, but it deliberately avoided confirming that

3    belief.

4         To establish induced infringement, it's not sufficient

5    that someone else directly infringes the claim, nor is it

6    sufficient that the company accused of inducing another's

7    direct infringement merely had knowledge or notice of an

8    asserted patent or had been aware of the acts by another that

9    allegedly constitute direct infringement.

10        Further, the mere fact that the company accused of

11   inducing another's direct infringement had known or should

12   have known that there was a substantial risk that someone

13   else's acts would infringe is not sufficient.  Rather, in

14   order to find inducement, you must find that CommScope

15   specifically intended or was willfully blind to that

16   infringement.

17        Now, TQ Delta also contends that CommScope has willfully

18   infringed the asserted claims of the patents-in-suit.  If you

19   decide that CommScope has infringed a valid claim, then you

20   must go on and address the issue of whether or not that

21   infringement was willful.  TQ Delta has the burden of proving

22   willful infringement by a preponderance of the evidence.

23        You may not determine that the infringement was willful

24   just because CommScope knew of the asserted patents and

25   infringed them.  You may find that CommScope willfully

1    infringed if you find that CommScope deliberately or

2    intentionally infringed the asserted patents.

3        You may find that CommScope's actions were willful if

4    CommScope acted in reckless or callous disregard of or with

5    indifference to the rights of TQ Delta.  A defendant is

6    indifferent to the rights of another when it proceeds in

7    disregard of a high or excessive danger of infringement that

8    is known to it or that would have been apparent to a

9    reasonable person in its position.

10        To determine whether CommScope acted willfully, consider

11    all the facts, and assess CommScope's knowledge at the time of

12    the challenged conduct.  Facts that may be considered include

13    whether or not CommScope reasonably believed that it did not

14    infringe or that the asserted patents were invalid.  You may

15    also find that CommScope's actions were deliberate or

16    intentional if CommScope was willfully blind to TQ Delta's

17    patent rights.

18        Your determination, ladies and gentlemen, of willfulness

19    should incorporate the totality of the circumstances based on

20    all the evidence presented during this trial.  Willfulness can

21    be established by circumstantial evidence.  If you decide that

22    any infringement was willful, that decision should not affect

23    any damages that you award in this case.  The Court will take

24    willfulness into account later, if you find it.

25        I'll now instruct you on the rules that you must follow

1    in deciding whether or not CommScope has proven that any of

2    the asserted claims of the asserted patents that have been

3    challenged as being invalid are, in fact, invalid.  Again,

4    four of the patents in this case have been challenged by

5    CommScope as being invalid, four of them as being invalid by

6    being obvious, two of those four as being invalid as being

7    anticipated by the prior art.

8         Now, a United States patent, ladies and gentlemen, is

9    accorded a presumption of validity based on the presumption

10   that the United States Patent and Trademark Office, which

11   you've heard referred to during the case as the PTO, or as the

12   Patent Office, acted correctly in issuing the patent.  This

13   presumption of validity extends to all issued United States

14   patents.

15        In order to overcome this presumption of validity,

16   CommScope must establish by clear and convincing evidence that

17   a claim is invalid.  Like infringement, invalidity is

18   determined on a claim-by-claim basis.  You must determine

19   separately for each claim whether that claim is invalid.  And

20   if one claim of a patent is invalid, this does not necessarily

21   mean that any other claim is invalid.

22        You've heard evidence of prior art that the Patent Office

23   may or may not have evaluated.  The fact that any particular

24   reference was or was not considered by the Patent Office does

25   not change CommScope's burden of proof.  However, in making

 1    your decision as to whether CommScope has met its burden of

 2    proof to prove invalidity, you may take into account the fact

 3    that the prior art was not disclosed or considered by the

 4    Patent Office.

 5        Prior art differing from the prior art considered by the

 6    Patent Office may, but does not always, carry more weight than

 7    the prior art that was considered by the Patent Office.

 8    Again, the ultimate responsibility for deciding whether the

 9    asserted claims that have been challenged as being invalid are

10    invalid is up to you, the members of the jury.

11        Now, claims are construed, ladies and gentlemen, in the

12    same way for determining infringement as for determining

13    invalidity.  You must apply the claim language consistently

14    and in the same manner for these issues, the issues of

15    infringement and invalidity.  Now, in making your

16    determination as to invalidity, you must consider each claim

17    separately.

18        When considering whether a particular reference predates

19    a particular asserted patent--and is, therefore prior art as

20    to that patent--the relevant date is called the patent's

21    priority date.  To be prior art, an item or reference must

22    have been made, known, used, published, or patented either

23    before the invention was made or more than one year before the

24    priority date.  Prior art does not include a publication that

25    describes the inventor's own work and was published less than

1    one year before the date of the invention.

2         The parties dispute the applicable priority date of the

3    '686 Patent in this case.  TQ Delta contends that the

4    applicable priority date for the '686 Patent is no later than

5    January the 7th, 2000.  CommScope contends that the relevant

6    date, the priority date, is August the 10th, 2000.  You must

7    determine the priority date for the claimed inventions of the

8    '686 Patent.

9         Commscope must demonstrate by clear and convincing

10   evidence that TQ Delta is not entitled to its claimed priority

11   date.  A claim is entitled to a priority date of an earlier

12   application if the earlier application contained a written

13   description of the invention as recited in that claim.

14        Now, as I've explained to you earlier, a previous device,

15   system, method, publication, or patent that predates the

16   claimed invention is generally called prior art and may

17   include items that were publicly known or that have been used

18   or offered for sale, or references such as publications or

19   other patents, that disclose the claimed invention or elements

20   of the claimed invention.  Prior art may be authored or

21   created by anyone, ladies and gentlemen.

22        In evaluating the prior art to determine whether an

23   invalidity defense has been proven by clear and convincing

24   evidence, you may consider whether that prior art was or was

25   not before the PTO.

1        In this case, CommScope, the Defendants, contend that

2   claim 36 of the '686 Patent is invalid as being obvious in

3   view of the ITU-T temporary document FI-071, which you've

4   heard referred to as the FI-071, in combination with ITU-T

5   recommendation G.992.1, which you have heard referred to as

6   the G.992.1.

7        CommScope also contends that claim 5 of the '048 Patent

8   is invalid as being obvious in view of U.S. Patent No.

9   7,267,208, which you've heard referred to as the Mazzoni

10  reference, in combination with ITU-T standard G.993.1, which

11  you've heard referred to as the G.993.1, and/or Mazzoni in

12  view of ITU-T contribution LB-031, which you've heard referred

13  to as LB-031.

14       CommScope claims that claim 14 of the '008 Patent is

15  invalid as anticipated and/or obvious in view of Patent No.

16  6,657,949, which you've heard referred to as Jones, or the

17  Jones reference.

18       CommScope contends that claim 10 of the '835 Patent is

19  invalid as anticipated in view of G.992.1 and/or obvious in

20  view of G.992.1 in combination with ITU-T SG 15/Q4

21  contribution SC-060, which you've heard referred to as SC-060.

22       I'll now instruct you on how to determine whether any of

23  the asserted claims of the asserted patents are invalid as

24  being anticipated.

25       In order for someone to be entitled to a patent, the

1    invention must actually be new, and the inventor must not have

2    lost his or her rights by delaying the filing of an

3    application claiming the invention.  In general, ladies and

4    gentlemen, inventions are new when the identical method has

5    not been used or disclosed before.

6        CommScope contends that claim 14 of the '008 Patent and

7    claim 10 of the '835 Patent are invalid because the claimed

8    inventions are not new.  In other words, CommScope contends

9    that these asserted claims are anticipated by the prior art.

10       Anticipation requires that all of the elements of a

11   patent claim be disclosed in a single prior art reference.

12   Also, the single prior art reference must disclose all

13   elements of the claim arranged or combined in the same way as

14   in the claim--that is, as the claim has been construed or

15   interrupted by the Court.

16       CommScope must prove by clear and convincing evidence

17   that an asserted claim was anticipated by the prior art

18   reference.

19       Anticipation must be determined on a claim-by-claim

20   basis.  If a dependent claim is anticipated by the prior art,

21   then the claims -- let me rephrase that.  If an independent

22   claim is anticipated by the prior art, then the claims from

23   which it depends are necessarily anticipated as well.

24       To anticipate the invention, the prior art does not have

25   to use the same words as the claim, but all the elements or

1    requirements of the claim must have been disclosed, either

2    stated expressly or implied, to a person having ordinary skill

3    in the art of the technology of the invention, so that looking

4    at that one reference, that person could make and use the

5    claimed invention.

6         Keep in mind that CommScope may not establish

7    anticipation by arguing that the accused products practice the

8    prior art, or by comparing the accused products to a prior art

9    reference.  An item of prior art may anticipate without

10   explicitly disclosing a feature of the claimed invention if

11   that missing characteristic is necessarily present, or

12   inherent, in the single anticipating reference.

13        Now, in this case, CommScope contends that claim 36 of

14   the '686 Patent, and claim 5 of the '048 Patent, and claim 14

15   of the '008 Patent, and claim 10 of the '835 Patent are

16   invalid as being obvious.  I'll refer to these claims as the

17   challenged claims.  Remember, there are four challenged claims

18   from four of the patents-in-suit.  Four of them -- all four of

19   them are challenged as being obvious.  Two of the same four

20   are also being challenged as being anticipated.

21        I'll now instruct you on how to determine whether any of

22   the challenged claims are invalid as being obvious.

23        Even though, ladies and gentlemen, an invention may not

24   have been identically disclosed or identically described in a

25   single prior art reference before it was made by an inventor,

1   in order to be patentable, that invention must also not have

2   been obvious to a person of ordinary skill in the field of the

3   technology of the asserted patent at the time the invention

4   was made.

5        CommScope, the Defendants, have the burden of

6   establishing obviousness by showing, through clear and

7   convincing evidence, that the claimed invention would have

8   been obvious to persons having ordinary skill in the art at

9   the time the invention was made in the field of the technology

10  of the accused patent.

11       In determining whether a claimed invention is obvious,

12  you must consider the level of ordinary skill in the field

13  that someone would have had at the time the invention was

14  made, the scope and content of the prior art, and any

15  differences between the prior art and the claimed invention.

16       Keep in mind that the existence of each and every element

17  of the claimed invention in the prior art does not necessarily

18  prove obviousness.  Most, if not all, inventions, ladies and

19  gentlemen, rely on the building blocks of prior art.  The

20  skill of the actual inventor is not necessarily relevant

21  because inventors may possess something that distinguishes

22  them from persons having ordinary skill in the art.

23       Now, in considering whether the claimed inventions were

24  obvious, you must first determine the scope and the content of

25  the prior art.  The scope and content of the prior art for

1    deciding whether an invention was obvious includes at least

2    art in the same field as the claimed invention.  It also

3    includes prior art from different fields that a person of

4    ordinary skill in the art would have considered when trying to

5    solve the problem that is addressed by the invention.

6         Further, teachings, suggestions, and motivations may also

7    be found within the knowledge of a person of ordinary skill in

8    the art, including references -- excuse me, inferences and

9    creative steps that a person of ordinary skill in the art

10   would employ.  A person of ordinary skill may be able to fit

11   the teachings of multiple pieces of prior art together like

12   the pieces of a puzzle.  The person of ordinary skill in the

13   art would have the capability of understanding the scientific

14   and engineering principles applicable to the prior art -- to

15   the pertinent prior art.

16        Now, in considering whether a claimed invention was

17   obvious, you may, but are not required, to find obviousness if

18   you find that, at the time of the claimed invention, there was

19   a reason that would have prompted a person having ordinary

20   skill in the field to combine the known elements in a way that

21   the claimed invention does, taking into account such factors

22   as:

23        1.  Whether the claimed invention was merely the

24   predictable result of using prior art elements according to

25   their known function;

     2.   Whether the claimed invention provides an obvious

solution to a known problem in the relevant field;

     3.   Whether the prior art teaches or suggests the

desirability of combining elements in the claimed invention;

     4.   Whether the prior art teaches away from combining

elements in the claimed invention;

     5.   Whether it would have been obvious to try the

combination of elements in the claimed invention, such as when

there is a design need or market pressure to solve a problem,

and there are a finite number of identified predictable

solutions; and

     6.   Whether the change resulted more from design

incentives or other market forces.

     To find that the prior art rendered the invention

obvious, you must find that it provided a reasonable

expectation of success.  Simply being obvious to try is not

sufficient in unpredictable technologies.

     In determining whether the claimed invention was obvious,

consider each claim separately.  Do not use hindsight, ladies

and gentlemen.  Consider only what was known at the time of

the invention.  In other words, you should not consider what a

person of ordinary skill in the art would know today or what

has been learned from the teachings of the patents-in-suit.

     Now, in making these assessments, you should take into

account any objective evidence, sometimes called secondary

1    considerations, that may have existed at the time of the

2    invention and afterwards that may shed light on the

3    obviousness or non-obviousness of the claimed invention.  The

4    following are possible secondary considerations, but it's up

5    to you, the jury, to decide whether secondary considerations

6    of non-obviousness exist at all.  These are:

7        1.   Whether the invention was commercially successful as

8    the result of the merits of the claimed inventions, rather

9    than the result of design needs or market pressure,

10   advertising, or similar activities;

11       2.   Whether the invention satisfied a long-felt need;

12       3.   Whether the inventor proceeded contrary to accepted

13   wisdom in the field;

14       4.   Whether others tried but failed to solve the problem

15   solved by the claimed invention;

16       5.   Whether others invented the invention at roughly the

17   same time;

18       6.   Whether others copied the claimed invention;

19       7.   Whether others accepted licenses under the

20   patents-in-suit because of the merits of the claimed

21   invention;

22       8.   Whether the claimed invention achieved unexpected

23   results;

24       9.   Whether others in the field praised the claimed

25   invention;

1          10.   Whether there were changes or related technologies

2     or market needs contemporaneous with the invention; and

3          11.   Whether persons having ordinary skill in the art at

4     the time of the invention expressed surprise or disbelief

5     regarding the invention.

6          These factors are relevant only if there is a connection

7     or a nexus between the factors and what differentiates the

8     claimed invention from the prior art.  TQ Delta, the

9     Plaintiff, has the burden of establishing this connection or

10    nexus.  Moreover, even if you conclude that some of the above

11    secondary considerations have been established, those factors

12    should be considered along with all the other evidence in this

13    case in determining whether CommScope has proven that the

14    claimed invention would have been obvious.

15         In support of obviousness, you may also consider whether

16    others independently invented the claimed invention before or

17    at about the same time as the named inventor thought of it.

18    In making these determinations, a person of ordinary skill

19    uses simple common sense and can rely upon the inferences and

20    creative steps that a person of ordinary skill in the art

21    would employ.

22         Also, CommScope does not need to show that one of

23    ordinary skill would actually have combined the physical

24    structures of two references.  One need only combine the

25    teachings.  Remember, as stated earlier, that prior art is not

1    limited to the patents and published materials, but includes

2    the general knowledge that would have been available at the

3    time to one of ordinary skill in the field of the invention.

4        If you find that CommScope has proven the obviousness of

5    a claim by clear and convincing evidence, then you must find

6    that that claim is invalid.

7        If you find that CommScope has infringed any valid claim

8    of the asserted patents, you must then consider what amount of

9    damages, if any, to award to TQ Delta.

10       I'm now going to instruct you about the measure of

11   damages, but by instructing you on damages, ladies and

12   gentlemen, I'm not suggesting which party should win this case

13   on any issue.

14       If you find that CommScope has infringed any valid claim

15   of the patents-in-suit, then TQ Delta -- I'm sorry.  Let me

16   restate that.  If you find that CommScope has not infringed

17   any valid claim of the patents-in-suit, then TQ Delta is not

18   entitled to any patent damages.

19       TQ Delta, the Plaintiff, has the burden to establish the

20   amount of its damages by a preponderance of the evidence.  In

21   other words, you should award only those damages that TQ Delta

22   establishes that it more likely than not suffered as a result

23   of CommScope's infringement.

24       Now, while TQ Delta is not required to prove the amount

25   of its damages with mathematical precision, it must prove them

1  with reasonable certainty.  TQ Delta is not entitled to

2  damages that are remote or that are only speculative.

3       Now, the damages that you award, if any, must be adequate

4  to compensate TQ Delta for any infringement that you may find.

5  You may not award to TQ Delta more damages than are adequate

6  to compensate for the infringement.  You also must not include

7  any additional amount in any award you make for the purposes

8  of punishing CommScope or for the purpose of setting an

9  example.

10      I'll now instruct you on how to calculate reasonable

11  royalty damages.

12      A royalty, ladies and gentlemen, is a payment made to a

13  patent holder in exchange for the right to make, use, or sell

14  the claimed invention.  The parties have put on evidence of

15  two different damages models in this case, and you may use

16  either method to calculate reasonable royalty damages.

17      TQ Delta, the Plaintiff, has proposed a cost-saving model

18  of calculating reasonable royalty damages that values the

19  accused products that CommScope, the Defendant, provides to

20  its customers.  This approach relies upon estimated costs, if

21  any, that CommScope saved from making, using, or selling the

22  accused products.

23      In considering the amount of reasonable royalty damages

24  under this cost-saving model, you should focus on whether

25  CommScope's make, use, or sale of the patented technology

1    allowed it to avoid taking a different, more costly course of

2    action, and if so, how much CommScope saved by using the

3    accused products instead of taking the more costly course of

4    action.

5         Now, a reasonable royalty may also be calculated by

6    determining the amount of the royalty payment that a patent

7    holder and the alleged infringer would have agreed to in a

8    hypothetical negotiation taking place at a time prior to when

9    the infringement first began.  The Defendants, CommScope, have

10   proposed a reasonable royalty calculation based on such a

11   hypothetical negotiation.

12        In considering this hypothetical negotiation, you should

13   focus on what the expectations of the patent holder and the

14   alleged infringer would have been had they entered into an

15   agreement at that time and had they been acting reasonably in

16   their negotiations.  In determining this, you must assume that

17   both parties to the hypothetical negotiation believed that the

18   patents-in-suit were valid and infringed, and that both

19   parties were willing to enter into an agreement.

20        The reasonable royalty you determine must be a royalty

21   that would have resulted from the hypothetical negotiation and

22   not simply a royalty that either party would have preferred.

23        Evidence of things that happened after the infringement

24   first began can be considered in evaluating the reasonable

25   royalty only to the extent that the evidence aids in assessing

1   what royalty would have resulted from a hypothetical

2   negotiation.

3        Although evidence of the actual profits of an alleged

4   infringer -- although evidence of the actual profits an

5   alleged infringer made may be used to determine the

6   anticipated profits at the time of the hypothetical

7   negotiation, the royalty must not be limited or increased

8   based on the actual profits that the alleged infringer made.

9        Now, in determining the reasonable royalty under the

10  hypothetical negotiation approach, you should consider all the

11  facts known and available to the parties at the time the

12  infringement began.

13       Some of the kinds of factors that you may consider in

14  making your determination are:

15       1.   The royalties received by the patentee for the

16  licensing of the patents-in-suit, proving or tending to prove

17  an established royalty;

18       2.   The rates paid by the licensee for the use of other

19  patents comparable to the patents-in-suit.  Comparable license

20  agreements include those covering the use of the claimed

21  invention or similar technology;

22       3.   The nature and scope of the license, as exclusive or

23  non-exclusive, or as restricted or non-restricted in terms of

24  territory, or with respect to whom the manufactured product

25  may be sold;

1          4.   The licensor's established policy and marketing

2     program to maintain its patent exclusivity by not licensing

3     others to use the invention or by granting licenses under

4     special conditions designed to preserve that exclusivity;

5          5.   The commercial relationship between the licensor and

6     licensee, such as whether they are competitors in the same

7     territory in the same line of business;

8          6.   The effect of selling the patented specialty in

9     promoting sales of other products of the licensee, the

10    existing value of the invention to the licensor as a generator

11    of sales of his non-patented items, and the extent of such

12    derivative or convoyed sales;

13         7.   The duration of the patent and the term of the

14    license;

15         8.   The established profitability of the product made

16    under the patents, its commercial success, and its current

17    popularity;

18         9.   The utility and advantages of the patented property

19    over the old modes or devices, if any, that had been used for

20    working out similar results;

21         10.  The nature of the patented invention, the character

22    of the commercial embodiment of it as owned and produced by

23    the licensor, and the benefits to those who have used the

24    invention;

25         11.  The extent to which the infringer has made use of

1    the invention and any evidence probative of the value of that

2    use;

3         12.  The portion of the profit or of the selling price

4    that may have been customary in the particular business or in

5    comparable businesses to allow for the use of the invention or

6    analogous inventions;

7         13.  The portion of the realizable profits that should be

8    credited to the invention, as distinguished from non-patented

9    elements, the manufacturing process, business risks, or

10   significant features or improvements added by the infringer;

11        14.  The opinion and testimony of qualified experts; and

12        15.  The amount that a licensor (such as the patentee)

13   and a licensee (such as the infringer) would have agreed upon

14   at the time the infringement began if both had been trying

15   reasonably and voluntarily to reach an agreement; that is, the

16   amount which a prudent licensee who desired as a business

17   proposition to obtain a license to the patented invention,

18   would have been willing to pay as a royalty and yet be able to

19   make a reasonable profit and which amount would have been

20   acceptable to a prudent patentee who was willing to grant a

21   license.

22        Now, you may have heard these factors referred to during

23   the trial, ladies and gentlemen, as the *Georgia-Pacific*

24   factors.  No one of these factors is dispositive, and you

25   could -- excuse me.  And you can and you should consider the

1    evidence that's been presented to you throughout the trial on

2    each of these factors.

3         You may also consider other factors which, in your mind,

4    would have increased or decreased the royalty that the alleged

5    infringer would have been willing to pay and the patent holder

6    would have been willing to accept, acting as normally prudent

7    businesspeople.

8         The Defendants, CommScope, contend that TQ Delta, the

9    Plaintiff, breached its contract with the ITU obligating it to

10   grant licenses to its standard essential patents on fair,

11   reasonable, and non-discriminatory FRAND terms and conditions.

12        I will give you further instructions regarding

13   CommScope's breach of contract claim shortly.  But if you find

14   that TQ Delta breached its FRAND obligation and if you also

15   find that CommScope infringed TQ Delta's asserted patents,

16   then TQ Delta's breach of its FRAND obligation should not

17   reduce or limit the damages awarded for CommScope's

18   infringement, if any.

19        Similarly, if the evidence supports, in your mind, a

20   finding of both infringement by CommScope and breach of

21   contract by TQ Delta, then you should award such an amount

22   that would compensate CommScope for such a breach, if any,

23   regardless of what your verdict might be regarding TQ Delta's

24   infringement claims.

25        Now, you've heard throughout this trial as to whether TQ

1    Delta should be entitled to a running royalty or a lump sum

2    royalty.  If you find that TQ Delta is entitled to damages in

3    the form of a reasonable royalty for infringement, you must

4    decide whether the parties would have agreed to a running

5    royalty or a fully paid-up lump sum royalty at the time of the

6    hypothetical negotiation.

7         A running royalty is a fee paid for the right to use the

8    patent that is paid for each unit of the infringing products

9    that have been sold.  If there are additional units sold in

10   the future, any damages for these sales will not be addressed

11   by you.  If you decide that a running royalty is appropriate,

12   then the damages you award, if any, should reflect the total

13   amount necessary to compensate TQ Delta for CommScope's past

14   infringement.

15        However, a lump sum royalty, a reasonable royalty in the

16   form of a lump sum royalty, is when the infringer pays a

17   single price for a license covering both past and future

18   infringing sales.  If you decide that a reasonable royalty in

19   the form of a lump sum is appropriate, then the damages you

20   award, if any, should reflect the total amount necessary to

21   compensate TQ Delta for CommScope's past and future

22   infringement.

23        Now, TQ Delta committed to the VDSL2, G.bond, and G.INP

24   standards, which I'll refer to as the standards of the ITU, to

25   license patents which are essential to the standards on FRAND

1    terms and conditions.  TQ Delta has also committed to license

2    the asserted patents on FRAND terms, subject to the conditions

3    such as reciprocity of potential licensees.

4        The FRAND commitment in this case does not require any

5    specific licensing model to determine a FRAND royalty.  You

6    should determine a FRAND royalty based on the totality of the

7    circumstances.  As I have previously instructed, FRAND and

8    RAND have been used interchangeably throughout this trial.

9        Now, the law requires that any royalty awarded to TQ

10   Delta correspond to the value of the patented invention within

11   the accused product, as distinct from other unpatented

12   features or market factors.  And this is particularly true

13   when the accused products have multiple features and multiple

14   components that are not covered by the asserted patents or

15   where the asserted patents work in conjunction with other

16   non-patented items.

17       If unpatented features contribute to the accused

18   products, you must apportion that value out so as to exclude

19   any value attributable to unpatented features.  You must

20   determine the appropriate royalty rate and the appropriate

21   royalty base that reflect the value attributable to the

22   patented invention alone.

23       In light of this FRAND commitment, ladies and gentlemen,

24   I have referred at times in these instructions to SEPs,

25   standard essential patents.  The parties have stipulated that

1    the '686 Patent, the '881 Patent, the '008 Patent, and the

2    '835 Patent, and the '354 Patent are standard essential

3    patents or SEPs.

4         The parties have also stipulated that the '048 Patent and

5    the '411 Patent are not standard essential patents and are not

6    SEPs and, therefore, a reasonable royalty determination

7    regarding these patents does not need to take into account any

8    FRAND obligations.

9         Now, TQ Delta and Aware, Inc., which you've heard

10   referred to as Aware and the entity from which TQ Delta

11   purchased the patents-in-suit, submitted written commitments

12   to the ITU covering the '881, the '686, the '008, the '835,

13   and the '354 Patents, in which they agreed to grant a license

14   on FRAND terms and conditions.

15        When dealing with standard essential patents, SEPs, there

16   are two special apportionment issues that arise.  First, the

17   patented features must be apportioned from all of the

18   unpatented features reflected in the standard.  Second, the

19   patentee's royalty must be premised on the value of the

20   patented features and not any value added by the standard's

21   adoption of the patented technology.

22        You must make sure that any reasonable royalty

23   determination takes into account TQ Delta's FRAND obligations,

24   as the Court has just explained it to you.  And a reasonable

25   royalty on the standard essential patents that the parties

1    have stipulated to, i.e., the '686, the '881, the '008, the

2    '835, and the '354 Patents, cannot exceed the amount permitted

3    under TQ Delta's FRAND obligations.

4         In determining what amount is a FRAND royalty, you may

5    consider any evidence of patent holdout.  Patent holdup exists

6    when the holder of standard essential patents demands an

7    excessive or unjustified royalty, which is, considering the

8    totality of the circumstances, not fair, reasonable, or

9    non-discriminatory.

10        Alternatively, ladies and gentlemen, you've also heard

11   the term holdout, which refers to an unwilling licensee of

12   standard essential patents, seeking to avoid taking a license

13   while practicing the standard and enjoying the benefit of the

14   SEP holder's technology.

15        In determining a reasonable royalty, you may also

16   consider whether CommScope had commercially-acceptable

17   non-infringing alternatives to the accused products that were

18   available at the time of the hypothetical negotiation and

19   whether that would have affected the reasonable royalty the

20   parties would have agreed upon.

21        A non-infringing alternative is a way of providing the

22   same or comparable functionality or achieving the same or a

23   comparable result that does not require the use of the

24   asserted claims.  You may compare the patented invention to

25   non-infringing alternatives to determine the value of said

1    patented invention, including the utility and advantages of

2    the patent over the old modes or devices, if any, that had

3    been used to achieve similar results.

4        Now, a patentee is not entitled to damages for any

5    infringement committed more than six years prior to the filing

6    of the claim for infringement.  In this case, the damages

7    period commences on August the 13th, 2015, six years prior to

8    the date on which TQ Delta filed its complaint in this case.

9    No damages can be awarded for any infringement that occurred

10   before the date that the asserted patents were issued.  Where

11   you find that an asserted claim is both infringed and not

12   invalid, you may not award damages for activities occurring

13   before the damages period begins.

14       A patentee is not entitled to damages after the

15   expiration of an asserted patent.  The '008 Patent expired on

16   November the 9th, 2020, and the '354 Patent expired on April

17   the 18th, 2021.  Therefore, the damages period for the '008

18   Patent ended on November the 9th, 2020, and the damages period

19   for the '354 Patent ended on April the 18th, 2021.

20       With regard to the Defendants' alleged breach of contract

21   claim against the Plaintiff, the Defendants CommScope bear the

22   burden of proving their breach of contract claim by a

23   preponderance of the evidence.  CommScope contends that TQ

24   Delta breached its contract with the ITU to grant licenses to

25   standard essential patents held by TQ Delta on FRAND terms and

1    conditions.  TQ Delta denies that it has breached any of its

2    contractual obligations.

3         Now, before you can decide these issues, you'll need to

4    understand the terms of the contract at issue in this case.  A

5    contract is a legally enforceable promise or set of promises.

6    When two individuals or entities enter into a contract that is

7    intended to benefit a third party, the third party has the

8    right to enforce the terms of the contract in the event the

9    contract is later breached.

10        The contract at issue in this case is the obligation

11   imposed on TQ Delta because certain of its patents were

12   contributed to the ITU, which is a standard-setting

13   organization.  The obligation is to license those standard

14   essential patents, or SEPs, to third parties on FRAND terms

15   and conditions.

16        The ITU has a policy called its common patent policy, or

17   CPP.  The common patent policy requires SEP owners to license

18   their patents on specific terms.  TQ Delta made a commitment

19   to the ITU that it would license its patents essential to the

20   standards on FRAND terms.

21        Whether or not a license is FRAND will depend on the

22   totality of the particular facts and circumstances existing

23   during the negotiations and leading up to the license.  There

24   is no fixed or required methodology for setting or calculating

25   the terms of a FRAND license other than when all aspects have

1    been considered, it is fair, reasonable, and

2    non-discriminatory.

3         Although CommScope is not a party to TQ Delta's contract

4    with the ITU, CommScope is a third-party beneficiary to TQ

5    Delta's FRAND commitment to the ITU and CommScope can enforce

6    that obligation.  CommScope contends that TQ Delta breached

7    its commitment to the ITU by failing to offer to CommScope a

8    license to TQ Delta's SEPs on FRAND terms.

9         To find that TQ Delta has breached a contractual

10   obligation, you must conclude that the party bound by the

11   contract did not fulfill its obligations under the contract.

12   In deciding whether or not TQ Delta has breached a contractual

13   obligation, you must determine (1) whether TQ Delta had a

14   contractual obligation; (2) whether TQ Delta violated any such

15   contractual obligation; (3) if TQ Delta violated a contractual

16   obligation, whether there is a defense for that violation; and

17   (4) if any obligations were violated and there is no defense,

18   what are the damages, if any, for the violation.

19        I'll now instruct you as to the measure of damages for a

20   breach of contract claim, and by instructing you on these

21   damages, I am not suggesting which party should win on any

22   issue.

23        To recover damages for breach of contract, CommScope must

24   prove by a preponderance of the evidence that TQ Delta failed

25   to comply with its contract with the ITU and that the failure

1    to comply with that contract resulted in harm to CommScope.

2    That means that CommScope must prove that TQ Delta breached

3    its FRAND obligations and that the breach caused harm to

4    CommScope.

5         If you find that TQ Delta has breached a contractual

6    obligation, then you must determine what amount fairly

7    compensates CommScope for all of its damages.  These damages

8    are called compensatory damages, and the purpose of

9    compensatory damages is to make the injured party whole--that

10   is, to compensate the injured party for the damage that it has

11   suffered.

12        The damages you award must be fair compensation for all

13   the injured party's -- all the injured party's damages, no

14   more, no less.  Damages, again, are not allowed as punishment

15   and cannot be imposed or increased to penalize a party who

16   breached a contract.  And you should not award compensatory

17   damages that are speculative or arbitrary.

18        Now, if you find by a preponderance of the evidence that

19   TQ Delta technically breached its contractual obligations, but

20   CommScope suffered no actual loss or injury as a result of

21   that violation, then you may award the non-breaching party a

22   nominal amount of damages.  Nominal damages are an

23   inconsequential or trifling sum awarded to a party when a

24   technical violation of its right has occurred but the party

25   has suffered no actual loss or injury.

1          As you've already heard, TQ Delta contends that CommScope

2     infringes the asserted claims of the patents-in-suit.  A

3     finding of infringement by CommScope should not reduce or

4     limit the damages for breach of warranty -- breach of

5     contract--I'm sorry--by TQ Delta, if any, but there may be

6     independent damages which, if shown, could flow from such

7     infringement.

8          If the evidence supports a finding of infringement by

9     CommScope, in your mind, then you should award such an amount

10    of damages to TQ Delta which it has proven would compensate it

11    for any such infringement by CommScope, regardless of what

12    your verdict is on CommScope's breach of contract claim

13    against TQ Delta.

14         Now, ladies and gentlemen, we're ready to hear closing

15    arguments from the attorneys in this case.  We'll begin with

16    the Plaintiff's first closing argument.

17         Mr. Davis, you may present the Plaintiff's first closing

18    argument to the jury.

19              MR. DAVIS:  Thank you, Your Honor.

20              THE COURT:  Would you like a warning on your time?

21              MR. DAVIS:  Yes, Your Honor, I would.  Could I have

22    a warning at 10 minutes and 20 minutes, when those amounts of

23    time have been used.

24              THE COURT:  I'll warn you when you have used 10

25    minutes and when you have used 20 minutes.

1          MR. DAVIS:  Thank you, Your Honor.

2          THE COURT:  You may proceed with closing argument

3     when you are ready.

4          MR. DAVIS:  Good morning, ladies and gentlemen of

5     the jury.

6          Again, I'd like to begin or end this process where we

7     began by thanking you.  We made it.  You've been here all week

8     and you've listened attentively, you've listened to a lot of

9     technical information and you've paid close attention, and we

10    appreciate your attention and the sacrifices you have made

11    this week.  We know it has not been easy.

12         It's been a long road to get here for TQ Delta, and to be

13    very clear, we are here for one reason and one reason only.

14    This moment has arrived because CommScope has been using TQ

15    Delta's patented technology without our permission and without

16    paying for it for 15 years.  We are here because to this very

17    moment today, they've refused to do the right thing.

18         It's been a tough road.  We put CommScope on notice back

19    in 2013 when we sent them the first letter, and we told them

20    that we believed they were using our patents back then.  And

21    what happened?  Did they come to the table?  Did they

22    negotiate in good faith?  No, they did not.  As you heard from

23    Ms. Divine, they refused to negotiate in good faith.

24         I'd like to remind you of some of the key events in this

25    case and the time period over which the facts in this case

1    spans.

2         Starting in 1999 through 2004, the inventions claimed in

3    the patents-in-suit were disclosed to the Patent Office

4    through provisional applications.  From 2005 to 2010, the

5    three standards that are at issue in this case were adopted by

6    the ITU.  In 2009-2010 time period, Aware, the company that

7    owned the patents, decided to exit the DSL business.  It

8    ultimately sold its patents to TQ Delta in 2012.

9         In 2012, TQ Delta began to manage the patents and

10   continued to develop the DSL technology with the help of Mr.

11   Tzannes and a contribute to the ITU by participating in the

12   standards meetings.

13        In 2015 -- I'm sorry.  On July 15th, 2013, TQ Delta sent

14   a letter to CommScope notifying it that it was using TQ

15   Delta's patents by selling standard essential DSL modems and

16   requested to enter into negotiations to license these standard

17   essential patents.

18        Those negotiations dragged on for years.  Despite TQ

19   Delta's best efforts to get CommScope to come to the table, by

20   providing information to them about the patents, about the

21   technology, by providing them with information about the range

22   of royalty rates that they would be looking for in the case,

23   CommScope refused to meaningfully engage.

24        And what happened in the interim?  In 2017, '18, and '19,

25   other members of the -- of the market, other DSL equipment

1    manufacturers, began to take licenses--Zhone, Fujitsu,

2    Siemens, ZyXEL.  And at those times, the royalty rates that TQ

3    Delta was charging for its standard essential patents became

4    set.  They weren't set back in 2009 with a different company,

5    with different licensees, with a chip component to the entire

6    box.

7         Commscope had the opportunity to participate in those

8    discussions.  They could have been the first one.  If they had

9    wanted to set the rates, they could have began talking with us

10   meaningfully in 2013, but they didn't.

11        And then more recently, in 2022, Nokia took a license,

12   and that license is important to this case and I'll talk more

13   about it later.

14        That's the overview of the history of the events in this

15   case.

16        All along the way, from 2013 up until now, in the course

17   of their licensing negotiations, CommScope never said, we

18   don't infringe, let us show you where you're wrong.  They

19   never said, your patents are invalid, let us show you where

20   they are.  They just stalled.  And, frankly, they probably

21   just hoped we would go away.  And all the while, the clock was

22   ticking.  They were generating revenue using our technology.

23        We want to -- we want to -- we want what we have wanted

24   since 2013.  We want CommScope to pay for the use of our

25   patented technology.  As you've heard from His Honor, you'll

1    have the jury instructions in the jury room.  And I'm going to

2    take a few minutes and walk you through the evidence I think

3    you're going to need to make your decision to show that we

4    have met our burden on infringement and damages and how

5    CommScope has utterly failed to meet theirs.

6        I'll start with infringement.  Our burden of proof is

7    preponderance of the evidence.  If the evidence we've brought

8    you tips the scales ever so slightly in our favor, then we've

9    met our burden.  I believe that we've more than met our burden

10   to prove infringement in this case.

11       What did we bring you?  For each of the seven patents

12   that I've listed on the left here with their patent number and

13   with the names, the nicknames, that we've used to refer to

14   these patents throughout the case.  We brought you testing

15   evidence.  We brought you source code.

16       We brought you experts who testified as to every claim,

17   every element of the claim, every word, every word of the

18   Court's constructions, and they showed you the evidence they

19   relied on, and they found that there was infringement.  We

20   brought you evidence from CommScope's own internal documents.

21       And, finally, we brought you evidence from the

22   UberMatrix.  The UberMatrix is the document that AT&T lists

23   its requirements and tells CommScope what products it wants in

24   the box, and CommScope provides those features and

25   functionality.

1           What did CommScope bring you?  Did CommScope bring you

2      any testing evidence?  No, they didn't.  They could have, but

3      they didn't.  Did they bring you source code evidence?  Their

4      experts could have looked at the source code, the ones that

5      testified, but they didn't.  All they did was criticize our

6      analysis of the code, but they never performed their own

7      analysis.

8           Each of the experts that testified, if they mentioned

9      source code at all, it was only to say, TQ Delta, you got it

10     wrong, but my understanding of the code, I got from another

11     expert who didn't come and testify.  And that's significant.

12     Right?  Because when you're testifying, you're under oath and

13     you're swearing to tell the truth.

14          The only expert that even -- that they brought to even

15     testify about non-infringement is a man named Niel Ransom.

16     Mr. Ransom testified as to a few of the patents, but the

17     evidence he brought did not satisfy their burden.  And Mr.

18     Ransom, each time he testified, confirmed that he did not look

19     at the code, he did not do testing, and that he relied on

20     someone else for source code evidence.

21          For CommScope's documents, I was paying attention and I

22     hope you were, too, that when their experts were testifying,

23     they didn't show you CommScope documents.  They didn't show

24     you any internal CommScope document and say, look, here's the

25     document that shows that our products work differently than

1    the claims.

2         And then for three of the patents, they brought their own

3    witnesses, a Mr. Wauters and a Mr. Miller who testified, but

4    those are their employees.  And did you listen to the

5    substance of their testimony?  They did not tell you that they

6    performed any kind of technical analysis that they could bring

7    into court and show you.

8         Mr. Wauters just said, oh, you know, we don't really use

9    that, AT&T doesn't use it.  But he didn't bring you any

10   evidence to corroborate that.  He's just asking you to take

11   his word for it.  And that witness is biased.  He's biased in

12   favor of his employer, CommScope.

13        Mr. Miller, he said that he did some testing, but he

14   didn't bring any proof to show that.  He said, oh, I've been

15   looking at watching whether or not this feature or that

16   feature's turned on.  That was news to us.  If he had proof,

17   he didn't bring it.

18        Doctor Ransom even confirmed that if you had wanted to do

19   a proper non-infringement analysis, you would have looked at

20   code and you would have looked at testing.

21        He was asked, And if you wanted to know how it was

22   actually implemented, one thing you would need to do is look

23   at the source code.  Right?

24        "That would have told me a lot."

25        He continues on about testing.  "That would be a good

 1     way, too."  And he didn't present any of that to the jury.

 2     The only expert for CommScope that testified on

 3     non-infringement, their claim that they don't infringe, he

 4     didn't bring any of that evidence.

 5          On the '048 Patent, the memory sharing, I'm sure you

 6     remember this slide from opening statements.  They made up a

 7     distinction that memory is not equal, that memory is not

 8     delay.  And in opening statement, CommScope's lawyer tried to

 9     bolster that claim by saying that, oh, Texas Instruments came

10     up with this idea and it made it into the standard and,

11     because of that, memory is not delay in the new standard.

12          And that was absolutely false, and Doctor Ransom

13     confirmed that.

14          This is Doctor Ransom:  "Isn't it true, Doctor Ransom,

15     that the ITU closed the proposal and that means that it was

16     not adopted?

17          "Evidently not in the standard.  Not in total."

18          Then when he was asked again whether if Mr. Dacus said

19     that it absolutely wasn't adopted into the standard, would

20     that be correct?  "No, it doesn't seem to be accurate."

21               THE COURT:  Ten minutes have been used.

22               MR. DAVIS:  Thank you, Your Honor.

23          CommScope has brought you little to no evidence that they

24     don't infringe.  We have brought you mountains of evidence

25     through the source code and the testing, their own documents,

1   the UberMatrix.  We believe that we have more than satisfied

2   our burden, and we're going to ask you to find that CommScope

3   infringes these patents.

4        So what does CommScope say?  They say, well, the patents

5   are invalid.  Of course, the Patent Office got it wrong, at

6   least four times.  Their burden for proving invalidity is

7   clear and convincing evidence.  They must bring you so much

8   evidence that you have an abiding conviction that these

9   patents are invalid.  They can't just tip the scales a little.

10  They've got to tip substantially.

11       Did they bring you any motivation to combine for any of

12  the obviousness arguments for the '686, the '008, or the '835

13  Patent?  I didn't hear it.  Did they bring you any evidence of

14  a reasonable expectation of success for any of these three

15  patents?  I didn't hear it.

16       What I heard was that they said, oh, was this known?  Was

17  this old?  Yes.  And the witness will say, yeah, that was old,

18  that was old.

19       But as Judge Gilstrap just instructed you, the existence

20  of each and every element of the claimed invention in the

21  prior art does not necessarily prove obviousness.  You can't

22  just say, oh, this piece was known, that piece was known, this

23  other piece was known, call them old, and say the patents are

24  invalid, the Patent Office got it wrong.  You've got to do

25  analysis.

1          And I didn't hear the level of analysis that you would

2     expect to hear to meet a burden of clear and convincing

3     evidence.

4          Look at the evidence we brought you for infringement

5     where our burden is simply preponderance.  I mean, our experts

6     sat on the stand for hours going through every element,

7     multiple categories of evidence.  Their experts got on the

8     stand, said, yeah, here's the concept of noise; yeah,

9     everybody knew about noise, that was old.

10         That's not a proper invalidity analysis, ladies and

11    gentlemen, to take away a duly-issued United States patent, to

12    take away the property of TQ Delta?  That doesn't cut it.

13         Regarding the fourth patent that CommScope claims is

14    invalid, that's the '048 Patent, you heard from Doctor Wesel,

15    and he was the only one to actually provide any testimony

16    about a motivation to combine from the Defendants.  You heard

17    him say that engineers at Siemens were looking to build a

18    VDSL1 product, and they were going to combine that with

19    something called Mazzoni.  I'm sure you remember the name

20    Mazzoni.

21         But the problem is that no one had ever deployed VDSL1,

22    and Doctor Ransom agreed with him.  VDSL1 was a dead end.  It

23    wasn't a good standard and it wasn't really adopted.  How can

24    you have any reasonable expectation of success or any

25    motivation to combine Mazzoni with a standard that was dead?

1          I want to talk about the Jones patent.  This is

2     the -- relates to the '008 Patent, the phase scrambling

3     patent.  And if you remember the testimony, Doctor Cimini

4     contended that the scrambler, which is in box 410, produces a

5     pseudorandom number that changes the phase.

6          But he was confronted on cross-examination with the fact

7     that the only random number generator is in box 406 and it's

8     not connected to the scrambler.  Jones knew how to claim a

9     random number generator for phase shifting when he wanted to,

10    but he didn't.  He used a scrambler.  And the scrambler just

11    produced a series of numbers sequential that are not

12    pseudorandom 123, 123.  Jones does not invalidate the '008

13    Patent.

14         In fact, Doctor Cimini admitted that Jones doesn't really

15    say one way or another whether it's using a series pattern or

16    a pseudorandom pattern.  That's correct.  You can't meet your

17    burden of clear and convincing evidence by saying, well, the

18    reference we're relying on doesn't really say one way or the

19    other.  It's just not enough, ladies and gentlemen.

20         The second -- another argument they have on the '835

21    Patent, which was the DSL reboot patent, is that it was

22    invalidated by one of the ITU standards, the G.992.1 standard.

23    But the G.992.1 standard, when it talks about switching on a

24    predefined codeword, the word of the claim is on?  The

25    language in the standard is around.  On does not mean around.

1    On means on.  And the words of a claim matter.  And if you're

2    going to invalidate a patent, you can't do it by just getting

3    close or just finding some similarities.  It's got to be in

4    there.

5        Additionally, the 992.1 reference talks about changing on

6    a superframe boundary, not a codeword boundary.  Different

7    words.  And Doctor Cimini tried to explain how they're really

8    the same thing, but they're not.  And you heard that on

9    cross-examination and you heard that from our experts.

10       That brings me to damages.  Damages, again, are

11   determined based upon a preponderance of the evidence.  And

12   where do we look for damages?  We look at the use made of the

13   invention by the infringer.

14       They want to say AT&T didn't use features or

15   functionality.  They brought no evidence of that.  They want

16   to distract you from their use, their 36 million units, the

17   $3.4 billion in revenue that they've generated from this.

18   They want to distract you from those numbers with a whole

19   bunch of things.

20       We're going to talk about some of those.  One of them is

21   nobody uses it, nobody cares about DSL anymore, DSL is

22   declining.  Well, sure, it's been declining for the last 20

23   years, and these patents are expiring.  Some of them have

24   already expired, and some of them are expiring over the next

25   six, four, five years.

1    And they've delayed negotiating with us for at least 10

2    of those years.  So it's not fair to come in here and say,

3    this stuff's old.  Sure, any technology is going to be old

4    after 20 years.  It's not fair to say that.  But that's what

5    they're saying because they're trying to take your focus off

6    of what you should be focused on.

7        And Doctor Putnam went through the analysis and showed

8    you exactly with -- he has a Ph.D. in economics.  He knows how

9    to do this.  He's evaluated standard essential patents any

10   number of times.  He walked you through his analysis.  And I

11   don't have time to do that, but his ultimate conclusion is

12   that it should be 33 cents per unit per standard per patent --

13   per standard practicing patent.

14       And he performed an analysis to show you how, if you look

15   at all the patents, these are the patents on the left, and

16   which standards those patents are essential to, you can line

17   up and figure out and come to a cumulative royalty rate.  So

18   those 33 cents per patent per standard per unit adds up to

19   $2.99 per unit.

20       And when you multiply that times the number of units at

21   issue in this case, the 36 million DSL modems that CommScope

22   has sold, that number comes out to 89 million.  That is a

23   reasonable royalty for this case.

24       Commscope has said, well, that's -- that's a lot of our

25   profits.

1      That's what they're concerned about.  They're not

2  concerned about doing the right thing.  They're concerned

3  about their profits.  That's why they've delayed.

4      And, yeah, if they had engaged and done the right thing

5  10 years ago, what reasonable companies do when they take

6  patent licenses is build the price of using other people's

7  technology, of licenses, of royalty rates, you build that into

8  the product, the price that they charged AT&T.  That's what

9  they should have done if they were worried about their

10  profits.  But they decided not to.  They didn't want to.

11      Doctor Putnam also provided you another analysis called

12  the holdout analysis, because when you're dealing with

13  standard essential patents, this kind of conduct in the

14  marketplace, it has real economic harm, not only to TQ Delta

15  but other market competitors.  They tried to get out in front

16  of that and say, we're being discriminated against, we're at a

17  competitive disadvantage from Zhone and ZyXEL.

18      Well, that's because you're infringing and you didn't

19  take a license.  Those other companies are paying the royalty

20  rates.  They're the ones that are competitively disadvantaged

21  because now you can sell products cheaper than they can

22  without the overhead of the licenses you need to make those

23  products in the first place.

24      Doctor Putnam walked through this analysis.  He showed

25  where CommScope has a competitive advantage, that it took

1    sales from competitors, licenses -- that TQ Delta's licensees

2    make fewer sales.  TQ Delta would get fewer royalties, and

3    CommScope's royalties are delayed.  You're able to model that

4    economically, and he modeled it at $7.4 million.

5         You are entitled to award that if you feel it's

6    appropriate.  We're not asking for that, but if you feel that

7    that's appropriate, that there's additional harm, you are

8    certainly entitled to award that on top of the reasonable

9    royalty.

10            THE COURT:  You've used 20 minutes, counsel.

11            MR. DAVIS:  Thank you, Your Honor.

12        This is another slide that Doctor Putnam used in his

13   direct examination.  And why did he talk about the licenses?

14   Well, there's a couple of reasons.  Number one is they do

15   provide an indication of what a reasonable royalty in this

16   case should be, and the license that he found to be most

17   comparable was the Nokia license.  Why is that?  Because Nokia

18   was taking a U.S.-only license, they were paying $2.52 a unit,

19   they're in the same market, they make consumer office devices,

20   the same standards are at issue, and the same damages period

21   was at issue.

22        The Siemens/Infineon/Lantiq license that CommScope is

23   relying on is not comparable.  It deals with a single

24   standard.  It deals with semiconductor chips.  The payment

25   amounts were unknown.  The units were unknown.  It resulted in

1    a one to 6 percent price and it took with it -- it carried

2    with it a 10-year relationship before that license was even

3    negotiated to.

4        So when looking at licenses, which one would be most

5    comparable?  It would be the Nokia license.  And not only

6    that, the Nokia license is relevant -- CommScope believes the

7    Nokia license is relevant because it shows that our rates are

8    somehow too high.

9        They say, well, Nokia, you know, you really licensed the

10   rest of the world.  You really licensed the rest of the world

11   with that so that rate is just, I think they called it, window

12   dressing.  Comm -- they knew that we were coming to trial.

13       Well, you know, there's no evidence of that.  That's just

14   attorney argument.

15       The fact is a sophisticated company, Nokia, who has a

16   massive standard essential patent portfolio, who knows how to

17   license standard essential patents, do you think they would

18   just agree to some sort of window dressing?  Do you think they

19   would just try to dress this up and, you know -- no.

20       What happened was the parties were in negotiations, they

21   decided to resolve one part of their dispute, which was the

22   U.S.-only, and they agreed to a stand-still for the rest of

23   the world for a period of four years.

24       Now, the only way that CommScope could explain that was

25   to come up with a theory that -- to try to inject evidence

1    into the case about statutes of limitations in other

2    countries.  You heard Doctor Becker try to slip that in:  Oh,

3    I know that in Germany the statute of limitations expires in

4    four years.

5         He has no evidence of that.  That wasn't in his report.

6    He just said it.  He doesn't know when the statute of

7    limitations expires in these other countries.

8         We know, I know, it is different from country to country,

9    and we don't even have patents in every country.  So if he's

10   referring to a country where we don't have patents, that's

11   irrelevant.  Japan is 20 years.

12        Why were they doing that?  Why are they making this trial

13   about that?  This is a patent infringement case.  Because they

14   have to explain away all these facts.

15        The other licenses show that TQ Delta's royalty

16   offers -- excuse me -- FRAND offers for its standard essential

17   patents to others in the market show that it has acted fair

18   and reasonably and non-discriminatory.  These other market

19   participants similarly-situated to CommScope paid what TQ

20   Delta offered to CommScope.

21        Yeah, sure, there were some differences.  There were some

22   -- two of them got a discount, early mover discount, sure.

23   Don't you think if CommScope had engaged with us in 2013, they

24   would have gotten that?  Well, we don't know because they held

25   out and delayed for 10 years.  So they're not even

1    similarly-situated to the parties that did get a discount.

2         Finally, you heard a lot about the chip.  You heard a

3    lot -- CommScope's trying to get you to focus on the chip, the

4    Broadcom chip in the devices.

5         Ladies and gentlemen, in order to be able to do that, to

6    perform that analysis to say that, hey, the smallest saleable

7    patent-practicing unit that would justify using a starting

8    cost from which to apportion down to a royalty is $10 instead

9    of a hundred dollars.

10        That's the reason they want you to focus on the chip.  It

11   requires an analysis of the claims.  It requires you to

12   show -- to prove that that chip actually practices all the

13   patents -- practices every claim of all the patents, every

14   element.  It's an infringement analysis.  And they didn't

15   bring it to you.

16        Doctor Becker just got up there and said, I had a

17   conversation with some experts and they said it was.

18        That's not sufficient.  It's disingenuous to come into

19   court, after all of this time, after all of this effort, and

20   not do the work to support their own damages model?  It's

21   frustrating, and I'm sure you saw me get a little frustrated

22   with Doctor Becker, because I don't know whether you

23   understand the significance of that.

24        Because if Doctor Becker gets to say that and you believe

25   it, then, of course, their damages number goes down to $5

1    million.  That's why they've been talking about the chip.

2    That's why Doctor Becker had to admit that the only evidence

3    he had was a phone call with some other expert that didn't

4    come to testify in front of you.  That means something, and

5    I'd like you to think about that.

6         I'll have an opportunity to come back up and speak to you

7    with what time I have remaining.  For now, I have to sit down,

8    but I do thank you for listening and I'll talk to you again

9    soon.

10        Thank you.

11             THE COURT:  Defendants may now present their closing

12   argument to the jury.

13        Mr. Dacus, would you like a warning on your time?

14             MR. DACUS:  Please, Your Honor.  If you would let me

15   know if I have five minutes left, and if I get there, would

16   you please let me know if I have one minute.

17             THE COURT:  I will.  You may proceed with

18   Defendants' closing argument when you're ready.

19             MR. DACUS:  Thank you, Your Honor.

20        I'll start today where I started with you last Friday,

21   and that is to say, on behalf of the men and women who work at

22   CommScope, a very sincere thank you.  As I told you then, it's

23   not lost on us what an effort this has been for you.   And I

24   told you then we would not be here if this case was not very

25   important to CommScope.  You probably know a little bit more

1    about why I said it at that time.

2        I also said to you then we believe that this case has

3    broader importance than just CommScope.  What you see on the

4    screen is our Constitution.  It's Article I, Section 8, that

5    actually created our patent system.  And the reason the

6    founders created the patent system was for the promotion of

7    the progress of science.  And I'll tell you, from CommScope's

8    perspective, we don't believe that this lawsuit and what's

9    gone on in this courtroom is about the promotion of the

10   progress of science.

11       This case has another piece of broader importance, and

12   it's probably something you didn't know much about before you

13   came to court, and that is the standard-setting organizations.

14   These standards are all around us--wall plugs, our cars,

15   phones.  They're everywhere.

16       And important in that standard-setting process is this

17   promise that those who participate in those organizations

18   agree that, if they have a patent, that they will license them

19   on non-discriminatory and reasonable terms.  And we're going

20   to talk a lot about that in the next 30 minutes or so.

21       You know, the last five days I'm confident have been to

22   you like drinking water through a fire hose.  You have gotten

23   a lot of information.  And sometimes it's good just to step

24   back and look at things from a 30,000-foot level.     When

25   you go home tonight and the Court final releases you to

1    actually talk about this case and you sit down to have a cup

2    of coffee with your spouse or your parents or your friends or

3    have a hamburger with them, and they're going to ask you what

4    the case is about.

5        And I assume you are going to say, well, this company TQ

6    Delta sued this company CommScope.  CommScope makes a CPE

7    modem device, and what TQ Delta sued them over was this

8    semiconductor chip made by a company named Broadcom that

9    CommScope buys from Broadcom.

10       Now, there's been a lot of discussion about is this

11   really about the chip.  Think about every expert that took the

12   stand on behalf of TQ Delta.  What did they look at?  They

13   looked at the source code for the chip.  That's what's really

14   accused of infringing is the chip.

15       You're also going to say to whoever you're sitting with

16   having a hamburger or a cup of coffee, what this TQ Delta

17   company wanted was $89 million from CommScope related to

18   savings that AT&T had, not savings that CommScope had, but

19   savings related to AT&T.

20       And on top of that, the way they calculated those AT&T

21   savings and tried to attribute those to CommScope was through

22   this thing called this Derwent knockout word process that

23   included words that the people who actually implemented it

24   didn't even know, had never even heard of.  In fact, no one in

25   the courtroom had probably ever heard of those words.  And

1  somehow they reduced 15,000 standard essential patents down to

2  71.

3       And I suspect when you have that conversation, the person

4  sitting across from you is going to scratch their head a

5  little bit about that.

6       Let's talk about this promise that TQ Delta and Aware

7  made to the ITU.  You know, and I don't need to belabor it,

8  it's absolutely of the utmost importance to standard-setting

9  organizations and how they operate to prevent people from

10  holding up -- if you're a patent holder or a patent owner, the

11  standard-setting organization like the ITU is attempting to

12  prevent you as a user, either a maker or a consumer, from

13  being held up for unreasonable amounts of money in the future.

14          The way the ITU requires that you do that is to sign

15  a contract and a promise that says you won't discriminate

16  against anyone on any basis and that you agree to license on

17  reasonable terms.

18       Now, we all know what discriminate means.  That means you

19  can't treat people unequally.  But you really don't have to

20  take that from me.  I put together what four of the TQ Delta

21  witnesses said non-discriminatory means.

22       Their lawyer said in opening it means you have to be fair

23  and consistent to each company.  Ms. Divine said you cannot

24  advantage one company over another.  Doctor Putnam said

25  requires that CommScope not be placed at a competitive

1   disadvantage to its competitors.  Doctor Michael Tzannes said,

2   we have to be consistent in the rates that we grant to people

3   who want our patents.

4        That's the standard against which you're measuring their

5   conduct in this case and the amount of money that they've

6   offered and are seeking.

7        And we know this is an important obligation because when

8   Aware made the decision -- when their business started to

9   decline and they made the decision to sell these patents, they

10  said to the world--this is Exhibit 81 when you go back in the

11  jury room--they said, hey, we're selling these patents, but

12  they have a FRAND obligation with them, and be aware we've

13  already licensed these two times.  That's what they told the

14  world, and they knew it was important because they'd already

15  set the FRAND rate.

16       You remember when the Judge said to you in preliminary

17  instructions and just now, compare what some witnesses say on

18  the witness stand to what they wrote or said in the past.

19       So Mr. Tzannes took the stand here and said, well, this

20  license agreements that we had with Infineon and Lantiq, don't

21  look at those, we would have probably licensed on different

22  terms.  That's what they said now that they have an $800,000 a

23  year lawsuit consultant.

24       What they said in the day before they thought it would be

25  in a court of law, they said this FRAND obligation is really

1    important, and if you buy these patents, you got to live up to

2    that promise.

3         We know that they were selling the patents because

4    they're licensing revenue--that's the primary way they made

5    money--was declining because the DSL business was declining.

6         We know that in 2012, TQ Delta decided that it would buy

7    those patents.  So it put together a group, paid 16 million

8    for approximately 148 patents, roughly $100,000 a patent, in a

9    declining business.  They decided to take the risk and to take

10   the gamble to see if they could make money.  But they did that

11   with their eyes wide open.

12        And we know they did it with their eyes wide open because

13   in Exhibit 78 at page 65, which is the valuation that they had

14   their company Stout do, Stout told them, If you go out and

15   take these patents and you seek to prosecute them in courts,

16   you got about a 25 percent chance of success, a one-in-four

17   chance of success.  TQ Delta was undeterred.

18        This has been a while.  I know we looked at this exhibit

19   on Monday.  It's Exhibit 79.  Ms. Divine testified about it.

20   This is the document where she was evaluating with and talking

21   to her investors and telling them how much money she believed

22   they could make by licensing the entire DSL industry.  And

23   what she said is, we think we can make somewhere between $85

24   million and $95 million by licensing the entire industry.

25        Now, that's important, and I'll tell you why.  That's

1    Exhibit 79 when you go back there.  For those of you that take

2    notes, you're welcome to look at it.

3         And we asked -- I asked Ms. Divine, at the time you told

4    them 85 to 95 million, that was an expectation that someone

5    putting in money would make somewhere around four times the

6    money they put in.  Correct?

7         She said, I believe that's true at the point in time this

8    was written.

9         That's important for this reason -- and you remember the

10   very first question that I asked in jury selection.  You've

11   probably forgotten last Friday, but the very first question I

12   asked was, do you think it's important to keep your promises?

13   And then I stood a couple of people up and said, well, what if

14   you could make a little more money by breaking your promise?

15   Do you think it would be okay to break your promise?  And of

16   course they said no.

17        And then I asked the entire panel, does anyone here on

18   the panel believe that it would be appropriate or right to

19   break your promise just because you can make more money?  And,

20   of course, no one raised their hand.  Of course that's not

21   right.

22        We now know from the evidence that the total amount of

23   money that TQ Delta has received in royalties is $27 million.

24   And, of course, they're at the end of this DSL campaign of

25   soliciting or trying to prosecute these patents and bringing

1    lawsuits against everyone in the industry.  So they're about

2    $70 million short from what they told their investors they

3    would receive.

4         But that's not a reason that you get to break your RAND

5    promise.  You don't get to break your original promise simply

6    because you promised others something different.

7         In 2017, TQ Delta sent us this demand letter, as you

8    know, asking us to pay what they called the standard rates,

9    the $1.85.

10        You know that that is not the standard rate.  You know

11   that, and you can look when you go back in the jury room at

12   Exhibit 78, you can look on page 16, you can look at Exhibit A

13   on page 16, and you will know what they charged ZyXEL.

14        Now, remember, ZyXEL is the largest company, biggest

15   competitor in this industry.  TQ Delta is saying to us, pay

16   $1.85.  That's not RAND.  They have an obligation not to

17   discriminate.

18        First of all, we've got Infineon and Lantiq.  We know

19   they paid much less.  We also know our largest competitor, our

20   largest competitor, they gave a 25 percent discount to and

21   further a 79.  On top of the 25, an additional 79 in some

22   years.  And they say, well, those are -- those are just --

23   those are just adjustments, those aren't real discounts.

24        I don't need to tell you.  What we're supposed to be

25   doing is looking and seeing what other people paid for these

1    licenses and whether or not they're requiring and

2    discriminating against us to make us pay more.  And of course

3    they are.  Of course they are.  You can -- if you have any

4    doubt about what was actually paid under that license, we've

5    talked a lot about it, you can go look at it.  You can see for

6    yourself exactly what our largest competitor paid.  It's ten

7    times less than what they're asking from us in this lawsuit.

8        In 2020 we responded to them and said, look, you heard

9    Mr. Wauters say CommScope has no desire to be in a fight in a

10   lawsuit where it's taking away from their business.  CommScope

11   is a company of engineers that makes products, makes products

12   to the best of their ability.  They have no desire to be in

13   this courtroom or any courtroom.

14       So in 2020 we sent an offer to them.  It was creative,

15   and we said, look, we'll pay you four-and-a-half million

16   dollars, but the way we'll do it is we have some of our own

17   patents that we think other people might use, maybe we can

18   find a creative way to resolve it.

19       What we also said to them is, we don't want you using

20   this in the courthouse to try to convince a jury that we did

21   something wrong just because we're trying to work out a

22   business solution.

23       We now know that they didn't keep that promise, either.

24   Ultimately, they filed a lawsuit against us because we

25   wouldn't agree to the $1.85, and in this lawsuit they seek

1    $2.99 for each unit for a total of $89 million.  That's not

2    FRAND.  That's not RAND.

3        I want to pause here for a second about this $2.99.  The

4    jury instruction that the Court just read you says that the

5    royalty cannot exceed the RAND obligation.  When you go back

6    there, the Court said you'll have your own copy.  Look on page

7    29.

8        So this RAND promise has two purposes in this lawsuit.

9    One is we claim they breached it, and we have a breach of

10   contract; and, two, any amount of money, if you get to that

11   point of awarding, cannot exceed the amount of the RAND.  In

12   other words, they can't charge us more -- they can't

13   discriminate against and charge us more than they did other

14   people in the industry.

15       And I asked Doctor Putnam about this.  "Do you

16   understand, sir, that damages in this case are constrained by

17   the RAND obligation?"

18       He said, "No, I firmly disagree with that."

19       I said, "Let's be really clear here.  You have done your

20   work in this case under the assumption that RAND does not

21   constrain the damages to be awarded.  Is that true?"

22       He said, "That's right."

23       Look at page 29 in the Court's instructions.  What he did

24   is absolutely contrary to what the Judge has instructed you

25   the law is.  If you adopt in any way the method and the

1    damages that Doctor Putnam put down, you have to absolutely

2    disregard the instructions the Court just gave you, because he

3    did not constrain himself by RAND and the Court has told you

4    unequivocally that you cannot exceed that RAND rate.

5         When you go back in the jury room, you're going to be

6    asked, did we prove to you that TQ Delta breached its duty to

7    grant licenses on a fair, reasonable, and non-discriminatory

8    term.  It's your decision to make.  But certainly there's

9    nothing about $2.99 or $1.85 that in any way is not

10   non-discriminatory.  It's absolutely discriminatory and not

11   reasonable.

12        You're also going to be asked, what sum of money would

13   compensate us for that breach.  We're not here about money.

14   We're not here asking for a bunch of money.  We will leave

15   that totally to your discretion.

16        You've heard Mr. Wauters explain that it's caused a huge

17   disruption at CommScope.  We get it.  They've had to spend

18   time, effort, and money responding to this, these claims that

19   are absolutely in breach of the RAND obligation.  You heard

20   the Judge say that you can -- you have the discretion to award

21   whatever you want to award here.  You can even award nominal

22   damages, $1.

23        We do -- it is important to us that you find that TQ

24   Delta breached this agreement and that you award some amount

25   of money, but how much we will leave totally in your

1    discretion.

2         Now, on this FRAND issue, we've heard a bunch of excuses,

3    and I think we should review them and address them.

4         What you've heard from TQ Delta is they've said, well,

5    the Infineon and the Lantiq agreements, those were our

6    friends, those were our joint development partners, so we gave

7    them a smaller rate and so you shouldn't look at it.

8         Folks, that -- that is the absolute purpose behind the

9    RAND agreement.  You can't give a better deal to your friends

10   and your joint development partners than you give to other

11   people in the industry.

12        They've said, well, we gave your direct competitors like

13   ZyXEL, we didn't really give them a discount, we just gave

14   them adjustments and those were pre-paid adjustments and first

15   mover adjustments, even though they are actually the fourth

16   mover.

17        You can look in the RAND agreement.  It's -- Exhibit 68

18   is the actual agreement.  And then the guidelines -- remember

19   there's those 10-page guidelines.  That's Exhibit 85 and 86.

20   And you won't find anything that allows for these

21   pre-payments, pre-paid judgments, anything along those lines.

22   All it says is don't discriminate, don't charge one company

23   one rate and another company another.

24        They came to court.  Doctor Putnam said, look, I'm going

25   to charge you this 60 percent upcharge over and above the

1    $1.85 to get to the $2.99.  You now know from the Court that

2    is not allowed.  That is absolutely not allowed under the law.

3    You can have to charge only the RAND rate.

4        Finally, I want to address this issue.  They've pointed a

5    couple of times to say in that RAND contract that it applies

6    to applicants.  But let's be clear how it works because the

7    Judge has been very clear here.  CommScope is not a party to

8    that ITU agreement or that ITU contract.  TQ Delta and Aware

9    were and ITU.  So this is a very special situation.

10        And the Court read you an instruction, and he said in his

11    preliminary instruction and today CommScope is a third-party

12    beneficiary of that contract.  We don't have any obligations.

13    We just get the benefit.  Like not only us but anyone who uses

14    the standard gets the benefit.

15        We just heard, as we've heard all week, that we didn't

16    engage in negotiations, we didn't provide sales data.  That's

17    not our obligation.  We don't have any obligation.  The only

18    obligation under FRAND is for TQ Delta to provide us with a

19    rate that is non-discriminatory.

20        They've never done it.  They have never done it.  That is

21    the only obligation.  The Court's told you that.  We're the

22    third-party beneficiary.  We're not the party to that

23    contract.  We don't have obligations under it.

24        I want to talk for a few minutes about non-infringement.

25    And I'll apologize up front because I certainly cannot cover

1    everything that you heard from the stand, but I think there

2    are some important points, particularly for -- as we go

3    through here, to remind you of what the key issues were.

4         On this '048 Patent, that's the patent that requires a

5    maximum memory, and it's the patent where TQ Delta wants you

6    to believe that time delay is the same as memory.

7         Under the old VDSL1 standard--that's not what's at issue

8    here; VDSL2 is at issue here--it required this maximum or

9    maximal interleaver memory.  But then for VDSL2, which is at

10   issue here, Texas Instruments did make a proposal, and they

11   said something very clearly that's important.  So if you're

12   wondering is time delay the same as memory, you don't have to

13   rely on us, you don't have to rely on TQ Delta.  Texas

14   Instruments said, in VDSL2, it's going to be specified in

15   terms of time delay, not in terms of memory.  Those are two

16   separate things.

17        Now, let's talk about this because it's been said two

18   different times that Texas Instruments, actually the proposal

19   they made was not adopted into VDSL2 and somehow I

20   misrepresented that.

21        Let's be really, really clear what's going on here.  So

22   right up here it says LB-031.  That was the actual proposal

23   that Texas Instruments made.  And so sort of the pump fake

24   that's going on is, at that particular meeting, LB-031 was not

25   adopted into VDSL2.  That's a true statement.

1     But at the next meeting the Texas Instruments proposal,

2     this max_delay_octet where time delay does not equal memory,

3     was adopted verbatim.  So if you paid attention to the

4     questions that were being asked, I said to you in opening the

5     Texas Instruments proposal in concept was adopted.  It was.

6          What they asked the witness and what they just showed you

7     was LB-031 adopted.  No, it wasn't, because that was the

8     meeting before VDSL2.  But every bit of this was adopted into

9     the standard.  And if you don't believe me, when you go back

10    to the jury room, look at Exhibit 34, look at table 12-56, and

11    you'll see that that Texas Instruments recommendation was

12    adopted into VDSL2, and it says, time delay does not equal

13    memory.  And here that means there is no infringement.

14         Now, for the '411 Patent, it's really the same issue.

15    The '048 and the '411, by the way, are the two patents that TQ

16    Delta absolutely agrees are not essential.  They don't even

17    dispute that.  These are not essential patents.

18         The '411 has the same issue, does time delay equal

19    memory.  You can decide these the same.  Whichever way you go

20    on infringement for the '048, it's the same issue for the '411

21    Patent.

22         Let's talk about the '354, the R-O-C or ROC patent.  Ben

23    Miller came and testified before you.  He's the gentleman at

24    CommScope who writes the programming code, what we call the

25    source code.  He doesn't need to test it.  He can look at it,

1    he knows, he's responsible for it.

2         And what he said with respect to ROC, has this feature

3    been off?

4         Yes, it's been off since at least 2012.

5         In addition, has any customer like AT&T or any customer

6    asked for it to be turned on?

7         No.

8         So no wonder it's turned off.  No customer's asking for

9    it.  It's turned off.  If it's turned off, that means we don't

10   infringe.  We don't use this '354 ROC patent.

11        But the proof goes further.  You remember that when Mr.

12   Stevens -- actually, I think it was Mr. Barton was

13   cross-examining their witness, Doctor Brody.  Doctor Brody

14   said, well, we had this other expert, Doctor Cooklev, who did

15   some testing on this ROC, and what the testing showed--this is

16   TQ Delta's testing that they're so proud of--is that this ROC

17   feature is not supported.  Their own testing proves it.

18        So what we know from that is the '354 Patent is also not

19   infringed.

20        What about the '008?  What do we know about that?  That's

21   the patent -- you're looking at the patent on the bottom of

22   the screen.  That's the patent that requires a phase shift for

23   each carrier signal and then a phase shift computed for each

24   respective carrier signal.

25        This is the patent where Mr. Stevens was asking their

1    expert to agree that a 90-degree turn on the clock, that's

2    what phase shift means, rotating on the clock, that's this

3    patent.

4         The standard -- and, by the way, I heard counsel say, oh,

5    they don't -- they don't point to their products.

6         We don't have to point to the products.  Remember what

7    the claim is here.  They say that because we use the standard,

8    we infringe.  So all we need to look at is the standard.

9         So what does the standard say about whether phase shift

10   is computed for each respective carrier signal?  The standard

11   says, the sub-carrier with index 0 shall not be rotated.

12        So let me put a finer point on this.  In the standard,

13   there are four sub-carriers--0, pi over two, pi, or 3 pi over

14   2.  That's the four sub-carriers in the standard.  The claim

15   says each one of those has to be shifted.  This one says --

16   the standard says don't shift one.  You're only shifting three

17   out of four.  That's different than shifting each one.  That

18   claim is not infringed.  The standard is different from what

19   the claim requires.

20        Remember our football and our soccer ball.  You can't say

21   in the standard or in the patent that each and every one have

22   to be rotated and then have the standard say we only do three

23   out of four.  That's non-infringement.

24        Claim 36 of the '686 Patent.  This is the patent that

25   requires that symbols be mapped to bits.  Symbols mapped to

1    bits.  The standard says just the opposite--map bits to

2    sub-carriers.  Sub-carriers are symbols.

3         And we know they're symbols because Doctor Brody, TQ

4    Delta's expert, when asked, "So what the standard that you

5    were talking about actually says is the mapping of bits to

6    sub-carriers.  In other words, the standard requires you map

7    the bits to symbols.  Is that right?

8         "Standard says that one information bit per DMT

9    symbol."

10        So the standard says bit to symbol.  Patent says symbol

11   to bit.  180 degrees' opposite.

12        And we said to Doctor Brody, Mr. Stevens said, "Doctor

13   Brody, that's different.

14        "Yep, it's different."

15        Soccer ball, football, 180 degrees' opposite.  The '686

16   Patent claim 36 is not infringed.

17        I asked Doctor Putnam about this.  This is that loop --

18   this patent is actually the loop diagnostic test.  That's how

19   we've referred to it.

20        And I asked Doctor Putnam, I said, "Doctor Putnam, does

21   AT&T even use this loop diagnostic test that you claim is so

22   important?

23        "I don't have an opinion."

24        So think about what's going on here.  He sat there and

25   heard their own expert say mapping bit to symbol is different

1    from symbol to map, and then you try to get him to say, well,

2    do you-all claim infringement, do you claim that AT&T actually

3    uses this in the CommScope products?  I don't have an opinion

4    on that.

5        And he's the man that's supposed to be valuing this --

6    this loop diagnostic test.  How can he say -- how can he put a

7    value on something that he doesn't even know if they use?

8        '881 Patent.  I'll be candid to you on this one.  This is

9    one that is sometimes tough for me to -- to get a grasp on.

10   So the claim requires -- the important part of the claim

11   requires, reduce a difference in latency.  That's what the

12   patent requires, reduce a difference in latency.

13       Tq Delta points to the standard and says the standard

14   operates the same way.

15       Not exactly.  The standard says control the maximum

16   latency.  Here's -- and you'll remember that what we put up as

17   an example was the difference between reducing your speed in a

18   vehicle, for example, and just controlling your speed.  And

19   I'll be honest with you, I said to my folks, I'm not sure I

20   get that.

21       Here -- here is how I would explain it.  The patent

22   says -- remember this is dealing with the two wires or the two

23   lines coming into a house and the bonding.  And this is -- the

24   patent is trying to reduce the difference in latency.  So the

25   way I think about it with my two hands is this is what the

1    patent requires--reducing the difference between my hands,

2    reducing the difference in latency.

3         But what the standard says is something very different.

4    The standard says, when you have this difference in latency,

5    we're just controlling the maximum, like how -- how -- how big

6    it can be.  That's very different.  The standard is very

7    different, controlling the maximum versus reducing the

8    difference.  And because of that, there is no infringement of

9    the '881 Patent.

10        Let me say a few things about invalidity.  And this is

11   tough because you heard the amount of effort and time that we

12   put into invalidity in having experts testify about it because

13   we have to show you that this stuff is not new.  I want to hit

14   some of the highlights.

15        We claim four of these patents should have never been

16   issued.  They are not new concepts.  For the '686 and the

17   '048, TQ Delta did not even put up an expert to rebut what we

18   said.  They put forward no expert.  We put forward proof.

19   They put forward no expert on those two patents.

20        The '686, that's the same claim where symbols are mapped

21   to bits, and then you have this idle channel noise

22   information.  This is the one that I showed you in opening

23   where AT&T had the exact concept that they introduced in the

24   standard, the old ADSL standard, the one that claimed VDSL,

25   and we don't have to guess about this because their own

1    inventors agreed.

2         You saw their video depositions.  Dr. David Krinsky, Did

3    you invent the concept of idle channel noise information

4    testing?  And remember I told you in opening watch his video

5    because when he says probably not, he says it in a way like

6    it's absurd to say that I did.  And you saw that.  He didn't

7    invent that.  He didn't -- that's not a new concept.

8         And then we asked the other inventor, Mr. Pizzano.  He

9    said, we used the one bit per symbol messaging scheme.

10        And then we said, that you pulled from the ITU standard?

11        And he said, we reused existing standardized symbols,

12   correct.

13        The opposite of what's new.  Not new at all.  This patent

14   should not have been issued.  They didn't bring forward an

15   expert to even rebut that issue.

16        Then you have the '048 Patent, the second one where they

17   didn't bring an expert.  This is the one where the patent

18   Mazzoni actually disclosed everything that's in the '048

19   Patent except for one thing that I'll show you.

20        So this is a patent that deals with a system that

21   allocates shared memory, shared memory between an interleaver

22   and a deinterleaver.  So in the Mazzoni patent, you got

23   interleaver and deinterleaver, and you got MM, which is shared

24   memory.  You have exactly what the patent requires.  You saw

25   our expert walk through that in detail.

1          And then on that same patent, what TQ Delta did is say,

2     well, you've got this limitation that requires transmitting or

3     receiving a message during initialization specifying a maximum

4     number of bytes of memory, and that's not in Mazzoni.

5          It may be true, but it's in the VDSL1 standard which came

6     before the patent.  It's that maximal interleaver memory.  All

7     of the concepts in the '048 Patent were contained in the

8     Mazzoni patent and in the VDSL1.  That patent should have

9     never been issued and is invalid.

10         The '008 Patent, same thing, it's the phase scrambling

11    patent.  This concept was not new.  The whole issue here boils

12    down to whether or not this scrambler is in the transmitter

13    system and whether or not there's a random number generator.

14    I know they want to talk about connected, but the issue is,

15    was there this random number generator.

16         Again, we don't have to guess.  This that I'm showing you

17    right here, this was what was in the prior art.  This is what

18    people had done before the '008 Patent.

19         We also don't have to guess because we asked Doctor

20    Madisetti:  Pseudorandom number generators were known before

21    Aware or Mr. Tzannes went to the Patent Office.  Is that

22    right?

23         Absolutely that's right.

24         That patent is, likewise, invalid.

25         Finally, the '835 Patent.  The '835 Patent, this is the

1    entirety of the claim language.  The only thing that TQ Delta

2    could bring themselves to contest was this one limitation to

3    say, well, the things that were -- that were old, they didn't

4    have actually a flag signal.

5         But we know that's not correct.  We know that's not

6    correct because in the old ADSL standard that came before VDSL

7    and came before this patent, it has this right here, this

8    thing called a DRA_swap_request.

9              THE COURT:  You have five minutes remaining.

10             MR. DACUS:  Thank you, Your Honor.

11        That DRA_swap_request is exactly a flag signal, and

12   because of that, that patent is likewise invalid.

13        Let me spend a little bit of time on damages.  You heard

14   a lot from Doctor Becker yesterday so I'm not going to belabor

15   that.  I'm sure that's fresh in your mind.

16        I want to say a couple of things about Doctor Putnam and

17   what he did.  What he did is take savings from AT&T, from

18   AT&T, and attempt to make us pay for those.  Just step back

19   and think about that.  That's -- that shouldn't be valid in

20   any industry, not just this industry, but it doesn't make

21   sense.  You're trying to make us pay for savings from AT&T.

22        The law, as Mr. Davis just put up, is what you're

23   supposed to assess is the benefit that, if any, to the

24   infringer, to CommScope, not to the carrier like AT&T.

25        What he also did, in addition to the Derwent, is he

1    assessed, he being Mr. Putnam, assessed patent damages on a

2    per-family basis.  When you read the instructions, go look at

3    page 28 and 29 of those instructions.  You're supposed to be

4    only assessing the value of the specific seven patents, not

5    the family.  The family contains many, many patents in it.

6    He's asking you to value many patents rather than the

7    one--again, asking you to disregard what the Court asked you

8    to do.

9         We know from Doctor Putnam that the most reliable

10   indicator of a patent's value for a royalty are the royalties

11   that were paid by others.

12        Doctor Becker walked you through the Lantiq and the

13   Infineon agreements.  And we know that, once the Lantiq and

14   the Infineon agreements were set, that establishes a royalty

15   under RAND and it establishes a reasonable royalty under any

16   sort of analysis.  That's the licenses that we're supposed to

17   look to.

18        Doctor Becker walked you through those.  He showed you

19   that those agreements were actually for 150 patents, not just

20   seven.  He walked you through exactly when you apportion, like

21   you're supposed to under the law, it comes to 1.57 to 2.91

22   percent of the chip cost, because that's what's at issue.

23   When you apply that percentage, as he showed you yesterday,

24   that total number is $5.7 million.  And that's for all seven

25   patents, 5.7.

1      So if you find any patent that's not infringed or is

2  invalid, you'd need to reduce one-seventh accordingly because

3  we have seven patents.

4      At the end of the day, that hypothetical negotiation

5  would have resulted in $5.76 million as a RAND royalty, as a

6  reasonable royalty, if you find all seven patents infringed

7  and valid.

8      There's another thing I want to say about these licenses.

9  Remember the purpose here.  We're supposed to be looking to

10  see what people would pay in the industry.  We're constrained

11  by RAND.  You can't discriminate against our -- us against our

12  biggest competitor.  Our biggest competitor paid $8.9 million

13  for a hundred patents, including these seven; not just any

14  hundred, including these seven, for the right to produce an

15  unlimited number of products.

16      The way I think about this is that has to be the absolute

17  ceiling of what we should pay, the absolute ceiling of what we

18  should pay, if you even get to the damages number.

19          THE COURT:  You have one minute remaining.

20          MR. DACUS:  Thank you, Your Honor.

21      This Nokia agreement, you've heard all about it.  This

22  $14.9 million, that was paid after they initially demanded

23  250-.  $250 million was their original demand to Nokia.  Nokia

24  sells different products.

25      I'm going to have to sit down, but here's what I'm going

1    to ask you to do.  This -- this conduct that's in this

2    courtroom that's occurred in this lawsuit is not the promotion

3    of science.  This conduct needs to stop.  I can't stop it, the

4    folks at CommScope can't stop it.  Only you can stop it.  And

5    it needs to be stopped now.

6         And here's how we know it needs to be stopped now.  Ms.

7    Divine, when her lawyer asked her on the stand, how will TQ

8    Delta be able to address CommScope's worldwide infringement?

9         "We're going to go country to country."  That's what she

10   said.  "We're going to go country to country asking for these

11   types of damages."

12             THE COURT:  Your time's expired, counsel.

13             MR. DACUS:  Thank you, Your Honor.

14             THE COURT:  Take just a second and finish up.

15             MR. DACUS:  I'll be happy to, Your Honor.  Thank

16   you.

17        Thank you very much for your time and attention this

18   week.  Our thank you to you is -- is not conditional.  It's

19   unequivocal.  No matter what your verdict is, we realize

20   you've taken time out of your life, and we're very

21   appreciative for it.

22        Thank you, Your Honor.

23             THE COURT:  All right.  Plaintiff, you may present

24   your second and final closing.

25             MR. DAVIS:  Thank you, Your Honor.

```
1          THE COURT:  You have 14 minutes and 10 seconds left,

2    Mr. Dacus [sic].  Would you like some warning on this time?

3          MR. DAVIS:  Yes, Your Honor.  May I have a warning

4    when I have four minutes remaining?

5          THE COURT:  I'll remind you when you have four

6    minutes remaining.

7          MR. DAVIS:  Thank you.

8       Ms. Brunson, could I please have the elmo for a minute?

9    Thank you.

10      This is a slide -- I want to address a few points that

11   Mr. Dacus just addressed on infringement.  This relates to

12   memory being time delay.  This is from the standard.

13      The O-PMS message, which is what we pointed to, what

14   Doctor Cooklev pointed to, specifies the portion of shared

15   interleaver memory that the VTU-R, the receiver, can use to

16   deinterleave the downstream data stream.

17      It doesn't say that it's delay.  It says it's memory.

18   They're playing a word game with you to try to say that

19   something in a computer isn't involved in memory.  Think about

20   that for a second.  Trying to say that the bits and the bytes

21   that express how to allocate memory between one function and

22   another isn't in memory.

23      Everything's in memory.  And this right here -- I mean,

24   it says it right here:  specifies that the portion of shared

25   interleaver memory.  Time is not memory.  Memory is memory.
```

1          Could I have Exhibit 78, please, Mr. Diaz?

2          You've seen this document a lot.  This is the

3     ZyXEL -- I'm sorry.  Not 78.

4          Well, I can just tell you about it.  Mr. Dacus showed you

5     about the ZyXEL agreement, and he said, they got a 79 percent

6     discount.

7          I'd like you to look at that agreement.  I'd like you to

8     look at the structure in Exhibit A of that agreement because

9     it lays out at the top what the rates are.  The very next

10    exhibit are the units, and it lays out line-by-line how to

11    calculate the rate.

12         And what you're going to find is that the biggest

13    difference between the ZyXEL agreement and CommScope--here we

14    go--when you look at Exhibit A and you compare it with Exhibit

15    B, is that ZyXEL didn't sell 36 million units.

16         He wants you to focus on the overall amount, I believe

17    $7.9 million or something that -- the ultimate amount, 6.8,

18    $8.8 million.  Why did they pay less?  Because they used less.

19    That's how a royalty works.  It's a rate times the number of

20    units.  You won't find anywhere in Exhibit A or Exhibit B 36

21    million units of sales.  That's why the total dollar amount is

22    less.

23         But the reason it's comparable and the reason it's not

24    discriminatory to CommScope is because ZyXEL paid the rates,

25    the same rates, that TQ Delta offered CommScope.  They got

1   their FRAND offer.  We've been trying to get them to take a

2   FRAND offer for 10 years.

3        Could I have the bottom part of this, please?  And blow

4   up -- yes, right here.

5        This is at the bottom, adjustment for patent expiration

6   and pre-payment of future royalties.  It's been called a

7   discount by CommScope this entire case.  It's not a discount.

8   Look at what that says--adjustment for patent expiration.

9   We're adjusting for the total number of units that are sold

10  over the -- over the entire life of the patents.

11       But in between the date of this agreement and the date

12  that the last patent expires, other patents are expiring along

13  the way.  And as those patents expire, rates fall off.  They

14  fall off.  That's an adjustment to not overcharge them.  It's

15  not a discount off the rate.  It's an adjustment to say, hey,

16  look when one of our patents expires, we're no longer going to

17  charge you for it.

18       He's called it a discount this entire trial.  It's not a

19  discount.

20       And it's also an adjustment for pre-payment of future

21  royalties.  ZyXEL paid in a lump sum.  That means TQ Delta got

22  all its money now, very basic economics.  When you prepay for

23  something, you reduce the value to the net present value of

24  today's dollars versus dollars in the future.  It's not an

25  adjustment off the rates.

1        And that pre-payment of future royalties, if CommScope

2   had taken a license from us in 2013 and they wanted to pay a

3   lump sum based on future projections, they would have gotten

4   the same discount -- I'm sorry.  The same pre-payment of

5   future royalties.  They would have gotten the same adjustment

6   for patent expiration.

7        The only discount in the ZyXEL agreement is the 25

8   percent discount.  It's the only time that the word 'discount'

9   is used.  And, frankly, it's insulting that they've been

10  calling these other things discounts this entire trial.

11       If I can go back to the slides, please, Mr. Diaz?  And if

12  I could have slide 24, please.

13       I want to remind you where this all started.  This all

14  started through the inventive work of Marcos Tzannes.  This is

15  a man who's been working in this field for 30 years.  This is

16  Marcos at the ITU meeting.  He told you about his inventive

17  work.

18       They say that our -- our patents, the patents that Marcos

19  Tzannes invented, the development that Aware did to support

20  him, and now the development and the support that TQ Delta has

21  provided him to continue to develop new standards, they say

22  it's not progress.  200 patents?  Do you think the Patent

23  Office got all those wrong?  Does that make any sense?

24       Do you think a photo like this would exist of a young

25  Marcos Tzannes standing at the board explaining to all these

1    other members of the industry -- CommScope's in the back of

2    the room.  Are they contributing?  No.  You heard it.  They've

3    never contributed a single thing to the ITU.  They've never

4    had a single idea adopted into a standard.

5         And not only that, they've never taken a single license

6    to any standard essential patent.  They've been using the

7    standards for years and haven't paid anybody on those

8    standards.  Who's the one in here telling the truth?  Who's

9    the one in here who's broken promises?  Who's the one who's

10   taking?  Who's the one who's providing?  Who's the innovator?

11   Who's the implementor?

12        They are the ones who are using our technology.  And for

13   them to say that none of this is progress, that we haven't

14   advanced art or science and to come in here with the kind of

15   analysis they provided and try to take away these patents,

16   wants you to essentially destroy them?

17        Could I have slide 27, please?

18        Let's talk about the promise.  You've seen this document

19   a lot.  It's Exhibit 68.  I do encourage you to look at this

20   because I think the language is very important for you to look

21   at in deciding whether or not the offers that TQ Delta has

22   made to CommScope were reasonable.

23        And I think what you're going to find is that nowhere in

24   this language does it say that when you -- the first time

25   standard essential patents are licensed, that the rate is set

1    for all people all time all eternity.  It doesn't say that.

2    What does it say?  It says negotiate, that you have to be

3    willing to grant a license to an unrestricted number of

4    applicants.  Applicants are people who are applying for

5    something, very basic.  They tried to run away from that word

6    just now.  And it's worldwide, non-discriminatory, reasonable

7    terms and conditions.

8         Does it say that the first time a license is entered

9    into, the rates are set for all time whether you're a chip

10   company, or a DSL company or someone else down the road?  No.

11   It doesn't.

12        It says, hey, these -- it's not as simple as that.  You

13   have to take into consideration the facts and the

14   circumstances and the parties and what -- I mean, we're having

15   a negotiation.  It's not just there's some license in the

16   past, we get that rate, and if you don't give it to us, you're

17   discriminating against us, and we get to come in here and sue

18   you for a breach, when they're the ones that are infringing,

19   folks.  They're the ones that are infringing on United States

20   patents.

21        They've tried to turn this whole thing around and make it

22   about us.  Other licenses, the other five licenses show that

23   what we've acted -- because they're market participants, too.

24   They show that the way we've acted is reasonable, that our

25   rates are fair.  They're fair to DSL modem makers.

1      It's unfair to us, it's unfair to Aware, it's unfair to

2  the other folks that have taken licenses from us, to go back

3  and say, nope, we, CommScope, since we're the biggest seller,

4  we sell 36 million units, we sold the most, we don't have to

5  pay what all the other folks paid, we get to go all the way

6  back to a relationship that started in 1998, and we get those

7  rates because we like the number that those rates give us.

8      It's not fair and reasonable.  And the rates are not set

9  at that point.  And that's what they've tried to convince you

10  of is that, oh, the rates are set, we're being discriminated

11  against, we can't compare it, we can't compete with ZyXEL

12  anymore, we can't compete with Zhone.

13      These are the guys that have sold more than anybody.

14  That's why the total amounts that those other folks have paid

15  is so much less than what these guys owe.  They're the ones

16  that have had the competitive advantage.  They're the ones

17  that sell 90 percent of their products to AT&T.

18      This case is about promises made, and it's about promises

19  that have been kept.

20          THE COURT:  Four minutes remaining, counsel.

21          MR. DAVIS:  I'm sorry, Your Honor?

22          THE COURT:  Four minutes remaining.

23          MR. DAVIS:  Thank you, Your Honor.

24      We promised you in opening statements that we would bring

25  you the evidence to show that CommScope is infringing on the

1    patents that are at issue in this case, that these patents are

2    standard essential, that these patents are valid, and we've

3    done that.  We've delivered on that promise.

4        And all you've received from CommScope is distractions

5    and delay and -- I mean, it's -- it's -- I agree the conduct

6    that has occurred in this courtroom is not the kind of conduct

7    that should be allowed to take place, and I hope you see that.

8        I know this is complicated.  I know you've been drinking

9    through a fire hose.  You're trying to understand patents and

10   FRAND and patent law damages, which is, you know, just a mess,

11   frankly.  It's -- there -- there's a lot going on there.  It's

12   a mess.

13       But I want you to remember what I started with in

14   opening -- in opening statements, and that is that this right

15   that we are all here for, this right to a jury trial, the

16   right of these parties to have members like you decide these

17   issues, it's not just our right; it's -- it's your right.

18   It's your ability to look at the conduct of parties and to

19   decide what you're going to condone and what you're not going

20   to condone.

21       And I submit to you that the conduct of CommScope over

22   the last 10 years, and particularly in the courtroom this

23   week, trying to say that the rates are set, trying to say that

24   time is memory, showing you graphics where the arrow's going

25   down to say that DSL is declining at this precipitous rate,

1    and they're showing you the wrong data, and the slide right

2    after it shows that it's holding pretty steady, there's a

3    little decline but it's holding pretty steady, that's not

4    conduct that should be condoned.

5         You have the ability to send a message.  Mr. Wauters has

6    been here all week in court.  He took the stand and didn't

7    know anything about this case, at least not when I was asking

8    him questions.  And his -- his lawyer got up there, and he

9    knew everything.

10        Mr. Wauters is here, and he has to make a phone call

11   after you return your verdict today.  He has to call back to

12   corporate offices and say, hey, we got away with it, keep

13   doing what you're doing, keep carrying on, keep infringing

14   patents, we don't have to pay standard essential patent

15   holders.

16        Are you going to let him make that phone call?  Or is he

17   going to have to make another phone call, a phone call that

18   says, we got to change the way we do business, we can't just

19   keep running over other people's patents.  I'm asking you to

20   make him make that second phone call.

21        I really appreciate your time.  I thank you for

22   everything you've done for this week sitting here listening to

23   all of this.  On behalf of everyone in this room, there's one

24   thing we can all agree on is that you guys are the heroes this

25   week, and so I thank you very much.  That's all I have.

1          Thank you, Your Honor.

2              THE COURT:  Ladies and gentlemen, I have a few final

3     instructions before you begin your deliberations.

4          You must perform your duty as jurors without bias or

5     prejudice as to any party.  The law does not permit you to be

6     controlled by sympathy, prejudice, or public opinion.  All

7     parties expect that you will carefully and impartially

8     consider all the evidence, follow the law as the Court has

9     given it to you, and reach a just verdict, regardless of the

10    consequences.

11         You should answer each question in the verdict form from

12    the facts as you find them to be, following the Court's

13    instructions about the law.  Again, do not decide who you

14    think should win and then answer the questions to reach that

15    result.  One more time, let me remind you:  Your answers to

16    those questions in the verdict form must be unanimous.

17         You should consider and decide this case as a dispute

18    between persons of equal standing in the community, of equal

19    worth, and holding the same or similar stations in life.  This

20    is true in patent cases between corporations, partnerships, or

21    even individuals.

22         A patent owner is entitled to seek to protect its rights

23    under the laws of the United States, and this includes

24    bringing a lawsuit in a United States District Court for

25    infringement, which is what we have here.  The law recognizes

1   no distinctions between the types of parties.  All parties

2   stand equal before the law.

3        Now, when you retire to the jury room in a few moments to

4   begin your deliberations on your verdict, as I've told you,

5   you're each going to have your own individual printed copy of

6   the lengthy instructions I've given you this morning.  You may

7   refer to it throughout your deliberations.

8        You also have your juror notebooks with the

9   patents-in-suit and other materials the Court has given you.

10   You may refer to those throughout your deliberations.

11        If during your deliberations you desire to review any of

12   the exhibits that have been admitted and used during the

13   course of the trial, you should advise me by a written note

14   signed by your foreperson and given to the Court Security

15   Officer who will bring it to me, and I will then send that

16   exhibit or those exhibits to you.

17        As I've told you, demonstratives are not exhibits and I

18   cannot send you demonstratives.  I can send you the exhibits

19   the Court has admitted into evidence, if you ask for them.

20        Now, once you retire, you should first select your

21   foreperson and you should then begin your deliberations.  And

22   if during your deliberations you recess for any reason, follow

23   all the instructions I've given you about your conduct over

24   the course of the trial.

25        After you have reached a verdict, you've answered each of

1    the questions in the verdict form in a unanimous fashion, then

2    your foreperson should fill in your answers reflecting those

3    unanimous decisions in the questions in the verdict form.

4    Your foreperson should then sign it, date it, and advise the

5    Court Security Officer you've reached a verdict.

6         Until then, you should not reveal your answers until

7    you're discharged by me from your position as jurors unless I

8    instruct you otherwise, and you must never disclose to anyone,

9    not even to me, your numerical division on any unresolved

10   question.

11        Any notes that you've taken over the course of this trial

12   are aids to your memory only.  If your memory should differ

13   from your notes, rely on your memory and not your notes.  And

14   a juror who has not taken notes should not be overly

15   influenced by the notes of another juror.  Notes are to

16   refresh your recollection of the testimony that you've seen

17   and heard, and that's the only reason you should be using

18   them.

19        If at any time during your deliberations you want to

20   communicate with me, you should give a message or a question

21   in writing signed by your foreperson to the Court Security

22   Officer who will bring it to me.  I will then respond to you

23   as promptly as possible, either in writing or by having you

24   brought back into the courtroom where I can address you

25   orally.  And, remember, I will always first disclose to the

1    attorneys in the case your question and my intended response

2    before I answer any question you may send me in writing.

3         Now, after you've reached a verdict and I've accepted

4    your verdict and discharged you from your position as jurors

5    in this case, at that time, ladies and gentlemen, you are not

6    required to talk with anyone about your service in this case

7    as jurors.  By the same token, you will be completely free to

8    talk with anyone about your service as jurors in the case.

9         But whether you talk about it or whether you don't, that

10   decision is yours.  It is not anyone else's.  It is yours 100

11   percent at that point in time.

12        I'm now going to hand eight printed copies of my final

13   jury -- the Court's final jury instructions and one clean copy

14   of the verdict form to the Court Security Officer to deliver

15   to you in the jury room.

16        Ladies and gentlemen of the jury, you may now retire to

17   the jury room to begin your deliberations.  We await your

18   decision.

19             (Whereupon, the jury left the courtroom.)

20             THE COURT:  Be seated, please.

21        Before the Court began its final instructions to the jury

22   this morning, I made it abundantly clear to all present that

23   during the Court's final instructions and closing arguments

24   from counsel I did not want any movement in the courtroom, I

25   did not want any disruptions, I wanted everyone to sit still

1    and quietly and be as respectful as possible.

2         Doctor Putnam, you got up in the middle of closing

3    arguments and you walked around to the aisle and sat in

4    another chair and leaned forward and asked whoever it was in

5    front of you to hand you a piece of paper, and then you leaned

6    down and wrote something on it.  Then you got up and walked

7    back to the middle of the gallery and sat where you are on the

8    back row.  That's in direct violation of my instructions.

9         Now, I don't know if you were here when I gave those

10   instructions, but I'm not required to repeat them every time

11   somebody comes into the courtroom.  Those are the rules.  You

12   violated them.  Don't ever do that in a courtroom in which I

13   am presiding again.  I don't want any response.  I just want

14   you to hear what I'm having to say.

15        Now, counsel, you are certainly entitled to wait here in

16   the courtroom while the jury deliberates or to have a

17   representative of your trial team wait in the courtroom.

18   You are also welcome to wait at another location where you've

19   been meeting during the course of the trial.  I would suggest

20   to you that you not go very far.  We may get questions; we may

21   get requests for exhibits.  I don't know.  You should position

22   yourselves, if you're not here in the courtroom, so that I can

23   get you back here without an undue delay.

24        I have, I believe, good working telephone cell phone

25   numbers for each trial team.  You are certainly entitled and

1   welcome to wait here if you choose to do so, but those are the

2   Court's instructions in that regard.

3        Now, awaiting either a question from the jury or a return

4   of their verdict, we stand in recess.

5                    (Jury deliberates.)

6        THE COURT:  Be seated, please.

7        Counsel, I've received the following note from the jury.

8   I'll read it for the record.  It says, "Your Honor, we have

9   reached a verdict."  It's signed by Brittanie Lowery,

10  foreperson who, as I recall, was Juror No. 4.  I'll mark the

11  note with '1' for identification in the upper right-hand

12  corner, and I'll hand it to the courtroom at this time to be

13  included in the papers of this cause.

14       I'm about to bring in the jury and receive their verdict.

15  Let me remind everyone that the Court expects complete silence

16  no matter what the verdict might be, and no overt reactions

17  either way to what it will be as soon as it's made public.

18       All right.  Are either Plaintiff or Defendants aware of

19  anything that should be taken up before I bring in the jury

20  and receive the verdict?

21            MR. DAVIS:  No, Your Honor.

22            MR. BARTON:  No, Your Honor.

23            THE COURT:  All right.  Let's bring in the jury,

24  please.

25            (Whereupon, the jury entered the courtroom.)

1          THE COURT:  Please be seated, members of the jury.

2      Ms. Lowery, I understand that you are the foreperson of

3  our jury.  Is that correct?

4          THE PRESIDING OFFICER:  Yes, Your Honor.

5          THE COURT:  Has the jury reached a verdict?

6          THE PRESIDING OFFICER:  We have, Your Honor.

7          THE COURT:  Will you hand the executed verdict form

8  to the Court Security Officer who will bring it to me at the

9  bench?

10     Ladies and gentlemen, I'm going to announce the verdict

11 into the record at this time, and I want to ask each member of

12 the jury to listen very carefully as I do this, because once I

13 have announced the verdict into the record, then I'm going to

14 follow that by polling the jury to ensure that this is, in

15 fact, the unanimous verdict of all eight members of our jury.

16     Turning to the verdict form and beginning on page 4 where

17 Question 1 was submitted to the jury, "Did TQ Delta, the

18 Plaintiff, prove by a preponderance of the evidence that

19 CommScope, the Defendants, infringed any of the following

20 asserted claims?"

21     For claim 17 of the '881 Patent, the jury's answer is

22 yes.  For claim 36 of the '686 Patent, the jury's answer is

23 "Yes."

24     For claim 14 of the '008 Patent, the jury's answer is

25 "No."

1        For claim 5 of the '048 Patent, the jury's answer is

2   "Yes."

3        For claim 10 of the '835 Patent, the jury's answer is

4   "Yes."

5        For claim 18 of the '411 Patent, the jury's answer is

6   "Yes."

7        For claim 10 of the '354 Patent, the jury's answer is

8   "Yes."

9        Turning to page 5 of the verdict form wherein Question 2

10  is found, "Did CommScope the Defendants prove by clear and

11  convincing evidence that any of the following asserted claims

12  are invalid?"

13       For claim 36 of the '686 Patent, the jury's answer is

14  "Yes."

15       For claim 14 of the '008 Patent, the jury's answer is

16  "No."

17       For claim 5 of the '048 Patent, the jury's answer is

18  "No."

19       For claim 10 of the '835 Patent, the jury's answer is

20  "Yes."

21       Turning to page 6 where Question 3 is found, "Did TQ

22  Delta, the Plaintiff, prove by a preponderance of the evidence

23  that CommScope, the Defendants, willfully infringed any of the

24  asserted claims that you found were infringed?"

25       The jury's answer is "Yes."

1          Turning to page 7 of the verdict form where Questions 4A

2     and 4B are located, and focusing on Question 4A, which is as

3     follows:  "What sum of money, if now paid in cash has TQ

4     Delta, the Plaintiff, proven by a preponderance of the

5     evidence would compensate it for the Defendants' infringement

6     of the asserted claims that you have found to be both

7     infringed and not invalid?"

8          The jury's answer is "$11,125,000."  I'll say that

9     again--$11,125,000.

10         Turning next to Question 4B, "Is the total amount of the

11    reasonable royalty that you have found in Question 4A a

12    one-time lump sum for past and future sales or a running

13    royalty for past sales only?"

14         The jury's answer is "Lump sum."

15         Turning to page 8 of the verdict form wherein Question 5

16    is found, "Did CommScope, the Defendants, prove by a

17    preponderance of the evidence that TQ Delta, the Plaintiff,

18    breached its contractual duty to grant licenses regarding its

19    standard essential patents to CommScope on fair, reasonable,

20    and non-discriminatory FRAND terms?"

21         The jury's answer is "No."

22         Pursuant to the Court's instructions and the verdict form

23    with an answer of "No" to question 5, the jury was instructed

24    not to answer Question 6.  Question 6 is unanswered as the

25    Court instructed.

1          Turning, then, to page 9, which is the final page of the

2     verdict form, I find that it is dated with today's date, and

3     it is signed by Ms. Lowery as the foreperson of the jury.

4          Ladies and gentlemen of the jury, let me poll you to make

5     sure that this verdict as I have read it into the record

6     unanimously reflects the agreement and decision of all eight

7     members of the jury.

8          If this is your verdict as I have read it, would you

9     please stand up?

10         Thank you.  Please be seated.

11         Let the record reflect that all eight members of the jury

12    immediately rose and stood in response to the Court's question

13    to poll the jury.  This confirms for the Court that this is

14    the unanimous verdict of all eight members of the jury.  I

15    accept the jury's verdict and I will deliver the original

16    verdict form to the Courtroom Deputy at this time.

17         Ladies and gentlemen, that completes the trial of this

18    case.  From the very beginning I have instructed you over and

19    over and over about your conduct, including telling you many,

20    many times not to discuss this case or communicate about this

21    case with anyone.  I am releasing you from all the

22    instructions I've given you because I am discharging you as

23    jurors in this case, and since you have been discharged and

24    are no longer subject to those instructions from the Court,

25    you are absolutely free to discuss your service or anything

1    about this case, this trial, with anyone of your choosing.  By

2    the same token, you are completely free not to discuss

3    anything about this trial or this case or your experience as

4    jurors.  It is totally 100 percent up to you.

5         Now, I need to let you know about a long-standing

6    practice and custom in the Marshall Division of the Eastern

7    District of Texas, because it was this way more than 30 years

8    ago when I got out of law school and practiced law here, began

9    practicing law here.  When a verdict's returned in this court

10   and is accepted by the Court and the jury's discharged, the

11   lawyers cannot initiate a consideration with you about this

12   case, and I can assure you the lawyers on both sides are very

13   anxious to know what you thought about this trial, how they

14   comported themselves, what suggestions or comments you might

15   have, but they can't initiate a conversation with you.  You

16   can, though.  Because you've now been discharged, you can

17   initiate a conversation with them if you choose to.

18        And the way that has developed over the many years that

19   that's been the practice here is that there's one way in this

20   building and there's one way out, and don't be surprised when

21   you go down those front steps if you don't find the lawyers in

22   this case standing on the sidewalk making themselves available

23   to you if you want to stop and have a conversation with them.

24   They are not going to stop you, they are not going to

25   interfere with you coming and going, they are not going to

1    initiate a conversation with you; they're just going to make

2    it easy for you if you choose to stop and initiate a

3    conversation with them.

4        If you want to do that--I understand it's quit raining

5    now--feel free to do that.  If you don't want to do that,

6    you're under absolutely no obligation to do it.  But don't be

7    surprised when you exit the building if you don't see some or

8    most of the lawyers outside on the sidewalk giving you an

9    opportunity to stop and talk to them if you choose to do it.

10       But again, let me stress, it is completely your decision,

11   and if you decide that you want to walk straight to your

12   vehicle and go home, nobody is going to stop you, nobody's

13   going to slow you down, and nobody's going to get in your way.

14       That's the way it's been for over 30 years here, because

15   I have participated in it as a lawyer, and I've seen it as a

16   judge, so I think I know what I'm talking about when I tell

17   you that's usually the way it works.  So those are the rules.

18       And if you want to stop, they'll stay until midnight and

19   talk to you, I suppose, because I know they're interested in

20   what you thought about this trial.  But you're not obligated

21   in any way.  It is strictly 100 percent your own personal

22   decision.

23       Now, having covered that, ladies and gentlemen, there's

24   one other thing I want to ask of you, and this is in the

25   nature of a personal favor to me.  In a moment you're going to

1    leave the jury box and you'll go back through the jury room as

2    you prepare to leave.  As a personal favor to me, I'm going to

3    ask you not to immediately leave once you get to the jury

4    room.  I'm going to ask you to wait there for just a minute so

5    that I can come into the jury room and I can look each one of

6    you in the eye and shake your hand and thank you personally

7    for your service as jurors in this case, because, quite

8    honestly, ladies and gentlemen, you've made a very real and

9    important sacrifice as good citizens to serve as jurors in

10   this case, and I believe that kind of public service warrants

11   the attention that only a handshake and a thank you

12   face-to-face can give you.  And I'd like to do that, if you'll

13   give me that opportunity.  Now that the verdict's been

14   accepted and you've been discharged as jurors, there's nothing

15   that prohibits me from talking with you directly, and I would

16   like to do that if you will give me that privilege.

17        I promise you--it's Friday evening, my wife's waiting for

18   me at home--it's not going to take me very long, and I'm not

19   going to hold you but for just a few minutes.  But if you

20   would do me that honor, I'd like to thank you personally

21   before you leave.

22        With that, ladies and gentlemen, the trial in this case

23   is completed, the verdict has been accepted, the members of

24   the jury are excused, and counsel, likewise, you are excused

25   as well.

1          (The proceedings were concluded at 5:15 p m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2      CORRECT TRANSCRIPT FROM THE RECORD OF

3      PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4      I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5      FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6      COURT AND THE JUDICIAL CONFERENCE OF THE

7      UNITED STATES.

8

9      S/Shawn McRoberts              03/24/2023

10     _____DATE_____
       SHAWN McROBERTS, RMR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25