IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| TQ DELTA, LLC, | § | |
| *Plaintiff*, | § § § | |
| v. | § § | CIVIL ACTION NO. 2:21-CV-00310-JRG |
| COMMSCOPE HOLDING COMPANY, INC., COMMSCOPE INC., ARRIS INTERNATIONAL LIMITED, ARRIS GLOBAL LTD., ARRIS US HOLDINGS, INC., ARRIS SOLUTIONS, INC., and ARRIS ENTERPRISES, LLC, | § § § § § § § § § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants CommScope Holding Company, Inc., CommScope Inc., Arris International Limited, Arris Global Ltd., Arris US Holdings, Inc., Arris Solutions, Inc., and Arris Enterprises, LLC's (collectively, "CommScope") Renewed Motion for Judgment as a Matter of Law (the "Motion"). (Dkt. No. 541.) In the Motion, CommScope requests that the Court enter judgment as a matter of law that Plaintiff TQ Delta, LLC ("TQ Delta") breached its contractual obligation to grant a license on fair, reasonable, and non-discriminatory ("FRAND") terms, and seeks a new trial limited to the question of the appropriate damages owed to CommScope for the alleged breach. (*Id.* at 1.) Having considered the arguments and briefing, the Court is of the opinion that the Motion should be and hereby is **DENIED**.

**I.      BACKGROUND**

On August 13, 2021, TQ Delta filed the above-captioned case against CommScope asserting infringement of certain patents. (*See* Dkt. No. 1.) CommScope answered the Complaint on October 22, 2021, asserting the defenses of invalidity and noninfringement. (*See* Dkt. No. 17.) Additionally, CommScope asserted a breach of contract counterclaim. (*Id.* at 37.) CommScope

alleged that TQ Delta entered into a contract with the International Telecommunications Union ("ITU"), and that under that contract, TQ Delta had an irrevocable obligation to permit use of its allegedly essential patents, including the Asserted Patents, by manufacturers like CommScope on FRAND terms. (*Id.*) Specifically, in its contract with the ITU, TQ Delta promised it would "grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use, and sell implementations of the" ITU-T Recommendation." (Dkt. No. 541 at 3, citing Ex. 68 at 2.) CommScope claimed that TQ Delta breached this contractual agreement. (Dkt. No. 17 at 37.) TQ Delta does not deny that its standard essential patents ("SEPs") are subject to a FRAND commitment with the ITU. (Dkt. No. 545 at 2.)

On March 17, 2023, a jury trial commenced in this case. After the close of evidence on March 23, 2023, the Court took up matters from both sides under Federal Rule of Civil Procedure 50(a), where CommScope moved for judgment as a matter of law that TQ Delta breached its FRAND obligations imposed by its contract with the ITU. (Dkt. No. 533 at 238:6–240:5.) Specifically, CommScope argued that TQ Delta failed to offer licenses to its patents to CommScope on FRAND terms. (*Id.* at 238:23–239:4.) The Court denied CommScope's 50(a) motion. (*Id.* at 249:6–11.)

On March 24, 2023, the Jury returned its verdict. (*See* Dkt. No. 508.) In pertinent part, the Jury found that CommScope failed to prove that TQ Delta breached its contractual duty to grant licenses regarding its patents declared to the standard on FRAND terms. (*Id.* at 8.) Further, the Jury found that CommScope infringed the asserted claims of the '881 Patent, the '686 Patent, the '048 Patent, the '835 Patent, the '411 Patent, and the '354 Patent. (*Id.* at 4.) The Jury also found, however, that the asserted claims of the '686 Patent and the '835 Patent were invalid. (*Id.* at 5.) The Jury assessed damages against CommScope in the amount of $11,125,000 for its infringement

2

of the four patents found infringed and not invalid.[1] (*See id.* at 7.) On May 3, 3023, the Court entered final judgment on the verdict. (Dkt. No. 513.) CommScope now renews its 50(a) JMOL, seeking judgment as a matter of law that TQ Delta breached its contractual obligation and seeking a new trial limited to the question of appropriate damages owed to CommScope for TQ Delta's alleged breach. (Dkt. No. 541 at 1.)

## II. LEGAL STANDARD

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court asks whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." FED. R. CIV. P. 50(b); *Am. Home Assur. Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict, and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of

---

[1] The '881 Patent, the '048 Patent, the '411 Patent, and the '354 Patent were found infringed and not invalid. (*See* Dkt. No. 508 at 4–5.)

3

impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 393 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

## III. DISCUSSION

Under Texas law, a party asserting breach of contract must prove: "(1) the existence of a valid contract; (2) that the [party] performed or tendered performance; (3) that the other party breached the contract; and (4) that the party was damaged as a result of the breach." *City of Dall. v. Delta Air Lines, Inc.*, 847 F.3d 279, 287 (5th Cir. 2017) (internal citations omitted). CommScope argues in its Motion that it demonstrated that each element of its breach of FRAND claim was met during trial, and urges that a reasonable jury could not have found otherwise. (Dkt. No. 541 at 2.) TQ Delta responds first that CommScope did not present evidence which would compel a reasonable jury to find that TQ Delta did not meet its FRAND obligations. (Dkt. No. 545 at 2.) Even if it had, TQ Delta argues that CommScope failed to prove harm, thereby eliminating any possibility of breach and any remedy. (*Id.*)

### A. CommScope Did Not Establish Harm

CommScope argues that it proved that TQ Delta's breach harmed CommScope. (Dkt. No. 541 at 8.) It contends that if TQ Delta had made an offer on FRAND terms for the declared essential patent portfolio, "CommScope *could* have accepted that offer and there would have been no need for this litigation." (*Id.*) (emphasis added). Further, CommScope points to the testimony of Mr.

4

Wauters, its corporate representative, that CommScope actively made its own FRAND offers to try to negotiate itself out of the business disruptions caused by the litigation. (*Id.*, citing Dkt. No. 528 at 283:11–23.) CommScope additionally notes that ███████████████████████████████ ███████████████████████ (*Id.* at 8 n.3, citing Dkt. No. 541-12 at 6–7.) Lastly, the Motion vaguely mentions "sales lost to competitors" without elaboration and without citation to the record. (*Id.*)

TQ Delta responds that CommScope failed to offer any evidence of pecuniary loss with any degree of certainty at trial. (Dkt. No. 545 at 3.) TQ Delta also notes that Mr. Wauters did not say that CommScope's business was disrupted or that the lawsuit took resources away from focus areas of the company.[2] (*Id.* (quoting Dkt. No. 530 at 283:11-23) (cited by CommScope at Dkt. No. 541 at 8).) Additionally, TQ Delta points out that under Texas law, damages for business interruption "are measured by the amount of profits lost due to the interruption," and that the "loss amount must be shown by competent evidence with reasonable certainty." *JPMorgan Chase Bank, N.A. v. Prof'l Pharmacy II*, 508 S.W.3d 391, 429 (Tex. App.–Fort Worth 2014). It urges that Mr. Wauters' testimony fails to meet this standard. (*Id.* at 4.) Further, TQ Delta notes that its own general reference to its own potential litigation costs at trial is not evidence of *CommScope's* damages. (*Id.*, emphasis in original.)

Lastly, TQ Delta asserts that CommScope did not show that it was entitled to nominal damages because it did not take the position that its harm was non-economic in nature. (*Id.* at 5 n.1, citing *Loeb-Defever v. Strategic Constr., Ltd.*, 2022 U.S. Dist. LEXIS 124597, at *15–18 (S.D.

---

[2] "[O]ur intention was to try to negotiate a deal with them so ultimately we wouldn't have to litigate it; we wouldn't end up in a courtroom like this. So our intention was to try to come up with a compromise with them, and that's why we offered the lump sum plus the other licensing arrangement in that offer. And also, frankly, we want to keep -- stay focused on designing and building products. Right? We don't want our business to be disrupted on events like this. And, I mean, this obviously can take a lot of resources away from our focus areas inside of our company, and so that definitely was the intent of making that offer over to TQ Delta." (Dkt. No. 530 at 283:11-23).

5

Tex. July 14, 2022).) CommScope replies that TQ Delta is "simply rehashing issues previously decided by the Court during the informal charge conference and in the verdict form." (Dkt. No. 553 at 3.) CommScope additionally notes that the Court instructed the Jury on nominal damages (*see* Dkt. No. 534 at 72:18–25) and made clear that a "contractual obligation where mere proof of the making and breach fully proved plaintiff's cause of action" would entitle the plaintiff to at least nominal damages. (*Id.*, quoting *Versata Software, Inc. v. Internet Brands, Inc.*, 2012 U.S. Dist. LEXIS 105585, at *10–12 (E.D. Tex. Jul. 30, 2012).)

The Court concludes that the CommScope put on no concrete evidence of harm or damages as a result of the alleged breach of FRAND. A reasonable jury could have concluded that CommScope was not harmed by any alleged breach based on the record produced at trial. As TQ Delta points out, CommScope only points to "speculative business disruption untethered to any actual damages," unsupported attorney argument via briefing of lost sales to unknown competitors, and its reference to litigation expenses on documents of TQ Delta's that were never presented to the Jury. (*See* Dkt. No. 545 at 4.)

The parties dispute whether CommScope was entitled to recover nominal damages when it asserted only economic harm. CommScope points to case law that discusses the availability of nominal damages in the context of a plaintiff proving the making of a contract and breach of the same. (*See* Dkt. No. 553 at 3–4, citing *Versata Software*, 2012 U.S. Dist. LEXIS 105585, at *10–12.) In any event, the Court instructed the Jury that nominal damages were recoverable in the event of a breach, and there was no objection to this instruction during the formal charge conference. (Dkt. No. 534 at 72:18–25; 15:4–18.) Therefore, the Jury could have found breach even if there was no harm in accordance with that instruction. For this reason, the Court next evaluates whether

6

there was sufficient basis for the Jury to find that there was no breach of TQ Delta's FRAND obligations.

## B. There Was Sufficient Evidence for the Jury to Conclude There Was No Breach

CommScope relies on two main points to demonstrate that no reasonable jury could have found that TQ Delta did not breach its FRAND obligations imposed by its contract with the ITU. First, it argues that TQ Delta licensed CommScope's DSL equipment maker competitors at a rate substantially less than any of TQ Delta's offers to CommScope for the same license. (*See* Dkt. No. 541 at 4–5.) Second, CommScope contends that because the Jury's damages award resulted in an "effective royalty" that was much lower than TQ Delta's offers, the Jury could only have found that TQ Delta breached its FRAND obligations. (*Id.* at 1; 5–8.)

### i. TQ Delta's Other Licenses

After acquiring the Asserted Patents, TQ Delta published its FRAND royalty rates of $0.60 to $1.35 per licensed product per standard (depending on the number of the following standards incorporated into each licensed product: VDSL2, G.Bond, and G.Inp).[3] (Dkt. No. 541 at 4, citing Dkt. No. 541-11; *see also* Dkt. No. 545 at 11.) It then entered licenses with DSL equipment makers



(*Id.*, citing Exs. 36-A, 36-B, 37, 38-A, 38-B, 40; Dkt. No. 528 at 99:1–102:2, 110:6–114:2, 122:22–124:8, 128:1–132:7.) Though TQ Delta asserted in trial that ▮▮▮▮▮▮▮▮▮▮ were licensed at a ▮▮▮

---

[3] TQ Delta purchased the Asserted Patents from Aware, Inc. ("Aware"), which had previously entered into a contractual obligation to the ITU commensurate with TQ Delta's. (Dkt. No. 541 at 3.) CommScope contends that when TQ Delta purchased the patent portfolio, it inherited the FRAND obligations and existing licenses reflecting those obligations. (*Id.*) In any event, TQ Delta signed its own obligation with the ITU, and does not dispute that (as explained *supra*).

7

per-unit rate, CommScope urges—as it did during trial—that was not the case. (*Id.*) Instead, CommScope points to discounts, or "adjustments," to the standard rate resulting in a per-unit rate of ▮. (*Id.*, citing Dkt. No. 528 at 105:18–20, 120:8–121:4; Tr. Vol. 5, Dkt. No. 533 at 153:10–155:9.) As explained further *infra*, the CommScope insists that the Jury found ▮ to be a reasonable "effective rate," and further insists that this amount is consistent with the average between these per-unit rates for TQ Delta's other licensees. (*Id.*)

TQ Delta's first offer to CommScope, prior to litigation, was a rate of ▮ per licensed products for the relevant accused standards—VDSL2, G.INP, and G.bond (designed to operate with VDSL2). (*Id.* at 5, citing Exs. 124B, 135B.) CommScope argues that this offer was not FRAND because CommScope's DSL equipment maker competitors all paid substantially less than ▮ (*Id.*) It asserts that TQ Delta "sought to commercially disadvantage CommScope by seeking to charge five times the alleged standard rate for the G.INP standard that CommScope's ▮ had paid." (*Id.*, citing Dkt. No. 532 at 114:7–18.) After litigation commenced, TQ Delta raised its demand to ▮ per licensed product; during trial, the demand was raised to ▮ per licensed product. (*Id.*, citing Dkt. No. 532 at 112:3–8; 112:19–113:3.) These post-litigation offers covered only five of the Asserted Patents (those subject to a FRAND commitment). (*Id.*) CommScope put on evidence of these offers at trial and argued that TQ Delta's offers breached its FRAND obligations.

In response, TQ Delta argues that the Jury was not required to accept what it views as CommScope's mischaracterization of the rates given to TQ Delta's other licensees. (Dkt. No. 545 at 5–6.) Regarding the ▮ agreements, TQ Delta put on evidence that they included an ▮

8

▇▇▇▇ (*Id.* at 6, citing Ex. 36-B at TQD_TX00313568; Ex. 37 at TQD_TX- 00044462; Dkt. No. 528 at 104:13-19, 106:11-107:5, 108:20-109:7, 115:11-118:12.) Regarding the ▇▇ agreement, TQ Delta argues that CommScope mischaracterized that license as a worldwide license when it was not. (*Id.*, citing Dkt. No. 533 at 153:10-155:9.) In TQ Delta's view, the Jury could have concluded that there was ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ did not compensate TQ Delta for approximately ▇▇▇▇ (which CommScope included in its calculation of the royalty rate). (*Id.*, citing Trial Exs. 38-A at TQD_TX00491591; 38-B; Dkt. No. 528 at 130:1-131:24, 132:12-16.)

TQ Delta further points out that the non-discriminatory aspect of the FRAND obligation applies to similarly situated competitors who have been similarly willing to negotiate licenses in good faith. (*Id.* at 6–7, citing Ex. 68; Dkt. No. 528 at 71:3-16, 149:10-151:4, 152:13-154:9, 185:8-12, 186:7-25; Dkt. No. 530 Tr. at 205:21-207:4.) TQ Delta points to important differences in negotiations between CommScope on the one hand, and with ▇▇▇▇▇▇▇▇ on the other. (*Id.* at 7.) At trial, TQ Delta put on evidence of differences relating to good faith negotiations, early negotiations, and expiration of some patents that resulted in adjustments for its other licensees but did not apply to CommScope. (*Id.* at 7–8, citing Dkt. No. 528 at 31:18-32:4, 117:21-118:7-21, 128:18-25, 163:13-165:6, 167:23-171:7, 173:13-19, 174:18-177:19, 178:14-25, 187:1-9; Dkt. No. 532 at 116:11-12, 123:12-25.) TQ Delta contended at trial that CommScope was not a willing licensee and failed to negotiate in good faith.[4] (*Id.* at 7–8.) TQ Delta's damages expert also

---

[4] In particular, TQ Delta put on evidence that CommScope did not negotiate in good faith because: (1) it did not approach TQ Delta for a license, (2) dragged out negotiations over years, (3) refused to provide technical and unit sales information to TQ Delta, and (4) its counteroffer required TQ Delta to enforce CommScope's patents in order to recover a substantial portion of the royalties. (Dkt. No. 545 at 7–8, citing Dkt. No. 528 at 14:22-21:16, 26:17-29:17, 32:8-43:20, 160:21-25, 169:6-10, 171:8-172:4; Dkt. No. 532 at 58:12-22; Dkt. No. 530 at 247:3- 252:11.)

9

testified at trial that its offer to CommScope was reasonable in comparison with TQ Delta's other licenses. (*Id.* at 8, citing Dkt. No. 532 at 9:11-13:25.)

The Court finds that substantial evidence supports the Jury's determination that there was no breach of TQ Delta's contractual obligations. Contrary to CommScope's argument, the Jury was free to credit TQ Delta's evidence over that of CommScope.

TQ Delta put on a myriad of evidence that ███████████ were not similarly situated to CommScope such that TQ Delta was not required to offer CommScope those same adjustments to meet its FRAND obligations. Take ████, for example, whom CommScope asserts is its closest competitor and argues is similarly situated. (*See* Dkt. No. 553 at 1.) TQ Delta put on evidence that ████ was offered ██████████ that CommScope was, but was granted adjustments because ████ was ████████████████████████████████████████████████████████████████████████████ ████ (*See* Dkt. No. 558 at 1–2; *see also infra*, n.6.) In contrast, TQ Delta put on evidence that CommScope was not an early mover, delayed negotiations approximately 10 years, withheld information, made an unreasonable counteroffer,[5] and sold ████████ in infringing products in the U.S. without a license.[6]

The evidence differentiating license negotiations between ████ and CommScope is only one example—TQ Delta put on evidence distinguishing ██████ from CommScope as well. (*See supra* at 8.) Additionally, Dr. Putnam testified that TQ Delta's offer to CommScope was reasonable and non-discriminatory when compared to TQ Delta's other licenses. (*See* Dkt. No.

---

[5] TQ Delta also put on evidence that it was willing to provide CommScope adjustments like those it gave to other licensees if CommScope provided it data necessary to apply the adjustments. (Dkt. No. 558 at 2.)

[6] *Compare* Dkt. No. 528 at 117:21–118:21, 167:23–171:7, 173:13–19, 178:14–22, 187:1-9; Dkt. No. 532 at 116:11-12, 123:12-25 (evidence regarding ██████); *with* Dkt. No. 528 at 14:22-21:16, 26:17- 29:17, 32:8-43:20, 106:20-107:5, 115:20-122:21, 160:18-22, 169:6-10, 171:8-173:8; Dkt. No. 530 at 247:3-252:11; Dkt. No. 532 at 58:12-22; Dkt. No. 533 at 116:9-117:2 (evidence regarding CommScope).

10

532 at 9:11-13:25, 26:23-25.) The Jury was free to credit TQ Delta's evidence showing it complied with its FRAND obligations, and to discredit CommScope's evidence that TQ Delta failed to comply with FRAND. Indeed, the Court finds that a reasonable jury could have found—as this Jury apparently did—that TQ Delta did not breach its FRAND obligations and that its offer of license to CommScope was commensurate with its offers to other licensees, accounting for differences in circumstances.

        ii.        **Jury's Damages Award for Infringement**

Next, CommScope urges that the Jury's award of $11,250,000 for the four patents found to be infringed, which corresponds to "a per-unit royalty of ▮▮▮▮▮ is a reasonable royalty under the circumstances.[7] (Dkt. No. 541 at 1.) CommScope argues that this amounts to a finding of breach on behalf of TQ Delta—even though the Jury explicitly found that there was no breach of FRAND. It points to the instruction to the Jury that it "must make sure that any reasonable royalty determination takes into account TQ Delta's FRAND obligations." (*Id.* at 5, citing Dkt. No. 534 at 67:22–23.) CommScope further urges that Dr. Putnam, TQ Delta's damages expert, admitted that the rate TQ Delta sought to charge CommScope for the G.INP standard would violate FRAND "if that were an offered license." (*Id.* at 6, citing Dkt. No. 532 at 114:23–115:4.) It also argues that TQ Delta mistakenly assumed throughout trial that it could charge CommScope non-FRAND rates for its declared-essential patent portfolio, as demonstrated by Dr. Putnam's testimony. (*Id.*, citing Dkt. No. 532 at 115:2-19.)

---

[7] CommScope calculated the ▮▮▮ amount from a royalty base of ▮▮▮ units of Accused Products. (Dkt. No. 541 at 7.) It additionally notes that the Jury's "effective reasonable royalty of ▮▮▮ per product" is about a tenth of TQ Delta's demands of ▮▮▮ per product. (*Id.*)

11

CommScope also contends that TQ Delta's proposed royalty rates (from ▮ per product) were not FRAND because "TQ Delta failed to apportion its rates to the value of the patents, overlooked that the accused products are 'subject to other patent pools,' and overlooked that the accused products include features beyond those claimed in the patents, such as WiFi and fiber connection." (*Id.* at 7, citing Dkt. No. 533 at 194:6–12, 146:19–147:6; *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).) Additionally, CommScope argues that all of the accused functionality was found only in the chipset, such that seeking to charge a percentage of the entire product was not FRAND.[8] (*Id.*)

In sum, CommScope asserts that the Jury's "finding" of ▮ reasonable royalty per product—when taking into account the royalty base of ▮ units and the award of $11,250,000 for four patents—is a rate consistent with those CommScope presented for ▮ ▮ (which average to ▮ per product). (*Id.*) CommScope notes this is also consistent with CommScope's application of the ▮ agreement (concerning ▮ ▮ to the ▮ chipsets in the Accused Products in this case (which CommScope posits resulted in a royalty rate of ▮ per product). (*Id.* at 7–8.) It concludes that the "jury's finding of a 'reasonable' royalty of ▮ …demonstrates that TQ Delta's offers to CommScope were *not* reasonable, and therefore *not* FRAND[.]" (*Id.* at 8.)

TQ Delta dismisses CommScope's argument as baseless. (Dkt. No. 545 at 8.) First, it points out that the Jury was not asked to decide (and did not decide) whether ▮, nor TQ Delta's other offers, were FRAND rates. (*Id.* at 9.) Second, TQ Delta correctly notes that CommScope failed to cite *any* authority supporting its proposition that when a jury awards less in royalty damages for

---

[8] CommScope notes that Aware's licenses were structured to ▮, and argues that TQ Delta should have done the same. (Dkt. No. 541 at 7.)

12

infringement than a patentee's request, the infringer is entitled to JMOL on a claim for breach of FRAND. (*Id.*) It argues that determining damages for infringement of SEPs is distinct from assessing whether a license offer is FRAND. (*Id.*) TQ Delta also notes that FRAND rates are found in a range rather than a single rate, such that even if ▇ is a FRAND rate, ▇ might be in the FRAND rate range as well. (*Id.*, citing *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1044-45 (9th Cir. 2015) (finding that, "in determining the RAND rate and range for each SEP portfolio," the district court did not err).)

Referring back to its assertion that CommScope mischaracterized the rates its other licensees paid, TQ Delta notes that CommScope's argument relies on the Jury's acceptance of CommScope's argument regarding those rates. (*Id.* at 9–10.) In other words, the Jury did not have to credit CommScope's argument regarding the effective rates of ▇ being ▇ respectively. TQ Delta also points out that CommScope's argument ignores licenses to other CPE makers—▇—in which TQ Delta's standard rates were paid. (*Id.* at 10.) As to CommScope's argument about the award being consistent with the ▇ agreement to the ▇ chipsets in the accused products, TQ Delta urges there is no support for this assertion. (*Id.*) It notes that ▇ infringing units results in a total of $11,184,668.60, not $11,125,000. (*Id.*, citing Dkt. No. 532 at 47:24-48:1; Dkt. No. 513 at 2.) TQ Delta also argues that ▇ (a chipmaker in ▇ with TQ Delta) and CommScope (a DSL CPE maker) were not similarly situated and would not have received the same rate. (*Id.*)[9] Lastly, TQ Delta contends it presented unrebutted evidence that the claimed inventions are not limited to the chipsets. (*Id.*, citing, *inter alia*, Dkt. No. 530 at 23:11- 24:24, 41:9-42:3, 116:24-118:18.)

---

[9] Citing Dkt. No. 528 at 25:14-26:4, 62:16-63:23, 157:1-15; Dkt. No. 532 at 52:18-53:15, 56:14-20; Dkt. No. 526 at 188:7-25; Dkt. No. 533 at 128:23-129:20, 132:10- 134:20; Dkt. No. 530 at 202:16-203:13, 208:5-209:23.

13

TQ Delta also argues that CommScope mischaracterizes Dr. Putnam's testimony and the law. (*Id.* at 13.) TQ Delta points out that Dr. Putnam specifically testified to the following: he took TQ Delta's FRAND obligations into account in his opinion (Dkt. No. 532 at 9:11-13:25); he considered FRAND obligations when apportioning the value of TQ Delta's SEPs (*id.* at 25:15-26:22, 30:24-33:9), and the final royalty he arrived at was non-discriminatory and comparable to the ▇▇▇ license royalty (*id.* at 48:24-52:12). (Dkt. No. 545 at 13.) TQ Delta acknowledges that Dr. Putnam testified that TQ Delta's patent infringement damages were not constrained by its FRAND obligations, but urges that he considered FRAND in his damages analysis. (*Id.*, citing Dkt. No. 541 at 6.) Additionally, TQ Delta argues that case law does not require Dr. Putnam's damages model to be constrained by TQ Delta's FRAND obligation, arguing that damages for patent infringement is an issue separate and apart from a FRAND obligation. (*Id.*, quoting *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12 F. 4th 476, 486, n.3 (5th Cir. 2021) (internal citations omitted) ("The act of determining the value of a standard[]essential patent for purposes of calculating damages is distinct from assessing whether a particular offer made during unique licensing negotiations was fair and reasonable.").)[10]

Lastly, TQ Delta addresses CommScope's apportionment argument. It asserts that Dr. Putnam did determine the value of the asserted SEPs and compared that value to offered rates, testifying that the gains of DSL over the next best alternative down to TQ Delta's asserted SEPs and compared the result of that apportionment to the ▇▇▇ license. (*Id.* at 14–15, citing Dkt. No. 532 at 9:11-52:12.) TQ Delta additionally outlined the contrary evidence it presented rebutting

---

[10] TQ Delta concludes that CommScope's quotation from *HTC Corp* that "a jury assessing patent infringement damages undertakes the same task of assessing whether an offered rate is FRAND" is taken out of context from the concurrence. (Dkt. No. 545 at 14, citing Dkt. No. 541 at 6.) It notes that statement was made in evaluating whether patent damages law should be used in a jury instruction for a breach of FRAND case. (*Id.*, citing *HTC Corp.*, 12 F.4th at 492.)

CommScope's critiques of TQ Delta's apportionment at trial. (*Id.* at 15.) For example, TQ Delta's managing director testified that CommScope never told TQ Delta its rates were too high in view of the price of a DSL modem. (*Id.*, citing Dkt. No. 528 at 162:16–24.) Additionally, TQ Delta explains that Dr. Putnam's damages model did apportion down to the value of TQ Delta's SEPs, excluding the value of other SEPs and features of the accused products not covered by the SEPs. (*Id.*, citing Dkt. No. 532 at 33:10–45:9, 106:7–19.)

The Court is persuaded that CommScope's argument premised on the Jury's damages award is unavailing. The Court declines to find that anything meaningful to the question of TQ Delta's alleged breach of FRAND can be taken from the Jury's lump sum damages award, where the Jury *expressly* found that there was no breach of FRAND.[11] To determine that the Jury must have found breach due to the amount it awarded TQ Delta for infringement, when the Jury also determined that there was no breach, flies in the face of logic. The first issue with CommScope's argument is the assumption that the Jury must have credited CommScope's theory that it was similarly situated to TQ Delta's other licensees, such that CommScope too should have received the same or similar adjustments. As the Court acknowledged above, the Jury was free to credit TQ Delta's argument and evidence to the contrary.

Further, TQ Delta put on evidence that its damages theory was consistent with FRAND terms, in that it was reasonable and nondiscriminatory. The Court agrees with TQ Delta that it was apparent from Dr. Putnam's testimony that he did consider FRAND in his damages analysis and that he compared his proposed damages figures to TQ Delta's ▮▮▮ license to confirm they were

---

[11] In addition to the arguments laid out in this Order, TQ Delta contends that Jury's verdict actually implies a royalty rate that is *greater* than the one sought by TQ Delta when one takes into account that TQ Delta's ▮▮▮ offer was for a 100-patent portfolio. (Dkt. No. 545 at 11–12.) It essentially argues that because the Jury's award was only for four patents, and the standard rate offer was for a 100-patent portfolio, the Jury's ▮▮▮ award implies that the Jury found that rates at least as high as ▮▮▮ per product for the entire portfolio would be FRAND. (*Id.* at 12.) However, because the Court does not accept the premise that the Jury's damages award supports a reversal of the Jury finding that there was no breach of FRAND under these circumstances, the Court does not address this argument.

15

non-discriminatory. (*See* Dkt. No. 532 at 9:11-13:25; 25:15-26:22, 30:24-33:9; 48:24-52:12.) Dr. Putnam did not testify that the damages TQ Delta sought at trial were inconsistent with FRAND; he testified that his damages model was not "constrained by the [F]RAND obligation." (*See* Dkt. No. 532 at 115:2–4, 116:1–3.) The Court is unpersuaded that Dr. Putnam's testimony constitutes overwhelming evidence of breach necessitating judgment as a matter of law. Moreover, the Jury was instructed to "take[] into account TQ Delta's FRAND obligations," that "[t]he FRAND commitment in this case does not require any specific licensing model to determine a FRAND royalty," and to "determine a FRAND royalty based on the totality of the circumstances." (Dkt. No. 534 at 66:4–67:23.) Dr. Putnam's damages model conformed to these instructions.

Lastly, the Court finds that Dr. Putnam put on testimony of the value of TQ Delta's asserted SEPs, compared that value to offered rates, and testified that he apportioned the gains of DSL over FTTP. (*See* Dkt. No. 532 at 9:11–52:12.) CommScope's arguments centered on Dr. Putnam's damages testimony fail, and TQ Delta's damages case does not mandate a finding of breach of FRAND.

## IV.    CONCLUSION

Since the Court does not grant judgment as a matter of law that TQ Delta breached its FRAND obligation, the request for a new trial on damages necessarily fails. Having considered the Motion, the Court finds that it should be and hereby is **DENIED**. The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

**So ORDERED and SIGNED this 15th day of February, 2024.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE